## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )                    Case No.: 1:07-cv-01282
 )
                Plaintiffs, )               **NOTICE OF MOTION OF**
 )                    **PLAINTIFFS PURSUANT TO**
    -v- )                    **FED. R. CIV. P. 56 FOR**
 )                    **SUMMARY JUDGMENT**
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
 )
              Defendants. )
_____ )

To:    Alberto R. Gonzales
       United States Attorney General
       U.S. Department of Justice
       950 Pennsylvania Avenue, NW
       Suite 500
       Washington, D.C. 20530-0001

       United States Department of Housing
        and Urban Development
       451 7th Street, SW
       Washington, D.C. 20410

       Jeffrey A. Taylor, Esq.
       United States Attorney for the District of Columbia
       555 4th Street, NW
       Washington, D.C. 20530

COUNSEL:

**PLEASE TAKE NOTICE** that Plaintiffs the Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC, by their undersigned counsel, shall move before the Honorable Paul L. Friedman at the U.S. District Court for the District of Columbia, E. Barrett Prettyman U.S. Courthouse, Room 6012, 333 Constitution Avenue, N.W., Washington, D.C. 20001, for an Order granting plaintiffs Summary Judgment on their declaratory judgment cause of action pursuant to Fed. R. Civ. P. 56; and granting such further relief as the Court may deem appropriate and just;

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, plaintiffs will rely upon the Affidavit in Support, the Exhibits annexed thereto, the accompanying Memorandum of Law, Statement of Material and all prior proceedings had herein; and

**PLEASE TAKE FURTHER NOTICE** that oral argument is requested.

Dated:  August 10, 2007
         Washington, D.C.

Respectfully submitted,

**THE MASON LAW FIRM, LLP**

  _/s/ Gary E. Mason_____
Gary E. Mason
Attorneys for Plaintiffs
1225 19th Street Northwest
Washington, D.C.  20036
(202) 429-2290

**KANTROWITZ, GOLDHAMER
  & GRAIFMAN, P.C.**
Attorneys for Plaintiffs
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, PENOBSCOT INDIAN NATION ENTERPRISES and GLOBAL DIRECT SALES, LLC, | ) ) ) | Case No.: 1:07-cv-01282 |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF MOTION OF** |
| | ) | **PLAINTIFFS PURSUANT TO** |
| -v- | ) | **FED. R. CIV. P. 56 FOR** |
| | ) | **SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF HOUSING | ) | |
| AND URBAN DEVELOPMENT, ALPHONSO | ) | |
| JACKSON IN HIS CAPACITY AS SECRETARY | ) | |
| OF HOUSING AND URBANDEVELOPMENT, | ) | |
| ROY A. BERNARDI, IN HIS CAPACITY AS | ) | |
| DEPUTY SECRETARY OF HOUSING AND | ) | |
| URBAN DEVELOPMENT AND BRIAN | ) | |
| MONTGOMERY, IN HIS CAPACITY AS | ) | |
| ASSISTANT SECRETARY OF HOUSING AND | ) | |
| URBAN DEVELOPMENT AND | ) | |
| COMMISSIONER OF THE FEDERAL HOUSING | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

---

# <u>TABLE OF AUTHORITIES</u>

CASES:                                                                    PAGE NO.

<u>Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.</u>
     523 U.S. 751 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

<u>Santa Clara Pueblo v. Martinez</u>
     436 U.S. 49 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

<u>Klinge v. Lutheran Charities Ass'n of St. Louis</u>
     523 F.2d 56 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

<u>Fruitico S.A. de C.V. v. Bankers Trust Co.</u>
     833 F.Supp. 288 (S.D.N.Y.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

<u>Celotex Corp. v. Catrett</u>
     477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

<u>Bestor v. F.B.I.</u>
     F.Supp.2d—, 2007 WL 2230267, (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Bilingual Institute v. Riley</u>
     930 F.Supp. 9 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

<u>Church v. Perales</u>
     39 S.W.3d 149 (Tenn.Ct.App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

<u>County of Yakima v. Confederated Tribe & Bands of the Yakima Indian Nation</u>
     502 U.S. 251 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

<u>Winters v. United States</u>
     207 U.S. 564 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>White Mountain Apache Tribe v. Bracker</u>
     448 U.S. 136 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STATUTES:

25 U.S.C. ¶¶ 1723 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

25 U.S.C. ¶ 4301 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 U.S.C.A. ¶ 4301(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 U.S.C.A. ¶ 4301(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C.A. ¶ 4304(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. ¶ 477 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## INTRODUCTION AND SUMMARY OF ARGUMENT

This memorandum of law is submitted in support of the plaintiffs' motion for summary judgment on their declaratory judgment cause of action.

Plaintiff, the Penobscot Indian Nation ("PIN"), is a federally recognized tribal government and municipality of the State of Maine.  PIN created a national down payment assistance ("DPA") program entitled the Grant America Program™ ("GAP").  GAP provides gift funds to low-to-moderate-income families purchasing a home and first-time homebuyers.  The Department of Housing and Urban Development ("HUD") allows gift funds from charitable organizations, governmental agencies or public entities to be used by homebuyers as a down payment towards the purchase of a home.  PIN is such an entity.

GAP operates identical to the HUD approved Nehemiah DPA program, except the gift is from PIN, a federally recognized tribal government and municipality of the State of Maine, not Nehemiah, a charitable organization.  According to HUD's website, HUD is currently performing over 240,000 loan transactions per year, with similarly operated charitable DPA programs.  Just as the Nehemiah and similar charitable DPA programs comply with HUD regulations because the regulations allow gift funds from charities, GAP complies with HUD regulations because the regulations allow gift funds from governmental agencies and public entities.

Nonetheless, in March 2007, while admittedly having a "paucity of information" regarding GAP, HUD began advising third-parties that GAP does not comply with HUD regulations.

It is submitted that HUD's averment that GAP is non-complaint is pre-textual, resulting from HUD's desire to eliminate seller-funded DPA programs, not any concerns regarding GAP.

2

On May 14, 2007, HUD proposed Rule FR-5087-P-01 (24 CFR Part 203)(dated April 13, 2007) "Standards for Mortgagor's Investment in Mortgaged Property."   The proposed rule was admittedly designed to eliminate seller-funded DPA programs that use a pre-existing pool of funds, which are given as grants to low to moderate income homebuyer's and which funds are replenished by charging the property sellers an enrollment fee.   These programs are used on approximately 25% of the loans originated by FHA, and HUD believes they perform poorly. However, HUD's proposed Rule FR-5087-P-01 has **not** been adopted.   In fact, The House of Representatives 2008 Appropriations Bill inserted language that prohibits HUD from implementing a rule that would block seller-funded down payment assistance on FHA insured mortgages.   HUD's desire to eliminate seller-funded DPA programs is well documented. However, since PIN's program, GAP, complies with HUD's current regulations, HUD should not be allowed to accomplish though its discriminatory conduct directed at PIN, what the House of Representatives has expressly prohibited.

As GAP operates identically to the HUD approved Nehemiah DPA program, the only question that needs to be resolved is whether PIN, as a federally recognized tribal government and municipality of the State of Maine, is a governmental agency or public entity, and therefore entitled to maintain GAP.   This question of law is well settled and appropriate for summary resolution.   Accordingly, plaintiffs' motion seeking a declaration that GAP complies with HUD regulations should be granted.

## STATEMENT OF FACTS

PIN is a federally recognized Native American Government located on the Penobscot River in the State of Maine. (Russell Affidavit at ¶ 6; <u>see also</u> 25 U.S.C §§ 1723 <u>et</u> seq.)  As a result of the Maine Indian Claims Settlement Act, PIN is a municipality of the State of Maine. Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a "Section 17" federally chartered Native American Corporation of PIN. (Russell affidavit at ¶ 7.)

On January 24, 2007, the PIN Tribal Counsel, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program. (Exhibit "A".)  PIN, PINE and Global Direct Sales, LLC ("GDS") entered into an Agreement to develop, organize and operate a DPA program wholly owned by PIN. (Exhibit "B".)  The DPA program, entitled Grant America Program™ ("GAP"), is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers across America. (Russell Affidavit at ¶ 10.)  GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment assistance grants. (<u>Id</u>.)

PINE is responsible for hiring and overseeing contractors that process and market GAP for PIN. (Russell Affidavit at ¶ 16; <u>see also</u> Exhibit "B".)  GDS provides marketing and processing services and software and database management for administering GAP. (Russell Affidavit at ¶ 17; <u>see also</u> Exhibit "B".)

Functionally, GAP operates identically to the Nehemiah DPA program, except that Nehemiah is a state chartered charitable organization. (Russell Affidavit at ¶ 14.)  The Nehemiah DPA program received a HUD approval letter in April 1998. (Exhibit "C".)  The only distinction between the programs is that with GAP the gift is from PIN, a federally recognized

4

tribal government and municipality of the State of Maine, not a charitable organization. (Russell Affidavit at ¶ 4.)  PIN wholly owns GAP, all gift funds are provided by PIN and PIN receives the enrollment fees from the sellers. (Russell Affidavit at ¶¶ 11,12.)  Pursuant to the information posted on HUD's website, HUD is currently performing over 20,000 FHA loan transactions per month and 240,000 loan transactions per year, with similarly operated charitable DPA programs. (Russell Affidavit at ¶ 39.)

GAP complies with HUD regulations because HUD regulations expressly allow gift funds from charitable organizations, governmental agencies or public entities to be used by homebuyers as a down payment towards the purchase of a home. (Exhibit "D" at p. 2-24.)  HUD regulations provide that "Federal, State and local government agencies . . . may provide secondary financing for the borrower's *entire cash investment*."  (Exhibit "D" at p. 1-30 (italics in original))  On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing.   Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs.

(Exhibit "F".)

HUD's Tribal Government-to-Government Consultation Policy provides that HUD operates within a government-to-government relationship with federally recognized tribes. (Exhibit "E".)   Despite GAP's compliance with HUD regulations, in March 2007, despite admittedly having a "paucity of information" regarding GAP, HUD began advising third parties that GAP does not comply with HUD regulations. (Russell Affidavit at ¶ ¶ 24-26, 28; <u>see also</u> Exhibits "H", "I" and "J".)

On June 25, 2007, plaintiffs met with HUD to answer any questions regarding GAP. (Russell Affidavit at ¶ 31.)  During the meeting, HUD's only inquiry regarding GAP was PIN's ability to operate beyond its tribal territory and tribal members. (Russell Affidavit at ¶ 31.)  On June 27, 2007 and June 29, 2007, HUD was provided authority for PIN's ability to operate beyond its tribal territory and tribal members. (Exhibit "L".)  HUD responded by stating that the FHA would review GAP and other similar programs. (Exhibit "M".)  Over the next month, HUD did not request any further information from plaintiffs regarding GAP. (Russell Affidavit at ¶ 35.)  However, on July, 25, 2007, one (1) month after the meeting and after this lawsuit was commenced, HUD requested limited additional information from plaintiffs. (Exhibit "O".)  On July 30, 2007, the requested information was provided and plaintiffs requested that if HUD desired any further information regarding GAP, that it request it in writing. (Exhibit "P".)  HUD has not requested any further information. (Russell Affidavit at ¶ 38.)

HUD's actions have improperly interfered with plaintiffs' DPA program and deprived potential homebuyers of down payment grants.  As GAP complies with HUD regulations, plaintiffs' motion for summary judgment should be granted.

**LEGAL ARGUMENT**

**POINT I**

**GAP COMPLIES WITH HUD RULES AND REGULATIONS**

GAP complies with HUD rules and regulations because HUD expressly allows the use of gift funds from charitable organizations, governmental agencies or public entities to a homebuyer for a down payment towards the purchase of a home. As both a federally recognized Native American Government and a municipality of the State of Maine, PIN is a governmental agency and public entity.

Pursuant to 25 U.S.C §§ 1723 et seq., PIN is a federally recognized Native American Government and pursuant to the Maine Settlement Act, PIN is a municipality of the State of Maine. HUD expressly allows gift funds from a charitable organizations, governmental agencies or public entities that have a program to provide homeownership assistance. HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> Gift Funds. **An outright gift of the cash investment is acceptable if the donor is** the borrower's relative, the borrower's employer or labor union, a **charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers,** or a close friend with a clearly defined and documented interest in the borrower.

HUD regulations provide that "Federal, State and local government agencies . . . may provide secondary financing for the borrower's *entire cash investment.*"

Accordingly, GAP complies with HUD regulations because HUD allows down payment assistance from governmental agencies and public entities and PIN is a governmental agency and public entity. Based on the foregoing, Plaintiffs' motion should be granted.

7

## POINT II

## PLAINTIFFS HAVE AUTHORITY TO OPERATE GAP BEYOND THEIR TRIBAL TERRITORY AND TRIBAL MEMBERS

As a federally recognized tribe and a municipality of the State of Maine, PIN's ability to operate as a governmental agency and public entity beyond its borders and tribal members is well settled. Statutory authority, case law and HUD's own policies make clear that PIN's governmental status remains when engaging in activities with non-tribal members outside of its territorial boundaries.

25 U.S.C. § 4301 et seq., of the Indian Regulatory Reform and Business Development Act of 2000, provides express statutory authority for PIN's operation outside of its territorial borders and tribal members. 25 U.S.C.A. § 4301(a)(emphasis added) provides, in pertinent part, that:

Congress finds that--

    3)    in 1994, President Clinton issued an Executive memorandum to the heads of departments and agencies that obligated all Federal departments and agencies, particularly those that have an impact on economic development, to evaluate the potential impacts of their actions on Indian tribes;

    (4)    **consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, Indian tribes retain the right to enter into contracts and agreements to trade freely**, and seek enforcement of treaty and trade rights;

            *    *    *

    (9)    the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to--
        (A)    encourage investment from outside sources that do not originate with the tribes; and
        (B)    **facilitate economic ventures with outside entities that are not tribal entities**;

25 U.S.C.A. § 4301(b)(emphasis added), provides, in pertinent part, that:

The purposes of this chapter are as follows:

   1)      To revitalize economically and physically distressed Native American economies by--
       (A)   encouraging the formation of new businesses by eligible entities, and the expansion of existing businesses; and
       (B)   **facilitating the movement of goods to and from Indian lands and the provision of services by Indians.**

               \*     \*     \*

   (5)    **To encourage intertribal, regional, and international trade and business development** in order to assist in increasing productivity and the standard of living of members of Indian tribes and improving the economic self-sufficiency of the governing bodies of Indian tribes.

25 U.S.C.A. § 4304(d)(emphasis added) provides that:

In conjunction with the activities described in subsection (c) of this section, the Secretary, acting through the Director, shall provide technical assistance and administrative services to eligible entities to assist those entities with--

   (1)    the identification of appropriate markets for Indian goods and services;
   (2)    entering the markets referred to in paragraph (1);
   (3)    compliance with foreign or domestic laws and practices with respect to financial institutions with respect to the export and import of Indian goods and services; and
   (4)    **entering into financial arrangements to provide for the export and import of Indian goods and services.**

Additionally, 25 U.S.C. § 477, Incorporation of Indian tribes; charter; ratification by election, provides that:

      Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law . . .

9

Tribes retain their status as government entities when conducting activities, including commercial activities, outside of their territorial jurisdiction. The Supreme Court addressed this issue, in the context of tribal immunity, an aspect of tribe's sovereign governmental status, in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751 (1998).

In Kiowa, the Kiowa Tribe's Industrial Development Commission agreed to purchase corporate stock from a technology company and gave a promissory note as part of the transaction. Under the note, the Kiowa Tribe agreed to pay the company $285,000 plus interest. The face of the note indicated it was signed in Carnegie, Oklahoma, where the Kiowa Tribe has a complex held for it in trust. According to the technology company, however, the Kiowa Tribe executed and delivered the note in Oklahoma City, beyond its tribal lands. The Tribe's payments were also to be made in Oklahoma City. When the tribe defaulted on the note, the technology company sued in state court for repayment. The Kiowa Tribe moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity from suit and state court jurisdiction.

The Supreme Court addressing tribal immunity, an aspect of the tribe's sovereign governmental status, stated that:

> **Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.**

Id. at 760 (emphasis added). The Kiowa Court continued that:

> tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians.

Id. at 758. Accordingly, it is well settled that tribes can engage in commercial activities outside of their jurisdictional territory while retaining their status as governmental agency. Likewise, it

is undisputable that tribal immunity is an aspect of their tribal sovereignty. <u>Santa Clara Pueblo v.</u> <u>Martinez</u>, 436 U.S. 49, 58 (1978).

Significantly, while HUD's handbook does define an Indian Area, HUD's PIH 2006-34, regarding the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), a federal program that provides housing assistance to Native American tribes and is operated by HUD, provides that:

> NAHASDA authorizes affordable housing activities in Indian areas. **Assistance is not limited to reservations. Essentially, an "Indian area" under NAHASDA is anywhere a tribe undertakes affordable housing.** (emphasis added)

Lastly, pursuant to the Maine Settlement Act, PIN is a municipality of the State of Maine. Maine provides for municipal "home rule," providing municipalities with authority to "exercise any power or function which the Legislature has power to confer upon it, which is not expressly denied or denied by clear implication." Maine's Home Rule Enabling Act, Title 30-A M.R.S.A. §3001. There is no legislation denying PIN's operation of GAP.

As a federally recognized tribe and a municipality of the State of Maine, PIN's ability to operate as a governmental agency beyond its territorial borders and tribal members is well settled. Accordingly, GAP complies with HUD regulations and plaintiffs' motion should be granted.

11

## POINT III

### SUMMARY JUDGMENT STANDARD & CANNONS OF INDIAN LAW CONSTRUCTION

GAP complies with HUD regulations and there is no material issue of fact regarding this legal issue, e.g., HUD regulations allows gift funds from governmental agencies and public entities and PIN is a governmental agency and public entity. Therefore, plaintiffs' summary judgment motion seeking a declaration that GAP complies with HUD regulations should be granted. However, to the extent that an ambiguity of statute or regulation exists, under the Indian Law cannons of construction, it must be construed in PIN's favor.

### A.    SUMMARY JUDGMENT STANDARD

As GAP operates identical to the HUD approved Nehemiah DPA program, the only question that needs to be resolved is whether PIN, as a federally recognized tribal government and municipality of the State of Maine, is a governmental agency or public entity? This strictly legal question is appropriate for summary resolution.

The purpose of summary judgment is to avoid the expenditure of judicial time and to avoid trial when the facts are not in dispute insofar as they are material to the lawsuit. Klinge v. Lutheran Charities Ass'n of St. Louis, 523 F.2d 56 (8th Cir. 1975). Motions for summary judgment facilitate the overall purpose of the Federal Rules of Civil Procedure, to secure just, speedy and inexpensive determination of every action. Frutico S.A. de C.V. v. Bankers Trust Co., 833 F.Supp. 288 (S.D.N.Y.1993). The moving party has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. Bestor v. F.B.I., --- F.Supp.2d ----, 2007 WL 2230267, *2 (D.D.C. 2007).

When the relevant facts are not in dispute, the legal issues may be resolved by summary judgment. <u>Bilingual Institute, Inc. v. Riley</u>, 930 F.Supp. 9, 11 (D.D.C 1996). Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. <u>Church v. Perales</u>, 39 S.W.3d 149, 156 (Tenn.Ct.App. 2000).

As HUD regulations allow gift funds from governmental agencies and public entities and PIN is a governmental agency and public entity, GAP complies with HUD regulations and plaintiffs' summary judgment should be granted.

**B.      INDIAN LAW CANNONS OF CONSTRUCTION**

For the reasons set forth above, GAP complies with HUD regulations because HUD clearly and expressly allow gift funds from governmental agencies and public entities. However, to the extent that an ambiguity of statute or regulation exists, under the Indian Law cannons of construction, it must be construed in PIN's favor.

The basic Indian law canons of construction require that statutes be liberally construed in favor of the Indians (<u>County of Yakima v. Confederated Tribe & Bands of the Yakima Indian Nation</u>, 502 U.S. 251, 269 (1992)) and all ambiguities are to be resolved in favor of the Indians. <u>Winters v. United States</u>, 207 U.S. 564, 576-577 (1908). "Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. 136, 143-144 (1980).

Accordingly, to the extent an ambiguity of statute or regulations exists, is shall be construed in PIN favor.

## CONCLUSION

HUD regulations allow gift funds from governmental agencies and public entities to a homebuyer for a down payment towards the purchase of a home.  As PIN is a governmental agency and public entity, GAP complies with HUD regulations and plaintiffs' motion seeking a declaration that GAP complies with HUD regulations should be granted.


Dated:  August 10,  2007
       Washington, D.C.

                    Respectfully submitted,

                    **THE MASON LAW FIRM, LLP**

                    /s/ Gary E. Mason_____
                    Gary E. Mason
                    Attorneys for Plaintiffs
                    1225 19th Street Northwest
                    Washington, D.C.  20036
                    (202) 429-2290


                    **KANTROWITZ, GOLDHAMER**
                     **& GRAIFMAN, P.C.**
                    Attorneys for Plaintiffs
                    747 Chestnut Ridge Road
                    Chestnut Ridge, N.Y. 10977
                    (845) 356-2570

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
|                                              |
PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )    Case No.: 1:07-cv-01282
)
         Plaintiffs, )
)    **PLAINTIFFS' STATEMENT**
    -v- )    **OF MATERIAL FACTS**
)
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
)
         Defendants. )
_____ )

      Plaintiffs the Penobscot Indian Nation ("PIN"), Penobscot Indian Nation Enterprises

("PINE") and Global Direct Sales, LLC ("GDS"), by their undersigned counsel, The Mason Law

Firm, LLP and Kantrowitz, Goldhamer & Graifman, LLC, pursuant to LCvR 56.1, hereby

submitted the following Statement Material Facts:

      1.     PIN is a federally recognized Native American Government located on the

Penobscot River in the State of Maine. (Russell Affidavit at ¶ 6; see also 25 U.S.C §§ 1723 et

seq.)

      2.     As a result of the Maine Indian Claims Settlement Act, PIN is a municipality of

the State of Maine.

3.      PINE is a "Section 17" federally chartered Native American Corporation of PIN. (Russell affidavit at ¶ 7.)

4.      On January 24, 2007, the PIN Tribal Counsel, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program ("DPA"). (Exhibit "A".)

5.      PIN, PINE and GDS entered into an Agreement to develop, organize and operate a DPA program wholly owned by PIN. (Exhibit "B".)

6.      The DPA program, entitled Grant America Program™ ("GAP"), is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers across America. (Russell Affidavit at ¶ 10.)

7.      GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment assistance grants. (Russell Affidavit at ¶ 10.)

8.      PINE is responsible for hiring and overseeing contractors that process and market GAP for PIN. (Russell Affidavit at ¶ 16; see also Exhibit "B".)

9.      GDS provides marketing, processing services and software and database management for administering GAP. (Russell Affidavit at ¶ 17; see also Exhibit "B".)

10.     Functionally, GAP operates identically to the Nehemiah DPA program, except that Nehemiah is a charitable organization. (Russell Affidavit at ¶ 14.)

11.     The Nehemiah DPA program received a HUD approval letter in April 1998. (Exhibit "C".)

12.     The only distinction between the Nehemiah program and GAP, is that with GAP the gift is from PIN, a federally recognized tribal government and municipality of the State of Maine, not a Nehemiah a charitable organization. (Russell Affidavit at ¶ 4.)

13.     PIN wholly owns GAP. (Russell Affidavit at ¶ 11.)

14.     All gift funds are provided by PIN. (Russell Affidavit at ¶ 11.)

15.     PIN receives the enrollment fees from the sellers. (Russell Affidavit at ¶ 11.)

16.     Pursuant to the information posted on HUD's website, HUD is currently performing over 20,000 FHA loan transactions per month and 240,000 loan transactions per year, with similarly operated charitable DPA programs. (Russell Affidavit at ¶ 39.)

17.     On May 14, 2007, HUD proposed Rule FR-5087-P-01 (24 CFR Part 203)(dated April 13, 2007) "Standards for Mortgagor's Investment in Mortgaged Property." (Judicial Notice, 24 CFR Part 203.)

18.      The proposed rule was designed to eliminate seller-funded DPA. (Judicial Notice, Margaret Burns' July 22, 2007 Congressional Hearing Testimony.)

19.     These programs are used on approximately 25% of the loans originated by FHA. (Judicial Notice, James Heist's July 22, 2007 Congressional Hearing Testimony.)

20.     HUD believes they perform poorly. (Judicial Notice, Margaret Burns' July 22, 2007 Congressional Hearing Testimony.)

21.     HUD's proposed Rule FR-5087-P-01 has not been adopted. (Judicial Notice.)

22.     The House of Representatives 2008 Appropriations Bill inserted language that prohibits HUD from implementing a rule that would block seller-funded down payment assistance on FHA insured mortgages. (Judicial Notice.)

23.     HUD current regulations expressly allow gift funds from charitable organizations, governmental agencies or public entities to be used by homebuyers as a down payment towards the purchase of a home. (Exhibit "D" at p. 2-24.)

24.     HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ , provides:

> <u>Gift Funds.</u>  An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.

(Exhibit "D" at p. 2-24.)

25.     HUD regulations provide that "Federal, State and local government agencies . . . may provide secondary financing for the borrower's *entire cash investment.*"  (Exhibit "D" at p. 1-30 (italics in original))

26.     On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing. (Exhibit "F".)

27.     Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs.

(Exhibit "F".)

28.     HUD's Tribal Government-to-Government Consultation Policy provides that HUD operates within a government-to-government relationship with federally recognized tribes. (Exhibit "E".)

29.     HUD's handbook does define an Indian Area. (Exhibit "D".)

30.    HUD's PIH 2006-34, regarding the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), a federal program that provides housing assistance to Native American tribes and is operated by HUD, provides that:

> NAHASDA authorizes affordable housing activities in Indian areas. Assistance is not limited to reservations. Essentially, an "Indian area" under NAHASDA is anywhere a tribe undertakes affordable housing.

(Exhibit "G".)

31.    Beginning in March 2007, HUD began advising third parties that GAP does not comply with HUD regulations. (Russell Affidavit at ¶ ¶ 24-26, 28; see also Exhibits "H", "I" and "J".)

32.    On June 20, 2007, HUD admitted having a "paucity of information" regarding GAP. (Exhibit ""K")

33.    On June 25, 2007, plaintiffs met with HUD to answer any questions regarding GAP. (Russell Affidavit at ¶ 31.)

34.    During the meeting, HUD's only inquiry regarding GAP was PIN's ability to operate beyond its tribal territory and tribal members. (Russell Affidavit at ¶ 31.)


Dated:  August 10, 2007
         Washington, D.C.

Respectfully submitted,

**THE MASON LAW FIRM, LLP**

/s/ Gary E. Mason_____
Gary E. Mason
Attorneys for Plaintiffs
1225 19th Street Northwest
Washington, D.C.  20036
(202) 429-2290

**KANTROWITZ, GOLDHAMER
  & GRAIFMAN, P.C.**
Attorneys for Plaintiffs
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————
PENOBSCOT INDIAN NATION, PENOBSCOT  )
INDIAN NATION ENTERPRISES and       )
GLOBAL DIRECT SALES, LLC,            )     Case No.: 1:07-cv-01282
                                     )
                Plaintiffs,          )     **AFFIDAVIT IN SUPPORT**
                                     )     **OF MOTION FOR**
        -v-                          )     **SUMMARY JUDGMENT**
                                     )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO      )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT,     )
ROY A. BERNARDI, IN HIS CAPACITY AS  )
DEPUTY SECRETARY OF HOUSING AND      )
URBAN DEVELOPMENT AND BRIAN          )
MONTGOMERY, IN HIS CAPACITY AS       )
ASSISTANT SECRETARY OF HOUSING AND   )
URBAN DEVELOPMENT AND                )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION,                      )
                                     )
                Defendants.          )
———————————————————  )

I, **CHRISTOPHER RUSSELL**, declare, under the penalty of perjury, as follows:

1.   I am the director Global Direct Sales, LLC ("GDS"), a Maryland limited liability company with its principal place of business located at 7824 Cessna Avenue, Gaithersburg, Maryland 20879.

2.   I submit this affidavit in support of plaintiffs' motion for summary judgment on their declaratory judgment cause of action.

A.   **SUMMARY OF ARGUMENT**

3.   Plaintiff, the Penobscot Indian Nation ("PIN"), is a federally recognized tribal government and municipality of the State of Maine.  PIN created a national down payment

assistance ("DPA") program entitled the Grant America Program™ ("GAP").  GAP provides gift

funds to low-to-moderate-income families purchasing a home and first-time homebuyers.  The

Department of Housing and Urban Development ("HUD") allows gift funds from charitable

organizations, governmental agencies and public entities to be used by homebuyers as a down

payment towards the purchase of a home.  PIN is such an entity.

4.     GAP operates identically to the HUD approved Nehemiah DPA program, except

the gift is from PIN, a federally recognized tribal government and municipality of the State of

Maine, not Nehemiah, a charitable organization.  Just as the Nehemiah and similar charitable

DPA programs comply with HUD regulations because the regulations allow gift funds from

charities, GAP complies with HUD regulations because the regulations allow gift funds from

governmental agencies and public entities.  According to HUD's website, HUD is currently

performing over 240,000 loan transactions per year, with similarly operated charitable DPA

programs.

5.     Nonetheless, in March 2007, while admittedly having a "paucity of information"

regarding GAP, HUD began advising third-parties that GAP does not comply with HUD

regulations.

**B.     FACTS**

6.     Plaintiff the Penobscot Indian Nation ("PIN") is a federally recognized Native

American Government located on the Penobscot River in the State of Maine.  As a federally

recognized Native American Government, PIN is a "governmental agency and public entity" as

defined by HUD.

7.     Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a "Section 17" federally

chartered Native American Corporation of PIN.

8.    On January 24, 2007, the PIN Tribal Counsel, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program to benefit low to moderate-income homebuyers across America. A copy of the PIN resolution is attached as Exhibit "A".

9.    PIN, PINE and GDS entered into an agreement to develop, organize and operate a DPA wholly owned by PIN. PIN is the source of all funds provided to the homebuyer under GAP. A copy of the PIN, PINE and GDS agreement is attached as Exhibit "B".

10.    GAP is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers. GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment grants.

11.    PIN is the program provider. All gift funds are provided by PIN and PIN receives the enrollment fees from the sellers.

12.    PIN provides a pre-existing pool of funds to be used as grants towards homebuyer's downpayments.

13.    Prior to closing, the homebuyer's grant is wired to the settlement agent from a PIN bank account using funds solely owned by PIN.

14.    GAP operates identically to the Nehemiah DPA program, except the gift is from PIN, a federally recognized tribal government and municipality of the State of Maine, not Nehemiah, a charitable organization. On April 3, 1998, HUD approved the Nehemiah DPA program. A copy of HUD's approval letter is attached as Exhibit "C"

15.    At closing, home sellers are charged an enrollment fee for enrolling their homes in the program. The funds generated from that fee go to replenish the grant fund pool and any excess is the property of PIN.

16.    PINE has the responsibility of hiring and overseeing contractors that process and market GAP for PIN.

17.    GDS provides marketing, processing services and software and database management for administering GAP. GDS is obligated to train and provide the infrastructure for processing services to PINE, upon request.

18.    GAP complies with HUD regulations because HUD regulations expressly allow gift funds from governmental agencies and public entities to be used by homebuyers as a down payment towards the purchase of a home. HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> Gift Funds.  **An outright gift of the cash investment is acceptable if the donor is** the borrower's relative, the borrower's employer or labor union, a **charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers**, or a close friend with a clearly defined and documented interest in the borrower.

19.    Further, HUD regulations provide that "Federal, State and local government agencies . . . may provide secondary financing for the borrower's *entire cash investment.*" (Italics in original). Copies of the relevant portions of HUD Handbook 4155.1 Rev (5) regarding the allowance of gift funds from governmental agencies and public entities and governmental agencies providing the borrower's entire cash investment are collectively attached as Exhibit "D".

20.    HUD's Tribal Government-to-Government Consultation Policy provides that HUD operates within a government-to-government relationship with federally recognized tribes. A copy of HUD's Tribal Government-to-Government Consultation Policy is Exhibit "E".

21.     On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing.  Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs.

A copy of HUD's Mortgagee Letter 2002-22 is attached as Exhibit "F".

22.     HUD's handbook does define an Indian Area.  However, HUD's PIH 2006-34 (emphasis added), regarding the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), a federal program operated by HUD which provides housing assistance to Native American tribes, provides that:

> NAHASDA authorizes affordable housing activities in Indian areas.  **Assistance is not limited to reservations.  Essentially, an "Indian area" under NAHASDA is anywhere a tribe undertakes affordable housing.**

A copy of HUD's PIH 2006-34 is attached as Exhibit "G".

23.     Despite GAP's compliance with HUD regulations, in March 2007, HUD began advising third parties that GAP does not comply with HUD regulations.

24.     In March 2007, Brenda Bellisario at the Philadelphia Homeownership Center, advised GMAC Bank that GAP did not meet HUD Guidelines.  GMAC advised plaintiffs that "HUD indicated that this program did not appear to meet their guidelines based on what was submitted. . . .This program request is denied."  A copy of GMAC's March 20 2007 fax is attached as Exhibit "H".

25.    I was advised, during a March 2007 telephone conversation with John Ertle at the Connecticut HUD office, that GAP did not meet HUD guidelines.  However, Mr. Ertle was unable to identify a regulation with which GAP did not comply.

26.    On May 30, 2007, Elaine A. Roberts, a HUD employee at the Denver Homeownership Center, wrote the following regarding GAP:

> Here is what our legal dept. said:
>
> The present status is that HQ Housing has instructed the HOCs [Homeownership Centers] in the interim that this program is not an acceptable source of down payment gift funds although the program is under review in HQ.  This program will probably be killed by the new proposed reg published on 5/11 for comment that will, if adopted as written, prohibit any gift funds from coming from the seller 'before during or after the closing.'

A copy of Ms. Roberts May 30, 2007 email is attached as Exhibit "I".

27.    To date, no new regulation has been adopted which effects GAP's compliance with HUD regulations.  On May 14, 2007, HUD's proposed Rule FR-5087-P-01 (dated April 13, 2007, which was admittedly designed to eliminate seller funded DPA programs.  However, HUD's proposed rule was not adopted.  In fact, The House of Representatives passed a HUD appropriations bill after inserting language that prohibits HUD from implementing a rule that would block seller-funded down payment assistance on FHA insured mortgages.

28.    On May 24, 2007, plaintiffs were notified by William W. White, a Supervisory Loan Specialist with Veterans Affairs Central Office ("VACO"), that HUD was reviewing GAP and that VACO would not approve GAP until it was in receipt of HUD's decision.  Mr. White wrote that:

> If you call HUD, ask for OIG as they may be the ones reviewing the request.

As far as our review, yes, any decision we make will be influenced
by HUD's decision.

29.     On June 13, 2007, our counsel wrote to HUD regarding GAP and the claims

raised in the instant lawsuit. A copy of the June 13, 2007 letter is attached as Exhibit "J".

30.     On June 20, 2007, HUD responded to our counsel's letter, stating that HUD had a

"paucity of information about GAP". A copy of HUD's June 20, 2007 letter is attached as

Exhibit "K".

31.     On June 25, 2007, we met with HUD to answer any questions regarding GAP.

During the meeting, HUD's only inquiry regarding GAP was PIN's ability to operate beyond its

tribal territory and tribal members.

32.     On June 27, 2007 and June 29, 2007, our counsel provided authority for PIN's

ability to operate beyond its tribal territory and tribal members. Copies of the June 27, 2007 and

June 29, 2007 letters are attached collectively as Exhibit "L".

33.     On July 6, 2007, HUD advised that the FHA would review GAP and similar

programs. A copy of HUD's July 6, 2007 letter is attached as Exhibit "M"

34.     Over the next month, HUD did not request any further information from plaintiffs

regarding GAP.

35.     On July 18, 2007, the instant lawsuit was commenced. A copy of the Summons

and Complaint is attached as Exhibit "N".

36.     On July 25, 2007, one (1) month after the meeting and after this lawsuit was

commenced, HUD requested some limited additional information from plaintiffs. A copy of

HUD's July 25, 2007 letter is attached as Exhibit "O".

7

37.    On July 30, 2007, the requested information was provided and plaintiffs requested that if HUD desired any further information regarding GAP, that it request it in writing.  A copy of our counsel's June 30, 2007 letter is attached as Exhibit "P".

38.    HUD has not requested any further information.

39.    Pursuant to the information posted on HUD's website, HUD is currently performing over 20,000 FHA loan transactions per month and 240,000 loan transactions per year, with similarly operated charitable DPA programs.

40.    HUD actions, including, but not limited to, the actions of its Denver and Philadelphia Homeownership Center, have improperly interfered with Plaintiffs' down payment assistance program and deprived potential homebuyers of down payment grants.

41.    There has been no prior application for the relief sought herein.

WHEREFORE, based on the foregoing, it is respectfully requested that the instant application be granted in its entirety.

_____

**Christopher Russell**


STATE OF MARYLAND    )
                                              )
COUNTY OF _Montgomery_ )


Subscribed and sworn to (or affirmed) before
me on this _9__ day of August, 2007.

_____
Notary Public

8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )               Case No.: 1:07-cv-01282
                                   )
                    Plaintiffs,    )       [PROPOSED] **ORDER**
                                   )       **GRANTING PLAINTIFFS'**
          -v-                      )       **MOTION PURSUANT TO**
                                   )       **FED. R. CIV. P. 56 FOR**
UNITED STATES DEPARTMENT OF HOUSING )      **SUMMARY JUDGMENT**
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
                                   )
                    Defendants.    )
_____ )

This matter having been presented to the Court upon the motion the plaintiffs the

Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC, by

their undersigned counsel, The Mason Law Firm, LLP and Kantrowitz, Goldhamer & Graifman,

LLC, in the presence of U.S. Department of Justice and the United States Attorney for the

District of Columbia, attorneys for the United States Department of Housing and Urban

Development, Alphonso Jackson in his capacity as Secretary of Housing and Urban

Development, Roy A. Bernardi, in his capacity as Deputy Secretary of Housing and Urban

Development and Brian Montgomery, in his capacity as Assistant Secretary of Housing and

Urban Development and Commissioner of the Federal Housing Administration; for an Order

granting summary judgment on their declaratory judgment cause of action seeking a declaration that the plaintiffs' down payment assistance program, entitled the Grant America Program™, complies with United States Department of Housing and Urban Development's regulations and guidance, and granting such further relief as the Court deems appropriate and just, and the Court having considered the papers submitted in support of and in opposition to the motion, and having heard the argument of counsel, if any, and good cause having been shown;

IT IS on this _____ day of _____, 2007 ORDERED that plaintiffs' motion for summary judgment on their declaratory judgment cause of action is granted.

_____
Paul L. Friedman, U.S.D.J.

# EXHIBIT A

**Office of the Chief and Council**

Kirk E. Francis
*Chief*

Dennis R. Pehrson Sr.
*Vice-Chief*

Donna Loring
*Representative*



Penobscot Nation
12 Wabanaki Way
Community Building
Indian Island, Maine 04468
(207) 827-7776

FAX (207) 827-6042

## RESOLUTION

### NUMBER: 01-24-07-01
### of the Governing Body
### of the Penobscot Nation
### Tribal Council

**WHEREAS,**   the Penobscot Indian Nation is a federally recognized sovereign Indian tribe, and the Penobscot Indian Nation Tribal Chief and Council is the duly authorized and elected governing body of the Penobscot Indian Nation; and

**WHEREAS,**   on March 15, 2005, the Tribal Chief and Council voted to establish a separate legal entity to engage in business enterprises on the Nation's behalf by forming a federally-chartered tribal corporation under the Indian Reorganization Act to be wholly owned by the Penobscot Indian Nation; and

**WHEREAS,**   on November 25, 2005, the Secretary of the Interior issued a federal Charter for Penobscot Indian Nation Enterprises (PINE) in response to the Nation's request, and PINE's federal Charter was ratified by the Tribal Chief and Council on January 10, 2006; and

**WHEREAS,**   among the purposes for PINE stated in its Charter are "to provide for the efficient and effective utilization of the resources of the Nation" and "to promote the economic development of the Nation and its members;" and

**WHEREAS,**   PINE has pursued an initiative with Global Direct Services (GDS) pursuant to which the Penobscot Indian Nation shall serve as a "program provider" of a down payment assistance (DPA) program to assist home buyers qualifying for mortgage insurance offered by the Federal Housing Administration of the U.S. Department of Housing and Urban Development; and

- 1 -

**WHEREAS,**    working with financial consultants and legal counsel, PINE has negotiated business terms as outlined in the attached Agreement between the Nation, PINE, and GDS for the provision of a DPA program with GDS (the "Agreement"); and

**WHEREAS,**    the Tribal Chief and Council concludes that establishing the Penobscot Nation Fair Housing Administration pursuant to which the Nation shall serve as Program Provider pursuant to the terms of the Agreement is an appropriate function of the Nation and that granting PINE the role of oversight and manager of the program falls within PINE's role;

**NOW, THEREFORE, BE IT RESOLVED,**

**THAT**    (1)    The Tribal Chief and Council hereby approve the terms of the Agreement and authorize the Penobscot Indian Nation to enter into and perform its obligations under the Agreement and further specifically authorize Chief Kirk Francis to execute the Agreement on behalf of the Nation with such non-material changes as he may determine are appropriate.

**THAT**    (2)    The Tribal Chief and Council hereby establish a Down Payment Assistance Program, to be known as the "Penobscot Nation Fair Housing Administration," to provide low- and middle-income home buyers and first-time home buyers with assistance in meeting the requirements for home mortgages insured by the Federal Housing Administration of the U.S. Department of Housing and Urban Development.

**THAT**    (3)    The Tribal Chief and Council hereby designate PINE, and delegate to PINE as the Nation's agent the authority necessary, to serve as overseer and manager of the Down Payment Assistance Program under the Agreement, including, without limitation, responsibility for receipt and accounting for all funds payable to the Nation under the Agreement and all other responsibilities of the Program Provider set forth in the Agreement.

03/19/07  MON 16:37 FAX                                                          @003

**THAT**     (4)    The Tribal Chief and Council hereby authorizes the establishment of
a Program bank account as provided in the Agreement where down payment
assistance funds will be pooled under the management and administration of
GDS with the direct oversight of PINE pursuant to the terms of the
Agreement.  This account shall be called the "Penobscot Nation Fair
Housing Administration" for the purposes of marketing.

**THAT**     (5)    The Tribal Chief and Council resolves that the Penobscot Nation
does not waive tribal sovereign immunity for itself or for PINE for the
purposes in this resolution or the actions of the Nation or PINE taken
pursuant to this resolution.

## CERTIFICATION

I, the undersigned Clerk of the Tribal Council of the Penobscot Indian Nation, do
hereby certify that the Tribal Council of the Penobscot Indian Nation is composed of
twelve (12) members, of whom 11 were present at a meeting held at Indian Island on the
24th day of January, 2007 of which all Council members received notice more than
twenty-four hours in advance, and at which the Vice-Chief was present and presided, and
that the foregoing Resolution was duly adopted by the affirmative vote of 10 Council
members.

Dated: January 29, 2007                    ATTEST: _Linda Socoby_
                                           LINDA SOCOBY, Tribal Clerk

                                           _Dennis R. Pehrson Sr._
                                           Dennis R. Pehrson, Sr., Vice-Chief

# EXHIBIT B

**DOWNPAYMENT ASSISTANCE AGREEMENT**
Penobscot Indian Nation
And
Penobscot Indian Nation Enterprises
And
Global Direct Sales

This DOWN PAYMENT ASSISTANCE AGREEMENT (this "Agreement") is made and entered into as of January 24, 2007, by and between Penobscot Indian Nation ("Nation"), Penobscot Indian Nation Enterprises ("PINE") and Global Direct Sales, a Maryland Limited Liability Company ("GDS").

RECITALS

A.    Penobscot Indian Nation is a federally recognized Indian tribe.

B.    Penobscot Indian Nation Enterprises is a tribal corporation of the Nation. PINE is a "Section 17" Native American corporation federally chartered under the Indian Reorganization Act of 1934, as amended, 25 U.S.C. 477.

B.    GDS is a privately-owned for-profit business entity created for the purpose of developing, organizing and operating Down Payment Assistance Programs ("DPAs" as defined below). These DPAs will be structured to (i) generate revenue for Program Providers, and (ii) provide a down payment assistance product that may be used to directly increase home ownership.

C.    The Nation, PINE and GDS desire to enter into this Agreement to develop, organize and operate one or more DPAs in which the Nation is the "Program Provider" during the term of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, the parties hereto agree as follows:

SECTION 1. _Definitions._ Whenever used herein, capitalized terms and phrases shall have the meanings assigned them in this Section 1, unless otherwise specified.

"Program Provider," for purposes of this Agreement, means the Nation

"Handbook 4155.1" means United States Department of Housing and Urban Development (HUD) Handbook 4155.1 Revision 5, as it exists as of the date of this Agreement, and as it may be amended from time to time.

"Down Payment Assistance" or "DPA" means any program that provides gift funds to low- or moderate-income families purchasing a home or first-time homebuyers, as defined by Handbook 4155.1, including without limitation a program in which seller pays a Program and Processing Fee post-closing consistent with HUD Mortgagee Letter 2002-22.

1

"Gift" means the amount given to a purchaser of residential property to be used for a down payment, without obligation or expectation of repayment.

"Enrollment Fee" means amount collected from the seller of a residential property enrolled in the DPA program.

"Program" or "Programs" means one or more DPAs maintained by a Program Provider pursuant to this Agreement.

"Processing Entity" means GDS or Program Provider, as the case may be, as determined pursuant to Section 5.1 below.

"Account" means the account or accounts established by the Nation for the purposes of administering the Program pursuant to Section 2.4 hereof.

SECTION 2.  GDS Services.  GDS will develop, organize and operate one or more DPAs in conjunction with Program Provider in accordance with this Agreement.  In particular, and without limiting the generality of the foregoing, GDS shall:

2.1.   Organize a DPA and in support thereof shall:

(a)    Provide the authorized use of a complete DPA processing system, including without limitation, transaction documents, marketing materials, processing software, communications and record-keeping systems, for the benefit of Program Provider and of the Processing Entity operating pursuant to Section 5.1;

(b)    Provide, at its sole expense, all financing, credit, industry expertise, software, facilities, industry contacts, and staffing required to carry out its responsibilities under this Agreement and to carry out the responsibilities of the Processing Entity, except for facilities, equipment and staffing of the Processing Entity when the Program Provider or its nominee is the Processing Entity;

(c)    Develop, provide, manage and direct the Internet presence and web interface for all Program processes and third party interactions;

(c)    Provide monthly reporting of Program activity in a form acceptable to Program Provider;

(d)    Provide transactional administration of all third party contracts;

(e)    Establish the Account to administer Programs (as more fully set forth in Section 2.4 below);

(f)    Market the Program(s) on a nationwide level; and

2

(g)    Maintain the foregoing activities without diminution of effort throughout the term of this Agreement, except as Processing Entity responsibilities may be transferred to the Program Provider, or as otherwise approved by Program Provider.

2.2.    GDS will not perform any services as a bank or an underwriter, or for which regulatory approvals of any kind are required, except as may hereafter be separately consented to in writing by GDS. GDS does not, and shall not, perform any service that requires federal, state or local government approval.

2.3.    GDS represents and warrants that, at all times during the term of this Agreement:

(a)    All transaction documents, forms, marketing documents and other materials bearing the name or logo of Program Provider, and any changes thereto, shall accurately describe the Program(s) provided for in this Agreement or otherwise agreed between the parties;

(b)    The Program(s) shall conform with the requirements of all applicable laws;

(c)    Performance by GDS under this Agreement will not include any service that requires federal, state or local government approval; and

2.4.    For each DPA established pursuant to this Agreement, GDS shall establish an account (individually and collectively, the "Account") at a reputable financial institution of its choosing for the purposes set forth in this Section 2.4. Unless otherwise agreed in writing between the parties, the Account shall be established in the name of the Program Provider. The Account shall be funded with all Enrollment Fees paid to the Program and by GDS in such additional amounts as are adequate to satisfy the obligations of the Program. For further clarity, however, the Account is not intended to act as the general operating account of the Program; instead, the Account is a special purpose account for the purposes specified herein. Subject to the limitations set forth in (a) immediately below, GDS shall have rights to make or direct the making of disbursements from the Account in connection with Program transactions.

(a)    Disbursements from the Account shall be limited to the following:

(i)    Gifts;

(ii)    Bank fees (to the extent not included in other permissible disbursements from the account);

(iii)    Fees payable to the Program Provider pursuant to Section 9.1 hereof;

3

(iv)     Consideration payable to GDS pursuant to Section 9.2 hereof; and

(v)     The fee payable to the Processing Entity pursuant to Section 5.2.

No other disbursements from the Account shall be permitted.

(b)     Following termination of this Agreement and payment of all Gifts, all amounts due to the Program Provider and all amounts due to the Processing Entity, any funds remaining in the Account shall be the property of GDS. GDS shall leave such excess funds in the Account for at least 180 days following termination of this Agreement for the purpose of providing security to the Program Provider and PINE with respect to the obligations of GDS under this Agreement.

SECTION 3.  NATION

3.1     The Nation shall allow for the creation of the Account (established under 2.4) and shall be the sole owner of the Account and give rights to GDS as outlined in 2.4 above.

3.2     Neither the Nation nor PINE waives its sovereign immunity in connection with this Agreement or in connection with its activities as Program Provider or as Processing Entity or in any other respect whatsoever.

3.3     The Nation shall be the Program Provider. The Nation shall delegate to PINE the responsibility of managing the Account and managing the Program(s) established under this agreement as outlined in Section 4. The Nation will establish the Penobscot Nation Fair Housing Administration program for the purpose of providing Down Payment Assistance in its capacity as Program Provider.

3.4     Neither the Nation nor PINE shall have any obligation to fund any expense, obligation or capital requirement of the Program(s).

SECTION 4.  PINE and Program Provider Agreements.

4.1.     PINE shall be responsible for oversight and management of the Account. PINE shall designate a ranking officer or official to oversee the obligations of PINE under this Agreement and to act and to act on behalf of the Nation as Program Provider.

4.2.     Program Provider agrees to undertake and perform the following in consideration of the agreements made herein. During the term hereof, Program Provider shall:

4.2.1.     Maintain the legal status and good standing of PINE as a federally chartered tribal corporation, with such corporate authority as may be required to operate the DPA established under this Agreement;

4

4.2.2.  Grant the right to use names, marks and logos of the Program Provider so that marks and images related to products administered hereunder may appear in web pages which provide interface for users of the Program(s) and for use on printed materials relating to Program(s).  In connection therewith, Program Provider shall have the right to approve all advertising, print and electronic media materials developed for the Program.  GDS shall obtain Program Provider's prior approval, which approval shall not unreasonably be withheld, delayed or conditioned, before using or changing any transaction documents, forms, marketing documents or other materials bearing the name or logo of PINE or any Program Provider.

4.3 .   PINE agrees to undertake and perform the following in consideration of the agreements made herein. During the term hereof, PINE shall:

4.3.1.  Provide a ranking officer or official of PINE to administer each DPA established pursuant to this Agreement; and

4.3.2.  Comply with laws applicable to all aspects of its activities under this Agreement, provided that this does not relieve GDS of the responsibility to assure that the Program(s) conforms with the requirements of all applicable laws including HUD laws governing downpayment assistance programs.

SECTION 5.  Processing of Transactions.

5.1.  GDS will initially perform the processing of the DPA as the Processing Entity. The Processing Entity shall be responsible for all physical and financial obligations outlined in **Attachment A**. Processing will be a function and responsibility of GDS until such time as the monthly Transaction volume equals 500 Transactions per month, at any time after which Program Provider shall have the right (but not the obligation) to request that responsibility for processing be transferred to Program Provider as Processing Entity.  If GDS agrees that Program Provider has the capacity to perform the functions of Processing Entity, which agreement shall not be unreasonably delayed or withheld, the transfer of the functions of the Processing Entity to the Program Provider shall be completed within 30 days of the transfer request, unless the parties shall agree in writing on a different time. At any time after the transfer of processing responsibility to Program Provider, Program Provider shall have the right to require that GDS resume acting as Processing Entity within 30 days of notice thereof.

5.2.  The Processing Entity will receive $100 from the Account per DPA gift transaction, paid on the 15th day of the month with respect to transactions closed in the previous month.

SECTION 6.  Warranty of Authority.  Each of the parties executing this Agreement hereby represents and warrants, in order to induce reliance on their authority hereunder, that each such party is duly authorized (i) to enter into this Agreement, and (ii) to comply with, carry out and perform all of the terms and conditions of this Agreement. The Nation, PINE and GDS (on

behalf of itself and each of its members and, in the event any such member of GDS is an entity, the owners of such member) represent and warrant to one another that they are not now the subject of any pending or threatened civil, administrative or criminal investigation, proceeding or litigation in any jurisdiction and that none of them is bound by any court or administrative order or decree or consent decree or agreement that limits or affects in any way their ability to perform their obligations under this Agreement. The foregoing representations are material to each of the parties hereto. Notwithstanding the foregoing, the Nation and PINE make no warranty or representation as to the eligibility of the Nation as a "government agency" to act as a DPA Program Provider.

SECTION 7. Exclusivity. This Agreement is intended to exclusively authorize GDS to operate the DPA to which Program Provider is a party during the term hereof, effective, as to each such DPA, as of the date the parties agree that the DPA is equipped and ready to begin operation. During the term hereof, GDS shall have the exclusive right to market and process DPA Program(s) for, and for the benefit of, Program Provider. GDS hereby grants to the Nation a right of first refusal to participate in any new DPA products created by GDS or any affiliated company controlled by one or more of the principals of GDS, which right the Nation shall have not less than thirty (30) days to exercise, from the date the offer and information about the new DPA product is provided to PINE and the Nation.

SECTION 8. Indemnities.

8.1    Each of GDS and Program Provider agrees to hold harmless, indemnify and defend the other for, from and against any loss, cost, liability, expense, claim or demand which arises out of or results from the indemnifying party's breach of this Agreement. This indemnity shall survive the termination of this Agreement.

8.2    GDS agrees to hold harmless, indemnify and defend the Nation and PINE, their officers, directors, employees, advisors and agents for, from and against any claim or demand, and any loss, cost, liability, or expense, including reasonable attorneys' fees, which arises out of or results from the Program, provided that GDS shall have no obligation to provide indemnity for losses resulting from Program Provider's gross negligence or willful misconduct. This indemnity shall survive the termination of this Agreement.

8.3    GDS agrees to provide documentation to the Nation of its tangible "net worth" of not less than $500,000 within six (6) months of date this Agreement is executed by GDS, which tangible net worth GDS covenants to maintain throughout the term of this Agreement (tangible net worth shall not include value attributable to good will or intellectual property). GDS shall provide the Nation with its audited or reviewed annual financial statements by March 30 of each calendar year to enable the Nation to verify the compliance of GDS with this covenant.

SECTION 9. Compensation.

9.1.    In consideration of Program Provider's participation in the Programs, Program Provider will receive:

6

(a)    Twenty Percent (20%) of the difference in each DPA transaction between the Gift and the Enrollment Fee. The foregoing amount shall be paid to Program Provider or its designee on a weekly basis with respect to DPA transactions closed in the previous week, which amount shall be transferred into an account designated by PINE.

(b)    For each DPA transaction in which Program Provider or its nominee is the Processing Entity, the processing fee payable under Section 5.2.

9.2.    In consideration of the services provided by GDS in connection with the Programs, GDS will be entitled to receive:

(a)    A sum equal to (i) the aggregate Enrollment Fees, minus (ii) Gifts disbursed, minus (iii) the amount paid to Program Provider pursuant to Section 9.1(a), minus (iv) the processing fee payable to the Processing Entity pursuant to Section 5.2., minus (v) any fees payable for maintenance and use of the Account.

(b)    For each DPA transaction in which GDS is the Processing Entity, the processing fee payable under Section 5.2.

SECTION 10. Term and Termination.

10.1.    This Agreement shall remain in effect from the date on which it is first fully and mutually executed and shall remain in effect for Five (5) years after such date. Thereafter, the Agreement shall automatically renew for up to five (5) renewal terms of five (5) years each unless either party notifies the other of its decision to terminate this Agreement, which notice is given not less than thirty (30) days prior to the then pending initial or renewal term hereof.

10.2.    GDS and Program Provider shall each have the right, at its option, to terminate this Agreement if at any time Program Provider shall be determined to be ineligible as a matter of law (by published government policy, rule or regulation, case law, or by other determination of a governmental authority with jurisdiction over such matters communicated to either party) to act as Program Provider. Notwithstanding the foregoing, upon receiving notification that Program Provider's eligibility to act as a Program Provider in a DPA Program is being challenged or questioned, the parties agree to consult with each other in good faith in order to develop an appropriate response to such determination; in the absence of an agreement between the parties after seven (7) days as to how to proceed, either party shall have the right to terminate this Agreement as aforesaid, effective upon delivery of written notice to the other party by any standard means of document transmission.

10.3    This Agreement may be terminated by written notice to the defaulting party hereunder if a representation made by the defaulting party in this Agreement was not true in all material respects when made or if the defaulting party fails to cure a default of a material agreement or warranty hereunder within ten days following receipt of written notice from the non-defaulting party specifying in reasonable detail the alleged material default hereunder.

7

10.4    This Agreement may be terminated if HUD or a court of competent jurisdiction determines that the downpayment assistance program is not in compliance with HUD requirements for such a program.

10.5    This Agreement may be terminated without cause by PINE or the Nation on sixty (60) days written notice to GDS.

SECTION 11. Affiliates of GDS.

11.1.    Program Provider and GDS acknowledge and agree that GDS has disclosed prior to the execution of this Agreement that GDS or its affiliates process gift funds transactions in the down payment gift funds industry. GDS or its affiliates have relationships with Rycho Funding, National Marketing Association and Owners Alliance. In addition, GDS is under common control with other companies involved in the down payment gift funds industry. Program Provider has been afforded an opportunity to inquire about such common ownership or common control and has satisfied itself that the benefits of this Agreement accruing to Program Provider are not mitigated, nor in any way reduced by the existence, or future existence of such relationships. Except as specifically set forth in Section 7 of this Agreement, GDS does not have any duty to Program Provider with respect to future business opportunities or the terms and conditions of any comparable relationships maintained by GDS other than the development of DPAs for which the Nation (or its affiliates qualified to provide a Down Payment Assistance program) is the Program Provider. GDS concurrently runs and processes other DPA programs.

11.2.    This Agreement establishes a contractual relationship between the parties. GDS is not a partner of Program Provider or PINE, nor is Program Provider or PINE a partner of GDS, and this Agreement does not establish any partnership relationship between the parties. The members of GDS are listed in **Attachment B.**

SECTION 12. General Provisions.

12.1.    Binding Effect; No Assignment. This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective heirs, legal representatives, successors and assigns. Except as provided in Section 3.3, this Agreement may not be assigned, pledged or hypothecated to, or assumed by, a third party without the prior written consent of each of the parties hereto.

12.2.    Notices. Except as provided in Section 10.2 of this Agreement, all notices and other communications hereunder shall be in writing and shall be deemed to have been given when delivered or five (5) days after mailing by certified or registered mail, postage prepaid, return receipt requested, to the address identified below. Each party may, by notice given hereunder, designate any further or different address to which subsequent notices and other communications shall be sent.

8

PINE and Program Provider:

> Penobscot Indian Nation Enterprises
> c/o EMDC
> 40 Harlow St.
> Bangor, ME 04402

GDS:    Global Direct Sales, LLC, an
        Maryland limited Liability Company
        18403 Woodfield Rd
        Suite E
        Gaithersburg, MD 20879

12.3. Governing Law. This Agreement shall be construed in accordance with the laws of the State of Maine applicable to private parties resolving disputes regarding contract obligations set forth herein within the State of Maine, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws without reference to its conflict of laws provisions.

12.4. Entire Agreement, Amendments. This agreement (including all exhibits and schedules attached hereto) between the parties pertaining to the subject matter hereof and supersedes any prior agreements, representations or understanding between the parties with respect thereto. This Agreement may not be amended, modified, changed, supplemented, superseded, canceled or terminated, nor may any obligations hereunder be waived, except by written instrument signed by all of the parties hereto or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto and lawful assignees.

12.5. Severability. In the event any court of competent jurisdiction shall hold any term or provision of this Agreement, or the application thereof to any person or circumstance, to be illegal, invalid or unenforceable, such holding shall not invalidate or render unenforceable or otherwise affect any other provision or provisions hereof, or the application of such term or provision to persons or circumstances other than those as to which it is held illegal, invalid or unenforceable, and the remaining terms, provisions and applications shall remain in full force and effect to the fullest extent permitted by law. Such illegal, invalid or unenforceable term or provision shall be amended, if possible, in order to accomplish the purposes of this Agreement. Notwithstanding the foregoing, if Section 8, or any provision thereof or agreement pursuant thereto, is held to be illegal, invalid or unenforceable, the Program Provider shall have the option to terminate this Agreement upon notice to GDS.

12.6. No Waiver. No waiver of any breach of any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained. No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act except those of the waiving party, which shall be extended by a period of time equal to the period of the delay. The failure by a party to enforce any provision of this

9

Agreement shall not be deemed a waiver of such provision or of any other provision applicable thereto and contemplated hereby. Any waiver regarding this Agreement shall be made in writing and shall specify such waiver.

      12.7.  Survival of Obligations and Covenants.  The termination of this Agreement shall not affect or limit the obligations of the parties hereto which by their terms are intended to survive the termination of this Agreement, including, without limitation, any monetary obligations owed hereunder and any claims for breach hereof or indemnity hereunder.

      12.8.  Counterparts.  This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

      12.9.  Consent to Jurisdiction.  Jurisdiction for any action pertaining to this Agreement shall be in the federal courts sitting in the State of Maine, and each party hereto consents to the jurisdiction and venue of such courts and waives any argument that venue in such forum is not convenient.  If any party commences any action in another jurisdiction or venue arising under this Agreement, the other parties hereto shall be entitled to have the case transferred to one of the jurisdictions and venues above-described, or if such transfer cannot be accomplished under applicable law, to have such case dismissed without prejudice.

     SECTION 13. Confidentiality.    Each party hereto agrees to hold in confidence information specified in writing by the other party hereto as non-public to the extent such information relates to the development, operation or administration techniques utilized by GDS, to the extent that such techniques include trade secrets owned by GDS. The parties hereto agree not disclose such information to persons other than that party's officers, directors, employees, advisors and agents except: (a) as required to disclose such information to a regulatory agency having jurisdiction over a DPA, or in connection with an examination of its records by examiners of that regulatory agency or at the express direction of any other authorized government agency; or (b) pursuant to a subpoena or other court order.  Confidential information shall not include information which becomes generally available to the public, other than as a result of disclosure by a party hereto, or its directors, officers, employees, advisors or agents in contravention of this Agreement, or becomes available to a party on a non-confidential basis from a source other than another party or its advisors, provided that such source is not known by the party receiving such information to be bound by a confidentiality agreement with, or other obligation of confidentiality to, another party.

     SECTION 14. Commitment Fee.  GDS shall pay a non-refundable fee of $15,000 on execution of this Agreement to Penobscot Indian Nation Enterprises.

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

10

**NATION:**

Penobscot Indian Nation, a federally recognized tribal nation

By: Kirk Francis, Chief
Duly authorized


**PINE:**

Penobscot Indian Nation Enterprises, a federally chartered tribal corporation

By: Yvonne Francis-Ferland, President
Duly authorized


**GDS:**
Global Direct Sales, LLC, a Maryland limited liability company

Scott Nash, Member

Christopher Russell, Member

11

## Attachment A

### Processing Function Responsibilities

The function of processing will consist of receiving applications for a DPA Gift electronically or via fax; entering data pertaining to the applicant's real estate purchase transaction in the database system created by GDS; tracking and monitoring the transaction as it nears settlement; contacting settlement or closing companies and having a settlement agreement signed; wiring down payment funds to a settlement or closing company when correct documentation is received and verified; collecting funds from the settlement company when the property transaction closes or within 72 hours after closing; accounting for all transactions and funds received; and disbursing funds as provided in Section 2 of the Agreement. Processing will also perform all acts of customer service as related to potential, current and past transactions.

The Processing Entity will also be responsible for the following:

**Office Space-** Sufficient office space shall be secured, and the lease and obligations thereunder shall be the responsibility of Processing Entity.

**Processing Staff-** Processing Entity shall employ enough personnel to expediently process all Gift requests. Staff payroll shall be responsibility of Processing Entity.

**Processing Management-** Processing Entity shall employ a management staff to competently oversee and manage the processing of Gifts. Processing Management payroll shall be responsibility of Processing Entity.

**Processing Administration-** Processing Entity shall hire adequate administrative staff to perform tasks that compliment grant processing, exclusive of marketing, sales and internet presence and web interface. Processing Administration payroll shall be responsibility of Processing Entity.

**Accounting-** Processing Entity shall hire adequate accounting staff whose primary responsibility will be to wire funds for Gift transactions to settlement companies and to collect enrollment fees via wire transfer. Accounting staff will also present a monthly report by the 15th of the month that will outline the monthly income and disbursements. All accounting staff and any other staff that has access to accounts and or wiring function shall be the responsibility of the Processing Entity.

**IT Support-** IT support shall be identified and can be outsourced. IT support will cover all phone, internet and computer installation and service. IT support is a responsibility of the Processing Entity.

**Computers-** Processing Entity is responsible for the purchase and maintenance of computers that are capable of running the latest Microsoft operating software and must be capable of accessing GDS' database.

12

**Telephones**- Processing Entity is responsible for the purchase and maintenance a VOIP phone system that is compatible with the current VOIP system of GDS.

**High Speed Internet**- Processing Entity is responsible for the purchase and maintenance a T-1 internet connection.

**Office Copier**- Processing Entity is responsible for the purchase or lease and maintenance of an office grade copier.

**Office Supplies**- Processing Entity is responsible for the purchase of all supplies needed for day to day office use.

**Wire/Bank Fees**- Processing Entity is responsible for the fees incurred by the Account established by GDS and Program Provider. This includes all wiring fees and any other fees associated with the processing of Gifts.

**Postage & Mailing**- Processing Entity is responsible for the postage and mailing fees associated with the processing of a grant transaction.

**Interest On Gift Funds Pool**- Processing Entity is responsible for all interest to third parties associated with funds in the "Gift Funds Pool"

**Bad Debt**- Processing Entity is responsible for all non-returned funds as associated with a DPA Gift transaction.

**Attachment B**

**Members of GDS**

John Wyatt – Chief Technical Officer - President
Chris Russell – Chairman of the Board
Ryan Hill – Chief Financial Officer/Treasurer
Scott Nash – Business Development/Secretary
Michael Tkac – Vice President, Sales & Marketing

*/267357*

14

**Office of the Chief and Council**

Kirk E. Francis
*Chief*

Dennis R. Pehrson Sr.
*Vice-Chief*

Donna Loring
*Representative*



Penobscot Nation
12 Wabanaki Way
Community Building
Indian Island, Maine 04468
(207) 827-7776

FAX (207) 827-6042

## RESOLUTION

### NUMBER: 01-24-07-01
### of the Governing Body
### of the Penobscot Nation
### Tribal Council

**WHEREAS,** the Penobscot Indian Nation is a federally recognized sovereign Indian tribe, and the Penobscot Indian Nation Tribal Chief and Council is the duly authorized and elected governing body of the Penobscot Indian Nation; and

**WHEREAS,** on March 15, 2005, the Tribal Chief and Council voted to establish a separate legal entity to engage in business enterprises on the Nation's behalf by forming a federally-chartered tribal corporation under the Indian Reorganization Act to be wholly owned by the Penobscot Indian Nation; and

**WHEREAS,** on November 25, 2005, the Secretary of the Interior issued a federal Charter for Penobscot Indian Nation Enterprises (PINE) in response to the Nation's request, and PINE's federal Charter was ratified by the Tribal Chief and Council on January 10, 2006; and

**WHEREAS,** among the purposes for PINE stated in its Charter are "to provide for the efficient and effective utilization of the resources of the Nation" and "to promote the economic development of the Nation and its members;" and

**WHEREAS,** PINE has pursued an initiative with Global Direct Services (GDS) pursuant to which the Penobscot Indian Nation shall serve as a "program provider" of a down payment assistance (DPA) program to assist home buyers qualifying for mortgage insurance offered by the Federal Housing Administration of the U.S. Department of Housing and Urban Development; and

- 1 -

**WHEREAS,**    working with financial consultants and legal counsel, PINE has negotiated business terms as outlined in the attached Agreement between the Nation, PINE, and GDS for the provision of a DPA program with GDS (the "Agreement"); and

**WHEREAS,**    the Tribal Chief and Council concludes that establishing the Penobscot Nation Fair Housing Administration pursuant to which the Nation shall serve as Program Provider pursuant to the terms of the Agreement is an appropriate function of the Nation and that granting PINE the role of oversight and manager of the program falls within PINE's role;

**NOW, THEREFORE, BE IT RESOLVED,**

**THAT**    (1)    The Tribal Chief and Council hereby approve the terms of the Agreement and authorize the Penobscot Indian Nation to enter into and perform its obligations under the Agreement and further specifically authorize Chief Kirk Francis to execute the Agreement on behalf of the Nation with such non-material changes as he may determine are appropriate.

**THAT**    (2)    The Tribal Chief and Council hereby establish a Down Payment Assistance Program, to be known as the "Penobscot Nation Fair Housing Administration," to provide low- and middle-income home buyers and first-time home buyers with assistance in meeting the requirements for home mortgages insured by the Federal Housing Administration of the U.S. Department of Housing and Urban Development.

**THAT**    (3)    The Tribal Chief and Council hereby designate PINE, and delegate to PINE as the Nation's agent the authority necessary, to serve as overseer and manager of the Down Payment Assistance Program under the Agreement, including, without limitation, responsibility for receipt and accounting for all funds payable to the Nation under the Agreement and all other responsibilities of the Program Provider set forth in the Agreement.

**THAT**    (4)    The Tribal Chief and Council hereby authorizes the establishment of a Program bank account as provided in the Agreement where down payment assistance funds will be pooled under the management and administration of GDS with the direct oversight of PINE pursuant to the terms of the Agreement. This account shall be called the "Penobscot Nation Fair Housing Administration" for the purposes of marketing.

**THAT**    (5)    The Tribal Chief and Council resolves that the Penobscot Nation does not waive tribal sovereign immunity for itself or for PINE for the purposes in this resolution or the actions of the Nation or PINE taken pursuant to this resolution.

## CERTIFICATION

I, the undersigned Clerk of the Tribal Council of the Penobscot Indian Nation, do hereby certify that the Tribal Council of the Penobscot Indian Nation is composed of twelve (12) members, of whom 11 were present at a meeting held at Indian Island on the 24th day of January, 2007 of which all Council members received notice more than twenty-four hours in advance, and at which the Vice-Chief was present and presided, and that the foregoing Resolution was duly adopted by the affirmative vote of 10 Council members.

Dated: January 29, 2007

ATTEST: _Linda Socoby_
LINDA SOCOBY, Tribal Clerk

_Dennis R. Pehrson Jr._
Dennis R. Pehrson, Sr., Vice-Chief

- 3 -

# EXHIBIT C



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3  1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments. Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program(as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah and all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

Sincerely,

Emelda Johnson
Deputy Assistant Secretary
Single Family Housing Programs

# EXHIBIT D

**4155.1 REV-5**

---

## FOREWORD

This Handbook describes the basic mortgage credit underwriting requirements for single-family (one to four units) mortgage loans insured under the National Housing Act. For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout this Handbook and must be supported by sufficient documentation.

These underwriting guidelines discuss the types of transactions and properties eligible for mortgage insurance, and FHA's requirements for determining the borrower's ability and willingness to repay the debt. Information regarding valuation and architectural requirements can be found in HUD Handbooks 4150.1 REV-1 and 4145.1 REV-2, CHG-1, respectively. These underwriting guidelines apply to mortgages insured under Sections 203(b) and 234(c) of the National Housing Act, and are also generally applicable to other single-family mortgage insurance programs (except where inconsistent with special features of those programs). Other single-family mortgage insurance programs are described in HUD Handbook 4000.2 REV-2.

This Handbook provides direction to lenders and FHA staff and is based on FHA's experience in insuring single-family mortgages. While it is not FHA's intent to insure mortgages that are likely to result in default, regardless of the borrower's equity, lenders may exercise some discretion in the underwriting of home mortgages where the borrower's financial and other circumstances are not specifically addressed by this Handbook. However, lenders are expected to exercise both sound judgment and due diligence in the underwriting of loans to be insured by FHA. For ease of reading, we have chosen to use "lender" in lieu of "mortgagee" throughout this user guide. However, "lender" is to be interpreted as a FHA-approved mortgagee as described in 24 CFR § 202.10. Similarly, "loan" is to be interpreted as "mortgage" as also described in 24 CFR § 202.10

Questions not addressed in the text should be directed to the appropriate Home Ownership Center (HOC) or the Director, Office of Single Family Program Development, HUD Headquarters, Robert Weaver Building, 451 Seventh St., SW, Washington, DC 20410-8000.

References:

1) 4000.2 REV-2 Mortgagees' Handbook, Application through Insurance
2) 4145.1 REV-2, CHG-1, Architectural Processing and Inspections
3) 4150.1 REV-1 Valuation Analysis for Home Mortgage Insurance
4) 4330.1 REV-5 Administration of Insured Home Mortgages
5) Code of Federal Regulations, Title 24 (24 CFR). Codifies the general and permanent rules of the Department.

---

4155.1 REV-5

## TABLE OF CONTENTS

### CHAPTER 1    INTRODUCTION

| 1-1 | WHAT FHA INSURES.................................................................................................... | 1-1 |

#### SECTION 1:    OCCUPANCY STATUS

| 1-2 | PRINCIPAL RESIDENCES ............................................................................................. | 1-1 |
| 1-3 | SECONDARY RESIDENCES........................................................................................... | 1-1 |
| 1-4 | INVESTMENT PROPERTIES ......................................................................................... | 1-1 |
| 1-5 | NONPROFIT ORGANIZATIONS AND GOVERNMENT AGENCIES ............. | 1-1 |

#### SECTION 2:    MAXIMUM MORTGAGE AMOUNTS

| 1-6 | MAXIMUM MORTGAGE AMOUNT.............................................................................. | 1-1 |
| 1-7 | MAXIMUM MORTGAGES FOR PURCHASE TRANSACTIONS.................... | 1-1 |
| 1-8 | TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS | 1-1 |

#### SECTION 3:    SETTLEMENT REQUIREMENTS

| 1-9 | SETTLEMENT REQUIREMENTS.................................................................................. | 1-1 |

#### SECTION 4:    REFINANCE TRANSACTIONS

| 1-10 | REFINANCING....................................................................................................................... | 1-1 |
| 1-11 | CALCULATING THE MORTGAGE AMOUNT ON REFINANCES................. | 1-1 |
| 1-12 | STREAMLINE REFINANCES ........................................................................................ | 1-1 |

#### SECTION 5:    SECONDARY FINANCING

| 1-13 | SECONDARY FINANCING............................................................................................. | 1-1 |

### CHAPTER 2    MORTGAGE CREDIT ANALYSIS

| 2-1 | OVERVIEW............................................................................................................................. | 2-1 |
| 2-2 | MORTGAGE ELIGIBILITY (BORROWERS)........................................................... | 2-1 |
| 2-3 | ANALYZING THE BORROWER'S CREDIT........................................................... | 2-1 |
| 2-4 | CREDIT REPORT REQUIREMENTS.......................................................................... | 2-1 |
| 2-5 | CREDIT ELIGIBILITY REQUIREMENTS................................................................. | 2-1 |

#### SECTION 2:    EFFECTIVE INCOME

| 2-6 | STABILITY OF INCOME................................................................................................... | 2-1 |
| 2-7 | SALARIES, WAGES, AND OTHER FORMS OF INCOME............................... | 2-1 |
| 2-8 | EMPLOYMENT BY FAMILY-OWNED BUSINESS............................................. | 2-1 |
| 2-9 | SELF-EMPLOYED BORROWERS................................................................................ | 2-1 |

#### SECTION 3:    BORROWER'S CASH INVESTMENT IN THE PROPERTY

| 2-10 | FUNDS TO CLOSE ............................................................................................................. | 2-1 |

#### SECTION 4:    TYPES OF LIABILITIES

| 2-11 | LIABILITIES .......................................................................................................................... | 2-1 |

#### SECTION 5:    BORROWER QUALIFYING

| 2-12 | DEBT TO INCOME RATIOS ........................................................................................... | 2-1 |
| 2-13 | COMPENSATING FACTORS.......................................................................................... | 2-1 |

**4155.1 REV-5**

## SECTION 6:     SPECIAL UNDERWRITING INSTRUCTIONS

| | | |
|---|---|---|
| 2-14 | TEMPORARY INTEREST RATE BUYDOWNS | 2-1 |
| 2-15 | ADJUSTABLE RATE MORTGAGES | 2-1 |
| 2-16 | CONDOMINIUM UNITS: UTILITY EXPENSES | 2-1 |
| 2-17 | CONSTRUCTION- PERMANENT MORTGAGE PROGRAM | 2-1 |
| 2-18 | MORTGAGE ASSISTANCE FOR DISASTER VICTIMS [Section 203(h)] | 2-1 |
| 2-19 | ENERGY EFFICIENT HOMES (EEH) | 2-1 |
| 2-20 | ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM | 2-1 |

# CHAPTER 3 DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

## SECTION 1:     UNDERWRITING DOCUMENTATION

| | | |
|---|---|---|
| 3-1 | APPLICATION PACKAGE | 3-1 |
| 3-2 | DOCUMENTATION STANDARDS | 3-1 |
| 3-3 | REAL ESTATE CERTIFICATION | 3-1 |
| 3-4 | AMENDATORY CLAUSE | 3-1 |

## SECTION 2:  PROCESSING REQUIREMENTS

| | | |
|---|---|---|
| 3-5 | POWER OF ATTORNEY | 3-1 |
| 3-6 | LOAN APPLICATION DOCUMENT PROCESSING | 3-1 |
| 3-7 | SEVEN-UNIT DOCUMENTATION | 3-1 |
| 3-8 | HOTEL AND TRANSIENT USE | 3-1 |
| 3-9 | SALES CONTRACT AND LOAN CLOSING | 3-1 |
| 3-10 | LENDER RESPONSIBILITY AT CLOSING | 3-1 |

## SECTION 3: FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

| | | |
|---|---|---|
| 3-11 | FEDERAL STATUTES AND REGULATIONS | 3-1 |
| 3-12 | FHA-PROCESSED HUD EMPLOYEE LOANS | 3-1 |

## CHAPTER 4 ASSUMPTIONS

| | | |
|---|---|---|
| 4-1 | GENERAL | 4-1 |
| 4-2 | RESTRICTIONS OF THE HUD REFORM ACT OF 1989 | 4-1 |
| 4-3 | RELEASE FROM LIABILITY | 4-1 |
| 4-4 | CREDIT-WORTHINESS REVIEW PROCESSING | 4-1 |
| 4-5 | LTV REDUCTION REQUIREMENTS | 4-1 |

## APPENDICES

| | | |
|---|---|---|
| I. | SINGLE FAMILY HOC JURISDICTIONS | |
| II. | CLOSING COSTS AVERAGES FOR STATES | |

**4155.1 REV-5**

## SECTION 5: SECONDARY FINANCING

### 1-13    SECONDARY FINANCING.

Any financing (other than the FHA-insured first mortgage) that creates a lien against the property is considered secondary financing and not a gift, even if it is a "soft" or "silent" second (i.e., has no monthly repayment provisions) or has other features forgiving the debt.

Documentation from the provider of the secondary financing must show the amount of funds provided to the borrower in each transaction and copies of the loan instruments are to be included in the endorsement binder. Costs incurred for participating in a downpayment assistance secondary financing program may only be included in the amount of the second lien. FHA reserves the right to reject any secondary financing that does not serve the needs of the intended borrower or where it believes the costs to the participants outweigh the benefits derived by the homebuyer. Permissible secondary financing arrangements include:

A.    **Government Agencies.** Federal, state, and local government agencies, as well as nonprofit agencies considered instrumentalities of government (see B, below), may provide secondary financing *for the borrower's entire cash investment.* The second lien itself must be made or held by the eligible governmental body or instrumentality. Neither governmental units nor their established nonprofit instrumentalities may use "agents," including other nonprofits or for-profit enterprises to make the second lien regardless of the source of those funds. In other words, even if the funds used for the secondary financing were *derived* from an acceptable source such as HUD HOME funds or from a unit of government or the eligible nonprofit instrumentality, the subordinate lien must be in the <u>name</u> of the eligible entity, i.e., the state, county, city or eligible nonprofit instrumentality must be the lien holder. This authority cannot be delegated to another party that is not itself permitted to provide this level of secondary financing. These other entities, however, may be used to *service* the subordinate lien if regularly scheduled payments are to be made by the mortgagor. Loans secured by secondary mortgages are subject to the conditions described below.

1.    The FHA-insured first mortgage, when combined with any second mortgage or other junior liens from government agencies may not result in cash back to the borrower. The sum of all liens cannot exceed 100 percent of the cost to acquire the property. The cost to acquire is the sales price plus allowable borrower-paid closing costs, discount points, repair and rehabilitation expenses, and prepaid expenses. The cost to acquire may exceed the appraised value of the property under these types of government assistance programs. The FHA insured first mortgage cannot exceed the

4155.1 REV-5

## SECTION 3: BORROWER'S CASH INVESTMENT IN THE PROPERTY

**2-10**  **FUNDS TO CLOSE.** The cash investment in the property must equal the difference between the amount of the insured mortgage, excluding any upfront MIP, and the total cost to acquire the property including prepaid expenses and closing costs as described in paragraph 1-9.

*All funds for the borrower's investment in the property must be verified and documented.* Acceptable sources of these funds include the following:

A.  **Earnest Money Deposit.** If the amount of the earnest money deposit exceeds 2 percent of the sales price *or* appears excessive based on the borrower's history of accumulating savings, the lender must verify with documentation the deposit amount and the source of funds. Satisfactory documentation includes a copy of the borrower's cancelled check. A certification from the deposit-holder acknowledging receipt of funds and separate evidence of the source of funds is also acceptable. Evidence of source of funds includes a verification of deposit or bank statement showing that at the time the deposit was made the average balance was sufficient to cover the amount of the earnest money deposit.

B.  **Savings and Checking Accounts.** A verification of deposit (VOD), along with the most recent bank statement, may be used to verify savings and checking accounts. If there is a large increase in an account, or the account was opened recently, the lender must obtain a credible explanation of the source of those funds.

C.  **Gift Funds.** An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower. The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them. Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price. No repayment of the gift may be expected or implied. (As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. Donors may borrow gift funds from any other acceptable source provided the mortgage borrowers are not obligors to any note to secure money borrowed to give the gift.) This rule also applies to properties of which the seller is a government agency selling foreclosed properties, such as the Veterans Administration or Rural Housing Services. Only family members may provide equity credit as a gift on a property being sold to other family members. These restrictions

**4155.1 REV-5**

on gifts and equity credit may be waived by the jurisdictional HOC provided that the seller is contributing to or operating an acceptable affordable housing program.

FHA deems the payment of consumer debt by third parties to be an inducement to purchase. While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing. Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price. The dollar-for-dollar reduction to the sales price also applies to gift funds not meeting the requirement that the gift be for downpayment assistance and is provided by an acceptable source. When someone other than a family member has paid off debts, the funds used to pay off the debt must be treated as an inducement to purchase and the sales price must be reduced by a dollar-for-dollar amount in calculating the maximum insurable mortgage.

**Documentation Requirements.** The lender must document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifies the dollar amount of the gift, states that no repayment is required, shows the donor's name, address, telephone number and states the nature of the donor's relationship to the borrower. In addition, the lender must document the transfer of funds from the donor to the borrower, as follows:

1.    If the gift funds are in the homebuyer's bank account, the lender must document the transfer of the funds from the donor to the homebuyer by obtaining a copy of the canceled check or other withdrawal document showing that the withdrawal is from the donor's account. The homebuyer's deposit slip and bank statement that shows the deposit is also required.

2.    If the gift funds are to be provided at closing:

    a.    If the transfer of the gift funds is by certified check made on the donor's account, the lender must obtain a bank statement showing the withdrawal from the donor's account, as well as a copy of the certified check.

    b.    If the donor purchased a cashier's check, money order, official check, or any other type of bank check as a means of transferring the gift funds, the donor must provide a withdrawal document or canceled check for the amount of the gift, showing that the funds came from the donor's personal account. If the donor borrowed the gift funds and cannot provide documentation from the bank or other

4155.1 REV-5

savings account, the donor must provide written evidence that those funds were borrowed from an acceptable source, i.e., not from a party to the transaction, including the lender. "Cash on hand" is not an acceptable source of the donor's gift funds.

Regardless of when the gift funds are made available to the homebuyer, the lender must be able to determine that the gift funds ultimately were not provided from an unacceptable source and were indeed the donor's own funds. When the transfer occurs at closing, the lender remains responsible for obtaining verification that the closing agent received funds from the donor for the amount of the purported gift and that those funds came from an acceptable source.

NOTE: FHA does not "approve" down payment assistance programs in the form of gifts administered by charitable organizations (i.e., nonprofits). Mortgage lenders are responsible for assuring that the gift to the homebuyer from the charitable organization meets the appropriate FHA requirements and the transfer of funds is properly documented. In addition, FHA does not allow nonprofit entities to provide gifts to homebuyers for the purpose of paying off installment loans, credit cards, collections, judgments, and similar debts.

D.    **Collateralized Loans.** Funds can be borrowed for the total required investment as long as satisfactory evidence is provided that the funds are fully secured by investment accounts or real property. Such assets may include stocks, bonds, real estate (other than the property being purchased), etc.

In addition, certain types of loans secured against deposited funds, such as signature loans, the cash value of life insurance policies, loans secured by 401(k)s, etc., in which repayment may be obtained through extinguishing the asset; do not require consideration of a repayment for qualifying purposes. However, in such circumstances, the asset securing the loan may not be included as assets to close or otherwise considered as available to the borrower.

An independent third party must provide the borrowed funds. The seller, real estate agent or broker, lender, or other interested third party may not provide such funds. Unacceptable borrowed funds include signature loans, cash advances on credit cards, borrowing against household goods and furniture and other similar unsecured financing.

# EXHIBIT E

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities Web site at **http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm**.

 # Government-to-Government Tribal Consultation Policy

**Department of Housing and Urban Development Tribal Government-to-Government Consultation Policy**

### I. Introduction

A. The United States Government has a unique relationship with American Indian governments as set forth in the Constitution of the United States, treaties, statutes, court decisions, and executive orders and memoranda.

B. On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

On May 14, 1998, the President issued Executive Order 13084, "Consultation and Coordination with Indian Tribal Governments," which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth guidelines for all federal agencies to (1) establish regular and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.

C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

In formulating or implementing such policies, HUD will be guided by the fundamental principles set forth in section 2 of Executive Order 13175, to the extent applicable to HUD programs. Section 2 of the Executive Order provides as follows:

> Sec. 2. Fundamental Principles. In formulating or implementing policies that have tribal implications, agencies shall be guided by the following fundamental principles:
>
> > (a) The United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive Orders,

and court decisions. Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protection. The Federal government has enacted numerous statutes and promulgated numerous regulations that establish and define a trust relationship with Indian tribes.

(b) Our Nation, under the law of the United States, in accordance with treaties, statutes, Executive Orders, and judicial decisions, has recognized the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory. The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights.

(c) The United States recognizes the right of Indian tribes to self- government and supports tribal sovereignty and self-determination.

## II. Definitions

A. "Consultation" means the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process. This definition adds to any statutorily mandated notification procedures. The goal of notification is to provide an opportunity for comment; however, with consultation procedures, the burden is on the federal agency to show that it has made a good faith effort to elicit feedback.

B. "Exigent situation" means an unforeseen combination of circumstances or the resulting state that calls for immediate action in order to preserve tribal resources, rights, interests, or federal funding.

C. "Indian tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a.

## III. Principles

A. HUD acknowledges the unique relationship between the federal government and Indian tribes.

B. HUD recognizes and commits to a government-to-government relationship with Federally-recognized tribes.

C. HUD recognizes tribes as the appropriate non-federal parties for making their policy decisions and managing programs at the local level for their constituents.

D. HUD shall take appropriate steps to remove existing legal and programmatic impediments to working directly and effectively with tribes on housing and community development programs administered by HUD.

E. HUD shall encourage states and local governments to work with and cooperate with tribes to resolve problems of mutual concern.

F. HUD shall work with other federal departments and agencies to enlist their interest and support in cooperative efforts to assist tribes to accomplish their goals within the context of all HUD programs.

G. HUD shall be guided by these policy principles in its planning and management activities, including its budget, operating guidance, legislative initiatives, management accountability system and ongoing policy and regulation development processes for all programs affecting tribes.

### IV. Tribal Coordination, Collaboration and Consultation

A. Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe. The Office of Native American Programs (ONAP), within the Office of Public and Indian Housing, may serve as the lead Departmental office for the implementation of this policy, and is the principal point of contact for consultation with tribes on all HUD programs.

B. Procedures and Methods for Implementation -Tribal, Regional and National Forums.

1. Based on a government-to-government relationship and in recognition of the uniqueness of each tribe, a primary focus for consultation activities is with individual tribal governments. The use of tribal organizations/committees will be in coordination with, and not to the exclusion of, consultation with individual tribal governments. When proposed federal government policies, programs or actions are determined by HUD as having tribal implications, HUD will notify the affected tribe(s) and take affirmative steps to consult tribe(s) or its (their) designee. Tribes at any time may exercise their right to request consultation with HUD.

2. Tribes are encouraged to exercise their option to convene regional tribal meetings to identify and address issues. Tribes may regional meetings with HUD representatives to address issues relevant to HUD policies, regulations, and statutes. At least one national tribal consultation meeting will be held by HUD each year. To reduce costs and conserve extent feasible, tribes and HUD will coordinate consultation meetings to be regularly scheduled meetings such as multi-agency and association meetings.

C. Tribal Advisory Organizations/Committees. The principal focus for consultation activities of HUD is with individual tribal governments. However, it is frequently necessary that HUD have organizations/committees in place from which to solicit tribal advice and recommendations, and to involve tribes in decision-making and policy development. In consultation with elected tribal governments, HUD recognizes tribal advisory organizations/committees. Consultation shall be

conducted as follows:

>1. Headquarters. HUD will consult with existing national organizations.
>
>2. Area Offices. Each Area ONAP Administrator, in consultation with tribal governments, will consult with organizations/committees and/or representatives of tribal governments served by the Area ONAP. The tribal organizations/committees and/or representatives will provide advice and consultation to the Area ONAP Administrator and staff. Meetings with the Area ONAP shall occur at least annually, or more frequently when there is a need.
>
>3. National/Area Coordination. To promote coordination in addressing issues arising from tribal consultation events at both the national and local level, a summary record of the comments made during national and area consultations will be made available to tribes.

D. Joint Federal/Tribal Work Groups or Task Forces. It may become necessary for HUD, to establish or select a work group or task force to develop recommendations on certain issues. The work group or task force may conduct its activities through conventional {e.g., telephone and mail), as well as innovative {e.g., e-mail and video conferences) means of communication.

>1. Membership and Meeting Notices.
>
>>a. Tribal representation should be consistent with the established standard of geographically diverse small, medium and large tribes, whenever possible.
>>
>>b. Meetings will be posted on the Internet and will be open to the public. In addition to Internet posting, HUD may also announce meetings through FAX, letter, e-mail, publication in the Federal Register, or other appropriate means.
>
>2. Participation.
>
>>a. Attendance: Work group members shall make good-faith attempts to attend all meetings. They may be accompanied by other individuals to advise them as they deem necessary.
>>
>>b. Appointment of Alternates: Alternate work group members may be appointed by written notification signed by the member. Such alternates shall possess the authority of the work group member to make decisions on their behalf if such authority is so delegated to them in writing.
>
>3. Work Group Protocols that may be established.
>
>>a. Roles of the work group members.
>>
>>b. Process for decision-making.

c. Process for creating written products and other decisional documents.

d. Other items as deemed necessary by the work group.

4. Work Group Final Products and Recommendations. All final recommendations will be given serious consideration by HUD. Whenever possible, all work group products should be circulated to tribal leaders for review and comment.

### V. Rulemaking

On issues relating to tribal self-government, tribal trust resources, or treaty and other rights, HUD will explore, and where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking. HUD may establish a standing committee, consisting of representatives of tribal governments, to consult on the appropriateness of using negotiated rulemaking procedures on particular matters. The procedures governing such a standing committee would be established through the mutual agreement of HUD and tribal governments.

### VI. Unfunded Mandates

To the extent practicable and permitted by law, HUD shall not promulgate any regulation that is not required by statute, that has tribal implications, and that imposes substantial direct compliance costs on such communities, unless:

1. Funds necessary to pay the direct costs incurred by the Indian tribal government in complying with the regulation are provided by the federal government; or

2. HUD, prior to the formal promulgation of the regulation:

a. Consulted with tribal officials early in the process of developing the proposed regulation;

b. In a separately identified portion of the preamble to the regulation as it is to be issued in the Federal Register, provides to the Director of the Office of Management and Budget a description of the extent of HUD's prior consultation with representatives of affected Indian tribal governments, a summary of the nature of their concerns and the agency's position supporting the need to issue the regulation; and

c. Makes available to the Director of the Office of Management and Budget any written communications submitted to HUD by such Indian tribal governments.

### VII. Increasing Flexibility for Indian Waivers

HUD shall review the processes under which Indian tribal governments apply for waivers of statutory and regulatory requirements and take appropriate steps to streamline those processes.

1. HUD shall, to the extent practicable and permitted by law, consider any application by an Indian tribal government for a waiver of statutory or regulatory

requirements in connection with any program administered by HUD with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable federal policy objectives and is otherwise appropriate.

2. HUD shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by HUD. HUD shall provide the applicant with timely written notice of the decision and, if the application for a waiver is not granted, the reasons for such denial.

3. This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by HUD. Applicable civil rights statutes and regulations are not subject to waiver.

**VIII. Implementation**

1. All committees shall be chaired by at least one tribal and one HUD representative.

2. Time Frames. Time frames for consultation outreach will depend on the need to act quickly. Suggested guidelines are not less than 60 days for significant new matters of national scale, 30 days for routine proposed actions, and 2-3 weeks with expanded tribal outreach efforts for proposed actions which must be "fast tracked" to respond to critical deadlines. These time frames may be compressed in exigent situations.

3. Methods of Communication. The following are examples of communication means by which consultation can be accomplished. The method(s) of communication used will be determined by the significance of the consultation matter, the need to act quickly, and other relevant factors: Internet; broadcast fax; U.S. Postal Service; telephone-conference calls; multimedia; direct contact; and formal meetings.

4. Reporting Mechanisms. In all cases where a tribe or tribes have been involved in the consultation process, the tribe(s) shall be notified of the HUD decision by one or more of the communication method(s) identified above. This notification shall specifically include a discussion of the basis for the HUD decision, including public comments received, relationship to the concerns raised in consultation, and any avenues available for further discussion, protest or appeal of the decisions.

5. Internal HUD policies and procedures are excluded from this policy.

**IX. Applicability of the Federal Advisory Committee Act**

The provisions of the Federal Advisory Committee Act (5 U.S.C. App.)(FACA) do not apply to consultations undertaken pursuant to this policy. In accordance with section 204(b) of the Unfunded Mandates Reform Act of 1995 (Pub.L. 104-4, approved March 22, 1995), FACA is not applicable to consultations between the Federal government and elected officers of Indian tribal governments (or their designated employees with authority to act on their behalf). As the Office of Management and Budget stated in its guidelines implementing section 204(b):

This exemption applies to meetings between Federal

officials and employees and ...tribal governments acting
through their elected officers, officials, employees, and
Washington representatives, at which 'views, information,
or advice are exchanged concerning the implementation of
intergovernmental responsibilities or administration,
including those that arise explicitly or implicitly under
statute, regulation, or Executive Order. The scope of
meetings covered by this exemption should be construed
broadly to include meetings called for any purpose relating
to intergovernmental responsibilities or administration.
Such meetings include, but are not limited to, meetings
called for the purpose of seeking consensus, exchanging
views, information, advice, and/or recommendations; or
facilitating any other interaction relating to
intergovernmental responsibilities or administration. (OMB
Memorandum 95-20 (September 21, 1995), pp. 6-7,
published at 60 FR 50651, 50653 (September 29, 1995)).

### X. General Provisions

This document has been adopted for the purpose of enhancing government-to-
government relationships, communications, and mutual cooperation between the
U.S. Department of Housing and Urban Development and tribes and is not
intended to, and does not, create any right to administrative or judicial review, or
any other right or benefit or trust responsibility, substantive or procedural,
enforceable by a party against the United States, its agencies or instrumentalities,
its officers or employees, or any other persons. This document is effective on the
date it is signed.


Dated: 06/28/2001

/s/
Mel Martinez, Secretary

[FR-4580-N-0l]


Content updated August 17, 2001

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112 Find the address of a HUD office near you

# EXHIBIT F

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc] [Bottom] [Help] [Text Only]



Click Here for MS Word version of this Notice

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

November 14, 2002

MORTGAGEE LETTER 2002-22

TO:  ALL GOVERNMENT AGENCIES
     ALL APPROVED MORTGAGEES
     ALL APPROVED NONPROFIT AGENCIES

SUBJECT:  Downpayment Assistance Programs Operated by
          Governmental Agencies and Nonprofits Using Subordinate Financing

Over the past few months, FHA has received several questions
about downpayment assistance programs operated by governmental
agencies and nonprofits.  The purpose of this Mortgagee Letter is
to provide technical guidance to mortgagees about these
downpayment assistance programs by summarizing existing program
rules and requirements, based on Section 528 of the National
Housing Act.

A.  State and Local Governments and Nonprofit Instrumentalities
of Government

Section 528 of the National Housing Act requires FHA to insure
first mortgages with second mortgages or loans made or held by
any state or local government agency or instrumentality of
government, provided all FHA requirements are met.  Mortgagee
Letter 94-2 describes the conditions that a nonprofit must meet
in order to be considered an instrumentality of government and,
thus, eligible to provide secondary financing for as much as 100%
of the borrower's required cash investment.  To obtain this
status, according to Section 528 of the National Housing Act, the
nonprofit must be an entity "established by a governmental body
or with governmental approval or under special law to serve a
particular public purpose or designated by law (statute or court
opinion)."  FHA also requires that the unit of government that
established the nonprofit also must either exercise
organizational control, operational control, or financial control
of the nonprofit in its entirety or, at minimum, the specific
homebuyer assistance program that is using FHA's credit
enhancement.  As described in ML 00-08 and ML 01-02, our
Homeownership Centers (HOCs) may review applications from
nonprofits that purport to be instrumentalities of government and
make approval decisions based on information submitted by the
nonprofit.

The policies discussed in ML 94-2 have enabled state and local

governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs. However, mortgagees must be aware that only the actual units of government or their established nonprofit instrumentalities may provide the second lien under the 100 percent financing policies acceptable to FHA.

B.  Information Regarding the Second Lien

The second lien itself must be made or held by the eligible governmental body or instrumentality. Neither governmental units nor their established nonprofit instrumentalities may use "agents," including other nonprofits or for-profit enterprises to make the second lien regardless of the source of those funds. In other words, even if the funds used for the secondary financing were derived from an acceptable source such as HUD HOME funds or from a unit of government or the eligible nonprofit instrumentality, the subordinate lien must be in the name of the eligible entity, i.e., the state, county, city or eligible nonprofit instrumentality must be the lien holder. This authority cannot be delegated to another party that is not itself permitted to provide this level of secondary financing. These other entities, however, may be used to service the subordinate lien if regularly scheduled payments are to be made by the mortgagor.

In addition, in accordance with 24 CFR 203.41, if the subordinate lien includes any restrictions on transferability, such as occupancy requirements or resale restrictions, those must automatically and permanently terminate upon foreclosure, deed-in-lieu of foreclosure, or assignment of the insured mortgage to HUD. The relevant legal documents must have language that accomplishes this result. It is also important to note that "forgivable" second liens (e.g., no repayment if the homeowner remains in the house for five years) are not gifts and, thus, are subject to these requirements.

    The FHA-insured mortgage amount is calculated by applying the maximum loan-to-value multipliers based on location of the property and value, as described in ML 98-29, to the lesser of the sales price or appraised value and making certain that there is at least a 3 percent cash investment (which may be met with proceeds from the second lien). The combined loan-to-value (CLTV) is limited to the amount to acquire the property, which may include the sales price, closing costs, prepaid expenses, and discount points, and in some cases, the costs for property rehabilitation; this may not, however, result in any cash back to the borrower. As an example, a $100,000 sales price would yield a $97,000 FHA mortgage amount. Combined with $3,500 for closing costs and prepaid expenses being paid by the nonprofit, the combined indebtedness could equal $103,500 with secondary financing equaling $6,500.

    In addition, the combined indebtedness may exceed the value of the property if the governmental unit or nonprofit instrumentality of government is supporting or engaging in a neighborhood revitalization effort. In many cases, the combined indebtedness including the amount spent for rehabilitation cannot be supported by the property's value after completing the improvements; these revitalization programs are usually designed

to increase property values of in the neighborhood over an
extended period of time.  Subject to approval by the HOC, the
subordinate financing, when combined with the FHA-insured first
mortgage, may exceed the value of the property even after
rehabilitation has been completed.  Repayment of the subordinate
lien is due only when the property is sold or the mortgage is
paid in full.

As an example, a $100,00 sales price would yield a $97,000
FHA mortgage amount.  Combined with $3,500 for closing costs and
prepaid expenses being paid by the nonprofit, along with $20,000
for rehabilitation, the combined indebtedness could equal
$123,500 with secondary financing equaling $26,500.  The
after-rehabilitation appraised value, however, is only $120,000.
Nevertheless, provided there are assurances that the funds for
rehabilitation are expended only for that purpose and not given
to the homebuyer, the HOC can approve revitalization programs
that result in the costs of the improvements exceeding their
effect on value.

C.  Nonprofits with FHA-Approved Affordable Housing Programs

In accordance with ML 00-08 and ML 02-01, when a nonprofit that
is not recognized by FHA as an instrumentality of government is
providing subordinate financing and that nonprofit has obtained
FHA's approval as a provider of subordinate financing, the
nonprofit may provide downpayment assistance that covers the gap
between the FHA first mortgage and amount to acquire the
property, minus the required homebuyer's minimum cash investment
requirement of three percent.

The FHA-insured mortgage amount is calculated by applying
the maximum loan-to-value multipliers based on the location of
the property and value, as described in Mortgagee Letter 98-29,
to the lesser of the sales price or appraised value and making
certain that there is a 3 percent cash investment (which may not
be met with proceeds from the second lien.)  The combined
loan-to-value (CLTV) is limited to the amount to acquire the
property, pay closing costs, prepaid expenses, and discount
points minus the statutory 3 percent investment which may come
from the homebuyer's own funds or from a legitimate gift from an
acceptable source.

As an example, a $100,000 sales price would yield a $97,000
FHA mortgage amount.  Combined with $3,500 for closing costs and
prepaid expenses being paid by the nonprofit, the combined
indebtedness could equal $100,500 with secondary financing
equaling $3,500.  The 3 percent required investment may not come
from any subordinate liens.

D.  Mortgage Amount Limitations When the Downpayment Assistance
Provider is Also the
        Seller of Property

In accordance with Section 528 of the National Housing Act, the
combined loan-to-value (CLTV) or indebtedness may be affected
when the downpayment assistance provider is also the seller.  All
sellers are permitted to pay the homebuyer's closing costs,
prepaid expenses, and discount points up to an amount equaling
six percent of the sales price; any amount above this threshold

results in a dollar-for-dollar reduction to the loan amount.
Similarly, if a governmental unit or nonprofit is providing a
gift of equity from the sale of the property, there must a
dollar-for-dollar reduction to the sales price.

E. Mortgagee Letter 2002-02

    ML 2002-02 was issued on January 16, 2002 to clarify and
amplify that FHA's existing underwriting policy does not permit
gifts to borrowers from third parties when such gifts are used to
pay off or reduce their outstanding consumer debt to enable them
to qualify for FHA-insured mortgages and the third parties
receive contributions from the sellers for payment of these
debts. ML 2002-02 referred to nonprofit organizations because
our experience has indicated that such entities are the only ones
that have engaged in this practice. References in ML 2002-02 to
nonprofit organizations should be construed as references to any
third parties. For example, a gift for debt payoff assistance
from a family member is not ordinarily prohibited unless the
family member making the gift receives the funds from the seller
or any other party with an interest in the transaction.

    Questions have arisen with regard to application of ML
2002-02 to gifts made for downpayment assistance in situations in
which donors receive contributions from sellers. ML 2002-02 is
limited to debt payoff assistance, not downpayment assistance.
ML 2002-02 does not apply to gifts for downpayment assistance by
nonprofit organizations or other third parties that receive
contributions from sellers or other parties with interests in the
transactions, provided that such contributions are made after
closing.

F. Mortgagee Roster Verification

    Mortgagees must verify that nonprofits providing secondary
financing are approved by HUD for that activity specifically by
consulting the Nonprofit Organization Roster, a listing of
nonprofits that HUD has determined are qualified to participate
in certain specified FHA single family activities, including
providing secondary financing. HUD recently (June 6, 2002)
published final regulations governing roster placement and
removal of nonprofit entities. The rules became effective on
July 8, 2002. The Roster can be accessed on HUD's web site at
http://www.hud.gov/offices/hsg/sfh/np/np_hoc.cfm

If you have any questions regarding this Mortgagee Letter, please
contact your Homeownership Center in Atlanta (888) 696-4687;
Denver (800) 543-9378; Philadelphia (800) 440-8647, or Santa Ana
(888) 827-5605.

Sincerely,

John C. Weicher

www.hudclips.org                                                    Page 5 of 5

```
Assistant Secretary for Housing-
Federal Housing Commissioner
```

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc]
[Top] [Help]

# EXHIBIT G



**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**

| | |
|---|---|
| Notice | **NOTICE PIH-2006-34 (TDHEs)** |
| Special Attention of: | |
| Administrators, Offices of Native | |
| American Programs; Tribal Government | Issued:  September 25, 2006 |
| Leaders; Tribally Designated Housing | |
| Entities | Expires:  September 30, 2007 |
| | |
| | Cross Reference: |
| | Notice PIH-2005-19 (TDHEs) |

SUBJECT:    Limiting Housing to Indian Families or Tribal Members when using Indian
Housing Block Grant (IHBG) Funds

**1. Purpose**

This Notice reissues Notice PIH-2005-19 (TDHEs) and explains when tribes or tribally
designated housing entities (TDHEs) (referred to in this Notice as 'Tribe') may limit housing
assistance to Indian families or tribal members.  This notice outlines how the requirements are
different if only IHBG funds are used or if IHBG funds are leveraged or combined with funds
from other sources.

**2. Background**

The IHBG program, created by the Native American Housing Assistance and Self-Determination
Act (NAHASDA), authorizes annual formula block grants to Indian tribes for affordable housing
activities, to primarily benefit low-income Indian families.  Section 201(b)(5) of NAHASDA
permits a preference to serve tribal members.

In general, housing recipients of federal funds (such as housing authorities) may not discriminate
against program beneficiaries (renters or homebuyers) on the bases of race, color, or national
origin.  In addition, other laws prevent most housing providers from discriminating against
renters or homebuyers based on religion, sex, familial status, or disability.

However, Section 201(b)(6) of NAHASDA states that Title VI of the Civil Rights Act of 1964,
and the Fair Housing Act "shall not apply to actions by federally recognized tribes and the
tribally designated housing entities of those tribes under this Act."  This provision also applies to
recipients established under the Alaska Native Claims Settlement Act and to State-recognized
tribes that receive grants under NAHASDA.

2

### 3. Definitions

*Affordable housing:* Housing that meets the requirements of Title II of NAHASDA, including housing units developed under the United States Housing Act of 1937, housing units developed under NAHASDA, and other housing units that are not assisted under NAHASDA, but which meet the requirements of Title II of NAHASDA.

*Combined Funds:* For purpose of this notice, funds are considered combined when IHBG funds are used with other funds for both eligible affordable housing for low-income Indian families and other housing that may not meet the requirements of NAHASDA.

*Fair Housing Act:* Title VIII of the Civil Rights Act of 1968, as amended, is also called the Fair Housing Act. It prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions, based on race, color, national origin, religion, sex, familial status, or disability.

*Indian Area:* The area within which an Indian tribe or its TDHE, as authorized by one or more Indian tribes, provides assistance under NAHASDA for affordable housing as stated in its Indian Housing Plan (IHP).

*Leveraging Funds:* Leveraged funds, in the context of section 102(c)(3) of NAHASDA, are additional resources used with IHBG funds for affordable housing activities under NAHASDA for low-income Indian families.

*Low-income family:* A family whose income does not exceed 80 percent of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families, except that the Secretary may, for purposes of this paragraph, establish income ceilings higher or lower than 80 percent of the median for the area on the basis of the findings of the Secretary or the agency that such variations are necessary because of prevailing levels of construction costs or unusually high or low family incomes.

*NAHASDA:* The Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4101 *et seq.*), as amended.

*Sovereignty/civil jurisdiction:* Authority to exercise governmental powers within a limited area.

*Title VI of the Civil Rights Act of 1964 (Title VI):* This law prohibits discrimination against beneficiaries of federally assisted programs based on race, color, or national origin (42 U.S.C. 2000 (d)).

### 4. Summary

In summary,

**Under NAHASDA, IHBG recipients do not violate Title VI of the Civil Rights Act or the Fair Housing Act when limiting assistance to low-income Indian families or providing preference to tribal members if:**

3

- the affordable housing project is on land where the tribe has sovereignty/civil jurisdiction regardless of any other funding that may have been used;

- the affordable housing project is funded solely with IHBG funds and is located on land subject to State or local law; or,

- the affordable housing project is funded with IHBG funds and leveraged with non-federal funds and located on land subject to State or local law.

However,

IF the tribe uses NAHASDA funds for a housing activity **in combination with other funds,**

AND, the project is on land where the tribe has **no sovereignty/civil jurisdiction,**

AND, **some** of the housing units in the project **do not** meet NAHASDA affordable housing requirements.

THEN, the tribe can only designate a proportionate percentage of the housing units in the project (the NAHASDA-assisted housing units) for Indian families or tribal members only.

If the funds used with NAHASDA are federal program funds that have program-specific nondiscrimination requirements in the program statute (such as HOME funds and CDBG funds), then these other federal funds must be **combined** with NAHASDA and only the NAHASDA-assisted housing units in the project can be limited to Indian families or tribal members.

## 5. Role of the IHBG Recipient

The tribe and/or its TDHE must comply with NAHASDA requirements and all other applicable federal requirements, whether its housing programs are funded solely with IHBG funds under NAHASDA, or with IHBG funds and other funding sources.

## 6. Tribal Sovereignty

There exists a unique relationship between the United States and Indian tribes. Indian tribes have sovereignty and exercise jurisdiction over their territory and their members.

**On lands where an Indian tribe exercises sovereignty, the tribe can limit housing to Indian families or tribal members regardless of the funds used to construct or otherwise assist the housing.**

HUD recognizes tribal sovereignty/civil jurisdiction over tribal trust land within a reservation, other tribal trust land, individual trust or allotted land, and fee land reacquired by the tribe within the boundaries of the reservation.

4

### 7. Location of Housing Funded with IHBG Funds under NAHASDA

NAHASDA authorizes affordable housing activities in Indian areas. Assistance is not limited to reservations. Essentially, an "Indian area" under NAHASDA is anywhere a tribe undertakes affordable housing activities.

### 8. Ownership of Housing Assisted under NAHASDA

NAHASDA encourages the involvement of the private sector in affordable housing activities. NAHASDA's requirement to primarily limit beneficiaries to low-income Indian families applies to all housing assisted with IHBG funds, regardless of who or what entity owns the housing.

### 9. Leveraged Funds

NAHASDA encourages using IHBG funding with other funds for affordable housing activities. When IHBG funds and other funds are used for affordable housing in accordance with NAHASDA requirements, the funds are said to be "leveraged."

When housing is located on land where the tribe has sovereignty/civil jurisdiction, and the housing is funded with IHBG and other federal funds (such as HOME and USDA Rural Housing Development funds), the housing can be limited to Indian families or tribal members without violating nondiscrimination requirements.

However, when housing is located on land where the tribe **does not** have sovereignty/ civil jurisdiction, and such housing is funded with IHBG and other federal funds, tribes are limited in their authority to designate such housing as Indian-only, if the other federal funds have program-specific nondiscrimination requirements in their program statute, i.e., CDBG and HOME programs.

If this is the case, the funds are combined funds and the tribe must determine which units are funded by each program, and can only designate the NAHASDA-assisted units as restricted to Indian families or tribal members. (If the units are similar in size and features, the number of units funded by each source can be determined on a pro-rata basis. Pro-rating examples can be found below.)

Private funds for Low Income Housing Tax Credit (LIHTC) projects and the credits themselves are not federal financial assistance, therefore, are not subject to Title VI. The use of IHBG funds with private funds for LIHTC projects would be considered leveraging, and Indian preference applies.

### 10. Combined Funds

If other funds are combined with IHBG funds but are not used for eligible affordable housing for low-income Indian families, the tribe must determine how it will meet the requirements of NAHASDA to serve only Indian families and also meet the requirements of the other programs which may require that all families must be served. The housing units funded under each program must be determined. If the housing units are located on land where the tribe has sovereignty/civil jurisdiction, there is no need to be concerned about different program

requirements because the housing may be limited to Indian families or tribal members and there is no violation of Title VI of the Civil Rights Act or the Fair Housing Act.

## 11. Leveraged or Combined Funds

If the housing is located on land where the tribe does not have sovereignty/jurisdiction, and the tribe will use other funds for the project, it must determine if the other funds will be leveraged funds or combined funds. However, because the HOME and CDBG program statutes have program-specific nondiscrimination requirements, the HOME and CDBG funds must be combined funds. In all other cases – i.e., where the federal funds do not have statutory program-specific nondiscrimination requirements, but are instead subject to Title VI and the Fair Housing Act – the tribe and the source of the other funds must determine if the funds will be combined or leveraged.

This decision will generally be based on the goals of the housing. For example, where due to great need, all housing units in a rental project will be occupied by low-income Indian families in accordance with NAHASDA requirements, the funds will be leveraged. Or where the goal is to not isolate Indian families from non-Indian families and the rental project will be occupied by both low-income Indian and non-Indian families, the funds will be combined. Where the goal is to integrate families of different incomes and the housing in a rental project will be occupied by both low-income Indian families and families who are not low income (mixed income project), the funds will be combined. Of course, the use of the other funds will be subject to whatever requirements apply to the funds, but at minimum, the housing will be subject to the Fair Housing Act.

## 12. Allocating Costs and Identifying NAHASDA-Assisted Units in Rental and Homeownership Projects.

Following are instructions on how to use IHBG funds, in combination with other funds, to develop housing projects that meet the requirements of each program. The examples show how to determine the minimum number of NAHASDA-assisted units in a project and how to allocate costs to the IHBG program. The tribe can start with either the number of housing units it wants to assist with IHBG funds (and determine the total amount of IHBG funds for the housing) or start with the total amount of IHBG for the housing (and determine the minimum number of NAHASDA-assisted units).

The IHBG program distinguishes between those units in a project that have been assisted with IHBG funds and those that have not.

IHBG funds may only be expended for units that are or will be occupied by low-income Indian families. Therefore, IHBG funds may be used in a mixed-funding project to assist the units in the project that will be occupied by low-income Indian families.

A. "Fixed" and "Floating" NAHASDA Designations for Housing Units

A tribe must determine the minimum number of units that will be designated NAHASDA-assisted. In general, this designation must be based on the actual NAHASDA investment in a unit or project. A tribe may choose to require that a

6

greater number of units be designated as NAHASDA-assisted to maximize the number of affordable units in the jurisdiction over time. A tribe may, on a project-by-project basis, choose to use either a fixed or a floating NAHASDA-assisted designation to track housing units.

A "fixed designation" means that the tribe determines from the outset which housing units are NAHASDA-assisted. For instance, in a 10-unit housing project, if the tribe designates units 1, 2, 3, 4, and 5 as the NAHASDA-assisted units, these specific units (1 through 5) remain NAHASDA-assisted units throughout the useful life and must be occupied by NAHASDA income-eligible families.

A "floating designation" gives a tribe the flexibility to maintain a certain number of NAHASDA-assisted units throughout the useful life, although the specific units so designated may vary with availability. For example, the tribe could designate five units as NAHASDA-assisted units, and at any given point in time throughout the useful life, five units must have the NAHASDA-assisted designation, and be occupied by NAHASDA income-eligible families. Substituted units must be comparable in size and features to the originally designated units.

A system of floating units is advantageous when a tribe wants to ensure that assisted units are indistinguishable from and interchangeable with market-rate units. In addition, the system of floating units provides consistency with the system required in projects developed with Low Income Housing Tax Credits.

B.    NAHASDA Project Rules

NAHASDA projects are subject to rent/homebuyer payment and occupancy requirements. A recipient shall not charge a low-income tenant or homebuyer rent/homebuyer payments that exceed 30 percent of the adjusted income of the family.

Noncompliance with the project income-targeting requirement is permissible when the non-compliance is caused by an increase in a family's income. For example, in rental housing, if a unit is made available for occupancy by a family that is a low-income family, and the tribe's policies and the tenant's lease require the family to move out if they are no longer low-income, then the family would have to move. Otherwise, the family would be permitted to stay in the unit. In a lease-purchase agreement for existing housing or housing to be constructed, if the family is low-income at the time the agreement is entered into and the family's income increases, the family may stay in the unit.

When a project has floating NAHASDA-assisted designations, the next comparable unit that becomes available in the project must be provided to a NAHASDA income-eligible family. That unit then becomes the NAHASDA-assisted unit, and the rent/homebuyer payment must be structured accordingly. When the income of a family in a NAHASDA-assisted unit rises above 80 percent of the area median, that family may be required to pay more than 30 percent of its

7

income for the monthly payment, except that, in projects where NAHASDA units float, the family's monthly payment may not exceed the fair market rent or the value of the unit.

C.    Allocating costs to NAHASDA-Assisted Units

IHBG funds may only pay actual costs of NAHASDA-assisted housing.

If the units in a project are comparable (in terms of size, features, and number of bedrooms), then the actual costs can be determined by pro-rating total (NAHASDA-eligible) development costs. IHBG funds can only pay the pro-rated share of the NAHASDA-assisted units.

When units are not comparable, the tribe must allocate the NAHASDA costs on a unit-by-unit basis, charging only actual costs to the IHBG program, as described below. Because units in projects with the floating NAHASDA designation must be comparable, a tribe should always pro-rate costs in these projects. When units are generally comparable but vary slightly in size or amenities, a combination of the two approaches may be used.

The basic considerations for allocation costs to NAHASDA-assisted units are as follows:

(1) *Comparability in Unit Size.* Comparability in size is defined by the bedroom count and square footage of individual units. Not all units with the same number of bedrooms are comparable in size. If there is a substantial difference in the square footage of two units with the same number of bedrooms, the units are not considered comparable.

(2) *Amenities.* Comparability in amenities means similar fixtures, appliances and other features. In many mixed-income projects, to demand varying rents, the quality and types of amenities may vary among units. For instance, a project manager can demand a higher rent for a unit with wall-to-wall carpeting, garbage disposal, dishwasher and finer fixtures than for a unit without these amenities. This type of project does not typically have comparability of units, unless there is an equal distribution of assisted and non-assisted units that have these amenities.

(3) *Common Costs.* Common costs are costs incurred for acquisition of improved or unimproved real property that benefit all residents of units in a project; rehabilitation or construction of shared systems (heating, plumbing, roofing) or shared facilities (community rooms, laundry facilities located in residential buildings); and on-site improvements. Costs associated with a project's on-site management office or the apartment of a resident manager may also be counted as common costs. The manner in which the costs for common elements of a project may be charged is dictated by the method chosen for allocating costs.

8

D.    Pro-Rating Cost Allocation Method

To use the pro-rating method of allocating costs, there must be comparability between the total inventory of NAHASDA-assisted and non-assisted units in a project.

For example, consider a 12-unit building in which 6 of the units have one bedroom and 6 have two bedrooms. The one-bedroom units are all comparable to each other and the two-bedroom units are all comparable to each other. Half of the building is NAHASDA-assisted. In this case, there should be an equal proportion of one- and two-bedroom units designated as assisted and non-assisted—three one-bedroom units, and three two-bedroom units.
Another example: consider the same 12-unit building in which one-third of the units are NAHASDA-assisted. You would need a total of four units designated (one-third of 12), so you must designate two one-bedroom units, and two two-bedroom units.

When assisted and non-assisted units are comparable, total eligible development costs (including acquisition, development hard costs to construct or rehabilitate the unit, and project soft costs), may be pro-rated to determine the NAHASDA share of the total costs.

Thus, all eligible project costs may be distributed between the IHBG program and other funding sources, provided that the NAHASDA share does not exceed the maximum per unit limit. This means NAHASDA can pay any eligible cost, and the tribe can pro-rate the NAHASDA share in relation to the total eligible costs to determine the minimum number of NAHASDA-assisted units.

For example, consider a tribe that buys land with $100,000 in IHBG funds. Then, that tribe uses $900,000 of private funds to construct a housing project on that land. The total cost of the project is $1 million. A minimum of one-tenth of the units in the project must be designated as NAHASDA-assisted, because IHBG funds provided one-tenth of the total funding. If the assisted and non-assisted units are comparable in size and distribution, a prorated share of the cost of common elements attributable to the NAHASDA-assisted units may be paid with IHBG funds.

For example, consider a tribe with a 24-unit building with 8 NAHASDA-assisted units (one-third of the units). The assisted units are comparable to the non-assisted units. The tribe replaces the heating system and the roof. In this case, the tribe may pay one-third of these total common costs with NAHASDA funds because one-third of the units are NAHASDA-assisted.

The ratio of the NAHASDA investment to the total eligible development cost is equivalent to the ratio of the minimum number of units that must be NAHASDA-assisted to the total number of units.

9

For example, a tribe buys and rehabilitates a 60-unit vacant building. The units
are comparable. Total acquisition and development costs are $1 million, and the
tribe uses $200,000 of IHBG funds. The IHBG investment, $200,000, is one-fifth
of the total, $1 million; so, one-fifth of the units must be designated as
NAHASDA-assisted. One-fifth of 60 units is 12 units. Therefore, 12 units must
be designated as NAHASDA-assisted and 48 can be designated as non-assisted.

E.    Unit-by-Unit Cost Allocation Method

When NAHASDA-assisted and non-assisted units in a project are NOT
comparable, the tribe must determine and charge the IHBG program for the actual
costs incurred for the acquisition and development of the NAHASDA units, plus
any common costs that can be attributed to the NAHASDA portion of the project.

To allocate these costs, the tribe must designate the NAHASDA-assisted units and
track the costs for each unit.

Common costs attributable to NAHASDA-assisted units are determined by
calculating the total square feet in NAHASDA units as a percentage of the total
square feet in the project. IHBG funds can pay for that percentage of the common
costs.

The actual cost for each unit is charged to the IHBG program. The actual cost is
charged, regardless of whether it is more or less than the pro-rated cost would be.

For example, a tribe proposes to construct a new 60-unit, mixed-income
development:

- One-third, or 20, of the units will be deluxe units, with total development
  costs of $2 million.

- Another third, 20 upgraded units, will be marketed to middle-income
  families (between 100 and 120 percent of the area median income), with
  total development costs of $1.5 million.

- The final third will be 20 basic units with few amenities and will be
  marketed to low-income families; the total development costs are $1
  million.

Because the units in this project are not comparable, the tribe may only use IHBG
funds for the cost of the units that will meet the NAHASDA requirements.
Therefore, it may invest up to $1 million in IHBG funds to construct the 20 units
for eligible low-income families, provided that the tribe's per unit limit equals at
least $50,000. All 20 units will be designated as NAHASDA-assisted.

In another example, a tribe proposes to use IHBG funds and local funds to
rehabilitate a 15-unit building it already owns. Ten units are two-bedroom and
are non-assisted; five units are efficiencies and are NAHASDA-assisted. In this

10

case, NAHASDA can only pay the actual rehabilitation costs, up to the per unit limit, of the units designated as NAHASDA-assisted.

F.    Maximum Per Unit Cost Limit

Housing developed, acquired, or assisted under NAHASDA is subject to limitations on cost or design standards. IHBG-assisted housing must meet the moderate design requirements.

## 13. Additional Information

If you have any questions, or require further information, please contact your Area Office of Native American Programs (ONAP).

/s/

Orlando J. Cabrera, Assistant Secretary
for Public and Indian Housing

# EXHIBIT H

# GMAC RFC

## GMAC/RFC DPA WHOLESALE REVIEW FORM

| TO: Scott Nash | Fax # 202-821-9507 |
|---|---|
| RE: Grant America Program-Penobscot Indian Nation | Date:03/30/07 |

| ACCEPTED ☐ | SUSPENDED ☐ | UNACCEPTABLE ☒ |
|---|---|---|

### GMAC UNDERWRITING DOCUMENT REQUIREMENTS

➢ GMAC FAX ALL BELOW CONDITIONS TO *215-682-3778*
➢ DIRECT ANY STATUS CALLS TO *877-700-4622 OPTION # 6*
➢ ALOW 5-7 BUSINESS DAYS FOR REVIEW

## DPA RESUBMISSION REQUIREMENTS

HUD generally does review programs for approval but they agreed to look at this case. Upon review of the documents, HUD indicated that this program did not appear to meet their guidelines based on what was submitted. Also, they did not like the fact that the borrower had to pay a $300 fee. There may also be an additional processing fee. Charging a borrower any type of fee would be outside the intention of these programs in their view. This program request is denied.

Revised 6/28/06

# EXHIBIT I

⌀002

05/31/07 THU 09:41 FAX

## Scott Nash

| | |
|---|---|
| **From:** | Roberts, Elaine A [Elaine.A.Roberts@hud.gov] |
| **Sent:** | Wednesday, May 30, 2007 3:21 PM |
| **To:** | clhauver@yahoo.com |
| **Subject:** | FW: Penobscot Native American Tribe |

Here is what out legal dept. said

The present status is that HQ Housing has instructed the HOCs in the interim that this program is not an acceptable source of down payment gift funds although the program is under review in HQ. This program will probably be killed by the new proposed reg published on 5/11 for comment that will, if adopted as written, prohibit any gift funds from coming from the seller "before during or after the closing."

**From:** cija hauver [mailto:clhauver@yahoo.com]
**Sent:** Wednesday, May 30, 2007 10:39 AM
**To:** Roberts, Elaine A
**Subject:** Penobscot Native American Tribe

Elaine-

THanks for talking with me last week about all the different issues going on right now.

I have received email solicitations from the "GAP" program to start using their down payment assistance program- this is the program provided by the Penobscot Native American tribe. Their argument is somewhat convincing when talking about the non-profit DAP programs.

Do you think it would be ok for our mortgage company to try them out? Does HUD have an issue with them or do they have a formal stance on the program? From our last conversation it sounded like the jury was still out on these guys.

Chris

1

# EXHIBIT J

June 13, 2007

**BY CERTIFIED MAIL, RETURN
RECEIPT REQUESTED AND
FAX: (202) 708-3389**

Robert M. Couch, Esq.
Acting General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

      Re:   The Penobscot Indian Nation et al. v. U.S. Department of Housing
             and Urban Development et al.

Dear Mr. Couch:

      We represent the Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC. We have been instructed to file the enclosed complaint on June 25, 2007, and simultaneously therewith bring an Order to Show Cause seeking a preliminary injunction and temporary restraining order. If you would like to meet and attempt to resolve this matter, you must contact me before the close of business on June 22, 2007.

      If you fail to do so, we have been instructed to commence legal action seeking all available remedies. Accordingly, it is imperative you contact me before the above date if this matter is to be resolved prior to litigation.

                     **KANTROWITZ, GOLDHAMER
                     & GRAIFMAN, P.C.**

             By:
                     Michael L. Braunstein

Enclosure
cc:    Christopher Russell, Director
        Gary E. Mason, Esq. (both w/ enclosure)

# EXHIBIT K



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-0500

OFFICE OF GENERAL COUNSEL

June 20, 2007

<u>By Facsimile</u>

Michael L. Braunsten, Esq.
Kantrowitz, Goldhamer & Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977-6216

Dear Mr. Braunstein,

     This letter responds to your June 13, 2007 letter to Robert M. Couch, HUD General Counsel. Your letter and its enclosures about the Penobscot Indian Nation, Penobscot Indian Nation Enterprises, and Global Direct Sales, LLC have been forwarded to me for reply which you asked to be provided by the close of business on Friday, June 22, 2007.

     FHA approved mortgagees have asked HUD about whether The Grant America Program[TM] (GAP) satisfies FHA requirements. HUD is unable to answer these inquiries due to the paucity of information about GAP. Attorneys in my office are available to discuss this matter with you and your clients in order to obtain a clear understanding about the operation of GAP. We are particularly interested in the ultimate source of downpayment funds, how those funds are made available to home purchasers, and whether there are any fees or contractual arrangements among the parties providing or receiving these funds. We also seek information about the operating authorities of the Penobscot Indian Nation, Penobscot Indian Nation Enterprises, Global Direct Sales, LLC, and GAP.

     Please contact me at 202-708-1274 to arrange a mutually convenient time for a meeting.

                       Sincerely,

                       John J. Daly
                       Associate General Counsel
                       for Insured Housing

# EXHIBIT L

LAW OFFICES

KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
747 CHESTNUT RIDGE ROAD - SUITE 200
CHESTNUT RIDGE, NEW YORK 10977-6216

(845) 356-2570
FAX # (845) 356-4335
www.kgglaw.com

June 27, 2007

PAUL B. GOLDHAMER*
BARRY S. KANTROWITZ*
GARY S. GRAIFMAN*
RANDY J. PERLMUTTER*
————
WILLIAM T. SCHIFFMAN*
REGINALD H. RUTISHAUSER*
JOHN M. CHAKAN*
RISA K. JAMESON**
MICHAEL L. BRAUNSTEIN*
————
OF COUNSEL
SHARON M. KANTROWITZ*
STEVEN B. ROTHSCHILD**

* N.Y. & N.J. BAR
I N.Y., N.J. & FLA. BAR
** N.Y. BAR ONLY

AFFILIATE

KANTROWITZ, GOLDHAMER & GRAIFMAN
NEW JERSEY
210 SUMMIT AVE.
MONTVALE, N.J. 07645
(201) 391-7000
FAX # (201) 307-1086

## VIA BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND FACSIMILE (202) 708-1826

Bruce S. Albright, Esq.
Assistant General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

Re:    The Penobscot Indian Nation et al. v. U.S. Department of Housing and Urban Development et al.

Dear Mr. Albright:

It was a pleasure meeting you on Monday. I write to address the issue raised by HUD regarding the Penobscot Indian Nation's down payment assistance program. A federally recognized tribe's ability to operate as a governmental entity beyond its borders and tribal members is well settled. Additionally, HUD's concern regarding the tribe's ability to operate as a governmental entity beyond its borders attempts to improperly assert an additional requirement for a governmental down payment assistance program which is not contained in HUD's regulations. Accordingly, there appears to be no reason why this matter should not be quickly resolved.

Regarding the tribe's ability to operate as a governmental entity beyond its borders and tribal members; the status of tribes as government entities is not dependent upon the location of tribal activities. Outside of its geographical or jurisdictional territory a tribe is still a governmental entity and retains its attributes of sovereignty. For example, a tribe has authority to purchase items from outside of its territory yet because of its status as a sovereign nation it retains immunity from state taxation. Central Machinery Co. v. Arizona Tax Comm'n, 448 U.S. 160 (1980).

Similarly, tribes retain their status as government entities when they conduct activities, including commercial activities, outside of their territorial jurisdiction. The Supreme Court addressed this issue, in the context of tribal immunity, an aspect of tribes sovereign

Bruce S. Albright, Esq.
June 27, 2007
Page 2

governmental status, in <u>Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.</u>, 523 U.S. 751 (1998).

In <u>Kiowa</u>, the Kiowa Tribe's industrial development commission agreed to purchase corporate stock from a technology company and gave a promissory note as part of the transaction. Under the note, the Kiowa Tribe agreed to pay the company $285,000 plus interest. The face of the note indicated it was signed in Carnegie, Oklahoma, where the Kiowa Tribe has a complex held for it in trust. According to the technology company, however, the Kiowa Tribe executed and delivered the note in Oklahoma City, beyond its tribal lands. The Tribe's payments were also to be made in Oklahoma City. When the tribe defaulted on the note, the technology company sued in state court for repayment. The Kiowa Tribe moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity from suit and state court jurisdiction.

The Supreme Court addressing tribal immunity, an aspect of the tribe's sovereign governmental status, stated that:

> **Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.**

<u>Id</u>. at 760 (emphasis added). The <u>Kiowa</u> Court continued that:

> tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. <u>See</u> <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) <u>Potawatomi</u>, <u>supra</u>; <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

<u>Id</u> at 758. Accordingly, it is well settled that tribes can engage in commercial activities outside of their jurisdictional territory while retaining their status as governmental entities. Likewise, it is undisputable that Indian tribes immunity is an aspect of their tribal sovereignty. <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 58 (1978).

Further, <u>Montana v. U. S.</u>, 450 U.S. 544 (1981), the case cited by HUD during Monday's meeting is not on point. <u>Montana</u> addressed whether the Crow Tribe had jurisdiction to regulate non-Indian hunting and fishing on non-Indian lands. <u>Montana</u>, which predates <u>Kiowa</u>, did not address the Crow Tribe's status as a sovereign nation when engaging in commercial activities off the reservation. HUD's reliance on <u>Montana</u> confuses tribal status as a sovereign government with its sovereign jurisdiction. Just as when the Governor of New York travels to Washington D.C. with his New York State Police security detail, their jurisdictional powers are altered, not their status as the Governor of New York and New York State Police. Likewise, tribes retain their status as governmental entities regardless of where their activities occur on or off the

Bruce S. Albright, Esq.
June 27, 2007
Page 3

reservation. Additionally, HUD's reliance on <u>Montana</u> is misplaced because the Penobscot Indian Nation is not attempting to regulate by force of tribal law the conduct of non-Indians engaging in activities outside of its territorial jurisdiction, but is making available a down payment assistance program in which buyers and sellers voluntarily participate.

Tribes status as a sovereign governmental entities entitled to recognition outside of its jurisdictional boundaries was also addressed in <u>Prairie Band Potowatomi Nation v. Wagnon</u>, No. 03-3322 )10th Cir. 2007). In <u>Prairie Band Potowatomi Nation</u> the Tenth Circuit struck down the State of Kansas' refusal to recognize license plates issued by tribes geographically located within the exterior boundaries of Kansas. The Tenth Circuit determined that since Kansas recognized license plates issued by other states as well as similarly situated sovereigns, the refusal to recognize Prairie Band Potowatomi Nation license plates was an impermissible discrimination between similarly situated sovereigns. Further, the Indian Reorganization Act was designed to encourage tribal enterprises to enter the white world on a footing of equal competition. <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. 145 (1973).

HUD's conduct also discriminates against the Penobscot Indian Nation because HUD has permitted down payment assistance programs from the Lower Brule Sioux, Citizen Band Potowatomi Nation and the Tlingit-Haida that provide down payments to non-tribal citizens outside tribal lands. As well as recognizing state organized not-for-profits to operate essentially identical down payment assistance programs nationwide.

In addition to confusing tribal status as a sovereign government with its sovereign jurisdiction, HUD's concern regarding the tribe's ability to operate as a governmental entity beyond its borders, attempts to improperly assert an additional requirement for a governmental down payment assistance program which is not contained in HUD's regulations. HUD expressly allows gift funds from a governmental agency or public entity that has a program to provide homeownership assistance. HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> **Gift Funds.** An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.

HUD's regulations assert no jurisdictional or territorial requirements or restrictions on governmental down payment assistance programs.

Lastly, on February 27, 2007, Alphonso Jackson, HUD's Secretary, while addressing the National Congress of American Indians stated that:

Bruce S. Albright, Esq.
June 27, 2007
Page 4

> At HUD, we are committed to partnering with you to create and sustain strong Native American communities through creative and effective housing and community development programs. Homeownership and the ability to build equity in one's home is an important component in the development of strong communities everywhere, including on tribal lands . . . By using homeownership and the development of affordable housing as vehicles to attract other sources of capital, we can contribute to the growth of Native American communities . . . We encourage tribes to pursue opportunities such as low-income housing tax-credits and other federal and state programs, and to seek partnerships with the private sector.

Mr. Jackson's comments make clear that tribal housing programs are not limited to tribe's territorial boundaries or members.

HUD's conduct, including advising third-parties that GAP does not comply with HUD regulations, despite failing to consult with PIN, HUD's policy of not reviewing or approving governmental down payment assistance programs and HUD's admitted "paucity" of information regarding GAP when it was advising third-parties of GAP's purported non-compliance is clearly actionable.

Based on the above, I see no reason that this matter should not be resolved within the next week. If you would like to resolve this matter, you must contact me before the close of business on July 6, 2007. If you fail to do so, we have been instructed to commence legal action seeking all available remedies. Accordingly, it is imperative you contact me before the above date if this matter is to be resolved prior to litigation.

KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.

By:

Michael L. Braunstein

cc:     Christopher Russell, Director
        Gary E. Mason, Esq.

June 29, 2007

**BY CERTIFIED MAIL, RETURN**
**RECEIPT REQUESTED AND**
**FACSIMILE:(202) 708-1826**

Bruce S. Albright, Esq.
Assistant General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

        Re:    The Penobscot Indian Nation et al. v. U.S. Department of Housing
               and Urban Development et al.

Dear Mr. Albright:

I am writing to supplement my June 27, 2007 letter. I direct you attention to 25 U.S.C. § 4301 et seq., Indian Regulatory Reform and Business Development Act of 2000, which provides express statutory authority for the Penobscot Indian Nation's operation outside of its territorial borders and tribal members. In addition to the existence of express authority for the tribe's activities, HUD's concern evidences a misunderstanding of the Commerce Clause.

25 U.S.C.A. § 4301(a)(emphasis added) provides, in pertinent part, that:

Congress finds that--

        3)     in 1994, President Clinton issued an Executive memorandum to the heads of departments and agencies that obligated all Federal departments and agencies, particularly those that have an impact on economic development, to evaluate the potential impacts of their actions on Indian tribes;

        (4)    **consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, Indian tribes retain the right to enter into contracts and agreements to trade freely**, and seek enforcement of treaty and trade rights;

Bruce S. Albright, Esq.
June 29, 2007
Page 2

＊　　＊　　＊

(9)     the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to--

    (A)     encourage investment from outside sources that do not originate with the tribes; and

    (B)     **facilitate economic ventures with outside entities that are not tribal entities;**

25 U.S.C.A. § 4301(b)(emphasis added), provides, in pertinent part, that:

The purposes of this chapter are as follows:

1)     To revitalize economically and physically distressed Native American economies by--

    (A)     encouraging the formation of new businesses by eligible entities, and the expansion of existing businesses; and

    (B)     **facilitating the movement of goods to and from Indian lands and the provision of services by Indians.**

＊　　＊　　＊

(5)     **To encourage intertribal, regional, and international trade and business development** in order to assist in increasing productivity and the standard of living of members of Indian tribes and improving the economic self-sufficiency of the governing bodies of Indian tribes.

25 U.S.C.A. § 4304(d)(emphasis added) provides that:

In conjunction with the activities described in subsection (c) of this section, the Secretary, acting through the Director, shall provide technical assistance and administrative services to eligible entities to assist those entities with--

(1)     the identification of appropriate markets for Indian goods and services;

(2)     entering the markets referred to in paragraph (1);

(3)     compliance with foreign or domestic laws and practices with respect to financial institutions with respect to the export and import of Indian goods and services; and

(4)     **entering into financial arrangements to provide for the export and import of Indian goods and services.**

Bruce S. Albright, Esq.
June 29, 2007
Page 3

Additionally, 25 U.S.C. § 477, Incorporation of Indian tribes; charter; ratification by election, provides that:

> The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: *Provided,* That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

It is also settled that a tribe's governmental status remains when engaged in activities with non-tribal members outside its territorial boundaries. see Gaines v. Ski Apache, 8 F.3d 726 (C.A.10 1993)(Indian tribe's constitutional, rather than corporate entity, operated ski resort located off of the reservation and thus, tribe was not a corporation under Indian Reorganization Act.); see also S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community, 674 P.2d 1376, 138 Ariz. 378 (Ariz.App.1983)(The commercial farming venture was a subordinate business organization of a government organization of the Indian tribe and was unrelated to the corporate entity acting as a business corporation so that activities of the commercial farming venture, initiated off the Indian reservation, were not related to the corporate entity and the "sue and be sued" clause contained in the corporate charter had application only to transactions involving the corporate entity in its capacity as a business corporation and did not apply to the governmental organization's operation of the commercial farming venture as subordinate economic enterprise.).

Based on the foregoing, it is clear that the Penobscot Indian Nation has express statutory authority to operate outside of its territorial borders and tribal members. Further, the tribe retains its tribal status when engaging in activities outside its territorial borders and tribal members.

Lastly, HUD's concern evidences a misunderstanding of the Commerce Clause. The Commerce Clause:

> Because the power granted to Congress under the Commerce Clause is the power to '*regulate* Commerce ... among the several States,' the correlative restrictions on the states under the Commerce Clause are invoked only when a state engages in regulation. Therefore, the Supreme Court has drawn a distinction between state 'regulation of' a market and state 'participation in' a market.

Bruce S. Albright, Esq.
June 29, 2007
Page 4

Chance Management, Inc. v. State of S.D., 97 F.3d 1107, 1110 (8th Cir. 1996). This issues was addressed by the Supreme Court in Hughes v. Alexandria Scrap Corp., 426 U.S. 794 (1976). Hughes involved a Maryland subsidy program created to ensure the recycling of abandoned automobiles known as "hulks". The program initially offered bounties for every Maryland-titled hulk converted to scrap. Both in-state and out-of-state processors who destroyed hulks with Maryland titles were eligible to collect the bounty. Maryland then revised the program, imposing stricter proof of title requirements on those delivering Maryland-titled hulks to out-of-state-processors. This resulted in a significant decline in the number of hulks delivered to out-of-state processors. As the State of Maryland entered the market to participate in, not regulate, commerce, the Supreme Court reversed the lower court's invalidating of the statute, stating that:

> We do not believe the Commerce Clause was intended to require independent justification for such action. Maryland entered the market for the purpose, agreed by all to be commendable as well as legitimate, of protecting the State's environment. As the means of furthering this purpose, it elected the payment of state funds in the form of bounties to encourage the removal of automobile hulks . . . **Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market** and exercising the right to favor its own citizens over others.

Id. at 809-810 (emphasis added); see also Reeves, Inc. v. Stake, 447 U.S. 429 (1980) (The Supreme Court saw no Constitutionally-mandated plan to limit states' ability to operate in a free market, explaining that the exception is based on the "long recognized right of trader or manufacturer . . . to exercise his own independent discretion as to parties with whom he will deal" and that "evenhandedness" requires that states should share these "freedoms from federal constraints" as well.).

For the reasons set forth, in my June 27, 2007 letter and draft complaint, HUD's conduct is clearly actionable. Accordingly, the deadline to resolve this matter without litigation remains the close of business on June 6, 2007. Accordingly, it is imperative you contact me before that time if this matter is to be resolved prior to litigation.

**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**

By:

Michael L. Braunstein

cc:    Christopher Russell, Director
       Gary E. Mason, Esq. (both via email)

# EXHIBIT M



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

July 6, 2007

Michael L. Braunstein, Esq.
Kantrowitz, Goldhamer & Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977-6216

Dear Mr. Braunstein,

This letter responds to your letters of June 27, 2007 and June 29, 2007 to Bruce Albright, Assistant General Counsel, about the Penobscot Indian Nation Fair Housing Administration (PINFHA) downpayment assistance program known as the Grant America Program (GAP). Your letters discussed your position that the Penobscot Indian's Nation's (PIN) has legal authority to provide downpayment assistance under FHA's single family mortgage insurance programs as a governmental entity beyond the boundaries of the tribe's reservation and to non-tribal members.

HUD Handbook 4155.1 REV. 5, Paragraph 2-10 C., states that "[a]n outright gift of the [required] cash investment is acceptable if the donor is ... a government agency ...." That paragraph also states a lender must determine that gift funds ultimately are provided from a source acceptable to FHA. Mortgagees have asked FHA to confirm the acceptability of downpayment assistance programs such as GAP. In light of PINFHA's representation that GAP complies with FHA requirements and inquiries from mortgagees asking FHA to confirm that representation, FHA is reviewing whether GAP, and similar programs, comply with FHA requirements.

FHA understands that its guidance on these programs is needed as soon as possible, but these facts and circumstances present a case of first impression that must be reviewed very carefully in order to provide a HUD response that would be available to all mortgagees. FHA's review of GAP continues to be given a high priority, but additional time is needed to complete that review and to develop (and circulate within HUD for clearance) an expression of HUD's position on GAP and similar programs that can be made available to all mortgagees participating in FHA single family mortgage insurance programs. FHA will use its best efforts to complete this review and issue its guidance within sixty (60) days. You will be contacted if additional information or supporting documentation is needed about GAP.

Sincerely,

Lily A. Lee
Deputy Assistant Secretary
for Single Family Housing

www.hud.gov      espanol.hud.gov

# EXHIBIT N



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN NATION<br>12 Wabanaki Way<br>Indian Island, ME 04468,      )<br>    )<br>PENOBSCOT INDIAN NATION ENTERPRISES )<br>12 Wabanaki Way     )<br>Indian Island, ME 04468     )<br>    )<br>and     )<br>    )<br>GLOBAL DIRECT SALES, LLC     )<br>7824 Cessna Avenue     )<br>Gaithersberg, MD 20879     ) | Case: 1:07-cv-01282<br>Assigned To : Friedman, Paul L.<br>Assign. Date : 07/18/2007<br>Description: ADMN AGENCY REVIEW |

Case: 1:07-cv-01282
Assigned To : Friedman, Paul L.
Assign. Date : 07/18/2007
Description: ADMN AGENCY REVIEW

PENOBSCOT INDIAN NATION
12 Wabanaki Way
Indian Island, ME 04468,                         )
                                                  )
PENOBSCOT INDIAN NATION ENTERPRISES )
12 Wabanaki Way                                   )
Indian Island, ME 04468                           )
                                                  )
and                                               )
                                                  )
GLOBAL DIRECT SALES, LLC                          )
7824 Cessna Avenue                                )
Gaithersberg, MD 20879                            )
                                                  )
                                                  )
                          Plaintiffs,             )     **COMPLAINT**
                                                  )
          -v-                                     )
                                                  )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION )
451 7th Street S.W. )
Washington, DC 20410 )
                                                  )
                                                  )
                          Defendants.             )
                                                  )

Plaintiffs, the Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC, by their attorneys Kantrowitz, Goldhamer and Graifman, P.C. and The Mason Law Firm, L.L.P., as and for their complaint against defendants, the Department of Housing and Urban Development *et al.*, allege as follows:

## SUMMARY OF THE ACTION

1.      The Penobscot Indian Nation is a federally recognized Native American Government which created The Grant America Program™, a government grant program that provides low to moderate-income homebuyers with a down payment grant to be used towards the purchase of a home.

2.      The Department of Housing and Urban Development ("HUD") is the federal agency that oversees the Federal Housing Administration. HUD regulations allow the use of gift funds from governmental agencies or public entities to a homebuyer for a down payment towards the purchase of a home. HUD has an express policy of "Consultation and Coordination with Indian Tribal Governments," which includes all HUD programs that have substantial direct effects on federally recognized Indian tribal governments. HUD also has a policy of not reviewing "downpayment programs operated by instrumentalities of government."

3.      Despite GAP's compliance with all HUD regulations, HUD has instructed plaintiffs and third-parties that the program does not comply with HUD regulations. HUD has done so despite the Penobscot Indian Nation's status as a governmental agency and public entity, the failure to consult with the Penobscot Indian Nation, the failure to obtain any program information from plaintiffs or even advise plaintiffs that a program review was being performed. HUD's actions were arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedures required by law and these actions have injured plaintiffs.

2

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 5 U.S.C. §§ 701-706 (Administrative Procedures Act).

5.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgment) because the Plaintiffs assert the Defendants are violating federal law.

6.    Venue is proper in the District Court for the District of Colombia pursuant to 28 U.S.C. 1391(e).

## PARTIES

7.    Plaintiff Penobscot Indian Nation ("PIN") is a federally recognized Native American Government located on the Penobscot River in the State of Maine.

8.    Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a tribal corporation of the PIN. PINE is a "Section 17" federally chartered Native American Corporation as defined under the Indian Reorganization Act of 1934, as amended, 25 U.S.C. 477 et. seq.

9.    Plaintiff Global Direct Sales, LLC ("GDS") is a Maryland limited liability company with its principal place of business located at 7824 Cessna Avenue, Gaithersburg, MD 20879.

10.    Defendant Department of Housing and Urban Development is the federal agency that oversees the Federal Housing Administration ("FHA"), including activities and programs that provide mortgage insurance and loan guarantees.

11.    Defendant Alphonso Jackson is the duly confirmed Secretary of HUD and is responsible for the administration and enforcement of all HUD policies and procedures, including those pertaining to down payment assistance programs.

3

12.    Defendant Roy A. Bernardi is the duly confirmed Deputy Secretary of HUD and is responsible for the administration and enforcement of HUD policies and procedures, including those pertaining to down payment assistance programs.

13.    Defendant Brian Montgomery is a duly confirmed Assistant Secretary of HUD and commissioner of the FHA and is responsible for the administration and enforcement of HUD and FHA policies and procedures, including those pertaining to down payment assistance programs.

## FACTS

A.    **PIN is Governmental Agency and Public Entity**
      **Which Created a Down Payment Assistance Program**

14.    Pursuant to 25 U.S.C §§ 1723 et seq., PIN is a federally recognized Native American Government.

15.    On January 24, 2007, the PIN Tribal Counsel passed Resolution 01-24-07-01, creating the PIN Fair Housing Administration and allowing a national down payment assistance program to benefit low to moderate-income homebuyers across America.

16.    PIN, PINE and GDS entered into an Agreement to develop, organize and operate a down payment assistance program ("DPA") wholly owned by PIN. PIN is the source of all funds provided to the homebuyer under GAP.

17.    As a federally recognized Native American Government, PIN is a "governmental agency and public entity" as defined by HUD.

18.    HUD's Tribal Government-to-Government Consultation Policy provides that "HUD recognizes and commits to a government-to-government relationship with Federally-recognized tribes."

4

**B.    Governmental Agencies and Public Entities
       Can Provide Gifts Towards Down Payments**

19.    GAP fully complies with HUD regulations because HUD regulations allow gift

funds from governmental agencies and public entities to be used as a down payment towards the

purchase of a home.

20.    HUD expressly allows gift funds from a governmental agency or public entity that

has a program to provide homeownership assistance.  HUD Handbook 4155.1 Rev (5), Section 3,

2-10, ¶ 3 (emphasis added), provides:

> Gift Funds.  An outright gift of the cash investment is acceptable if
> the donor is the borrower's relative, the borrower's employer or
> labor union, a charitable organization, a governmental agency or
> public entity that has a program to provide homeownership
> assistance to low- and moderate-income families or first-time
> homebuyers, or a close friend with a clearly defined and
> documented interest in the borrower.

21.    HUD regulations provide that "Federal, State and local government agencies . . .

may provide secondary financing for the borrower's *entire cash investment.*"  HUD Handbook

4155.1 Rev (5), Section 5, 1-13, ¶ A (italics in original).

22.    HUD's stated Tribal Government-to-Government Consultation Policy reaffirms

HUD's:

> commitment to operate within a government-to-government
> relationship with federally recognized American Indian and Alaska
> Native tribes, and to advance self-governance for such tribes.
> http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm

23.    On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's

operated by Governmental Agencies and Nonprofits using subordinate financing.  Mortgagee

Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs.

24.    GAP complies with HUD regulations because HUD allows down payment assistance from governmental agencies and public entities and recognizes PIN as a governmental agency and public entity.

## C.    HUD's Policies Regarding Program Review and Tribal Consultations

25.    HUD maintains a policy of not reviewing downpayment assistance programs operated by governmental agencies and public entities and consulting with federally recognized Indian tribes regarding HUD policies and programs that substantially effect federally recognized Indian tribal governments. Despite these policies and GAP's compliance with HUD regulations, HUD has notified plaintiffs' and third parties that GAP does not comply with HUD regulations.

26.    HUD's "Downpayment Assistance Through Secondary Finance Providers (DPA)" policy provides that no approval is necessary or provided for government entity down payment assistance programs. The policy states:

> **Government Entity DAPs:** No approval is required for Government Entities that provide secondary financing in the form of a lien in conjunction with an FHA first mortgage lien. HUD does not maintain a list of Government Entity DAP providers. http://www.hud.gov/offices/hsg/sfh/np/sfhdap01.cfm

27.    On May 7, 2007, HUD advised plaintiffs in writing that "HUD does not review downpayment programs operated by instrumentalities of government."

28.    HUD's stated "Tribal Government-to-Government Consultation Policy" provides that:

> The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent

6

permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

**D.    HUD's Conduct**

29.    Contrary to HUD rules, regulations and policies, HUD has improperly advised plaintiffs and third parties that GAP does not comply with HUD regulations, despite its compliance, HUD's policy not to review such programs and the failure to consult with plaintiffs or receive any input from plaintiffs regarding GAP.

30.    In March 2007, Brenda Bellisario at the Philadelphia Homeownership Center, advised GMAC Bank, that GAP did not meet HUD Guidelines. GMAC advised plaintiffs that "HUD indicated that this program did not appear to meet their guidelines based on what was submitted. . . .This program request is denied."

31.    During a March 2007 telephone conversation, John Ertle at the Connecticut HUD office advised Christopher Russell, Director of GDS that GAP did not meet HUD guidelines, but was unable to identify a regulation with which GAP did not comply.

32.    On May 30, 2007, Elaine A. Roberts, a HUD employee at the Denver Homeownership Center, wrote the following regarding GAP:

Here is what our legal dept. said:

The present status is that HQ Housing has instructed the HOCs [Homeownership Centers] in the interim that this program is not an acceptable source of down payment gift funds although the program is under review in HQ. This program will probably be killed by the new proposed reg published on 5/11 for comment that will, if adopted as written, prohibit any gift funds from coming from the seller 'before during or after the closing.'

7

33.   To date, no new regulation has been adopted which affects GAP's compliance with HUD regulations.

34.   Before making these statements, HUD had not contacted PIN, PINE or GDS regarding a program review or requested any information regarding GAP.  Accordingly, any program review was being conducted without any input from or consultation with plaintiffs, including PIN.

35.   HUD is currently performing over 20,000 FHA loan transactions per month and 240,000 loan transactions per year, with similarly operated nonprofit DPA programs, which are not governmental agencies or public entities.

36.   HUD actions, including, but not limited to, the Denver, Connecticut and Philadelphia Homeownership Center, have improperly interfered with Plaintiffs' DPA.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

37.   Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

38.   There is a justiciable issue involving the parties which requires a declaration of the parties' rights.

39.   Plaintiffs seek a declaration that GAP complies with HUD regulations.

## SECOND CAUSE OF ACTION
### (Violation of the Administrative Procedure Act)

40.   Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

41.   Defendants' actions regarding plaintiffs and GAP were arbitrary, capricious, and abuse of discretion, not in accordance with law and without observance of procedure required by law, all in violation of the APA.

42.   As a result of defendants' wrongful actions, plaintiffs have been injured.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

43.   Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

44.   The Trade and Intercourse Act of 1790, Act July 22, 1790, c. 33, 1 Stat. 137, now covered by the Indian Trade Commission Act, § 2(3), 25 U.S.C.A. § 70a (3), established a fiduciary relationship between Indians and United States Government.

45.   Defendants actions have breached their fiduciary duty to Plaintiffs PIN and PINE.

46.   Defendants' breach of their fiduciary duty was a substantial factor in causing plaintiffs' damages.

47.   As a result of Defendants' wrongful actions, plaintiffs have been injured and are entitled to compensatory and punitive damages.

### FOURTH CAUSE OF ACTION
### (Injunctive Relief)

48.   Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

49.   Defendants' conduct has improperly interfered with plaintiffs' GAP causing injury to plaintiffs.

50.   Defendants should be permanently enjoined from interfering with GAP.

9

51.    The grounds for an injunction are present therein, including the fact that plaintiffs have a likelihood of success on the merits; irreparable harm will be done if the injunction is denied; the balance of the equities is in favor of granting the injunction and plaintiffs have been injured by defendants' action and will continue to be injured absent the requested injunctive relief.

**WHEREFORE**, plaintiffs demand judgment as follows:

a)    On their first cause of action, declaring that GAP is compliant with HUD regulations and awarding costs, attorneys' fees and other relief;

b)    On their second cause of action, declaring that defendants' conduct violated and continues to violate the administrative procedures Act and awarding appropriate damages, costs and attorneys' fees and other relief;

c)    On their third cause of action, declaring that defendants breached their fiduciary duty and awarding compensatory and punitive damages, costs, attorneys' fees and other relief;

d)    On their fourth cause of action, enjoining defendants from interfering with GAP, costs, attorneys' fees and other relief; and

e)    For such other, further and different relief as the court deems just and proper.

Dated:  July 18, 2007

RESPECTFULLY SUMITTED,
**THE MASON LAW FIRM, L.L.P.**

Gary E. Mason
DC Bar #418073
1225 19th Street NW. Suite 500
Washington, D.C. 20036
(202) 429-2290

Michael Braunstein
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570
Attorneys for Plaintiffs

10

# EXHIBIT O



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING                    **July 25, 2007**

Michael L. Braunstein, Esq.
Kantrowitz, Goldhamer & Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY  10977-6216

Dear Mr. Braunstein:

We are reviewing the Penobscot Indian Nation Fair Housing Administration (PINFHA) downpayment assistance program known as the Grant America Program$^{TM}$ (GAP). To facilitate our review, additional information is necessary.

We have obtained a copy of the PIN tribal council resolution 01-24-07-01, dated January 29, 2007. That resolution makes reference to an attached "Agreement" between the PIN, Penobscot Indian Nation Enterprises (PINE), and Global Direct Services (GDS) regarding the formation of the GAP. The agreement, however, was not attached to the copy of the resolution provided to us. We understand that the agreement outlines the business terms among PIN, PINE, and GDS for the GAP. The agreement will assist us in understanding more clearly the GAP and the business relationships among the parties. Please send us a copy of that Agreement.

Please provide us with supporting documentation and/or a written explanation of the following:

(1) The respective roles of PIN, PINE, and GDS in the operation of PINFHA and GAP (i.e., describe the responsibilities and the flow of funds among these parties).
(2) The terms "managing partner" and "program provider" for purposes of the GAP.

FHA's review of GAP and similar programs is a high priority for HUD, and your expeditious submission of the requested information will assist in that review.

Sincerely,

Lily A. Lee
Deputy Assistant Secretary
  for Single Family Housing

# EXHIBIT P

LAW OFFICES

# KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.

PAUL B. GOLDHAMER*
BARRY S. KANTROWITZ†
GARY S. GRAIFMAN*
RANDY J. PERLMUTTER*
─────
WILLIAM T. SCHIFFMAN*
REGINALD H. RUTISHAUSER*
JOHN M. CHAKAN*
RISA K. JAMESON**
MICHAEL L. BRAUNSTEIN*

OF COUNSEL
SHARON M. KANTROWITZ*
STEVEN B. ROTHSCHILD**

* N.Y. & N.J. BAR
† N.Y., N.J. & FLA. BAR
** N.Y. BAR ONLY

747 CHESTNUT RIDGE ROAD - SUITE 200
CHESTNUT RIDGE, NEW YORK 10977-6216

(845) 356-2570
FAX # (845) 356-4335
www.kgglaw.com

July 30, 2007

AFFILIATE
─────
KANTROWITZ, GOLDHAMER & GRAIFMAN
NEW JERSEY
210 SUMMIT AVE.
MONTVALE, N.J. 07645
(201) 391-7000
FAX # (201) 307-1086

## BY REGULAR MAIL &
## FACSIMILE:(202) 708-1826

Lily A. Lee, Esq.
Deputy Assistant Secretary
 for Single Family Housing
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

> Re:    The Penobscot Indian Nation et al. v. U.S. Department of
> Housing and Urban Development et al.

Dear Ms. Lee:

I write to respond to your July 25, 2007 letter. As a month has passed since our meeting regarding GAP without a request from HUD for additional program information, I am surprised to hear that HUD, only after suit has been commenced, believes that additional information is necessary. Additionally, I believe that the House of Representatives' blocking of HUD's proposed rule banning seller funded DPA programs makes this matter moot, as HUD has not disputed GAP's compliance with current HUD guidelines since obtaining additional program information. Nonetheless, I am happy to oblige. Pursuant to your request, enclosed please find a copy of the Agreement between the Penobscot Indian Nation ("PIN"), Penobscot Indian Nation Enterprises ("PINE") and Global Direct Sales, LLC ("GDS") regarding GAP.

You also requested "supporting documentation and/or a written explanation of: 1) The respective roles of PIN, PINE and GDS in operation of PINFHA and GAP (i.e., describe the responsibilities and the flow of funds among the parties); and 2) The terms "managing partner" and "program provider" for purposes of the GAP." While I believe that the Agreement answers the above inquiries, I will also provide a written explanation.

PINFHA is an internal division of PIN. PINE and GDS do not have any role in the operation of PINFHA. Regarding GAP, pursuant to the Agreement and Tribal Resolution Number 01-24-07-01, PIN is the program provider. PIN provides a pre-existing pool of funds to be used as grants towards homebuyer's downpayments. The homebuyer's grant is wired to the

Lily A. Lee, Esq.
July 30, 2007
Page 2

settlement agent from a PIN bank account using funds solely owned by PIN. Home sellers are charged an enrollment fee for enrolling their homes in the program. The funds generated from that fee go to replenish the grant fund pool and any excess is the property of PIN.

PINE has the responsibility of hiring and overseeing contractors that process and market GAP for PIN. GDS provides processing services and software and database management for administering GAP. GDS is obligated to train and provide the infrastructure for processing services to PINE, upon request.

For the purposes of the homebuyers' gift funds or grants and the sellers' enrollment fee, there is no "flow of funds among the parties". All gift funds are provided by PIN and PIN receives the enrollment fees from the sellers. GAP operates identically to the Nehemiah Program in function, with the exception that the gift is from PIN and not a 501(c)(3) entity. As I am sure you are aware, the Nehemiah program received a HUD approval letter in April 1998.

The compensation arrangement between the parties is set forth in the Agreement. In sum, PIN receives 20% of the difference between each DPA gift and Enrollment Fee and GDS receives the aggregate enrollment fees, minus gifts disbursed, the amount received by PIN and processing fees.

I trust this adequately supplies the requested information. If you believe that any other information is necessary for FHA's review of GAP, kindly advise of the same in writing immediately.

KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.

By:

Michael L. Braunstein

Enclosure

cc:     Bruce S. Albright, Esq. (via fax)
        John J. Daly, Esq. (via fax)
        Christopher Russell, Director (via email)
        Gary E. Mason, Esq. (via email) (all with enclosure)