## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, | ) | |
| PENOBSCOT INDIAN NATION ENTERPRISES, and | ) | |
| GLOBAL DIRECT SALES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1282 (PLF) |
| | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND | ) | |
| URBAN DEVELOPMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6), Defendants United States Department of Housing and Urban Development ("HUD"), Alphonso Jackson, Secretary of Housing and Urban Development, Roy A. Bernardi, Deputy Secretary of Housing and Urban Development, and Brian Montgomery, Assistant Secretary of Housing and Urban Development and Commissioner of the Federal Housing Administration respectfully move to dismiss the complaint in this case for lack of subject matter jurisdiction and for failure to state a claim for which relief can be granted. Plaintiffs' claims are not ripe for judicial review. In addition, Plaintiffs have failed to identify a final agency action under the Administrative Procedure Act ("APA"), so there is no waiver of sovereign immunity for the claims. There is also no waiver of sovereign immunity for Plaintiffs' monetary claims. Accordingly, this case should be dismissed because otherwise the Court's adjudication without the development of necessary facts would produce an improper advisory opinion.

The grounds for this motion are set forth in the accompanying memorandum and a proposed order is attached.

Dated:  September 26, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W – Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)

Of Counsel:
Louis J. Giola, Department of Housing and Urban Development

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PENOBSCOT INDIAN NATION, ) | |
| PENOBSCOT INDIAN NATION ENTERPRISES, and ) | |
| GLOBAL DIRECT SALES, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-1282 (PLF) |
| ) | |
| ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND ) | |
| URBAN DEVELOPMENT, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**Introduction**

This case presents a premature legal challenge to a policy currently being developed by the Department of Housing and Urban Development ("HUD"). The policy relates to restrictions on the sources for cash gifts to borrowers where the funds are used to satisfy the cash investment requirement for home mortgages insured by the government. In recent years, concerns have developed that new loan product services involving charitable organizations providing down payment assistance to a home buyer while simultaneously receiving an equivalent payment from the home seller could be used to obtain mortgages for people who could not otherwise qualify for them and to circumvent the statutory requirement that the homeowners be personally invested in the property.

Plaintiffs provide downpayment assistance services to "low to moderate income homebuyers across America" (Complaint, ¶ 15) without limitation to membership in the Penobscot Indian Nation. Plaintiff Penobscot Indian Nation ("PIN") describes itself as "a

federally recognized Native American Government located on the Penobscot River in the State of Maine." Complaint, ¶ 7. PIN claims to have created The Grant America Program ("GAP"), described by Plaintiffs as "a [Native American] government grant program that provides low to moderate-income homebuyers with a downpayment grant to be used toward the purchase of a home." Id. ¶ 1. Plaintiff Penobscot Indian Nation Enterprises ("PINE") describes itself as "a tribal corporation of the PIN." Id. ¶ 8. Plaintiff Global Direct Sales, LLC ("GDS") describes itself as "a Maryland limited liability company." Id. ¶ 9.

Plaintiffs filed this action on July 18, 2007, seeking to challenge alleged HUD statements to Plaintiffs and third-parties that GAP does not comply with HUD regulations. Id. ¶¶ 29-32. Plaintiffs seek a declaration that GAP complies with HUD regulations as well as compensatory and punitive damages on the theory that the alleged statements constitute a breach of fiduciary duty. Id. ¶¶ 39, 47. HUD is currently reviewing these types of programs generally and no final decision has yet been reached on either how HUD will treat GAP or other similar existing entities. Because there is no final agency action to challenge, Plaintiffs' action is premature. Plaintiffs' other claims fail for lack of any fiduciary relationship and the absence of a waiver of sovereign immunity. Accordingly, Defendants now move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim for which relief can be granted.

## BACKGROUND

The Federal Housing Administration was created by the National Housing Act in 1934 for the purpose of insuring mortgage lenders against monetary default by borrowers on their mortgage loans. 48 Stat. 1246 (1934). In 1965, Congress created HUD, and transferred to the Secretary of HUD all of the functions, powers and duties of the Federal Housing Administration. Department of Housing and Urban Development Act ("HUD Act"). 42 U.S.C. §§ 3532 & 3533.

Section 4(b) of the HUD Act also provides:

> There shall be in the Department a Federal Housing Commissioner, who shall be one of the Assistant Secretaries, who shall head a Federal Housing Administration within the Department, who shall have such duties and powers as may be prescribed by the Secretary, and who shall administer, under the supervision and direction of the Secretary, departmental programs relating to the private mortgage market. The Secretary shall ensure, to the extent practicable, that managers of Federal Housing Administration programs at each level of the Department, shall be accountable for program operation, risk management, management of cash and other Federal assets, program financing related to activities over which such managers have responsibility.

Pursuant to § 203(b)(9) of the National Housing Act, 12 U.S.C. § 1709(b)(9), one of the requirements for a mortgage to be eligible for insurance is that it be executed by a mortgagor who shall have paid a downpayment of at least three percent, or such larger amount as the Secretary may determine, of the Secretary's estimate of the cost of acquisition.[1] Section 203.19 of FHA's Single Family Regulations, 24 CFR § 203.19, is captioned "Mortgagor's minimum investment," but does nothing more than repeat the language of §203(b)(9) of the National Housing Act . HUD Handbook 4155.1, Rev 5, Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties, which mortgage lenders are required to follow, permits, at Paragraph 2-10. C., gifts to borrowers to be used to meet this cash investment requirement, as follows:

> C. Gift Funds. An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower. The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them. Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price. No repayment of the gift may be expected or implied. (As a rule, we are not concerned with how the donor obtains the gift funds provided

---

[1] Section 203(b)(9) contains some exemptions from the downpayment requirement, but they are not relevant to the claims in this case.

they are not derived in any manner from a party to the sales transaction. Donors may borrow gift funds from any other acceptable source provided the mortgage borrowers are not obligors to any note to secure money borrowed to give the gift.)  This rule also applies to properties of which the seller is a government agency selling foreclosed properties, such as the Veterans Administration or Rural Housing Services.  Only family members may provide equity credit as a gift on a property being sold to other family members.  These restrictions on gifts and equity credit may be waived by the jurisdictional HOC provided that the seller is contributing to or operating an acceptable affordable housing program.

In addition to describing the types of persons or entities that can make gifts for the buyer's cash investment, this section also places qualifications on the source of funding for the gift, on the relationship between the donor and buyer, and other restrictions on acceptable gifts.

The purposes of these qualifications and restrictions and the concerns they attempted to avoid were expressed in a 2005 Government Accountability Office report entitled "Mortgage Financing Actions Need to Help FHA Manage Risks from New Loan Products," which stated that seller-related contributions could contribute to an overvaluation of the price of the property. GAO report at 16.  Exhibit A.[2]  In May 2006, the Internal Revenue Service ("IRS") issued

---

2 When subject matter jurisdiction is challenged under Fed. R. Civ. P. 12(b)(1), the Court may consider evidentiary material outside of the pleadings without treating the motion as one for summary judgment.  Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947); Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); Herbert v. National Academy of Sciences, 974 F.2d 192, 197-98 (D.C. Cir. 1992); Bonterra America, Inc. v. Bestmann, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995).  In addition, courts applying Rule 12 have made "exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  Schultz v. Braga, 290 F.Supp.2d 637, 651 n.8 (D. Md. 2003) (citing Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)); see also Papasan v Allain, 478 U.S. 265, 268 n. 1 (1986) (although case was before the Supreme Court on a motion to dismiss under Rule 12(b)(6), judicial notice could be taken of items in public record, such as the documentation of a history of school grants); United States ex rel Willard v. Humana Health Plan of Texas, Inc., 336 F.3d 375, 379 (5th Cir. 2003); New England Health Care Employees Pensions Fund v. Ernst & Young, LLP, 336 F. 3d 495, 501 (6th Cir. 2003); cert. denied, 540 U.S. 1183 (2004).  Even where documents are not attached to or incorporated by reference in a complaint, a defendant may

Revenue Ruling 2006-27, which provides guidelines as to downpayment assistance to homebuyers that do not qualify for tax-exempt status by the donor. Ex. B. The IRS stated that when a charitable organization provides down payment assistance to a home buyer, and also receives a payment from the home seller that directly correlates to the amount of the down payment assistance the charitable organization provides to the home buyer, the payment received by the home buyer does not qualify for exclusion from gross income as a gift under section 102 of the Internal Revenue Code. Id. The payment does not proceed from detached and disinterested generosity, but rather is in response to an anticipated economic benefit, namely facilitating the sale of a seller's home. Such a payment is not a gift for purposes of section 102, but rather represents a rebate or purchase price reduction. Id. Moreover, a study performed by an FHA consultant found that these types of "gifts" resulted in inflated sales prices and inflated mortgages, which led to an increase in the severity of insurance claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages. Concentrate Consulting Group, C-OPC-22550/M0001, "An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations," 2005, Ex. C.

One consequence of the Revenue Ruling is that some organizations are now funding governmental entities for the purpose of making gifts to borrowers, and the sellers then pay these organizations. On May 11, 2007, FHA published in the Federal Register a proposed rule that would prohibit all seller-funded downpayment assistance based on NPHDC-type programs. 72 Fed. Reg. 27048, et seq. (May 11, 2007). The rule has not yet been adopted. Comp. ¶ 33. This proposed rule would not prohibit government entities from making gifts as long as such gifts are

---

submit an "indisputably authentic copy" which the Court may consider in ruling if the documents are referred to in the complaint and central to plaintiff's claim. MacArthur v. San Juan County, 309 F.3d 1216, 1221 (10th Cir. 2002), cert. denied sub nom. Riggs v. San Juan Co., 539 U.S. 902 (2003).

not ultimately funded by sellers.  Inasmuch as there were approximately 7,000 comments received with regard to the proposed rule, FHA is still developing the final rule and has not made a final decision with regard to tribal governments.  72 Fed. Red. 37500 (July 10, 2007).

Neither Paragraph 2-10. C. of Handbook 4155.1, nor the proposed rule, define "government," and FHA has had inquiries from lenders and tribal governments—including the Penobscot Indian Tribe—as to whether tribal governments are included in the term "government."  HUD has also received comments on the proposed rule that address this issue.

On July 6, 2007, in response to correspondence by plaintiffs' counsel of June 27, 2007 and June 29, 2007, Exhibit D, HUD's Deputy Assistant Secretary for Single Family Housing, Lily A. Lee, informed Plaintiffs' counsel that "[i]n light of [Penobscot Indian Nation Fair Housing Administration's] representation that GAP complies with FHA requirements and inquiries from mortgagees asking FHA to confirm that representation, FHA is reviewing whether GAP, and similar programs, comply with FHA requirements."  Ex. E. Ms. Lee added that "FHA will use its best efforts to complete this reviewand issue it's guidance within sixty (60) days."  Ex. E.  Plaintiffs responded on July 9, 2007, demanding a compliance letter from HUD for the GAP program.  On July 12, 2007, HUD confirmed that "FHA's review of GAP remains a high priority at HUD" and that guidance on acceptable downpayment assistance will be issued.  Ex. F.  Plaintiffs commenced this action on July 18, 2007.

## ARGUMENT

### I.    STANDARDS OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move to dismiss a complaint where the court "lack[s] jurisdiction over the subject matter."  The plaintiff bears the burden of establishing that this Court has subject matter jurisdiction. See Lujan v. Defenders of

Wildlife, 504 U.S. 555 (1992). When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the allegations of the complaint must be construed in favor of the pleader. See Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). The Court need not accept factual inferences drawn by the plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions. See Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

To make out a claim, the factual allegations "must be enough to raise a right to relief above the speculative level," and a plaintiff must make "a 'showing,' rather than a blanket assertion, of entitlement to relief.'" Bell Atlantic Corp. v. Twombly, --- U.S. —, 127 S. Ct. 1955, 1964-65 (2007). Thus, although the factual allegations of the complaint must be taken in the light most favorable to plaintiffs, and all ambiguities or doubts in the factual allegations must be resolved in favor of the pleader, id., the complaint must set forth sufficient factual information to suggest that there exists some recognized legal theory upon which relief can be granted. Caudle v. Thomason, 942 F. Supp. 635, 638 (D.D.C. 1996).

## II.    PLAINTIFFS' CLAIMS FAIL FOR LACK OF SUBJECT MATTER JURISDICTION

### A.    Plaintiffs Lack Standing

To establish constitutional standing, a plaintiff must satisfy three requirements: First, a plaintiff must show an "injury-in-fact," which is defined as "an invasion of a legally protected interest that is (a) concrete and particularized [meaning that the injury must affect the plaintiff in a personal and individual way], and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 & n.1(citations and quotation marks omitted); see also Warth v. Seldin,

422 U.S. 490, 508 (1975); <u>Sierra Club v. Morton</u>, 405 U.S. 727, 740-41 n.16 (1972).  Second, the

plaintiff must demonstrate a "causal connection between the injury and the conduct complained

of."  <u>Lujan</u>, 504 U.S. at 560.  This means that the injury has to be "fairly . . . trace[able] to the

challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

third party not before the court."  <u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41-42

(1976).  Third, the injury in question must be redressable by the relief sought by the complaint.

This means that it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be

'redressed by a favorable decision.'" <u>Lujan</u>, 504 U.S. at 561 (quoting <u>Simon</u>, 426 U.S. at 38); <u>see</u>

<u>also</u> <u>Allen</u>, 468 U.S. at 750-51.

     In addition to the constitutional requirements for standing, the Court must consider

whether any prudential limitations should restrain it from exercising its judicial power.  <u>See</u>

<u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99 (1979).  Among the prudential

limitations identified by the Supreme Court are the doctrines that (1) a plaintiff cannot rest his

claim to standing on the rights and interests of third-parties, <u>Lujan</u>, 504 U.S. at 562; <u>Simon</u>, 426

U.S. at 44-45; <u>Warth</u>, 422 U.S. at 499; (2) the plaintiff must be in the zone of interests meant to

be protected by the statute in question, in order to have standing to challenge the government's

application of the statute, <u>Office of Workers' Compensation Programs v. City of Newport News</u>,

514 U.S. 122, 127 (1995); and (3) a plaintiff cannot rely on a generalized grievance shared by a

large segment of the populace in order to establish standing to raise the grievance, <u>Gladstone</u>

<u>Realtors</u>, 441 U.S. at 100; <u>Warth</u>, 422 U.S. at 499.  <u>See also</u> <u>McKinney v. United States Dep't of</u>

<u>Treasury</u>, 799 F.2d 1544, 1550-51 (Fed. Cir. 1986).  In the context of action by federal agencies,

the Supreme Court has emphasized that judicial review of broad legislative mandates, such as

protection of public health, is limited:

> The principal purpose of the APA limitations we have discussed . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved – which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 66-67 (2004).

Here, Plaintiffs have failed to allege any actual or concrete injury. Although they have alleged that government officials in regional offices made certain statements questioning the compliance of GAP with federal housing regulations, the only allegation of harm is "impoper[] interfere[nce] with Plaintiffs'" downpayment assistance program. See Complaint, ¶ 36. Plaintiffs have not alleged either that the downpayment assistance program generates financial profits or gains or that a single home mortgage has been denied because the funds for the downpayment were supplied by Plaintiffs. Thus, the injury is purely speculative. Moreover, the interests of the homebuyers and the taxpayers whose funds would be used to satisfy any defaults, and not Plaintiffs', are those within the zone of interests of the statutes, and Plaintiffs may not rely on those third-party interests to establish standing.

Plaintiffs' nervous anticipation of possible guidance or policy statements in the future from HUD are not enough to trigger this Court's jurisdiction. Because the utterance of statements of noncompliance alone is insufficient to cause a concrete injury, Plaintiffs lack standing and this case should be dismissed. See Laird v. Nelms, 406 U.S. 797 (1972) (no strict liability against the federal government).

**B.    Plaintiffs' Claims Are Not Ripe**

Plaintiffs have failed to meet their burden of establishing the ripeness of their claims.

The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Worth v. Jackson, 451 F.3d 854, 861 (D.C. Cir. 2000) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003).  The question of ripeness goes to the Court's subject matter jurisdiction. DKT Memorial Fund v. Agency for Int'l Dev., 887 F.2d 275 (D.C. Cir. 1989).

Here, Plaintiffs have filed suit before the agency has taken any final or definitive action,[3] seeking to compel the Court to enter an order directing the outcome of the agency's decision. Plaintiffs' action is particularly egregious, given the fact that HUD represented to them that it would act in the near future. Exs. E & F; Comp. ¶ 32. This untimely demand by Plaintiffs is fundamentally inconsistent with established principles of judicial review of agency action. To determine whether a claim is ripe, courts examine the "fitness of the issue for judicial decision" and the "hardship to the parties of withholding court consideration." Nat'l Park Hospitality Ass'n, 538 U.S. at 808; Worth, 451 F.3d at 861.

---

[3] Even if a final action occurs during the pendency of this litigation, Plaintiffs' claims would not be saved.  "When a court reviews claims for ripeness or standing to pursue a claim, such *review is conducted based on the facts that existed at the time the complaint was filed*." Ctr. for Sci. in the Public Interest v. FDA, 2004 U.S. Dist. LEXIS 20781, *8 (D.D.C. 2004) (emphasis added) (citing Arizonans for Official English v. Ariz., 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, [a] . . . controversy must be extant at all stages of review.")); Lujan v. Defenders of Wildlife, 504 U.S. 555, 569 n.4 (1992) (explaining that "the existence of federal jurisdiction ordinarily depends on facts *as they exist when the complaint is filed*" -- later fulfillment of the standing requirements does not give plaintiffs standing.) (emphasis in original); Sierra Club v. Dombeck, 161 F. Supp. 2d 1052, 1062 (D. Ariz. 2001) ("ripeness is determined at the time of the filing of the complaint"); Natural Law Party of the United States of Am. v. FEC, 111 F. Supp. 2d 33, 40 (D.D.C. 2000) ("standing is determined at the time the complaint is filed")).

    *1.   The issue is not currently fit for judicial decision.*

Under the "fitness of the issues" prong of ripeness review, a court will consider the "interests of the court and agency in postponing review until the question arises in some more concrete and final form." Cont'l Air Lines v. CAB, 522 F.2d 107, 125 (D.C. Cir. 1975). "The interest in postponing review is strong if the agency position whose validity is in issue is not in fact the agency's final position." Id. see also State Farm Mut. Auto Ins. Co. v. Dole, 802 F.2d 474, 480 (D.C. Cir. 1986), cert. denied, 480 U.S. 951 (1987).

Plaintiffs' allegations make clear that no final decision has been made. Plaintiffs point to a communication on May 30, 2007 from a HUD employee stating that: "The *present status* is that HQ Housing has instructed the HOCs [Homeownership Centers] *in the interim* that this program is not an acceptable source of down payment gift funds *although the program is under review in HQ*." Comp. ¶ 32 (emphasis added). As of the date Plaintiff filed the Complaint, HUD had issued no final decision, whether in the form of guidance, Mortgagee Letter, or any other communication to plaintiffs or third parties. Furthermore, FHA' proposed rule, 72 Fed. Reg. 27048, *et seq.*, that would prohibit all seller-funded downpayment assistance based on NPHDC-type programs, and thus may directly effect the consideration of the program at issue here, is still being developed into a final rule.

In determining a case's fitness for review, a court will also determine whether "resolution of the dispute is likely to prove unnecessary." State Farm, 802 F.2d at 479. Despite HUD's assurances to Plaintiffs that HUD will review the matter and reach a conclusion on the program at issue, Plaintiffs nonetheless filed this action. At a minimum, it is likely that a concrete finalized decision will alter the allegations in the complaint sufficiently enough as to alter the very nature of this lawsuit. The current complaint alleges a few specific statements made by

HUD employees in various offices across the country as the basis for Plaintiffs' claimed harm. Comp. ¶ 30-32. If these few statements are enough for this case to be fit for review, any future statements, especially including the Mortgagee Letter or Final Rule that will be issued by HUD, will give rise to the need for amended allegations, amended answers, and procedural confusion. The Court is entitled to the benefit of making a decision based on a concrete formalized decision supported by a full record, as opposed to sifting through a few, potentially inconsistent statements by HUD personnel to determine what HUD's policy might be.

      2.   *Withholding court consideration presents no additional hardship to the parties.*

      Plaintiffs cannot satisfy the "hardship" aspect of the ripeness inquiry. "It is well settled that for an institutional interest in deferral to be outweighed, postponing review must impose a hardship on the complaining party that is immediate, direct, and significant." State Farm, 802 F.2d 479-80. Plaintiffs' complaint does not indicate how, or to what extent, HUD's alleged conduct has "improperly interfered with Plaintiffs' [downpayment assistance plan]." Comp. ¶ 36. Only one allegation gives rise to the inference that a third-party lender's interpretation of alleged HUD statements caused them to deny the program request. Comp. ¶ 30. Even assuming the truth of this allegation, it is unclear from this allegation whether the lender's interpretation of HUD's statement was the sole reason for program denial or one factor out of many.

      Furthermore, it is unclear from the Complaint the significance of further delay on the Plaintiffs. Plaintiffs do not indicate, *inter alia*, the level of funding involved, the number of potential recipients, whether the recipients are tribal members or individuals unrelated to tribal interests, whether the program involved would be ready and able to begin distributing funds if not for the lack of immediate final HUD action. Postponing review cannot, therefore, fairly be

viewed as imposing a hardship inasmuch as plaintiffs have failed to quantify the harm they face. Consequently, plaintiff's claims are not ripe and should be dismissed.

### C.     There is No Final Agency Action

The APA empowers a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  But not everything an agency does is subject to judicial review, and Plaintiffs' claims fall outside the scope of the APA.  Here, Plaintiffs may not invoke the review provisions of the APA because they have failed to challenge an appropriate type of agency action.

Judicial review under the APA is limited to an "agency action" that is "final agency action" within the statute's meaning.  5 U.S.C. §§ 702, 704; Lujan, 497 U.S. at 882.  The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); Lujan, 497 U.S. at 882.  As a general matter, two conditions must be satisfied for agency action to be "final."  First, the agency action must mark the consummation of the agency's decision-making process; it must not be of a tentative or interlocutory nature.  Bennett v. Spear, 520 U.S. 154, 177-78 (1997); accord Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 483 (2004). Second, the action must be one by which rights or obligations have been determined or from which legal consequences flow.  Id.

In determining whether an action is a final agency action, the Court considers the statutory and regulatory setting, the nature of the agency action at issue under that scheme, whether the action is definitive and its effect upon the challenging party.  E.g., National Ass'n of Home Builders v. Norton, 415 F.3d 8, 16 (D.C. Cir. 2005); Reliable Automatic Sprinkler Co. v.

Consumer Prod. Safety Comm'n, 324 F.3d 726 (D.C. Cir. 2003); Barrick Goldstrike Mines, Inc.

v. Browner, 215 F.3d 45 (D.C. Cir. 2000); Appalachian Power Co. v. EPA, 208 F.3d 1015, 1023

(D.C. Cir. 2000); Ciba-Geigy Corp. v. U.S. EPA, 801 F.2d 430 (D.C. Cir. 1986).  Two

conditions must be satisfied. The agency's position must be "definitive'" and it must have "a

'direct and immediate. . . effect on the day-to-day business' of the parties."  Ciba-Geigy, 801 F.2d

at 436, quoting Federal Trade Comm'n v. Standard Oil Co., 449 U.S. 232, 239 (1980) (internal

quotes omitted).  Neither condition is satisfied here.  As a result, Plaintiffs fail to state any valid

claim.

### D.    This Court Lacks Jurisdiction Over Plaintiffs' Claims for Monetary Damages

This Court has no jurisdiction to hear the claims for the compensatory and punitive

damages prayed for here.  Comp. ¶ 47.  Pursuant to the Tucker Act, the Court of Federal Claims

has exclusive jurisdiction "to render judgment upon any claim against the United States founded

either upon the Constitution, or any Act of Congress or any regulation of an executive

department." 28 U.S.C. § 1491(a)(1).  The Tucker Act vests exclusive jurisdiction over such

claims against the United States in excess of $10,000 in the Court of Federal Claims.  See 28

U.S.C. § 1491(a)(1); Enters. v. Apfel, 524 U.S. 498, 521 (1998) ("Under the Tucker Act, the

Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the

United States for money damages exceeding $ 10,000 that is 'founded either upon the

Constitution, or any Act of Congress or any regulation of an executive department . . . .'"

(internal citations omitted)); National Asso. of Counties v. Baker, 842 F.2d 369, 373-74 (D.C.

Cir. 1988). See also, e.g., Begner v. United States, 428 F.3d 998, 1002 (11th Cir. 2005)("[u]nder

the Tucker Act, the Court of Federal Claims has exclusive jurisdiction for contracts in excess of

$10,000"); Friedman v. United States, 391 F.3d 1313, 1315 (11th Cir. 2004) (the Tucker Act

"requires that claims against the United States for amounts in excess of $10,000 founded on contracts with the United States must be brought in the Court of Claims"); Mark Dunning Indus., Inc. v. Cheney, 934 F.2d 266, 269 (11th Cir. 1991); Graham v. Henegar, 640 F.2d 732, 734 (5th Cir. 1981).

Here Plaintiffs demand judgment on their Third Cause of Action for compensatory and punitive damages.  Comp. ¶ 47.  Plaintiffs' theory of recovery is founded upon an Act of Congress, specifically the Trade and Intercourse Act of 1790, Act July 22, 1790, c. 33, 1 Stat. 137, now covered by the Indian Trade Commission Act, § 2(3), 25 U.S.C.A. § 70a (3).  Id. ¶ 44. Plaintiffs do not specify the amount of damages they seek.  Since the amount of damages is material to jurisdiction, and no amount is stated in the Complaint, Plaintiffs have failed to satisfy their burden of establishing subject matter jurisdiction.  Leveris v. England, 249 F. Supp. 2d 1, 4 (D. Me. 2003). See also Van Drasek v. Lehman, 762 F.2d 1065 (D.C. Cir. 1985).

To the extent that Plaintiffs seek damages for alleged constitutional violations against the individual defendants in their official capacities, these claims must be dismissed absent a waiver of sovereign immunity.  Meyer v. Reno, 911 F. Supp. 11 (D.D.C. 1996); Marshall v. Reno, 915 F. Supp. 426 (D.D.C. 1996); Deutsch v. Dep't of Justice, 881 F. Supp. 49, 55 (D.D.C. 1995). The inherent sovereign immunity of the United States protects it and its agencies [such as HUD] from suit absent express waiver.  See United States v. Nordic Village, 503 U.S. 30 (1992). Sovereign immunity also bars suits for money damages against officials in their official capacities for nondiscretionary acts absent a specific waiver by the government.  Clark v. Library of Congress, 750 F.2d 89, 101-02 (D.C. Cir. 1984).  Plaintiffs' Complaint does not contain any colorable basis for such a waiver and must be dismissed for lack of subject matter jurisdiction.

To the extent Plaintiffs are seeking monetary damages against individual agency officials in their official capacities, the lawsuit must be construed as against the United States. <u>Laury v. Greenfield</u>, 87 F. Supp. 2d 1210, 1213 (D. Kansas 2000) (relying on <u>Kentucky v. Graham</u>, 473 U.S. 159 (1985)). The United States, however, has not waived its immunity from constitutional tort lawsuits. <u>See</u> <u>Federal Deposit Insurance Corp. v. Meyer</u>, 510 U.S. 471, 475 (1994); <u>Deaf Smith County Grain Processors, Inc. v. Glickman</u>, 162 F.3d 1206, 1210 (D.C. Cir. 1998). The only waiver exposing the United States to tort liability is the Federal Tort Claims Act (28 U.S.C. §§ 2671-2680), which does not apply to constitutional torts. <u>Risley v. Hawk</u>, 918 F. Supp. 18 (D.D.C. 1996). The FTCA also bars imposition of punitive damages on the federal government in the circumstances of this case. 28 U.S.C. § 2674; <u>see</u> <u>Molzov v. United States</u>, 502 U.S. 301 (1992).

Moreover, interference with contracts is a tort and Plaintiffs have failed to allege that they timely filed an administrative claim with HUD. Thus, among other reasons, the Court lacks jurisdiction under the FTCA. <u>See</u> 28 U.S.C. § 2401(b); <u>see also</u> 28 U.S.C. § 2680(h) (interference with contract rights is an exception to the FTCA); <u>Art-Metal-U.S.A., Inc. v. United States</u>, 753 F.2d 1151, 1153-55 (D.C. Cir. 1985) (the United States cannot be held liable for plaintiff being in breach of any contract); <u>Cafeteria & Restaurant Workers Union v. McElroy</u>, 284 F.2d 173, 184 (D.C. Cir. 1960) (same). Accordingly, the Court lacks jurisdiction.

## II.  PLAINTIFFS' ACTION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

"The United States, as sovereign, is immune from suit save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." <u>Hercules Inc. v. United States</u>, 516 U.S. 417, 422 (1996) (quoting <u>United States v.</u>

Sherwood, 312 U.S. 584, 586 (1941)) (citations and internal punctuation omitted). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). Therefore, in analyzing whether Congress has waived the immunity of the United States, waivers must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires. McMahon v. United States, 342 U.S. 25, 27 (1951); Ruckelshaus v. Sierra Club, 463 U.S. 680, 685-86 (1983); Eastern Transp. Co. v. United States, 272 U.S. 675, 686 (1927). Accordingly, Plaintiffs may not maintain any claims against the Federal Defendants absent a waiver of sovereign immunity that covers those claims, and Plaintiffs are bound by any limitations, substantive or procedural, that any such waiver imposes. Dorsey v. U.S. Dept. of Labor, 41 F.3d 1551, 1555 (D.C. Cir. 1994) ("The federal government's waiver of sovereign immunity must be 'unequivocally expressed'" and may not be "judicially implied.").

### A. Plaintiffs Third Cause of Action Should be Dismissed Because There is No Waiver of Sovereign Immunity.

Plaintiffs' Third Cause of Action claims HUD breached a fiduciary duty to plaintiffs PIN and PINE. Comp. ¶ 45.[4] Plaintiffs claim this fiduciary duty was "established by the Trade and Intercourse Act of 1790, Act July 22, 1790, c. 33, 1 Stat. 137, now covered by the Indian Trade Commission Act, § 2(3), 25 U.S.C.A. § 70a (3)." Id. ¶ 44. The Act provided jurisdiction for the Indian Claims Commission to hear "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Indian Claims Commission Act, § 2(5), 60 Stat. 1049, 1050 (1946). However, this only applied to claims accruing before the effective date

---

4  Plaintiffs' Fourth Cause of Action seeks permanent injunctive relief premised on HUD's alleged interference with Plaintiffs' business. See Complaint, ¶¶ 49-50. This amounts to a request for a particular form of relief which is purely derivative of Plaintiffs' other claims. In other words, by itself, the Fourth Cause of Action fails to state a claim because it depends upon a demonstration of success on the merits of what appears to be an unexhausted and barred tort claim. National Ass'n of Psychiatric Health Systems v. Shalala, 120 F.Supp.2d 33, 44 (D.D.C. 2000) (foundation of any injunction is showing of success on the merits). In any event, it is clear that the Fourth Cause of Action fails to set forth a separate claim and should also be dismissed. Fed. R. Civ. P. 8(a); 12(b)(6).

of the Act.  Id.  Jurisdiction was placed in the Court of Claims for claims accruing after the date

of the Act which "aris[e] under the Constitution, laws, treaties of the United States, or Executive

orders of the President, or is one which otherwise would be cognizable in the Court of Claims if

the claimant were not an Indian tribe, band, or group." Id. at § 24.  This section merely provided

that "nothing contained in this section shall be construed as altering the fiduciary or other

relations between the United States and the several Indian tribes, bands, or groups." Act Aug. 13,

1946, ch. 959, § 24, 60 Stat. 1049.  This Act did not create any new fiduciary duties, especially

none that would be explicit enough to waive sovereign immunity. Gila River Pima-Maricopa

Indian Community v. United States, 140 F. Supp. 776, 780-81 (Ct. Cl. 1956).

Moreover, language about fiduciary relationships in section 24 was omitted when the

Judicial code was amended to incorporate section 24. Act of May 24, 1949, § 89, 63 Stat. 89, 102

(current version at 28 U.S.C. § 1505 (2007)); see Gila River Pima-Maricopa Indian Community,

140 F.Supp at 188 ("This amendatory enactment omitted all provisions of section 24 except the

first sentence.").  Furthermore, the Indian Trade Commission Act has since been entirely omitted

from the United States Code because the Indian Claims Commission was terminated on Sept. 30,

1978. Public Law No. 94-465, § 2, 90 Stat. 1990 (1976).  As a result, Plaintiffs have failed to

establish any current fiduciary duty owed by the United States to PIN and PINE under the Trade

and Intercourse Act of 1790.

Any fiduciary duty Plaintiffs claim are owed to them does not apply here.  The Trade and

Intercourse Act of 1790, Act July 22, 1790, c. 33, 1 Stat. 137, upon which Plaintiffs rely for the

establishment of a fiduciary relationship, not only expired "after the term of two years, and from

thence to the end of the next session of Congress, and no longer," § 7, but at most created only

fiduciary duties within the narrow requirements of the Act.  §1 ("That no person shall be

permitted to carry on any trade or intercourse with the Indian tribes, without license for that purpose .... [Licensee] shall enter into bond with one or more surities ... for the use of the United States, conditioned for the true and faithful observance of such rules, regulations and restrictions, as now are, or hereafter shall be made for the government of trade and intercourse with Indian Tribes."); § 2 (granting government "full power and authority to recall all such licenses"); § 3 (persons without a license found trading with Indian tribes shall forfeit the merchandise "one half to the benefit of the person prosecuting, and the other half to the benefit of the United States"); § 4 ("That no sale of lands made by any Indians ... shall be valid" except "under authority of the United States."); § 5 (establishing criminal jurisdiction and for non-Indians committing crimes on Indian land); § 6 (setting criminal procedures for above offenses). To the extent that the Act has been "[p]eriodically renewed and remain[s] substantially in force today, see Rev. Stat. § 2116, 25 U.S.C. § 177," the Act still only "bars sales of tribal land without the acquiescence of the Federal Government." City of Sherrill v. Oneida Indian Nation, 544 U.S. 197, 205 (2005) (internal citation omitted). See Oneida Indian Nation v. New York, 691 F.2d 1070 (2d Cir. 1982) (referring to 25 U.S.C. § 177 as the current codification of 1 stat. § 137); Joint Tribal Council of Passamaquoddy Tribe v. Morton, 388 F. Supp. 649 (D. Maine 1975). This case does not involve any claims implicating the sale of tribal lands.

Even if there were a fiduciary relationship, it would not subject the United States to monetary damages if an "Act does not unambiguously provide that the United States has undertaken full fiduciary responsibilities." United States v. Mitchell, 445 U.S. 535, 542 (1980). There must exist "substantive obligations imposed on the United States by those statutes and regulations" to create a fair inference of a fiduciary relationship "enforceable by damages." United States v. White Mt. Apache Tribe, 537 U.S. 465, 473-76 (2003). The only substantive

obligations have been found in instances where the United States holds property, whether land or money, as trustee, in trust for the benefit of the beneficiary Indian Tribe. Shoshone Indian Tribe of the Wind River Reservation v. United States, 52 Fed. Cl. 614, 624-625 (2002). It is the traditional trustee/beneficiary relationship which gives rise to a claim for damages. In finding a fair inference of a fiduciary relationship between an Indian tribe and the United States, which waived sovereign immunity, the Supreme Court based its reasoning on "elementary trust law, [which] after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets." White Mt. Apache Tribe, 537 U.S. at 475 (internal punctuation and citations omitted) (quoting Restatement 2nd of Torts ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property.")).

There can be no fair inference of a fiduciary relationship relating to the issues here which would waive sovereign immunity. While Plaintiffs are entitled to all favorable inferences that can be drawn from his factual allegations, Warth v. Seldin, 422 U.S. 490, 501 (1975), the Court need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint. Kowal, 16 F.3d at 1276. Further, while the Court must accept the Plaintiffs' allegations of fact as true, the Court is not required to accept as correct the conclusions Plaintiffs would draw from such facts. Taylor v. Federal Deposit Ins. Corp., 132 F.3d 753, 762 (D.C. Cir. 1997); Nat'l Treasury Employees Union, 101 F.3d at 1430. Nor must a court "accept legal conclusions cast in the form of factual allegations." Kowal, 16 F.3d at 1276; see also Papasan v. Allain, 478 U.S. 265, 286 (1986).

Here, Plaintiffs allege no facts that support a finding of waiver of sovereign immunity. Their statement that there is a fiduciary relationship with regard to the issues here is merely a legal conclusion cast as a factual allegation. Taiwo Okusami v. Psychiatric Institute of Washington, Inc., 959 F.2d 1062, 1069 (D.C. Cir. 1992) (while court must accept plaintiff's allegations of fact as true, it is not required to accept as correct the legal conclusions plaintiff would draw from such facts) (Sentelle, J., concurring in part and dissenting in part). Furthermore, there is no waiver of sovereign immunity located anywhere in the law which would be effective here because this situation does not fall into the traditional fiduciary relationship between Indian tribes and the United States.

In this case, there is no property being held in trust and there is no corpus that can be identified, which is a necessary component of forming a trust. United States v. Mitchell, 463 U.S. 206, 225 (1983) ("All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds."). Plaintiffs merely allege that HUD actions interfered with Plaintiffs' downpayment assistance program. HUD is not holding funds or any other property in trust. HUD is not in possession of any land related to this program. There simply is no trustee/beneficiary relationship which is necessary to give rise to a claim for breach of fiduciary duties owed from the United States to Indian Tribes. Additionally, Plaintiffs' Complaint does not give HUD the necessary notice of what the claims are against it or what relief can be granted. Fed. R. Civ. P. 8.

### B.     Plaintiffs Cannot Maintain Suit Under the APA, Which Provides the Only Possible Waiver of Sovereign Immunity.

The APA provides the only waiver of sovereign immunity available to Plaintiffs for their challenges to alleged federal actions, but it does not provide for monetary damages. 5 U.S.C. §

702. Before the APA can be used as a basis for judicial review, Plaintiffs bear the burden of identifying a final agency action taken by HUD. Because the alleged actions of HUD in the complaint do not constitute any final agency action and since HUD has not yet issued a final determination on whether PIN's GAP is a proper downpayment assistance plan, Plaintiffs have not met their burden.

In addition to the APA, 5 U.S.C. § 701-706, Plaintiffs allege jurisdiction on the basis of 28 U.S.C. §§ 1331 and 2201. Compl. ¶¶ 4-5. However, neither of these statutory provisions waives the United States' sovereign immunity. C&E Services, Inc. of Washington v. District of Columbia Water and Sewer Authority, 310 F.3d 197, 201 (D.C. Cir. 2002) ("[W]e begin with the well-established rule that the Declaratory Judgment Act 'is not an independent source of federal jurisdiction.'") (quoting Schilling v. Rogers, 363 U.S. 666, 677 (1960) (citing Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950) (the Declaratory Judgment Act, 28 U.S.C. § 2201, is "procedural only" and does not constitute a waiver of sovereign immunity because "[j]urisdiction in this sense was not altered by the Declaratory Judgment Act.")); Swan v. Clinton, 100 F.3d 973, 977 n.1, 981 (D.C. Cir. 1996) (neither the federal question statute, 28 U.S.C. § 1331, nor the Declaratory Judgment Act, 28 U.S.C. § 2201, independently creates subject matter jurisdiction by waiving the federal government's sovereign immunity); Washington Legal Foundation v. U.S. Sentencing Comm'n, 89 F.3d. 897, 902 (D.C. Cir. 1996) ("It is well settled that this statute [§ 1361] does not by itself waive sovereign immunity."); Continental Bank & Trust Co. v. Martin, 303 F.2d 214, 215 (D.C. Cir. 1962) (Declaratory Judgment Act "does not afford an independent basis for jurisdiction. It has to do with the kind of relief which might be available and not with jurisdiction."). Accordingly, the APA provides the only waiver of sovereign immunity available to Plaintiffs.

Section 704 of the APA defines the limits of this waiver of sovereign immunity. It provides for judicial review of only two categories of administrative action: (1) "[a]gency action made reviewable by statute" and (2) "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because Plaintiffs have not identified any substantive statutes under which Plaintiffs may bring suit, they must rely on the second category of section 704 for the waiver of sovereign immunity. Consequently, Plaintiffs have the burden of establishing "final agency action for which there is no other adequate remedy in a court." Id; see Lujan, 497 U.S. 871, 882 (1990) ("When, as here, review is sought . . . under the general review provisions of the APA, the agency action in question must be final agency action.").

No such final agency action is alleged here. Plaintiffs are not permitted to make generalized attacks upon actions undertaken by HUD. "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." Norton v. Southern Utah Wilderness Alliance, 543 U.S. 55, 64 (2004) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990)). The Norton Court noted that these must be "circumscribed, discrete agency actions" and may include "five categories of decisions made or outcomes implemented by an agency – 'agency rule, order, license, sanction or relief.'" Id. at 2378–80 (citing 5 U.S.C. § 551(13)).

"As a general matter, two conditions must be satisfied for an agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process — *it must not be of a merely tentative or interlocutory nature*. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (emphasis added) (citation and internal punctuation omitted). "The purpose behind the final agency action requirement is to allow the

agency a full opportunity to make a decision and correct its mistakes, to avoid disrupting the agency's processes, and to relieve the courts from engaging in inefficient or unnecessary review." See DRG Funding Corp. v. Secretary of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996).

Here there are only tentative and interlocutory statements alleged by Plaintiffs. It is clear from the alleged communications in the complaint and by communications between Plaintiffs and HUD that there has not yet been a consummation of the agency's decisionmaking process. HUD is reviewing Plaintiffs' program and plans to issue guidance to the acceptability of such programs. Allowing judicial review here would essentially be allowing Plaintiffs to overcome sovereign immunity by simply making an inquiry to an agency, no matter the answer. That runs contrary to the requirements for waiver of sovereign immunity and the purpose of having a deliberative agency process culminating in a discrete final action. "The natural consequence of a rule that made the Government liable for the statements of its agents would be a decision to cut back and impose strict controls upon Government provision of information in order to limit liability." Office of Pers. Management v. Richmond, 496 U.S. 414 (1990).

In Melius v. National Indian Gaming Comm'n, No. 98-2210, 1999 U.S. Dist. LEXIS 17537 (D.D.C. 1999), the National Indian Gaming Commission informed Plaintiff a contract he was involved in would likely be disapproved unless he removed himself from financial participation in the contract. Since "[t]he NIGC never rendered a formal determination, and the background investigation was never completed" the court determined there was no agency action. Id. at *26. "While the NIGC's statement to Melius, with no additional explanation, that he must withdraw from the contract or risk disapproval may seem inappropriate, it [did] not

constitute 'final agency action.'" Id. at *27.  Here, there has similarly been no formal determination.

To the extent that any of HUD's actions to date might even be properly classified as determinations, they are at best a "preliminary determination by a local agency representative [which may be] later overruled at a higher level within the agency."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 127 S. Ct. 2518, 2529 (2007) (looking only to a final notice as the final agency action and not "the various statements made by the involved agencies' regional offices during the early stages of consideration").

As much as Plaintiffs would appreciate responses to their inquiries on their schedule, the passage of time after the alleged initial statements by HUD giving rise to this action does not in any way elevate those statements to final determinations.  Lapse of time between issues being raised as to the propriety of a program and a final determination settling those issues by an agency are a necessary and unavoidable part of the administrative process.  An agency "alone is cognizant of the many demands on it, its limited resources, and the most effective structuring and timing of proceedings to resolve those competing demands."  Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1056 (D.C. Cir. 1979).  Moreover, HUD's indication that it will provide a response to Plaintiffs' inquiries and the pending proposed rule is further verification that the initial statements were not the consummation of HUD's decision making process.  Plaintiffs do not allege that the delay associated with HUD's review has been unreasonable, and no such claim would have merit because, to date, the delay has consumed only a matter of a few weeks.  See 5 U.S.C. § 706(1); Cobell v. Norton, 240 F.3d 1081, 1096 (D.C. Cir. 2001) ("courts are reluctant to upset existing agency priorities, unless the delay is 'egregious.'").

Finally, Plaintiffs' allegations that HUD's policy is to not "review downpayment programs operated by instrumentalities of government" (Comp. ¶ 27) neither removes the requirement of final agency action nor does it create a final agency action when HUD decided to review the program in question. The D.C. Circuit rejected similar reasoning in Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Commission, 324 F.3d 726 (D.C. Cir. 2003). In Reliable, plaintiffs argued that although there was no final determination as to the danger of a particular product, there was final action in the ongoing investigation into such products since the agency had no regulatory jurisdiction over those products. Id. at 731. The D.C. Circuit rejected that line of reasoning. Id. The assumption of jurisdiction on the part of the agency so that it could fully investigate the matter and reach an informed final decision was not itself a final agency action. It is even clearer that HUD's review of the program at issue is not a final agency action.

Moreover, unlike in Reliable, where the plaintiffs claimed the agency had no statutory authority to investigate the product in question, here Plaintiffs only allege that HUD violates some broad statement on its website and in letters.[5] Plaintiffs point to no statutory or regulatory provision that would prevent HUD from reviewing the downpayment assistance program at issue. Furthermore, one of the very issues HUD is considering is whether Indian tribes fit into the meaning of "government" as it is used in regard to downpayment assistance programs. As this is an issue of first impression for HUD, HUD is entitled to fully review the program, and any challenge of that review must wait until a final action has been taken by HUD.

---

5 Even if the policy guidelines in letters or on a website dictated a presumptive norm, they would not amount to final agency action. DRG Funding Corp. v. Secretary of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996) (agency order is non-final where it "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action"); see Reliable, 324 F.3d at 731-32.

**CONCLUSION**

For the reasons stated above, defendants respectfully request that the court grant their motion to dismiss.

Dated:  September 26, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. – Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)

Of Counsel:
Louis J. Gioia, Department of Housing and Urban Development

United States Government Accountability Office

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

February 2005

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products



**G A O**
Accountability ★ Integrity ★ Reliability

February 2005

# G A O
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-05-194, a report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products

## Why GAO Did This Study

The U.S. Department of Housing and Urban Development (HUD), through its Federal Housing Administration (FHA), insures billions of dollars in home mortgage loans made by private lenders. FHA insures low down payment loans and a number of parties have made proposals to either eliminate or otherwise change FHA's borrower contribution requirements. GAO was asked to (1) identify the key characteristics of existing low and no down payment products, (2) review relevant literature on the importance of loan-to-value (LTV) ratios and credit scores to loan performance, (3) report on the performance of low and no down payment mortgages supported by FHA and others, and (4) identify lessons for FHA from others in terms of designing and implementing low and no down payment products.

## What GAO Recommends

GAO suggests that Congress consider limiting any new no down payment product it may authorize. GAO recommends that HUD, among other things, consider piloting new or changed products and that HUD establish a framework for when and how to pilot products. In written comments, HUD stated that it had considered these actions, including piloting, but instead adopted an alternative solution. However, it is not clear under which circumstances HUD would consider piloting.

www.gao.gov/cgi-bin/getrpt?GAO-05-194.

To view the full product, including the scope and methodology, click on the link above. For more information, contact William B. Shear at (202) 512-8678 or shearw@gao.gov.

## What GAO Found

FHA and many other mortgage institutions provide many low and no down payment products with requirements that vary in terms of eligibility, borrower investment, underwriting, and risk mitigation. While these products are similar, there are some important differences, including that FHA has lower loan limits, allows closing costs and the up-front insurance premium to be financed in the mortgage, and permits the down payment funds to come from nonprofits that receive funds from sellers. FHA also differs in that it does not require prepurchase counseling.

A substantial amount of research GAO reviewed indicates that LTV ratio and credit score are among the most important factors when estimating the risk level associated with individual mortgages. GAO's analysis of the performance of low and no down payment mortgages supported by FHA and others corroborates key findings in the literature. Generally, mortgages with higher LTV ratios (smaller down payments) and lower credit scores are riskier than mortgages with lower LTV ratios and higher credit scores.

Some practices of other mortgage institutions offer a framework that could help FHA manage the risks associated with introducing new products or making significant changes to existing products. Mortgage institutions may impose limits on the volume of the new products they will permit and on who can sell and service these products. FHA officials question the circumstances in which they can limit volumes for their products and believe they do not have sufficient resources to manage a product with limited volumes. Mortgage institutions sometimes require additional credit enhancements, such as higher insurance coverage; and sometimes require stricter underwriting, such as credit score thresholds, when introducing a new low or no down payment product. FHA is authorized to require an additional credit enhancement by sharing risk through co-insurance but does not currently use this authority. FHA has used stricter underwriting criteria but this has not included credit score thresholds.



Average Four-Year Default Rates for FHA Insured Loans Originated in 1998, 1999, and 2000 (by LTV)

| LTV | Average default rate |
|---|---|
| High (>96%) | 3.37 % |
| Medium (87%-96%) | 2.26 |
| Low (<83%) | .90 |

Source: FY 2003 Actuarial Review of the Mutual Mortgage Insurance Fund.

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 3 |
| | Background | 7 |
| | Characteristics and Standards of Low and No Down Payment Products Vary by Mortgage Institution | 12 |
| | Research Shows LTV Ratio and Credit Score Are Important When Estimating Risk of Individual Mortgages | 23 |
| | Our Analysis Indicated That Mortgages with Higher LTV Ratios and Lower Credit Scores Pose Greater Risks | 28 |
| | Several Practices Mortgage Institutions Use in Designing and Implementing Low and No Down Payment Products Could Be Instructive for FHA | 39 |
| | Conclusions | 46 |
| | Matters for Congressional Consideration | 47 |
| | Recommendations for Executive Action | 48 |
| | Agency Comments and Our Evaluation | 48 |

| Appendixes | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 51 |
| Appendix II: | Papers Identified in Literature Search and Included in Analysis | 57 |
| Appendix III: | Comments from the Department of Housing and Urban Development | 60 |
| Appendix IV: | GAO Contacts and Staff Acknowledgments | 62 |
| | GAO Contacts | 62 |
| | Staff Acknowledgments | 62 |

| Tables | | |
|---|---|---|
| Table 1: | Eligibility Limitations of FHA Compared with RHS, VA, and Selected Products of Fannie Mae and Freddie Mac | 15 |
| Table 2: | LTV Calculations for FHA, RHS, VA, Fannie Mae, and Freddie Mac | 18 |

| Figures | | |
|---|---|---|
| Figure 1: | Evolution of Low and No Down Payment Products | 9 |
| Figure 2: | Percentage of Home Purchase Mortgages with a LTV Ratio Higher Than 95 Percent for HUD (FHA), VA, Fannie Mae, and Freddie Mac for Loans Originated in 2000 | 10 |

Contents

Figure 3:  Percentage of Loans with LTV Ratios of 95 Percent or
          Higher That Fannie Mae and Freddie Mac Purchased,
          1997-2000                                                        11
Figure 4:  Four-year Relative Default Rates by LTV Ratio for
          FHA-Insured Mortgages (1992, 1994, and 1996)                    30
Figure 5:  Four-year Relative Default Rates by Credit Score for
          FHA-Insured Mortgages (1992, 1994, and 1996)                    31
Figure 6:  Four–year Relative Default Rates by LTV Ratio and Credit
          Score for FHA-insured Mortgages (1992, 1994, and
          1996)                                                           32
Figure 7:  Four-Year Relative Default Rates by LTV Ratio for
          Conventional Mortgages (1997, 1998, and 1999)                   34
Figure 8:  Four-Year Relative Default Rates by Credit Score for
          Conventional Mortgages (1997, 1998, and 1999)                   35
Figure 9:  Four-Year Relative Default Rates by LTV Ratio and Credit
          Score for Conventional Mortgages (1997, 1998, and
          1999)                                                           37

## Abbreviations

| | |
|---|---|
| ARM | adjustable rate mortgage |
| FASAB | Federal Accounting Standards Advisory Board |
| FHA | Federal Housing Administration |
| GSE | government-sponsored enterprise |
| HECM | Home Equity Conversion Mortgage |
| HUD | U.S. Department of Housing and Urban Development |
| LTV | loan-to-value |
| MMI | Mutual Mortgage Insurance |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| RHS | Rural Housing Service |
| USDA | U.S. Department of Agriculture |
| VA | U.S. Department of Veterans Affairs |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

## Most Low and No Down Payment Products Require Some Form of Borrower Investment

Most low and no down payment mortgage products require some form of borrower investment, either a borrower contribution or cash reserve, as a way of reducing risk and assuring that the borrower has a stake in the property. Low down payment products offered by FHA, Fannie Mae, Freddie Mac and private insurers require a cash investment of at least 3 percent from the borrower. No down payment mortgage products offered by VA, RHS, Fannie Mae, Freddie Mac, and some private insurers require either no down payment or a minimum amount (such as $500 in Fannie Mae's MyCommunityMortgage program).

Many institutions permit down payment assistance. FHA stipulates that the gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or entity associated with them. FHA mortgagee letters state that "gifts from these sources (seller, builder, etc.) are considered inducements to purchase and must be subtracted from the sales price." However, FHA allows nonprofit agencies that may receive contributions from the seller to provide down payment assistance to the borrower. In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property.

Even where borrowers pay no down payment they very often must pay a minimum percentage of closing costs from their own funds.[18] FHA requires that borrowers pay 3 percent of the total loan amount toward the purchase of the home. This contribution may be used for down payment or closing costs. Thus, FHA borrowers may finance closing costs, within limits. FHA borrowers may also finance their insurance premium. Unlike FHA, some mortgage institutions do not allow financing of the closing costs and the insurance premiums in the first mortgage. VA generally allows payment of all closing costs to be negotiated while restricting those that may be charged to the borrower. VA allows borrowers to finance their insurance premium, called the funding fee. In the section 502 Guaranteed Loan program for RHS, borrowers may pay closing costs but they are not required to do so and may be allowed to finance the closing costs and their

---

[18]Closing costs could include a loan origination fee, a mortgage recordation fee, a title transfer tax, appraisal fees, attorney fees, and title insurance.

insurance premium, called the Guarantee Fee.[19] Freddie Mac in its no down payment product requires a 3 percent borrower contribution to be used for closing costs, financing costs, or prepaids and escrows, all of which can come from gifts or property seller contributions.

FHA, RHS, VA, Fannie Mae, and Freddie Mac differ somewhat in terms of their maximum allowable LTV ratios and how they calculate this ratio. LTV ratios are important because of the direct relationship that exists between the amount of equity borrowers have in their homes and the likelihood of risk of default. The higher the LTV ratio, the less cash borrowers will have invested in their homes and the more likely it is that they may default on mortgage obligations, especially during times of economic hardship.

The Omnibus Budget Reconciliation Act of 1990 (Pub. L. No. 101-508), established LTV limits for FHA-insured mortgages of 98.75 percent if the home value is $50,000 or less, or 97.75 percent if the home value is in excess of that. However, because FHA allows financing of the up-front insurance premium, borrowers can receive a mortgage with an effective LTV ratio of close to 100 percent.

In table 2, we calculate the effective LTV ratio for selected low and no down payment products. The example assumes a $100,000 purchase price (appraisal value) and a 30-year fixed-rate mortgage. It also assumes average closing costs of about 2.1 percent of sales price. FHA has a formula to calculate the maximum loan amount based on a percentage of the purchase price of the home. FHA does not have a down payment requirement but instead has what FHA calls a minimum cash investment requirement. This investment requirement can be used to pay either the down payment and in some cases the closing costs. Not shown are the actual out-of-pocket expenses to the borrower which could vary based on the individual transaction and whether the investment requirement was split among the closing costs and down payment, as well as whether the borrower opted to finance their up-front premium.[20]

---

[19]According to USDA officials, a borrower may finance closing costs and the Guarantee Fee as long as they do not exceed the property's appraised value.

[20]Out-of-pocket expenses can include expenses such as funds required to establish an escrow account.

**Table 2: LTV Calculations for FHA, RHS, VA, Fannie Mae, and Freddie Mac**

| | Government | | | Conventional |
|---|---|---|---|---|
| Mortgage elements | FHA[a] 203b | USDA 502 guaranteed program | VA zero down | Fannie Mae and Freddie Mac 100 LTV products |
| Purchase price | $100,000 | $100,000 | $100,000 | $100,000 |
| Loan amount before up-front insurance | 97,750[b] | 100,000 | 100,000 | N/A |
| Plus up-front insurance premium/fee | +1,466[c] (1.5%) | +2,000[d] (2%) | +2,150[e] (2.15%) | N/A |
| **Total mortgage** | **99,216[f]** | **102,000** | **102,150** | **100,000** |
| Effective LTV ratio[g] | 99.2% | 102% | 102% | 100% |

Sources: HUD, VA, USDA, Fannie Mae, and Freddie Mac.

[a]This is the existing FHA mortgage insurance product that requires the least amount of a down payment. This product is not a "no down" mortgage product.

[b]We are assuming, for this example, that the mortgage is in a state with average closing costs of above 2.1 percent of sales price. In this case, the maximum mortgage (not including a financed up-front insurance premium) would be $100,000 x 97.75 percent.

[c]Up-front insurance premium = $97,750 x 1.5 percent = $1,466.

[d]Guarantee fee = $100,000 x 2 percent = $2,000. Loans can be guaranteed up to 102 percent LTV if doing so is necessary to allow the 2 percent guarantee fee to be financed by the borrower. A 100 percent LTV threshold may only be exceeded to allow the guarantee fee to be financed. If a borrower chooses not to finance the guarantee fee, loans are limited to 100 percent LTV. Closing costs are allowed but closing costs may not be financed if the borrower is already financing the guarantee fee such that they have reached the maximum allowed LTV of 102 percent, not including closing costs.

[e]Funding fee = $100,000 x 2.15 percent = $2,150.

[f]The borrower is required to pay 3 percent (of the contract sales price—called a minimum cash investment requirement) toward closing costs and down payment.

[g]Calculation = total mortgage / purchase price.

In addition, some of the affordable conventional mortgage products allow for subordinate financing in the form of secondary mortgages to pay for a down payment and/or closing costs. These secondary mortgages allow for a total effective LTV of up to 105 percent.

## Some Underwriting Standards Differ between FHA and Other Mortgage Institutions

When underwriting mortgages, FHA and other mortgage institutions require that lenders examine a borrower's ability and willingness to repay the mortgage debt. Lenders for low and no down payment mortgages may use automated underwriting systems examining the borrower's credit score or creditworthiness, qualifying ratios, and cash reserves. In some cases, they use manual underwriting to accommodate nontraditional credit histories. By screening the majority of applications with automated

# Part I. Rulings and Decisions Under the Internal Revenue Code of 1986

## Section 61.—Gross Income Defined

Whether certain down payment assistance provided to a home buyer is includible in the recipient's gross income under section 61. See Rev. Rul. 2006-27, page 915.

## Section 102.—Gifts and Inheritances

Whether certain down payment assistance provided to a home buyer is excludible from the recipient's gross income as a gift under section 102. See Rev. Rul. 2006-27, page 915.

## Section 501.—Exemption From Tax on Corporations, Certain Trusts, etc.

*26 CFR 1.501(c)(3)–1: Organizations organized and operated for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals. (Also §§ 61, 102, 1012.)*

**Down payment assistance; home buyers.** This ruling sets forth the applicable rules and standards for determining whether organizations that provide down payment assistance to home buyers qualify as tax-exempt charities. In addition, the ruling addresses whether assistance received for a down payment is treated as a gift and included in a home buyer's basis.

## Rev. Rul. 2006–27

ISSUES:

1. Whether organizations that otherwise meet the requirements of § 501(c)(3) of the Internal Revenue Code and are described in the situations below operate exclusively for charitable purposes.

2. Whether home buyers who receive down payment assistance from the organizations may exclude the amount of the assistance from their gross income as gifts under § 102.

3. Whether home buyers who receive down payment assistance from the organizations may include the amount of the assistance in the cost basis of their homes under § 1012.

FACTS

Situation 1

*X* is a non-profit corporation that helps low-income individuals and families purchase decent, safe and sanitary homes throughout the metropolitan area in which *X* is located. As a substantial part of its activities, *X* makes assistance available exclusively to low-income individuals and families to provide part or all of the funds they need to make a down payment on the purchase of a home. *X* uses standards set by Federal housing statutes and administered by the Department of Housing and Urban Development to determine who is a low-income individual. Individuals are eligible to receive assistance from *X*'s program if they are low-income individuals, have the employment history and financial history necessary to qualify for a mortgage, and would so qualify but for the lack of a down payment. *X* also offers financial counseling seminars and conducts other educational activities to help prepare potential low-income home buyers for the responsibility of home ownership.

*X* will consider applications for assistance in connection with an applicant's purchase of any home that meets *X*'s standards for habitability. Before making a grant of down payment assistance, *X* requires a home inspection report for the property that the applicant intends to buy to ensure that the house will be habitable.

To fund its down payment assistance program and other activities, *X* conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

*X*'s grantmaking process is structured to ensure that *X*'s staff awarding grants on behalf of *X* does not know the identity of the party selling the home to the grant applicant or the identities of any other parties, such as real estate agents or developers, who may receive a financial benefit from the sale. The staff also does not know whether any of the interested parties to the transaction have been solicited for contributions to *X* or have made pledges or actual contributions to *X*. Further, *X* does not

accept any contributions contingent on the sale of a particular property or properties.

Situation 2

*Y* is a nonprofit corporation that is like *X* in all respects as set forth in Situation 1, except as follows. Under *Y*'s grantmaking procedures, *Y*'s staff considering a particular applicant's application knows the identity of the party selling the home to the grant applicant and may also know the identities of other parties, such as real estate agents and developers, who may receive a financial benefit from the sale. Moreover, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller. Further, there is a direct correlation between the amount of the down payment assistance provided by *Y* in connection with each of these transactions and the amount of the home seller's payment to *Y*. Finally, *Y* does not conduct a broad based fundraising campaign to attract financial support. Rather, most of *Y*'s support comes from home sellers and real estate-related businesses that may benefit from the sale of homes to buyers who receive *Y*'s down payment assistance.

Situation 3

*Z* is a nonprofit corporation formed to combat community deterioration in an economically depressed area that has suffered a major loss of population and jobs. Studies have shown that the average income in the area is below the median level for the State. *Z* cooperates with government agencies and community groups to develop an overall plan to attract new businesses to the area and to provide stable sources of decent, safe and sanitary housing for the area residents without relocating them outside the area. As part of the renewal project, *Z* receives funding from government agencies to build affordable housing units for sale to low and moderate-income families. As a substantial part of its activities, *Z* makes down payment assistance available to eligible home buyers who wish to purchase the newly-constructed units

from *Z*. *Z* also offers financial counseling seminars and conducts other educational activities to help prepare potential low and moderate-income home buyers for the responsibility of home ownership.

To fund its down payment assistance program and other activities, *Z* conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

LAW

Section 501 of the Code provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided that no part of the net earnings inures to the benefit of any private shareholder or individual. *See* § 501(c)(3).

Section 1.501(c)(3)–1(c)(1) of the Income Tax Regulations provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in § 501(c)(3). An organization must not engage in substantial activities that fail to further an exempt purpose. In *Better Business Bureau of Washington, D.C. v. U.S.*, 326 U.S. 279, 283 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number and importance of truly . . . [exempt] purposes."

Section 1.501(c)(3)–1(d)(1)(ii) provides that an organization is not organized or operated exclusively for exempt purposes unless it serves a public rather than a private interest. To meet this requirement it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests.

Section 1.501(c)(3)–1(d)(2) defines the term "charitable" as used in § 501(c)(3) as including the relief of the poor and distressed or of the underprivileged, and the promotion of social welfare by organizations designed to lessen neighborhood tensions, to eliminate prejudice and discrimination, or to combat community deterioration. The term "charitable" also includes the advancement of education.

Section 1.501(c)(3)–1(d)(3)(i) provides, in part, that the term "educational" as used in § 501(c)(3) relates to the instruction of the public on subjects useful

to the individual and beneficial to the community.

Section 1.501(c)(3)–1(e) provides that an organization that operates a trade or business as a substantial part of its activities may meet the requirements of § 501(c)(3) if the trade or business furthers an exempt purpose, and if the organization's primary purpose does not consist of carrying on an unrelated trade or business.

In *Easter House v. U.S.*, 12 Cl. Ct. 476, 486 (1987), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988), the U.S. Court of Federal Claims considered whether an organization that provided adoption and related health services to pregnant women who agreed to place their newborns for adoption through the organization qualified for exemption under § 501(c)(3). The court concluded that the organization did not qualify for exemption under § 501(c)(3) because its primary activity was placing children for adoption in a manner indistinguishable from that of a commercial adoption agency. The court rejected the organization's argument that the adoption services merely complemented the health-related services to unwed mothers and their children. Rather, the court found that the health-related services were merely incident to the organization's operation of an adoption service, which, in and of itself, did not serve an exempt purpose. The organization did not provide health-related services to unwed mothers who wished to keep their children or who arranged for an adoption independent of the organization. The organization's sole source of support was the fees it charged adoptive parents, rather than contributions from the public. The court also found that the organization competed with for-profit adoption agencies, engaged in substantial advertising, and accumulated substantial profits. Accordingly, the court found that the "business purpose, and not the advancement of educational and charitable activities purpose, of plaintiff's adoption service is its primary goal" and held that the organization was not operated exclusively for purposes described in § 501(c)(3). *Easter House*, 12 Cl. Ct. at 485–86.

In *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the court held that an organization that operated a school to train individuals for careers as political campaign profession-

als, but that could not establish that it operated on a nonpartisan basis, did not exclusively serve purposes described in § 501(c)(3) because it also served private interests more than incidentally. The court found that the organization was created and funded by persons affiliated with a particular political party and that most of the organization's graduates worked in campaigns for the party's candidates. Consequently, the court concluded that the organization conducted its educational activities with the objective of benefiting the party's candidates and entities. Although the candidates and entities benefited were not organization "insiders," the court stated that the conferral of benefits on disinterested persons who are not members of a charitable class may cause an organization to serve a private interest within the meaning of § 1.501(c)(3)–1(d)(1)(ii). The court concluded by stating that even if the political party's candidates and entities did "comprise a charitable class, [the organization] would bear the burden of proving that its activities benefited members of the class in a non-select manner." *American Campaign Academy*, 92 T.C. at 1077.

In *Columbia Park and Recreation Association v. Commissioner*, 88 T.C. 1 (1987), *aff'd* without published opinion, 838 F.2d 465 (4th Cir. 1988), the court held that an association formed in a private real estate development to operate parks, swimming pools, boat docks, and other recreational facilities did not qualify as a § 501(c)(3) organization. Although the organization provided some benefit to the general public, the primary intended beneficiaries were the residents and property owners of the private development. Thus, the organization operated for a substantial non-exempt purpose rather than for exclusively charitable purposes.

Rev. Rul. 67–138, 1967–1 C.B. 129, held that helping low-income persons obtain adequate and affordable housing is "charitable" because it relieves the poor and distressed or underprivileged. In Rev. Rul. 67–138, the organization carried on several activities directed to assisting low-income families in obtaining improved housing, including (1) conducting a training course relative to various aspects of homebuilding and homeownership, (2) coordinating and supervising joint construction projects, (3) purchasing building

sites for resale at cost, and (4) lending aid in obtaining home construction loans.

Rev. Rul. 70–585, 1970–2 C.B. 115, discussed four situations of organizations providing housing and analyzed whether each organization qualified as charitable within the meaning of § 501(c)(3). Situation 1 described an organization formed to construct new homes and renovate existing homes for sale to low-income families who could not obtain financing through conventional channels. The organization also provided financial aid to low-income families eligible for loans under a Federal housing program who did not have the necessary down payment. The organization made rehabilitated homes available to families who could not qualify for any type of mortgage. When possible, the organization recovered the cost of the homes through very small periodic payments, but its operating funds were obtained from federal loans and contributions from the general public. The revenue ruling held that by providing homes for low-income families who otherwise could not afford them, the organization relieved the poor and distressed.

Situation 2 described an organization formed to ameliorate the housing needs of minority groups by building housing units for sale to persons of low and moderate-income on an open-occupancy basis. The housing was made available to members of minority groups who were unable to obtain adequate housing because of local discrimination. The housing units were located to help reduce racial and ethnic imbalances in the community. As the activities were designed to eliminate prejudice and discrimination and to lessen neighborhood tensions, the revenue ruling held that the organization was engaged in charitable activities within the meaning of § 501(c)(3).

Situation 3 described an organization formed to formulate plans for the renewal and rehabilitation of a particular area in a city as a residential community. The median income level in the area was lower than in other sections of the city and the housing in the area generally was old and badly deteriorated. The organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project, and involved residents in the area renewal plan. The organization also purchased an apartment building that it rehabilitated and rented at cost to low and

moderate-income families with a preference given to residents of the area. The revenue ruling held that the organization was described in § 501(c)(3) because its purposes and activities combated community deterioration.

Situation 4 described an organization formed to alleviate a shortage of housing for moderate-income families in a particular community. The organization planned to build housing to be rented at cost to moderate-income families. The Service held that the organization failed to qualify for exemption under § 501(c)(3) because the organization's program was not designed to provide relief to the poor or further any other charitable purpose within the meaning of § 501(c)(3) and the regulations.

Rev. Rul. 72–147, 1972–1 C.B. 147, held that an organization that provided housing to low-income families did not qualify for exemption under § 501(c)(3) because it gave preference to employees of a business operated by the individual who also controlled the organization. Although providing housing for low-income families furthers charitable purposes, doing so in a manner that gives preference to employees of the founder's business primarily serves the private interest of the founder rather than a public interest.

Rev. Rul. 72–559, 1972–2 C.B. 247, held that an organization that subsidized recent law graduates during the first three years of their practice to enable them to establish legal practices in economically depressed communities that have a shortage of available legal services, and to provide free legal services to needy members of the community, qualified for exemption under § 501(c)(3). Although the recipients of the subsidies were not themselves members of a charitable class, the resulting benefit to them did not detract from charitable purposes. Rather, the young lawyers were merely the instruments by which the organization accomplished the charitable purpose of providing free legal services for those unable to pay for, or obtain, such services.

Rev. Rul. 74–587, 1974–2 C.B. 162, held that an organization providing low-cost or long-term loans to, or equity investments in, businesses operating in economically depressed areas qualified for exemption under § 501(c)(3). The organization provided financial assistance only to

businesses that were unable to obtain funds from conventional sources, and gave preference to businesses that would provide training and employment opportunities for unemployed or under-employed area residents. Although some of the individual business owners receiving financial assistance from the organization were not themselves members of a charitable class, the benefit to them did not detract from the charitable character of the organization's program. As in Rev. Rul. 72–559, the recipients of aid were instruments for accomplishing the organization's charitable purposes.

Rev. Rul. 76–419, 1976–2 C.B. 146, held that an organization that converts blighted land in an economically depressed community to an industrial park and leases space on favorable terms to businesses that agree to hire a significant number of unemployed area residents and train them in needed skills qualifies for exemption under § 501(c)(3). The organization furthered charitable purposes by improving economic conditions for the poor and distressed and combating community deterioration. The organization offered inducements to businesses solely for the purpose of advancing charitable goals.

Section 61 provides that, except as otherwise provided in subtitle A (relating to income taxes), gross income means all income from whatever source derived.

Section 1012 provides, generally, that the basis of property shall be its cost to the taxpayer.

Section 1016(a)(1) provides that proper adjustment shall be made to the basis of property for expenditures, receipts, losses, or other items properly chargeable to capital account.

Section 1001(a) provides that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis for determining gain provided in § 1011. Section 1011(a) provides generally that the adjusted basis for determining gain from the sale or other disposition of property is the basis determined under § 1012, adjusted as provided in § 1016.

Section 102 provides that the value of property acquired by gift is excluded from gross income. A gift "proceeds from a 'detached and disinterested generosity,' 'out of affection, respect, admiration,

charity or like impulses.'" *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). Payments that proceed from "the constraining force of any moral or legal duty," or from "'the incentive of anticipated benefit' of an economic nature," are not gifts. *Duberstein*, 363 U.S. at 285. Thus, payments attendant to ordinary business or commercial transactions, or that proceed primarily from the moral or legal obligations attendant such transactions, are not gifts. However, a payment made to an individual that responds to the individual's needs, that is made without economic or other consideration being received by the donor, and that does not proceed from any moral or legal duty, is motivated by detached and disinterested generosity, and may be excluded from gross income as a gift under § 102. *See, e.g.*, Rev. Rul. 99–44, 1999–2 C.B. 549.

ANALYSIS

In Situation 1, *X*'s purposes and activities relieve the poor, distressed and underprivileged by enabling low-income individuals and families to obtain decent, safe and sanitary homes. The way *X* conducts its down payment assistance program establishes that *X*'s primary purpose is to address the needs of its low-income grantees. *See* Rev. Rul. 70–585, Sit. 1. As a condition of providing assistance, *X* requires a home inspection to ensure that the house the applicant intends to buy will be habitable. *X*'s financial counseling seminars and other educational programs help to prepare potential home buyers for the responsibility of home ownership. *See* Rev. Rul. 67–138. *X* conducts a broad based fundraising program, and *X* receives support from a wide array of sources. *X*'s policies of ensuring that its grantmaking staff does not know the identity or contributor status of the party selling the home to the grant applicant (or any other party who may receive a financial benefit from the sale), and of not accepting contributions contingent on the sale of any particular properties, ensure that *X* is not beholden to any particular donors or other supporters whose interest may conflict with that of the low-income buyers *X* is working to help.

*X*'s grantmaking procedures combined with its efforts to educate home buyers ensure that *X* is operated primarily to benefit the low-income beneficiaries of its down-

payment assistance. The low-income beneficiaries constitute a charitable class. Any benefit to other parties (such as home sellers, real estate agents, or developers) who participate in the transactions does not detract from the charitable purpose of relieving the poor and distressed. *See* Rev. Ruls. 72–559, 74–587, 76–419. Because *X* is operated exclusively for charitable purposes, *X* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

By contrast, in Situation 2, *Y* does not qualify as an organization described in § 501(c)(3). To finance its down payment assistance activities, *Y* relies on sellers and other real-estate related businesses that stand to benefit from the transactions *Y* facilitates. Furthermore, in deciding whether to provide assistance to a low-income applicant, *Y*'s grantmaking staff knows the identity of the home seller and may also know the identities of other interested parties and is able to take into account whether the home seller or another interested party is willing to make a payment to *Y*. *Y*'s receipt of a payment from the home seller corresponding to the amount of the down payment assistance in substantially all of the transactions, and *Y*'s reliance on these payments for most of its funding indicate that the benefit to the home seller is a critical aspect of *Y*'s operations. In this respect, *Y* is like the organization considered in *Easter House*, which received all of its support from fees charged to adoptive parents, so that the business purpose of the adoption service became its primary goal and overshadowed any educational or charitable purpose. Like the organization considered in *American Campaign Academy*, *Y* is structured and operated to assist private parties who are affiliated with its funders. Like the organizations considered in *American Campaign Academy*, *Easter House*, and *Columbia Park Recreation Association*, *Y* also serves an exempt purpose, but because *Y* is not operated exclusively for exempt purposes, *Y* does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

In Situation 3, although *Z* does not limit its down payment assistance program to low-income recipients, *Z*'s down payment assistance program still serves a charitable purpose described in § 501(c)(3) because it combats community deterioration

in a specific, economically depressed area that has suffered a major loss of population and jobs. Through a combination of counseling and financial assistance, *Z* helps low and moderate-income families in that area to acquire decent, safe and sanitary housing and to prepare for the responsibilities of home ownership. In this respect, *Z* is like the organization described in Situation 3 of Rev. Rul. 70–585. Because *Z* is operated exclusively for charitable purposes, *Z* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

Down payment assistance payments for home buyers in Situations 1 and 3 are made by those organizations out of a detached and disinterested generosity and from charitable or like impulse, rather than to fulfill any moral or legal duty, and thus qualify for exclusion from such home buyers' gross incomes as "gifts" under § 102. The benefits provided to the home buyers in these circumstances are sufficiently removed from the interests of any home sellers or sales agents that they proceed from a detached and disinterested generosity on the part of the donor organization, and such grants lack the indicia of a rebate, price adjustment, or *quid pro quo* incident to a sale. Favorable treatment under § 102 is thus appropriate. The home buyer's payment of such amount toward the purchase of the residence will be included in his or her cost basis under § 1012.

In Situation 2, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller that directly correlates to the amount of the down payment assistance *Y* provides to the home buyer. In those cases, the payments received by the home buyers do not qualify for exclusion from gross income as gifts under § 102. The payments do not proceed from detached and disinterested generosity, but rather are in response to an anticipated economic benefit, namely facilitating the sale of a seller's home. Under *Duberstein*, *supra*, such payments are not gifts for purposes of § 102. Unlike in Situations 1 and 3, in Situation 2, the down payment assistance received by those home buyers represents a rebate or purchase price reduction. As a rebate or purchase price reduction, the down payment assistance is not includible in a home

buyer's gross income under § 61 and the amount of the down payment assistance is not included in the home buyer's cost basis under § 1012, as adjusted under § 1016.

HOLDINGS

1. In Situations 1 and 3, the organization is operated exclusively for charitable purposes and qualifies for exemption from federal income tax as an organization described in § 501(c)(3). In Situation 2, the organization is not operated exclusively for charitable purposes, and consequently, does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

2. In Situations 1 and 3, the home buyers may exclude the down payment assistance from their gross income as gifts under § 102. In Situation 2, the home buyers may not exclude the down payment assistance as gifts under § 102. However, in Situation 2, the down payment assistance is excluded from the gross income of home buyers because it represents a rebate or purchase price reduction.

3. In Situations 1 and 3, the home buyers may include the down payment assistance in the cost basis of their homes under § 1012. In Situation 2, the home buyers may not include the amount of the down payment assistance in the cost basis of their homes under § 1012. Rather, the amount of the down payment assistance represents a rebate or purchase price reduction that is excluded from the home buyer's cost basis under § 1012.

DRAFTING INFORMATION

The principal author of this revenue ruling is Elizabeth C. Kastenberg of Exempt Organizations, Tax Exempt and Government Entities Division. For further information regarding this revenue ruling, contact Elizabeth C. Kastenberg at (202) 283–9468 (not a toll-free call).

# Section 1012.—Basis of Property—Cost

Whether certain down payment assistance provided to a home buyer is included in the buyer's cost basis under section 1012. See Rev. Rul. 2006-27, page 915.

# Section 1502.—Regulations

26 CFR 1.1502–13: Intercompany transactions.

## T.D. 9261

## DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## 26 CFR Part 1

## Intercompany Transactions; Manufacturer Incentive Payments

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document contains final regulations under section 1502 of the Internal Revenue Code. *Example 13* of the intercompany transaction regulations illustrates the treatment of manufacturer incentive payments. Because a premise underlying the example is under reconsideration, these final regulations remove and reserve this example. The regulations will affect corporations filing consolidated returns.

DATES: *Effective Date:* These regulations are effective on May 8, 2006.

FOR FURTHER INFORMATION CONTACT: Frances Kelly, (202) 622–7770 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

**Background**

Section 1.1502–13 of the consolidated return regulations provides rules for taking into account items of income, gain, deduction, and loss of members from intercompany transactions. In particular, §1.1502–13(c)(7)(ii), *Example 13*, illustrates how the matching rule of the intercompany transaction regulations treats a transaction involving manufacturer incentive payments. On August 13, 2004, the IRS and Treasury Department published a notice of proposed rulemaking (REG–131264–04, 2004–2 C.B. 506) in the **Federal Register** (69 FR 50112) proposing regulations to address additional transactions involving manufacturer incentive payments and to clarify the

proper treatment of such incentive payments under the intercompany transaction regulations.

On April 25, 2005, the IRS and Treasury Department published Rev. Rul. 2005–28, 2005–19 I.R.B. 997, which suspends, in part, Rev. Rul. 76–96, 1976–1 C.B. 23. Rev. Rul. 2005–28 states that the IRS will not apply, and taxpayers may not rely upon, the conclusion reached in Rev. Rul. 76–96 that certain rebates made by a manufacturer to retail customers are ordinary and necessary business expenses deductible under section 162, pending the IRS's reconsideration of the issue and publication of subsequent guidance.

**Explanation of Provisions**

The manufacturer incentive payment transaction described in §1.1502–13(c)(7)(ii), *Example 13*, relies, in part, upon the premise that the manufacturer incentive payment is an ordinary and necessary business expense deductible under section 162. To the extent that this premise is correct, this example illustrates the proper application of the intercompany transaction regulations. However, because Rev. Rul. 2005–28 suspends Rev. Rul. 76–96, in pertinent part, these final regulations remove §1.1502–13(c)(7)(ii), *Example 13*, pending further guidance on the section 162 issue considered in Rev. Rul. 76–96.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. These final regulations do not alter substantive provisions of the intercompany transaction regulations. They merely remove an example which may be misleading and cause confusion for taxpayers. Accordingly, good cause is found for dispensing with prior notice and comment pursuant to 5 U.S.C 553(b), and for dispensing with a delayed effective date pursuant to 5 U.S.C 553(d). Because no notice of proposed rulemaking is required, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply. Pursuant to section 7805(f)

# AN EXAMINATION OF DOWNPAYMENT GIFT PROGRAMS ADMINISTERED BY NON-PROFIT ORGANIZATIONS

### FINAL REPORT

### HUD CONTRACT NO: C-OPC-22550/M0001

### SUBMITTED TO: THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT



### MARCH 1, 2005

**PREPARED BY:**



733 Fifteenth St. NW, Suite 340; Washington, DC 20005 * (202) 969-2880

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

FOREWORD

The Office of Housing, in the U.S. Department of Housing and Urban Development, commissioned an examination by Concentrance Consulting Group, Inc., a Washington, D.C., based management consulting firm, of downpayment gift programs administered by non-profit organizations. This report is the culmination of a ten-month effort, beginning in January, 2004, to understand the influence of seller-funded nonprofit downpayment assistance on the origination of FHA-insured home loans. The study involved travel to ten cities and interviews of over 400 persons involved in mortgage transactions—from homebuyers and sellers to realtors, appraisers, underwriters, loan officers, builders, and downpayment assistance providers. The report concludes that seller-funded downpayment assistance for mortgage downpayments has led to underwriting problems that require immediate attention, and HUD is already acting upon recommendations made in this report.

President George W. Bush and Secretary Alphonso Jackson are committed to expanding homeownership opportunities while providing adequate protections to low- and moderate-income homebuyers. This report advances these goals, and I commend it to all readers who share these objectives.

John C. Weicher
Assistant Secretary for Housing/FHA Commissioner



An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations
HUD Contract No: C-OPC-22550/M0001

# Table of Contents

EXECUTIVE SUMMARY ........................................................................................IV

I. INTRODUCTION/BACKGROUND ................................................................ 1

II. KEY OBSERVATIONS ..................................................................................... 4

III. METHODOLOGY ............................................................................................ 11

IV. COLLECTIVE ASSESSMENT AND CROSS SECTIONAL ANALYSES...... 20

V. INTERVIEW RESULTS BY SUBJECT GROUP .................................... 31

    NON-PROFITS ........................................................................................... 31
    LENDERS AND UNDERWRITERS ........................................................ 48
    HOMEBUYERS .......................................................................................... 57
    INDIVIDUAL SELLERS............................................................................ 65
    BUILDERS .................................................................................................. 70
    REAL ESTATE AGENTS ......................................................................... 77
    APPRAISERS ............................................................................................. 85
    OTHER RESPONDENTS.......................................................................... 94

VI. ANALYSIS OF FINDINGS AND RECOMMENDATIONS........................... 95

APPENDIX I
    RESEARCH OBJECTIVES....................................................................... 105

APPENDIX II
    LINES OF INQUIRY.................................................................................. 107

APPENDIX III
    QUANTIFIABLE INTERVIEW RESULTS.............................................. 122

APPENDIX IV
    DETAILED FLOW CHART OF A DOWNPAYMENT ASSISTANCE TRANSACTION ................. 135

APPENDIX V
    2002 IRS FORM 990 HIGHLIGHTS......................................................... 137

APPENDIX VI
    COMPARATIVE FINANCING SCENARIOS .......................................... 139

 An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations
HUD Contract No: C-OPC-22550/M0001

# VI. ANALYSIS OF FINDINGS AND RECOMMENDATIONS

The Concentrance team conducted interviews with 401 respondents in ten SMSAs. The respondents included representatives from non-profit organizations involved in DAPs; real estate agents; appraisers; mortgage company executives; loan officers; mortgage brokers; underwriters; builders; homebuyers and sellers. The primary focus was on programs administered by seller-funded DA providers. The examination objectives were to analyze program characteristics, participant relationships, structure and ownership of the seller-funded DA providers and default and foreclosure risks caused by the program. After completing the examination based on the research objectives, the Concentrance team analyzed the findings with respect to three factors for analysis as indicated in the contract SOW. These analysis factors focus on the incentives and motivations of the different parties involved in the transaction; the safeguards built-in to mitigate any increased default risk; and the risks to underwriting quality that these programs may pose.

This section addresses our findings and recommendations relative to each of the factors. Each analysis factor is described, our findings are summarized, the risk associated with each finding is identified and options for mitigating these risks are recommended for HUD's consideration.

---

**Factor #1:**    Incentives

**Description:**    Ways in which seller-funded DAPs affect the incentives of various agents in the homebuying and mortgage underwriting process.

---

## Synopsis of Findings:

We carefully examined seller-funded DAPs offered by twenty-two DA providers. These providers were responsible for 73.76%, or 63,895 of the 86,629 FHA-insured loans with DA in the ten SMSAs identified by HUD for FY2000-2003.The DA provider was indicated in only 5,900 or 6.81% of the remaining 22,734 loans. However, the research team did not interview these DA providers. The top ten volume-based seller-funded DA providers interviewed were responsible for 96% of the 63,895 DA transactions accredited to the top twenty-two providers. Furthermore, the top three seller-funded DA providers were responsible for 75% of these transactions.

To determine ways in which seller-funded DAPs affect the incentives of various agents in the homebuying and mortgage underwriting process we first, identified all the other mortgage professionals and their role in these transactions; we then focused on their interactions and attempted to identify the primary motivations or incentives that contributed to the actions of each of these parties in the transaction.



## Seller Incentives

Concentrance has analyzed the study results and has concluded that allowing these new organizations to flourish has increased the percentage of FHA-insured households with relatively high probabilities of default and foreclosure, and has done so in such a way that even more credit risk is added because of the incentives of property sellers to recoup their cost via a higher house sales price. The seller-funded DA provider does not directly cause any of these outcomes; it is a catalyst. According to 88% of appraisers, the presence of seller-funded DA in a transaction does contribute to price inflation.

## Transaction Facilitator Incentives

Concentrance recognizes that there are natural tendencies in a production driven environment to place volume as a first priority ahead of loan quality. However, the seller-funded DAP exacerbates the subjective motivations of the participants who facilitate the negotiation, loan processing and risk management functions of the transaction, placing the FHA Insurance Funds at increased risk of mortgage defaults and foreclosures. HUD attempts to balance these tendencies by requiring that qualified gatekeepers be in place, such as underwriters and appraisers, to ensure that quality standards are upheld.

A significant portion of the underwriters and appraisers interviewed expressed concern about their ability to protect HUD's interest in this regard due to pressures from production personnel, such as mortgage brokers and loan officers, who control the process and have the power to determine which appraisers get work. Transaction participants, such as mortgage brokers, loan officers and real estate agents, earn their commissions only if the transaction closes. While underwriters are salaried and do not have volume based incentives, they report that they are subject to rebuke by management or to being fired if they are too effective at identifying high risk loans or inflated appraised values.

Feedback from respondents suggests that the risk control process that is most vulnerable to compromise is the property valuation process. Appraisers reported persistent pressure from mortgage brokers and loan officers to "bring in the value." Sixty-two percent of respondents agreed that seller-funded DAPs inflated the appraised value of the home. Appraisers only receive income if they receive orders from the production oriented mortgage broker or loan officer. When repeat business is based on whether or not the valuation outcome facilitates the consummation of the transaction versus the quality and accuracy of the report, then the appraiser is subject to the same production driven incentives as mortgage brokers, loan officers and real estate agents. In those cases, objectivity in valuation is often compromised, as reported by appraisers and underwriters. However, we do not know the extent to which valuation decisions are compromised.

The production driven parties in the transaction have a financial incentive to complete the transaction regardless of its shortcomings to the borrower, lender, investor or FHA.



**An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

## Risk Implications:

- Risk management controls that customarily segregate duties and responsibilities necessary to ensure that each professional in the transaction is allowed the opportunity to act with prudence in carrying out their functions in the transaction are compromised. This increases the risk of insuring loans that pose a risk to the FHA Insurance Funds due to their compromised collateral assessment. In order to support the sellers' contribution to the seller-funded DA provider, the subsequent gift to the purchaser and the sellers' profit requirements, these parties rely on the appraiser to "stretch" the appraised value of the property.

- Appraised values on properties with seller-funded DA are at greater risk of being inflated due to production pressures and lack of risk controls in appraisal ordering and payment processing. These production practices and lack of risk controls have the potential of increasing claim amounts and adversely affecting the FHA Insurance Funds.

## Risk Management Options:

- Work with the mortgage and appraisal industries to establish standards for documenting and adjusting property values, as necessary, for homes purchased with seller-funded DA and develop uniform control requirements for mortgage lenders to follow for ordering and managing the appraisal process. Most large mortgage lenders currently employ practices in their portfolio lending units that address the appraisal ordering and compensation issues observed in third party originator operations. Appraisal trade groups would also be a willing and valuable ally in identifying controls and remedies for behaviors that adversely impact their members.

- Reinforce existing HUD guidelines requiring the separation of production and risk management personnel.

  - Explicitly require mortgage lenders to implement controls that separate the ordering and receipt of appraisals from other processing and production functions for their internal and third party originations. Most wholesale mortgage lenders said they were incapable of setting requirements for their third party originators without the approval or concurrence of HUD. In addition, they said that in order for this change to be effective it has to be adopted throughout the mortgage industry.

  - Reinforce existing underwriting guidelines in HUD handbook 4155.1 REV -5 relative to the role of the underwriter in managing credit and collateral risk. Underwriters in the study reported that they do not feel supported in their role as the "gatekeeper" for loan quality. They report being under increased pressure when underwriting loans with seller-funded DA to



support production goals at the expense of loan and collateral quality. Lender controls should be in place to ensure that the underwriter's determination of the reasonableness of the collateral, as well as the adequacy of borrower credit and capacity is not influenced or controlled by production pressures. One way HUD could accomplish this is by placing increased emphasis on lender controls relative to the separation of production and underwriting functions during lender examinations.

- Support a statutory change in underwriting policy to include the seller-funded DA in the 6% seller contribution limit. In examining data gathered during the base period of this Contract involving 8,294 loans, we observed that the average seller contribution for loans in that sample with a gift was 3% of the sales price. The average seller-funded DA, excluding the application processing fee and any other transaction fees averaged about 3.5% of the sales price. Combined, the seller contribution and the seller-funded DA, excluding fees, was about 6.5% of the sales price. It is reasonable to theorize that limiting the total seller contribution to 6% has the potential to reduce the sales price and pressure to "stretch" appraised value. The other added benefit is clear articulation to mortgage lenders and appraisers on the treatment of all funds contributed by the seller. Supporting a statutory change in underwriting policy to include the seller-funded DA in the 6% seller contribution limit also clears up the confusion relative to whether these funds are "derived in any manner from a party to the sales transaction."

- Better align the incentives of the production area with the risk management functions by adding a registration requirement for loan officers. Under this option, HUD would assign registration numbers to loan officers, thus enabling HUD to track performance by loan officer as they currently track performance by originating mortgagee. Whether this simple practice will alter long established behaviors is uncertain, but at a minimum, it will provide those in the industry with the measuring tools to improve program operations. HUD has several metrics they use to reward and punish mortgage lenders in general and individual professionals in particular. Appraisers are tracked and unacceptable performance (i.e., defaults in cases where HUD determines that the appraised value is not supported by market data) is the basis for sanctions. Likewise, underwriters are tracked to determine if sufficient controls are in place to manage and identify loans that pose an unacceptable risk to the FHA Insurance Funds. However, there are no controls or tracking mechanisms available to aid in identifying which loan officer originated these loans. Concentrance believes that there is benefit in having full accountability throughout the entire mortgage process.



**An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

---

**Factor #2:**     Safeguards

**Description:**   Ways in which program designs have safeguards built-in to mitigate any increased default risk that may result from minimizing the direct equity investment of the homeowner.

---

**Synopsis of Findings:**

Based upon our interviews, the overwhelming majority of seller-funded DA providers did not offer any safeguards built into their program to mitigate any increased default risk associated with the lack of direct equity investment by the homeowner. Only one small DA provider had a privately funded one-year mortgage payment protection program that appeared viable. This program was in addition to the typical MPPI policy offered by most of the other providers. A couple of mortgage lenders described implementing underwriting requirements designed to manage risk layering.

<u>Analysis of Seller-Funded DA Provider Safeguards</u>

The most prominent safeguard reported by seller-funded DA providers, touted as a risk advantage, was that the borrower had equity in the property, unlike the 100% financing programs. However, parties to the transaction overwhelmingly reported that the sales price was increased to cover the seller's reimbursement to the seller-funded DA provider for the assistance advanced to the borrower plus any processing fees or MPPI premiums. This description of the structure of the seller-funded DA differed markedly from the seller-funded DA providers' characterization and the examples on most of their websites. The seller-funded DA providers describe on their websites a process where the seller is simply selling the property for "full list price." In fact, several seller-funded DA providers stated that they will not do business with a lenders or mortgage brokers that allow the DA to be added to the sales price. Real estate agents and mortgage lender respondents based their belief that the borrower had equity in the property on the premise that the appraiser provided an appraised value that was equal to or greater than the sales price.

Not withstanding the very firm opinions of the seller-funded DA providers, the research strongly suggests that the seller-funded DA is being added to the sales price. The seller is reimbursing the seller-funded DA provider and the buyer is reimbursing the seller. This circular process increases the sales price of the property and wipes away any borrower equity in the property.

The seller-funded DA providers reported other safeguards such as voluntary homeownership education, counseling programs and MPPI. While some form of education and/or counseling programs are offered by most seller-funded DA providers, the intended beneficiary, the buyer, is generally not aware of the program. In fact, the seller-funded DA providers reported having extremely limited contact with the borrower. The loan officers,

---

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

mortgage brokers and settlement agents were their only contacts in the transaction. Unlike non-seller-funded DA providers, the centralized structure of most seller-funded DA providers created a logistical problem in providing comprehensive, face-to-face borrower education and counseling services. Borrowers who reported receiving counseling or homeownership education, in most cases did not receive it from the seller-funded DA provider. In other words, for the most part, the borrower counseling or homeownership education was not a pre-requisite for receiving seller-funded DA. Only one small seller-funded DA provider actually <u>required</u> internet-based borrower pre-purchase counseling through a third party vendor. Another regional seller-funded DA provider supplied documentation showing that they counseled nearly 4,500 prospective homeowners in 2003. Their face-to-face counseling program was part of a separate, affiliated business - not part of their seller-funded DAP. When asked, they could not confirm how many of these prospective homeowners receiving face-to-face counseling also received downpayment assistance.

MPPI, as described by seller-funded DA providers, offers little protection to the investor or borrower. These policies were reported to have many exclusionary provisions that lessen their risk mitigating benefits. Examples of these provisions include:

- A vesting period of two months where the borrower must remain employed,
- A requirement that loss of employment must be involuntary and the borrower is not eligible to receive any benefits unless unemployment has persisted for at least 30 days, and
- An exclusionary clause that excludes coverage for job loss due to medical reasons or disability.

In addition to the exclusions outlined above other limiting conditions of this type of insurance include, a $1,800 cap on the maximum monthly mortgage payment and a maximum of six payments during the twelve-month coverage term. Also, seller-funded DA providers suggested that the claims rates on these MPPI policies are very low and complained that the claims paid by the MPPI provider were disproportionately small compared with the premiums paid for the insurance. Some seller-funded DA providers confided that the MPPI policies were more of a marketing tool than a risk mitigation benefit.

Seller-funded DA providers reported that MPPI policies were cost-free in appearance only. The policy fee was initially paid by the seller but recouped in the sales price paid by the buyer. Therefore, it is just another cost paid by the seller and added to the purchase price of the property. When asked about the level of participation in these MPPI programs, seller-funded DA providers indicated that participation was limited.

According to several respondents, the MPPI was designed initially to offset the impact of early payment defaults to the mortgage lender. However, the mortgage lender plays no role in ensuring that the borrower files a claim for benefits in the event of default. One major mortgage lender stated that they did not want to be involved with promoting these plans or with advising delinquent borrowers on the possibility of benefits because they did not want to be perceived as an endorser of such plans.

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

<u>Analysis of Lending Safeguards</u>

These loans are processed and underwritten in the same way that loans with FHA's minimum 3% statutory investment are processed and underwritten. Furthermore, there are no additional premiums charged to compensate for the increased risk of these loans or to protect the FHA Insurance Funds from potential losses. Yet, these loans are tantamount to a zero downpayment mortgage (See Appendix VI), as most borrowers clearly do not have a direct investment in the mortgage transaction. The funds for the DA are borrowed. In fact, in those limited cases where the borrower attempted to make an investment in the property, they reported that they received their deposits back at settlement.

A couple of mortgage company executives reported that, because of the lack of borrower investment and inferior credit quality, they required additional underwriting criteria such as FICO scores within a certain range or a cash investment by the borrower. Another mortgage company executive would not allow a borrower receiving seller-funded DA to use a temporary interest rate buydown account. HUD's Mortgagee Letter 2004-28 dated July 21, 2004 stated that "the Department is concerned with the use of temporary interest rate buydown accounts on fixed-rate mortgages and the ensuring payment shock…Consequently, FHA will no longer permit *underwriting* at the buydown rate on fixed-rate mortgages." In making this policy change, it appears that HUD recognized the potential consequences that sudden, increased expenses can have on borrower behavior and sustainable homeownership.

The few above-mentioned changes sponsored by mortgage company executive management are the exception and not the rule. The majority of mortgage company executives did not impose any additional requirements even if they reported having higher delinquencies and defaults for loans with seller-funded DA.

**Risk Implications:**

- Loans with seller-funded DA, where the assistance is added to the sales price, result in 100% financing. In most cases the borrower has no equity in the property and the there is a strong likelihood that the appraised value of the property was "stretched to the upper end of the market range," or inflated. These loans are insured without any additional risk mitigating requirements or increased mortgage insurance premiums and pose an increased risk of potential losses to the FHA Insurance Funds.

**Risk Management Options:**

- Require more stringent underwriting requirements or other eligibility criteria such as:
  - o Cash reserves or borrower investment equal to at least 1% of the sales price.
  - o A minimum credit threshold for approval (e.g., no delinquencies in the past 12 months or layering of risk).
  - o Lower income and/or debt ratios than those currently required for the FHA program.



**An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

The information above is not an exhaustive list of underwriting requirements or eligibility criteria but rather several examples for consideration.

- Apply the same enhanced, risk-based premium structure to these loans as in the proposed zero downpayment program. All zero downpayment programs should have the same risk management controls. Recognition of the seller-funded DA as 100% financing levels the playing field and allows added protections to the FHA Insurance Funds. Currently, the FHA Insurance Funds are being placed at increased risk of potential losses without these prescribed risk management protections. Borrowers are misinformed about the level of equity they have in the property. These loans with seller-funded DA, at 100% financing levels, are being serviced similar to the way loans are serviced with an investment by the borrower.

- Implement the proposed zero downpayment program. Because of the incentives to raise the property sales price to cover the cost of the downpayment assistance, seller-funded DA creates an illusion of equity.

**Factor #3:** Underwriting Quality and Homeownership Costs

**Description:** Ways in which program designs, or incentives created by individual programs, lessen the underwriting quality of mortgages and/or increase effective homeownership costs to downpayment gift recipients.

**Synopsis of Findings:**

Interviews with transaction participants revealed that the level of readiness and the credit profile of borrowers that receive seller-funded DA are inferior to those borrowers that do not. In addition, underwriters cited certain financing features used to facilitate borrower qualification for the mortgage as having an adverse affect on the loan quality. These features such as temporary interest rate buydowns accounts, when added to the seller-funded DA were reported to have risk-layering effects that increase the risk of potential losses to the FHA Insurance Funds. Furthermore, costs that are ultimately incurred by these borrowers for the seller-funded DA processing fees and the MPPI premiums are unnecessary. The seller-funded DA provider adds no additional value or other protections to the investor or borrower and the MPPI is not a cost-effective risk mitigation tool.

Borrower Credit Profiles

Underwriters report that loans with seller-funded DA tend to have more credit issues than other FHA loans. In addition, some major mortgage company executives reported that these loans had higher delinquencies than their overall FHA portfolio. In new construction markets with high concentrations of seller-funded DA, builders reported that the prevalence of seller-funded DA had depleted the market of qualified starter home purchasers. One builder reported taking as many as 20 applications to qualify one purchaser. They said that


**An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

this was one of the adverse effects of seller-funded DA in the market over an extended period of time. In this particular market, Charlotte, builders reported that being competitive in the starter home market meant you had to offer DA. Although several builders raised these concerns, we observed several subdivisions with homes under construction advertising the availability of DA.

Another impact of this market entrenchment of seller-funded DA is that borrowers reported that the prospect of "no money down" influenced them to make a spontaneous decision to purchase. This, so called, purchase spontaneity is not an innocent self propagating activity. Builder sales agents in the Charlotte market said they used seller-funded DA as a marketing tool because they were aware of its "no money down" allure to borrowers. One agent commented that "if we get them in the [sales] trailer we don't let them leave until they buy a house. We can then use our complete suite of sales tools to close the deal."

In the above instances the borrower literally has no time to prepare for the responsibilities of homeownership. Once the sales contract is signed the entire lending process is triggered with one objective in mind "doing whatever it takes to add the deal to the monthly office production numbers." This production driven process has the inherent potential of approving borrowers for loans that are ill-prepared for homeownership and thus pose an increased risk to the FHA Insurance Funds.

Transaction Structure

Underwriters reported that in order to qualify many of the borrowers from an income perspective, they needed loan terms that involved many layers of risk. These risk layers include combinations of maximum ratios, temporary interest rate buydowns, and premium interest rates in addition to the "financed" seller-funded DA. Compounding the risk of the loan structure is the typical borrower credit profile. Underwriters describe the typical borrower profile as "first time purchaser, lack of credit or old bruised credit with a lack of savings."

Most respondents say the success of the seller-funded DAP design is predicated upon adding the DA to the sales price thus increasing homeownership costs; while seller-funded DA providers see the situation a little differently. They say the success of the seller-funded DAP is based on not reducing the sales price, but selling the property at the "full list price." Regardless of which argument you accept the borrower ends up financing the contribution by the seller to the seller-funded DA provider in their FHA-insured mortgage. In addition to the downpayment, the borrower finances the processing fee and, in some cases, the MPPI premiums. While these borrowers have minimal assets and cannot avoid financing the downpayment, the results of the study suggest that the fees and premiums incurred by the borrower are unnecessary. The entities receiving these payments either do not add any value to the transaction or do not offer a solution that is cost effective.

The ability of the seller-funded DA providers to act as a conduit for the DA is rooted in the misperception that the seller, acting in the capacity as a contributor to the DA provider, is

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

not also acting as an "interested party" to the sales transaction. As noted earlier, HUD's underwritting standards clearly prohibit any party to the sales transaction from being the source of the downpayment, directly or indirectly. The MPPI appears to offer more value as a marketing tool. It gives the impression that the borrower, mortgage lender and FHA are protected in the event of default, but in reality, the plan offers very little protection for any party in the transaction.

### Risk Implications:

The influence of seller-funded DA is causing unprepared borrowers to commit to homeownership without fully understanding the financial impacts. This leads to increased borrower costs, poor loan performance and the potential for increased losses to the FHA Insurance Funds due to default and foreclosure.

### Risk Management Options:

- Allow the seller to provide DA directly to the borrower without the seller-funded DA providers as an intermediary. This policy change would solve the confusion around whether or not the seller-funded DA is a seller contribution or concession. It adds clarity to the valuation process. Appraisers reported being clear on the treatment of "seller contributions" in the valuation process. This proposal to allow the seller to provide DA directly to the borrower without the seller-funded DA provider reinforces their existing training and understanding.

- Acknowledge that downpayment funded by the seller is a valid risk factor that must be considered in underwriting. These loans share the same risk profile of loans that would be eligible under the proposed zero downpayment program. Therefore, the same risk controls and underwriting requirements proposed for loans originated under the proposed zero downpayment program should be applied to seller-funded DA loans.

- Explore risk-mitigating options to better prepare borrowers receiving seller-funded DA for sustainable homeownership. It is clear based upon our interviews that borrowers receiving downpayment assistance are not as prepared for the responsibilities of homeownership as those who do not. Options to consider to better prepare borrowers include but are not limited to the use of pamphlets, courses, marketing campaigns and housing fairs to increase borrower awareness and to sensitize them to the importance of understanding the responsibilities of homeownership. In addition, real estate agents, lenders and seller-funded DA providers should be encouraged to make borrowers receiving DA more aware of counseling and homeownership programs available. HUD has an entire network of trained and experienced counseling organizations that are available to assist borrowers in becoming more aware of the responsibilities of homeownership.

LAW OFFICES

# KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.

PAUL B. GOLDHAMER*
BARRY S. KANTROWITZ†
GARY S. GRAIFMAN*
RANDY J. PERLMUTTER*

WILLIAM T. SCHIFFMAN*
REGINALD H. RUTISHAUSER*
JOHN M. CHAKAN*
RISA K. JAMESON**
MICHAEL L. BRAUNSTEIN*

OF COUNSEL
SHARON M. KANTROWITZ*
STEVEN B. ROTHSCHILD**

* N.Y. & N.J. BAR
† N.Y., N.J. & FLA. BAR
** N.Y. BAR ONLY

747 CHESTNUT RIDGE ROAD - SUITE 200
CHESTNUT RIDGE, NEW YORK 10977-6210

(845) 356-2670
FAX # (845) 356-4335
www.kgglaw.com

June 27, 2007

AFFILIATE
KANTROWITZ, GOLDHAMER & GRAIFMAN
NEW JERSEY
210 SUMMIT AVE.
MONTVALE, N.J. 07646
(201) 391 7000
FAX # (201) 357-1086

## VIA BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND FACSIMILE (202) 708-1826

Bruce S. Albright, Esq.
Assistant General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

> Re:   The Penobscot Indian Nation et al. v. U.S. Department of Housing and Urban Development et al.

Dear Mr. Albright:

It was a pleasure meeting you on Monday. I write to address the issue raised by HUD regarding the Penobscot Indian Nation's down payment assistance program. A federally recognized tribe's ability to operate as a governmental entity beyond its borders and tribal members is well settled. Additionally, HUD's concern regarding the tribe's ability to operate as a governmental entity beyond its borders attempts to improperly assert an additional requirement for a governmental down payment assistance program which is not contained in HUD's regulations. Accordingly, there appears to be no reason why this matter should not be quickly resolved.

Regarding the tribe's ability to operate as a governmental entity beyond its borders and tribal members; the status of tribes as government entities is not dependent upon the location of tribal activities. Outside of its geographical or jurisdictional territory a tribe is still a governmental entity and retains its attributes of sovereignty. For example, a tribe has authority to purchase items from outside of its territory yet because of its status as a sovereign nation it retains immunity from state taxation. Central Machinery Co. v. Arizona Tax Comm'n, 448 U.S. 160 (1980).

Similarly, tribes retain their status as government entities when they conduct activities, including commercial activities, outside of their territorial jurisdiction. The Supreme Court addressed this issue, in the context of tribal immunity, an aspect of tribes sovereign

Bruce S. Albright, Esq.
June 27, 2007
Page 2

governmental status, in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751 (1998).

In Kiowa, the Kiowa Tribe's industrial development commission agreed to purchase corporate stock from a technology company and gave a promissory note as part of the transaction. Under the note, the Kiowa Tribe agreed to pay the company $285,000 plus interest. The face of the note indicated it was signed in Carnegie, Oklahoma, where the Kiowa Tribe has a complex held for it in trust. According to the technology company, however, the Kiowa Tribe executed and delivered the note in Oklahoma City, beyond its tribal lands. The Tribe's payments were also to be made in Oklahoma City. When the tribe defaulted on the note, the technology company sued in state court for repayment. The Kiowa Tribe moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity from suit and state court jurisdiction.

The Supreme Court addressing tribal immunity, an aspect of the tribe's sovereign governmental status, stated that:

> **Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.**

Id. at 760 (emphasis added). The Kiowa Court continued that:

> tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) Potawatomi, supra; Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

Id at 758. Accordingly, it is well settled that tribes can engage in commercial activities outside of their jurisdictional territory while retaining their status as governmental entities. Likewise, it is undisputable that Indian tribes immunity is an aspect of their tribal sovereignty. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978).

Further, Montana v. U. S., 450 U.S. 544 (1981), the case cited by HUD during Monday's meeting is not on point. Montana addressed whether the Crow Tribe had jurisdiction to regulate non-Indian hunting and fishing on non-Indian lands. Montana, which predates Kiowa, did not address the Crow Tribe's status as a sovereign nation when engaging in commercial activities off the reservation. HUD's reliance on Montana confuses tribal status as a sovereign government with its sovereign jurisdiction. Just as when the Governor of New York travels to Washington D.C. with his New York State Police security detail, their jurisdictional powers are altered, not their status as the Governor of New York and New York State Police. Likewise, tribes retain their status as governmental entities regardless of where their activities occur on or off the

Bruce S. Albright. Esq.
June 27, 2007
Page 3

reservation. Additionally, HUD's reliance on <u>Montana</u> is misplaced because the Penobscot Indian Nation is not attempting to regulate by force of tribal law the conduct of non-Indians engaging in activities outside of its territorial jurisdiction, but is making available a down payment assistance program in which buyers and sellers voluntarily participate.

Tribes status as a sovereign governmental entities entitled to recognition outside of its jurisdictional boundaries was also addressed in <u>Prairie Band Potowatomi Nation v. Wagnon</u>, No. 05-3322 )10th Cir. 2007). In <u>Prairie Band Potowatomi Nation</u> the Tenth Circuit struck down the State of Kansas' refusal to recognize license plates issued by tribes geographically located within the exterior boundaries of Kansas. The Tenth Circuit determined that since Kansas recognized license plates issued by other states as well as similarly situated sovereigns, the refusal to recognize Prairie Band Potowatomi Nation license plates was an impermissible discrimination between similarly situated sovereigns. Further, the Indian Reorganization Act was designed to encourage tribal enterprises to enter the white world on a footing of equal competition. <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. 145 (1973).

HUD's conduct also discriminates against the Penobscot Indian Nation because HUD has permitted down payment assistance programs from the Lower <u>Brule</u> Sioux, Citizen Band Potowatomi Nation and the Tlingit-Haida that provide down payments to non-tribal citizens outside tribal lands. As well as recognizing state organized not-for-profits to operate essentially identical down payment assistance programs nationwide.

*[handwritten margin note: conferenced call as Field to whether not aware of any approves]*

In addition to confusing tribal status as a sovereign government with its sovereign jurisdiction, HUD's concern regarding the tribe's ability to operate as a governmental entity beyond its borders, attempts to improperly assert an additional requirement for a governmental down payment assistance program which is not contained in HUD's regulations. HUD expressly allows gift funds from a governmental agency or public entity that has a program to provide homeownership assistance. HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> **<u>Gift Funds.</u> An outright gift of the cash investment is acceptable if the donor is** the borrower's relative, the borrower's employer or labor union, a charitable organization, a **governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers**, or a close friend with a clearly defined and documented interest in the borrower.

HUD's regulations assert no jurisdictional or territorial requirements or restrictions on governmental down payment assistance programs.

Lastly, on February 27, 2007, Alphonso Jackson, HUD's Secretary, while addressing the National Congress of American Indians stated that:

Bruce S. Albright, Esq.
June 27, 2007
Page 4

> At HUD, we are committed to partnering with you to create and sustain strong Native American communities through creative and effective housing and community development programs. Homeownership and the ability to build equity in one's home is an important component in the development of strong communities everywhere, including on tribal lands . . . By using homeownership and the development of affordable housing as vehicles to attract other sources of capital, we can contribute to the growth of Native American communities . . . We encourage tribes to pursue opportunities such as low-income housing tax-credits and other federal and state programs, and to seek partnerships with the private sector.

Mr. Jackson's comments make clear that tribal housing programs are not limited to tribe's territorial boundaries or members.

HUD's conduct, including advising third-parties that GAP does not comply with HUD regulations, despite failing to consult with PIN, HUD's policy of not reviewing or approving governmental down payment assistance programs and HUD's admitted "paucity" of information regarding GAP when it was advising third-parties of GAP's purported non-compliance is clearly actionable.

Based on the above, I see no reason that this matter should not be resolved within the next week. If you would like to resolve this matter, you must contact me before the close of business on July 6, 2007. If you fail to do so, we have been instructed to commence legal action seeking all available remedies. Accordingly, it is imperative you contact me before the above date if this matter is to be resolved prior to litigation.

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**

By:

Michael L. Braunstein

cc:    Christopher Russell, Director
       Gary E. Mason, Esq.

LAW OFFICES

## KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
747 CHESTNUT RIDGE ROAD - SUITE 200
CHESTNUT RIDGE, NEW YORK 10977-6216

PAUL B. GOLDHAMER·
BARRY S. KANTROWITZ·
GARY S. GRAIFMAN·
RANDY J. PERLMUTTER·

WILLIAM T. SCHIFFMAN·
REGINALD H. RUTISHAUSER·
JOHN M. CHAKAN·
RISA K. JAMESON··
MICHAEL L. BRAUNSTEIN·

OF COUNSEL
SHARON M. KANTROWITZ·
STEVEN B. ROTHSCHILD·

· N.Y. & N.J. BAR
: N.Y. N.J. & FLA. BAR
·· N.Y. BAR ONLY

(845) 356-2570
FAX # (845) 356 4335
www.kglaw.com

AFFILIATE
KANTROWITZ, GOLDHAMER & GRAIFMAN
NEW JERSEY
210 SUMMIT AVE
MONTVALE, N.J. 07645
(201) 391-7000
FAX # (201) 307-1088

June 29, 2007

**BY CERTIFIED MAIL, RETURN
RECEIPT REQUESTED AND
FACSIMILE:(202) 708-1826**

Bruce S. Albright, Esq.
Assistant General Counsel
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

Re:    The Penobscot Indian Nation et al. v. U.S. Department of Housing
        and Urban Development et al.

Dear Mr. Albright:

I am writing to supplement my June 27, 2007 letter. I direct you attention to 25 U.S.C. § 4301 et seq., Indian Regulatory Reform and Business Development Act of 2000, which provides express statutory authority for the Penobscot Indian Nation's operation outside of its territorial borders and tribal members. In addition to the existence of express authority for the tribe's activities, HUD's concern evidences a misunderstanding of the Commerce Clause.

25 U.S.C.A. § 4301(a)(emphasis added) provides, in pertinent part, that:

Congress finds that--

3)    in 1994, President Clinton issued an Executive memorandum to the heads of departments and agencies that obligated all Federal departments and agencies, particularly those that have an impact on economic development, to evaluate the potential impacts of their actions on Indian tribes;

(4)    **consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, Indian tribes retain the right to enter into contracts and agreements to trade freely,** and seek enforcement of treaty and trade rights;

Bruce S. Albright, Esq.
June 29, 2007
Page 2

\*       \*       \*

(9)    the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to--

(A)    encourage investment from outside sources that do not originate with the tribes; and

(B)    **facilitate economic ventures with outside entities that are not tribal entities;**

25 U.S.C.A. § 4301(b)(emphasis added), provides, in pertinent part, that:

The purposes of this chapter are as follows:

1)    To revitalize economically and physically distressed Native American economies by--

(A)    encouraging the formation of new businesses by eligible entities, and the expansion of existing businesses; and

(B)    **facilitating the movement of goods to and from Indian lands and the provision of services by Indians.**

\*       \*       \*

(5)    **To encourage intertribal, regional, and international trade and business development** in order to assist in increasing productivity and the standard of living of members of Indian tribes and improving the economic self-sufficiency of the governing bodies of Indian tribes.

25 U.S.C.A. § 4304(d)(emphasis added) provides that:

In conjunction with the activities described in subsection (c) of this section, the Secretary, acting through the Director, shall provide technical assistance and administrative services to eligible entities to assist those entities with--

(1)    the identification of appropriate markets for Indian goods and services;

(2)    entering the markets referred to in paragraph (1);

(3)    compliance with foreign or domestic laws and practices with respect to financial institutions with respect to the export and import of Indian goods and services; and

(4)    **entering into financial arrangements to provide for the export and import of Indian goods and services.**

Bruce S. Albright, Esq.
June 29, 2007
Page 3

Additionally, 25 U.S.C. § 477, Incorporation of Indian tribes; charter; ratification by election, provides that:

> The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

It is also settled that a tribe's governmental status remains when engaged in activities with non-tribal members outside its territorial boundaries. see Gaines v. Ski Apache, 8 F.3d 726 (C.A.10 1993)(Indian tribe's constitutional, rather than corporate entity, operated ski resort located off of the reservation and thus, tribe was not a corporation under Indian Reorganization Act.); see also S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community, 674 P.2d 1376, 138 Ariz. 378 (Ariz.App.1983)(The commercial farming venture was a subordinate business organization of a government organization of the Indian tribe and was unrelated to the corporate entity acting as a business corporation so that activities of the commercial farming venture, initiated off the Indian reservation, were not related to the corporate entity and the "sue and be sued" clause contained in the corporate charter had application only to transactions involving the corporate entity in its capacity as a business corporation and did not apply to the governmental organization's operation of the commercial farming venture as subordinate economic enterprise.).

Based on the foregoing, it is clear that the Penobscot Indian Nation has express statutory authority to operate outside of its territorial borders and tribal members. Further, the tribe retains its tribal status when engaging in activities outside its territorial borders and tribal members.

Lastly, HUD's concern evidences a misunderstanding of the Commerce Clause. The Commerce Clause:

> Because the power granted to Congress under the Commerce Clause is the power to *regulate* Commerce ... among the several States,' the correlative restrictions on the states under the Commerce Clause are invoked only when a state engages in regulation. Therefore, the Supreme Court has drawn a distinction between state 'regulation of' a market and state 'participation in' a market.

Bruce S. Albright, Esq.
June 29, 2007
Page 4

_Chance Management, Inc. v. State of S.D._, 97 F.3d 1107, 1110 (8th Cir. 1996). This issues was addressed by the Supreme Court in _Hughes v. Alexandria Scrap Corp._, 426 U.S. 794 (1976). _Hughes_ involved a Maryland subsidy program created to ensure the recycling of abandoned automobiles known as "hulks". The program initially offered bounties for every Maryland-titled hulk converted to scrap. Both in-state and out-of-state processors who destroyed hulks with Maryland titles were eligible to collect the bounty. Maryland then revised the program, imposing stricter proof of title requirements on those delivering Maryland-titled hulks to out-of-state-processors. This resulted in a significant decline in the number of hulks delivered to out-of-state processors. As the State of Maryland entered the market to participate in, not regulate, commerce, the Supreme Court reversed the lower court's invalidating of the statute, stating that:

> We do not believe the Commerce Clause was intended to require independent justification for such action. Maryland entered the market for the purpose, agreed by all to be commendable as well as legitimate, of protecting the State's environment. As the means of furthering this purpose, it elected the payment of state funds in the form of bounties to encourage the removal of automobile hulks . . . **Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market** and exercising the right to favor its own citizens over others.

_Id_. at 809-810 (emphasis added); _see_ _also_ _Reeves, Inc. v. Stake_, 447 U.S. 429 (1980) (The Supreme Court saw no Constitutionally-mandated plan to limit states' ability to operate in a free market, explaining that the exception is based on the "long recognized right of trader or manufacturer . . . to exercise his own independent discretion as to parties with whom he will deal" and that "evenhandedness" requires that states should share these "freedoms from federal constraints" as well.).

For the reasons set forth, in my June 27, 2007 letter and draft complaint, HUD's conduct is clearly actionable. Accordingly, the deadline to resolve this matter without litigation remains the close of business on June 6, 2007. Accordingly, it is imperative you contact me before that time if this matter is to be resolved prior to litigation.

KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.

By: _____

Michael L. Braunstein

cc:    Christopher Russell, Director
       Gary E. Mason, Esq. (both via email)



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

July 6, 2007

Michael L. Braunstein, Esq.
Kantrowitz, Goldhamer & Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977-6216

Dear Mr. Braunstein,

This letter responds to your letters of June 27, 2007 and June 29, 2007 to Bruce Albright, Assistant General Counsel, about the Penobscot Indian Nation Fair Housing Administration (PINFHA) downpayment assistance program known as the Grant America Program (GAP). Your letters discussed your position that the Penobscot Indian's Nation's (PIN) has legal authority to provide downpayment assistance under FHA's single family mortgage insurance programs as a governmental entity beyond the boundaries of the tribe's reservation and to non-tribal members.

HUD Handbook 4155.1 REV. 5, Paragraph 2-10 C., states that "[a]n outright gift of the [required] cash investment is acceptable if the donor is … a government agency …." That paragraph also states a lender must determine that gift funds ultimately are provided from a source acceptable to FHA. Mortgagees have asked FHA to confirm the acceptability of downpayment assistance programs such as GAP. In light of PINFHA's representation that GAP complies with FHA requirements and inquiries from mortgagees asking FHA to confirm that representation, FHA is reviewing whether GAP, and similar programs, comply with FHA requirements.

FHA understands that its guidance on these programs is needed as soon as possible, but these facts and circumstances present a case of first impression that must be reviewed very carefully in order to provide a HUD response that would be available to all mortgagees. FHA's review of GAP continues to be given a high priority, but additional time is needed to complete that review and to develop (and circulate within HUD for clearance) an expression of HUD's position on GAP and similar programs that can be made available to all mortgagees participating in FHA single family mortgage insurance programs. FHA will use its best efforts to complete this review and issue its guidance within sixty (60) days. You will be contacted if additional information or supporting documentation is needed about GAP.

Sincerely,

Lily A. Lee
Deputy Assistant Secretary
for Single Family Housing

LAW OFFICES

## KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
747 CHESTNUT RIDGE ROAD · SUITE 200
CHESTNUT RIDGE, NEW YORK 10977-6216

PAUL B. GOLDHAMER·
BARRY S. KANTROWITZ†
GARY S. GRAIFMAN·
RANDY J. PERLMUTTER·

WILLIAM T. SCHIFFMAN·
REGINALD H. RUTISHAUSER·
JOHN M. CHAKAN·
RISA K. JAMESON··
MICHAEL L. BRAUNSTEIN·

OF COUNSEL
SHARON M. KANTROWITZ·
STEVEN B. ROTHSCHILD··

· N.Y. & N.J. BAR
† N.Y., N.J. & FLA. BAR
·· N.Y. BAR ONLY

(845) 356-2570
FAX # (845) 356-4335
www.kgglaw.com

AFFILIATE

KANTROWITZ, GOLDHAMER & GRAIFMAN
NEW JERSEY
210 SUMMIT AVE.
MONTVALE, N.J. 07645
(201) 391-7000
FAX # (201) 307-1086

July 9, 2007

**BY E-MAIL, OVERNIGHT
DELIVERY AND FACSIMILE:(202) 708-1826**

Lily A. Lee, Esq.
Deputy Assistant Secretary
  for Single Family Housing
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Washington, DC 20410

Re:    The Penobscot Indian Nation et al. v. U.S. Department of
       Housing and Urban Development et al.

Dear Ms. Lee:

I write to respond to your July 6, 2007 letter. It is clear that the Penobscot Indian Nation's down payment assistance program, The Grant America Program™ ("GAP"), complies with all HUD regulations and that the Penobscot Indian Nation ("PIN"), as a federally recognized tribe, has authority to operate as a governmental entity beyond its territorial borders and tribal members. Accordingly, your position that FHA will use its best efforts to review GAP within the next sixty (60) days and issue guidance is unacceptable.

HUD's discriminatory conduct has resulted in the inability to operate GAP for the past six (6) months and PIN will not acquiesce to the unlawful interruption with GAP continuing for another sixty (60) days. Accordingly, to resolve this matter prior to litigation it is demanded that HUD provided a letter, similar in content to the 1998 Nehemiah Home Ownership 2000 letter, a copy of which is enclosed (a "compliance letter"), stating that GAP complies with HUD regulations and guidance pertaining to down payment assistance programs and the source of funds for the borrowers' down payments and that if HUD changes its policies regarding the source of borrower down payment funds, the changes will become applicable to GAP six (6) months after the final promulgation and issuance of any such changes. Written confirmation that HUD will provide a compliance letter must be received by July 12, 2007 or this offer will be withdrawn and suit will be commenced.

Lily A. Lee, Esq.
July 9, 2007
Page 2

For the reasons set forth in my June 27, 2007 letter, June 29, 2007 letter and draft complaint, HUD's conduct is clearly actionable. In fact, HUD has not disputed GAP's compliance with HUD regulations and HUD's conduct has violated stated HUD polices and regulations and damaged PIN. Accordingly, absent written confirmation by July 12, 2007 that a compliance letter will be provided, we will commence legal action seeking all available remedies and immediate injunctive relief. Accordingly, it is imperative you contact me before the above date if this matter is to be resolved prior to litigation.

KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.

By: _____

Michael L. Braunstein

Enclosure

cc:    Bruce S. Albright, Esq. (via e-mail, overnight delivery and fax)
       John J. Daly, Esq. (via e-mail, overnight delivery and fax)
       Christopher Russell, Director (via email)
       Gary E. Mason, Esq. (via email) (all with enclosure)

 U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

July 12, 2007

Michael L. Braunstein, Esq.
Kantrowitz, Goldhamer & Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977-6216

Dear Mr. Braunstein:

This letter responds to your July 9, 2007 letter about the Penobscot Indian Nation Fair Housing Administration (PINFHA) downpayment assistance program known as the Grant America Program™ (GAP). Your letter implies that the Federal Housing Administration's (FHA) review of the GAP is discriminatory because HUD has permitted the Lower Brule Sioux tribe, the Citizen Band Potawatomi Nation, and the Tlingit and Haida tribes of Alaska to provide downpayment assistance beyond their reservations and to non-tribal members. Your implication is incorrect. In fact, HUD has not advised that such downpayment assistance programs that may be offered by these tribes are acceptable to FHA.

In a letter dated December 8, 2006 from Margaret Burns, Director, Office of Single Family Program Development, to the Lower Brule Sioux tribe, Ms. Burns stated that "[t]here is no provision under FHA guidelines that would require the Lower Brule Sioux to be approved by FHA as a government entity if the Tribe will strictly be providing gifts funds." That letter was in reply to an inquiry related to expansion of homeownership opportunities for tribal members using HUD programs specifically designed for tribal lands. With regard to programs that may be offered by the Citizen Band Potawatomi Nation and the Tlingit and Haida tribes, HUD has no record of their downpayment assistance being acceptable to FHA in connection with FHA-insured financing for the purchase of properties by non-tribal members or in locations beyond tribal boundaries.

FHA's review of GAP remains a high priority at HUD. As stated in my July 6, 2007 letter, FHA will use its best efforts to complete its review of GAP and similar programs within 60 days so that guidance on types of downpayment assistance acceptable to FHA can be made available to lenders that have inquired about whether these programs can be used in conjunction with FHA-insured financing.

Sincerely,

Lily A. Lee
Deputy Assistant Secretary
for Single Family Housing