**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

PENOBSCOT INDIAN NATION *et al.*,                )
                                                 )        Case No.: 07-1282 (PLF)
                                                 )
                                    Plaintiffs,  )
                                                 )
            -v-                                  )
                                                 )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT *et al.*,                  )
                                                 )
                                    Defendants.  )
_____ )

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY OF REPLY**

This memorandum of law is submitted in response to defendants' opposition papers and

in further support of the plaintiffs' motion for summary judgment on their declaratory judgment

cause of action.

GAP operates identical to the HUD approved Nehemiah DPA program, except the gift is

from PIN, a federally recognized tribal government and municipality of the State of Maine, not

Nehemiah, a charitable organization. Just as the Nehemiah and similar charitable DPA programs

comply with HUD regulations because the regulations allow gift funds from charities, GAP

complies with HUD regulations because the regulations allow gift funds from governmental

agencies and public entities.

However, beginning in March 2007, and continuing during the pendency of this action,

HUD has continuously advised third-party lenders that GAP does not comply with HUD

regulations. HUD's conduct was final under the Administrative Procedure Act (APA), among

other reasons, because:

- HUD's continuous representations that GAP did not comply with HUD regulations evidences a definitive position;

- HUD's advising third-party lenders that GAP was not HUD compliant resulted in Lenders not using the program and had a direct and immediate effect on plaintiffs' day to day operations; and

- HUD's affirmative refusal, in writing, to review GAP consummated the administrative process.

For nine (9) months HUD continuously advised third-party lenders that GAP was not HUD compliant, averring that tribal governments were not an appropriate source of down payment assistance. However, HUD Rule 24 CFR Part 203 concedes that "a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance." (Exhibit "Q".)

Accordingly, plaintiffs' motion seeking a declaration that GAP complies with HUD regulations should be granted.

## LEGAL ARGUMENT

## POINT I

## GAP COMPLIES WITH HUD RULES AND REGULATIONS

GAP complies with HUD rules and regulations because HUD expressly allows the use of gift funds from charitable organizations, governmental agencies or public entities to a homebuyer for a down payment towards the purchase of a home.  As both a federally recognized Native American Government and a municipality of the State of Maine, PIN is a governmental agency and public entity.

HUD expressly allows gift funds from a charitable organizations, governmental agencies or public entities that have a program to provide homeownership assistance.  HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> Gift Funds.  **An outright gift of the cash investment is acceptable if the donor is** the borrower's relative, the borrower's employer or labor union, a **charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate- income families or first-time homebuyers,** or a close friend with a clearly defined and documented interest in the borrower.

Contrary to defendants' argument, plaintiffs do not rely on HUD regulations regarding secondary financing, but on HUD's express language regarding "Gift Funds".

While defendants' make conclusory allegations that a material issue of fact exists regarding the operation of GAP, defendants' fail to raise or identify any such issue and have been provided with all requested information regarding GAP.  On June 25, 2007, plaintiffs met with HUD to answer any questions regarding GAP. (Russell Affidavit at ¶ 31.)  During the meeting, HUD's only inquiry regarding GAP was PIN's ability to operate beyond its tribal territory and tribal members. (Russell Affidavit at ¶ 31.)  On June 27, 2007 and June 29, 2007,

HUD was provided authority for PIN's ability to operate beyond its tribal territory and tribal members. (Exhibit "L".)  HUD responded by stating that the FHA would review GAP and other similar programs. (Exhibit "M".)   Over the next month, HUD did not request any further information regarding GAP. (Russell Affidavit at ¶ 35.)   However, on July, 25, 2007, one (1) month after the meeting and after this lawsuit was commenced, HUD requested limited additional information. (Exhibit "O".)  On July 30, 2007, the requested information was provided and plaintiffs requested that if HUD desired any further information regarding GAP, that it request it in writing. (Exhibit "P".)   HUD has not requested any further information. (Russell Affidavit at ¶ 38.)

HUD's conclusory allegation that a material issue of fact exists, is insufficient to defeat summary judgment in light of HUD's complete failure to identify any missing information or material factual issue.  Further, in light of HUD's recent concession that "a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance" (Exhibit "Q"), plaintiffs' motion should be granted.

## POINT II

## PLAINTIFFS HAVE AUTHORITY TO OPERATE GAP BEYOND THEIR TRIBAL TERRITORY AND TRIBAL MEMBERS

As a federally recognized tribe and a municipality of the State of Maine, PIN's ability to operate as a governmental agency and public entity beyond its borders and tribal members is well settled. Despite the averments contained in defendants' opposition papers, HUD Rule 24 CFR Part 203, concedes that "a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance." (Exhibit "Q".)

Further, the Supreme Court addressed this issue, in the context of tribal immunity, an aspect of tribe's sovereign governmental status, in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751 (1998). The Supreme Court addressing tribal immunity, an aspect of the tribe's sovereign governmental status, stated that:

> **Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.**

Id. at 760 (emphasis added). The Kiowa Court continued that:

> tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians.

Id. at 758. Accordingly, it is well settled that tribes can engage in commercial activities outside of their jurisdictional territory while retaining their status as governmental agency.

HUD's actions have improperly interfered with plaintiffs' DPA program, injured plaintiffs and deprived potential homebuyers of down payment grants. As GAP complies with HUD regulations, plaintiffs' motion for summary judgment should be granted.

## POINT III

## HUD'S CONDUCT WAS FINAL AGENCY ACTION
## UNDER THE ADMINISTRATIVE PROCEDURE ACT

As will addressed in greater detail in responding to defendants' motion to dismiss, or any future motion to dismiss, HUD's conduct was final agency action under the Administrative Procedure Act (APA), among other reasons, because:

- HUD's continuous representations that GAP did not comply with HUD regulations evidences a definitive position;

- HUD's advising third-party lenders that GAP was not HUD compliant resulted in Lenders not using the program and had a direct and immediate effect on plaintiffs' day to day operations; and

- HUD's affirmative refusal, in writing, to review GAP consummated the administrative process.

Despite GAP's compliance with HUD regulations, beginning in March 2007 and continuing during the pendency of this action, multiple HUD representatives in multiple locations continuously advised third-party lenders that GAP does not comply with HUD regulations.  As mortgagees are responsible for determining whether all FHA requirements are met, HUD's conduct resulted in lenders not using GAP for fear that the mortgage would not be FHA insured.  Accordingly, HUD's conduct had a direct and immediate effect on plaintiffs' day to day operations and injured plaintiffs.

Further, HUD refused to review GAP.  In May 8, 2007, HUD wrote to plaintiff advising that:

> The letter was not concerning HUD/FHA's review and/or approval of the Grant America Program.  HUD does not approve downpayment programs operated by instrumentalities of government.

Exhibit "R".

That multiple HUD representatives in multiple locations were advising lenders that GAP was not compliant evidences a definitive HUD position on the matter.  Further, with regard to plaintiffs, HUD's refusal to review GAP completed and finalized the administrative process.

In Bravos v. Green, 306 F.Supp.2d 48, 55 (D.D.C 2004) (internal cites omitted) the Court addressed when an agency decision is final for the purpose of judicial review, stating that:

> In determining whether agency action is final for purposes of judicial review, the Court must 'look primarily to whether the agency's position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties challenging the action.'

In Vann v. Kempthorne, 467 F.Supp.2d 56, 71 (D.D.C 2006) the Court confirmed that the agency action did not have to be the last administrative act, stating that:

> To be final, an action need not be 'the last administrative [action] contemplated by the statutory scheme.' Envtl. Def. Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 589 n. 8 (D.C.Cir.1971). Rather, an agency action is final where 'rights or obligations have been determined,' or from which 'legal consequences will flow.' Barrick Goldstrike Mines, Inc., v. Browner, 215 F.3d 45, 48 (D.C.Cir.2000) (internal quotation marks omitted).

Further, a subordinate officer's actions become reviewable as final when they carry a direct and immediate consequence. Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

In determining fitness of agency action for judicial review, court must first look to whether issues presented are purely legal, in which case they are presumptively reviewable. National Wildlife Federation **v.** Brownlee, 402 F.Supp.2d 1, 8 (D.D.C 2005).

HUD refused to review GAP.  (Exhibit "R".)  After refusing the review GAP, HUD cannot evade judicial review by proclaiming, after receipt of a courtesy copy of the complaint, that it is reviewing GAP.  Further, HUD represented that its review would be complete by

September 4, 2007.  Now, approximately one month later, its purported review has not been provided.

> We agree, as a general matter, that an administrative agency cannot legitimately evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on 'final agency action' grounds.

National Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1239 (D.D.C 2003).

HUD asserted a definitive position regarding GAP's non-compliance with HUD regulations, which had a direct and immediate effect on the plaintiffs' day-to-day business. Thereafter, HUD refused to review GAP (Exhibit "R"), completing the administrative process available to the plaintiffs.  HUD cannot now forestall judicial review.

Accordingly, plaintiffs' motion for summary judgment should be granted.

## <u>CONCLUSION</u>

HUD regulations allow gift funds from governmental agencies and public entities to a homebuyer for a down payment towards the purchase of a home. As PIN is a governmental agency and public entity, GAP complies with HUD regulations and plaintiffs' motion seeking a declaration that GAP complies with HUD regulations should be granted.


Dated: October 1, 2007
.

Respectfully submitted:

**THE MASON LAW FIRM, LLP**

/s/ Gary E. Mason_____
Gary E. Mason
Attorneys for Plaintiffs
1225 19th Street Northwest
Washington, D.C. 20036
(202) 429-2290


**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
Michael L. Braunstein
Attorneys for Plaintiffs
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PENOBSCOT INDIAN NATION *et al.*, ) | |
| ) | Case No.: 07-1282 (PLF) |
| Plaintiffs, ) | |
| ) | |
| -v- ) | |
| ) | **REPLY AFFIDAVIT** |
| UNITED STATES DEPARTMENT OF HOUSING ) | |
| AND URBAN DEVELOPMENT *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

I, **Michael L. Braunstein, Esq.,** declare, under the penalty of perjury, as follows:

     1.     I am an attorney with Kantrowitz, Goldhamer & Graifman, P.C., attorneys

for the plaintiffs' in the instant action..

     2.     I submit this reply affidavit in further support of plaintiffs' motion for

summary judgment on their declaratory judgment cause of action.

     3.     A copy of HUD Rule 24 CFR Part 203 is attached as Exhibit "Q".

     4.     A copy HUD's May 8, 2007 letter is attached as Exhibit "R".

     WHEREFORE, based on the foregoing, it is respectfully requested that the instant

application be granted in its entirety.

                                           _____
                                          Michael L. Braunstein, Esq.

STATE OF NEW YORK    )
                           )
COUNTY OF ROCKLAND  )

Subscribed and sworn to (or affirmed) before
me on this 1st day of October, 2007.

_____
Notary Public

MICHELE LISA MEYERS
Notary Public, State of New York
Np. 01ME6143556
Qualified in Rockland County
Commission Expires 04/10/2010

Federal Register: October 1, 2007 (Volume 72, Number 189)]
[Rules and Regulations]
[Page 56001-56007]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr01oc07-18]


[[Page 56001]]

-----------------------------------------------------------------------

Part IV




Department of Housing and Urban Development




-----------------------------------------------------------------------




24 CFR Part 203




Standards for Mortgagor's Investment in Mortgaged Property: Final Rule


[[Page 56002]]

-----------------------------------------------------------------------

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

24 CFR Part 203

[Docket No. FR-5087-F-02]
RIN 2502-AI52


Standards for Mortgagor's Investment in Mortgaged Property

AGENCY: Office of the Assistant Secretary for Housing--Federal Housing
Commissioner, HUD.

ACTION: Final rule.

-----------------------------------------------------------------------

SUMMARY: This final rule amends the Department's regulations governing

the specific standards for a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this final rule codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards established by this final rule address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and also specify prohibited sources for a mortgagor's investment. The final rule establishes that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: The seller, or any other person or entity that financially benefits from the transaction; or any third party or entity that is reimbursed directly or indirectly by the seller, or any other person or entity that financially benefits from the transaction.

This final rule follows publication of a May 11, 2007, proposed rule and takes into consideration the public comments received on the proposed rule. After considering all comments received, HUD is adopting the May 11, 2007, proposed rule with certain minor clarification changes.

DATES: Effective Date: October 31, 2007.

FOR FURTHER INFORMATION CONTACT: Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone number (202) 708-2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877-8339.

SUPPLEMENTARY INFORMATION:

I. Background

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act (Title IV of Pub. L. 101-625, 104 Stat. 4148, approved November 28, 1990). HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property. FHA's experience is that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly.

Although FHA has attempted to preclude downpayment funding derived
from contributions of the seller of the property, some so-called
charitable organizations have been able to circumvent these
restrictions in various ways, including the establishment of a fund
that provides the so-called ``gift'' to the homebuyer. The situations
that cause FHA concern are those in which a so-called charitable
organization provides a so-called gift to a homebuyer from funds that
it receives, directly or indirectly, from the seller. In these cases,
there is a clear quid pro quo between the homebuyer's purchase of the
property and the seller's ``contribution'' or payment to the charitable
organization. This is also true if the contribution to the charitable
organization comes from an entity, other than the seller, that has an
expectation of being reimbursed by the seller. Often, these
contributions function as an inducement to purchase the home. It is
these concerns that prompted HUD's rulemaking in 1999, which did not
result in final regulations, and now again, in 2007.

II. The May 11, 2007, Proposed Rule

    On May 11, 2007, HUD published a proposed rule (72 FR 27047) for
public comment to codify standards regarding the use of gifts as a
source of the mortgagor's investment in the mortgaged property, and to
also specify prohibited sources for a mortgagor's investment. The
proposed rule established that a prohibited source of downpayment
assistance is a payment that consists, in whole or in part, of funds
provided by any of the following parties before, during, or after
closing of the property sale: (1) The seller, or any other person or
entity that financially benefits from the transaction; or (2) any third
party or entity (referred to as a ``donor'') that is reimbursed
directly or indirectly by any of the parties listed in clause (1).
    As discussed in the proposed rule, FHA's primary concern with these
transactions is that the sales price is often increased to ensure that
the seller's net proceeds are not diminished, and such increase in
sales price is often to the detriment of the borrower and FHA. A
Government Accountability Office (GAO) report released in 2005 entitled
``Mortgage Financing: Actions Needed to Help FHA Manage Risks from New
Loan Products' (GAO Mortgage Financing Report) stated that Fannie Mae
and Freddie Mac do not allow seller-related contributions to the
downpayment, and that seller-related contributions could contribute to
an overvaluation of the price of the property (GAO Mortgage Financing
Report, at page 16).
    In May 2006, the Internal Revenue Service (IRS) addressed these
same concerns by issuing Revenue Ruling 2006-27, which provides
guidelines on organizations that may provide downpayment assistance to
homebuyers and qualify as tax-exempt charitable or educational
organizations under Internal Revenue Code (IRC) section 501(c)(3), and
those that do not qualify for this tax-exempt status. The IRS, in its
press announcement of the ruling, stated that funneling downpayment
assistance from sellers to buyers through ``self-serving, circular-
financing arrangements'' is inconsistent with operation as a section
501(c)(3) charitable organization. The IRS stated that, in a typical
scheme, there is a direct correlation between the amount of the
downpayment assistance provided to the buyer and the payment received
from the seller, the seller pays the organization only if the sale
closes, and the organization usually charges an

additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at http://www.irs.gov/newsroom/article/0 ,id=156675,00.html.)

    As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments.
    Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan. While these situations represent a financial burden for FHA and taxpayers, of equal if not greater concern, is that they hurt the families who lose their homes and the neighborhoods in which those homes are located.

III. This Final Rule

    For the foregoing reasons, HUD is proceeding, through this final rule, to codify the regulations submitted for public comment in the May 11, 2007, proposed rule. This final rule makes the following change to the May 11, 2007, proposed rule in response to public comment. This final rule clarifies in Sec. 203.19(f) that a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance. Additionally, the final rule revises in Sec. 203.19(f) the description of tax-exempt organizations that are permissible sources of gifts to more closely align this description with the description used by IRS of such organizations.
    In addition, notwithstanding the effective date provided under the DATES caption of this rule, pursuant to an April 1998 settlement agreement resolving litigation between the Nehemiah Progressive Housing Development Corporation (Nehemiah) and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD.
    While this rule prevents sellers from funding downpayments in their own home sales transactions, the rule is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule changes HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

IV. Discussion of Key Issues Raised by Public Commenters on Proposed Rule

The public comment period for the May 11, 2007, proposed rule was initially set to close on July 10, 2007, but HUD extended the comment period to August 10, 2007. HUD received approximately 15,000 public comments on the proposed rule. The overwhelming majority of these comments consisted of brief statements opposing HUD's rule, with the majority also submitting their comments in a standard similar format and wording, and urging HUD not to eliminate downpayment assistance in connection with FHA-insured mortgages. However, a number of comments supported the rule, and approved of FHA's efforts to harmonize its regulations regarding downpayment assistance with recent rulings of the IRS. These commenters shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure. They stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems.

The following provides a summary of the major themes and issues raised during the public comment period on the proposed rule.

Comment: HUD should not eliminate downpayment assistance, but regulate such assistance, or establish standards for downpayment supported loans, including taking action to improve appraisals and require stricter underwriting and a higher insurance premium for such loans.

HUD response: Many commenters, through their statements urging HUD not to eliminate downpayment assistance, indicated that they believed the May 11, 2007, proposed rule would eliminate all downpayment assistance. HUD's May 11, 2007, rule did not propose to eliminate downpayment assistance, but rather proposed to regulate such assistance as the commenters requested. Additionally, HUD is not eliminating all privately funded downpayment assistance. Such assistance is permitted, for example, from family members, the borrower's employer, state or local governments, charitable organizations that do not rely upon a party with a financial interest in the transaction for downpayment assistance, or labor organizations. The proposed rule, however, did propose to preclude as acceptable downpayment assistance, assistance that, in whole or in part, is funded by the seller or any other person or entity that financially benefits from the transaction or any third party or entity that is reimbursed, directly or indirectly, by the seller or any other party that financially benefits from the transaction.

Comment: Although downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level.

HUD response: Based on HUD's analysis of its loan portfolio going back to 1998, HUD has assessed that risk and has determined that there is 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with downpayment assistance from all other sources.

For example, for loans endorsed for insurance in Fiscal Year (FY) 2001, the cumulative claim rate as of July 2007 was 7.1 percent for loans with downpayment assistance from relatives, public agencies, and employers, but 15.8 percent for loans with downpayment assistance from nonprofit entities that received reimbursements from sellers. A

cumulative claim rate is calculated by dividing the number of claims that have occurred to date by the number of loans endorsed in a particular fiscal year. In conjunction with the FY 2006 Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's independent actuaries estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 11.04 percent if they did not have seller-funded downpayment assistance, but 23.06 percent if they did. An ultimate claim rate is defined as the total number of

[[Page 56004]]

claims expected to occur over the 30-year life of a book of business divided by the total number of loans endorsed in a particular fiscal year. The difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund.

In addition, HUD has determined that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction are also associated with a higher loss rate than other single family loans insured by FHA. In other words, homeowners with this type of downpayment assistance have a two to three times higher possibility of losing their home. This rule, therefore, is HUD's effort to mitigate an unacceptable level of risk.

Comment: HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers.

HUD response: FHA requirements currently require disclosure of the full amount of downpayment assistance.

Comment: Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

HUD response: HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

Comment: Price inflation does not arise from downpayment assistance, but from the appraisal process. The appraisal process should be reformed, for example, by establishing a blind pool appraiser selection process for loans with downpayment assistance.

HUD response: Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule. HUD has already taken steps to address the appraisal issue. HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages.

Comment: HUD should make rules to deal with predatory lenders and lenders who charge outrageous rates. Such lenders are the real problem,

rather than downpayment assistance. It is a lender's responsibility to ensure that people cannot buy more than they can afford, and downpayment assistance should not be affected because of bad lender decisions.

HUD response: HUD acknowledges that problems may arise at each stage of, and with each party to, a complex transaction such as purchasing a home. In addition, problems change over time, and the way any given problem is addressed also changes. This rule addresses an aspect, other than predatory lending, of the home purchase transaction that has been identified as a problem. HUD notes the recommendation is outside the scope of this rule. Although HUD does not regulate non-FHA lending practices, HUD has taken steps, such as issuing rules on property flipping, appraisal reform, and lender accountability, to address predatory lending, and continues to monitor this problem and develop new ways of addressing it. FHA has also taken steps to mitigate mortgage insurance losses with the development and implementation of Credit Watch, Neighborhood Watch, and Appraiser Watch. FHA also strengthened its education efforts by doubling housing counseling grant funds, creating anti-predatory lending brochures, featuring anti-predatory lending messages in advertising, and increasing training opportunities for FHA's program participants.

Comment: HUD should require homebuyer education instead of eliminating downpayment assistance.

HUD response: HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages. HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule.

Comment: HUD should permit sellers to directly contribute downpayment assistance to buyers without a middleman.

HUD response: HUD has determined that contributions to downpayment assistance from sellers and other parties with a financial interest in the transaction, whether direct or indirect, present an unacceptable level of risk for FHA-insured mortgages.

Comment: Rather than doing away with downpayment assistance, HUD should increase FHA loan limits.

HUD response: It is unclear how increasing loan limits would mitigate the risk that HUD has experienced with seller-funded downpayment assistance.

Comment: Rather than doing away with downpayment assistance, HUD should enforce Mortgagee Letter 02-02.

HUD response: While noting again that HUD is not ending downpayment assistance, HUD also notes that Mortgagee Letter 02-02 addresses a different issue than that addressed by this rule. Mortgagee Letter 02-02 addresses a situation where a seller or a nonprofit entity has paid a homebuyer's consumer debt, which then makes it easier for the buyer to meet debt to income ratios. Further, HUD does enforce Mortgagee Letter 02-02. The focus of this rule is downpayment assistance provided by a party with a financial interest in the transaction.

Comment: Rather than doing away with downpayment assistance, HUD should limit the seller contribution to 3 percent.

HUD response: HUD reiterates that it is seeking to establish reasonable and prudent standards for the use of downpayment assistance, and that downpayment assistance from a seller or other party with a financial interest in the transaction presents an unacceptable risk to FHA.

Comment: Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

HUD response: The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not. As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage. For this reason, downpayment assistance cannot be treated as closing costs.

Comment: Downpayment assistance helps first-time, low-credit, and low-income homebuyers, who are often minority or single-parent households. HUD should not eliminate or limit such assistance.

HUD response: As noted, HUD is not eliminating downpayment assistance but is establishing reasonable and prudent standards for the use of downpayment assistance. All homebuyers will benefit if the debt

[[Page 56005]]

burdens of homeownership are set more realistically and if price inflation at the time of purchase is mitigated. Further, mortgage insurance premiums would likely have to be increased without these standards, which would negatively impact all homebuyers. In addition, an analysis of HUD Real Estate Owned (REO) sales since 2004 shows that sales proceeds from this type of downpayment assistance is 3 to 6 percent less than other REO sales. This suggests that the sales prices of such properties may have been inflated.

Comment: This rule will negatively impact the market devastated by Hurricane Katrina by reducing the number of families willing to rebuild or buy in that market.

HUD response: A number of special incentives and forms of assistance, such as disaster relief loans and grants and lower buyer investment requirements, are available in disaster zones such as that created by Hurricane Katrina. FHA, for example, offers eligible disaster victims section 203(h)-insured mortgages, which require no downpayment. Such assistance and requirements appropriately leave homebuyers in a much more favorable position to reestablish homeownership. The reasonable and prudent standards established by this rule will help to ensure that the benefits provided to disaster victims are not undercut by burdensome price and debt inflation.

Comment: The rule will have a negative impact on FHA's business, because of the substantial percentage of loans supported by downpayment assistance. The rule would immediately cause a huge contraction in FHA's business.

HUD response: HUD does not intend to maintain or expand the volume of FHA business at the expense of sound and sustainable purchases by homebuyers. Such a result would be contrary to the public purposes underlying FHA's business.

Comment: The rule is not supported by data. The analysis of the Government Accountability Office (GAO) found that downpayment-assisted loans had higher default and claim rates than other FHA loans, but did not segregate the effects of downpayment assistance from those of low downpayments and low credit ratings. HUD should conduct additional research because the data presented does not appear to be conclusive.

HUD response: HUD has collected and analyzed additional data through its portfolio analysis. This analysis provides additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party compared to downpayments funded from other sources, which HUD continues to permit.

HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO portfolio.

Comment: Prohibition of downpayment assistance would harm otherwise qualified borrowers, who will have to delay or forego homeownership or turn to the subprime market.

HUD response: HUD notes again that the current rule does not prohibit or eliminate downpayment assistance, but only establishes reasonable and prudent standards for its use that will benefit, and not harm, homebuyers. The purpose of the rule is to mitigate the harm caused by downpayment assistance from sources with a financial interest in the transaction, and help assure continued homeownership. As previously stated, downpayment assistance from parties with a financial interest in the transaction have higher default and claim rates and higher loss rates.

Comment: Downpayment assistance should not be prohibited because it provides borrowers instant equity when they purchase a home.

HUD response: HUD agrees, and the rule does not prohibit all downpayment assistance.

Comment: The rule will have a negative impact on the housing market and on the economy.

HUD response: To the contrary, HUD expects that the reasonable and prudent approach taken by this rule will have a positive impact on the housing market and on the economy by reducing the number of mortgages that would otherwise default and go into foreclosure, driving down property values and negatively impacting a community's tax base and economic viability.

Comment: HUD should partner with downpayment assistance programs to promote homeownership. A zero downpayment program or downpayment assistance is needed to address the subprime crisis, because there is little or no equity in a substantial number of troubled properties. HUD should postpone action on downpayment assistance until 100 percent financing is permitted.

HUD response: HUD does sponsor downpayment assistance programs through such programs as the American Dream Downpayment Initiative, and others in which the assistance is not linked to the financial interest of parties other than the homebuyer. HUD currently does not have the authority for a zero downpayment program; however, a zero downpayment program would not address this issue of the financial interest of the providers of downpayment assistance. Reasonable standards would still be necessary for downpayment assistance, even if there is no requirement for a minimum investment by the homebuyer.

Comment: HUD is replacing a private sector program that works and is forcing people to rely on government bureaucracy. In addition, government-sponsored downpayment assistance has eligibility requirements such as income limits. Private downpayment assistance is available to anyone. The rule will vastly increase the size and cost of government.

HUD response: Many of the comments recognized the value of, and the need for, reasonable standards, and the eligibility requirements noted here provide such standards. The cost of government is controlled by prioritizing the availability of benefits to those who need them most. Private downpayment assistance that does not rely upon a party with a financial interest in the transaction is not affected by this rule, which establishes reasonable and prudent standards for the use of downpayment assistance. This rule addresses certain forms of

downpayment assistance that increase the cost of government because they increase FHA mortgage insurance payments for losses attributable to loan defaults and lower REO sales proceeds.

Comment: A developer should be able to offer buyers incentives to purchase properties.

HUD response: A developer's ability to offer incentives, such as a reduced purchase price or a lower interest rate, is not affected by this rule. These incentives are distinguishable from downpayment assistance, and only the provision of downpayment assistance by a seller or a party with a financial interest in the transaction is prohibited by this rule.

Comment: Real estate agents should be permitted to use their commission to fund the downpayment where the real estate agent is the buyer/mortgagor, because the commission is earned, and not a seller contribution or gift.

HUD response: The circumstance described by this comment are not affected by this rule, because a borrower's earned income, such as a real estate agent's commission, is a permissible source of downpayment.

Comment: The rule should not exclude Indian tribes or tribally designated housing entities (TDHEs)

[[Page 56006]]

from the governments considered in the rule. In taking this significant action, HUD did not follow its own policy on tribal consultation and the rule should be withdrawn until HUD follows the consultation procedure.

HUD response: The rule did not intend to exclude Indian tribes or TDHEs from the governments considered in the rule. This final rule specifically clarifies the treatment of downpayment assistance from Indian tribes and TDHEs. As with other rules that are generally applicable and, thus, also incidentally apply to Indian tribes, HUD did not undertake tribal consultation. HUD's tribal consultation policy states, ``Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe.'' (66 FR 49785). Since the effect of the rule on tribes is only incidental and since the rule applies to all FHA-insured single family mortgages, the tribal consultation policy is not applicable. All providers of downpayment assistance are subject to the general standard of this rule and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction. HUD follows, and will continue to follow, its tribal consultation policy when identified by HUD as applicable.

Comment: HUD should clarify whether downpayment assistance provided by grantees under government programs is permitted.

HUD response: Grant funds made available to assist homebuyers may be used for downpayment assistance because such funds are not linked to the sources addressed by this standard, namely, the seller or other parties with a financial interest in the transaction. Grantees act with a public purpose, using government-provided funds, rather than acting with a private financial interest in the transaction or using funds from parties with a financial interest in the transaction.

Comment: HUD should provide a definition of ``family members.''

HUD response: The term ``family member'' is defined at section 201(e) of the National Housing Act (12 U.S.C. 1707(e)) and governs regulations issued for FHA programs under section 203 of the National

Housing Act, such as the current rule.

Comment: HUD should permit loans for downpayment assistance and second mortgages, including loans from the seller and from governments.

HUD response: The rule continues to permit loans authorized by statute as a source for the minimum investment. Loans from sellers are not authorized by statute.

Comment: HUD should clarify that this rule does not prohibit assistance from nonprofit developers.

HUD response: HUD permits downpayment assistance from charitable organizations. Downpayment assistance from nonprofit developers is permitted as long as it complies with this general standard and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction.

V. Findings and Certifications

Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed the rule under Executive Order 12866, Regulatory Planning and Review. OMB determined that the rule is a ``significant regulatory action,'' as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). The docket file was available for public inspection in the Regulations Division, Office of General Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410-0500.

Environmental Review

A Finding of No Significant Impact was not required for the proposed rule. Under 24 CFR 50.19(b)(6), the rule is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 et seq.) and that categorical exclusion continues to apply.

Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

The purpose of this rule, as noted in the preamble, is to establish standards regarding the use of gifts by borrowers with an FHA-insured mortgage--primarily standards that would address gifts by charitable organizations--as a source of an FHA mortgagor's investment in the mortgaged property. To date, HUD's practice has been to limit permissible sources of gifts to family members, governmental agencies, employer of the mortgagor, labor union of the mortgagor, or charitable organizations. HUD is not narrowing the sources of gifts through this rulemaking, but rather is striving to ensure that gifts are gifts and that, especially in the situation of gifts from charitable organizations, the gift is not a quid pro quo between the homebuyer's purchase of the property and the seller's ``contribution'' or payment to the charitable organization.

The prohibited sources of downpayment assistance, as structured in the final rule, are narrow and should not encompass a substantial

number of small entities that are engaged in downpayment assistance to
homebuyers, which, to date, have primarily been charitable
organizations with tax-exempt status. Charitable organizations, large
or small, remain eligible to provide downpayment assistance to FHA
mortgagors, subject to meeting the requirements of Sec.  203.19, as
revised by this final rule.
    Accordingly, the undersigned certifies that this rule will not have
a significant economic impact on a substantial number of small
entities.

Executive Order 12612, Federalism

    Executive Order 12612, (entitled ``Federalism'') prohibits, to the
extent practicable and permitted by law, an agency from promulgating a
regulation that has federalism implications and either imposes
substantial direct compliance costs on state and local governments and
is not required by statute, or preempts state law, unless the relevant
requirements of section 6 of the Executive Order are met. This final
rule does not impose substantial direct compliance costs on state and
local governments or preempt state law within the meaning of the
Executive Order. This final rule solely addresses requirements under
HUD's FHA mortgage insurance programs.

Unfunded Mandates Reform Act

    Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104-
4, approved March 22, 1995) established requirements for federal
agencies to assess the effects of their regulatory actions on state,
local, and tribal governments, and the private sector. This final rule
does not impose any federal mandates on any state, local, or tribal
governments or the private sector within the meaning of the Unfunded
Mandates Reform Act of 1995.

Catalog of Federal Domestic Assistance

    The Catalog of Federal Domestic Assistance Number for the principal
FHA single family mortgage insurance program is 14.117. This final rule
also applies through cross-referencing to FHA mortgage insurance for
condominium units (14.133), and other smaller single family programs.

[[Page 56007]]

List of Subjects in 24 CFR Part 203

    Loan programs--housing and community development, Mortgage
insurance, Reporting and recordkeeping requirements.

0
Accordingly, the Department amends 24 CFR part 203, as follows:

PART 203--SINGLE FAMILY MORTGAGE INSURANCE

0
1. The authority citation for part 203 continues to read as follows:

    Authority: 12 U.S.C. 1709, 1710, 1715b, 1715z-16, and 1715u; 42
U.S.C. 3535(d).

0
2. Section 203.19 is revised to read as follows:

Sec.  203.19  Mortgagor's investment in the property.

    (a) Required funds. The mortgagor must have available funds equal
to the difference between:
    (1) The cost of acquisition, which is the sum of the purchase price
of the home and settlement costs acceptable to the Secretary; and
    (2) The amount of the insured mortgage.
    (b) Mortgagor's minimum cash investment. The required funds under
paragraph (a) of this section must include an investment in the
property by the mortgagor, in cash or cash equivalent, equal to at
least 3 percent of the cost of acquisition, as determined by the
Secretary, unless the mortgagor is:
    (1) A veteran meeting the requirements of Sec.  203.18(b); or
    (2) A disaster victim meeting the requirements of Sec.  203.18(e).
    (c) Restrictions on seller funding. Notwithstanding paragraphs (e)
and (f) of this section, the funds required by paragraph (a) of this
section shall not consist, in whole or in part, of funds provided by
any of the following parties before, during, or after closing of the
property sale:
    (1) The seller or any other person or entity that financially
benefits from the transaction; or
    (2) Any third party or entity that is reimbursed, directly or
indirectly, by any of the parties described in paragraph (c)(1) of this
section.
    (d) Gifts and loans usually prohibited for minimum cash investment.
A mortgagor may not use funds for any part of the minimum cash
investment under paragraph (b) of this section if the funds were
obtained through a loan or a gift from any person, except as provided
in paragraphs (e) and (f) of this section, respectively.
    (e) Permissible sources of loans.
    (1) Statutory authorization needed. A statute must authorize a loan
as a source of the mortgagor's minimum cash investment under paragraph
(b) of this section.
    (2) Examples. The following loans are authorized by statute as a
source for the minimum investment:
    (i) A loan from a family member, a loan to a mortgagor who is at
least 60 years old when the mortgage is accepted for insurance, or a
loan that is otherwise expressly authorized by section 203(b)(9) of the
National Housing Act;
    (ii) A loan made or held by, or insured by, a federal, state, or
local government agency or instrumentality under terms and conditions
approved by the Secretary;
    (iii) A loan made or held by, or insured by, a tribal government or
an agency or instrumentality thereof, including a tribally designated
housing entity as defined at 25 U.S.C. 4103(21), which is treated as a
state or local government under applicable state or local law, under
terms and conditions approved by the Secretary; and
    (iv) A federal disaster relief loan.
    (f) Permissible sources of gifts. The following are permissible
sources of gifts or grants used for the mortgagor's minimum investment
under paragraph (b) of this section:
    (1) Family members and governmental agencies and instrumentalities

eligible under paragraphs (e)(2)(i) and (ii) of this section;
    (2) A tribal government or an agency or instrumentality thereof,
including a tribally designated housing entity, as defined at 25 U.S.C.
4103(21);
    (3) An employer or labor union of the mortgagor;
    (4) Organizations described in section 501(c)(3) and exempt from
taxation under section 501(a) of the Internal Revenue Code;
    (5) Disaster relief grants; and
    (6) Other sources as may be approved by the Secretary on a case-by-
case basis.

    Dated: September 26, 2007.
Brian D. Montgomery,
Assistant Secretary for Housing--Federal Housing Commissioner.
[FR Doc. 07-4846 Filed 9-28-07; 8:45 am]

BILLING CODE 4210-67-P



**U.S. Department of Housing and Urban Development**

Homeownership Center
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3389

May 8, 2007

Mr. John Wyatt
President
Grant America Program
18403 Woodfield Rd., Suite E
Gaithersburg, MD 20879-4794

Dear Mr. Wyatt:

This is in reference to my letter, dated April 4, 2007, that was posted on Grant America Program's website at www.fhadpa.com. The letter was addressing the Grant America Program website's failure to contain a disclosure that Grant America Program is not the federal government and not part of the U. S. Department of Housing and Urban Development/Federal Housing Administration (HUD/FHA). 18 U.S.C. Section 709, a criminal statute, precludes the use of the words "HUD/FHA" in such a manner as to give the appearance of a connection with a Federal government agency. The use of the letters "FHA" in your website gave the impression that your company was affiliated with HUD/FHA.

The letter was not concerning HUD/FHA's review and/or approval of the Grant America Program. HUD does not approve downpayment programs operated by instrumentalities of government. The Department holds approved mortgagees responsible for determining that all FHA requirements are met. By posting the letter to your website, you are giving the impression that HUD/FHA has endorsed and/or approved the Grant America Program. Please provide this office with a response within 10 days and indicate that you removed the letter from Grant America Program's website or put a disclaimer that the Department has not reviewed and/or approved this program.

If you have any questions regarding this letter, please contact me at (215) 861-7216.

Sincerely,

Julie A. Shaffer
Director
Quality Assurance Division

*Visit our web page at http://www.hud.gov/local/phihoc.html*