## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
PENOBSCOT INDIAN NATION, PENOBSCOT  )
INDIAN NATION ENTERPRISES and  )
GLOBAL DIRECT SALES, LLC,  )     Case No.: Case No.: 07-1282 (PLF)
  )
         Plaintiffs,  )
  )
  )
    -v-  )
  )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO  )
JACKSON IN HIS CAPACITY AS SECRETARY  )
OF HOUSING AND URBANDEVELOPMENT,  )
ROY A. BERNARDI, IN HIS CAPACITY AS  )
DEPUTY SECRETARY OF HOUSING AND  )
URBAN DEVELOPMENT AND BRIAN  )
MONTGOMERY, IN HIS CAPACITY AS  )
ASSISTANT SECRETARY OF HOUSING AND  )
URBAN DEVELOPMENT AND  )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION ,  )
  )
        Defendants.  )
_____ )

## AMENDED COMPLAINT FOR JUDICIAL REVIEW
## OF FINAL AGENCY ACTION AND FOR
## <u>INJUNCTIVE AND DECLARATORY REFLIEF</u>

Plaintiffs, the Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global

Direct Sales, LLC, by their attorneys Kantrowitz, Goldhamer and Graifman, P.C. and the Mason

Law Firm, LLP, as and for their amended complaint against defendants, the Department of

Housing and Urban Development *et al*., allege as follows:

## <u>SUMMARY OF COMPLAINT</u>

1.    This action is brought under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, and arises from the United States Department of Housing and Urban Development

("HUD") final agency action regarding plaintiffs' down payment assistance program and the issuance by HUD of a final rule ("Final Rule") regarding standards for a mortgagor's investment in property for a Federal Housing Administration ("FHA") insured mortgage.

2.    Plaintiff Penobscot Indian Nation ("PIN") is a federally recognized Native American Government, a municipality of the State of Maine and a small governmental jurisdiction.  Plaintiffs developed and operate a down payment assistance program, entitled the Grant America Program ("GAP"), that provides gift funds to low-to-moderate-income families purchasing a home and first-time homebuyers,

3.    This action seeks a declaration that GAP complies with HUD's rules and regulation.  GAP operates identical to the HUD approved Nehemiah DPA program, except the gift is from PIN, a federally recognized tribal government and municipality of the State of Maine, not Nehemiah, a charitable organization.  Just as the Nehemiah and similar charitable DPA programs comply with HUD regulations because the regulations allow gift funds from charities, GAP complies with HUD regulations because the regulations allow gift funds from governmental agencies and public entities.

4.    However, beginning in March 2007, and continuing during the pendency of this action, HUD has continuously advised third-party lenders that GAP does not comply with HUD regulations.  HUD's conduct was final under the Administrative Procedure Act (APA), because, among other reasons:

- HUD's continuous representations by multiple individuals in multiple locations that GAP did not comply with HUD regulations evidences a definitive position;

- HUD's advising third-party lenders that GAP was not HUD compliant resulted in Lenders not using the program and had a direct and immediate effect on plaintiffs' day to day operations; and

- HUD's affirmative refusal, in writing, to review GAP consummated the administrative process.

5.   For nine (9) months HUD continuously advised third-party lenders that GAP was not HUD compliant, averring that tribal governments were not an appropriate source of down payment assistance.  However, the Final Rule concedes that "a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance."

6.   HUD's enactment of the Final Rule is arbitrary, capricious and contrary to law. According to HUD, "Down payment costs – including closing costs – remain the most significant single barrier to homeownership, especially for low- to moderate-income households."   See Barriers to Minority Homeownership, available on HUD's website at http://www.hud.gov/news/releasedocs/barriers.cfm.  For approximately 10 years, DPA programs have helped over one million individuals and families buy their own homes, approximately 80 percent for the first time.

7.   In order for a mortgage to be eligible for FHA insurance, the homebuyer or "mortgagor" is required to make a down payment of at least 3 percent of the purchase price of the home.  The governing law specifically authorizes the provision of gifts and loans from family members and others to assist the homebuyer in making the required down payment.

8.   The Final Rule effectively prohibits plaintiffs, and other privately-funded down payment assistance providers, from providing gifts to homebuyers to enable them to purchase homes financed by FHA-insured mortgages.

9.   HUD adopted this regulation after 10 years of actively facilitating DPA programs, and more than six years after abandoning a rulemaking proceeding in which HUD had proposed a virtually identical rule due to overwhelming opposition.  HUD also adopted this regulation in

3

the face of strong opposition from Members of Congress, the public and the imminent prospect of legislation that, if signed into law, will render the regulation moot.

 10. The regulation adopted by HUD is arbitrary and capricious, because, among other reasons:

- It is contrary to the clear intent of Congress;

- It is contrary to HUD's own historic practices and interpretations, and governing judicial precedents;

- It violates HUD's policy regarding considering the impact of the Final Rule on small entities;

- It violates HUD's Tribal Government-to-Government Consultation Policy;

- It is not reasonably supported by HUD's explanations and justifications, and fails to offer a rational basis for rejecting alternative approaches; and

- Its effective date of October 31, 2007, is inconsistent with HUD's sworn testimony before Congress.

 11. Enactment of the Final Rule will significantly inhibit FHA from performing its fundamental purpose - insuring mortgages for those underserved by the conventional mortgage market.  Accordingly, HUD's actions with respect to the Final Rule were arbitrary, capricious and contrary to law.

 12. Accordingly, HUD's actions with respect to both the Final Rule and GAP were arbitrary, capricious and contrary to law.

## JURISDICTION AND VENUE

 13. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331.  This action arises under the National Housing Act of 1934, as amended, 12 U.S.C. §§ 1701 et seq.

("NHA"), the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the Fifth Amendment to the United States Constitution.

14.    An actual controversy exists between the parties within the meaning of 28 U.S.C.

§ 2201 (declaratory judgment) because the Plaintiffs assert the Defendants are violating federal

law.

15.    Venue is proper in the District Court for the District of Colombia pursuant to 28

U.S.C. 1391(e).

## PARTIES

16.    PIN is a federally recognized Native American Government located on the

Penobscot River in the State of Maine and as a result of the Maine Indian Claims Settlement Act,

enacted by the State of Maine in chapter 732 of the Maine Public Laws of 1979, as amended by

chapter 675 of the Maine Public Laws of 1981 and chapter 672 of the Maine Public Laws of

1985, and all subsequent amendments thereto, is a municipality of the State of Maine.

17.    Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a tribal corporation of

the PIN.  PINE is a "Section 17" federally chartered Native American Corporation as defined

under the Indian Reorganization Act of 1934, as amended, 25 U.S.C. 477 et. seq.

18.    Plaintiff Global Direct Sales, LLC ("GDS") is a Maryland limited liability

company with its principal place of business located at 7824 Cessna Avenue, Gaithersburg, MD

20879.

19.    Defendant United States Department of Housing and Urban Development is an

executive agency of the United States of America, and is responsible among other things, for

regulating the administration of the mortgage insurance program under Section 203(b)(9) of the

National Housing Act ("NHA"), 12 U.S.C. § 1709.

20.     Defendant Alphonso Jackson is the Secretary ("Secretary") of HUD.  He is responsible for the operation of HUD and the promulgation of rules and regulations by that agency, in particular the rule at issue herein.  He is sued in his official capacity only.

21.     Defendant Roy A. Bernardi is the duly confirmed Deputy Secretary of HUD and is responsible for the administration and enforcement of HUD policies and procedures, including those pertaining to down payment assistance programs.  He is sued in his official capacity only.

22.     Defendant Brian Montgomery is a duly confirmed Assistant Secretary of HUD and commissioner of the FHA and is responsible for the administration and enforcement of HUD and FHA policies and procedures, including those pertaining to down payment assistance programs.  He is sued in his official capacity only. (Defendants Alphonso Jackson, Roy A. Bernardi, Brian Montgomery and U.S. Department of Housing and Urban Development are hereinafter referred to collectively as "HUD").

## FACTS

**A.     HUD's Final Agency Action Regarding GAP
        was Arbitrary, Capricious and Contrary to Law.**

23.     Pursuant to 25 U.S.C §§ 1723 et seq., PIN is a federally recognized Native American Government and a municipality of the State of Maine.

24.      On January 24, 2007, the PIN Tribal Counsel, in a vote of 10 to 1, passed Resolution 01-24-07-01, which was ratified by Chief Kirk E. Francis on January 29, 2007.  This resolution created the PIN Fair Housing Administration and allowed for the creation of a national down payment assistance program to benefit low to moderate-income homebuyers across America.

25.     PIN, PINE and GDS entered into an Agreement to develop, organize and operate a down payment assistance program ("DPA") wholly owned by PIN.

26.     The DPA program entitled Grant America Program™ ("GAP") is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers, as defined by HUD Handbook 4155.1.

27.     GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment grants.

28.     PIN is the source of all funds provided to the homebuyer under GAP.

29.     As a federally recognized Native American Government, PIN is a "governmental agency and public entity" as defined by HUD.

30.     HUD's Tribal Government-to-Government Consultation Policy provides that "HUD recognizes and commits to a government-to-government relationship with Federally-recognized tribes." HUD's Government-to-Government Trial Consultation Policy (I)(B).

31.     GAP fully complies with HUD regulations because HUD regulations allow gift funds from governmental agencies and public entities to be used as a down payment towards the purchase of a home.

32.     HUD expressly allows gift funds from a governmental agency or public entity that has a program to provide homeownership assistance. HUD Handbook 4155.1 Rev (5), Section 3, 2-10, ¶ 3 (emphasis added), provides:

> **Gift Funds.  An outright gift of the cash investment is acceptable if the donor is** the borrower's relative, the borrower's employer or labor union, a charitable organization, **a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers**, or a close friend with a clearly defined and documented interest in the borrower.

33.     GAP complies with HUD regulations because HUD allows downpayment assistance from governmental agencies and public entities, recognizes PIN as a governmental

agency and public entity and does not geographically limit PIN's downpayment assistance efforts.

34.    Despite GAP's compliance with HUD regulations, beginning in March 2007 and continuing during the pendency of this action, multiple HUD representatives in multiple locations continuously advised third-party lenders that GAP does not comply with HUD regulations.

35.    HUD's conduct was final agency action under the Administrative Procedure Act (APA), among other reasons, because:

  a)  HUD's continuous representations that GAP did not comply with HUD regulations evidences a definitive position;

  b)  HUD's advising third-party lenders that GAP was not HUD compliant resulted in Lenders not using the program and had a direct and immediate effect on plaintiffs' day to day operations; and

  c)  HUD's affirmative refusal, in writing, to review GAP consummated the administrative process.

36.    As mortgagees are responsible for determining whether all FHA requirements are met, HUD's conduct resulted in lenders not using GAP for fear that the mortgage would not be FHA insured.

37.    Accordingly, HUD's conduct had a direct and immediate effect on plaintiffs' day to day operations and injured plaintiffs.

38.    Further, HUD refused to review GAP.  On May 8, 2007, HUD wrote to plaintiff advising that:

> The letter was not concerning HUD/FHA's review and/or approval of the Grant America Program.  HUD does not approve downpayment programs operated by instrumentalities of government.

39. That multiple HUD representatives in multiple locations were advising lenders that GAP was not compliant evidences a definitive HUD position on the matter. Further, with regard to plaintiffs, HUD's refusal to review GAP completed and finalized the administrative process.

40. Plaintiffs were injured by defendants' conduct.

**A. HUD's Enactment of the Final Rule was Arbitrary, Capricious and Contrary to Law.**

41. HUD's enactment of the Final Rule is contrary to the clear intent of Congress; contrary to HUD's own historic practices and interpretations, and governing judicial precedents; is not reasonably supported by HUD's explanations and justifications; fails to offer a rational basis for rejecting alternative approaches and its effective date of October 31, 2007, is inconsistent with HUD's sworn testimony before Congress. Accordingly, HUD's actions with respect to the Final Rule were arbitrary, capricious and contrary to law.

42. The FHA provides mortgage insurance on loans made by FHA approved lenders throughout the United States and its territories. "The primary mission of FHA is to reach borrowers who either are not being served or are being underserved, and to help them achieve the American Dream of homeownership." Statement of HUD Secretary Jackson, dated September 19, 2007, posted on HUD's website at www.hud.gov/news/.

43. In order for a mortgage to be eligible for FHA insurance, Section 203(b)(9) of the National Housing Act, 12 U.S.C. § 1709 ("NHA"), requires a homebuyer to make a down payment of at least 3 percent of the purchase price. According to HUD, "Down payment costs – including closing costs – remain the most significant single barrier to homeownership, especially for low-to-moderate-income households." See Barriers to Minority Homeownership, available on HUD's website at http://www.hud.gov/news/releasedocs/barriers.cfm.

44.     The NHA provides a number of avenues by which a prospective homeowner can obtain assistance in connection with the required down payment for an FHA loan.  For example, section 203(b)(9) explicitly authorizes loan assistance for the down payment requirement for certain types of loans:  a loan to a mortgagor who is over 60 years of age, a loan under the low-income housing demonstration project pursuant to Section 1436 of Title 42, or a mortgage covering a housing unit in connection with a homeownership program under the Home Ownership and Equity Protection at ("HOEPA"), 15 U.S.C. §§ 1602, et seq.

45.     Section 203(b)(9) also authorizes loans from family members:  "[F] purposes of this paragraph, the Secretary shall consider as cash or its equivalent any amounts borrowed from a family member (as such term is defined in section 1707 of this title), subject only to the requirements that, in any case in which the repayment of such borrowed amounts is secured by a lien against the property, such lien shall be subordinate to the mortgage and the sum of the principal obligation of the mortgage and the obligation secured by such lien may not exceed 100 percent of the appraised value of the property plus any initial service charges, appraisal, inspection, and other fees in connection with the mortgage."

46.     On or about May 11, 2007, HUD published the proposed Final Rule regarding standards for mortgagor's investment in the property under section 203(b)(9) of the NHA and its implementing regulation at 24 C.F.R. § 203.19.

47.     The APA requires agencies to provide notice and an opportunity to comment on proposed rules.  Agencies are required to provide substantive responses to all public comments that are relevant and significant.

48.     On or about October 1, 2007, HUD issued its Final Rule, a copy of which is attached hereto as Exhibit "A".

49.     The NHA requires homebuyers to make a down payment of 3 percent of the purchase price of their home to quality for FHA mortgage guarantees.  See U.S.C. § 1709(b)(9). Many prospective low-and-moderate-income homebuyers are unable to meet this requirement without the assistance of organizations such as GAP.

50.     The Final Rule prohibits certain persons and entities from providing down payment assistance.  Specifically, the Final Rule establishes that the source of the mortgagor's investment in the property "shall not consist, in whole or in part, of funds provided by any of the following parties, before, during, or after closing of the property sale:

> (a) The seller or any other person or entity that financially benefits from the transaction; or
>
> (b) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c) (1) of this section."

Exhibit A, § 203.19(c)(1)(2).

51.     GAP provides gift funds to qualified homebuyers who use an eligible loan product such as an FHA insured mortgage or conventional loan.  Gift funds are available for the purchase of a participating home and the funds can be used for down payment and/or closing costs.  Under GAP, these gift funds never have to be repaid by the homebuyer.  There are no buyer income limitations and no area restrictions.  The seller must make a contribution to GAP.

52.     Implementation of the Final Rule is contrary to HUD's stated position about the down payment assistance program.  On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing.  Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities

established by the governmental units, to operate successful downpayment assistance programs.

53.     Further, in a letter dated October 25, 2005, Assistant Secretary – Federal Housing Commissioner Brian Montgomery stated:

> Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with  financing options that are more costly and riskier than FHA.  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

54.     HUD's use of purported default statistics to support its final rule demonstrates the arbitrary nature of the rulemaking process undertaken here.  Specifically, the statistics cited by HUD compared default rates on FHA loans with down payment assistance with FHA loans without down payment assistance.  This analysis is skewed on its face because borrowers in need of down payment assistance are already more financially challenged than other FHA borrowers. The only proper performance comparison for FHA loans with down payment assistance is to compare that group with subprime loans originated with little or no borrower equity.  Under that comparison, the claim rate of approximately 6 percent for a down payment assistance FHA loan found by a Government Accountability Office study is substantially less than the subprime default rate which is reported to be 12 percent and climbing.

55.     The regulation contravenes the NHA's purpose of promoting housing affordability and choice; of facilitating access to, and competition and efficiency in the provision of, housing finance; of protecting the availability of adequate funding for housing at low cost;

and of contributing to the general well-being of the housing sector in the national economy. The regulation is also contrary to HUD's own historic practices and interpretations, and governing judicial precedents.

56. The regulation exceeds the scope of the Secretary's authority to interpret, and promulgate regulations under, section 1709(b)(9) of the NHA. Because the regulation exceeds HUD's statutory jurisdiction, authority, and right, it is invalid pursuant to 5 U.S.C. § 706(2)(c).

57. The regulation is also not reasonably supported by HUD's explanation and justifications, and HUD has failed to offer any rational reasons for its rejection of alternative approaches to the regulation. The regulation is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. As such, the regulation is invalid pursuant to 5 U.S.C. § 706(2)(a).

58. Contrary to previous practices by HUD on this specific issue, HUD has failed to recognize the over 14,000 comments against the regulation versus less than 100 in support. In past attempts to issue such a rule, a margin of 1,800 comment against to 30 in support was sufficient for HUD to withdraw the rule. Furthermore, HUD stated publicly during the rule-making process that he was going to implement the Rule regardless of the public comments.

59. HUD has also failed to give adequate notice of the regulation it adopted and failed to articulate a rational basis for its decision to adopt this regulation, which is inconsistent with past positions taken and interpretations made by HUD. For these and other reasons, HUD's regulation is invalid pursuant to 5 U.S.C. §§ 553(c) and 706(2)(d).

60. The regulation is void, invalid and unenforceable because it has been promulgated in violation of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 et seq., and Executive Order 12866. See Exec. Order No. 12,886, 58 Fed. Reg. 51, 735 (1993).

61.    The regulation is void, invalid and unenforceable because it violates the United States Constitution by irrationally discriminating against organizations and tribal governments that provide DPA in the form of gifts, which are partly supported by donations and service fees from home builders or home sellers, while permitting down payment gifts from governmental agencies and instrumentalities, family members, disaster relief grants and charitable organizations that are not so supported.

62.    The regulation further violates the Constitution by irrationally discriminating among groups of low-to-moderate-income homebuyers.  Those with access to funds from churches, government agencies, and approved charities will have the means to buy their own homes after the regulation goes into effect.  By contrast, those who depend upon DPA from organizations such as GAP – a disproportionate number of whom are minorities, legal immigrants, female-headed households and single parents – will be unable to do so.  There is no rational basis upon which HUD may legitimately impose disparate burdens on these two groups.

63.    The regulation's effective dates' impermissibility discriminate among similarly-situated DPA providers in violation of the United States Constitution.  The regulation is effective as against DPA providers thirty (30) days from date of the regulation's publication in the Federal Register with the exception of Nehemiah Progressive Development Corporation ("Nehemiah"), which is a state charted non-profit.  The regulation is not effective as against Nehemiah until six months after the regulation's publication in the Federal Register.  There is no rational basis for such disparate treatment of a state charted non-profit provider and a federally recognized tribal government based DPA provider like GAP.  Further, this disparate treatment of tribal government based DPA providers, like GAP, violates the United States Government's fiduciary duty to federally recognized tribal governments.

64.     Additionally, the regulation's effective date is inconsistent with HUD's testimony at the June 22, 2007 Congressional Hearing regarding Homeowner Downpayment Assistance and Related Issues.

65.     Further, HUD violated its tribal consultation policy.   HUD's stated Tribal Government-to-Government Consultation Policy provides that:

> On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm

66.     HUD's stated "Tribal Government-to-Government Consultation Policy" further provides that:

> The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

67.     HUD's "Tribal Government-to-Government Consultation Policy" further provides that:

> On May 14, 1998, the President issued Executive Order 13084, 'Consultation and Coordination with Indian Tribal Governments,' which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth guidelines for all federal agencies to (1) establish regular and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.

C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

68. Lastly, HUD's Tribal Government-to-Government Consultation Policy provides that "Consultation":

means the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process.

69. PIN requested that HUD consult with PIN regarding the Final Rule.

70. HUD knowingly failed to consult with PIN or any other federally recognized tribal government regarding the Final Rule.

71. HUD's conduct violated its own polices, as well as the United States Government's fiduciary duty to federally recognized tribal governments.

72. HUD violated its own policies by failing to consider the impact the Final Rule will have on small entities. HUD's "Policy for Considering Potential Impacts of HUD Rules on Small Entities" provides that:

It is HUD's policy to thoroughly review its draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as required by the Regulatory Flexibility Act. HUD's two principal methods for accomplishing these goals are through the review and analysis of all draft HUD rules by its Regulatory Flexibility Officer, and the undertaking of outreach efforts to solicit the views of small entities in the development of HUD rules.

73. Small entities include "small governmental jurisdictions" as defined by 601(5) of the Regulatory Flexibility Act, which provides that:

the term 'small governmental jurisdiction' means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

74.    The Final Rule directly impacts small entities, including plaintiffs.

75.    HUD has not provided a review and analysis of the Final Rule's impact on small entities.

76.    HUD has failed to engage in outreach efforts to solicit the views of small entities in the development of the Final Rule.

77.    Enactment of the Final Rule will significantly inhibit FHA from performing its fundamental purpose - insuring mortgages for those underserved by the conventional mortgage market.  Accordingly, HUD's actions with respect to the Final Rule were arbitrary, capricious and contrary to law.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of the Administrative Procedure Act)

78.    Plaintiffs repeat and reallege the allegations contained in preceding paragraphs of the Amended Complaint as though fully set forth herein.

79.    The Final Rule is an arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2)(A) because HUD failed to provide substantive responses to all relevant and significant pubic comments  that were timely submitted during the comment period.

80.    Specifically, following the publications of the proposed Final Rule on May 11, 2007, more than 14,000 comments were submitted to HUD during the comment period that ended on August 10, 2007.  In addition to an insufficient amount of time in which to adequately review all of the submissions, the Secretary of HUD eviscerated the rulemaking process by granting interviews to news organizations such as Bloomberg News during the rulemaking process where he was quoted as being "very much against (the down payment assistance

17

program),” and that he personally believed the program was “wrong.”  Such comments by the Secretary during the comment period have the effect of tainting the rulemaking process and stifling additional comments because of the obviously predetermined outcome.  In fact, as noted in the Final Rule, the proposed Final Rule was simply adopted “with certain minor clarification changes.”  See Final Rule, Summary Section.

81.    The Final Rule is an arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2)(A) because its enforcement will result in fewer prospective homebuyers being eligible to obtain FHA-insured loans and, thus, is contrary to FHA’s mission of insuring mortgages for those underserved by the conventional mortgage market.

82.    HUD’s Final Rule violates the APA inasmuch as it constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to the statutory provisions of the NHA.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Declaratory Judgment)

83.    Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

84.    There is a justiciable issue involving the parties which requires a declaration of the parties’ rights.

85.    Plaintiffs seek a declaration that GAP complies with HUD regulations.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of the Administrative Procedure Act)

86.    Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

87.    Defendants' final agency action regarding plaintiffs and GAP were arbitrary, capricious, and abuse of discretion, not in accordance with law and without observance of procedure required by law, all in violation of the APA.

88.    As a result of defendants' wrongful actions, plaintiffs have been injured.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

58.    Plaintiffs repeat each and every allegation contained in the preceding paragraphs of the complaint as if set forth at length herein.

59.    The United States Government has a fiduciary duty to Federal Recognized tribal governments.

60.    HUD has breached its fiduciary duty to Plaintiff PIN.

61.    HUD's breach of its fiduciary duty was a substantial factor in causing plaintiffs' damages.

62.    As a result of Defendants' wrongful actions, plaintiffs have been injured and are entitled to compensatory and punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully prays:

a.    That the Final rule be declared arbitrary and capricious and contrary to law pursuant to 5 U.S.C. § 706(2)(A), and thus cannot be enforced;

b.    That the Court enjoin HUD, its officers, employees, agents, and servants from enforcing the Final rule;

c.    That pending the final hearing and determination by the Court of this matter, a preliminary injunction be issued restraining HUD, its officers, employees, agents or servants from enforcing the Final Rule;

d.      On their second cause of action, declaring that GAP is compliant with HUD regulations and awarding costs, attorneys' fees and other relief;

e.      On their third cause of action, declaring that defendants' conduct violated and continues to violate the administrative procedures Act and awarding appropriate damages, costs, attorneys' fees and other relief;

f.      On their fourth cause of action, declaring that defendants breached their fiduciary duty and awarding compensatory and punitive damages, costs, attorneys' fees and other relief;

g.      That the Court award plaintiff its costs and expenses, including reasonable attorneys' fees and expert witness fees; and

h.      That the Court issue such other and further relief as it may deem necessary and proper.


Dated:  October 9 2007                                Respectfully submitted,

                                                     /s/ Gary E. Mason
                                                     Gary E. Mason
                                                     THE MASON LAW FIRM, LLP
                                                     1225 19th Street, N.W. Suite 500
                                                     Washington, D.C.  20036
                                                     (202) 429-2290

                                                     Michael L. Braunstein
                                                     KANTROWITZ, GOLDHAMER
                                                     & GRAIFMAN, P.C.
                                                     747 Chestnut Ridge Road
                                                     Chestnut Ridge, N.Y. 10977
                                                     (845) 356-2570

                                                     Attorneys for Plaintiffs

EXHIBIT A

Federal Register: October 1, 2007 (Volume 72, Number 189)]
[Rules and Regulations]
[Page 56001-56007]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr01oc07-18]


[[Page 56001]]

-----------------------------------------------------------------------

Part IV



Department of Housing and Urban Development



-----------------------------------------------------------------------



24 CFR Part 203



Standards for Mortgagor's Investment in Mortgaged Property: Final Rule


[[Page 56002]]

-----------------------------------------------------------------------

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

24 CFR Part 203

[Docket No. FR-5087-F-02]
RIN 2502-AI52


Standards for Mortgagor's Investment in Mortgaged Property

AGENCY: Office of the Assistant Secretary for Housing--Federal Housing
Commissioner, HUD.

ACTION: Final rule.

-----------------------------------------------------------------------

SUMMARY: This final rule amends the Department's regulations governing

the specific standards for a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this final rule codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards established by this final rule address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and also specify prohibited sources for a mortgagor's investment. The final rule establishes that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: The seller, or any other person or entity that financially benefits from the transaction; or any third party or entity that is reimbursed directly or indirectly by the seller, or any other person or entity that financially benefits from the transaction.

This final rule follows publication of a May 11, 2007, proposed rule and takes into consideration the public comments received on the proposed rule. After considering all comments received, HUD is adopting the May 11, 2007, proposed rule with certain minor clarification changes.

DATES: Effective Date: October 31, 2007.

FOR FURTHER INFORMATION CONTACT: Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone number (202) 708-2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877-8339.

SUPPLEMENTARY INFORMATION:

I. Background

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act (Title IV of Pub. L. 101-625, 104 Stat. 4148, approved November 28, 1990). HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property. FHA's experience is that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly.

Although FHA has attempted to preclude downpayment funding derived from contributions of the seller of the property, some so-called charitable organizations have been able to circumvent these restrictions in various ways, including the establishment of a fund that provides the so-called ``gift'' to the homebuyer. The situations that cause FHA concern are those in which a so-called charitable organization provides a so-called gift to a homebuyer from funds that it receives, directly or indirectly, from the seller. In these cases, there is a clear quid pro quo between the homebuyer's purchase of the property and the seller's ``contribution'' or payment to the charitable organization. This is also true if the contribution to the charitable organization comes from an entity, other than the seller, that has an expectation of being reimbursed by the seller. Often, these contributions function as an inducement to purchase the home. It is these concerns that prompted HUD's rulemaking in 1999, which did not result in final regulations, and now again, in 2007.

II. The May 11, 2007, Proposed Rule

On May 11, 2007, HUD published a proposed rule (72 FR 27047) for public comment to codify standards regarding the use of gifts as a source of the mortgagor's investment in the mortgaged property, and to also specify prohibited sources for a mortgagor's investment. The proposed rule established that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity (referred to as a ``donor'') that is reimbursed directly or indirectly by any of the parties listed in clause (1).

As discussed in the proposed rule, FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. A Government Accountability Office (GAO) report released in 2005 entitled ``Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products' (GAO Mortgage Financing Report) stated that Fannie Mae and Freddie Mac do not allow seller-related contributions to the downpayment, and that seller-related contributions could contribute to an overvaluation of the price of the property (GAO Mortgage Financing Report, at page 16).

In May 2006, the Internal Revenue Service (IRS) addressed these same concerns by issuing Revenue Ruling 2006-27, which provides guidelines on organizations that may provide downpayment assistance to homebuyers and qualify as tax-exempt charitable or educational organizations under Internal Revenue Code (IRC) section 501(c)(3), and those that do not qualify for this tax-exempt status. The IRS, in its press announcement of the ruling, stated that funneling downpayment assistance from sellers to buyers through ``self-serving, circular-financing arrangements'' is inconsistent with operation as a section 501(c)(3) charitable organization. The IRS stated that, in a typical scheme, there is a direct correlation between the amount of the downpayment assistance provided to the buyer and the payment received from the seller, the seller pays the organization only if the sale closes, and the organization usually charges an

[[Page 56003]]

additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at http://www.irs.gov/newsroom/article/0,id=156675,00.html.)

As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments.

Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan. While these situations represent a financial burden for FHA and taxpayers, of equal if not greater concern, is that they hurt the families who lose their homes and the neighborhoods in which those homes are located.

## III. This Final Rule

For the foregoing reasons, HUD is proceeding, through this final rule, to codify the regulations submitted for public comment in the May 11, 2007, proposed rule. This final rule makes the following change to the May 11, 2007, proposed rule in response to public comment. This final rule clarifies in Sec. 203.19(f) that a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance. Additionally, the final rule revises in Sec. 203.19(f) the description of tax-exempt organizations that are permissible sources of gifts to more closely align this description with the description used by IRS of such organizations.

In addition, notwithstanding the effective date provided under the DATES caption of this rule, pursuant to an April 1998 settlement agreement resolving litigation between the Nehemiah Progressive Housing Development Corporation (Nehemiah) and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD.

While this rule prevents sellers from funding downpayments in their own home sales transactions, the rule is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule changes HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

IV. Discussion of Key Issues Raised by Public Commenters on Proposed Rule

The public comment period for the May 11, 2007, proposed rule was initially set to close on July 10, 2007, but HUD extended the comment period to August 10, 2007. HUD received approximately 15,000 public comments on the proposed rule. The overwhelming majority of these comments consisted of brief statements opposing HUD's rule, with the majority also submitting their comments in a standard similar format and wording, and urging HUD not to eliminate downpayment assistance in connection with FHA-insured mortgages. However, a number of comments supported the rule, and approved of FHA's efforts to harmonize its regulations regarding downpayment assistance with recent rulings of the IRS. These commenters shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure. They stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems.

The following provides a summary of the major themes and issues raised during the public comment period on the proposed rule.

Comment: HUD should not eliminate downpayment assistance, but regulate such assistance, or establish standards for downpayment supported loans, including taking action to improve appraisals and require stricter underwriting and a higher insurance premium for such loans.

HUD response: Many commenters, through their statements urging HUD not to eliminate downpayment assistance, indicated that they believed the May 11, 2007, proposed rule would eliminate all downpayment assistance. HUD's May 11, 2007, rule did not propose to eliminate downpayment assistance, but rather proposed to regulate such assistance as the commenters requested. Additionally, HUD is not eliminating all privately funded downpayment assistance. Such assistance is permitted, for example, from family members, the borrower's employer, state or local governments, charitable organizations that do not rely upon a party with a financial interest in the transaction for downpayment assistance, or labor organizations. The proposed rule, however, did propose to preclude as acceptable downpayment assistance, assistance that, in whole or in part, is funded by the seller or any other person or entity that financially benefits from the transaction or any third party or entity that is reimbursed, directly or indirectly, by the seller or any other party that financially benefits from the transaction.

Comment: Although downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level.

HUD response: Based on HUD's analysis of its loan portfolio going back to 1998, HUD has assessed that risk and has determined that there is 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with downpayment assistance from all other sources.

For example, for loans endorsed for insurance in Fiscal Year (FY) 2001, the cumulative claim rate as of July 2007 was 7.1 percent for loans with downpayment assistance from relatives, public agencies, and employers, but 15.8 percent for loans with downpayment assistance from nonprofit entities that received reimbursements from sellers. A

cumulative claim rate is calculated by dividing the number of claims that have occurred to date by the number of loans endorsed in a particular fiscal year. In conjunction with the FY 2006 Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's independent actuaries estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 11.04 percent if they did not have seller-funded downpayment assistance, but 23.06 percent if they did. An ultimate claim rate is defined as the total number of

[[Page 56004]]

claims expected to occur over the 30-year life of a book of business divided by the total number of loans endorsed in a particular fiscal year. The difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund.

  In addition, HUD has determined that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction are also associated with a higher loss rate than other single family loans insured by FHA. In other words, homeowners with this type of downpayment assistance have a two to three times higher possibility of losing their home. This rule, therefore, is HUD's effort to mitigate an unacceptable level of risk.

  Comment: HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers.

  HUD response: FHA requirements currently require disclosure of the full amount of downpayment assistance.

  Comment: Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

  HUD response: HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

  Comment: Price inflation does not arise from downpayment assistance, but from the appraisal process. The appraisal process should be reformed, for example, by establishing a blind pool appraiser selection process for loans with downpayment assistance.

  HUD response: Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule. HUD has already taken steps to address the appraisal issue. HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages.

  Comment: HUD should make rules to deal with predatory lenders and lenders who charge outrageous rates. Such lenders are the real problem,

rather than downpayment assistance. It is a lender's responsibility to ensure that people cannot buy more than they can afford, and downpayment assistance should not be affected because of bad lender decisions.

HUD response: HUD acknowledges that problems may arise at each stage of, and with each party to, a complex transaction such as purchasing a home. In addition, problems change over time, and the way any given problem is addressed also changes. This rule addresses an aspect, other than predatory lending, of the home purchase transaction that has been identified as a problem. HUD notes the recommendation is outside the scope of this rule. Although HUD does not regulate non-FHA lending practices, HUD has taken steps, such as issuing rules on property flipping, appraisal reform, and lender accountability, to address predatory lending, and continues to monitor this problem and develop new ways of addressing it. FHA has also taken steps to mitigate mortgage insurance losses with the development and implementation of Credit Watch, Neighborhood Watch, and Appraiser Watch. FHA also strengthened its education efforts by doubling housing counseling grant funds, creating anti-predatory lending brochures, featuring anti-predatory lending messages in advertising, and increasing training opportunities for FHA's program participants.

Comment: HUD should require homebuyer education instead of eliminating downpayment assistance.

HUD response: HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages. HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule.

Comment: HUD should permit sellers to directly contribute downpayment assistance to buyers without a middleman.

HUD response: HUD has determined that contributions to downpayment assistance from sellers and other parties with a financial interest in the transaction, whether direct or indirect, present an unacceptable level of risk for FHA-insured mortgages.

Comment: Rather than doing away with downpayment assistance, HUD should increase FHA loan limits.

HUD response: It is unclear how increasing loan limits would mitigate the risk that HUD has experienced with seller-funded downpayment assistance.

Comment: Rather than doing away with downpayment assistance, HUD should enforce Mortgagee Letter 02-02.

HUD response: While noting again that HUD is not ending downpayment assistance, HUD also notes that Mortgagee Letter 02-02 addresses a different issue than that addressed by this rule. Mortgagee Letter 02-02 addresses a situation where a seller or a nonprofit entity has paid a homebuyer's consumer debt, which then makes it easier for the buyer to meet debt to income ratios. Further, HUD does enforce Mortgagee Letter 02-02. The focus of this rule is downpayment assistance provided by a party with a financial interest in the transaction.

Comment: Rather than doing away with downpayment assistance, HUD should limit the seller contribution to 3 percent.

HUD response: HUD reiterates that it is seeking to establish reasonable and prudent standards for the use of downpayment assistance, and that downpayment assistance from a seller or other party with a financial interest in the transaction presents an unacceptable risk to FHA.

Comment: Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

HUD response: The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not. As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage. For this reason, downpayment assistance cannot be treated as closing costs.

Comment: Downpayment assistance helps first-time, low-credit, and low-income homebuyers, who are often minority or single-parent households. HUD should not eliminate or limit such assistance.

HUD response: As noted, HUD is not eliminating downpayment assistance but is establishing reasonable and prudent standards for the use of downpayment assistance. All homebuyers will benefit if the debt

[[Page 56005]]

burdens of homeownership are set more realistically and if price inflation at the time of purchase is mitigated. Further, mortgage insurance premiums would likely have to be increased without these standards, which would negatively impact all homebuyers. In addition, an analysis of HUD Real Estate Owned (REO) sales since 2004 shows that sales proceeds from this type of downpayment assistance is 3 to 6 percent less than other REO sales. This suggests that the sales prices of such properties may have been inflated.

Comment: This rule will negatively impact the market devastated by Hurricane Katrina by reducing the number of families willing to rebuild or buy in that market.

HUD response: A number of special incentives and forms of assistance, such as disaster relief loans and grants and lower buyer investment requirements, are available in disaster zones such as that created by Hurricane Katrina. FHA, for example, offers eligible disaster victims section 203(h)-insured mortgages, which require no downpayment. Such assistance and requirements appropriately leave homebuyers in a much more favorable position to reestablish homeownership. The reasonable and prudent standards established by this rule will help to ensure that the benefits provided to disaster victims are not undercut by burdensome price and debt inflation.

Comment: The rule will have a negative impact on FHA's business, because of the substantial percentage of loans supported by downpayment assistance. The rule would immediately cause a huge contraction in FHA's business.

HUD response: HUD does not intend to maintain or expand the volume of FHA business at the expense of sound and sustainable purchases by homebuyers. Such a result would be contrary to the public purposes underlying FHA's business.

Comment: The rule is not supported by data. The analysis of the Government Accountability Office (GAO) found that downpayment-assisted loans had higher default and claim rates than other FHA loans, but did not segregate the effects of downpayment assistance from those of low downpayments and low credit ratings. HUD should conduct additional research because the data presented does not appear to be conclusive.

HUD response: HUD has collected and analyzed additional data through its portfolio analysis. This analysis provides additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party compared to downpayments funded from other sources, which HUD continues to permit.

HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO portfolio.

Comment: Prohibition of downpayment assistance would harm otherwise qualified borrowers, who will have to delay or forego homeownership or turn to the subprime market.

HUD response: HUD notes again that the current rule does not prohibit or eliminate downpayment assistance, but only establishes reasonable and prudent standards for its use that will benefit, and not harm, homebuyers. The purpose of the rule is to mitigate the harm caused by downpayment assistance from sources with a financial interest in the transaction, and help assure continued homeownership. As previously stated, downpayment assistance from parties with a financial interest in the transaction have higher default and claim rates and higher loss rates.

Comment: Downpayment assistance should not be prohibited because it provides borrowers instant equity when they purchase a home.

HUD response: HUD agrees, and the rule does not prohibit all downpayment assistance.

Comment: The rule will have a negative impact on the housing market and on the economy.

HUD response: To the contrary, HUD expects that the reasonable and prudent approach taken by this rule will have a positive impact on the housing market and on the economy by reducing the number of mortgages that would otherwise default and go into foreclosure, driving down property values and negatively impacting a community's tax base and economic viability.

Comment: HUD should partner with downpayment assistance programs to promote homeownership. A zero downpayment program or downpayment assistance is needed to address the subprime crisis, because there is little or no equity in a substantial number of troubled properties. HUD should postpone action on downpayment assistance until 100 percent financing is permitted.

HUD response: HUD does sponsor downpayment assistance programs through such programs as the American Dream Downpayment Initiative, and others in which the assistance is not linked to the financial interest of parties other than the homebuyer. HUD currently does not have the authority for a zero downpayment program; however, a zero downpayment program would not address this issue of the financial interest of the providers of downpayment assistance. Reasonable standards would still be necessary for downpayment assistance, even if there is no requirement for a minimum investment by the homebuyer.

Comment: HUD is replacing a private sector program that works and is forcing people to rely on government bureaucracy. In addition, government-sponsored downpayment assistance has eligibility requirements such as income limits. Private downpayment assistance is available to anyone. The rule will vastly increase the size and cost of government.

HUD response: Many of the comments recognized the value of, and the need for, reasonable standards, and the eligibility requirements noted here provide such standards. The cost of government is controlled by prioritizing the availability of benefits to those who need them most. Private downpayment assistance that does not rely upon a party with a financial interest in the transaction is not affected by this rule, which establishes reasonable and prudent standards for the use of downpayment assistance. This rule addresses certain forms of

downpayment assistance that increase the cost of government because they increase FHA mortgage insurance payments for losses attributable to loan defaults and lower REO sales proceeds.

Comment: A developer should be able to offer buyers incentives to purchase properties.

HUD response: A developer's ability to offer incentives, such as a reduced purchase price or a lower interest rate, is not affected by this rule. These incentives are distinguishable from downpayment assistance, and only the provision of downpayment assistance by a seller or a party with a financial interest in the transaction is prohibited by this rule.

Comment: Real estate agents should be permitted to use their commission to fund the downpayment where the real estate agent is the buyer/mortgagor, because the commission is earned, and not a seller contribution or gift.

HUD response: The circumstance described by this comment are not affected by this rule, because a borrower's earned income, such as a real estate agent's commission, is a permissible source of downpayment.

Comment: The rule should not exclude Indian tribes or tribally designated housing entities (TDHEs)

[[Page 56006]]

from the governments considered in the rule. In taking this significant action, HUD did not follow its own policy on tribal consultation and the rule should be withdrawn until HUD follows the consultation procedure.

HUD response: The rule did not intend to exclude Indian tribes or TDHEs from the governments considered in the rule. This final rule specifically clarifies the treatment of downpayment assistance from Indian tribes and TDHEs. As with other rules that are generally applicable and, thus, also incidentally apply to Indian tribes, HUD did not undertake tribal consultation. HUD's tribal consultation policy states, ``Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe.'' (66 FR 49785). Since the effect of the rule on tribes is only incidental and since the rule applies to all FHA-insured single family mortgages, the tribal consultation policy is not applicable. All providers of downpayment assistance are subject to the general standard of this rule and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction. HUD follows, and will continue to follow, its tribal consultation policy when identified by HUD as applicable.

Comment: HUD should clarify whether downpayment assistance provided by grantees under government programs is permitted.

HUD response: Grant funds made available to assist homebuyers may be used for downpayment assistance because such funds are not linked to the sources addressed by this standard, namely, the seller or other parties with a financial interest in the transaction. Grantees act with a public purpose, using government-provided funds, rather than acting with a private financial interest in the transaction or using funds from parties with a financial interest in the transaction.

Comment: HUD should provide a definition of ``family members.''

HUD response: The term ``family member'' is defined at section 201(e) of the National Housing Act (12 U.S.C. 1707(e)) and governs regulations issued for FHA programs under section 203 of the National

Housing Act, such as the current rule.
    Comment: HUD should permit loans for downpayment assistance and
second mortgages, including loans from the seller and from governments.
    HUD response: The rule continues to permit loans authorized by
statute as a source for the minimum investment. Loans from sellers are
not authorized by statute.
    Comment: HUD should clarify that this rule does not prohibit
assistance from nonprofit developers.
    HUD response: HUD permits downpayment assistance from charitable
organizations. Downpayment assistance from nonprofit developers is
permitted as long as it complies with this general standard and their
downpayment assistance cannot be funded by sellers or other parties
with a financial interest in the transaction.

V. Findings and Certifications

Regulatory Planning and Review

    The Office of Management and Budget (OMB) reviewed the rule under
Executive Order 12866, Regulatory Planning and Review. OMB determined
that the rule is a ``significant regulatory action,'' as defined in
section 3(f) of the Order (although not an economically significant
regulatory action under the Order). The docket file was available for
public inspection in the Regulations Division, Office of General
Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410-
0500.

Environmental Review

    A Finding of No Significant Impact was not required for the
proposed rule. Under 24 CFR 50.19(b)(6), the rule is categorically
excluded from the requirements of the National Environmental Policy Act
(42 U.S.C. 4332 et seq.) and that categorical exclusion continues to
apply.

Regulatory Flexibility Act

    The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.)
generally requires an agency to conduct a regulatory flexibility
analysis of any rule subject to notice and comment rulemaking
requirements, unless the agency certifies that the rule will not have a
significant economic impact on a substantial number of small entities.
    The purpose of this rule, as noted in the preamble, is to establish
standards regarding the use of gifts by borrowers with an FHA-insured
mortgage--primarily standards that would address gifts by charitable
organizations--as a source of an FHA mortgagor's investment in the
mortgaged property. To date, HUD's practice has been to limit
permissible sources of gifts to family members, governmental agencies,
employer of the mortgagor, labor union of the mortgagor, or charitable
organizations. HUD is not narrowing the sources of gifts through this
rulemaking, but rather is striving to ensure that gifts are gifts and
that, especially in the situation of gifts from charitable
organizations, the gift is not a quid pro quo between the homebuyer's
purchase of the property and the seller's ``contribution'' or payment
to the charitable organization.
    The prohibited sources of downpayment assistance, as structured in
the final rule, are narrow and should not encompass a substantial

number of small entities that are engaged in downpayment assistance to
homebuyers, which, to date, have primarily been charitable
organizations with tax-exempt status. Charitable organizations, large
or small, remain eligible to provide downpayment assistance to FHA
mortgagors, subject to meeting the requirements of Sec.  203.19, as
revised by this final rule.
    Accordingly, the undersigned certifies that this rule will not have
a significant economic impact on a substantial number of small
entities.

Executive Order 12612, Federalism

    Executive Order 12612, (entitled ``Federalism'') prohibits, to the
extent practicable and permitted by law, an agency from promulgating a
regulation that has federalism implications and either imposes
substantial direct compliance costs on state and local governments and
is not required by statute, or preempts state law, unless the relevant
requirements of section 6 of the Executive Order are met. This final
rule does not impose substantial direct compliance costs on state and
local governments or preempt state law within the meaning of the
Executive Order. This final rule solely addresses requirements under
HUD's FHA mortgage insurance programs.

Unfunded Mandates Reform Act

    Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104-
4, approved March 22, 1995) established requirements for federal
agencies to assess the effects of their regulatory actions on state,
local, and tribal governments, and the private sector. This final rule
does not impose any federal mandates on any state, local, or tribal
governments or the private sector within the meaning of the Unfunded
Mandates Reform Act of 1995.

Catalog of Federal Domestic Assistance

    The Catalog of Federal Domestic Assistance Number for the principal
FHA single family mortgage insurance program is 14.117. This final rule
also applies through cross-referencing to FHA mortgage insurance for
condominium units (14.133), and other smaller single family programs.

[[Page 56007]]

List of Subjects in 24 CFR Part 203

    Loan programs--housing and community development, Mortgage
insurance, Reporting and recordkeeping requirements.

0
Accordingly, the Department amends 24 CFR part 203, as follows:

PART 203--SINGLE FAMILY MORTGAGE INSURANCE

0
1. The authority citation for part 203 continues to read as follows:

    Authority: 12 U.S.C. 1709, 1710, 1715b, 1715z-16, and 1715u; 42
U.S.C. 3535(d).

0
2. Section 203.19 is revised to read as follows:


Sec. 203.19  Mortgagor's investment in the property.

    (a) Required funds. The mortgagor must have available funds equal
to the difference between:
    (1) The cost of acquisition, which is the sum of the purchase price
of the home and settlement costs acceptable to the Secretary; and
    (2) The amount of the insured mortgage.
    (b) Mortgagor's minimum cash investment. The required funds under
paragraph (a) of this section must include an investment in the
property by the mortgagor, in cash or cash equivalent, equal to at
least 3 percent of the cost of acquisition, as determined by the
Secretary, unless the mortgagor is:
    (1) A veteran meeting the requirements of Sec.  203.18(b); or
    (2) A disaster victim meeting the requirements of Sec.  203.18(e).
    (c) Restrictions on seller funding. Notwithstanding paragraphs (e)
and (f) of this section, the funds required by paragraph (a) of this
section shall not consist, in whole or in part, of funds provided by
any of the following parties before, during, or after closing of the
property sale:
    (1) The seller or any other person or entity that financially
benefits from the transaction; or
    (2) Any third party or entity that is reimbursed, directly or
indirectly, by any of the parties described in paragraph (c)(1) of this
section.
    (d) Gifts and loans usually prohibited for minimum cash investment.
A mortgagor may not use funds for any part of the minimum cash
investment under paragraph (b) of this section if the funds were
obtained through a loan or a gift from any person, except as provided
in paragraphs (e) and (f) of this section, respectively.
    (e) Permissible sources of loans.
    (1) Statutory authorization needed. A statute must authorize a loan
as a source of the mortgagor's minimum cash investment under paragraph
(b) of this section.
    (2) Examples. The following loans are authorized by statute as a
source for the minimum investment:
    (i) A loan from a family member, a loan to a mortgagor who is at
least 60 years old when the mortgage is accepted for insurance, or a
loan that is otherwise expressly authorized by section 203(b)(9) of the
National Housing Act;
    (ii) A loan made or held by, or insured by, a federal, state, or
local government agency or instrumentality under terms and conditions
approved by the Secretary;
    (iii) A loan made or held by, or insured by, a tribal government or
an agency or instrumentality thereof, including a tribally designated
housing entity as defined at 25 U.S.C. 4103(21), which is treated as a
state or local government under applicable state or local law, under
terms and conditions approved by the Secretary; and
    (iv) A federal disaster relief loan.
    (f) Permissible sources of gifts. The following are permissible
sources of gifts or grants used for the mortgagor's minimum investment
under paragraph (b) of this section:
    (1) Family members and governmental agencies and instrumentalities

eligible under paragraphs (e)(2)(i) and (ii) of this section;

(2) A tribal government or an agency or instrumentality thereof, including a tribally designated housing entity, as defined at 25 U.S.C. 4103(21);

(3) An employer or labor union of the mortgagor;

(4) Organizations described in section 501(c)(3) and exempt from taxation under section 501(a) of the Internal Revenue Code;

(5) Disaster relief grants; and

(6) Other sources as may be approved by the Secretary on a case-by-case basis.

Dated: September 26, 2007.
Brian D. Montgomery,
Assistant Secretary for Housing--Federal Housing Commissioner.
[FR Doc. 07-4846 Filed 9-28-07; 8:45 am]

BILLING CODE 4210-67-P