**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) | |
| Defendants. | ) ) | |
| AMERIDREAM, INCORPORATED, | ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) ) | |
| Intervenors, | ) ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendant. | ) ) ) ) | |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR**
**TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The FHA Mortgage Insurance Program. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Three Percent Cash Investment and Permissible Sources Thereof. . . 5

    C.    The Loophole and HUD's Early Treatment of It. . . . . . . . . . . . . . . . . . . 7

    D.    The Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    E.    The Instant Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.    PRELIMINARY INJUNCTION STANDARD. . . . . . . . . . . . . . . . . . 15

        B.    STANDARD OF REVIEW OF AGENCY ACTION UNDER
             THE ADMINISTRATIVE PROCEDURE ACT. . . . . . . . . . . . . . . . . . 15

    II.    PLAINTIFFS DO NOT HAVE A LIKELIHOOD OF SUCCESS
        ON THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    PLAINTIFFS' APA ARGUMENTS ARE WITHOUT MERIT. . . . . . . 16

             1.    HUD Was Free to Change its Position on Seller-Funded DPA
                  Provided Through Non-Profit Entities and Provided a
                  Reasoned Basis For Doing So. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             2.    HUD Considered Reasonable Alternatives and Properly
                  Rejected Them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

             3.    HUD Provided Sufficient Notice of the Regulation. . . . . . . . . . 21

             4.    HUD Did Not Act Arbitrarily or Capriciously With Regard
                  to the Effective Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

             5.    HUD Did Not Exceed Its Statutory Mandate to Promulgate
                  Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  B. PLAINTIFFS' EQUAL PROTECTION ARGUMENTS FAIL
   AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  C. THE AGENCY DID NOT IMPROPERLY PREJUDICE
   THE OUTCOME OF THE RULEMAKING. . . . . . . . . . . . . . . . . . . . . . 31

III. THERE IS NO SUBSTANTIAL THREAT OF IRREPARABLE INJURY
  TO PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTIVE
  RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IV. A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE HUD. . . . . . 42

V. THE PUBLIC INTEREST DISFAVORS INJUNCTIVE RELIEF IN THIS
  CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## INTRODUCTION

The Federal Housing Administration ("FHA"), a unit of the United States Department of Housing and Urban Development ("HUD"), insures mortgages, meaning that it agrees to protect mortgage lenders against the risk of losses caused by the borrower's non-payment. As a condition for insuring mortgages, the statute requires that the home buyer make a cash investment, or "down payment," of at least 3% of the total cost of acquisition. See 12 U.S.C. § 1709(b)(9). HUD's longstanding policy -- not challenged in these cases -- has been to allow relatives, legitimate charitable organizations, and certain others to assist home buyers with this down payment, but not to allow such assistance to come directly from the home seller or other parties with an interest in the transaction, which of course would distort the fundamental economics of the transaction and the resulting mortgage loan.

However, beginning in the late 1990s, a few organizations found a way to exploit HUD's allowance of down payment assistance provided by charities in a way that enables sellers and buyers to do indirectly what they could not do directly. These organizations devised a form of transaction in which a "charity" or other permitted entity would make a "gift" to the home buyer to fund the necessary down payment, with the understanding that the home seller in the same transaction would later make a concomitant "donation" to the charity. According to the logic of this scheme, the down payment assistance was being provided by the "charity," not by the home seller, so it was not prohibited and FHA would have to insure the resulting mortgage. For its services as a conduit for the forbidden funds, the "charity" would collect a substantial processing fee. A number of "charities" and other entities began to implement this business model or variations on it.

When this scheme was in its nascent stage, HUD did not act immediately to stop it. In the ensuing years, however, the scheme spread like wildfire, with dire consequences for the FHA

insurance fund.  As estimated by Congress's Government Accountability Office ("GAO"), in 2004

30% of all FHA-insured loans originated with down payment assistance from nonprofits, over 90%

of which were seller-funded.  <u>See</u> GAO Report No. 06-24, Mortgage Financing:  Additional Action

Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance (Nov. 2005)

("GAO 2005 Report"), at 14 (A.R. 00518, 00537)[1] (attached hereto as Ex. 1).  HUD observed that

loans originated with seller-funded down payment assistance performed significantly worse than

other FHA-insured loans, meaning that they experienced a much higher rate of defaults, foreclosures,

and resultant claims on the FHA insurance fund, and could eventually be expected to threaten the

fund's solvency.  In 2006, the Internal Revenue Service ("IRS") issued a Revenue Ruling holding

that entities that facilitate seller-funded down payment assistance through this scheme are not true

charitable organizations and not entitled to tax-exempt status under Section 501(c)(3) of the Internal

Revenue Code.  <u>See</u> Rev. Rul. 2006-27, 2006-21 I.R.B. 915 (A.R. 00021) (attached hereto as Ex.

2).

HUD's new rule, Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg.

56,002 (Oct. 1, 2007) (to be codified at 24 C.F.R. § 203.19) (A.R. 00001) (the "Regulation"), closes

the seller-funded down payment assistance loophole once and for all.[2]  The Regulation provides in

pertinent part that, in order for FHA to insure a mortgage, the funds for the buyer's down payment

---

[1] "A.R." refers to the Administrative Record, filed October 26, 2007.

[2] This brief will use the term "seller-funded down payment assistance" or "seller-funded DPA" to refer to the particular type of transaction proscribed by the new rule, <u>i.e.</u>, a transaction in which downpayment funds are provided by the seller or any other person or entity that financially benefits from the transaction, or any third party or entity that is reimbursed, directly or indirectly, by any such party, either before, during, or after closing of the property sale. It should be clear that, as discussed above, down payment assistance funded directly by the seller has never been allowed for FHA-insured mortgage loans.

"shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:  (1) The seller or any other person or entity that financially benefits from the transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in the paragraph (c)(1) of this section." 72 Fed. Reg. at 56,007 (to be codified at 24 C.F.R. § 203.19(c)) (A.R. 00007).  Thus, while legitimate charities remain free to provide down payment assistance in general to home buyers, the source (direct or indirect) for those funds can no longer be the seller in the transaction or another person who stands to benefit financially from the transaction.

Plaintiffs are "charities" and Indian tribal entities who apparently have built up a business model around the expectation of being able to exploit the previous loophole indefinitely.[3]  Their motions for temporary restraining orders and preliminary injunctions to delay the October 31, 2007 effectiveness of the Regulation should be denied.  First, they cannot show a likelihood of success in having the Rule invalidated.  HUD followed all requirements for notice-and-comment rulemaking under the Administrative Procedure Act ("APA"); the Regulation is a reasonable and well-supported response to an obvious problem and easily passes rational-basis review for plaintiffs' equal protection claims; and plaintiffs' claim of impermissible bias on HUD's part stemming from a vague news story falls far short of the requisite standard in this Circuit.  Second, plaintiffs cannot

---

[3] This consolidated memorandum in opposition responds to a number of separate motions for preliminary injunctions and temporary restraining orders filed by plaintiffs and intervenors in the above-captioned cases over the last few days.  The term "plaintiffs" will be used collectively to describe plaintiffs in Civil Action No. 07-1282 (Penobscot Indian Nation, Penobscot Nation Enterprises, and Global Direct Sales, LLC), intervenors in Civil Action No. 07-1752 (Genesis Foundation, Home Downpayment Gift Foundation, Partners in Charity, Inc., and Futures Home Assistance Program, Sovereign Grant Alliance, Freedom Home Baptist Church, Inc., and Dove Foundation, Inc.).

demonstrate irreparable harm.  Several of the plaintiffs do not even attempt to make any particularized showing of injury to themselves.  But even those who do make such an attempt, with their cataclysmic assertions about being put out of business, ignore that this rule has been in the offing since May 2007, that the IRS Revenue Ruling has essentially foreclosed this kind of business model since May 2006, that the GAO recommended prohibiting this kind of down payment assistance in connection with FHA-insured loans two years ago.  If plaintiffs have linked their fortunes to a business model predicated on a loophole, in the face of repeated notice that the loophole was being closed, any harm they stand to suffer is self-inflicted.  Third, HUD would suffer significant harm if the Regulation is enjoined.  As the administrative record shows, loans originated with seller-funded down payment assistance perform significantly worse than other FHA-insured loans, and the exponential growth in such loans threatens the continued viability of the FHA insurance fund.  Fourth, allowing the Regulation to go into effect on its normal schedule is in the public interest because of the high rate of foreclosures of loans initiated with seller-funded down payment assistance and the negative domino effect such foreclosures have in surrounding communities.

## BACKGROUND

A.    The FHA Mortgage Insurance Program

FHA was created by the National Housing Act of 1934 to insure mortgage lenders against default by borrowers to whom they had provided single family home mortgage financing.  48 Stat. 1246 (1934).[4]  To carry out the mortgage insurance program, HUD and FHA rely on the Mutual

---

[4]  With the creation of HUD in 1965, Congress transferred to the Secretary of HUD all of the duties and powers of the FHA.  See 42 U.S.C. §§ 3532, 3533.  The FHA is a part of HUD,

(continued...)

Mortgage Insurance Fund ("MMIF").  See 12 U.S.C. § 1708(a).  The MMIF is a revolving fund that uses the proceeds from insurance premiums, investment income, and foreclosure sales to provide funds for future mortgage insurance.  Id.; see also Lee v. Kemp, 731 F. Supp. 1101, 1103-04 (D.D.C. 1989).  When an FHA-insured mortgage has been in monetary default for at least three months, or when the FHA-approved mortgagee forecloses on a property, the insured mortgagee is entitled to file a claim for insurance benefits payable from the MMIF.  See 12 U.S.C. § 1710(a); 24 C.F.R. §§ 203.355 to 203.371.  To receive the benefits, the mortgage-holder generally must convey clear title to HUD and deliver the property in vacant condition.  12 U.S.C. § 1710(a)(1).  Aside from an initial $10 million appropriation from Congress when the MMIF was created by statute, HUD has operated the MMIF without any congressional appropriations, using only the proceeds that the fund generates.  See generally Lee, 731 F. Supp. at 1103.

     B.     The Three Percent Cash Investment and Permissible Sources Thereof

     Section 203 of the National Housing Act, codified at 12 U.S.C. § 1709, sets forth the requirements for insuring mortgages that meet the Act's eligibility requirements.  Among other things, the purchaser of the home generally must provide a cash or cash-equivalent down payment representing at least 3 percent of the total cost of acquisition.  12 U.S.C. § 1709(b)(9).[5]  This

---

     [4](...continued)
and the FHA Commissioner serves as one of several Assistant Secretaries of HUD.  See 42 U.S.C. § 3533(b).

     [5]  The statute contains two built-in exceptions to this requirement, allowing family members to provide loans to other family members to satisfy the 3% requirement, and allowing the 3% payment to be paid by someone other than mortgagor in certain other narrowly limited circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a single-family home being purchased in a certain demonstration project, or a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act.
     (continued...)

requirement helps to ensure, among other things, that the purchaser begins home ownership with an equity stake and is committed to making mortgage payments.

HUD Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties," sets forth HUD's longstanding policy regarding credit underwriting requirements, including the buyer's cash investment. HUD allows a buyer's minimum down payment to be financed by a gift from certain specified sources, including the buyer's relatives, his employer or labor union, a charitable organization, or a governmental agency or certain public entities. See HUD Handbook 4155.1, Rev. 5, ¶ 2-10(C) (attached as Ex. 3). But HUD expressly prohibits the seller from financing the buyer's down payment.

> The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them. Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price. No repayment of the gift may be expected or implied. []As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. . . . While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing. Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price.

Id. Accordingly, while HUD allows buyers to finance down payments through gifts from charitable organizations, it is settled HUD policy that sellers may not provide the required investment in the property.[6]

Indeed, for a home seller to fund a home buyer's down payment creates an obvious circularity

---

[5](...continued)
See 12 U.S.C. § 1709(b)(9).

[6] Similar language appears in prior versions of the HUD Handbook going back at least to 1983.

and distorts the fundamental economics of a home purchase transaction. Naturally, a home seller who has to pay the buyer's down payment in order to make the transaction happen will often demand a higher sale price for that transaction than he would have required in an otherwise equivalent transaction where such down payment assistance was not necessary (or will refrain from discounting the sales price when he otherwise would have done so). Thus, seller-funded down payment assistance tends to push sales prices upwards, because it can be generally expected that the seller will attempt to recoup at least some, if not all, of the down payment assistance through a higher sales price. Higher prices, in turn, result in larger mortgage loans, with the buyer essentially paying the amount of the down payment assistance through a higher sales price and mortgage. Larger mortgage loans mean larger monthly payments, making it more difficult for the purchaser/borrower to make those payments. Thus, while the seller and lender both walk away from closing with immediate benefits, the home purchaser/borrower and FHA bear the long-term risks of default and foreclosure that are associated with less sound mortgages. It is not difficult to see why HUD has long prohibited such seller-funded down payment assistance when provided directly.

C.     The Loophole and HUD's Early Treatment of It

In the late 1990s, certain organizations found a way around HUD's requirement that FHA-insured loans not be initiated through a transaction involving seller-funded down payment assistance. These groups figured that because HUD did allow down payment gifts from charitable organizations and certain other entities (such as governmental entities, including Indian tribal governments), if the down payment assistance came in the first instance from a charitable organization's general fund, it would be permitted by HUD even if the charity's "gift" ultimately would be reimbursed by the home seller after closing. In other words, by having the charity act as intermediary to mask the

7

ultimate source of the funding, sellers could indirectly fund buyers' down payments on homes purchased with FHA-insured mortgages even though they could not do so directly. For its role in facilitating the transaction, the charity would typically collect a substantial processing fee from the seller.

Indeed, one of the plaintiffs' submissions on this very motion aptly describes how the scheme works:

> Here's how you pay for that dream house. Let's say the asking price is $100,000 but the seller is willing to accept $95,000.
>
> The buyer gets a $95,000 bank loan to pay the seller. Then he gets a $5,000 gift from Partners in Charity to cover his down payment. So, the seller gets a total of $100,000. In return, the seller donates $5,000 to Partners in Charity, and that's used to help the next person.

Ex. 28 to Partners in Charity, Inc. et al.'s Motion for a Preliminary Injunction. In this hypothetical transaction, the buyer ends up with, and FHA winds up insuring, a $95,000 mortgage loan for a property whose apparent fair market value is $95,000 -- a loan-to-value ratio of 100%. (While the quoted hypothetical conveniently omits the small matter of the processing fee -- for builders, "only" $500, "lowest in the country," according to its website[7] -- Partners in Charity earns for its largesse, the form agreement that Partners in Charity requires its sellers to sign as a condition of participation notably does not leave this detail to chance. <u>See</u> The PIC Program Seller Participating Agreement, ¶ 2 ("In consideration of the foregoing, Seller agrees to make a contribution to PIC in the amount of $_____ (gift amount <u>plus fee</u>) within (2) business days from the transfer of the Participating

---

[7]   <u>See</u> www.partnersincharity.org/builders/index.htm.

Home to the Buyer.") (emphasis added), attached hereto as Ex. 4.[8])

From the beginning, HUD had concerns about the propriety of this form of transaction. Initially, however, the practice was not widespread and did not affect a material number of FHA-insured loans.  HUD realized that there could be technical legal arguments, depending on the timing and other circumstances, to the effect that the charity's payment to the home buyer and the home seller's payment to the charity are not related.[9]  For a period of time, HUD also sought to address the problem from the demand side, by pursuing a statutory amendment to authorize FHA to insure certain zero down payment loans, which, if enacted, would have cut off or lessened the demand for schemes designed to exploit the loophole.  For various reasons, HUD did not immediately take action to directly curb this newly evolving scheme, but instead resolved to study and monitor the issue over a period of years.[10]

---

[8]  The form agreement also leaves no doubt that the seller's contribution is a quid pro quo for the gift to its buyer.  See The PIC Program Seller Participating Agreement, ¶ 2 ("Seller further understands that the Seller is only obligated to make the contribution if a homebuyer utilizing The PIC Program purchases the Participating Home."), ¶ 3 ("Seller understands that the Seller is not obligated to make the contribution if the escrow/closing is terminating.").

[9]  One of the original proponents of the scheme was an entity known as Nehemiah Progressive Development Corporation ("Nehemiah").  In 1997 and 1998, Nehemiah and HUD engaged in litigation over the validity of Nehemiah's seller-funded down payment program.  See Nehemiah Progressive Housing Corp. v. Andrew Cuomo, et al., Civ. S-97-1817-GEB/PAN (E.D. Cal.).  That litigation was settled by an agreement in which HUD represented that it had determined that Nehemiah's down payment assistance program was not in conflict with HUD's regulations and administrative requirements, but "expressly reserv[ed] the right to and may take such actions with regard to down payment assistance programs generally, and with regard to changes or modifications to HUD's regulations, handbook, mortgagee letters, or other governing documents applicable to transactions under Section 203(b) in particular, as they may deem appropriate."  Settlement Agreement dated April 3 and 6, 1998, ¶ 2 (A.R. 00884) (attached hereto as Ex. 5).

[10]  In 1999, HUD proposed a rule that would have done substantially the same thing as the
(continued...)

In the ensuing years, use of seller-funded DPA in FHA-insured loans increased by orders of magnitude, with deleterious consequences for both the MMIF and for homeowners who became victims of foreclosure after having been lured into seller-funded down payment transactions that were not good deals for them.  The GAO issued a report in 2005 expressing its concern that seller-funded DPA resulted in higher home prices without comparable increases in equity for buyers, as well as a greater likelihood of delinquency and default claims.  See GAO 2005 Report, at 22-23, 26 (A.R. at 00545-46, 00549).  The GAO report noted that in 2004 30% of all FHA-insured loans originated with nonprofit, and generally seller-funded, down payment assistance, up from 6% in 2000.  See id.  The GAO report recommended, inter alia, that HUD revise FHA standards to prohibit DPA from seller-funded entities from being used to satisfy the buyer's 3% cash minimum investment requirement.  Id. at 45-46 (A.R. 00568-69).[11]

In May 2006, the Internal Revenue Service released Revenue Ruling 2006-27, regarding the ability of DPA providers to qualify as charitable organizations under section 501(c)(3) of the Internal Revenue Code of 1986, 26 U.S.C. § 501(c)(3).  See Rev. Rul. 2006-27, 2006-21 I.R.B. 915 (A.R. 00021).  The ruling established that an organization is not eligible for 501(c)(3) status when it

---

[10](...continued)
present Regulation, see 64 Fed. Reg. 49,956 (Sept. 14, 1999), but later withdrew that rule, see 66 Fed. Reg. 2,851 (Jan. 12, 2001).

[11] In a response to the report, Assistant Secretary for Housing and Federal Housing Commissioner Brian D. Montgomery informed the GAO that HUD intended to implement or otherwise substantially agreed with several of the report's other recommendations.  See 2005 GAO Report, at 89-91 (A.R. 00612-14).  With respect to certain nonprofit DPA programs, Commissioner Montgomery explained HUD's position at that time was that if a seller's contribution could not be traced to the organization's gift to the buyer who purchased the seller's home, the contribution was not an "inducement to purchase" by the seller.  See id. at 91 (A.R. 00614).

receives substantial funding from sellers and other entities that stand to benefit from the home purchases facilitated by the organization. See id. at 918. In a press release accompanying the ruling, the IRS expressed its concern with what it called "self-serving, circular-financing arrangements," in which the seller only pays the organization if the buyer completes the purchase of the home, and noted that such a "scheme" leads to increased home prices. I.R.S. News Release IR-2006-74 (May 4, 2006) (A.R. 00026).

Most importantly, HUD found in its own experience that loans originated with seller-funded down payment assistance had a much higher rate of defaults and foreclosures than FHA-insured loans in general, and that the continued growth of such transactions would eventually threaten the solvency of the MMIF. HUD decided that it needed to take action directly to stem this tide.

> D.    The Regulation

On May 11, 2007, HUD published a notice of proposed rulemaking. Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 27,048 (May 11, 2007) (A.R. 00011) (to be codified at 24 C.F.R. pt. 203). The notice indicated that "[t]he proposed rule would establish that a prohibited source of down payment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity . . . that is reimbursed directly or indirectly by any of the parties listed in clause (1)." Id. at 27,049 (A.R. 00012).

In the notice, HUD explained its concern that seller-funded DPA leads to inflated sales prices and "inflated mortgage amounts, which increase the severity of individual claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages." Id. The notice also discussed

a 2005 GAO report and Revenue Ruling 2006-27.  Id.  Finally, the notice offered a detailed discussion of the terms of the proposed rule.  Id.  HUD initially provided a 60-day period for public comment.  Id. at 27,048 (A.R. 00011).  On July 11, 2007, HUD extended that period for an additional 30 days.  72 Fed. Reg. 37,500 (A.R. 00008-09).

There is little doubt that the proposed rule was widely known and discussed among organizations with seller-funded DPA programs.  HUD received over 15,000 public comments; most opposed the proposed rule, with the vast majority of the opposition comments being submitted "in a standard similar format and wording." 72 Fed. Reg. at 56,003 (A.R. 00003).  After reviewing and evaluating the comments, HUD published the Regulation, which is substantially identical to the proposed rule, on October 1, 2007.  Id.  The publication included HUD's discussion of many key issues raised in the public comments.  Id. at 56,003-06 (A.R. 00003-06).

The Regulation replaces existing 24 C.F.R. § 203.19 and sets forth HUD's standards regarding the mortgagor's (i.e., home purchaser's) investment in property purchased with an FHA-insured mortgage.  As relevant here, the Regulation requires that the purchaser have available funds equal to the difference between the cost of acquisition (that is, the sum of the purchase price of the home and appropriate settlement costs) and the amount of the insured mortgage.  See 72 Fed. Reg. at 56,007 (A.R. 00007).  The Regulation further requires that those funds "shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:  (1) The seller or any other person or entity that financially benefits from the transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section." Id.

The Regulation is scheduled to take effect on October 31, 2007.  Pursuant to the 1998

12

settlement agreement between HUD and Nehemiah mentioned above, see supra note 8, HUD is contractually required to delay enforcement of the rule against Nehemiah for six months from the date of publication.[12]  Accordingly, the preamble to the Regulation noted that it would not be effective as to Nehemiah until March 31, 2008.

      E.     The Instant Litigation

     Civil Action No. 07-1282.  On July 18, 2007, Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales LLC ("Penobscot Plaintiffs") filed a complaint alleging that HUD instructed them and third parties that their program did not comply with HUD regulations (dkt. no. 1).  On October 10, 2007, the Penobscot Plaintiffs filed a motion for summary judgment, and Defendants responded to the Complaint and this motion with a motion to dismiss (dkt. nos. 5, 12).  The government argued, inter alia, that there had been no final agency action with respect to the Penobscot Plaintiffs' claims.  On October 9, 2007, the Penobscot Plaintiffs filed an Amended Complaint, in which they included a challenge to HUD's final rule (dkt. no. 15).  On October 24, 2007, the Penobscot Plaintiffs filed a motion for a preliminary injunction, seeking to stay enforcement of the final rule (dkt. no. 16).

     Civil Action No. 07-1752.  Plaintiff AmeriDream, Incorporated filed its complaint on October 1, 2007, the same day the Regulation was issued.  Soon thereafter, AmeriDream filed motions for a temporary restraining order and a preliminary injunction to prevent the Regulation from becoming effective (dkt. nos. 3, 4).  However, AmeriDream withdrew those motions after the

---

[12] The Nehemiah settlement agreement provides in pertinent part that "[a]ny such actions, changes or modifications regarding the source of down payment assistance funds shall thereafter become applicable to plaintiff's DAP after the expiration of six (6) months from the date of final promulgation and issuance of any such changes or modifications."  Settlement Agreement dated April 3 and 6, 1998, ¶ 2 (A.R. 00884).

parties were able to agree to a stipulation that stayed the effectiveness of the Regulation as to AmeriDream and set a schedule for briefing this matter on the administrative record. See Stipulation and Order filed Oct. 19, 2007 (dkt. no. 10).

Until October 19, just eight business days before the effective date of the Regulation, none of the intervenors in Civil Action No. 07-1752 had participated, or sought to participate, in the litigation, or had even contacted counsel for HUD. Late on October 19, now-intervenors Genesis Foundation and Home Downpayment Gift Foundation moved for leave to file an amicus curiae brief (dkt. no. 11) in support of AmeriDream's motion for preliminary injunction, even though the underlying motion for preliminary injunction had been withdrawn. On October 22, Genesis Foundation and Home Downpayment Gift Foundation moved to intervene (dkt. no. 12) and for an emergency hearing on their motion to intervene (dkt. no. 13). A nearly identical motion to intervene (dkt. no. 15) and for an emergency hearing (dkt. no. 16) by Partners in Charity, Inc., Futures Home Assistance Program, and Sovereign Grant Alliance, followed on October 23. On October 25, the Court held a hearing and granted the respective motions to intervene (dkt. no. 19).[13] Also on October 25, yet another group -- Freedom Home Baptist Church, Inc. and the Dove Foundation, Inc. -- filed motions to intervene. Pursuant to a schedule set at the October 25 hearing, the various groups of

_____

[13] With respect to Sovereign Grant Alliance, the Court's October 25, 2007 order only provisionally granted the motion to intervene, holding that "Sovereign Grant Alliance must dismiss [its pending suit challenging the Regulation in the United States District Court for the District of Idaho] in order to be permitted to intervene in this action  Sovereign Grant Alliance's intervention in this action will not be effective until that other action is dismissed." Mem. Op. and Order at 2-3 (dkt. no. 19). Shortly before filing this brief, undersigned counsel became aware that Sovereign Grant Alliance on October 25, 2007 had filed a "Motion to Withdraw Complaint" in the Idaho action without serving undersigned counsel. Defendants are responding to Sovereign Grant Alliance's motion for preliminary injunction in this action on the express condition that the "Motion to Withdraw Complaint" in the Idaho action be treated as an effective voluntary dismissal of that action under Fed. R. Civ. P. 41(a)(1).

14

intervenors have filed separate motions for preliminary injunctive relief.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    PRELIMINARY INJUNCTION STANDARD

A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, the plaintiff "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).[14]

### B.    STANDARD OF REVIEW OF AGENCY ACTION UNDER
###        THE ADMINISTRATIVE PROCEDURE ACT

In evaluating plaintiffs' likelihood of success on the merits, the standard of review applicable to the merits is relevant. This Court has aptly described the standard of review in cases challenging agency action under the APA:

> Under the Administrative Procedure Act ("APA"), a reviewing court may only set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if an agency has "entirely failed to

---

[14] The same factors that apply to a motion for preliminary injunction also govern the issuance of temporary restraining orders. Vencor Nursing Ctrs. v. Shalala, 63 F. Supp. 2d 1, 7 n.5 (D.D.C. 1999).

> consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 42, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).  Especially in complex, technical areas, there is a strong presumption in favor of upholding agency decisions.  <u>See Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 375-78, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989).

<u>Hammond v. Norton</u>, 370 F. Supp. 2d 226, 238 (D.D.C. 2005).  Furthermore, "the Court must defer to the agency's interpretation of a statute that it implements so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." <u>Id.</u> at 239 (internal quotation marks omitted).

## II.    PLAINTIFFS DO NOT HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS

To obtain preliminary injunctive relief, plaintiffs must show, <u>inter alia</u>, "a substantial likelihood of success on the merits." <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir. 2001).  Collectively, plaintiffs challenge the Regulation under various APA theories, the equal protection component of the Fifth Amendment, and under a theory that HUD prejudged the outcome of the rulemaking process.  As we show below, plaintiffs are not likely to have the Regulation set aside on any of these bases.

### A.    PLAINTIFFS' APA ARGUMENTS ARE WITHOUT MERIT

#### 1.    HUD Was Free to Change its Position on Seller-Funded DPA Provided Through Non-Profit Entities and Provided a Reasoned Basis For Doing So

Plaintiffs' primary argument is that HUD violated the APA by changing its position on whether FHA will insure mortgages initiated with DPA funded by the seller but funneled through

an otherwise permitted source such as a charity.[15]  This argument is without merit.

The Supreme Court has emphasized that an agency can – and should – continually evaluate its interpretations and policies to ensure that they are consistent with the factual and legal environment.  See Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe R.R. Co., 387 U.S. 397, 416 (1967) ("flexibility and adaptability to changing needs . . . is an essential part of the office of a regulatory agency").  When an agency changes course on an issue that it has previously considered, "courts may require only 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'"  Springfield, Inc. v. Buckles, 292 F.3d 813, 819 (D.C. Cir. 2002) (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970) (internal citations omitted)).  It is settled that "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances."  Greater Boston Television Corp., 444 F.2d at 852.

In Springfield, for example, the D.C. Circuit considered the Bureau of Alcohol, Tobacco and Firearms' ("BATF") interpretation of a statute requiring the authorization for importation of a firearm that is "of a type" "generally recognized as particularly suitable for or readily adaptable to sporting purposes."  18 U.S.C. § 925(d)(3).  In 1989, BATF determined that certain modified semiautomatic assault rifles satisfied the "sporting purposes" test and thus authorized their importation, despite a BATF study calling for their ban.  Springfield, 292 F.2d at 816.  Nine years later, BATF reversed that decision and banned the weapons, relying in part on the earlier BATF study.  The D.C. Circuit found nothing in the administrative record explaining BATF's 1989 decision or noting a fundamental change in factual circumstances.  Id. at 819.  "What changed . . . is not so

---

[15] See Penobscot Mem. at 13-15; Genesis/HDGF PI Mem. at 6-8.

much the agency's view of the statute, but its application of an interpretation it had long followed." Id. at 817. Yet the D.C. Circuit found no problem, and, instead, accepted that the agency had merely revised its position on the issue. While BATF relied on arguments and analysis it had previously rejected, it was sufficient that the agency "fully explained why it has now decided that this particular military feature found in Springfield's rifles is of considerable significance." Id. at 819.

Here, the careful analysis conducted by HUD and the agency's coherent justifications for the new rule support HUD's decision to no longer insure mortgages originated with seller-funded DPA. As demonstrated by HUD's earlier consideration of the rule at issue and Commissioner Montgomery's 2005 letter to the GAO, see GAO 2005 Report, at 89-91 (A.R. 00612-14), and contrary to plaintiffs' assertion that HUD has affirmatively endorsed seller-funded DPA, HUD has long been concerned about such risks and has considered numerous alternative courses of action to combat the problem. While the agency chose in 2001 and 2005 not to stop insuring such mortgages altogether, Commissioner Montgomery's letter shows that the agency was considering a range of actions designed to address the issue. See GAO 2005 Report, at 89-91 (A.R. 00612-14). It is both permissible and desirable for an agency subsequently to evaluate the success of its actions and to reconsider carefully and thoughtfully the merits of previous decisions in light of economic trends and developments.

As HUD's analysis shows, the problems associated with seller-funded DPA have greatly magnified since HUD first considered precluding its use in FHA-insured mortgages in 1999. In 2000, only 6% percent of FHA-insured loans received DPA from nonprofits. See GAO 2005 Report, at 14 (A.R. 00537). In 2004, that proportion had risen to 30%. See id. The higher risks of default associated with seller-funded DPA than with other FHA-insured loans, combined with the 400

18

percent increase in the proportion of FHA-insured loans financed by seller-funded DPA, have led to severe exposure for the MMIF.  In these circumstances, it was hardly unreasonable for HUD to reconsider the propriety of continuing to insure such a problematic category of loans.  Given that HUD has adequately justified its decision, there is no fault in "providing a fresh analysis of the problem."  Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 1002 (2005).

It is also important to note that rather than a far-reaching and unanticipated departure from settled issues of policy, as plaintiffs suggest, the Regulation in fact reconciles HUD's longstanding policies of allowing charitable organizations and certain other specified entities, but not sellers, to contribute to a home buyer's down payment.  The Regulation continues to allow "[o]rganizations described in section 501(c)(3) . . . of the Internal Revenue Code," tribal governments, and others to provide gifts or grants to a home buyer, but prohibits the use of funds provided by "(1) The seller or any other person or entity that financially benefits from the transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph [](1) of this section."  72 Fed. Reg. at 56,007 (A.R. 00007).  The impact of the Regulation is to preclude charitable organizations from operating simply as a conduit for a seller's contribution to a buyer's required cash investment – a type of payment long prohibited by HUD when made directly.  By eliminating a loophole that was increasingly rendering the prohibition on seller contributions meaningless, the agency is not departing from longstanding policy, but rather is ensuring greater and more effective enforcement of such policy.

2.     HUD Considered Reasonable Alternatives and Properly
       Rejected Them

Plaintiffs' contention that HUD failed to adequately address "reasonable alternatives" that commenters proposed[16] defies the facts and distorts the law.  The APA "has never been interpreted to require the agency to respond to every comment, or to analyse every issue or alternative raised by the comments, no matter how insubstantial." Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984).  Rather, the agency is obliged to address in a reasonable manner those comments that raised "significant problems."  See Covad Commc'ns v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006). Conversely, the agency bears no obligation to provide a substantive response to comments that are not themselves substantial. See Thompson, 741 F.2d at 408 (citing Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)).  To that end, a lack of specific response to any discrete comment is significant "'only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" Covad, 450 F.3d at 550 (quoting Thompson, 741 F.2d at 408).  And a comment must contain "meaningful analysis or data refuting the agency's conclusions" to merit substantive response.  Thompson, 741 F.2d at 409.

Here, contrary to plaintiffs' assertions, HUD adequately considered each and every significant comment and reasonable alternative submitted in reaching the conclusions contained in the Regulation.  Indeed, nearly four full pages of the Federal Register issuing release are devoted to a detailed discussion of 28 discrete categories of comments.  See 72 Fed. Reg. at 56,003-56,006 (A.R. 00003-06).

Astonishingly, the only specific example plaintiffs give of HUD not addressing comments

---

[16] See, e.g., Penobscot Mem. at 15-18; Genesis/HDGF Mem. at 8-11.

20

to their satisfaction are so-called "alternative" proposals to require "a complete home inspection, to avoid potentially huge repair costs" to homebuyers; to require homeowner's warranties for a specified period after purchase; and to require that mandatory risk mitigation "tools" and insurance be offered to homebuyers.  Penobscot Mem. at 17; Genesis/HDGF Mem. at 10.  These comments do not contain the type of "meaningful analysis or data refuting the agency's conclusions" that would require a substantive response.  Thompson v. Clark, 741 F.2d at 409.  Far from being "responsible" alternatives to the proposed rule, Penobscot Mem. at 17, they represent, at best, a set of band-aid measures that have nothing to do with the systemic risks posed by seller-financed DPA.  Home inspections and warranties, regardless of their merits as a general matter, have nothing to do with the fundamental problem HUD was confronting.  As the D.C. Circuit has emphasized, the detail required in responding to comments depends on "the subject of the regulation and the nature of the comments received," Reytblatt v. NRC, 105 F.3d 715, 722 (D.C. Cir. 1997), and the inclusion of "meaningful analysis or data refuting the agency's conclusions," Thompson v. Clark, 741 F.2d at 409.  Given the lack of any meaningful analysis or data, these so-called "alternatives" were afforded exactly the level of attention that they merited.

3.     HUD Provided Sufficient Notice of the Regulation

The APA requires that an agency publish a notice of proposed rulemaking, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and that it "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," id. § 553(c).  See Owner-Operator Indep. Driver Ass'n, Inc. v. FMCSA, 494 F.3d 188, 199 (D.C. Cir. 2007).  To comply with § 553, the agency need not literally fill the pages of the Federal Register with reams of raw data; rather, it

simply must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." Florida Power & Light Co. v. United States, 846 F.2d 765, 771 (D.C. Cir. 1988), cert. denied, 490 U.S. 1045 (1989). Plaintiffs' contention[17] that HUD's promulgation of the Regulation ran afoul of this requirement is plainly without merit.

As discussed above, HUD published its notice of proposed rulemaking ("NPRM") on May 11, 2007, with a 60-day period for comments. See 72 Fed. Reg. 27,048 (A.R. 00011). The NPRM set forth the statutory and regulatory background, and explained in detail the reasons why HUD was concerned about seller-funded DPA. HUD observed that "the sales price is often increased to ensure that the seller's net proceeds are not diminished," and noted that the GAO had concluded that seller-related contributions could contribute to an overvaluation of the price of the property. See id. at 27,048-27,049 (A.R. 00011-12). HUD also noted that the Internal Revenue Service had recently held that seller-funded DPA transactions were not consistent with tax-exempt status under section 501(c)(3) of the Internal Revenue Code, and had recognized the many problems, including inflated sales prices, associated with these transactions. See id. at 27,049 (A.R. 00012). HUD then discussed the resulting risk to FHA and the MMIF when borrowers default on FHA-insured loans originated in transactions financed through seller-funded DPA. See id. Finally, HUD provided a detailed section-by-section analysis of the text of the proposed regulation. See id. at 27,049-27,050 (A.R. 00012-13). On July 11, 2007, HUD extended the public comment period for another 30 days "[d]ue to significant interest in this rule." See 72 Fed. Reg. 37,500 (A.R. 00008-09). The resulting 90-day comment period, coupled with the fact that HUD received approximately 15,000 comments on the proposed rule, see 72 Fed. Reg. at 56,003 (A.R. 00003), belie any suggestion that "interested

_____

[17] See, e.g., Penobscot Mem. at 18-20; Genesis/HDGF Mem. at 11-13.

22

persons" were somehow unable to "comment meaningfully," <u>Florida Power & Light</u>, 846 F.2d at 771. Indeed, some of the plaintiffs herein submitted extensive comments, although others submitted only perfunctory comments or none at all.

Plaintiffs do not dispute this history, but argue that HUD committed a "bait-and-switch"[18] by referring in the final issuing release to additional analysis of its loan portfolio that it conducted. But this argument overlooks that HUD's reference to this analysis came in response to comments to the effect that "[a]lthough downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level." 72 Fed. Reg. at 56,003. "It is impossible to perceive why correction of a deficiency in earlier studies -- which correction confirms the accuracy of those studies -- should give rise to an additional opportunity to comment." <u>Cmty. Nutrition Inst. v. Block</u>, 749 F.2d 50, 58 (D.C. Cir. 1984). Indeed, plaintiffs' argument would place HUD -- and any administrative agency -- in a catch-22 position: if HUD ignores the comment or simply repeated verbatim its earlier statements, it would undoubtedly be attacked on that ground; but if HUD addresses the comment, under plaintiffs' regime it would be unable to go beyond what it already said or the analysis it already performed. This constrictive approach would hardly promote the effective interchange of ideas that notice-and-comment rulemaking is supposed to embody. For good reason, the D.C. Circuit routinely rejects similar arguments.[19]

---

[18]  Penobscot Mem. at 19; Genesis/HDGF Mem. at 12.

[19]  <u>See</u> <u>Appalachian Power Co. v. EPA</u>, 135 F.3d 791, 804 n.22 (D.C. Cir. 1998) ("reject[ing] Appalachian Power's assertion that EPA's enlargement of the database post-proposal constituted a procedural violation" because it "served only to bolster the validity of the model by increasing the amount of data upon which it was based"); <u>Solite Corp. v. EPA</u>, 952

(continued...)

As even plaintiffs concede, see Genesis/HDGF Mem. at 12, the D.C. Circuit has held that "further notice and comment are not required when additional fact gathering merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, by confirming or corroborating data in the rulemaking record, or by internally generating information using a methodology disclosed in the rulemaking record." Chamber of Commerce v. SEC, 443 F.2d 890, 900 (D.C. Cir. 2006) (citations omitted). That is exactly what occurred here. Only the "most critical factual material" supporting the rule must be disclosed prior to the comment period. The additional analysis of mortgage data that HUD performed in response to public comments is not the "most critical factual material" on which the Regulation rests; it merely bolstered and corroborated what the GAO report found and what has long been readily apparent to anyone who looked at the issue other than those with a financial stake in seller-funded DPA: that seller-funded DPA leads to riskier mortgage loans.

---

[19](...continued) F.2d 473, 484-85 (D.C. Cir. 1991) (rejecting argument that EPA "'performed a classic bait-and-switch' by 'substituting at the last moment one set of data and analysis for another,'" because the "updated and expanded data in the [new survey] enabled EPA to respond to several industry objections to use of the data in the [earlier report] . . . by providing a more precise quantitative measure based on more complete information . . . ."); Community Nutrition Institute, 749 F.2d at 57 (upholding Department of Agriculture rule against a claim that the agency violated the APA "by relying on two scientific studies completed by its staff after the close of the comment period without giving interested parties an opportunity to comment on them," because the new studies "did not provide entirely new information 'critical' to the Secretary's determination" but instead simply "expanded on and confirmed information" summarized in the notice of proposed rulemaking); see also Public Service Comm'n of D.C. v. FCC, 906 F.2d 713, 717 (D.C. Cir. 1990) ("a reasonable attempt to accommodate commentators by responding to their suggestions for changes does not render a final rule something other than a logical outgrowth of the original proposal").

24

4.    HUD Did Not Act Arbitrarily or Capriciously With Regard
to the Effective Date

Plaintiffs also assert that, because it provides a different effective date for Nehemiah

Progressive Housing Development Corporation than for other DPA providers, the Regulation effects

"widely disparate treatment of major DPA providers" that "is the essence of arbitrariness."

Penobscot Mem. at 20.  However, as the issuing release for the Regulation explains, this different

treatment is no way arbitrary; rather, it is dictated by a settlement of earlier litigation.  See 72 Fed.

Reg. at 56,003 (A.R. 00003) (explaining that "pursuant to an April 1998 settlement agreement

resolving litigation between [Nehemiah] and HUD, the effective date shall be March 31, 2008 for

the Nehemiah downpayment assistance program  described in the settlement agreement between

Nehemiah and HUD"); see supra note 8 (discussing 1998 settlement).  Under plaintiffs' logic, any

time an agency settled a case with a particular party, it would become locked in to giving the same

terms and benefits to every other party in the future, even though that other party supplied no

consideration in the original settlement.  Needless to say, nothing in the APA requires such a bizarre

result.[20]  Plaintiffs also complain about the October 19, 2007 stipulation that HUD entered into with

AmeriDream in the instant litigation, staying the effectiveness of the Regulation as against

AmeriDream until February 29, 2008.  However, plaintiffs provide no authority for the novel

proposition that an agency's strategic decisions in defending litigation are themselves subject to

---

[20] While it is true that at the time of the 1998 settlement with Nehemiah, HUD told
Nehemiah that it planned voluntarily to extend the same six-month delayed effectiveness to "all
other similarly situated DPA programs" (A.R. 00891), this expression of intent was not binding
or irrevocable, and was not intended to be relied upon by entities that were not even then in
existence.  It was not arbitrary and capricious for the agency to reconsider this statement based on
dramatically changed circumstances since the statement was made nearly ten years ago.  See
supra at 10 (describing explosive growth of seller-funded DPA).

25

"arbitrary and capricious" review under the APA. In any event, HUD was willing to stipulate with AmeriDream because it was the only plaintiff at that time (other than Penobscot Plaintiffs, who had not filed a motion for a preliminary injunction and had not approached HUD about a stipulated stay), and a stay as to a single provider of seller-funded DPA presents vastly different considerations than a universal stay as to all providers. See infra Parts IV, V (discussing harm to HUD and public interest from global delay in effective date of Regulation).

     5.    HUD Did Not Exceed Its Statutory Mandate to Promulgate Regulations

Plaintiffs also argue that the Regulation exceeds HUD's authority to promulgate regulations under the National Housing Act.[21] This claim is wholly without merit. The National Housing Act requires that a mortgagor "shall have paid" a down payment of at least three percent of the Secretary's estimated cost of acquisition in order to be eligible for an FHA-insured mortgage. See 12 U.S.C. § 1709(b)(9). To enforce this requirement and others, Congress gave HUD broad authority to issue regulations: "The Secretary is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter." Id. § 1715b; see NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 32 (1st Cir. 1999) (holding that statutory grants of rulemaking authority employing the phrase "as may be necessary" confer broad power on agencies).[22]

To ensure that the down payment reflects a genuine investment by the buyer, HUD has long

---

[21] See Penobscot Mem. at 21-22; Genesis/HDGF Mem. at 14-15.

[22] In addition to the general grant of rulemaking authority in the statute, 12 U.S.C. § 1709(a) specifically authorizes the Secretary to insure mortgages that meet the eligibility requirements of the statute "upon such terms as the Secretary may prescribe." This language clearly empowers the Secretary to regulate concerning the conditions upon which mortgages will be accepted for insurance by FHA.

refused to insure mortgages where sellers directly provided the money for the buyer's down payment.

Tellingly, plaintiffs do not suggest that this prohibition is not a proper exercise of the agency's

authority and responsibility under the statute. Yet the Regulation is no more than a logical extension

of that policy. To allow a third party reimbursed by the seller after loan closing to finance a

borrower's down payment is simply an end run around the prohibition on sellers providing such

financing directly. HUD's authority to implement and enforce § 1709(b)(9) necessarily includes the

ability to strengthen enforcement of the provision by filling gaps in the statute. See Chevron, U.S.A.,

Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) ("The power of an administrative

agency to administer a congressionally created . . . program necessarily requires the formulation of

policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (quoting

Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

    To the extent that plaintiffs suggest Congress's legislative silence on seller-funded DPA

constitutes "endorsement" of HUD's previous tolerance of seller-funded DPA provided through

nonprofits, that argument is entirely flawed. The D.C. Circuit rejected a similar argument in AFL-

CIO v. Donovan, 757 F.2d 330, 344 (D.C. Cir. 1985), in which the Department of Labor ("DOL")

adopted three regulations applying a more restrictive interpretation of the Service Contract Act of

1965 than DOL's past regulations. The plaintiffs claimed that since Congress had amended the law

several times since the original regulations were enacted, Congress had ratified the previous

interpretation of the statute and thus the new regulations conflicted with the will of Congress. The

D.C. Circuit found no merit in that contention, given that the plaintiffs had "come forward with no

indication . . . that Congress even considered the regulations in question when it amended the Act.

What we have here is merely non-action." Id. at 344 n.11. As in Donovan, Congress's inaction does

not effect a codification of the regulatory status quo, binding upon an agency.[23]  See also Bob Jones

Univ. v. United States, 461 U.S. 574, 600 (1983) ("Ordinarily, and quite appropriately, courts are

slow to attribute significance to the failure of Congress to act on particular legislation.").  As in

Donovan, Congress's amendment of the statute in unrelated ways during a period in which HUD

withheld taking action to prohibit seller-funded DPA in FHA-insured mortgages simply does not

serve to demonstrate any congressional intent to forbid HUD from taking such action.

### B.    PLAINTIFFS' EQUAL PROTECTION ARGUMENTS FAIL AS A MATTER OF LAW

Plaintiffs' likelihood of success on their equal protection claims is even more dubious than

on their APA claims.  Plaintiffs wisely concede (Penobscot Mem. at 23; Genesis/HDGF Mem. at 15)

that the Regulation is subject only to rational-basis review, the lowest and most deferential form of

scrutiny.  See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (equal protection "require[s]

only that the classification challenged be rationally related to a legitimate state interest."); see also

American Towers, Inc. v. Williams, 146 F. Supp. 2d 27, 30-31 (D.D.C. 2001) ("To pass

constitutional muster under the equal protection component of the Fifth Amendment's Due Process

Clause, an official government action need only bear a rational relationship to a legitimate

governmental purpose so long as no suspect or quasi-suspect class is involved."), aff'd mem., 50 Fed.

---

[23]The cases relied on by plaintiff do not suggest otherwise.  Both cases arguably support the principle that, when an agency's long-standing regulation or interpretation of a statute is left unchanged by repeated congressional reenactments of the underlying statute, the agency's action has received the approval of Congress and should be given appropriate deference by a court.  See Cook County, Ill v. United States ex rel. Chandler, 538 U.S. 119, 132 (2003) (assessing availability of damages under False Claims Act); Cottage Savs. Ass'n v. C.I.R., 499 U.S. 554, 561 (1991) (evaluating Treasury regulations).  It is one thing to give an agency deference on the basis of implicit congressional approval of the agency's action, but it is entirely another to require the agency to refrain from acting in light of congressional silence.

28

Appx. 448 (D.C. Cir. 2002).  Each of the classifications that plaintiffs attack the Regulation for

making plainly has a rational relationship to a legitimate governmental purpose.

    Plaintiffs first argue that the Regulation improperly distinguishes between "classes of DPA

providers and recipients:  those that provide or receive gifts supported in part by seller-funded

donations and those that provide or receive gifts that are not so supported."  Penobscot Mem. at 22,

23-25.  In fact, however, the relevant portion of the Regulation, subsection (c),  does not classify

providers <u>qua</u> providers or recipients <u>qua</u> recipients; rather, the distinction it makes is between

permissible sources of funding and non-permissible sources of funding.  <u>See</u> 72 Fed. Reg. at 56,007

(A.R. 00007).[24]  As to that distinction, there are obvious reasons for treating "gifts" financed directly

or indirectly by the seller or another party with their own self-interest in the transaction differently

from true gifts from legitimate charities, relatives, or other permitted sources.  Home sellers have a

self-interest in seeing a particular transaction completed in a way that other donors do not.  Indeed,

home sellers are uniquely situated to inflate the selling price (or to refrain from discounting an

already inflated selling price) to offset a DPA gift, whereas with other donors there is no possibility

of the transaction being distorted in this way.  As discussed above, HUD found that seller-funded

down payment assistance posed special problems, such as increased risk of default, that are simply

not associated in the same magnitude with down payment assistance from other sources, such as

family members or legitimate charities.  <u>See</u> 72 Fed. Reg. at 56,003 (A.R. 00003) (noting that for

loans endorsed for insurance in FY 2001, the cumulative claim rate as of July 2007 was 7.1% for

_____

    [24]  Providers and recipients are not divided into rigid, fixed classes as plaintiffs' theory
posits.  Any provider is free to provide a DPA gift permitted by the Regulation (<u>i.e.</u>, one not
funded directly or indirectly by the seller or another interested party), and any home buyer is free
to receive such a DPA gift.

loans with permitted sources of DPA such as relatives, but 15.8% for loans with seller-funded DPA). Thus, the Regulation's prohibition of seller-funded down payment assistance is rationally related to the legitimate governmental interests in preventing abusive transactions that circumvent the statutory three-percent purchaser-contribution requirement and result in higher sale prices and more risky loans at the expense of the overall viability of the MMIF. The Regulation plainly does not violate equal protection on this basis.[25]

Plaintiffs also assert that the Regulation effects an impermissible classification by providing a different effective date for Nehemiah than for other DPA providers. See Penobscot Mem. at 25-26. As discussed above, however, this different treatment is not irrational; it is dictated by a settlement of earlier litigation. See 72 Fed. Reg. at 56,003 (A.R. 00003) (explaining that "pursuant to an April 1998 settlement agreement resolving litigation between [Nehemiah] and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD"); see supra Part II.A.4 (discussing this issue in APA context). Again, plaintiffs' argument essentially boils down to the notion that if the

---

[25] The cases plaintiffs cite for support of their rational-basis equal protection analysis are far afield from the instant case. In Romer v. Evans, 517 U.S. 620 (1996), the Supreme Court invalidated a Colorado constitutional amendment that "operat[ed] to repeal and forbid all laws or policies providing specific protection for gays or lesbians by every level of Colorado government." Id. at 629. The Supreme Court held that even under deferential rational basis review, this provision violated equal protection because such a "disqualification of a class of persons from the right to seek specific protection from the law is unprecedented in our jurisprudence." Id. at 633. In Brown v. Barry, 710 F. Supp. 352, 355-56 (D.D.C. 1989), the court invalidated a 1905 D.C. ordinance forbidding shoeshine vendors, but no other type of vendor, in public places, after the District was completely unable to explain any reason for that distinction. Plainly, the classifications successfully challenged in each of those cases bear little similarity to a HUD regulation that distinguishes, on the basis of empirical evidence, between proper and improper sources of down payment assistance in home purchases financed with FHA-insured mortgages.

government settles litigation with one party, it becomes obligated in perpetuity to extend the same terms and benefits to any other similarly situated entity, who provided no consideration in the earlier settlement and who may not have even been in existence then -- on pain of violating the Fifth Amendment. Plaintiffs cite no cases supporting this bizarre theory, which would have the far-reaching consequence of making it nearly impossible for the government ever to settle litigation. The different effective date for Nehemiah plainly is rationally related to the government's legitimate interest in settling the earlier litigation, and does not violate equal protection principles.

### C.     THE AGENCY DID NOT IMPROPERLY PREJUDICE THE OUTCOME OF THE RULEMAKING

Plaintiffs' argument that HUD improperly prejudged the outcome of the rulemaking process[26] rests entirely on a single Bloomberg.com news story dated June 5, 2007, attributing certain comments to Secretary Alphonso Jackson. Plaintiffs cannot carry their heavy burden to show that HUD prejudiced the outcome of the rulemaking process. "An administrative official is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" United Steelworkers of Am. v. Marshall, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)). "Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." Housing Study Group v. Kemp, 736 F. Supp. 321, 332 (D.D.C. 1990). As plaintiffs concede, a court may set aside agency action based on an official's public comment "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the

---

[26] See Penobscot Mem. at 26-27; Genesis/HDGF Mem. at 16-17.

proceeding." Ass'n of Nat'l Advertisers, Inc. v. FCC, 627 F.2d 1151, 1170 (D.C. Cir. 1979). Moreover, for obvious reasons, agency officials have much more leeway to engage in discussion of policy issues in the rulemaking context, compared to adjudications. See id. at 1168 ("The legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues."); Housing Study Group, 736 F. Supp. at 333 ("In order to intelligently perform his duties by making informed decisions, Secretary Kemp has made his intention known so that interested parties can contribute to the debate.").

The Bloomberg.com story cited by plaintiff clearly does not meet the Association of National Advertisers standard. The story provides a single quotation from Secretary Jackson addressing seller-funded DPA: "'I'm very much against it,' Jackson said in an interview. 'I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.'" Penobscot Mot. Ex. K. The article then purports to paraphrase Secretary Jackson, contending that "Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." Id.

The direct-quote statement, of course, does nothing more than show that Secretary Jackson "expressed strong views" or "[held] an underlying philosophy," which as a matter of law does not establish predecisional bias. Housing Study Group, 736 F. Supp. at 332. Nor does a statement attributed to Secretary Jackson that HUD intended to approve the rule even if it received critical comments "clear and convincing" proof of an "unalterably closed mind." Ass'n of Nat'l Advertisers, 627 F.2d at 1170. Significantly, the latter statement is presented in the story as a paraphrase rather than a direct quotation, leaving to speculation what exact words the Secretary may have used, what context may have been omitted, or what degree of accentuation or embellishment occurred. In any

event, even if the statement is read as if it were a verbatim quote with no qualifications, the fact that an agency has published a notice of proposed rulemaking itself is an indication of the agency's <u>intention</u> to promulgate a final rule, similar to the one published in the notice, at the end of the public comment period.  While the review and evaluation of comments can certainly lead the agency to revise or even withdraw the proposed rule – as HUD's previous consideration of the rule at issue shows – it is hardly prejudicial for an agency official to express the mere intention to implement the rule as proposed.  Furthermore, HUD and Secretary Jackson had every reason to anticipate heavy opposition to the proposed rule, given the mobilization of entities with a financial interest in being able to continue their seller-funded DPA programs, and given that the previous consideration of this issue led to an "overwhelming majority of comments" opposing the rule.  66 Fed. Reg. 2,851.  Simply put, a single paraphrased line in a news story, susceptible to varying interpretations, cannot overcome the "strong presumption of administrative regularity."  <u>Ass'n of Nat'l Advertisers</u>, 627 F.2d at 1168.[27]

---

[27] Indeed, it is telling that plaintiffs have to reach outside this jurisdiction to locate their single case where a court found prejudgment based on an agency official's comments, <u>see</u> <u>Int'l Snowmobile Mfrs. Ass'n v. Norton</u>, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004) (finding prejudgment based on written memorandum and transcript of speech), while ignoring cases in this Circuit and District rejecting predecisional bias claims on grounds plainly applicable here. <u>See</u> <u>Consumers Union v. FTC</u>, 801 F.2d 417, 427 (D.C. Cir. 1986) (rejecting argument that prediction, after the proposed rule was published but before the close of the comment period, that the agency would not adopt a certain provision did not constitute "clear and convincing evidence" of an "unalterably closed mind"); <u>Housing Study Group</u>, 736 F. Supp. at 332-33 (rejecting claim that HUD Secretary Kemp was impermissibly biased because of quotations in press release announcing intent to terminate coinsurance program before commencing rulemaking proceedings on the subject).

**III.    THERE IS NO SUBSTANTIAL THREAT OF IRREPARABLE INJURY
TO PLAINTIFFS IN THE ABSENCE OF THE REQUESTED INJUNCTIVE
RELIEF**

Even if plaintiffs had established a substantial likelihood of success on the merits – and they

have not – none of them have shown that they face a substantial threat of irreparable injury in the

absence of preliminary injunctive relief.  Several of the plaintiffs have made no showing, or only the

most cursory showing, of irreparable harm.  Even those that have attempted to make a genuine

showing have alleged only a speculative, theoretical injury – a potential loss of income derived from

processing seller-funded DPA "gifts" that purportedly would force them to terminate their operations

and lead to the dispersal of their work force – that is within their own power to mitigate.  But that

injury, to the extent it actually exists, is a product of plaintiffs' own decision to link their fortunes

to a narrow business model premised on being able to exploit a loophole in perpetuity.  Plaintiffs

have been on notice for at least the past eighteen months that the regulatory loophole that permitted

their seller-funded DPA programs could soon be closed; this should have given them ample

opportunity to begin diversifying their respective business models well before the NPRM was even

published six months ago.  Insofar as plaintiffs have failed to do so, despite extensive lead time, the

allegedly fatal injury of which they complain should be viewed as an essentially self-inflicted blow.

For these reasons, plaintiffs' allegations are insufficient to warrant preliminary injunctive relief.

To establish a substantial threat of irreparable injury, plaintiffs must meet two requirements.

First, the injury "'must be both certain and great; it must be actual and not theoretical.'"  Chaplaincy

of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting Wisc. Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  To that end, a plaintiff seeking injunctive relief must

demonstrate that "'[t]he injury complained of is of such imminence that there is a clear and present

need for equitable relief to prevent irreparable harm.'" Id. (quoting Wisc. Gas Co., 758 F.2d at 674) (emphasis in original, additional internal quotation marks omitted). Second, "the injury must be beyond remediation." Id. As the D.C. Circuit has emphasized, a loss of money in and of itself is rarely irreparable, or beyond remediation:

> "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

Id. at 297-98 (citing Sampson v. Murray, 415 U.S. 61, 90 (1974) (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958))). Moreover, insofar as the injury alleged is self-inflicted, it cannot be considered "irreparable." See, e.g., Salt Lake Tribune Publishing Co. v. AT&T Corp., 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable. . . ."); Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995) ("Because defendants have acted to permit the outcome which they find unacceptable, we must conclude that such an outcome is not an irreparable injury."); Barton v. District of Columbia, 131 F. Supp. 2d 236, 247-48 (D.D.C. 2001).

Plaintiffs have satisfied neither requirement for showing a substantial threat of irreparable injury. As to the first requirement, several of the plaintiffs have failed altogether to allege any imminent injury. For example, the sole relevant statements by the Penobscot plaintiffs are that "[t]he Regulation will cut off the great majority of PIN funding," and that "by cutting off PIN's principal sources of funding, the Regulation will cause PIN to cease operations and terminate its employees in the near term." Penobscot Mem. at 27, 28. Supporting those propositions is a general citation, without specification of any particular paragraph, to a 50-paragraph affidavit by Christopher Russell,

35

who is director of Global Direct Sales LLC ("GDS"), a Maryland-based limited liability company, but is not a member of, or otherwise affiliated with, Penobscot. See Russell Aff. ¶ 1. Upon examination, the sole paragraphs of the Russell Declaration that discuss the Penobscot plaintiffs' particular situation are paragraphs 10-14. Those paragraphs simply describe who each of the Penobscot plaintiffs are, state that the "PIN Tribal Counsel" [sic] authorized creation of a "national down payment assistance program" in January 2007, and that the three Penobscot plaintiffs subsequently entered into an agreement to develop such a program, which they call the Grant America Program ("GAP"). Russell Aff. ¶¶ 10-14. Of particular note, Mr. Russell testifies that "PIN is the source of all funds provided to the homebuyer under GAP." Russell Aff. ¶ 13.

These allegations fail altogether to show how the Penobscot plaintiffs stand to suffer imminent harm. In particular, they do not demonstrate how Penobscot or its affiliates will even be affected by the Regulation, as none of their submissions even specify whether their program relies on the seller financing that the Regulation prohibits. There is simply nothing in the Russell affidavit that would remotely permit any conclusion about "cut[ting] off the great majority of PIN funding," let alone "caus[ing] PIN to cease operations and terminate its employees in the near term."[28] Indeed, Penobscot Indian Nation's website lists a wide range of activities, including business ventures such as Penobscot High-Stakes Bingo, which has existed since 1973.[29] By comparison, Penobscot only joined the seller-funded DPA industry this year. Thus, the notion that the Regulation could somehow spell the end of the entire Penobscot Indian Nation by prohibiting seller-funded DPA is simply

---

[28] Notably, the text of the irreparable-harm section of the Penobscot plaintiffs' brief seems to be lifted almost verbatim from AmeriDream's (now withdrawn) motion for preliminary judgment, with only the names of the entities substituted.

[29] See http://www.penobscotnation.org.

unsupportable.

For somewhat different reasons, Plaintiff Sovereign Grant Alliance also cannot demonstrate a substantial threat of imminent harm caused by the Regulation. HUD published its NPRM on May 11, 2007. 72 Fed. Reg. 27,047 (May 11, 2007). Sovereign Grant Alliance has only existed since August 2007, when it incorporated as a 501(c)(3), approximately three months after publication of the NPRM. See Sovereign Grant Alliance, Inc., Articles of Incorporation (Aug. 21, 2007) (attached as Ex. 6). Given that Sovereign Grant Alliance began its corporate existence on notice that a proposed rule proscribing the use of seller-funded DPA as to FHA-insured home purchase loans was pending, it is inconceivable how it could claim any injury caused by the Regulation, much less an irreparable one.

Turning to the second requirement – that plaintiffs prove that their threatened injury is "irreparable" – plaintiffs again fall short of meeting their burden. To be irreparable, or beyond remediation, an injury must extend beyond a mere loss of money, Chaplaincy of Full Gospel Churches, 454 F.3d at 297-98 (citing Sampson v. Murray, 415 U.S. at 90)), and it cannot be one that is self-inflicted, see, e.g., Salt Lake Tribune Publishing Co., 320 F.3d at 1106; Caplan, 68 F.3d at 839; Barton v. District of Columbia, 131 F. Supp. 2d at 247-48. The evolving regulatory environment surrounding seller-funded DPA should have long ago alerted these plaintiffs that the regulatory loophole that had allowed their shared business model to persist might soon be closed in one or more of several ways. Thus, to the extent that plaintiffs have failed to diversify their operations in advance of this day despite those warning signs, any potentially fatal injury should be viewed as a self-inflicted blow that cannot constitute irreparable harm as a matter of law. See, e.g., Salt Lake Tribune Publishing Co., 320 F.3d at 1106; Caplan, 68 F.3d at 839; Barton v. District of

Columbia, 131 F. Supp. 2d at 247-48.

There is little question that any injury plaintiffs stand to incur would be attributable to their own collective failure to diversify an inherently fragile business model whose survival was entirely dependent upon a single regulatory loophole that was likely to be closed at some point. It has been almost two years since GAO's November 2005 Report recommended, inter alia, that HUD revise FHA standards to proscribe seller-funded DPA provided by nonprofits such as plaintiffs. See GAO 2005 Report at 44-45 (A.R. 00567-68). In addition, it has been eighteen months since the IRS issued Revenue Ruling 2006-27, which established that organizations that facilitate home purchases using substantial funding from property sellers and other entities that stand to benefit from such transactions do not qualify for nonprofit status under 26 U.S.C. § 501(c)(3). See IRS Rev. Rul. 2006-27, 2006-21 I.R.B. 915 (A.R. 00021) . Although the IRS apparently has not yet revoked the 501(c)(3) status for the plaintiffs that purport to be charitable organizations, Revenue Ruling 2006-27 was a shot across the bow for each of them, as it directly barred their common business model from operating under 501(c)(3) status.[30] Under longstanding FHA guidelines independent of the new Regulation, if they do not qualify as legitimate charities, the nongovernmental entities among plaintiffs cannot provide downpayment assistance for home purchases financed with FHA-insured mortgages. See HUD Handbook 4155.1, Rev. 5, ¶ 2-10(C) (Ex. 3). Given these developments, plaintiffs could not have reasonably expected that the regulatory loophole that had enabled them to

---

[30] Plaintiff AmeriDream (which is not before the Court on the instant motions for preliminary injunctive relief, as discussed elsewhere) apparently recognized the potential threat posed by these actions, as it commissioned researchers at George Mason University to prepare studies to help it "respond to challenges" to its program the same year as Revenue Ruling 2006-27. See Lisa A. Fowler, et al., An Evaluation of Research on the Performance of Loans with Down Payment Assistance, George Mason University School of Public Policy, Center for Regional Analysis (Sept. 2006) at 1 (A.R. 438) (attached as Ex. 7).

create and maintain their lucrative businesses would remain open in perpetuity. Indeed, one of their competitors responsibly discontinued its seller-funded DPA programs after realizing that the Revenue Ruling made its business model no longer viable. See www.buyersfund.com/index.asp (screen shot attached hereto as Ex. 11). The failure of these plaintiffs to plan for the potential closing of the loophole by diversifying their operations thus cannot be regarded as irreparable harm sufficient to warrant preliminary injunctive relief, as it was self-inflicted in each instance.[31]

In addition, the existing evidence actively undermines plaintiffs' conclusory allegations that any injury caused by the Regulation would amount to more than a loss of money, as it must to be considered irreparable. Sampson v. Murray, 415 U.S. at 90. The Regulation's prohibition of seller-funded DPA for FHA-insured home purchase loans has no effect whatsoever on the market for loans that are not FHA-insured, which represent the overwhelming majority of the home purchase loan market in the United States. This means that the Regulation does nothing to prevent plaintiffs from providing seller-funded DPA in the vast majority of home sales. By illustration, non-FHA-insured mortgages represented almost 94 percent of all loans originated in the United States in 2005. See GAO Report No. 07-645, Federal Housing Administration: Decline in the Agency's Market Share Was Associated with Product and Process Developments of Other Mortgage Market Participants, at 35, tbl. 1 (attached as Ex. 8). And as the November 2005 GAO Report noted, seller-funded DPA was potentially available as to some of these transactions, typically subject to restrictions on the amount of such assistance that a home buyer may receive and how that assistance can be used. GAO 2005 Report at 35 (A.R. 00558). For example, the November 2005 GAO Report noted, Fannie Mae

---

[31] The self-inflicted nature of this injury is particularly pronounced as to Plaintiff Sovereign Grant Alliance, which incorporated in August 2007, months after publication of the NPRM. See Ex. 6.

and Freddie Mac "permit homebuyers to obtain funds provided by seller-funded nonprofits but only up to 3 percent of the sales price and only for closing costs." Id. at 35-36 (A.R. 00558-59). Plaintiff Partners in Charity, for one, recognizes this, explaining on its website that its services can be used "with any loan type," including not only FHA loans, but non-conforming and conventional loans as well. See http://partnersincharity.org/lender/step1a.htm (screen capture attached as Ex. 9). Given the size of this portion of the market in contrast to the far smaller portion occupied by FHA-insured loans, the premise of plaintiffs' irreparable harm argument – that the Regulation will destroy their businesses – is unconvincing. Insofar as more than nine out of ten home purchase loans are unaffected by the Regulation, plaintiffs' common contention of injury represents at most a loss of income, and thus cannot constitute irreparable harm.[32]

Moreover, the Regulation will not prohibit plaintiffs from participating in the FHA-insured market. Because the Regulation is intended only to bar the provision of DPA from parties who stand to benefit financially from the sale of a home, it does not prohibit legitimate charities from providing DPA. Specifically, these plaintiffs can still provide DPA to the FHA-insured market, so long as their DPA "gifts" are not funded or reimbursed by the property seller or any other party with an interest in the transaction. See 72 Fed. Reg. at 56,003 ("While this rule prevents sellers from funding

---

[32] In fact, no plaintiff has even identified what percentage of its business involves the provision of seller-funded DPA in transactions involving FHA-insured home purchase loans, much less provided evidence to support any allegation on that topic. As the entire basis for plaintiffs' irreparable harm arguments, these bare allegations thus fall far short of meeting their evidentiary burden of establishing an actual rather than theoretical injury. Time Warner Entertainment Co. v. FCC, 810 F. Supp. 1302, 1304 (D.D.C. 1992) (citing Nat'l Treasury Employees Union v. United States, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991)) (Plaintiffs must provide evidence supporting allegations of irreparable harm; failure to provide such proof "may warrant the refusal of pendente lite relief and require the movant to await the conclusion of the case.").

40

downpayments in their own home sales transactions, [it] is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller.").  While the rule thus may require plaintiffs to more carefully scrutinize the sellers and buyers with whom they work, or to devote more resources to accounting, such additional potential burdens cannot constitute irreparable injury.

In light of these facts, plaintiffs' reliance on Washington Metropolitan Area Transit Commission v. Holiday Tours, 559 F.2d 841 (D.C. Cir. 1977) to argue that "destruction" of an ongoing business constitutes irreparable harm is unavailing.  While the opinion in Holiday Tours does not specifically describe the facts of the case, there was no indication that the plaintiff's purportedly imminent destruction in the absence of preliminary relief was self-inflicted.  See id. Here, by contrast, there is ample indication that any injury to plaintiffs is fundamentally self-inflicted, as each has known for eighteen months or more that the loophole around which it constructed its operation was in serious question.[33]  Further, despite the lack of discussion of the record in Holiday Tours, it must be assumed that there was credible, reasonably specific evidence in that case that the plaintiff's business was at risk of destruction in the absence of preliminary injunctive relief.  See Holiday Tours, 559 F.2d at 843; see also Time Warner Entertainment Co. v. FCC, 810 F. Supp. 1302, 1304 (D.D.C. 1992) (citing Nat'l Treasury Employees Union v. United States, 927 F.2d 1253, 1254-

---

[33] Plaintiffs' reliance upon the district court decisions in Canterbury Career School v. Riley, 833 F. Supp. 1097 (D.N.J. 1993), and Ross University School of Medicine v. Cavazos, 716 F. Supp. 638 (D.D.C. 1989), is unavailing for similar reasons.  The court's discussion of the facts in each case indicates no basis for concluding that the alleged injury – the termination of federal student loan funding – was self-inflicted.  See Canterbury Career School, 833 F. Supp. at 1100-02, 1105; Ross University School of Medicine, 716 F. Supp. at 639-41, 644.

55 (D.C. Cir. 1991)) (movant's failure to provide proof of factors supporting preliminary injunctive relief, including irreparable harm, "may warrant the refusal of <u>pendente</u> <u>lite</u> relief and require the movant to await the conclusion of the case."). Here, there is no such reasonably specific evidence of irreparable harm; plaintiffs' testimony fails to offer anything other than bare allegations that their businesses stand to be destroyed by the Regulation. For these reasons, <u>Holiday Tours</u> is inapplicable to the facts of this case.

## IV.     A PRELIMINARY INJUNCTION WOULD SUBSTANTIALLY INJURE HUD

Injunctive relief should not be granted where it would substantially injure other interested parties. <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (citing <u>CityFed Financial Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 746 (D.C. Cir. 1995)). Consequently, "even where denial of a preliminary injunction will harm the plaintiff, the injunction should not be issued where it would work a great and potentially irreparable harm to the party enjoined." <u>Dorfmann v. Boozer</u>, 414 F.2d 1168, 1173 (D.C. Cir. 1969). As with the other preliminary injunction factors, the moving party bears the burden of showing that the non-moving party will <u>not</u> be substantially injured. <u>Time Warner Entertainment Co. v. FCC</u>, 810 F. Supp. at 1304 (citing <u>Nat'l Treasury Employees Union v. United States</u>, 927 F.2d at 1254-55).

Plaintiffs' only arguments as to the lack of substantial injury to HUD – that HUD's tolerance of seller-funded DPA for the past ten years, and its decisions to extend the effective date of the Regulation as to Nehemiah and AmeriDream, mean that HUD will not be injured if these plaintiffs continue to provide seller-funded DPA to secure FHA-insured home purchase loans for the duration of this litigation – fail to satisfy their evidentiary burden. In fact, the evidence shows precisely the opposite: that a preliminary injunction would substantially injure HUD by increasing both the default

42

rate among FHA-insured home loans and the resulting drain upon the MMIF.  For example, if implementation of the Regulation is delayed across-the-board until March 1, 2008, HUD's actuarial analysis projects that approximately 40,700 new home purchase loans secured using seller-funded DPA will be insured by FHA under the MMIF between today and February 29, 2008.  Declaration of Judith V. May, Oct. 29, 2007 ("May Decl.") at ¶ 11, attached hereto as Ex. 10.  The mortgage-holders for approximately 9,400 of those loans (or slightly more than 23 percent) can be expected to submit insurance claims under the MMIF at some point during the lifetime of those loans, a claim rate more than double that of the approximately 11 percent claim rate for FHA-insured loans secured without seller-funded DPA. Id. ¶¶ 12-13.  Of those approximately 9,400 claims, approximately 7,000 would be attributable to loans obtained through DPA providers other than Nehemiah and AmeriDream. Id. ¶ 13.  The average loss on a claim under the MMIF is approximately $40,000; thus, the total projected loss to the MMIF from those claims would be approximately $375.6 million, of which approximately $278.3 million would be attributable to loans obtained through DPA providers other than Nehemiah and AmeriDream. Id. ¶ 14.  Thus, the injury to HUD if a preliminary injunction is granted would be substantial, and militates against the award of preliminary injunctive relief.

## V.    THE PUBLIC INTEREST DISFAVORS INJUNCTIVE RELIEF IN THIS CASE.

Finally, plaintiffs must prove that the public interest will be furthered by the injunction they seek.  Time Warner Entertainment Co. v. FCC, 810 F. Supp. at 1304 (citing Nat'l Treasury Employees Union v. United States, 927 F.2d at 1254-55).  As to this factor, plaintiffs present an essentially circular argument, contending that they will be forced to cease operations, and that the resulting harm to the public will be "immediate and severe," particularly to low- and moderate-income families that purportedly depend upon seller-funded DPA to purchase homes.  See, e.g.,

Penobscot Pls.' Mem. at 28. As shown in Part IV, <u>supra</u>, plaintiffs' premise is unfounded based on the evidence before the Court. But even assuming <u>arguendo</u> that plaintiffs' reports of their own collective demise are not greatly exaggerated, the evidence does not support their claims as to the impact upon the public interest.

Contrary to plaintiffs' conclusory assertions, implementation of the Regulation as scheduled would serve the public interest by reducing default and claim rates among FHA-insured loans through the elimination of seller-funded DPA for such loans; the reduction of default rates among FHA-insured loans would mitigate the negative consequences that defaults generate in communities with high default rates. <u>See</u> 72 Fed. Reg. at 56,003. As demonstrated in Part IV, <u>supra</u>, if implementation of the Regulation is delayed across-the-board until March 1, 2008, the delay would result in an additional projected 7,000 claims attributable to seller-funded DPA providers other than Nehemiah and AmeriDream. May Decl. ¶ 13. Aside from resulting in projected losses to the MMIF of $278.3 million, this delay would result in almost 7,000 families losing homes to foreclosure actions that would in turn damage the fabric of the neighborhoods of which they are a part. <u>Id.</u> ¶ 13. These concerns, which are exacerbated in stagnant or depreciating housing markets, were significant to HUD when it adopted the Regulation. <u>See</u> 72 Fed. Reg. at 56,003 (noting that defaults and foreclosures not only "represent a financial burden for FHA and taxpayers," but also "hurt the families who lose their homes and the neighborhoods in which those homes are located"). Thus, insofar as implementation of the Regulation as scheduled (even if suspended as to Nehemiah and AmeriDream) would prevent the creation of thousands of new loans of a type demonstrably more likely to result in defaults and foreclosures, the public interest favors the denial of plaintiffs' requested preliminary injunctive relief.

44

## CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motions for temporary restraining orders and for preliminary injunctions be denied.

Dated: October 29, 2007                         Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General


                                                 /s/ Robert J. Katerberg
                                                MICHAEL SITCOV
                                                TAMARA ULRICH
                                                CHRISTOPHER HALL
                                                ROBERT J. KATERBERG
                                                SCOTT RISNER
                                                United States Department of Justice
                                                20 Massachusetts Avenue, N.W.
                                                Washington, D.C. 20530
                                                Telephone: (202) 514-4778
                                                Fax: (202) 616-8470

                                                Attorneys for Defendant

45

# Exhibit 1

United States Government Accountability Office

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

November 2005

# MORTGAGE FINANCING

## Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance



00518

## The Percentage of Purchase Loans in FHA's Portfolio with Down Payment Assistance Has Been Increasing Since 2001

As the number of home mortgages FHA insures each year has fallen, the number of FHA-insured single-family purchase money loans with nonprofit down payment assistance has not. As a result, the proportion of loans with down payment assistance that FHA insures each year has increased significantly. From 2000 to 2004, the total proportion of FHA-insured single-family purchase money loans that had an LTV ratio greater than 95 percent and that also involved down payment assistance, from any source, grew from 35 to nearly 50 percent (fig. 2).[21] Assistance from nonprofit organizations, about 93 percent of which were funded by sellers, accounted for an increasing proportion of this assistance. Approximately 6 percent of FHA-insured loans received down payment assistance from nonprofit organizations in 2000, but, by 2004 this figure had grown to about 30 percent.[22] Our analysis of a sample of FHA-insured loans from 2000 to 2002 showed that the average amount of down payment assistance, regardless of source, was about $3,400 and that the amount of down payment assistance relative to sales price was about 3 percent.[23]

---

[21]The data sample we relied on included only FHA-insured, single-family purchase money loans with an LTV ratio greater than 95 percent. Loans with an LTV ratio greater than 95 percent account for almost 90 percent of FHA's total portfolio.

[22]Loans insured by FHA's 203(b) program, its main single-family program, and its 234(c) condominium program. Small specialized programs, such as 203(k) rehabilitation and 221(d) subsidized mortgages, were not included. For 2000, 2001, and 2002, our analysis is based on a representative sample of FHA-insured purchase money loans with an LTV ratio greater than 95 percent. For 2003, 2004, and 2005, our analysis is based on the total universe of FHA-insured purchase money loans with an LTV ratio greater than 95 percent. HUD data do not differentiate between nonprofit down payment assistance providers that receive funding from sellers and those that do not. See the note to figure 2 for details on the proportions of loans in the samples with seller-funded assistance.

[23]Ninety percent of assistance from seller-funded nonprofit organizations was between 2.8 and 5.5 percent of the sales price; however, 90 percent of assistance from other sources was between 1.0 percent and 8.8 percent of the sales price.

**00537**

**Figure 5: Generic Illustration of Addendum to the Sales Contract Completed Prior to Closing that Facilitates Seller's Commitment to Providing Financial Payment to the Nonprofit Organization after Closing**



Source: GAO.

## Seller-Funded Down Payment Assistance Often Results in Higher Sales Prices

When a homebuyer receives down payment assistance from a seller-funded nonprofit, property sellers often raise the sales price of the property to recover the required payment to the nonprofit providing the assistance. GAO analysis of a national sample of FHA-insured loans endorsed in 2000, 2001, and 2002 suggests that homes with seller-funded assistance were appraised and sold for about 3 percent more than comparable homes without such assistance.[27] Additionally, our analysis of more recent loans, a sample of FHA-insured loans settled in March 2005, indicates that homes sold with nonprofit assistance were appraised and sold for about 2 percentage points more than comparable homes without nonprofit

---

[27]We drew the sample of loans for this analysis from a national sample of FHA-insured loans developed through a file review study funded by HUD and conducted by the Concentrance Consulting Group. The sample consisted of just over 5,000 purchase money loans endorsed in 2000, 2001, and 2002 with LTV ratios greater than 95 percent.

**00545**

assistance.[28] To examine the possibility that sales prices of homes with seller-funded assistance were in fact higher than sales prices of comparable homes without such assistance, we contracted with First American Real Estate Solutions to provide estimates of the value of homes in a sample of FHA-insured loans. The values were calculated for the month prior to the closing, using an AVM. AVMs, which use statistical processes to estimate the property values, using property characteristics and trends in sales prices in the surrounding areas, are widely used in the mortgage industry for quality control and other purposes. We examined the ratio of the estimated AVM values to the appraisal values and sales prices and found that the ratios for loans with seller-funded nonprofit down payment assistance ranged from about 2 to 3 percentage points lower than the ratios for loans without such assistance. In other words, for loans with seller-funded down payment assistance, the appraised value and sales price were higher as compared with loans without such assistance. See appendix II for the details of our analysis.

---

[28]The sample of loans for this analysis is a stratified random sample of 2,000 FHA-insured purchase money loans with first amortization dates in April 2005, extracted from FHA's Single-Family Data Warehouse.

**00546**

assistance provided by a party with an interest in the sale of the property is limited to 6 percent of the sales price and can be used only for closing costs. Contributions from interested parties, such as sellers, that exceed 6 percent of the sales price or the actual closing costs result in a dollar-for-dollar reduction to the sales price when calculating the loan's LTV ratio. Along with the maximum allowable LTV ratio, the effect of this requirement is to ensure that FHA homebuyers obtain a certain amount of "instant equity" at closing. That is, when the sales price represents the fair market value of the house, and the homebuyer contributes 3 percent of the sales price at the closing, the LTV ratio is less than 100 percent. But when a seller raises the sales price of a property to accommodate a contribution to a nonprofit that provides down payment assistance to the buyer, the buyer's mortgage may represent 100 percent or more of the property's true market value.

## FHA-Insured Loans with Down Payment Assistance, particularly from Seller-Funded Nonprofits, Do Not Perform as Well as Similar Loans without Assistance

Holding other variables constant, FHA-insured loans with down payment assistance do not perform as well as similar loans without such assistance. Furthermore, loans with down payment assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources. This difference in performance may be explained, in part, by the higher sales prices of comparable homes bought with seller-funded down payment assistance.

For our analyses, we used two samples (i.e., national and MSA) of FHA-insured single-family purchase money loans endorsed in 2000, 2001, and 2002.[35] We grouped the loans into the following three categories:

- loans with assistance from seller-funded nonprofit organizations,

- loans with assistance from nonseller-funded sources, and

---

[35]The data (current as of June 30, 2005) consisted of loans insured by FHA's 203(b) program, its main single-family program, and its 234(c), condominium program. Small specialized programs, such as 203(k) rehabilitation and 221(d) subsidized mortgages, were not in the sample. The national sample included all 50 states and the District of Columbia, but not U.S. territories. The Metropolitan Statistical Area (MSA) sample consisted of loans from three MSAs with high rates of down payment assistance (Atlanta, Indianapolis, and Salt Lake City). Performance is measured by claim rate, 90-day delinquency rate, and rate of loss given default.

**00549**

- loans without assistance.[36]

We analyzed loan performance by source of down payment assistance, controlling for the maximum age of the loan. As shown in figure 7, in both samples and in each year, loans with down payment assistance from seller-funded nonprofit organizations had the highest rates of delinquency and claims, and loans without assistance the lowest. Specifically, between 22 and 28 percent of loans with seller-funded assistance had experienced a 90-day delinquency, compared to 11 to 16 percent of loans with assistance from other sources and 8 to 12 percent of loans without assistance. The claim rates for loans with seller-funded assistance ranged from 6 to 18 percent, for loans with other sources of assistance ranged from 5 to 10 percent, and for loans without assistance from 3 to 6 percent.

[36]HUD data does not differentiate between nonprofit down payment assistance providers that receive funding from sellers and those that do not. The group of seller-funded nonprofit organizations includes only nonprofit organizations we could verify as requiring funds from sellers as a condition of providing assistance. All other nonprofits were included in the nonseller-funded (other sources) group. In the national and MSA samples combined, 1,655 loans had at least one gift letter source indicating a nonprofit. Of those, 1,548 (93.5 percent) were seller-funded, 29 (1.8 percent) were not seller-funded, 8 (.5 percent) were from a nonprofit with both seller-funded and nonseller-funded programs, and 70 (4.2 percent) were from nonprofits with a status that we could not identify.

**00550**

**FHA Standards Permit Borrowers to Obtain Down Payment Assistance from Seller-Funded Sources**

Government internal control guidelines do not prescribe standards specifically for loans with down payment assistance but do advise agencies to consider and recognize the value of industry practices that may be applicable to agency operations. FHA practices related to down payment assistance are in many ways comparable to industry practices. The agency applies the same standards to loans with down payment assistance as it does to other FHA-insured loans—for example, placing a 6 percent cap on the amount of funds sellers can contribute to loan transactions and requiring borrowers to meet the same underwriting requirements as other borrowers. FHA does not consider the presence, source, or amount of down payment assistance as a factor in its underwriting guidelines; more specifically, FHA does not include down payment assistance as a variable in its TOTAL Mortgage Scorecard.[47] Similarly, mortgage industry participants reported not imposing additional underwriting criteria for loans with down payment assistance.

FHA's standards regarding sources of down payment assistance differ from those of key mortgage industry participants in one important respect— while FHA permits down payment assistance from seller-funded sources, mortgage industry participants restrict or prohibit such assistance. FHA, like other mortgage industry participants, does not permit homebuyers to obtain down payment assistance directly from property sellers but does permit them to get it from nonprofits that receive contributions from property sellers. Further, FHA does not include down payment assistance from seller-funded nonprofits in the 6 percent limit that it has imposed on seller contributions. In contrast, some mortgage industry participants we met with told us that they viewed down payment assistance from seller-funded nonprofits as an inducement and, therefore, either restricted or prohibited its use. Although some mortgage industry participants do permit homebuyers to use seller-funded nonprofits, these entities typically impose restrictions on the amount of assistance a homebuyer may receive and how the funds can be used. For example, Fannie Mae and Freddie Mac permit homebuyers to obtain funds provided by seller-funded nonprofits but only

---

[47]Although FHA's TOTAL Mortgage Scorecard does not directly consider the presence of down payment assistance, it is possible that a loan with down payment assistance "looks better" as compared with a loan without assistance, because (1) the effective LTV ratio is higher than the LTV ratio entered into the TOTAL Mortgage Scorecard because the dollar value used for the property value  may be higher for transactions utilizing seller-funded down payment assistance and (2) the borrower reserves are higher (because the borrower doesn't have to use their own funds to make the down payment)—both of which would raise the borrower's score.

**00558**

up to 3 percent of the sales price and only for closing costs. FHA standards for other sources of down payment assistance are similar to those of mortgage industry participants we spoke with. Specifically, neither limits the amount of assistance a homebuyer may receive from sources such as relatives, and this money can be used for the down payment, as well as the closing costs. Also, as mentioned earlier, FHA applies the same underwriting standards to loans with down payment assistance as it applies to loans without such assistance.

Mortgage industry participants we spoke with cited three reasons for restricting down payment assistance from seller-funded nonprofits. First, some mortgage industry participants noted that seller-funded nonprofits are not disinterested third parties because of the contingency requiring contributions from sellers after the loan closes. Second, some mortgage industry participants noted that homebuyers receiving down payment assistance from seller-funded nonprofits often finance larger loan amounts than they would otherwise because sellers increase the sales price to compensate for the contribution. Third, some mortgage industry participants noted that, in effect, seller-funded nonprofits can be used as intermediaries to enable sellers to contribute funds in excess of HUD's 6 percent limit on seller contributions.

Additionally, another HUD program has more restrictive standards on permitted sources of down payment assistance. The American Dream Downpayment Initiative, a program administered by HUD's Office of Community Planning and Development that provides grants for down payment assistance programs, does not permit seller-funded nonprofits to administer its funds.[48] And, in 1999, HUD proposed a rule that would prohibit borrowers from obtaining down payment assistance from organizations that received funds from sellers. HUD stated that this rule was "intended to prevent a seller from providing funds to an organization as a quid pro quo for that organization's down payment assistance for purchase of one or more homes from the seller."[49] HUD later withdrew this

---

[48]HUD's Office of Community Planning and Development administers this grant program, which provides down payment assistance funds to homebuyers. Initially, HUD awards funds to state and local governments that are participating jurisdictions. These jurisdictions may choose to designate nonprofit organizations to administer the funds, but not seller-funded nonprofits.

[49]Proposed Rule, The U.S. Department of Housing and Urban Development, 24 C.F.R. Part 203, 64 F.R. 49956 (Sept. 14, 1999).

00559

Specifically, given the increased risks posed by loans with down payment assistance, from any source, we recommend that the Secretary of HUD direct the Assistant Secretary for Housing (Federal Housing Commissioner) to consider the following four actions to better understand and manage these risks:

- To provide FHA with data that would permit the agency to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit nonseller-funded" and require lenders to accurately identify and report this information when submitting loan information to FHA;

- To more fully consider the risks posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Mortgage Scorecard during the underwriting process;

- To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance; and

- To more accurately reflect the impact that down payment assistance has on loan performance, continue to include the presence and source of down payment assistance in future loan performance models. To enhance the actuarial reviews' estimates of claims, consider including in the annual review of actuarial soundness, the impact that the presence and source of down payment assistance has on claim severity.

We further recommend that the Secretary of HUD direct the Assistant Secretary for Housing (Federal Housing Commissioner) to take the following two actions to balance the goals of expanding homeownership and sustaining the actuarial soundness of the Fund by managing the risks associated with loans that involve "gifts" of down payment assistance from nonprofit organizations that receive funding from sellers:

- To ensure that appraisers have the information necessary to establish the market value of the properties, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source; and

**00567**

- Because down payment assistance provided by seller-funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from seller-funded nonprofits as a gift from the seller and, therefore, subject to the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD for its review and comment. We received written comments from HUD's Assistant Secretary for Housing (Federal Housing Commissioner), which are reprinted in appendix IV. HUD generally agreed with the report's findings, noting that the analysis of loan performance is consistent with its own findings regarding the performance of loans with down payment assistance and how seller-funded down payment assistance programs operate. HUD also agreed to take steps that will improve its oversight of down payment assistance lending. Specifically, HUD will modify its information systems to document assistance from seller-funded nonprofits, and HUD will consider incorporating down payment assistance into FHA's TOTAL Mortgage Scorecard and requiring lenders to inform appraisers when assistance is provided by seller-funded nonprofits.

The department commented on certain aspects of selected recommendations. First, although HUD agreed with the report's recommendation to perform routine and targeted loan performance analyses of loans with down payment assistance, it maintained that FHA already performs monitoring of these loans. We recognized that FHA has conducted ad hoc risk analyses of its loans with down payment assistance. Additionally, the actuarial review of FHA's insurance Fund for 2005 includes, for the first time, down payment assistance as a variable in its model of loan performance. Consistent with our findings, the 2005 actuarial review found the presence of down payment assistance to be a significant factor in explaining loan performance. Further, the 2005 actuarial review states that loans with down payment assistance should be closely monitored. We agree. Because the proportion of loans FHA insures that involve some form of down payment assistance is growing dramatically, and because the risks associated with down payment assistance are substantial, we continue to recommend that FHA more routinely monitor the performance of loans with down payment assistance.

Second, HUD disagreed with our recommendation that it should revise its standards to prohibit the use of down payment assistance from seller-funded nonprofit organizations to meet the three percent borrower

contribution requirement. Our recommendation was based on our conclusion that the down payment assistance provided by seller-funded nonprofits was, in effect, a seller inducement to purchase. As the basis of its disagreement with our recommendation, FHA cites a 1998 internal HUD Office of the General Counsel memorandum, acknowledged in our report. The 1998 HUD memorandum reasoned that as long as seller-funded down payment assistance is provided to the buyer *before* closing, and the seller's contribution to the nonprofit entity occurs *after* closing, the buyer has not received funds that can be directly traced to the seller's contribution.

We realize that FHA relies on HUD's 1998 memorandum to authorize sellers to do indirectly what they cannot do directly, namely provide gifts of down payment assistance to buyers. We continue to believe that HUD should recognize that because gifts of down payment assistance from seller-funded nonprofits are ultimately funded by the sellers, they are like gifts of down payment assistance made directly by sellers. We, therefore, continue to believe that FHA should revise its standards to treat assistance from a seller-funded entity as a seller inducement to purchase.

In addition, as noted in our report, HUD agreed with our conclusion and recommendation after it issued its 1998 memorandum. In 1999, HUD proposed a rule that would have prohibited use of gifts from nonprofit organizations for buyers' down payment assistance, if the organizations received funds for the gifts—directly or indirectly—from sellers. Although HUD later withdrew the rule without substantive explanation, we continue to believe HUD's rationale in proposing the rule was correct.

Third, in its comment letter, HUD stated that FHA has incorporated the source of down payment assistance in the 2005 actuarial review of the Mutual Mortgage Insurance Fund, which was published during the course of obtaining HUD's comments on a draft of this report. In response, we have added information describing the analyses contained in the 2005 actuarial review, and modified our recommendation to address a weakness in the actuarial review's analysis of down payment assistance, and to emphasize the need to continue considering the presence and source of down payment assistance in future loan performance models.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate Congressional Committees and the Secretary of Housing and

Urban Development. We also will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questions concerning this report, please contact me at (202) 512-8678 or shearw@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix V.

Sincerely yours,

*William B. Shear*

William B. Shear
Director, Financial Markets and
    Community Investment

**00570**

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

October 25, 2005

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D. C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING:  Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years.  The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA.  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit.  The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance.  FHA represents a better, safer

**00612**

Appendix IV
Comments from the Department of Housing
and Urban Development

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their homes or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

<u>GAO Recommendation</u>: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

<u>FHA Response</u>: FHA agrees with this recommendation and will modify the systems to collect this additional information.

<u>GAO Recommendation</u>: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

<u>FHA Response</u>: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

<u>GAO Recommendation</u>: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

<u>FHA Response</u>: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

<u>GAO Recommendation</u>: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

<u>FHA Response</u>: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

00613

Appendix IV
Comments from the Department of Housing
and Urban Development

-3-

GAO Recommendation:  To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

FHA Response:  Lenders are required to inform appraisers about all seller concessions, including down payment assistance.  Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report.  Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

GAO Recommendation:  Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

FHA Response:  HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase.  If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment.  After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity.  The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property.  Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report.  Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

00614

# Exhibit 2

# Part I. Rulings and Decisions Under the Internal Revenue Code of 1986

## Section 61.—Gross Income Defined

Whether certain down payment assistance provided to a home buyer is includible in the recipient's gross income under section 61. See Rev. Rul. 2006-27, page 915.

## Section 102.—Gifts and Inheritances

Whether certain down payment assistance provided to a home buyer is excludible from the recipient's gross income as a gift under section 102. See Rev. Rul. 2006-27, page 915.

## Section 501.—Exemption From Tax on Corporations, Certain Trusts, etc.

*26 CFR 1.501(c)(3)–1: Organizations organized and operated for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals. (Also §§ 61, 102, 1012.)*

**Down payment assistance; home buyers.** This ruling sets forth the applicable rules and standards for determining whether organizations that provide down payment assistance to home buyers qualify as tax-exempt charities. In addition, the ruling addresses whether assistance received for a down payment is treated as a gift and included in a home buyer's basis.

## Rev. Rul. 2006–27

ISSUES:

1. Whether organizations that otherwise meet the requirements of § 501(c)(3) of the Internal Revenue Code and are described in the situations below operate exclusively for charitable purposes.

2. Whether home buyers who receive down payment assistance from the organizations may exclude the amount of the assistance from their gross income as gifts under § 102.

3. Whether home buyers who receive down payment assistance from the organizations may include the amount of the assistance in the cost basis of their homes under § 1012.

FACTS

Situation 1

X is a non-profit corporation that helps low-income individuals and families purchase decent, safe and sanitary homes throughout the metropolitan area in which X is located. As a substantial part of its activities, X makes assistance available exclusively to low-income individuals and families to provide part or all of the funds they need to make a down payment on the purchase of a home. X uses standards set by Federal housing statutes and administered by the Department of Housing and Urban Development to determine who is a low-income individual. Individuals are eligible to receive assistance from X's program if they are low-income individuals, have the employment history and financial history necessary to qualify for a mortgage, and would so qualify but for the lack of a down payment. X also offers financial counseling seminars and conducts other educational activities to help prepare potential low-income home buyers for the responsibility of home ownership.

X will consider applications for assistance in connection with an applicant's purchase of any home that meets X's standards for habitability. Before making a grant of down payment assistance, X requires a home inspection report for the property that the applicant intends to buy to ensure that the house will be habitable.

To fund its down payment assistance program and other activities, X conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

X's grantmaking process is structured to ensure that X's staff awarding grants on behalf of X does not know the identity of the party selling the home to the grant applicant or the identities of any other parties, such as real estate agents or developers, who may receive a financial benefit from the sale. The staff also does not know whether any of the interested parties to the transaction have been solicited for contributions to X or have made pledges or actual contributions to X. Further, X does not

accept any contributions contingent on the sale of a particular property or properties.

Situation 2

Y is a nonprofit corporation that is like X in all respects as set forth in Situation 1, except as follows. Under Y's grantmaking procedures, Y's staff considering a particular applicant's application knows the identity of the party selling the home to the grant applicant and may also know the identities of other parties, such as real estate agents and developers, who may receive a financial benefit from the sale. Moreover, in substantially all of the cases in which Y provides down payment assistance to a home buyer, Y receives a payment from the home seller. Further, there is a direct correlation between the amount of the down payment assistance provided by Y in connection with each of these transactions and the amount of the home seller's payment to Y. Finally, Y does not conduct a broad based fundraising campaign to attract financial support. Rather, most of Y's support comes from home sellers and real estate-related businesses that may benefit from the sale of homes to buyers who receive Y's down payment assistance.

Situation 3

Z is a nonprofit corporation formed to combat community deterioration in an economically depressed area that has suffered a major loss of population and jobs. Studies have shown that the average income in the area is below the median level for the State. Z cooperates with government agencies and community groups to develop an overall plan to attract new businesses to the area and to provide stable sources of decent, safe and sanitary housing for the area residents without relocating them outside the area. As part of the renewal project, Z receives funding from government agencies to build affordable housing units for sale to low and moderate-income families. As a substantial part of its activities, Z makes down payment assistance available to eligible home buyers who wish to purchase the newly-constructed units

from Z. Z also offers financial counseling seminars and conducts other educational activities to help prepare potential low and moderate-income home buyers for the responsibility of home ownership.

To fund its down payment assistance program and other activities, Z conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

LAW

Section 501 of the Code provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable and educational purposes, provided that no part of the net earnings inures to the benefit of any private shareholder or individual. *See* § 501(c)(3).

Section 1.501(c)(3)–1(c)(1) of the Income Tax Regulations provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in § 501(c)(3). An organization must not engage in substantial activities that fail to further an exempt purpose. In *Better Business Bureau of Washington, D.C. v. U.S.*, 326 U.S. 279, 283 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

Section 1.501(c)(3)–1(d)(1)(ii) provides that an organization is not organized or operated exclusively for exempt purposes unless it serves a public rather than a private interest. To meet this requirement it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests.

Section 1.501(c)(3)–1(d)(2) defines the term "charitable" as used in § 501(c)(3) as including the relief of the poor and distressed or of the underprivileged, and the promotion of social welfare by organizations designed to lessen neighborhood tensions, to eliminate prejudice and discrimination, or to combat community deterioration. The term "charitable" also includes the advancement of education.

Section 1.501(c)(3)–1(d)(3)(i) provides, in part, that the term "educational" as used in § 501(c)(3) relates to the instruction of the public on subjects useful

to the individual and beneficial to the community.

Section 1.501(c)(3)–1(e) provides that an organization that .operates a trade or business as a substantial part of its activities may meet the requirements of § 501(c)(3) if the trade or business furthers an exempt purpose, and if the organization's primary purpose does not consist of carrying on an unrelated trade or business.

In *Easter House v. U.S.*, 12 Cl. Ct. 476, 486 (1987), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988), the U.S. Court of Federal Claims considered whether an organization that provided adoption and related health services to pregnant women who agreed to place their newborns for adoption through the organization qualified for exemption under § 501(c)(3). The court concluded that the organization did not qualify for exemption under § 501(c)(3) because its primary activity was placing children for adoption in a manner indistinguishable from that of a commercial adoption agency. The court rejected the organization's argument that the adoption services merely complemented the health-related services to unwed mothers and their children. Rather, the court found that the health-related services were merely incident to the organization's operation of an adoption service, which, in and of itself, did not serve an exempt purpose. The organization did not provide health-related services to unwed mothers who wished to keep their children or who arranged for an adoption independent of the organization. The organization's sole source of support was the fees it charged adoptive parents, rather than contributions from the public. The court also found that the organization competed with for-profit adoption agencies, engaged in substantial advertising, and accumulated substantial profits. Accordingly, the court found that the "business purpose, and not the advancement of educational and charitable activities purpose, of plaintiff's adoption service is its primary goal" and held that the organization was not operated exclusively for purposes described in § 501(c)(3). *Easter House*, 12 Cl. Ct. at 485–86.

In *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the court held that an organization that operated a school to train individuals for careers as political campaign profession-

als, but that could not establish that it operated on a nonpartisan basis, did not exclusively serve purposes described in § 501(c)(3) because it also served private interests more than incidentally. The court found that the organization was created and funded by persons affiliated with a particular political party and that most of the organization's graduates worked in campaigns for the party's candidates. Consequently, the court concluded that the organization conducted its educational activities with the objective of benefiting the party's candidates and entities. Although the candidates and entities benefited were not organization "insiders," the court stated that the conferral of benefits on disinterested persons who are not members of a charitable class may cause an organization to serve a private interest within the meaning of § 1.501(c)(3)–1(d)(1)(ii). The court concluded by stating that even if the political party's candidates and entities did "comprise a charitable class, [the organization] would bear the burden of proving that its activities benefited members of the class in a non-select manner." *American Campaign Academy*, 92 T.C. at 1077.

In *Columbia Park and Recreation Association v. Commissioner*, 88 T.C. 1 (1987), *aff'd* without published opinion, 838 F.2d 465 (4th Cir. 1988), the court held that an association formed in a private real estate development to operate parks, swimming pools, boat docks, and other recreational facilities did not qualify as a § 501(c)(3) organization. Although the organization provided some benefit to the general public, the primary intended beneficiaries were the residents and property owners of the private development. Thus, the organization operated for·a substantial non-exempt purpose rather than for exclusively charitable purposes.

Rev. Rul. 67–138, 1967–1 C.B. 129, held that helping low-income persons obtain adequate and affordable housing is "charitable" because it relieves the poor and distressed or underprivileged. In Rev. Rul. 67–138, the organization carried on several activities directed to assisting low-income families in obtaining improved housing, including (1) conducting a training course relative to various aspects of homebuilding and homeownership, (2) coordinating and supervising joint construction projects, (3) purchasing building

sites for resale at cost, and (4) lending aid in obtaining home construction loans.

Rev. Rul. 70–585, 1970–2 C.B. 115, discussed four situations of organizations providing housing and analyzed whether each organization qualified as charitable within the meaning of § 501(c)(3). Situation 1 described an organization formed to construct new homes and renovate existing homes for sale to low-income families who could not obtain financing through conventional channels. The organization also provided financial aid to low-income families eligible for loans under a Federal housing program who did not have the necessary down payment. The organization made rehabilitated homes available to families who could not qualify for any type of mortgage. When possible, the organization recovered the cost of the homes through very small periodic payments, but its operating funds were obtained from federal loans and contributions from the general public. The revenue ruling held that by providing homes for low-income families who otherwise could not afford them, the organization relieved the poor and distressed.

Situation 2 described an organization formed to ameliorate the housing needs of minority groups by building housing units for sale to persons of low and moderate-income on an open-occupancy basis. The housing was made available to members of minority groups who were unable to obtain adequate housing because of local discrimination. The housing units were located to help reduce racial and ethnic imbalances in the community. As the activities were designed to eliminate prejudice and discrimination and to lessen neighborhood tensions, the revenue ruling held that the organization was engaged in charitable activities within the meaning of § 501(c)(3).

Situation 3 described an organization formed to formulate plans for the renewal and rehabilitation of a particular area in a city as a residential community. The median income level in the area was lower than in other sections of the city and the housing in the area generally was old and badly deteriorated. The organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project, and involved residents in the area renewal plan. The organization also purchased an apartment building that it rehabilitated and rented at cost to low and

moderate-income families with a preference given to residents of the area. The revenue ruling held that the organization was described in § 501(c)(3) because its purposes and activities combated community deterioration.

Situation 4 described an organization formed to alleviate a shortage of housing for moderate-income families in a particular community. The organization planned to build housing to be rented at cost to moderate-income families. The Service held that the organization failed to qualify for exemption under § 501(c)(3) because the organization's program was not designed to provide relief to the poor or further any other charitable purpose within the meaning of § 501(c)(3) and the regulations.

Rev. Rul. 72–147, 1972–1 C.B. 147, held that an organization that provided housing to low-income families did not qualify for exemption under § 501(c)(3) because it gave preference to employees of a business operated by the individual who also controlled the organization. Although providing housing for low-income families furthers charitable purposes, doing so in a manner that gives preference to employees of the founder's business primarily serves the private interest of the founder rather than a public interest.

Rev. Rul. 72–559, 1972–2 C.B. 247, held that an organization that subsidized recent law graduates during the first three years of their practice to enable them to establish legal practices in economically depressed communities that have a shortage of available legal services, and to provide free legal services to needy members of the community, qualified for exemption under § 501(c)(3). Although the recipients of the subsidies were not themselves members of a charitable class, the resulting benefit to them did not detract from charitable purposes. Rather, the young lawyers were merely the instruments by which the organization accomplished the charitable purpose of providing free legal services for those unable to pay for, or obtain, such services.

Rev. Rul. 74–587, 1974–2 C.B. 162, held that an organization providing low-cost or long-term loans to, or equity investments in, businesses operating in economically depressed areas qualified for exemption under § 501(c)(3). The organization provided financial assistance only to

businesses that were unable to obtain funds from conventional sources, and gave preference to businesses that would provide training and employment opportunities for unemployed or under-employed area residents. Although some of the individual business owners receiving financial assistance from the organization were not themselves members of a charitable class, the benefit to them did not detract from the charitable character of the organization's program. As in Rev. Rul. 72–559, the recipients of aid were instruments for accomplishing the organization's charitable purposes.

Rev. Rul. 76–419, 1976–2 C.B. 146, held that an organization that converts blighted land in an economically depressed community to an industrial park and leases space on favorable terms to businesses that agree to hire a significant number of unemployed area residents and train them in needed skills qualifies for exemption under § 501(c)(3). The organization furthered charitable purposes by improving economic conditions for the poor and distressed and combating community deterioration. The organization offered inducements to businesses solely for the purpose of advancing charitable goals.

Section 61 provides that, except as otherwise provided in subtitle A (relating to income taxes), gross income means all income from whatever source derived.

Section 1012 provides, generally, that the basis of property shall be its cost to the taxpayer.

Section 1016(a)(1) provides that proper adjustment shall be made to the basis of property for expenditures, receipts, losses, or other items properly chargeable to capital account.

Section 1001(a) provides that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis for determining gain provided in § 1011. Section 1011(a) provides generally that the adjusted basis for determining gain from the sale or other disposition of property is the basis determined under § 1012, adjusted as provided in § 1016.

Section 102 provides that the value of property acquired by gift is excluded from gross income. A gift "proceeds from a 'detached and disinterested generosity,' . . . 'out of affection, respect, admiration,

charity or like impulses.'" *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). Payments that proceed from "the constraining force of any moral or legal duty," or from "'the incentive of anticipated benefit' of an economic nature," are not gifts. *Duberstein*, 363 U.S. at 285. Thus, payments attendant to ordinary business or commercial transactions, or that proceed primarily from the moral or legal obligations attendant such transactions, are not gifts. However, a payment made to an individual that responds to the individual's needs, that is made without economic or other consideration being received by the donor, and that does not proceed from any moral or legal duty, is motivated by detached and disinterested generosity, and may be excluded from gross income as a gift under § 102. *See, e.g.*, Rev. Rul. 99–44, 1999–2 C.B. 549.

ANALYSIS

In Situation 1, *X*'s purposes and activities relieve the poor, distressed and underprivileged by enabling low-income individuals and families to obtain decent, safe and sanitary homes. The way *X* conducts its down payment assistance program establishes that *X*'s primary purpose is to address the needs of its low-income grantees. *See* Rev. Rul. 70–585, Sit. 1. As a condition of providing assistance, *X* requires a home inspection to ensure that the house the applicant intends to buy will be habitable. *X*'s financial counseling seminars and other educational programs help to prepare potential home buyers for the responsibility of home ownership. *See* Rev. Rul. 67–138. *X* conducts a broad based fundraising program, and *X* receives support from a wide array of sources. *X*'s policies of ensuring that its grantmaking staff does not know the identity or contributor status of the party selling the home to the grant applicant (or any other party who may receive a financial benefit from the sale), and of not accepting contributions contingent on the sale of any particular properties, ensure that *X* is not beholden to any particular donors or other supporters whose interest may conflict with that of the low-income buyers *X* is working to help.

*X*'s grantmaking procedures combined with its efforts to educate home buyers ensure that *X* is operated primarily to benefit the low-income beneficiaries of its down-payment assistance. The low-income beneficiaries constitute a charitable class. Any benefit to other parties (such as home sellers, real estate agents, or developers) who participate in the transactions does not detract from the charitable purpose of relieving the poor and distressed. *See* Rev. Ruls. 72–559, 74–587, 76–419. Because *X* is operated exclusively for charitable purposes, *X* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

By contrast, in Situation 2, *Y* does not qualify as an organization described in § 501(c)(3). To finance its down payment assistance activities, *Y* relies on sellers and other real-estate related businesses that stand to benefit from the transactions *Y* facilitates. Furthermore, in deciding whether to provide assistance to a low-income applicant, *Y*'s grantmaking staff knows the identity of the home seller and may also know the identities of other interested parties and is able to take into account whether the home seller or another interested party is willing to make a payment to *Y*. *Y*'s receipt of a payment from the home seller corresponding to the amount of the down payment assistance in substantially all of the transactions, and *Y*'s reliance on these payments for most of its funding indicate that the benefit to the home seller is a critical aspect of *Y*'s operations. In this respect, *Y* is like the organization considered in *Easter House*, which received all of its support from fees charged to adoptive parents, so that the business purpose of the adoption service became its primary goal and overshadowed any educational or charitable purpose. Like the organization considered in *American Campaign Academy*, *Y* is structured and operated to assist private parties who are affiliated with its funders. Like the organizations considered in *American Campaign Academy*, *Easter House*, and *Columbia Park Recreation Association*, *Y* also serves an exempt purpose, but because *Y* is not operated exclusively for exempt purposes, *Y* does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

In Situation 3, although *Z* does not limit its down payment assistance program to low-income recipients, *Z*'s down payment assistance program still serves a charitable purpose described in § 501(c)(3) because it combats community deterioration in a specific, economically depressed area that has suffered a major loss of population and jobs. Through a combination of counseling and financial assistance, *Z* helps low and moderate-income families in that area to acquire decent, safe and sanitary housing and to prepare for the responsibilities of home ownership. In this respect, *Z* is like the organization described in Situation 3 of Rev. Rul. 70–585. Because *Z* is operated exclusively for charitable purposes, *Z* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

Down payment assistance payments for home buyers in Situations 1 and 3 are made by those organizations out of a detached and disinterested generosity and from charitable or like impulse, rather than to fulfill any moral or legal duty, and thus qualify for exclusion from such home buyers' gross incomes as "gifts" under § 102. The benefits provided to the home buyers in these circumstances are sufficiently removed from the interests of any home sellers or sales agents that they proceed from a detached and disinterested generosity on the part of the donor organization, and such grants lack the indicia of a rebate, price adjustment, or *quid pro quo* incident to a sale. Favorable treatment under § 102 is thus appropriate. The home buyer's payment of such amount toward the purchase of the residence will be included in his or her cost basis under § 1012.

In Situation 2, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller that directly correlates to the amount of the down payment assistance *Y* provides to the home buyer. In those cases, the payments received by the home buyers do not qualify for exclusion from gross income as gifts under § 102. The payments do not proceed from detached and disinterested generosity, but rather are in response to an anticipated economic benefit, namely facilitating the sale of a seller's home. Under *Duberstein*, *supra*, such payments are not gifts for purposes of § 102. Unlike in Situations 1 and 3, in Situation 2, the down payment assistance received by those home buyers represents a rebate or purchase price reduction. As a rebate or purchase price reduction, the down payment assistance is not includible in a home

buyer's gross income under § 61 and the amount of the down payment assistance is not included in the home buyer's cost basis under § 1012, as adjusted under § 1016.

HOLDINGS

1. In Situations 1 and 3, the organization is operated exclusively for charitable purposes and qualifies for exemption from federal income tax as an organization described in § 501(c)(3). In Situation 2, the organization is not operated exclusively for charitable purposes, and consequently, does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

2. In Situations 1 and 3, the home buyers may exclude the down payment assistance from their gross income as gifts under § 102. In Situation 2, the home buyers may not exclude the down payment assistance as gifts under § 102. However, in Situation 2, the down payment assistance is excluded from the gross income of home buyers because it represents a rebate or purchase price reduction.

3. In Situations 1 and 3, the home buyers may include the down payment assistance in the cost basis of their homes under § 1012. In Situation 2, the home buyers may not include the amount of the down payment assistance in the cost basis of their homes under § 1012. Rather, the amount of the down payment assistance represents a rebate or purchase price reduction that is excluded from the home buyer's cost basis under § 1012.

DRAFTING INFORMATION

The principal author of this revenue ruling is Elizabeth C. Kastenberg of Exempt Organizations, Tax Exempt and Government Entities Division. For further information regarding this revenue ruling, contact Elizabeth C. Kastenberg at (202) 283–9468 (not a toll-free call).

## Section 1012.—Basis of Property—Cost

*Whether certain down payment assistance provided to a home buyer is included in the buyer's cost basis under section 1012. See Rev. Rul. 2006-27, page 915.*

## Section 1502.—Regulations

*26 CFR 1.1502–13: Intercompany transactions.*

## T.D. 9261

## DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## 26 CFR Part 1

## Intercompany Transactions; Manufacturer Incentive Payments

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document contains final regulations under section 1502 of the Internal Revenue Code. *Example 13* of the intercompany transaction regulations illustrates the treatment of manufacturer incentive payments. Because a premise underlying the example is under reconsideration, these final regulations remove and reserve this example. The regulations will affect corporations filing consolidated returns.

DATES: *Effective Date:* These regulations are effective on May 8, 2006.

FOR FURTHER INFORMATION CONTACT: Frances Kelly, (202) 622–7770 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

**Background**

Section 1.1502–13 of the consolidated return regulations provides rules for taking into account items of income, gain, deduction, and loss of members from intercompany transactions. In particular, §1.1502–13(c)(7)(ii), *Example 13*, illustrates how the matching rule of the intercompany transaction regulations treats a transaction involving manufacturer incentive payments. On August 13, 2004, the IRS and Treasury Department published a notice of proposed rulemaking (REG–131264–04, 2004–2 C.B. 506) in the **Federal Register** (69 FR 50112) proposing regulations to address additional transactions involving manufacturer incentive payments and to clarify the

proper treatment of such incentive payments under the intercompany transaction regulations.

On April 25, 2005, the IRS and Treasury Department published Rev. Rul. 2005–28, 2005–19 I.R.B. 997, which suspends, in part, Rev. Rul. 76–96, 1976–1 C.B. 23. Rev. Rul. 2005–28 states that the IRS will not apply, and taxpayers may not rely upon, the conclusion reached in Rev. Rul. 76–96 that certain rebates made by a manufacturer to retail customers are ordinary and necessary business expenses deductible under section 162, pending the IRS's reconsideration of the issue and publication of subsequent guidance.

**Explanation of Provisions**

The manufacturer incentive payment transaction described in §1.1502–13(c)(7)(ii), *Example 13* relies, in part, upon the premise that the manufacturer incentive payment is an ordinary and necessary business expense deductible under section 162. To the extent that this premise is correct, this example illustrates the proper application of the intercompany transaction regulations. However, because Rev. Rul. 2005–28 suspends Rev. Rul. 76–96, in pertinent part, these final regulations remove §1.1502–13(c)(7)(ii), *Example 13*, pending further guidance on the section 162 issue considered in Rev. Rul. 76–96.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. These final regulations do not alter substantive provisions of the intercompany transaction regulations. They merely remove an example which may be misleading and cause confusion for taxpayers. Accordingly, good cause is found for dispensing with prior notice and comment pursuant to 5 U.S.C 553(b), and for dispensing with a delayed effective date pursuant to 5 U.S.C 553(d). Because no notice of proposed rulemaking is required, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply. Pursuant to section 7805(f)

**Exhibit 3**

# FOREWORD

This Handbook describes the basic mortgage credit underwriting requirements for single-family (one to four units) mortgage loans insured under the National Housing Act. For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout this Handbook and must be supported by sufficient documentation.

These underwriting guidelines discuss the types of transactions and properties eligible for mortgage insurance, and FHA's requirements for determining the borrower's ability and willingness to repay the debt. Information regarding valuation and architectural requirements can be found in HUD Handbooks 4150.1 REV-1 and 4145.1 REV-2, CHG-1, respectively. These underwriting guidelines apply to mortgages insured under Sections 203(b) and 234(c) of the National Housing Act, and are also generally applicable to other single-family mortgage insurance programs (except where inconsistent with special features of those programs). Other single-family mortgage insurance programs are described in HUD Handbook 4000.2 REV-2.

This Handbook provides direction to lenders and FHA staff and is based on FHA 's experience in insuring single-family mortgages. While it is not FHA's intent to insure mortgages that are likely to result in default, regardless of the borrower's equity, lenders may exercise some discretion in the underwriting of home mortgages where the borrower's financial and other circumstances are not specifically addressed by this Handbook. However, lenders are expected to exercise both sound judgment and due diligence in the underwriting of loans to be insured by FHA. For ease of reading, we have chosen to use "lender" in lieu of "mortgagee" throughout this user guide. However, "lender" is to be interpreted as a FHA-approved mortgagee as described in 24 CFR § 202.10. Similarly, "loan" is to be interpreted as "mortgage" as also described in 24 CFR § 202.10

Questions not addressed in the text should be directed to the appropriate Home Ownership Center (HOC) or the Director, Office of Single Family Program Development, HUD Headquarters, Robert Weaver Building, 451 Seventh St., SW, Washington, DC 20410-8000.

References:

1) 4000.2 REV-2 Mortgagees' Handbook, Application through Insurance
2) 4145.1 REV-2, CHG-1, Architectural Processing and Inspections
3) 4150.1 REV-1 Valuation Analysis for Home Mortgage Insurance
4) 4330.1 REV-5 Administration of Insured Home Mortgages
5) Code of Federal Regulations, Title 24 (24 CFR). Codifies the general and permanent rules of the Department.

# TABLE OF CONTENTS

## CHAPTER 1        INTRODUCTION

1-1               WHAT FHA INSURES ........................................................................   1-1

### SECTION 1:    OCCUPANCY STATUS

1-2        PRINCIPAL RESIDENCES .................................................................   1-1
1-3        SECONDARY RESIDENCES................................................................   1-1
1-4        INVESTMENT PROPERTIES..............................................................   1-1
1-5        NONPROFIT ORGANIZATIONS AND GOVERNMENT AGENCIES ...............   1-1

### SECTION 2:    MAXIMUM MORTGAGE AMOUNTS

1-6        MAXIMUM MORTGAGE AMOUNT .....................................................   1-1
1-7        MAXIMUM MORTGAGES FOR PURCHASE TRANSACTIONS ....................   1-1
1-8        TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS   1-1

### SECTION 3:    SETTLEMENT REQUIREMENTS

1-9               SETTLEMENT REQUIREMENTS..........................................................   1-1

### SECTION 4:    REFINANCE TRANSACTIONS

1-10       REFINANCING ...............................................................................   1-1
1-11       CALCULATING THE MORTGAGE AMOUNT ON REFINANCES...................   1-1
1-12       STREAMLINE REFINANCES .............................................................   1-1

### SECTION 5:    SECONDARY FINANCING

1-13       SECONDARY FINANCING.................................................................   1-1

## CHAPTER 2    MORTGAGE CREDIT ANALYSIS

2-1        OVERVIEW....................................................................................   2-1
2-2        MORTGAGE ELIGIBILITY (BORROWERS)............................................   2-1
2-3        ANALYZING THE BORROWER'S CREDIT .............................................   2-1
2-4        CREDIT REPORT REQUIREMENTS......................................................   2-1
2-5        CREDIT ELIGIBILITY REQUIREMENTS ...............................................   2-1

### SECTION 2:    EFFECTIVE INCOME

2-6        STABILITY OF INCOME...................................................................   2-1
2-7        SALARIES, WAGES, AND OTHER FORMS OF INCOME................................   2-1
2-8        EMPLOYMENT BY FAMILY-OWNED BUSINESS............................................   2-1
2-9        SELF-EMPLOYED BORROWERS ........................................................   2-1

### SECTION 3:    BORROWER'S CASH INVESTMENT IN THE PROPERTY

2-10       FUNDS TO CLOSE ..........................................................................   2-1

### SECTION 4:    TYPES OF LIABILITIES

2-11       LIABILITIES ..................................................................................   2-1

### SECTION 5:    BORROWER QUALIFYING

2-12       DEBT TO INCOME RATIOS ...............................................................   2-1
2-13       COMPENSATING FACTORS ...............................................................   2-1

4155.1 REV-5

## SECTION 6:    SPECIAL UNDERWRITING INSTRUCTIONS

2-14        TEMPORARY INTEREST RATE BUYDOWNS .................................    2-1
2-15        ADJUSTABLE RATE MORTGAGES....................................................    2-1
2-16        CONDOMINIUM UNITS: UTILITY EXPENSES ..............................    2-1
2-17        CONSTRUCTION- PERMANENT MORTGAGE PROGRAM ...........    2-1
2-18        MORTGAGE ASSISTANCE FOR DISASTER VICTIMS [Section 203(h)] .........    2-1
2-19        ENERGY EFFICIENT HOMES (EEH) ..............................................    2-1
2-20        ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM....................    2-1

## CHAPTER 3 DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

### SECTION 1:    UNDERWRITING DOCUMENTATION

3-1        APPLICATION PACKAGE ....................................................................    3-1
3-2        DOCUMENTATION STANDARDS.......................................................    3-1
3-3        REAL ESTATE CERTIFICATION.......................................................    3-1
3-4        AMENDATORY CLAUSE ....................................................................    3-1

### SECTION 2:  PROCESSING REQUIREMENTS

3-5        POWER OF ATTORNEY ......................................................................    3-1
3-6        LOAN APPLICATION DOCUMENT PROCESSING...........................    3-1
3-7        SEVEN-UNIT DOCUMENTATION ....................................................    3-1
3-8        HOTEL AND TRANSIENT USE..........................................................    3-1
3-9        SALES CONTRACT AND LOAN CLOSING ......................................    3-1
3-10        LENDER RESPONSIBILITY AT CLOSING ......................................    3-1

### SECTION 3:  FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

3-11        FEDERAL STATUTES AND REGULATIONS....................................    3-1
3-12        FHA-PROCESSED HUD EMPLOYEE LOANS ..................................    3-1

## CHAPTER 4 ASSUMPTIONS

4-1        GENERAL .............................................................................................    4-1
4-2        RESTRICTIONS OF THE HUD REFORM ACT OF 1989 ...................    4-1
4-3        RELEASE FROM LIABILITY.............................................................    4-1
4-4        CREDIT-WORTHINESS REVIEW PROCESSING .............................    4-1
4-5        LTV REDUCTION REQUIREMENTS.................................................    4-1

### APPENDICES

I.        SINGLE FAMILY HOC JURISDICTIONS .........................................
II.        CLOSING COSTS AVERAGES FOR STATES.....................................

## SECTION 3: BORROWER'S CASH INVESTMENT IN THE PROPERTY

**2-10     FUNDS TO CLOSE.**  The cash investment in the property must equal the difference between the amount of the insured mortgage, excluding any upfront MIP, and the total cost to acquire the property including prepaid expenses and closing costs as described in paragraph 1-9.

*All funds for the borrower's investment in the property must be verified and documented*.  Acceptable sources of these funds include the following:

A.     **Earnest Money Deposit.**  If the amount of the earnest money deposit exceeds 2 percent of the sales price *or* appears excessive based on the borrower's history of accumulating savings, the lender must verify with documentation the deposit amount and the source of funds.  Satisfactory documentation includes a copy of the borrower's cancelled check.  A certification from the deposit-holder acknowledging receipt of funds and separate evidence of the source of funds is also acceptable.  Evidence of source of funds includes a verification of deposit or bank statement showing that at the time the deposit was made the average balance was sufficient to cover the amount of the earnest money deposit.

B.     **Savings and Checking Accounts.**  A verification of deposit (VOD), along with the most recent bank statement, may be used to verify savings and checking accounts.  If there is a large increase in an account, or the account was opened recently, the lender must obtain a credible explanation of the source of those funds.

C.     **Gift Funds.**  An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.  The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them.  Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price.  No repayment of the gift may be expected or implied.  (As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. Donors may borrow gift funds from any other acceptable source provided the mortgage borrowers are not obligors to any note to secure money borrowed to give the gift.)  This rule also applies to properties of which the seller is a government agency selling foreclosed properties, such as the Veterans Administration or Rural Housing Services.  Only family members may provide equity credit as a gift on a property being sold to other family members.  These restrictions

on gifts and equity credit may be waived by the jurisdictional HOC provided that the seller is contributing to or operating an acceptable affordable housing program.

FHA deems the payment of consumer debt by third parties to be an inducement to purchase.  While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing.  Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price.  The dollar-for-dollar reduction to the sales price also applies to gift funds not meeting the requirement that the gift be for downpayment assistance and is provided by an acceptable source. When someone other than a family member has paid off debts, the funds used to pay off the debt must be treated as an inducement to purchase and the sales price must be reduced by a dollar-for-dollar amount in calculating the maximum insurable mortgage.

**Documentation Requirements.**  The lender must document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifies the dollar amount of the gift, states that no repayment is required, shows the donor's name, address, telephone number and states the nature of the donor's relationship to the borrower.  In addition, the lender must document the transfer of funds from the donor to the borrower, as follows:

1.    If the gift funds are in the homebuyer's bank account, the lender must document the transfer of the funds from the donor to the homebuyer by obtaining a copy of the canceled check or other withdrawal document showing that the withdrawal is from the donor's account.  The homebuyer's deposit slip and bank statement that shows the deposit is also required.

2.    If the gift funds are to be provided at closing:

    a.    If the transfer of the gift funds is by certified check made on the donor's account, the lender must obtain a bank statement showing the withdrawal from the donor's account, as well as a copy of the certified check.

    b.    If the donor purchased a cashier's check, money order, official check, or any other type of bank check as a means of transferring the gift funds, the donor must provide a withdrawal document or canceled check for the amount of the gift, showing that the funds came from the donor's personal account.  If the donor borrowed the gift funds and cannot provide documentation from the bank or other

# Exhibit 4

# The PIC Program Seller Participating Agreement

This agreement is entered into this_____ day of _____, 20__ by and between Partners In Charity, Inc. (PIC) and _____ Seller(s)

PIC is a charitable organization whose mission is to promote responsible home ownership. Seller desires to qualify a certain property located at:

_____ Property Street Address
_____ City, State and Zip Code
_____ County

The above listed property (Subject Property) as a Participating Home under PIC's down payment assistance program commonly referred as The PIC Program.

1.  <u>Qualification of the Subject Property as a Participating Home</u>. Seller agrees to perform all of the following conditions to qualify the subject property as a participating home under The PIC Program.
    a.  Accept buyer's terms for financing utilizing an eligible loan program that accepts charitable gifts from non-profit organizations.
    b.  Deliver or cause to be delivered the real estate purchase contract and receipt for deposit to a PIC approved escrow officer or closing agent.

The satisfaction of all the criteria set forth above qualifies the Subject Property as a property that may be purchased by a Buyer utilizing gift funds from the "PIC Program" ("Participating Home").

2.  <u>Seller Contributions to PIC for Homeownership Outreach Services</u>.
    PIC agrees to assist in the dissemination of pre-qualification information to prospective homebuyers, including the PIC home buying guide, and to utilize the PIC Program to provide home ownership education and down payment assistance to qualified homebuyers, any one of which may elect to purchase the Participating Home. In consideration of the foregoing, Seller agrees to make a contribution to PIC in the amount of $_____ (gift amount plus fee) within (2) business days from the transfer of the Participating Home to the Buyer.

    Seller understands that the contribution will ***not*** be used to provide down payment assistance to the Buyer of the Participating Home, and that the gift funds provided to the Buyer toward the purchase of the Seller's home are derived from pre-existing PIC funds. Seller further understands that the Seller is only obligated to make the contribution if a homebuyer utilizing The PIC Program purchases the Participating Home. Contribution cannot be used as a charitable deduction for federal tax purposes.

3.  <u>Return of Gift Funds in the Event of Non-Purchase</u>.
    Seller acknowledges that in the event that the Buyer is unsuccessful in obtaining a loan and does not close within two (2) days after the gift funds are deposited with the closing agent, then the seller instructs and authorizes the closing agent to return the gift funds to PIC without recourse. Seller understands that the Seller is not obligated to make the contribution if the escrow/closing is terminated.

Agreed: Seller(s) Signature: _____ & _____

Name Printed: _____ & _____ DATE: _____

| Real Estate Information:  Listing Agent | Real Estate Information:  Buyers Agent |
|---|---|
| Agent Name: _____ | Agent Name:_____ |
| Company Name:_____ | Company Name:_____ |
| Agent Phone #:_____ | Agent Phone #:_____ |
| Agent Fax #:_____ | Agent Fax #:_____ |



**Partners In Charity**

*"We're helping you PIC your future!"*

**IMPORTANT NOTE:   GIFT FUNDS WILL NOT BE DELIVERED WITHOUT COMPLETELY FILLING OUT ALL OF THE REQUIRED INFORMATION. PLEASE BE SURE YOUR FORM IS COMPLETE PRIOR TO SUBMISSION TO PIC FOR GIFT FUNDS.**

*613 W. Main Street, West Dundee, IL 60118*
Phone # 800-705-8350 / Fax # 800-514-9848

# Gift Funds Request Form

Please Type or Print Legibly

**800-942-8431  Toll-Free**

| | |
|---|---|
| Closing Office: | Escrow/Closing File#: |
| Closing Agent's Name: | Closing Office PIC ID Number: |
| Telephone#: | Fax#: |

| | | |
|---|---|---|
| Borrower First Name: | Borrower Last Name: | SS#: |
| Co-Borrower First Name: | Co-Borrower Last Name: | SS#: |

| | |
|---|---|
| Address of Property Being Purchased: | Contract Sales Price: |

| | | | |
|---|---|---|---|
| City: | State: | County: | Zip: |

| | |
|---|---|
| Gift Funds Requested:  $ | Buyer's Annual Income: |
| Loan Originator's Employer: | Lending Institution: |
| Loan Originator's Address: | Lending Institution Address: |

| | | | | | |
|---|---|---|---|---|---|
| City: | State: | Zip: | City: | State: | Zip: |

| | | |
|---|---|---|
| Loan Originator's Name: | Lender's Phone#: | Lenders's Fax#: |
| Loan Originator's Phone#: | Loan File Case#: | Closing Date: |
| Loan Originator's Fax#: | | |
| Homebuilder's Name / Seller Name: | Lending Institution's HUD ID # | |

Please note the loan type below:
☐ FHA (203b)      ☐ FHA 203K      ☐Construction to Perm      ☐Other: _____
☐ Conventional FHLMC: Name of lender:_____
☐ Conventional Portfolio:  Name of lender:_____

**Is this loan underwritten and approved?   ☐Yes          ☐No**

**The Following Documents Are To Be Faxed In The Following Order To:**
**Partners In Charity, Inc., 613 West Main Street, West Dundee, IL  60118**
**Fax # (800)-514-9848.  (Allow 48 Hours From Receipt of Completed Package For Funding)**

✱　Gift Letter and Grant Application from the Loan Originator signed by all occupant borrowers.
✱　Signed Participating Seller Agreement.
✱　Copy of Appraisal (First 2 pages only)
　　**NOTE: PARTNERS IN CHARITY WILL NOT FUND INCOMPLETE PACKAGES!**

✱　Closing Agent understands that the Seller and PIC have entered into an agreement under which the seller is to make a contribution to PIC. *CLOSING AGENT IS RESPONSIBLE FOR COLLECTING AND DISTRIBUTING THE CONTRIBUTION TO PIC FROM THE PROCEEDS OF THE SALE.*

# Gift Letter and Grant Application

Congratulations on the successful completion of the requirements necessary for the purchase of your new home.  We recognize that buying a home can be a difficult process and we commend you on what you have already achieved in the home buying process.

**Once Partners In Charity, Inc., a non-profit organization, has received the following:**

1. A signed copy of this form.
2. A copy of the Seller Participating Agreement.
3. The lender's request for gift funds.
4. Copy of Appraisal ( First 2 pages only)

**PIC will wire Gift Funds to the closing office, in the amount of $_____ to assist you in the purchase of your new home.**

**Confirmation of Completion: (Please Read and Sign)**

I/we, the undersigned, have completed the necessary requirements, which qualify me/us for down payment and closing costs assistance toward the purchase of a PIC participating home.  I/we understand that my/our ability to receive down payment assistance from the PIC Program is subject to the availability of funds, that these funds are a gift, and that PIC is not obligated to provide these funds to me/us.

I/we, the undersigned buyer(s), instruct the closing agent or escrow officer to use the PIC gift funds to purchase the property listed below.  We acknowledge and understand that the escrow instructions may call for a release of the gift funds and may contain provisions regarding the disbursement of funds in the event the escrow is terminated.  I/we acknowledge that in the event I/we are unsuccessful in obtaining a loan or the loan does not fund within three (3) days after the gift funds are received by the closing office, I/we authorize the closing office to return the gift funds to PIC without recourse.

I/We, understand that the gift funds given to us the homebuyer were not made available to the donor from any person or entity with an interest in the sale of the property including the seller, real estate agent or broker, builder, loan officer or any entity associated with them.

I/we also understand that I/we am/are under no obligation whatsoever to repay any amount of the down payment assistance received from Partners In Charity, Inc. for the purchase of my/our home.

Borrower's First Name: _____        SS#_____ - _____- _____
Borrower's Last Name: _____

Co-Borrower's First Name: _____        SS#_____ - _____- _____
Co-Borrower's Last Name: _____
Borrower/Co-Borrower's Mobile Phone: _____
Borrower/Co-Borrower's Email Address: _____
Address of Property: _____
City: _____ State: _____ Zip: _____ County: _____
If new construction, name of builder: _____Phone # _____

Contract Sales Price:  $_____        Gift Funds Requested: $_____
Borrower and Co-Borrower's Combined Income: $_____ (For statistics only)
Lender's HUD Identification Number: _____-_____

*The following information is required by PIC to assist in monitoring conformance with equal credit opportunity, fair housing and home mortgage disclosure laws.  The lender is required to provide the following information in the exact manner that it appears on Form 1003 (Residential Loan Application).*

**Borrower**
☐American Indian or Alaskan Native
☐Asian or Pacific Islander
☐Black, not of Hispanic origin
☐White, not of Hispanic origin
☐Hispanic
☐Other: (specify)_____
☐Male        ☐Female

**Co-Borrower**
☐American Indian or Alaskan Native
☐Asian or Pacific Islander
☐Black, not of Hispanic Origin
☐White, not of Hispanic Origin
☐Hispanic
☐Other: (specify) _____
☐Male        ☐Female

Borrower's Signature: _____ Date:_____

Co-Borrower's Signature:_____ Date:_____

PIC Signature As Acknowledgement of Down Payment Assistance Gift:_____

*Partners In Charity – 613 West Main Street, West Dundee, IL  60118*
*Fax Number: 1-800-514-9848  Phone Number 1-800-942-8431*

# Exhibit 5

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement" or "Settlement Agreement") is entered into in the matter of Nehemiah Progressive Housing Corporation, vs. Andrew Cuomo, et al., Civ. S-97-1817-GEB/PAN, United States District Court, Eastern District of California ("the action").

Plaintiff Nehemiah Progressive Housing Corporation, a California corporation, is hereinafter referred to as "Nehemiah" or "plaintiff."

Defendants Andrew Cuomo, Secretary, United States Department of Housing and Urban Development, et al. are collectively referred to hereinafter as "defendants." Each of the defendants is sued only in his/her official capacity. Defendant Andrew Cuomo, sued herein in his official capacity as Secretary of the United States Department of Housing and Urban Development, is hereinafter referred to as "HUD."

Nehemiah and HUD are collectively referred to hereinafter as "the parties to this Agreement."

The parties to this agreement, for and in consideration of the matters herein set forth, hereby agree as follows:

1. <u>Dismissal Of Action And Reservation Of Jurisdiction</u>: Upon the execution, by the parties to this Agreement, of this Agreement and the Stipulation For Dismissal With Prejudice and For Reservation of Jurisdiction, a copy of which is attached hereto as **Exhibit A**, plaintiff shall cause that Stipulation to be lodged with the Clerk of the United States District Court, for consideration and action by the Court.

2. <u>Status of Program</u>: Consistent with the letter attached hereto as **Exhibit B**, HUD has determined that plaintiff's down payment assistance program ("DAP") is not in conflict with HUD's

-1-

**00883**

regulations and administrative requirements. Plaintiff may operate that DAP throughout the United States, in accordance with the approval set forth herein and with HUD's existing regulations, handbook, mortgagee letters and other governing documents applicable to transactions under Section 203(b) of the Act.

Notwithstanding the approval of plaintiff's DAP, however, HUD and/or defendants and their successors expressly reserve the right to and may take such actions with regard to down payment assistance programs generally, and with regard to changes or modifications to HUD's regulations, handbook, mortgagee letters, or other governing documents applicable to transactions under Section 203(b) of the Act in particular, as they may deem appropriate. Any such actions, changes or modifications regarding the source of down payment assistance funds shall thereafter become applicable to plaintiff's DAP after the expiration of six (6) months from the date of final promulgation and issuance of any such changes or modifications. Prior to that date, plaintiff may continue to operate its down payment assistance program in accordance with the approval set forth herein and with HUD's existing regulations, handbook, mortgagee letters and other governing documents applicable to transactions under Section 203(b) of the Act.

3. <u>Release and Waiver</u>: Plaintiff, individually and on behalf of its past, present and future principals, agents, servants, employees, attorneys, representatives, predecessors in interest, successors in interest, affiliates, directors, officers, stockholders and all other persons and entities acting for or on behalf of plaintiff, hereby expressly releases and forever discharges each named individual defendant and HUD, and HUD's past, present and future employees, agents, attorneys, representatives, and all other persons and entities acting for or on behalf of HUD, from any and all conduct, claims, demands,

00884

damages, injuries, grievances, charges, actions or causes of
action, known or unknown, either at law or in equity, which
plaintiff, at any time prior to the effective date of this
Settlement Agreement, had or now has against defendants, arising
out of or in any way related to, directly or indirectly, the
dispute referenced in plaintiff's complaint or this Settlement
Agreement.

   This Agreement is intended to be complete and final and to
cover not only conduct, claims, demands, damages, injuries,
grievances, charges, actions and causes of action which are
known, but also conduct, claims, demands, damages, injuries,
grievances, charges, actions and causes of action that the
plaintiff does not know or suspect to exist in its favor which,
if known at the time of executing this Agreement, might have
affected the Agreement and the plaintiff's willingness to enter
into and execute it.  Accordingly, except as otherwise expressly
set forth herein, plaintiff expressly waives the benefit of the
provisions of Section 1542 of the California Civil Code, and the
benefit of any other statutes and/or common law principles of
similar effect arising in any other jurisdiction.  Section 1542
of the California Civil Code provides:

   A general release does not extend to claims which the
   creditor does not know or suspect to exist in his favor at
   the time of executing the release, which if known by him
   must have materially affected his settlement with the
   debtor.

Plaintiff hereby represents that it understands and acknowledges
the significance and consequences of the foregoing waiver and the
exceptions thereto, and assumes full responsibility for any
damage or loss that may be incurred as a result of such waiver.
Plaintiff further represents that if any fact with respect to any
matter covered by this Agreement is found hereafter to be other
than or different from the facts now believed by plaintiff to be
true, this Agreement shall nevertheless be and remain effective
notwithstanding any such difference.

-3-

00885

 

4.    <u>Waiver of Costs and Attorneys' Fees</u>:  It is agreed, by
and among the parties to this Agreement, that in consideration
for settlement of the action which is the subject of this
Agreement, the respective parties will each bear their own costs,
attorneys' fees and expenses.

5.    <u>No Admission Of Liability</u>:  This Agreement has resulted
from a compromise of disputed claims and demands, and each party
to this Agreement agrees that it is not to be construed by any
person, entity or administrative, judicial or other deliberative
body as an admission of liability or responsibility, or non-
liability or non-responsibility, on the part of any party to this
Agreement to any party to this Agreement, or of the existence or
non-existence of any fact whatsoever, except as otherwise
expressly set forth herein.

5.    <u>Warranties Of The Parties And Representatives</u>:
Plaintiff and HUD hereby warrant and represent to each other as
follows:

     a.    That no promises, representations, understandings
or warranties have been made to either of them by any other party
to this Agreement other than those which are expressly contained
herein;

     b.    That the Secretary of Housing and Urban
Development, through his designee, has heretofore authorized his
attorney in the action to execute this Agreement on  behalf of
HUD, and that by doing so, that attorney has full legal and
factual authority and capacity to bind HUD to the terms and
provisions of this Agreement; and

//

//

//

-4-

      c.   That plaintiff and its signing representative have full legal and factual authority and capacity to execute and enter into this Agreement.

DATED: 4/6        , 1998     NEHEMIAH PROGRESSIVE HOUSING
                                  DEVELOPMENT CORPORATION
                                  BY: _____
                                  DON F. HARRIS, President

APPROVED AS TO FORM:

McDONOUGH, HOLLAND & ALLEN
Professional Corporation
By: _____
         RICHARD W. NICHOLS
          Attorneys for Plaintiff

DATED: April 3    , 1998     PAUL L. SEAVE
                                  United States Attorney

                                  _____
                                  KENDALL J. NEWMAN
                                  Assistant U.S. Attorney
                                  EDWARD EITCHES
                                  Senior Trial Attorney
                                  U.S. Dept. Of Housing and Urban Development

                                  Attorneys for Defendant Secretary
                                  of Housing and Urban Development

10/19/1999  21:51  916-554-2900        US ATTORNEY                    PAGE  10
  94-03-98    17:53   BLDG MAINT SECTION → 916 554 2100               NO.545    002



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3 1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

     The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments. Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program(as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

     Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah and all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

                              Sincerely,

                              Emelda Johnson
                              Deputy Assistant Secretary
                                Single Family Housing Programs

# EXHIBIT B

00891

# Exhibit 6

200



# ARTICLES OF INCORPORATION
## (General Business)
### (Instructions on back of application)

2007 AUG 21  PM 4: 41

SECRETARY OF STATE
STATE OF IDAHO

FILED EFFECTIVE

The undersigned, in order to form a Corporation under the provisions of Title 30, Chapter 1, Idaho Code, submits the following articles of incorporation to the Secretary of State.

**Article 1:** The name of the corporation shall be:

Sovereign Grant Alliance , Inc

**Article 2:** The number of shares the corporation is authorized to issue: 10,000

**Article 3:** The street address of the registered office is: 1311 11th Street South, Nampa, Idaho 83651

and the name of the registered agent at such address is: Michael Whipple

**Article 4:** The name of the incorporator is: Michael Whipple

and address of the incorporator is: 2810 Bayhill Court, Nampa Idaho  83686

**Article 5:** The mailing address of the corporation shall be:

1311 11th STreet South, Nampa Idaho  83686

**Optional Articles:**

Customer Acct #:

(if using pre-paid account)

Secretary of State use only

Signature of at least one incorporator:

Typed Name:  Michael Whipple

Typed Name:

Web Form

IDAHO SECRETARY OF STATE
08/22/2007  05:00
CK: 1253983  CT: 172099  BH: 1071859
1 @ 100.00 = 100.00  CORP # 2

C174646



# Exhibit 7



George Mason University School of Public Policy
**Center for Regional Analysis**

# *An Evaluation of Research on the Performance of Loans with Down Payment Assistance*

by

Lisa A. Fowler, PhD
Stephen S. Fuller, PhD

Center for Regional Analysis
George Mason University
Fairfax, Virginia

September 2006

**00437**

# HIGHLIGHTS

## Purpose of the Study

*AmeriDream, Incorporated requested an analysis of the fiscal, economic and social impact of non-profit down payment assistance programs. As part of this larger project, the research team conducted an independent evaluation of prior research on the performance of home mortgage loans with down payment and other assistance. The objective of this analysis was to provide AmeriDream, Inc. staff with a sound understanding of the prior research in order for them to respond to challenges to their program.*

## Main Findings

• The descriptive results from studies done by the Office of the Inspector General and the General Accountability Office could be overstating the extent of the default and/or claim rates of FHA loans with assistance from nonprofit downpayment assistance programs compared with loans with other types of assistance (e.g. gifts from realtives).

• The General Accountability Office report provides the most rigorous analysis of claim rates. Based on GAO's national sample, the three-year claim rate for loans receiving assistance from nonprofit downpayment assistance providers was 6% (compared with 5% for loans with other assistance.)

• When foreclosure (or claim rate) is used as the performance measure, the difference in the performance of loans with nonprofit down payment assistance may be (i) much smaller than these studies suggest and/or (ii) related not to assistance from nonprofit downpayment assistance programs specifically but rather to loans where the buyer receives a gift from any source.

• The Office of the Inspector General studies used data on just four cities with a relatively large share of loans with nonprofit down payment assistance. The sample data, therefore, represent places with slower than average housing markets and relatively depressed economies. Focusing on underserved or economically lagging metropolitan areas may result in findings that overstate the difference in performance nationally of loans with nonprofit down payment assistance and loans with other types of assistance.

• The studies focused on home prices but did not show a direct link between assistance from nonprofit down payment assistance programs, higher home prices, and foreclosure. Higher home prices, therefore, may not be a predictor of poor loan performance.

• The most significant methodological issue is the lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim: (i) the financial situation of the borrower and (ii) the economic conditions of the area in which the home is located. GAO attempted to account for some of these other factors, but data limitations led to the inclusion of incomplete information. Their results, therefore, could be subject to alternative interpretation.

# Exhibit 8

**United States Government Accountability Office**

# GAO

Report to Congressional Requesters

June 2007

# FEDERAL HOUSING ADMINISTRATION

## Decline in the Agency's Market Share Was Associated with Product and Process Developments of Other Mortgage Market Participants



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-07-645

# Appendix II: Data on Market Share Trends in the Mortgage Market and Selected Submarkets from 1996 through 2005

This appendix contains the results of our analysis using Home Mortgage Disclosure Act (HMDA) and Federal Housing Administration (FHA) data for calendar years 1996 through 2005. Tables 1 through 3 provide information on home purchase mortgages. More specifically, table 1 contains market shares for FHA and other market participants and segments over the 10-year period. Table 2 contains FHA market shares and numbers of mortgages in each state. Table 3 contains market shares in selected submarkets for FHA and other market participants and segments. Table 4 provides market shares for home purchase and refinance loans combined. Finally, table 5 provides market shares for refinance loans.

**Table 1: Market Shares for Home Purchase Loans, 1996-2005**

Market shares

|         | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---------|------|------|------|------|------|------|------|------|------|------|
| Prime   | 73.2% | 71.8% | 72.8% | 71.5% | 71.2% | 71.1% | 73.0% | 74.0% | 75.7% | 76.4% |
| Subprime | 1.6 | 2.6 | 3.7 | 4.5 | 5.9 | 5.0 | 6.6 | 9.3 | 12.0 | 14.5 |
| FHA     | 18.8 | 19.6 | 17.6 | 19.0 | 18.6 | 19.3 | 16.5 | 13.1 | 9.2 | 6.3 |
| VA      | 6.0 | 5.4 | 5.3 | 4.5 | 3.9 | 4.2 | 3.6 | 3.1 | 2.6 | 2.4 |
| RHS     | 0.4 | 0.5 | 0.6 | 0.5 | 0.4 | 0.4 | 0.4 | 0.5 | 0.4 | 0.4 |
| GSE     | 26.8 | 26.6 | 32.6 | 29.2 | 30.1 | 35.1 | 39.3 | 38.2 | 35.1 | 30.4 |

Number of loans

|         | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---------|------|------|------|------|------|------|------|------|------|------|
| Prime   | 2,270,445 | 2,338,558 | 2,793,403 | 2,914,713 | 2,825,668 | 2,852,557 | 2,928,394 | 3,174,378 | 3,400,642 | 3,557,981 |
| Subprime | 48,778 | 85,721 | 143,395 | 181,779 | 235,044 | 199,875 | 265,000 | 397,833 | 540,352 | 675,389 |
| FHA     | 582,781 | 637,354 | 675,737 | 774,259 | 737,914 | 776,380 | 660,726 | 561,582 | 413,754 | 294,777 |
| VA      | 187,424 | 176,768 | 201,973 | 183,875 | 156,767 | 168,365 | 142,673 | 134,759 | 117,961 | 109,873 |
| RHS     | 13,122 | 16,804 | 21,961 | 19,716 | 14,304 | 16,906 | 16,600 | 21,773 | 19,696 | 18,471 |
| GSE     | 831,869 | 865,428 | 1,250,629 | 1,188,913 | 1,193,653 | 1,408,297 | 1,576,259 | 1,639,462 | 1,577,474 | 1,415,366 |

Source: GAO analysis of HMDA data.

Note: We calculated market shares based on numbers of loans and, to the extent possible, excluded piggyback loans. The prime, subprime, FHA, VA, and RHS market shares add to 100 percent (figures used in this table were rounded to the nearest tenth of a percent). The GSE market segment is primarily a subset of the prime market segment. Data for the GSEs do not include loans originated and purchased in different years or all of the loans sold to intermediaries before being purchased by the GSEs.

**Exhibit 9**



**Step One**

**Step Two**

**Step Three**

**Partners In Charity**
**613 West Main Street**
**West Dundee, IL 60118**
**1-800-705-8350 Toll Free**
**1-800-514-9848  FAX**

# Use Partners In Charity (PIC) with any loan type:

* **FHA**
* **Non-Conforming**
* **Conventional**

Click the links below to hear all about the PIC Program (MP3 format).

 **Dial-Up Modem Users Click Here**     **Cable/DSL/Broadband Users Click Here**

Download the required forms now:

 **Click Here to Download PIC Forms and Marketing Materials**

---

# Use these easy-to-fill-out forms and grant money will be wired to the closing table.

# Grant money is available up to 10%!

**The amount of the grant is determined by you the loan officer and your buyer's need. Buyer's needs may include:**

**Down Payment**
**Closing Costs**
**Rate Reduction,**
**and More!**

# <u>Click here</u>
# for 3 EZ Steps to working with PIC...

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) ) | |
| Defendants. | ) | |
| AMERIDREAM, INCORPORATED, | ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) | |
| Intervenors, | ) ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## Declaration of Judith V. May

**Introduction**

1.      I am the Director of the Office of Evaluation, which is in the Office of Finance and Budget within the Office of Housing in the Department of Housing and Urban Development (HUD).  This declaration is based on my personal knowledge or

information provided to me in my official capacity, and is intended only to respond to arguments raised by the plaintiffs' motions for preliminary injunction in the above-captioned matter.

2.      The Federal Housing Administration (FHA) provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories. FHA insures mortgages on single family and multifamily housing, including manufactured homes, hospitals, and senior living centers.  At present, FHA insures over 3.7 million single family home mortgages totaling over $342 billion.  The Office of Housing operates the FHA mortgage insurance programs.

3.      The Mutual Mortgage Insurance Fund (MMIF) is the principal fund that supports insurance on single-family home mortgages, and is the largest of all the FHA Funds. MMIF programs have long contributed to expanding opportunities for homeownership in the United States and are an important policy tool for meeting the needs of first-time homebuyers, working families, and minorities, and underserved communities, especially central city and rural areas.

4.      MMIF programs are unique in the Federal budget because they are intended to provide net budgetary receipts, rather than requiring appropriations.  In budgetary parlance, MMIF programs are required to have a "negative subsidy," meaning they are expected to take in more in premiums and recoveries than is spent on insurance claims. In its 73 year history, the MMIF has always been self-supporting and, other than an initial funding of $10 million, has never burdened the taxpayer by requiring an appropriation.

5.      The Office of Evaluation monitors the performance of FHA-insured loans, and it oversees preparation of the statutorily-mandated annual (independent) actuarial review of the MMIF.  The Office of Evaluation also estimates the required loss reserves (liability for loan guarantees) of all outstanding insurance contracts for the annual audited financial statements of FHA and HUD, and it provides the dollar estimates required by OMB for measuring the budgetary impact of FHA programs.

6.      Each year, as part of the budget formulation process overseen by OMB, FHA estimates the budget receipts that it expects to generate from the loans that it will insure in the following fiscal year.  Budget receipts are the net present value of the total cash inflows and outflows of loans insured within a given fiscal year.  These inflows and outflows include premiums collected, claims paid, and recoveries from the disposition of foreclosed properties.  Those budget receipts are used by Congress when it counts all revenues available for spending in the fiscal year at issue.

7.      On the basis of the FY 2006 Independent Actuarial Review, FHA concluded that the growth in volume and the poor performance of loans with seller-funded downpayment assistance had affected the MMIF to where it would require appropriations beginning with loans insured in FY 2008, unless significant changes were made.  If the Downpayment Assistance Rule were not implemented at all, using the estimates of insurance volume that were used in the budgeting process totaling $52.6 billion, budget

receipts for FY2008 would fall by $276.5 million and the MMIF would need appropriations of $231.5 million for the year in order to be able to endorse any loans. One of the changes intended to address this potential insolvency of the MMIF is the final rule on downpayment assistance.  In addition, FHA plans to implement risk-based pricing beginning January 1, 2008.  See 72 F.R. 53872 (Sept. 20, 2007).

**Dollar Estimates of the Impact of Delay**

8.      Using standard estimation procedures, the Office of Evaluation has estimated the financial effect on HUD from any delay of implementation of the final rule on downpayment assistance.

9.      Implementing risk-based pricing on January 1, 2008, and assuming updated insurance volumes to reflect current business activity totaling $73.2 billion, delaying implementation of the Downpayment Assistance Rule until April 1, 2008, so that FHA would be required to insure all mortgages with seller-funded downpayment assistance for another five months, would cause budget receipts to fall by approximately $158 million in net present value dollars.  Since Nehemiah and AmeriDream may continue to provide seller-funded downpayment assistance until March 1, 2008, and April 1, 2008, respectively, at FY 2007 levels of activity, budget receipts for FY 2008 are expected to fall by approximately $37 million in net present value dollars. Therefore, enjoining the implementation of the rule as to all other providers until April 1, 2008, will cause an additional loss of budget receipts of approximately $121 million for FY 2008.

10.      Thus, the projected loss to the MMIF will range between $37 million and $158 million, in net present value dollars over the 30-year life of the loans, depending upon the amount of plaintiffs' and intervenors' seller-funded DPA business that is assumed by Nehemiah and Ameridream.

11.      Another way to analyze the impact of delay of the rule is as follows:
If a preliminary injunction is granted delaying the implementation of the rule until February 29, 2008, then, assuming FY 2007 experience, FHA could be expected to insure approximately 40,700 new loans with seller-funded DPA between October 31, 2007, and February 29, 2008.  Of these, approximately 10,500 would receive downpayment assistance from Nehemiah or AmeriDream, and approximately 30,200, from other downpayment assistance providers.

12.      FHA's independent actuaries have estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 23.06% for loans with seller-funded downpayment assistance (compared to 11.04% for those without it).  72 Fed. Reg. at 56,003.

13.      Therefore, out of the approximately 40,700 new loans with seller-funded DPA that can be expected to be initiated between now and February 29, 2008, if the Final Rule is delayed, approximately 9,400 of those can be expected to experience a claim for insurance benefits at some point during their existence.  Of these claims, approximately

2,400 would be attributable to loans with downpayment assistance from Nehemiah and AmeriDream, and 7,000, to other downpayment assistance providers.

14.     The average loss on a claim on the MMIF in FY 2007 was estimated to be $40,021. Therefore, delaying the rule to February 29, 2008, is likely to result in cumulative losses of approximately $376 million, over a 30-year period. Of these losses, approximately $96 million would be attributable to the loans with downpayment assistance from Nehemiah and AmeriDream, while approximately $280 million would be attributable to loans with downpayment assistance from the other providers. These losses are expressed in nominal rather than discounted dollars. These numbers are likely to be underestimates, as our experience has shown that claims resulting from loans initiated with seller-funded DPA tend to be on average 3% higher than the average claim on the MMIF. This loss is sufficient to threaten the solvency of the MMIF.

I declare under penalty of perjury that the following is true and correct.

_____
Judith V. May

Dated: __10/29/2007__

4

# Exhibit 11



**Homebuyer Education**

**Contact Us**

**Important Announcement (May 21, 2007):**

Based on ongoing discussions with the Internal Revenue Service and after careful consideration of Revenue Ruling 2006-27, Buyers Fund will discontinue providing down payment assistance after July 3, 2007. We would like to reassure our valued customers with whom we are presently working that we are in good standing with the Internal Revenue Service and all applicable regulatory agencies and will continue to honor the commitments we have made to you during this transition period.

For years we have been fortunate to work with all of you as we have had the distinct privilege of providing grants to those who needed our assistance and want to assure you that we will continue to provide the same level of professionalism and quality customer service through our final date of business on July 3, 2007.

May we take this opportunity to thank you for using Buyers Fund and for helping over 120,000 borrowers achieve the American Dream of Home Ownership.

**Updated Important Announcement (July 4, 2007)**

During the month of May Buyers Fund notified the public of our decision to discontinue Down Payment assistance on July 3rd, 2007. Accordingly, we have now discontinued Down Payment Assistance Services and will no longer provide grants. However we will continue to offer educational assistance on grants which have been previously processed and will be available to answer any questions concerning the services we previously provided.

May we take this opportunity to thank all of you who have worked with us as we have had the distinct privilege of helping over 120,000 borrowers achieve the American Dream of Home Ownership.

©2002 The Buyers Fund Inc.

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) | |
| Defendants. | ) ) | |
| AMERIDREAM, INCORPORATED, | ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) ) | |
| Intervenors, | ) ) | |
| v. | ) ) | Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendant. | ) ) ) ) | |

## DECLARATION OF SCOTT RISNER

1.     The statements herein are based on my personal knowledge and, if called upon to testify, I could and would competently testify thereto.

2.    I am a Trial Attorney with the United Sates Department of Justice and am one of the attorneys engaged in the defense of the above-captioned cases.

3.    Exhibit 6 to Defendants' Consolidated Opposition to Motions for Temporary Restraining Orders and Preliminary Injunctions is a true and accurate copy of a document entitled "Articles of Incorporation." I obtained this document from a website titled "Search for Business Entities," purported to be maintained by the Idaho Secretary of State, at http://www.accessidaho.org/public/sos/corp/search.html?ScriptForm.startstep=crit, on October 29, 2007. I obtained the document after a search for the "Business Entity Name" of "Sovereign Grant Alliance, Inc."

4.    Exhibit 9 to Defendants' Consolidated Opposition to Motions for Temporary Restraining Orders and Preliminary Injunctions is a true and accurate copy of a document entitled "Use Partners In Charity (PIC) with any loan type." I downloaded this document from a website purporting to be that of Partners In Charity, Inc., at http://partnersincharity.org/lender/step1a.htm, on October 29, 2007.

5.    Exhibit 11 to Defendants' Consolidated Opposition to Motions for Temporary Restraining Orders and Preliminary Injunctions is a true and accurate copy of a document entitled "Important Announcement (May 11, 2007)." I obtained this document from a website purporting to be that of Buyers Fund, at http://www.buyersfund.com/index.asp, on October 29, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2007.

SCOTT RISNER