## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, PENOBSCOT | ) | |
| INDIAN NATION ENTERPRISES and | ) | |
| GLOBAL DIRECT SALES, LLC, | ) | Case No.: 1:07-cv-01282 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOUSING | ) | |
| AND URBAN DEVELOPMENT, ALPHONSO | ) | |
| JACKSON IN HIS CAPACITY AS SECRETARY | ) | |
| OF HOUSING AND URBANDEVELOPMENT, | ) | |
| ROY A. BERNARDI, IN HIS CAPACITY AS | ) | |
| DEPUTY SECRETARY OF HOUSING AND | ) | |
| URBAN DEVELOPMENT AND BRIAN | ) | |
| MONTGOMERY, IN HIS CAPACITY AS | ) | |
| ASSISTANT SECRETARY OF HOUSING AND | ) | |
| URBAN DEVELOPMENT AND | ) | |
| COMMISSIONER OF THE FEDERAL HOUSING | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

To:    Christopher R. Hall, Esq.
       U.S. DEPARTMENT OF JUSTICE
       20 Massachusetts Avenue, NW
       Room 7224
       Washington, DC 20530

       Robert J. Katerberg, Esq.
       U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS
       20 Massachusetts Avenue, NW
       Washington, DC 20530

       Tamara Lynn Ulrich, Esq.
       U.S. DEPARTMENT OF JUSTICE
       P.O. Box 883
       Washington, DC 20044

**COUNSEL:**

**PLEASE TAKE NOTICE** that plaintiffs the Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC, by their undersigned counsel, shall move before the Honorable Paul L. Friedman at the U.S. District Court for the District of Columbia, E. Barrett Prettyman U.S. Courthouse, Room 6012, 333 Constitution Avenue, N.W., Washington, D.C. 20001, for an Order granting plaintiffs' motion to supplement the administrative record and granting the plaintiffs Summary Judgment:

    (1)    declaring that the Final Rule is contrary to law, arbitrary and capricious, unenforceable and otherwise unlawful;

    (2)    granting permanent injunctive relief enjoining the defendants from enforcing the Final Rule; and

    (3)    granting such further relief as the Court may deem appropriate and just.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, the plaintiffs will rely upon the Declaration of Kirk Francis, Affidavit of Michael L. Braunstein, the Exhibits annexed thereto, the accompanying Memorandum of Law, Statement of Material Facts, and all prior proceedings had herein; the plaintiffs adopt and incorporate by reference all supporting documents and arguments submitted by plaintiffs AmeriDream, Incorporated, Freedom Home Baptist Church, Inc., Dove Foundations, Inc., Partners In Charity, Inc., Future Home Assistance Program, Sovereign Grant Alliance, Genesis Foundation and Home Downpayment Gift Foundation; and

**PLEASE TAKE FURTHER NOTICE** that oral argument is requested.

Dated:  November 16, 2007                    **THE MASON LAW FIRM, LLP**

                                             /s/ Gary E. Mason_____
                                             Gary E. Mason
                                             DC Bar #418073
                                             Nicholas A. Migliaccio
                                             DC Bar# 484366
                                             Attorneys for Plaintiffs
                                             1225 19th Street Northwest
                                             Washington, D.C.  20036
                                             (202) 429-2290

                                             **KANTROWITZ, GOLDHAMER
                                               & GRAIFMAN, P.C.**
                                             Michael Braunstein
                                             747 Chestnut Ridge Road
                                             Chestnut Ridge, N.Y. 10977
                                             (845) 356-2570

                                             Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )            Case No.: 1:07-cv-01282
)
               Plaintiffs, )
)
      -v- )
)
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
)
           Defendants. )
——————————————————————— )

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Plaintiffs the Penobscot Indian Nation ("PIN"), Penobscot Indian Nation Enterprises ("PINE") and Global Direct Sales, LLC ("GDS"), by their undersigned counsel, The Mason Law Firm, LLP and Kantrowitz, Goldhamer & Graifman, LLC, pursuant to LCvR7(h), hereby submitted the following Statement Material Facts:

### Plaintiffs and their DPA Program

1.     PIN is a federally recognized Native American Government located on the Penobscot River in the State of Maine. (Francis Dec. at ¶ 1; see also 25 U.S.C §§ 1723 et seq.)

2.     PIN is a municipality of the State of Maine.   (Maine Indian Claims Settlement Act.)

3.     Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a "Section 17" federally chartered Native American Corporation of PIN. (Francis Dec. at ¶ 4.)

4.     On January 24, 2007, the PIN Tribal Counsel, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program. (Francis Dec. at ¶ 5.)

5.     PIN, PINE and Global Direct Sales, LLC ("GDS") entered into an Agreement to develop, organize and operate a DPA program wholly owned by PIN. (Francis Dec. at ¶ 6.)

6.     The DPA program, entitled Grant America Program™ ("GAP"), is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers across America. (Francis Dec. at ¶ 7.)

7.     GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment assistance grants. (Francis Dec. at ¶ 8.)

8.     PINE is responsible for hiring and overseeing contractors that process and market GAP for PIN. (Francis Dec. at ¶ 9.)

9.     GDS provides marketing and processing services and software and database management for administering GAP. ((Francis Dec. at ¶ 10.)

10.     PIN wholly owns GAP, all gift funds are provided by PIN and PIN receives the enrollment fees from the sellers. (Francis Dec. at ¶ 11.)

11.     PIN provides a pre-existing pool of funds to be used as grants towards homebuyer's downpayments. (Francis Dec. at ¶ 12.)

12.     Prior to closing, the homebuyer's grant is wired to the settlement agent from a PIN bank account using funds solely owned by PIN. (Francis Dec. at ¶ 13.)

13.     At closing, home sellers are charged an enrollment fee for enrolling their homes in the program. (Francis Dec. at ¶ 14.)

14.     The funds generated from that fee go to replenish the grant fund pool and any excess is the property of PIN. (Francis Dec. at ¶ 15.)

15.     GAP requires that the seller certify that the sale price has not been increased to account for the seller's contribution to GAP. (Francis Dec. at ¶ 16.)

16.     All GAP transactions are accompanied by a real estate appraisal by a FHA certified appraiser. (Francis Dec. at ¶ 17.)

17.     HUD has a stated Tribal Government-to-Government Consultation Policy  that provides that Federal Government operates within a government-to-government relationship with federally recognized tribal governments. (Exhibit "D".)

18.     The consultation policy applies to all HUD programs that have substantial direct effects on federally recognized Indian tribal governments. (Francis Dec. at ¶ 26-29 and Exhibit "D".)

19.     PIN requested that HUD consult with PIN regarding the Final Rule. (Francis Dec. at ¶ 30.)

20.     HUD failed to consult with PIN regarding the Final Rule. (Francis Dec. at ¶ 31.)

21.     HUD has a "Policy for Considering Potential Impacts of HUD Rules on Small Entities". (Francis Dec. at ¶ 33 and Exhibit "E".)

22.     Small entities include "small governmental jurisdictions" as defined by 601(5) of the Regulatory Flexibility Act. (Francis Dec. at ¶ 34 and Exhibit "E".)

23.    The Final Rule directly impacts small entities, including plaintiffs. (Francis Dec. at ¶ 35.)

24.    HUD has not provided a review and analysis of the Final Rule's impact on small entities. (Francis Dec. at ¶ 36.)

25.    HUD has failed to engage in outreach efforts to solicit the views of small entities in the development of the Final Rule. (Francis Dec. at ¶ 37.)

26.    The elimination of GAP will have a serious detrimental effect on PIN. (Francis Dec. at ¶ 38.)

27.    PIN is an economically depressed area in need of revitalization. (Francis Dec. at ¶ 39.)

28.    In keeping with the Indian Regulatory Reform and Business Development Act of 2000, PIN, through GAP, is attempting to engage in economic ventures with outside non-tribal entities, provide services outside the reservation and develop independent revenue streams. (Id.)

29.    PIN is responsible for providing all of its essential government functions, including its fire and police departments, street lights, road maintenance and plowing and health care. (Francis Dec. at ¶ 40.)

30.    Currently, PIN's governmental operations are in the negative and PIN's only independent revenue sources are stumpage (tree cutting) and GAP. (Francis Dec. at ¶ 41.)

31.    PIN operates a bingo game that is not a profitable venture. (Id.)

32.    PIN is relying on profits from GAP to provide essential government functions. (Francis Dec. at ¶ 42.)

33.    PIN would like to use profits from GAP to implement the educational and social programs necessary to revitalize PIN. (Id.)

34.     The enforcement of the Final Rule will eliminate GAP as an independent revenue stream, forcing PIN to remain dependant on Government subsidies and frustrate the very purpose of the Indian Regulatory Reform and Business Development Act of 2000. (Francis Dec. at ¶ 43.)

34.     PIN has contributed substantial resources developing, implementing and marketing GAP which will be lost along with its hopes of an independent revenue stream by the enforcement of the Final Rule. (Francis Dec. at ¶ 44.)

**FHA and Downpayment Assistance**

35.     Congress created the Federal Housing Administration ("FHA") in 1934 to establish and implement crucial policy initiatives to assist low- and moderate-income individuals and families in making the transition from tenants to homeowners.  (12 U.S.C. §§ 1701 et seq. (2000).)

36.     The FHA guarantees certain loans for moderately priced homes. (Id.)

37.     To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer make a downpayment of at least three percent of the purchase price of the home. (12 U.S.C. § 1709(b)(9)(2000).)

38.     Congress has expressly permitted to use of monetary gifts to make the required downpayments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, governmental agencies, pubic entities, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code.  (U.S.C. § 1709(b)(9).)

39.     A borrower's earned income, such as a commission, is a permissible source of downpayment. (AR at 5.)

40.     On October 25, 2005, HUD noted the successes of seller-financed DPA, rejected suggestions that those programs be curtailed and proposed a reasonable less restrictive alternative that it would adopt. (AR at 612.)

41.     On October 25, 2005, Brian Montgomery wrote that:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA.  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan. (AR at 612.)

42.     Without explanation, HUD failed to adopt its self-proposed, reasonable and less restrictive alternative. (AR at 1-7.)

**The Final Rule**

43.     In May 2007, HUD published "Standards for Mortgagor's Investment in Mortgaged Property". (AR at 10-14.)

44.     The Proposed Final Rule sought to completely prohibit DPA in the form of gifts from programs supported in part by contributions from sellers or others that financially benefit from the transaction. (AR at 10-14.)

45.     During the public comment period for the Proposed Final Rule HUD received approximately 15,000 comments. (AR at 50,000-66,631.)

46.     Over 14,000 comments opposed the Final Rule and requested that it be withdrawn, while fewer than 30 comments supported the Final Rule. (AR at 50,000-66,631.)

47.     Notwithstanding this strong opposition, HUD published the Final Rule adopting this change on October 1, 2007. (AR at 1-7.)

**HUD Rationale for the Final Rule**

48.     HUD articulates a single "primary" concern "that the sales price is often increased to ensure that the seller's net proceeds are not diminished." (AR at 11.)

49.     The only sources cited as providing the basis for HUD's concern are a February 2005 GAO study, a 2006 IRS press release and 2006 IRS Revenue Ruling (AR at 10-14.)

50.     HUD's identified data deals exclusively with charitable DPA programs. (AR at 10-14.)

51.     HUD did not identify data regarding governmental agency DPA programs. (AR at 10-14.)

52.      HUD did not identify data regarding tribal government DPA programs. (AR at 10-14.)

**February 2005 GAO Report**

53.     In the Notice of Proposed Rulemaking and explanation for the final rule, HUD claims that a GAO report released in February 2005, entitled "Mortgage Financing:  Actions Needed to Help FHA Manage Risks from New Loan Products" ("February 2005 GAO Report"), found "that seller-related contributions could contribute to an overvaluation of the price of the property." (AR at 470.)

54.     The GAO Financing Report states that "Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the property." (<u>Id</u>.)

55.    There is no indication in the GAO report that the Fannie Mae or Freddie Mac officials cited any data or other source supporting their observation, or whether they even had any particular knowledge of the issue, or any expertise to evaluate the relevant facts. (Id.)

56.    HUD does not address the flaws identified in the methodology used by GAO to examine the relationship between nonprofit downpayment DPA and home purchase prices, which was addressed by a George Mason University School of Public Policy study ("GMU Study"). (AR at 437-450.)

57.    The GMU Study questioned the methodology underlying the GAO study because it "could be overstating the extent of the default and/or claim rates of FHA loans with assistance from NDPA [nonprofit downpayment assistance] providers." (AR at 449.)

58.    Specifically, the GMU Study rebuked the GAO for the "lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim:  (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is located." (AR at 438.)

**IRS Press Release on Revenue Ruling 2006-27**

59.    HUD claims its final regulation is justified because it "harmonize[s] its regulations regarding downpayment assistance with recent rulings of the IRS."  (AR at 3.)

60.    According to HUD, the revenue ruling "addresses [the] same concerns" that HUD incorrectly to the February 2005 GAO Report, i.e., that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished." (AR at 4.)

61.    The IRS revenue ruling deals with whether charitable organizations providing DPA may properly maintain their as tax-exempt charitable status under the Internal Revenue Code section 501(c)(3). (AR at 21-25.)

62.    The IRS revenue ruling deals exclusively with charitable DPA providers and has no bearing on plaintiffs' DPA program or any other government agency or tribal government DPA program. (AR at 21-25.)

**The Effective Date of the Final Rule**

63.    The Final Rule will take effect thirty days after publication in the Federal Register (AR at 2) except as to Nehemiah Progressive Housing Development Corporation ("Nehemiah"), which is not subject to the Final Rule until six months after publication (March 31, 2008). (AR at 3.)

64.    According to HUD, this disparate treatment of Nehemiah stems from an April 1998 settlement agreement resolving litigation with Nehemiah. (Id.)

65.    The Nehemiah letter that forms part of HUD's court-approved settlement agreement provides that:

> [i]n the event that there are any such changes regarding the source of borrower downpayment funds, the changes will become applicable to Nehemiah and all other similarly situated downpayment assistance programs six months after the final promulgation and issuance of any such changes. (AR at 891.)

66.    On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing. (Exhibit "B".)

67.    Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs. (Exhibit "B".)

68.    The November 2005 GAO provides that "[l]oans with assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources." (AR at 519.)

69.    On June 5, 2007, Bloomberg News reported that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said." (Exhibit "C" and Roland Affidavit.)

70.    HUD Secretary Alphonso Jackson stated: "I'm very much against it . . . I think it's wrong.  I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments." (Id.)

71.    HUD Secretary Alphonso Jackson stated that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." (Id.)


Dated:  November 16, 2007                    **THE MASON LAW FIRM, LLP**

                                             /s/ Gary E. Mason_____
                                             Gary E. Mason
                                             DC Bar #418073
                                             Nicholas A. Migliaccio
                                             DC Bar # 484366
                                             Attorneys for Plaintiffs
                                             1225 19th Street Northwest
                                             Washington, D.C.  20036
                                             (202) 429-2290

                                             **KANTROWITZ, GOLDHAMER**
                                             **  & GRAIFMAN, P.C.**
                                             Michael Braunstein
                                             747 Chestnut Ridge Road
                                             Chestnut Ridge, N.Y. 10977
                                             (845) 356-2570
                                             Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | |
| PENOBSCOT INDIAN NATION, PENOBSCOT ) | |
| INDIAN NATION ENTERPRISES and ) | |
| GLOBAL DIRECT SALES, LLC, ) | Case No.: 07-1282 (PLF) |
| ) | |
|          Plaintiffs, ) | |
| ) | |
|  -v- ) | |
| ) | |
| UNITED STATES DEPARTMENT OF HOUSING ) | |
| AND URBAN DEVELOPMENT, ALPHONSO ) | |
| JACKSON IN HIS CAPACITY AS SECRETARY ) | |
| OF HOUSING AND URBANDEVELOPMENT, ) | |
| ROY A. BERNARDI, IN HIS CAPACITY AS ) | |
| DEPUTY SECRETARY OF HOUSING AND ) | |
| URBAN DEVELOPMENT AND BRIAN ) | |
| MONTGOMERY, IN HIS CAPACITY AS ) | |
| ASSISTANT SECRETARY OF HOUSING AND ) | |
| URBAN DEVELOPMENT AND ) | |
| COMMISSIONER OF THE FEDERAL HOUSING ) | |
| ADMINISTRATION, ) | |
| ) | |
|         Defendants. ) | |
| _____ ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF THE
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND TO
## SUPPLEMENT THE ADMINISTRATIVE RECORD

---

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    A.    PLAINTIFFS AND THEIR DPA PROGRAM . . . . . . . . . . . . . . . . . . . . . .  4
    B.    FHA AND DOWNPAYMENT ASSISTANCE . . . . . . . . . . . . . . . . . . . . .  7
    C.    THE FINAL RULE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        1.    HUD RATIONALE FOR THE FINAL RULE . . . . . . . . . . . . . . .  9
        2.    FEBRUARY 2005 GAO REPORT . . . . . . . . . . . . . . . . . . . . . . . .  10
        3.    IRS PRESS RELEASE ON REVENUE RULING 2006-27 . . . . . .  11
    D.    THE EFFECTIVE DATE OF THE FINAL RULE . . . . . . . . . . . . . . . . . .  12
    E.    PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

LEGAL ARGUMENT - POINT I  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    PLAINTIFFS PREVAL ON THE MERITS BECAUSE THE FINAL RULE
    VIOLATES THE ADMINISTRATIVE PROCEDURES ACT

    A.    HUD RELIES ON DATA THAT PROVIDES NO BASIS FOR
        THE RULE OR WAS NEVER PRODUCED FOR COMMENT . . . . . . . .  16
    B.    HUD FAILED TO CONSIDER REASONABLE ALTERNATIVES
        OR OFFER A REASONED EXPLANATION FOR REJECTING
        THEM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
        1.    HUD SHOULD SAFEGUARD THE APPRAISAL PROCESS . . . .  20
        2.    FHA SHOULD CHARGE A HIGHER PREMIUM FOR
            LOANS WITH DPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
        3.    HUD FAILED TO ADDRESS THE GMU STUDY . . . . . . . . . . . . .  22
    C.    HUD'S EFFECTIVE DATE DISPARITY TREATS
        SIMILARLY-SITUATED ENTITIES DIFFERENTLY
        WITHOUT A REASONED JUSTIFICATION . . . . . . . . . . . . . . . . . . . . . .  22
    D.    HUD IMPROPERLY PREJUDICED THE OUTCOME OF THE
        RULEMAKING PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
    E.    HUD VIOLATED ITS OWN POLICIES DURING THE
        RULE MAKING PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
        1.    HUD VIOLATED ITS TRIBAL CONSULTATION POLICY . . . . . .  25
        2.    HUD VIOLATED ITS POLICY FOR CONSIDERING
            POTENTIAL IMPACTS OF HUD RULES ON SMALL
            ENTITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

LEGAL ARGUMENT - POINT II  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

    PIN WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

LEGAL ARGUMENT - POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    ISSUANCE OF AN INJUNCTION WILL NOT CAUSE SUBSTANTIAL
    HARM TO HUD

LEGAL ARGUMENT - POINT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

    GRANTING INJUNCTIVE RELIEF TO PLAINTIFFS WILL FURTHER
    THE PUBLIC INTEREST

LEGAL ARGUMENT - POINT V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    THE ADMINISTRATIVE RECORD SHOULD BE SUPPLEMENTED TO
    PRESERVE MEANINGFUL JUDICIAL REVIEW

LEGAL ARGUMENT - POINT VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    SUMMARY JUDGMENT STANDARD

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

**TABLE OF AUTHORITIES**

CASES:                                                                PAGE NO.

Adams v. Quattlebaum
    219 F.R.D. 195 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Allergan. Inc. v. Shalala
    6 Food and Drug Rep. 389, No. 94-1223 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . .23

ANR Pipeline Co. v. FERC
    71 F.3d 897 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ass'n of Nat'l Advertisers, Inc.
    627 F.2d 1151 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Citizens to Preserve Overton park v. Volpe
    401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) . . . . . . . . . . . . . . . . . . . . . . 14

City of Brookings Mun. Telephone Co. v. FCC
    822 F.2d 1153 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Columbia Broad. Sys. v. FCC
    454 F.2d 1018 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Conn. Light and Power Co. v. Nuclear Regulatory Comm'n
    673 F.2d 525 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cubic Applications, Inc. v. United States
    37 Fed.Cl. 345 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Etelson v. Office of Personal Management
    684 F.2d 918 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Hous. Study Group v. Kemp
    736 F.Supp. 321 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Independent Petroleum Association of America v. Babbit
    92 F.3d 1248 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Int'l Ladies Garment Workers' Union v. Donovan
    722 F.2d 795 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Int'l Snowmoble Mfrs. Ass'n v. Norton

      340 F.Supp.2d 1249 (D. Wyo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.
      463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) . . . . . . . . . . . . . . . . . . . . . 14

NLRB v. Bell Aerospace Co.
      416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) . . . . . . . . . . . . . . . . . . . . . 14

Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.
      494 F.3d 188 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier
      494 F.3d 188 (C.A.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Planned Parenthood of Metropolitan Washington, D.C., Inc. v. Horner
      691 F.Supp 449 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Ramaprakash v. FAA
      346 F.3d 1121 (D.C. cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Robert Wood Johnson Hosp. v. Thompson
      297 F.3d 273 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

SEC v. Chenery Corp.
      318 U.S. 80, 63 S.Ct. 454, 87 L.Ed 626 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . .31

Shays v. FEC
      No. 04-1597, 2007 WL 2446159 (D.D.C. Aug. 30, 2007) . . . . . . . . . . . . . . . . . .15

Tafas v. Dudas
      2007 WL 3196683 (E.D.Va. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Thomas Jefferson Univ. Hosp. v. Shalala
      512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) . . . . . . . . . . . . . . . . . . . .31

STATUTES:

25 U.S.C. §§ 1723 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

12 U.S.C. §§ 1701 et seq. (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S.C. § 1709 (b)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

12 U.S.C. § 1709(b)(9)(2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

5 U.S.C. § 706 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 U.S.C. § 553(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5 U.S.C. § 706(2)(A)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

MISCELLANEOUS:

National Housing Act, ch. 847, 48 Stat. 1246 (1934) . . . . . . . . . . . . . . . . . . . . . . 7

Internal Revenue code section 501(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This memorandum of law is submitted in support of the plaintiffs' motion for summary judgment declaring that HUD's Final Rule cannot be enforced because it is arbitrary, capricious and contrary to law and to supplement the administrative record. The Administrative Record ("AR") shows that the Final Rule was a result based determination directed by HUD and the FHA and not the end product of objective study.

The Final Rule violates the Administrative Procedures Act, 5 U.S.C. § 706 ("APA") because: 1) HUD relies on data that provides no basis for the Final Rule or was never produced for comment; 2) HUD failed to offer a reasoned explanation for rejecting reasonable less restrictive alternatives; 3) HUD's effective date disparity treats similarly-situated entities differently without explanation; and 4) HUD improperly prejudiced the outcome of the rulemaking proceeding. Accordingly, summary judgment is appropriate.

The Final Rule violates the APA because it relies upon the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release that provide no support for the rule or available critical data which was not made available during the comment period. Further, HUD's identified data deals exclusively with charitable DPA programs, which has no bearing on governmental agency or tribal government DPA programs an important distinction since the available data shows loan performance varies based on the type of entity providing the downpayment assistance ("DPA"). Further, GAP requires more stringent borrower and seller requirements then unregulated non-profits. HUD has the necessary information available to determine the performance of loans by DPA provider because the DPA program tax identification number is required when FHA loans are originated.

Additionally, HUD ignored its obligation to consider and address less-restrictive alternatives.  In fact, HUD even ignored a less restrictive alternative it proposed, stated it would adopt and then abandoned without explanation.

Further, the Final Rule provides that it will take effect thirty (30) days after publication for all DPA providers except for Nehemiah, which is not subject to the Regulation until six months after publication.  HUD's failure to provide a rational basis for treating similar entities differently is the essence of arbitrariness and violates settled principles of administrative law.

Lastly, HUD Secretary Alphonso Jackson statements that HUD intends to approve the new rule even if the agency receives critical comments, made while HUD's proposal was out for public comment and agency decision-makers were required to exercise an open mind, show that HUD had already reached a prejudged political conclusion.

Under these circumstances, HUD's Final Rule cannot stand and the plaintiffs' motion for summary judgment should be granted its entirety.

## STATEMENT OF FACTS

**A.    Plaintiffs and their DPA Program**

PIN is a federally recognized Native American Government located on the Penobscot River in the State of Maine. (Francis Dec. at ¶ 1; see also 25 U.S.C §§ 1723 et seq.)  As a result of the Maine Indian Claims Settlement Act, PIN is a municipality of the State of Maine.  Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a "Section 17" federally chartered Native American Corporation of PIN. (Francis Dec. at ¶ 4.)

On January 24, 2007, the PIN Tribal Counsel, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program. (Francis Dec. at ¶ 5.)  PIN, PINE and Global Direct Sales, LLC ("GDS") entered into an Agreement to develop, organize and operate a DPA program wholly owned by PIN. (Francis Dec. at ¶ 6.)  The DPA program, entitled Grant America Program™ ("GAP"), is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers across America. (Francis Dec. at ¶ 7.)  GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment assistance grants. (Francis Dec. at ¶ 8.)

PINE is responsible for hiring and overseeing contractors that process and market GAP for PIN. (Francis Dec. at ¶ 9.)  GDS provides marketing and processing services and software and database management for administering GAP. ((Francis Dec. at ¶ 10.)  PIN wholly owns GAP, all gift funds are provided by PIN and PIN receives the enrollment fees from the sellers. (Francis Dec. at ¶ 11.)

PIN provides a pre-existing pool of funds to be used as grants towards homebuyer's downpayments. (Francis Dec. at ¶ 12.)  Prior to closing, the homebuyer's grant is wired to the

settlement agent from a PIN bank account using funds solely owned by PIN. (Francis Dec. at ¶ 13.)  At closing, home sellers are charged an enrollment fee for enrolling their homes in the program. (Francis Dec. at ¶ 14.)  The funds generated from that fee go to replenish the grant fund pool and any excess is the property of PIN. (Francis Dec. at ¶ 15.)  GAP requires that the seller certify that the sale price has not been increased to account for the seller's contribution to GAP. (Francis Dec. at ¶ 16.)  Further, all transactions are accompanied by a real estate appraisal by a FHA certified and licensed appraiser. (Francis Dec. at ¶ 17.)  GAP also makes additional requirements, such as buyer education, limitation on closing cost contributions and a seller certification that the price has not been increased that are more stringent that HUD requires.

HUD's stated Tribal Government-to-Government Consultation Policy provides that Federal Government operates within a government-to-government relationship with federally recognized tribal governments.  The consultation policy applies to all HUD programs that have substantial direct effects on federally recognized Indian tribal governments. (Francis Dec. at ¶ 26-29.)  PIN requested that HUD consult with PIN regarding the Final Rule. (Francis Dec. at ¶ 30.)  HUD knowingly failed to consult with PIN or any other federally recognized tribal government regarding the Final Rule. (Francis Dec. at ¶ 31.)

HUD has a "Policy for Considering Potential Impacts of HUD Rules on Small Entities." (Francis Dec. at ¶ 33.)  Small entities include "small governmental jurisdictions" as defined by 601(5) of the Regulatory Flexibility Act. (Francis Dec. at ¶ 34.)  The Final Rule directly impacts small entities, including plaintiffs. (Francis Dec. at ¶ 35.)  HUD has not provided a review and analysis of the Final Rule's impact on small entities. (Francis Dec. at ¶ 36.)  HUD has failed to engage in outreach efforts to solicit the views of small entities in the development of the Final Rule. (Francis Dec. at ¶ 37.)

The elimination of GAP will have a serious detrimental effect on PIN. (Francis Dec. at ¶ 38.)  PIN is an economically depressed area in need of revitalization. (Francis Dec. at ¶ 39.)  In keeping with the Indian Regulatory Reform and Business Development Act of 2000, PIN, through GAP, is attempting to engage in economic ventures with outside non-tribal entities, provide services outside the reservation and develop independent revenue streams. (Id.)

PIN is responsible for providing all of its essential government functions, including its fire and police departments, street lights, road maintenance and plowing and health care. (Francis Dec. at ¶ 40.)  Currently, PIN's governmental operations are in the negative and PIN's only independent revenue sources are stumpage (tree cutting) and GAP. (Francis Dec. at ¶ 41.)  PIN also operates a bingo game, however, that is no longer a profitable venture. (Id..)  PIN is relying on profits from GAP to provide essential government functions. (Francis Dec. at ¶ 42.) Additionally, PIN would like to use profits from GAP to implement the educational and social programs necessary to revitalize PIN. (Id.)  GDS has agreed to participate in the PINE Manager Apprenticeship Program to assist tribal members in learning the entrepreneurial, management and business knowledge and skills necessary to develop independent revenue sources.

The enforcement of the Final Rule will eliminate GAP as an independent revenue stream, forcing PIN to remain dependant on Government subsidies and frustrate the very purpose of the Indian Regulatory Reform and Business Development Act of 2000. (Francis Dec. at ¶ 43.)  PIN has contributed substantial resources developing, implementing and marketing GAP which will be lost along with its hopes of an independent revenue stream by the enforcement of the Final Rule. (Francis Dec. at ¶ 44.)

**B.**     <u>**FHA and Downpayment Assistance**</u>

Congress created the Federal Housing Administration ("FHA") in 1934 to establish and implement crucial policy initiatives to assist low- and moderate-income individuals and families in making the transition from tenants to homeowners. <u>See</u> National Housing Act, ch. 847, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701 <u>et seq.</u> (2000)). To achieve this goal, the FHA guarantees certain loans for moderately priced homes. To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer must make a downpayment of at least three percent of the purchase price of the home. National Housing Act, 12 U.S.C. § 1709(b)(9)(2000).

Congress has long recognized that the downpayment requirement would prove too burdensome for many of the families whom Congress sought to help. For this reason, prospective homebuyers are expressly permitted to use monetary gifts to make the required downpayments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, governmental agencies, pubic entities, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code. <u>See</u> U.S.C. § 1709(b)(9).

Beginning in the mid-1990s, a number of organizations came forward to meet the need for DPA. To date, approximately one million low- and moderate-income families and individuals have purchased homes using DPA. Moreover, a study by the George Mason University School of Public Policy estimated that those purchasers built approximately $9.6 billion in home equity between 2000 and 2005.

For approximately ten years, HUD has expressly permitted DPA providers to accept contributions from sellers and others involved in the real estate industry.  For example, in 1998, HUD's Office of General Counsel reviewed the process for accepting contributions and awarding gifts utilized by numerous DPA providers, and found that it was in compliance with HUD's guidelines.

In fact, on October 25, 2005, approximately nine months after the February 2005 GAO report averred to be relied upon by HUD, HUD noted the successes of seller-financed DPA, rejected suggestions that those programs be curtailed and proposed a reasonable less restrictive alternative that it would adopt:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA.  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan. (AR at 612.)

Without explanation, HUD failed to adopt its self-proposed, reasonable and less restrictive alternative.

HUD has also encouraged the rapid growth of DPA providers by readily extending FHA insurance to loans obtained in transactions utilizing downpayment assistance and even using DPA in the sale of certain HUD-owned properties.

**C.    The Final Rule**

In May 2007, HUD departed from its longstanding approval of seller-financed DPA when it published "Standards for Mortgagor's Investment in Mortgaged Property". (AR at 10-

14.)  Contrary to its prior position, the Proposed Final Rule sought to completely prohibit DPA in the form of gifts from programs supported in part by contributions from sellers or others that financially benefit from the transaction.

During the public comment period for the Proposed Final Rule HUD received approximately 15,000 comments. (AR at 50,000-66,631.)  Over 14,000 comments opposed the Final Rule and requested that it be withdrawn, while fewer than 30 comments supported the Final Rule.  Notwithstanding this strong opposition, HUD published the Final Rule adopting this change on October 1, 2007. (AR at 1-7.)

### 1.       HUD Rationale for the Final Rule

There is no dispute that HUD-approve DPA programs have enabled hundreds of thousands of low- to moderate-income families to purchase homes for the first time, thus helping to increase homeownership rates to record levels, particularly among minority groups.   Yet despite their undisputed success, HUD provides no reasoned explanation for its abrupt change of course, contradiction of its prior longstanding policy and statements regarding these DPA programs.

HUD articulates a single "primary" concern "that the sales price is often increased to ensure that the seller's net proceeds are not diminished." (AR at 11.)  But the only sources cited as providing the basis for that concern – a February 2005 GAO study, a 2006 IRS press release and  2006 IRS Revenue Ruling – do not state what HUD claims. (AR at 451-517, 26 and 21-25.)

Further, HUD's identified data deals exclusively with charitable DPA programs and has no bearing on governmental agency and tribal government DPA programs, an important distinction since the available data shows loan performance varies based on the entity providing the DPA. (AR 519.)

2.    **February 2005 GAO Report**

In the Notice of Proposed Rulemaking and explanation for the final rule, HUD claims that a GAO report released in February 2005, entitled "Mortgage Financing:  Actions Needed to Help FHA Manage Risks from New Loan Products" ("February 2005 GAO Report"), found "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added.)  Yet what HUD presents as a determination made by GAO, presumably based on rigorous analysis and reliable data, is only a remark made, without attribution, in a conversation with unidentified Fannie Mae and Freddie Mac officials.  The GAO Financing Report merely states that "Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the property." (Id.) Moreover, there is no indication in the GAO report that the Fannie Mae or Freddie Mac officials with whom GAO chatted cited any data or other source supporting their observation, or whether they even had any particular knowledge of the issue, or any expertise to evaluate the relevant facts.

Nor does HUD address the serious flaws identified in the methodology used by GAO to examine the relationship between nonprofit downpayment DPA and home purchase prices, which was addressed by a George Mason University School of Public Policy study ("GMU Study"). (AR at 437-450.)  The GMU Study questioned the methodology underlying the GAO study because it "could be overstating the extent of the default and/or claim rates of FHA loans with assistance from NDPA [nonprofit downpayment assistance] providers." (AR at 449.)

Specifically, the GMU Study rebuked the GAO for the "lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim:  (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is

10

located." (AR at 438.)  As HUD itself acknowledges, DPA providers tend to help families with more limited means, living in more marginal neighborhoods than FHA generally serves, and any quantitative analysis of their work properly should factor in the types of families and communities they serve.  The GAO study fails to provide an analysis of the default rates of other types of DPA programs.

### 3.     IRS Press Release on Revenue Ruling 2006-27

HUD also relies on statements found in an IRS press release and claims its final regulation is justified because it "harmonize[s] its regulations regarding downpayment assistance with recent rulings of the IRS."  (AR at 3.)  However, Revenue Ruling 2006-27 concerns an entirely different set of regulatory concerns.

According to HUD, the revenue ruling "addresses [the] same concerns" (Id.) that HUD incorrectly attributes to the February 2005 GAO Report, i.e., that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished." (AR at 4.)  In fact, Revenue Ruling 2006-27 does not.  The revenue ruling deals with whether charitable organizations providing DPA may properly maintain their as tax-exempt charitable status under the Internal Revenue Code section 501(c)(3). (AR at 21-25)   HUD's confusion on the meaning of the revenue ruling may be due to its misplaced reliance on a one-page IRS press release announcing the revenue ruling, instead of the ruling itself. (AR at 26.) Lastly, the IRS revenue ruling deals exclusively with charitable DPA providers and has no bearing on plaintiffs' DPA program or any other government agency or tribal government DPA program. (AR at 21-25.)

**D.    The Effective Date of the Final Rule**

The Final Rule will take effect thirty days after publication in the Federal Register (AR at 2) except as to Nehemiah Progressive Housing Development Corporation ("Nehemiah"), which is not subject to the Final Rule until six months after publication (March 31, 2008). (AR at 3.) According to HUD, this disparate treatment of Nehemiah purportedly stems from an April 1998 settlement agreement resolving litigation with Nehemiah. (Id.)  However, in a letter that forms part of HUD's court-approved settlement agreement with Nehemiah, HUD states that this six-month "grace period" will apply not just to Nehemiah but also to all similarly situated DPA programs:

> In the event that there are any such changes regarding the source of borrower downpayment funds, the changes will become applicable to Nehemiah **and all other similarly situated downpayment assistance programs six months after the final promulgation and issuance of any such changes.** (AR at 891)(emphasis added.)

HUD's failure to provide a rational basis for treating similar entities differently is the essence of arbitrariness and violates settled principles of administrative law.

**E.    Procedural History**

On July 18, 2007, the plaintiffs' filed their complaint, asserting claims other then the current APA challenge.  On August 10, 2007, the plaintiffs' moved for partial summary judgment.  On September 26, 2007, the defendants, after receiving extensions of time to respond to the complaint and summary judgment motion, opposed the plaintiffs' summary judgment motion and moved to dismiss the complaint.  On October 9, 2007, pursuant to Fed. R. Civ. P. 15(a), the plaintiffs amended their complaint as of right.  In light of the plaintiffs' amended complaint, the defendants' pending motion to dismiss is moot, as the amended complaint supersedes the original complaint. Adams v. Quattlebaum, 219 F.R.D. 195 (D.D.C. 2004).  The

plaintiffs' summary judgment motion is still before the Court.   The plaintiffs' amended complaint contains the current APA challenge.

On October 24, 2007, after the defendants' refused to agree to the same stipulation given to plaintiff AmeriDream, Incorporated., the plaintiffs' moved for a preliminary injunction.   On October 26, 2007 the defendants filed the administrative record.   On October 29, 2007, the defendants opposed the plaintiffs' motion for a preliminary injunction.   On October 31, 2007, after a hearing on the preliminary injunction motion, the Court granted the plaintiffs' motion for a preliminary injunction and set forth that summary judgment motions would be briefed on the schedule set forth in the AmeriDream stipulation.   The defendants' time to respond to the plaintiffs' amended complaint has been extended until November 11, 2007.

# LEGAL ARGUMENT

## POINT I

### PLAINTIFFS PREVAIL ON THE MERITS BECAUSE THE FINAL RULE VIOLATES THE ADMINISTRATIVE PROCEDURES ACT

The Final Rule violates the APA and the plaintiffs' motion for summary judgment should be granted because: 1) HUD relies on data that provides no basis for the Final Rule or was never produced for comment; 2) HUD failed to offer a reasoned explanation for rejecting reasonable alternatives; 3) HUD's effective date disparity treats similarly-situated entities differently without explanation; and 4) HUD improperly prejudiced the outcome of the rulemaking proceeding.

The Final Rule is subject to judicial review pursuant to the Administrative Procedures Act, 5 U.S.C. § 706 (2000) ("APA"). When reviewing agency action pursuant to the APA, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). In applying the "arbitrary and capricious" standard, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Upon review of an agency's action, the Court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

While APA review is deferential, this Court has recognized that an agency has a higher burden where, as here, it changes longstanding policy. <u>Shays v. FEC</u>, No. 04-1597, 2007 WL 2446159, at *4 (D.D.C. Aug. 30, 2007) (<u>Shays III</u>). The D.C. Circuit has explained the reason for this higher burden:

> An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion, it may cross the line from tolerably terse to the intolerably mute.

The "failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." <u>Ramaprakash v. FAA</u>, 346 F.3d 1121, 1125 (D.C. Cir. 2003)(<u>citing</u> <u>Columbia Broad. Sys. V. FCC</u>, 454 F.2d 1018, 1027 (D.C. Cir. 1971)). "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." <u>ANR Pipeline Co. v. FERC</u>, 71 F.3d 897, 901 (D.C. Cir. 1995).

For nearly a decade, HUD has regarded seller-funded DPA programs as consistent with the letter of the law, as well as the purposes of the National Housing Act. It defies well-settled principles of administrative law for HUD to eliminate these DPA programs without addressing its longstanding record and explaining the reasons for the complete reversal in its position. Nevertheless, HUD fails to acknowledge, much less explain, the striking departure from its record of approving these DPA programs, facilitating their operation and even utilizing such programs itself when selling its own properties.

A.    **HUD Relies On Data That Provides No Basis for the**
      **Rule or Was Never Produced For Comment**

The Final Rule violates the APA because the material it relies upon, namely the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, provide no support for the rule. And, the newly revealed portfolio analysis that HUD heavily relies upon was never made available during the comment period.

Further, HUD has relied exclusively on data regarding charitable DPA programs, which has no bearing on governmental agency or tribal government DPA programs operated by the plaintiffs which is an important distinction since the available data shows loan performance varies based on the type of entity providing the DPA.  On November 14, 2002, HUD issued Mortgage Letter 2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate financing.  Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs. (Exhibit "B".)

Further, the November 2005 GAO provides that **"[l]oans with assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources."** (AR at 519) (emphasis added.)  Accordingly, at minimum, the Final Rule is arbitrary, capricious and contrary to law with regard to governmental and tribal DPA programs.

The APA requires that an agency publish a notice of proposed rulemaking, setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  Id. at § 553(c).

As the D.C. Circuit recently explained:

'Integral' to these requirements 'is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules . . . . An Agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.'

Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 199 (D.C. Cir. 2007) (internal citations omitted).

As discussed above, HUD's rulemaking proposal cited only three sources for HUD's purported concerns about the impact of DPA loans on sales prices and the alleged negative impact on borrowers and the FHA: an IRS press release, an IRS revenue ruling and a February 2005 GAO report. As discussed supra, and as argued in comments on the proposed rule, HUD may not defer to a press release and ruling by an agency with an entirely different mission and expertise. As discussed supra, the GAO report does not examine DPA programs or their impact on property values and HUD offered no defense in response to commenters' criticisms concerning its reliance on the GAO report. Lastly, the three sources deal exclusively with charitable DPA and do not address in any manner government agency or tribal government DPA.

Instead, HUD responded to commenters' objections by interjecting the unsubstantiated claim that it has performed a **new** analysis to support its conclusions, purportedly based on its loan portfolio dating back to 1998. This bait-and-switch approach demonstrates that the Final Rule is a result based determination directed by HUD and the FHA, not the end product of objective study and is improper under the APA. Moreover, the rulemaking proposal contains no mention of the data that HUD purportedly relies on, and no information about HUD's methodology in choosing the data and conducting its analysis.

As the Court of Appeals stated in Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier, 494 F.3d 188, 199 (C.A.D.C. 2007) :

17

> '[i]ntegral' to these requirements 'is the agency's duty 'to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.... An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.' <u>Solite Corp. v. EPA</u>, 952 F.2d 473, 484 (D.C.Cir.1991) (<u>quoting</u> <u>Connecticut Light & Power Co. v. NRC</u>, 673 F.2d 525, 530-31 (D.C. Cir. 1982)); <u>see</u> <u>Chamber of Commerce v. SEC</u>, 443, F.3d 890, 899 (D.C. Cir. 2006); <u>see</u> <u>also</u> <u>Air Transp. Ass'n of Am.,</u> 169 F.3d 1, 7 (D.C.Cir.1999) (" '[T]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation.'" (<u>quoting</u> <u>Association of Data Processing Serv. Orgs. V. Bd. Of Governors of the Fed. Reserve Sys.,</u> 745 F.2d 677, 684 (D.C. Cir. 1984)).

The data underlying HUD's newly-revealed analysis allegedly comes from HUD's own loan portfolio from 1998. This data obviously existed and was available **before** the notice and comment period. Further, as the IRS press release, an IRS revenue ruling and a February 2005 GAO report provide no basis for the Final Rule, HUD's analysis for of its loan portfolio is "the most critical factual material that is used to support" HUD's position. <u>See</u> <u>Id</u>. In fact, HUD's portfolio analysis is the only data which HUD relies upon in the Final Rule when defending comments that the Final Rule is not supported by data. (AR at 5.) Accordingly, the new data is not supplemental, but the only arguable support for the Final Rule.

As the D.C. Circuit aptly stated in <u>Conn. Light and Power Co. v. Nuclear Regulatory Comm'n</u>, 673 F.2d 525, 530 (D.C. Cir. 1982):

> [t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should e a genuine interchange as mere bureaucratic sport.

HUD's failure to disclose the data on which it relied and the methodology it employed for reaching its conclusions violates fundamental tenets of administrative law, and compels

reversal of the Final Rule.  Accordingly, as the material relied upon, the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, provide no support for the rule and have no bearing on governmental agency or tribal government DPA programs, the plaintiffs' motion for summary judgment should be granted.

**B.    HUD Failed to Consider Reasonable Alternatives or
       Offer A Reasoned Explanation For Rejecting Them**

An agency must, in a statement of basis and purpose accompanying a final rule, provide a reasoned explanation of its rejection of reasonable alternatives.  If the agency fails to do so, the final rule will be vacated.  See Shays III, 2007 WL2616689, at *24 ("Unless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.").  In violation of APA requirements, HUD has ignored proposals advanced for remedying alleged shortcomings in current DPA programs, including a proposal HUD itself advanced.

In City of Brookings Mun. Telephone Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987), the D.C. Circuit invalidated action by the FCC for "failure to even consider" a proposal:

> It is well settled than an agency has 'a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'  Of course, as the [FCC] emphasizes in its defense, this duty extends only to 'significant and viable' alternatives, not to 'every alternative device and thought conceivable by the mind of man … regardless of how uncommon or unknown that alternative may have been.  But with that sensible caveat, the fact remains that '[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal.'

An agency's duty to consider responsible alternatives clearly applies where, as here, the agency is offered less restrictive alternatives to the action taken.  In Int'l Ladies Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), the D.C. Circuit considered the Secretary of Labor's rescission of longstanding restrictions on employing homeworkers in the

knitted outerwear industry. The Court vacated the agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding the Department of Labor's longstanding restrictions:

> We do not suggest that [the Secretary] had to opt for any particular one of these proposals. However, he was required to address common and known or otherwise reasonable options, and to explain any decision to reject such options. His complete failure to satisfy these quintessential aspects of reasoned decision making is the primary basis for our decision to vacate his rescission of the restrictions in the knitted outerwear industry.

Id. at 818.

HUD's explanation for the challenged regulation fails to address reasonable alternatives. In fact, none of the various proposals are even mentioned in HUD's statement of basis and purpose for the Final Rule. In violation of APA requirements, HUD has ignored proposals advanced during the comment period for remedying alleged shortcomings in current DPA programs, including a proposal HUD itself advanced. Accordingly, the Final Rule cannot be sustained.

## 1.    HUD Should Safeguard the Appraisal Process

HUD should deal directly with the alleged problem by safeguarding the appraisal process to ensure home prices are not manipulated to exceed actual fair market value and are supported by an accurate appraisal. HUD has not provided a reasoned explanation for its rejection of this reasonable alternative that deals directly with HUD's purported concern and was proposed during the comment period.

While "FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA",  the Final Rule ignores reasonable

alternatives that deal directly with the HUD's alleged concern – that families who purchase homes with DPA may pay prices which have been manipulated to exceed actual fair market value, that is, the purchase price might not be supported by an accurate appraisal. (AR at 11.)

Despite HUD's averred concern, HUD ignores that transactions involving DPA, like all purchases utilizing loans guaranteed by the FHA, have home prices validated using HUD-approved appraisal criteria applied by HUD-certified appraisers that are not chosen by the DPA providers, buyers or sellers.  In other words, a FHA certified appraiser with no relation to the DPA provider, buyer or seller, confirms that the sale price does not exceed fair market value. HUD ignores comments regarding safeguarding the integrity of the appraisal process, such as the random assignment of HUD-certified appraisers and mechanisms for reviewing appraisals prior to closing, stating primarily that the alternative is "an issue outside the scope of the present rule." (AR at 4.)

HUD, in violation of the APA, failed to provide a reasoned explanation for rejecting less restrictive alternatives.

### 2.    FHA Should Charge a Higher Premium for Loans With DPA

In addition to ignoring reasonable alternatives set forth during the comment period, HUD ignored a reasonable alternative that it proposed and stated that it would implement.

On October 25, 2005, approximately nine months after the February 2005 GAO report allegedly relied upon by HUD, HUD noted the successes of seller-financed DPA, rejected suggestions that those programs be curtailed and stated that it would implement a less restrictive reasonable alternative:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions

> that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. **Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan**.

(AR at 612)(emphasis added.)

HUD, in violation of the APA, has failed to provide a reasoned explanation for its rejection of a reasonable less-restrictive alternative that it proposed and stated it would implement.

### 3. HUD Failed to Address the GMU Study

Finally, HUD completely ignores studies presented in the rulemaking proceeding that contradict the information on which HUD purports to rely. For example, HUD did not address the 2006 GMU Study, which showed that homeowners receiving assistance from DPA saw their total wealth grow by $9.6 billion between 2000 and 2005, thereby generating additional spending and new jobs.

In its rush to judgment, HUD simply ignored its obligation to consider less-restrictive alternatives, even ignoring the alternative it proposed in response to the November 2005 GAO Report. As this Court observed only last month, a decision lacking such consideration "can hardly be classified as reasoned." Shays III, 2007 WL 2616689, at *24.

### C. HUD's Effective Date Disparity Treats Similarly-Situated Entities Differently Without A Reasoned Justification

The Final Rule will take effect thirty days after publication in the Federal Register for all DPA providers except for Nehemiah, which is not subject to the Regulation until six months after publication. This widely disparate treatment of a major DPA provider is the essence of arbitrariness and HUD's attempt to justify it falls well short of what is required under settled

principles of administrative law.  Additionally, the disparate effective date was not included, or referenced, in HUD's proposed rule, eliminating the opportunity for comment on the issue.

The District of Colombia Court of Appeals has repeatedly held that "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." Independent Petroleum Association of America v. Babbit, 92 F.3d 1248, 1258 (D.C. Cir. 1996) (internal citation omitted). "Government is at its most arbitrary when it treats similarly situated people differently." Etelson v. Office of Personal Management, 684 F.2d 918, 926 (D.C. Cir. 1982).  "If an agency treats similarly situated parties differently, its action is arbitrary and capricious in violation of the APA." Allergan. Inc. v. Shalala, 6 Food and Drug Rep. 389, 391, No. 94-1223 (D.D.C. 1994).

HUD avers that the disparate treatment was the result of the settlement of prior litigation. However, the settlement document provides that:

> the changes will become applicable to Nehemiah and **all other similarly situated downpayment assistance programs six months after the final promulgation and issuance of any such changes**. (AR at 891)(emphasis added).

Despite its efforts, HUD cannot ignore the plain language of this document.  While the settlement may explain Nehemiah's effective date, it does not explain or provide any rational basis for treating differently all other similarly-situated organizations, particularly in light of the fact that this portion of the agreement was expressly intended to extend to all similarly-situated DPA programs.  There is simply nothing "reasoned" about HUD's favoritism towards Nehemiah.

**D.    HUD Improperly Prejudiced the Outcome
        of the Rulemaking Proceeding**

A court may set aside a final regulation based on prejudgment of the outcome "when there has been a clear and convincing showing that the agency member has an unalterably closed

mind on matters critical to the disposition of the proceeding." <u>Ass'n of Nat'l Advertisers, Inc.</u>, 627 F.2d 1151, 1170 (D.C. Cir. 1979). "Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" cannot overcome the presumption that an official has to keep an open mind. <u>Hous. Study Group v. Kemp</u>, 736 F.Supp. 321 (D.D.C. 1990). In this matter, HUD Secretary Alphonso Jackson, the deciding official, did not merely express an opinion; he committed himself to an outcome.

Indeed, statements made by HUD Secretary Alphonso Jackson, during the pendency of the challenged rulemaking, establish beyond doubt that HUD was not going to be swayed by the comment process, and would reach exactly the conclusion it did: adoption of the proposed rule. On June 5, 2007, Bloomberg News reported that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said." The Secretary stated: "I'm very much against it . . . I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments." <u>Id.</u> With respect to the then-pending rulemaking proceeding, "**Jackson said in his interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments.**" (Exhibit "C" and Roland Affidavit.)

These statements amply satisfy the "clear and convincing showing" of agency prejudgment. First, the statements not only express the Secretary's strong opposition to DPA programs, but explicitly conveys HUD's intention to approve the proposal to abolish DPA programs by year-end "even if the agency receives critical comments." Second, the Secretary's comments were made during the very period HUD's proposal was out for public comment and agency decision-makers were required to exercise an open mind.

Under these circumstances, HUD's Final Rule violates due process and cannot stand. See Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F.Supp.2d 1249, 1261 (D. Wyo. 2004) ("definite" statements by Assistant Secretary during the administrative process show that the National Park Service had already reached a prejudged political conclusion).

**E.    HUD Violated Its Own Policies During the Rule Making Process**

HUD violated its own policies regarding tribal consultation and considering potential impacts of HUD rules on small entities during the rule making process. Accordingly, the Final Rule should not stand.

**1.    HUD Violated its Tribal Consultation Policy**

HUD violated its tribal consultation policy. HUD's stated Tribal Government-to-Government Consultation Policy provides that:

> On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm

The policy further provides that:

> The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

HUD's "Tribal Government-to-Government Consultation Policy" continues, stating that:

> On May 14, 1998, the President issued Executive Order 13084, 'Consultation and Coordination with Indian Tribal Governments,' which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth the policy guidelines for all federal agencies to (1) establish regular

> and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.
>
> C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

Lastly, the policy states that "Consultation":

> [M]eans the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process.

PIN requested that HUD consult with PIN regarding the Final Rule which impacts the plaintiffs' ability to generate the independent revenue streams necessary to become independent of government subsidies and provide the essential government functions and social and educational programs necessary to revitalize PIN and HUD knowingly failed to consult with PIN or any other federally recognized tribal government regarding the Final Rule.  HUD's conduct violated its own polices, as well as the United States Government's fiduciary duty to federally recognized tribal governments.   Accordingly, the plaintiffs' motion for summary judgment should be granted.

### 2.    HUD Violated its Policy for Considering Potential Impacts of HUD Rules on Small Entities

HUD violated its own policies by failing to consider the impact the Final Rule will have on small entities.  HUD's "Policy for Considering Potential Impacts of HUD Rules on Small Entities" provides that:

It is HUD's policy to thoroughly review its draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as required by the Regulatory Flexibility Act. HUD's two principal methods for accomplishing these goals are through the review and analysis of all draft HUD rules by its Regulatory Flexibility Officer, and the undertaking of outreach efforts to solicit the views of small entities in the development of HUD rules.

Small entities include "small governmental jurisdictions" as defined by 601(5) of the Regulatory Flexibility Act, which provides that:

[t]he term 'small governmental jurisdiction' means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

The Final Rule directly impacts small entities, including plaintiffs. HUD has not provided a review and analysis of the Final Rule's impact on small entities. HUD has failed to engage in outreach efforts to solicit the views of small entities in the development of the Final Rule. Accordingly, the plaintiffs' motion for summary judgment should be granted.

## POINT II

## PIN WILL SUFFER IRREPARABLE
## HARM ABSENT INJUNCTIVE RELIEF

The elimination of GAP will have a serious detrimental effect on PIN.  PIN is an economically depressed area in need of revitalization.  In keeping with the Indian Regulatory Reform and Business Development Act of 2000, PIN, through GAP, is attempting to engage in economic ventures without outside non-tribal entities, provide services outside the reservation and develop independent revenue streams.

PIN is responsible for providing all of its essential government functions, including its fire and police departments, street lights, road maintenance and plowing and health care. Currently, PIN's governmental operations are in the negative and PIN's only independent revenue sources are stumpage (tree cutting) and GAP.  PIN also operates a bingo game; however, that is no longer a profitable venture.  PIN is relying on profits from GAP to provide essential government functions.  Additionally, PIN would like to use profits from GAP to implement the educational and social programs necessary to revitalize PIN.

PIN has contributed substantial resources developing, implementing and marketing GAP which will be lost by the enforcement of the Final Rule.  The enforcement of the Final Rule will eliminate GAP as an independent revenue stream, forcing PIN to remain dependant on Government subsidies and frustrate the very purpose of the Indian Regulatory Reform and Business Development Act of 2000.

The Final Rule will cut off the great majority of GAP's funding.  This fact alone constitutes grounds for injunctive relief.  In Planned Parenthood of Metropolitan Washington, D.C., Inc. v. Horner, 691 F.Supp 449, 457 (D.D.C. 1988), this Court granted an injunction, ruling that Planned Parenthood would suffer irreparable injury because the sources of donations from

which the charity would be cut off by the rule would be "irreplaceable," even thought those donations constituted a small portion of the organization's revenues.  Because the Final Rule would eliminate most of GAP's funding, the direct financial harm is much greater than that found sufficient in Planned Parenthood.

## POINT III

### ISSUANCE OF AN INJUNCTION WILL NOT
### CAUSE SUBSTANTIAL HARM TO HUD

HUD adopted this Regulation after ten years of actively approving and facilitating seller-funded DPA programs.  In fact, HUD has utilized seller-funded DPA to sell its own government owned properties.  Further, HUD has presented no meaningful evidence that it will incur any substantial harm if injunction relief against implementation of the Final Rule is issued.

## POINT IV

### GRANTING INJUNCTIVE RELIEF TO PLAINTIFFS
### WILL FURTHER THE PUBLIC INTEREST

Granting injunctive relief will further the public interest.  If the Final Rule is implemented, the plaintiffs and other similar programs, which fund virtually all DPA programs, will cease operations.

The resulting harm to the public will be immediate and severe.  A range of statistics quantify the devastating impact of this result, particularly to the low- and moderate-income families that the FHA historically has had difficulty reaching:  most notably, over the past decade, seller-funded DPA programs have helped over one million of those individuals and families to buy their own homes.  However, HUD itself presents the most compelling accounts of the devastating impact of curtailing DPA.

HUD expressly recognized as much in its 2005 HUD Letter to GAO.  More recently, HUD addressed the problems presented by FHA's downpayment requirement and the need to help aspiring homeowners who "find it difficult to save for a downpayment, but have adequate incomes to make monthly mortgage payments and do not pose a significant credit risk." Assistant Secretary Montgomery noted that those families "[w]ithout a viable FHA alternative" would be left vulnerable to predatory lenders, which in turn presented greater foreclosure risks. He added, "I think we can all agree that foreclosures are bad for families, bad for neighborhoods, and bad for the economy as a whole."

Assistant Secretary Montgomery further acknowledged that "[t]he downpayment is the biggest barrier to homeownership in this country," and a major impediment to borrowers seeking access to FHA-insured loans.  Although his testimony advocated overcoming that impediment by changing FHA's authorizing statute to permit it to insure zero downpayment loans, the fact remains that FHA cannot insure such loans under current law.  Thus, homebuyers deprived of seller-funded DPA will likely be unable to purchase a home at all or forced to take out predatory loans.

## POINT V

### THE ADMINISTRATIVE RECORD SHOULD BE SUPPLEMENTED TO PRESERVE MEANINGFUL JUDICIAL REVIEW

The administrative record does not contain materials, such as the congressional hearing transcript regarding the Final Rule, news stories regarding statements made by HUD Secretary Alphonso Jackson and HUD mortgagee letters, which are appropriate to preserve meaningful judicial review.  Accordingly, the administrative record should be supplemented.

Supplementation of the administrative record is appropriate when materials outside the record are necessary to "preserve a meaningful judicial review." Cubic Applications, Inc. v. United States, 37 Fed.Cl. 345, 350 (1997)

> 'Even in APA record review cases, circumstances may justify expanding the record or permitting discovery,' including 'such a failure in the record to explain administrative action as to frustrate judicial review, the agency's reliance on materials or documents not included in the administrative record, or the need to supplement the record to explain or clarify technical terms or other difficult subject matter included in the record.'

Tafas v. Dudas, 2007 WL 3196683, *7 (E.D.Va. 2007)(internal citations omitted).

Accordingly, the administrative record should be supplemented to include the congressional hearing transcript regarding the Final Rule, news stories regarding statements made by HUD Secretary Alphonso Jackson and HUD mortgagee letters regarding DPA.

## POINT VI

## SUMMARY JUDGMENT STANDARD

Pursuant to the standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706, a Secretary's decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] unsupported by substantial evidence" will be overturned. 5 U.S.C. § 706(2)(A)(E); Robert Wood Johnson Hosp. v. Thompson, 297 F.3d 273, 280 (3rd Cir. 2002). A reviewing court may not merely rubber-stamp the Secretary's actions, but must ensure that the agency's ruling is neither clearly erroneous nor inconsistent with applicable regulations. Thomas Jefferson Univ. Hosp. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Further, an agency's decision may only be affirmed on grounds which the agency actually relied, and not on the basis of alternative rationales or justifications put forward after the fact. SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed 626 (1943).

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that this Court grant plaintiffs'

motion in its entirety.

Dated:  November 16, 2007            **THE MASON LAW FIRM, LLP**

                                          /s/ Gary E. Mason_____
                                          Gary E. Mason
                                          DC Bar # 418073
                                          Nicholas A. Migliaccio
                                          DC Bar # 484366
                                          Attorneys for Plaintiffs
                                          1225 19th Street Northwest
                                          Washington, D.C.  20036
                                          (202) 429-2290

                                       **KANTROWITZ, GOLDHAMER**
                                        **& GRAIFMAN, P.C.**
                                          Michael Braustein
                                          747 Chestnut Ridge Road
                                          Chestnut Ridge, N.Y. 10977
                                          (845) 356-2570

                                          Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN NATION, PENOBSCOT ) INDIAN NATION ENTERPRISES and ) GLOBAL DIRECT SALES, LLC, ) ) Plaintiffs, ) ) -v- ) ) UNITED STATES DEPARTMENT OF HOUSING ) AND URBAN DEVELOPMENT, ALPHONSO ) JACKSON IN HIS CAPACITY AS SECRETARY ) OF HOUSING AND URBANDEVELOPMENT, ) ROY A. BERNARDI, IN HIS CAPACITY AS ) DEPUTY SECRETARY OF HOUSING AND ) URBAN DEVELOPMENT AND BRIAN ) MONTGOMERY, IN HIS CAPACITY AS ) ASSISTANT SECRETARY OF HOUSING AND ) URBAN DEVELOPMENT AND ) COMMISSIONER OF THE FEDERAL HOUSING ) ADMINISTRATION, ) ) Defendants. ) ) | Case No.: 1:07-cv-01282 |

### DECLARATION IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

I, **KIRK FRANCIS**, declare, under the penalty of perjury, as follows:

1. I am the Tribal Chief of the Penobscot Indian Nation ("PIN"). PIN is a federally recognized Native American Government located on the Penobscot River in the State of Maine.

2. I submit this declaration in support of plaintiffs' motion for summary judgment.

3. PIN is a federally recognized Native American Government located on the Penobscot River in the State of Maine.

4.      Plaintiff Penobscot Indian Nation Enterprises ("PINE") is a "Section 17" federally chartered Native American Corporation of PIN as authorized under the Indian Reorganization Act of 1934.

5.      On January 24, 2007, the PIN Tribal Council, passed Resolution 01-24-07-01 creating the PIN Fair Housing Administration and enabling the creation of a national down payment assistance program.

6.      PIN, PINE and Global Direct Sales, LLC ("GDS") entered into an Agreement to develop, organize and operate a DPA program wholly owned by PIN.

7.      The DPA program, entitled Grant America Program™ ("GAP"), is a program that provides gift funds to low-to-moderate-income families purchasing a home or first-time homebuyers across America.

8.      GAP was established to help low to moderate income homebuyers realize the dream of home ownership by providing down payment assistance grants.

9.      PINE is responsible for hiring and overseeing contractors that process and market GAP for PIN.

10.     GDS provides marketing and processing services and software and database management for administering GAP.

11.     PIN wholly owns GAP, all gift funds are provided by PIN and PIN receives the enrollment fees from the sellers.

12.     PIN provides a pre-existing pool of funds to be used as grants towards homebuyer's down payments.

13.     Prior to closing, the homebuyer's grant is wired to the settlement agent from a PIN bank account using funds solely owned by PIN.

2

14.    At closing, home sellers are charged an enrollment fee for enrolling their homes in the program.

15.    The funds generated from that fee go to replenish the grant fund pool and any excess is the property of PIN.

16.    GAP requires that the seller certify that the sale price has not been increased to account for the seller's contribution to GAP.

17.    Further, all transactions are accompanied by a real estate appraisal by a licensed appraiser.

18.    In May 2007, HUD, contrary to its longstanding prior position, proposed the Final Rule publishing "Standards for Mortgagor's Investment in Mortgaged Property", 72 Fed. Reg. 27,048-51 (proposed May 11, 2007)(to be codified at 24 C.F.R. pt. 203, which sought to completely to prohibit DPA in the form of gifts from programs supported in part by contributions from sellers or others that financially benefit from the transaction.

19.    The public comment period for the Proposed Final Rule was extended from July 10, 2007 until August 10, 2007, during which time HUD received approximately 15,000 comments.  Regulation, 72 Fed. Reg. at 56,003.  Over 14,000 comments opposed the Final Rule and requested that it be withdrawn, while fewer than 30 comments supported the Final Rule. Notwithstanding this strong opposition, HUD published the Final Rule adopting this change on October 1, 2007.

20.    PIN submitted substantive comments during the comments period.  Additional substantive comments were submitted by Christopher Russell, a principal of GDS and by others on PIN's behalf.

21.    The Final Rule relies upon material, the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, that provide no support for the rule and upon available critical data what was not made available during the comment period.

22.    HUD's identified data deals exclusively with charitable DPA programs, which has no bearing on governmental agency, public entity or tribal government DPA programs. This is particularly important because the November GAO Report acknowledges that "[l]oans with assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources."

23.    Additionally, HUD simply ignored its obligation to consider less-restrictive alternatives and did not adequately address alternatives proposed during the comment period. In fact, HUD even ignored a less restrictive alternative it proposed in its response to the November 2005 GAO Report.

24.    The Final Rule provides that it will take effect thirty (30) days after publication for all DPA providers except for Nehemiah, which is not subject to the Regulation until six months after publication and HUD failed to provide a rational basis for treating similar entities differently.

25.    Further, HUD Secretary Alphonso Jackson statements, made while HUD's proposal was out for public comment and agency decision-makers were required to exercise an open mind, show that HUD had already reached a prejudged political conclusion. Under these circumstances, HUD's Final Rule violates due process and cannot stand.

26.    Further, HUD violated its tribal consultation policy. HUD's stated Tribal Government-to-Government Consultation Policy provides that:

> On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within

a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm

27.    HUD's stated "Tribal Government-to-Government Consultation Policy" further provides that:

> The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

28.    HUD's "Tribal Government-to-Government Consultation Policy" further provides that:

> On May 14, 1998, the President issued Executive Order 13084, 'Consultation and Coordination with Indian Tribal Governments,' which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth guidelines for all federal agencies to (1) establish regular and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.
>
> C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

29.    Lastly, HUD's Tribal Government-to-Government Consultation Policy provides that "Consultation":

> means the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and

individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process.

30.    PIN requested that HUD consult with PIN regarding the Final Rule.

31.    HUD knowingly failed to consult with PIN or any other federally recognized tribal government regarding the Final Rule.

32.    HUD's conduct violated its own polices, as well as the United States Government's fiduciary duty to federally recognized tribal governments.

33.    HUD violated its own policies by failing to consider the impact the Final Rule will have on small entities. HUD's "Policy for Considering Potential Impacts of HUD Rules on Small Entities" provides that:

> It is HUD's policy to thoroughly review its draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as required by the Regulatory Flexibility Act. HUD's two principal methods for accomplishing these goals are through the review and analysis of all draft HUD rules by its Regulatory Flexibility Officer, and the undertaking of outreach efforts to solicit the views of small entities in the development of HUD rules.

34.    Small entities include "small governmental jurisdictions" as defined by 601(5) of the Regulatory Flexibility Act, which provides that:

> the term 'small governmental jurisdiction' means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

35.    The Final Rule directly impacts small entities, including plaintiffs.

36.    HUD has not provided a review and analysis of the Final Rule's impact on small entities.

37.    HUD has failed to engage in outreach efforts to solicit the views of small entities in the development of the Final Rule.

38.    The elimination of GAP will have a serious detrimental effect on PIN.

39.    PIN is an economically depressed area in need of revitalization.  In keeping with the Indian Regulatory Reform and Business Development Act of 2000, PIN, through GAP, is attempting to engage in economic ventures without outside non-tribal entities, provide services outside the reservation and develop independent revenue streams.

40.    PIN is responsible for providing all of its essential government functions, including its fire and police departments, street lights, road maintenance and plowing and health care.

41.    Currently, PIN's governmental operations are in the negative and PIN's only independent revenue sources are stumpage (tree cutting) and GAP.  PIN also operates a bingo game, however, that is no longer a profitable venture.

42.    PIN is relying on profits from GAP to provide essential government functions. Additionally, PIN would like to use profits from GAP to implement the educational and social programs necessary to revitalize PIN.

43.    The enforcement of the Final Rule will eliminate GAP as an independent revenue stream forcing PIN to remain dependant on Government subsidies and frustrate the very purpose of the Indian Regulatory Reform and Business Development Act of 2000.

44.    PIN has contributed substantial resources developing, implementing and marketing GAP which will be lost by the enforcement of the Final Rule.

45.    There has been no prior application for the relief sought herein.

WHEREFORE, based on the foregoing, it is respectfully requested that the instant application be granted in its entirety.

**Kirk Francis, Tribal Chief**
**Penobscot Indian Nation**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION *et al.*, | ) | |
| | ) | Case No.: 07-1282 (PLF) |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOUSING | ) | |
| AND URBAN DEVELOPMENT *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>AFFIDAVIT</u>**

I, **Michael L. Braunstein, Esq.,** declare, under the penalty of perjury, as follows:

1.      I am an attorney with Kantrowitz, Goldhamer & Graifman, P.C., attorneys for the plaintiffs' in the instant action.  I submit this affidavit in support of the plaintiffs' motion for summary judgment and to supplement the administrative record.

2.      Copies of relevant portions of the Congressional Hearing entitled "Homeowner Downpayment Assistance Programs and Related Issues", held on June 22, 2007 are attached as Exhibit "A".

3.      A copy HUD's Mortgagee Letter 2002-22 is attached as Exhibit "B".

4.      A copy of Bloomberg and other news stories regarding HUD Secretary Alphonso Jackson statements are attached collectively as Exhibit "C".

5.      A copy of HUD's Tribal Government-to-Government Consultation Policy is attached as Exhibit "D".

6.      A copy of HUD's "Policy for Considering Potential Impacts of HUD Rules on Small Entities" is attached as Exhibit "E".

WHEREFORE, based on the foregoing, it is respectfully requested that the instant application be granted in its entirety.

**Michael L. Braunstein, Esq.**

STATE OF NEW YORK )
)
COUNTY OF ROCKLAND )

Subscribed and sworn to (or affirmed) before me on this 16th day of November, 2007.

_____
        Notary Public

# EXHIBIT A

# HOMEOWNER DOWNPAYMENT ASSISTANCE PROGRAMS AND RELATED ISSUES

## HEARING

BEFORE THE

SUBCOMMITTEE ON
HOUSING AND COMMUNITY OPPORTUNITY

OF THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

JUNE 22, 2007

Printed for the use of the Committee on Financial Services

### Serial No. 110–45



U.S. GOVERNMENT PRINTING OFFICE

37–562 PDF          WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## HOUSE COMMITTEE ON FINANCIAL SERVICES

BARNEY FRANK, Massachusetts, *Chairman*

PAUL E. KANJORSKI, Pennsylvania
MAXINE WATERS, California
CAROLYN B. MALONEY, New York
LUIS V. GUTIERREZ, Illinois
NYDIA M. VELAZQUEZ, New York
MELVIN L. WATT, North Carolina
GARY L. ACKERMAN, New York
JULIA CARSON, Indiana
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
DENNIS MOORE, Kansas
MICHAEL E. CAPUANO, Massachusetts
RUBEN HINOJOSA, Texas
WM. LACY CLAY, Missouri
CAROLYN McCARTHY, New York
JOE BACA, California
STEPHEN F. LYNCH, Massachusetts
BRAD MILLER, North Carolina
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
MELISSA L. BEAN, Illinois
GWEN MOORE, Wisconsin,
LINCOLN DAVIS, Tennessee
ALBIO SIRES, New Jersey
PAUL W. HODES, New Hampshire
KEITH ELLISON, Minnesota
RON KLEIN, Florida
TIM MAHONEY, Florida
CHARLES A. WILSON, Ohio
ED PERLMUTTER, Colorado
CHRISTOPHER S. MURPHY, Connecticut
JOE DONNELLY, Indiana
ROBERT WEXLER, Florida
JIM MARSHALL, Georgia
DAN BOREN, Oklahoma

SPENCER BACHUS, Alabama
RICHARD H. BAKER, Louisiana
DEBORAH PRYCE, Ohio
MICHAEL N. CASTLE, Delaware
PETER T. KING, New York
EDWARD R. ROYCE, California
FRANK D. LUCAS, Oklahoma
RON PAUL, Texas
PAUL E. GILLMOR, Ohio
STEVEN C. LATOURETTE, Ohio
DONALD A. MANZULLO, Illinois
WALTER B. JONES, JR., North Carolina
JUDY BIGGERT, Illinois
CHRISTOPHER SHAYS, Connecticut
GARY G. MILLER, California
SHELLEY MOORE CAPITO, West Virginia
TOM FEENEY, Florida
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
GINNY BROWN-WAITE, Florida
J. GRESHAM BARRETT, South Carolina
JIM GERLACH, Pennsylvania
STEVAN PEARCE, New Mexico
RANDY NEUGEBAUER, Texas
TOM PRICE, Georgia
GEOFF DAVIS, Kentucky
PATRICK T. McHENRY, North Carolina
JOHN CAMPBELL, California
ADAM PUTNAM, Florida
MICHELE BACHMANN, Minnesota
PETER J. ROSKAM, Illinois
THADDEUS G. McCOTTER, Michigan

JEANNE M. ROSLANOWICK, *Staff Director and Chief Counsel*

SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY

MAXINE WATERS, California, *Chairwoman*

NYDIA M. VELÁZQUEZ, New York
JULIA CARSON, Indiana
STEPHEN F LYNCH, Massachusetts
EMANUEL CLEAVER, Missouri
AL GREEN, Texas
WM. LACY CLAY, Missouri
CAROLYN B. MALONEY, New York
GWEN MOORE, Wisconsin,
ALBIO SIRES, New Jersey
KEITH ELLISON, Minnesota
CHARLES A. WILSON, Ohio
CHRISTOPHER S. MURPHY, Connecticut
JOE DONNELLY, Indiana
BARNEY FRANK, Massachusetts

JUDY BIGGERT, Illinois
STEVAN PEARCE, New Mexico
PETER T. KING, New York
PAUL E. GILLMOR, Ohio
CHRISTOPHER SHAYS, Connecticut
GARY G. MILLER, California
SHELLEY MOORE CAPITO, West Virginia
SCOTT GARRETT, New Jersey
RANDY NEUGEBAUER, Texas
GEOFF DAVIS, Kentucky
JOHN CAMPBELL, California
THADDEUS G. McCOTTER, Michigan

# CONTENTS

| | Page |
|---|---|
| Hearing held on: | |
| June 22, 2007 | 1 |
| Appendix: | |
| June 22, 2007 | 39 |

## WITNESSES

### FRIDAY, JUNE 22, 2007

| | Page |
|---|---|
| Ashburn, Ann, President and CEO, Ameridream, Inc. | 28 |
| Burns, Margaret, Director, Office of Single Family Housing Program Development, Federal Housing Administration | 8 |
| Fuller, Dr. Steven S., Center for Regional Analysis, George Mason University School of Public Policy | 33 |
| Heist, James A., Assistant Inspector General for Audits, Office of the Inspector General, U.S. Department of Housing and Urban Development | 9 |
| Osta, John F., Vice President, Gallinger Realty USA | 32 |
| Queen, Beverly, Homeowner | 34 |
| Richardson, Todd, Vice President of Legal Affairs, C.P. Morgan | 32 |
| Shear, William B., Director, Financial Markets and Community Investment, U.S. Government Accountability Office | 11 |
| Syphax, Scott C., President and CEO, Nehemiah Corporation of America | 30 |

## APPENDIX

| | Page |
|---|---|
| Prepared statements: | |
| Carson, Hon. Julia | 40 |
| Maloney, Hon. Carolyn B. | 41 |
| Ashburn, Ann | 43 |
| Burns, Margaret | 54 |
| Fuller, Dr. Steven S. | 57 |
| Heist, James A. | 62 |
| Osta, John F. | 70 |
| Queen, Beverly | 73 |
| Richardson, Todd | 76 |
| Shear, William B. | 82 |
| Syphax, Scott C. | 100 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | Page |
|---|---|
| Waters, Hon. Maxine: | |
| Statement of the American Enterprise Institute | 114 |
| Statement of the National Association of Realtors | 120 |
| Miller, Hon. Gary: | |
| Bloomberg News article dated June 5, 2007 | 124 |

13

Chairwoman WATERS. I want you to tell me—

Ms. BURNS. Yes.

Chairwoman WATERS. —how the FHA is going to have a program with no downpayments and not have the foreclosure exposure that you have described here in some detail.

Ms. BURNS. That is right.

The reason that these particular borrowers get into trouble is because these programs only work in weak markets. Sellers do not want to participate in this kind of a program in a market where they can get the full asking prices for their homes. What that means is, when borrowers receive one of these gifts and pay a higher sales price as a result and essentially finance their own gifts and get an inflated mortgage amount, they are already upside down. They do not have instant equity. They have no equity.

Chairwoman WATERS. In essence, what you are telling me is, with the FHA program, there is going to be some assurance that they are going to know that the selling price of the home that is being purchased is of fair market value, that it is not going to be inflated, that it is going to be a price where, if the same person were to get a downpayment from these programs, he would be able to perform better with the FHA? Is that what you are telling me?

Ms. BURNS. Yes. Absolutely.

Chairwoman WATERS. How will they guarantee a fair market price on the purchase or on the sale of homes?

Ms. BURNS. For every financing transaction, there is an appraisal performed, and the appraisal determines the appropriate value of the home, and that is exactly what would happen.

Chairwoman WATERS. So am I to understand that they do not have appraisals in Nehemiah and in the other programs?

Ms. BURNS. There are appraisals that are performed today.

Chairwoman WATERS. Is something wrong with those appraisals?

Ms. BURNS. I think we all—

Chairwoman WATERS. Are they illegal?

Ms. BURNS. No, absolutely not. They are not illegal. The appraisers are doing the best that they can.

Chairwoman WATERS. What is going to be the difference between the appraisals that the FHA will have and the appraisals that are now working with these programs? How do you know that the price of the house will not be inflated?

Ms. BURNS. There will not be any reason for price inflation. There will not be a nonprofit involved in the middle of the transaction providing the seller—

Chairwoman WATERS. So the only time that you have inflated prices in the market is when you have a program like this, but they are probably never inflated? When you are dealing with the market and with the FHA or with other financial institutions, you never have inflated home prices?

Ms. BURNS. I cannot speak to other types of transactions, but I can speak to this particular type of transaction.

Chairwoman WATERS. So you cannot guarantee me that FHA contracts will not have inflated prices?

Ms. BURNS. Yes, there will be no reason for an inflated sales price. That is correct.

14

Chairwoman WATERS. But you do not know that there will not be. I am just trying to understand.

Ms. BURNS. Right. I mean, we do not know that there will not be, no, but we know that there will not be a reason for it. We will be eliminating the cause that exists today.

Chairwoman WATERS. So the reason for inflated prices, wherever it occurs, is that people want to make more money.

Ms. BURNS. Oh, absolutely.

Chairwoman WATERS. Wherever it occurs, that is the reason for inflated prices. You simply cannot tell us that the only place for inflated prices is in a program like this where you have the nonprofit who is, in some way, inflating the price of the sale of the house just to make the downpayment. I suspect that may be true, and I am not arguing that point.

The point that I am arguing is that the prices of homes do get inflated. The appraisals, we hope, would always be good appraisals, but they are not. Those of us who are real estate people here on the panel know something about that.

Okay. Do you have anything you would like to say about this, Mr. Heist?

Mr. HEIST. Only that in conjunction with some of our audit work, we have seen examples of where there is pressure put on the home seller to raise the price of the property to cover the downpayment gift that the seller has to provide to the nonprofit. In fact, we have seen examples of where there is a list price put out by the builder of the home, and actually, the borrower is going into the closing, expecting that is going to be the price of the property, and yet, when they come to the closing, they find that the price of the home has increased to cover the cost of the downpayment gift that they are expected to provide to the nonprofits.

So that is—

Chairwoman WATERS. So what you are basically describing to me—as for the appraisers, as I understand it, when they go into an area, they get comparables, and what you are saying is, if Nehemiah or if one of these programs is involved with the sale of a property, that they may increase it beyond the comparable value of the other houses in the community; and the person who is selling does not know, and the buyer does not know, that they are all being duped.

Mr. HEIST. I am only saying that the buyer may not be aware of the increase in the sales price. Oftentimes, these are first-time home buyers who have not gone through the transaction they are confronted with.

Chairwoman WATERS. I see. All right. Thank you very much. I will recognize our ranking member, Mrs. Biggert.

Mrs. BIGGERT. Thank you, Chairwoman Waters.

Mr. Heist, on pages 7 and 8 of your testimony, you present two cases there which, I think, are similar to what you were referring to with Ms. Waters where there has been the gift. But after you have gone through these two cases, you say that neither borrower was able to keep current on their inflated mortgage loans, and they eventually lost their homes to foreclosure.

In the FHA modernization bills we have put in, as for the zero downpayment, there was one where, if you have the zero downpay-

15

ment, then you have to pay more annually; at least in the bill that I have, we raised the premium without the downpayment.

Would that same thing occur if the annual premium were raised by FHA? I mean, the property value in that case would not be inflated, would it?

Mr. HEIST. I do not know if that would have an effect on the price, but it would certainly affect the amount that would be financed under the mortgage because you have additional mortgage insurance premiums which may or may not be financed as part of the mortgage, so it may not affect the price, but it could affect the amount of the mortgage, certainly.

Mrs. BIGGERT. Well, there seem to be people who do not have the money for the downpayment, but—they have the money to meet the monthly payments just based on salary, but they do not have a savings to make the downpayment. I am trying to distinguish what the difference is between that and having somebody give a gift of the downpayment.

Mr. HEIST. Well, one thing that would not be present would be the processing fee that the nonprofit charges to make the transaction.

Mrs. BIGGERT. Okay. Can you give us an idea of what those charges are?

Mr. HEIST. I believe they run around 1 percent, but I am not certain.

Mrs. BIGGERT. Okay. Ms. Burns, do you know, or Mr. Shear?

Ms. BURNS. The most recent figure I had heard was that the average is $500.

Mrs. BIGGERT. So it is like another closing cost. Okay.

Then, Ms. Burns, I understand that FHA data indicates that over one-third of homeowners receiving downpayment assistance have low FICO scores and high delinquency rates; is that true?

Ms. BURNS. I am not familiar with those statistics. Sorry.

Mrs. BIGGERT. Okay. Well then, you would not know, on the flip side, if two-thirds of homeowners receiving downpayment assistance have average or above average FICO scores and lower delinquency rates?

Ms. BURNS. No. I am not familiar with those figures.

Mrs. BIGGERT. Okay. Thanks.

I yield back.

Chairwoman WATERS. Thank you very much.

Let us just go right down and start with Ms. Velazquez.

Ms. Velazquez, do you have questions?

Ms. VELAZQUEZ. Ms. Burns, either you or Mr. Heist, can you tell me, in terms of the audit that found that 19.39 percent of the loans were in default for at least 90 days, how many of those at the end became foreclosed?

Mr. HEIST. I believe, overall, there are statistics that suggest that roughly a third of 90-day defaults end up in foreclosure. One has to wait for a particular year's portfolio to mature before you realize what the exact percentage is.

Ms. VELAZQUEZ. How does that compare with a subprime foreclosure?

Mr. HEIST. I do not have that information.

Ms. VELAZQUEZ. Do you?

16

Ms. BURNS. No, I do not know the subprime foreclosure rate. However, the average foreclosure rate for these particular loans is approximately 16 percent.

Ms. VELAZQUEZ. Ms. Burns, what is your response to those supporters of downpayment programs such as Nehemiah who argue that even if HUD's audit conclusion is correct, this Downpayment Assistance Program serves low-income home buyers better than subprime mortgages, which have even higher default rates?

Ms. BURNS. I would say that the FHA could serve them even better, which is why we would hope to have 100 financing—

Ms. VELAZQUEZ. Traditionally, you have not.

Ms. BURNS. Traditionally, the FHA, previous to the last 5 years, did serve low- and moderate-income families. It is true that over the last 5 years the trend has gone to subprime loans. That is very true, and that is of great concern to us.

Ms. VELAZQUEZ. Well, let me just say this. I will recommend very strongly to both the chairwoman and to the ranking member that we study this further. The fact of the matter is that transformation and renaissance have been taking place in neglected areas like in New York. In New York, there were areas that were low-income communities, totally neglected. The Federal Government never really put any type of program to assist low-income earners to become homeowners.

Today, there is a renaissance happening in those places, and it is because of Nehemiah's presence in that community. So we need to study this further. I am not convinced, and I will strongly advocate to oppose this regulation.

Thank you, Madam Chairwoman.

Chairwoman WATERS. Thank you very much.

Mr. Miller.

Mr. MILLER. Thank you.

I am usually the guy on HUD's side, and I am really confused. I mean, I have been going through this paperwork for weeks.

Mr. Heist, do you know who the bad guys are? You said you reviewed paperwork, and there were letters saying that the prices were inflated.

Who is doing this? Do you know?

Mr. HEIST. Only to the extent that we—

Mr. MILLER. Well, no. If you read the stuff, then you know who the bad guys are; is that not fair?

Mr. HEIST. Well, the focus of our lender audits is on the origination of the—

Mr. MILLER. No. I only have 5 minutes.

You told me in testimony that you read letters saying they inflated the appraisals, and they did this and that. So you have to know who they ware. What did you do—

Mr. HEIST. Our focus was on the—

Mr. MILLER. No. What did you do? I do not have time. Did you do anything, "yes" or "no?"

Mr. HEIST. To look at the—

Mr. MILLER. Did you do anything to correct the problem, "yes" or "no?"

Mr. HEIST. Not to—

Mr. MILLER. Okay. Thank you.

17

GAO, you came out with a study in 2005, and you made some legitimate—I am on your side. I am not chewing you out. You made some good recommendations.

Did you guys do anything, "yes" or "no?"

Ms. BURNS. No.

Mr. MILLER. No, you did not do anything?

I read a letter from Nehemiah back in 1999 to HUD, and it says, "You need to regulate our industry. You need to do these things." HUD's response was, "At the very least, we believe that several of your proposals may require the rather protracted and rigorous process of rulemaking rather than the simple issue of a mortgage letter, as you suggested. In any event, we will keep your letter and accompanying brochures as reference material should we elect to seek changes in the future."

So you have probably the largest downpayment assistance program saying, "Please regulate our industry so we do not have bad guys," and under Cuomo's charge—and Carter wrote this letter— he said, "No, we do not want to do anything."

Now, the problem I am having is, you have guys trying to put them out of business—and I love you guys, we are buddies. So you are trying to put them out of business. The IRS is trying to tax them to death when they did not make any money. I have a real problem with this.

Ms. Burns, you said it is better with the zero downpayment. You set standards, and you guys require certain underwriting standards from an FHA loan, do you not, "yes" or "no?"

Ms. BURNS. Yes.

Mr. MILLER. You do. Good. Okay.

Now, if you require standards for underwriting and standards for appraisal, you are telling me that they are better off with a zero downpayment on a $200,000 home than they are getting $6,000 from a nonprofit as a downpayment, only owing $194,000 rather than $200,000. That does not make sense to me.

I was a developer for over 35 years. Sorry, it does not make sense. I know nonprofits who require the seller to certify in writing under penalty of perjury that they are not inflating this price at all, that this is the normal market price, so some of them are trying to do it. If some are not, let us fix them.

You said this only works in a downward market; is that correct?

Ms. BURNS. Yes.

Mr. MILLER. What happened between 1998 and 2005? Were there any downpayment assistance programs processed through you, "yes" or "no?"

Ms. BURNS. FHA—

Mr. MILLER. Yes, there were.

What was happening during 1998 to 2005? Was it a bad estate market or was it probably the best real estate market we have ever seen in history? Was it better or worse?

Ms. BURNS. The real estate market—

Mr. MILLER. The real estate market was the healthiest market we have ever experienced in my lifetime. I am 58 years old; that is not young. So, if they are making all of these downpayment assistance programs in a marketplace where buyers are standing in

20

Ms. BURNS. I don't know.

Mr. CLEAVER. Would you say negligible?

Ms. BURNS. No. I would say from an FHA perspective that the concern is with the budget, and that if we continue to permit these kinds of programs, we would grow positive next year; we would need appropriations to operate next year.

Mr. CLEAVER. But we don't know how much they are losing. We just know that they need to go next year with appropriations, but—

Ms. BURNS. I am sure someone in FHA's budget office could provide you with those figures if you would like us to provide that after the hearing.

Mr. CLEAVER. I would. It would seem to me that a major issue here is, I was expecting someone to say that we are losing $25 billion a year.

Thank you, Madam Chairwoman.

Chairwoman WATERS. Thank you very much.

Mr. Neugebauer.

Mr. NEUGEBAUER. Well, thank you, Madam Chairwoman. I have been in a markup. I understand that my good friend from California, Mr. Miller, had some interesting dialogue going on prior to my getting here, and so I will yield him my time to let him have some follow-up time.

Chairwoman WATERS. Very good.

Mr. MILLER. Thank you very much. Oh, welcome back.

How do you propose preventing risk in the future associated with the new zero downpayment program?

Ms. BURNS. There are several measures we will take. One is clearly on the underwriting side; with underwriting the core components that you look at are the credit history of the borrower—

Mr. MILLER. Standards, that is good. And what else?

Ms. BURNS. It would be primarily on the underwriting standards. That is really where we will—

Mr. MILLER. Could you not apply this same standard to downpayment assistance?

Ms. BURNS. Yes.

Mr. MILLER. Could you enforce that standard?

Ms. BURNS. Absolutely.

Mr. MILLER. So you are telling me that it is possible to be certain on appraisals, it is possible to be certain on underwriting standards where the program would be safe and sound. That is possible? Because I am very concerned about whether we are making loans that put the program at risk. I don't want do that.

Based on your testimony, it is possible to do that?

Ms. BURNS. It is possible to put—

Mr. MILLER. Then why don't we?

Ms. BURNS. —more stringent underwriting standards.

Mr. MILLER. Why don't we?

Ms. BURNS. Well, we are in the middle of a rulemaking process.

Mr. MILLER. No, we are in the middle of saying, we don't want these babies thrown out—

Ms. BURNS. That is an indication of FHA's position but—

Mr. MILLER. I would like to propose that you listen to your testimony, and if it is possible—I think we should do it. So I am just

21

adding to the debate at this point in time; you haven't released the rule.

I am strongly suggesting, and I think many will echo this, that maybe that is the approach we should take, because that is not the approach I am reading of this coming down.

Ms. BURNS. Right. And just so you know, we certainly hear you and that is what the rulemaking process is all about.

Mr. MILLER. I love you, and I am glad.

Do you know how many people in the last 8 years, who are lower creditworthy borrowers, who would not be in a home today if it weren't for downpayment assistance programs? Do you have any idea?

Ms. BURNS. I believe the figure is approximately 50,000.

Mr. MILLER. I think it would be more than that. I know they made more than a million loans.

Let's say a million people out there wouldn't be in a home today. There are 850,000 families in homes that are making the payments, they are not a risk, they would probably be renting an apartment somewhere.

Let's say some of those people could have put together the money for a downpayment, let's say—is 15 percent a fair number? Is 20 percent a fair number? Throw me a number. Give me a number. I will go with it.

Let's say 20 percent.

So let's take 180,000, out of 850,000, might have gotten into a home, and then the other 15 percent that maybe you might come back and foreclose the other 5 or 6 percent; the others might work it out somehow.

Some of the 15 percent may sell that house and even pay you off and make a profit. If they bought their home back in 2000, something happened that they can't make the payment today, the numbers are there they are probably going to be able to sell that home and make a profit. Even if that market had inflated that sales price by 6 percent or 4 percent or 3 percent to come up with the downpayment, because when I read the charts on how much housing was inflating from 2000 to 2006, it doubled in most areas.

So if they inflated to 3 percent, they will probably still make a profit. And that is where I am having problems: If it was possible to establish standards, and we didn't establish standards, and GAO said, you should have established standards in 2005. And Nehemiah said in 1998–1999, do we need some standards? In all the paperwork I have back here everybody says, "no."

Why didn't you implement some standards?

Ms. BURNS. We decided internally that a better way to deal with this was to request additional authority to offer 100 percent financing programs. We have been pursuing that.

Mr. MILLER. You have asked us to implement—I have been working for 3 years on the zero downpayment. I think it is a good idea. Because that was a concept that we couldn't guarantee would happen, we did nothing with what was assumed to be a problem.

I love Alphonso.

Shame on us. If we had known there was a problem and we do nothing about it—and the problem is not everybody, I don't believe that at all. There are some bad apples, and some doing a great job.

22

So if we did nothing about the bad apples, and now based on language I am seeing in the proposed ruling, we are going to throw them all out, maybe we need to rethink it.

Thank you. I yield back.

Chairwoman WATERS. Thank you very much.

Let me say, Mr. Miller, before I call on Mr. Green, that none of us were told that is the reason why FHA wanted zero downpayment in the bill that we had put together. I feel a little bit duped.

Mrs. Biggert was not told; I just consulted with her. You may want to look at the FHA bill and may want to save the trouble with pursuing the regs by just overlapping with legislation.

I call on Mr. Green at this point.

Mr. GREEN. Thank you, Madam Chairwoman. I want to thank Congressman Miller for showing some love this morning. You indicated that you love Secretary Jackson. I want you to know that I love you. Just to make sure that I spread the love around, I want all of the panelists to know that I love you too.

What Mr. Miller has made clear, I shall now make transparently clear. You agree—I have to say this, sometimes when people finish, I don't know whether they have said, "yes," or "no," so I am going to ask that you say, "yes," or "no," and then perhaps we will hear an explanation.

But do you agree that price inflation was one of your primary concerns in instituting this new policy? Do you agree? Do you agree that a seller can cover the cost of downpayment and you can have a legitimate transaction, one that is not invidious, that is not onerous, do you agree that that can take place, ma'am? Or are you saying that every time a seller covers a downpayment, it is inherently evil? No.

Ms. BURNS. No.

Mr. GREEN. So do you agree that you can have a legitimate transaction where the seller covers part of the downpayment, assuming that the price is right, meaning the price has not been inflated? Do you agree?

Ms. BURNS. Yes, that can happen.

Mr. GREEN. Do you agree, sir?

Mr. HEIST. I would say it is possible.

Mr. GREEN. It is possible. If the price is not inflated, and the seller wants to give his money away, the law does not prevent people from giving their money to whomever they choose.

Do you agree that a seller can give his money to whomever he chooses and pay a downpayment and that can be legitimate?

Mr. HEIST. Well, the law addresses that—

Mr. GREEN. Can you have a legitimate transaction with the seller paying a part of the downpayment?

Mr. HEIST. I think that depends on how you evaluate legitimacy.

Mr. GREEN. Assuming that the price has been properly staged, that there is no inflated price.

Now, sir, if there is no inflated price, and the seller wants to give his money to someone, do you agree that he can?

Mr. HEIST. Under current guidelines and interpretations, yes.

Mr. GREEN. Sir?

Mr. SHEAR. I would say the answer is "yes." It is a question of facts and circumstances.

23

Mr. GREEN. All the facts and circumstances are legitimate; the seller has a legitimate appraisal and the seller decides, I want to give some of my money to this buyer.

Mr. SHEAR. Yes. Then it is a gift. It is a gift and, yes, that can happen.

Mr. GREEN. That can be a legitimate transaction?

Mr. SHEAR. Yes.

Mr. GREEN. Listen, now, you have to realize people are listening to you and this makes sense to the other people here and to the people who may not be in this room who are listening. People with common sense can tell you that a seller can have an appraisal that is legitimate and give his money to whomever he chooses. That makes sense.

Now, if this is the case, if you can have these legitimate transactions, the question becomes, why would we end a process as opposed to amend the process to make the process legitimate such that we can continue the process?

Why would we want to eliminate as oppose to regulate? That is the question we are trying to get to, because truthfully, it appears to me that what you have done is overreact. It was not necessary to go to the extreme that you have gone to when you could have done some things in between and protected people who truly want to buy homes and don't have downpayments.

Now, given that we can have this legitimate transaction, the question becomes this as to your statistical information. In your statistical information, do you agree that it includes those loans where the persons were foreclosed on—the 16 percent that we are talking about, it includes those loans where you had persons who could not pay the inflated price, as well as persons who probably could not have paid a price that was not inflated?

You see, you commingled inflated, and you don't know whether the persons—let me give you an example since you are shaking your head, ma'am.

Suppose some of these persons actually went into foreclosure and they had to file for bankruptcy. It may have been totally unrelated to the home, they could have had some other circumstance in life that they had to cope with. So you have those persons who could not have paid even a lower loan included those with the inflated prices.

So you commingled them, have you not—if you do statistical analysis appropriately, you have to dissect and take out those that would have paid less and would have still lost their homes.

Madam Chairwoman, you have been very generous with the time, and I want you to know that I truly do love you; you will get Christmas cards from me. Thank you.

Chairwoman WATERS. Thank you very much.

Mr. Sires.

Mr. SIRES. There is a lot of love going on here, but I just want to thank Mr. Miller for clarifying a couple of things in your questioning that I had some doubts about.

What is the average mortgage payment for people who get down-payment assistance?

Ms. BURNS. Monthly mortgage payment?

Mr. SIRES. Yes.

27

choice on the part of the borrower to go out and seek some form of downpayment assistance.

Mr. SCOTT. So there are no requirements, no requirements that are there to make a person eligible? I am looking for reasons why this person is chosen to participate in the program.

Ms. BURNS. Right. No, no, FHA does not have criteria for eligibility.

Mr. SCOTT. What role is the downpayment program playing in the subprime market?

Ms. BURNS. I don't believe any role today. I believe on the subprime side, when people need 100 percent financing, they get a first and a second mortgage or they get a full 100 percent financing product.

Mr. SCOTT. Now, should your rule go through, how will this affect those individuals in the process now of receiving downpayment assistance?

Ms. BURNS. It would not. We would obviously recognize all borrowers who had signed a sales contract prior to an effective date for the rule to take effect so that anyone who was in the process of purchasing a home and financing that home, they would not be affected.

Mr. SCOTT. So your proposal rule changes are retroactive?

Ms. BURNS. Proactive. It would only be for those transactions that occur in the future.

Mr. SCOTT. Okay. Are there any plans in place—I know you said this will not eliminate the program, but are there any other plans in place that could very well take the place of this program?

Ms. BURNS. I don't know if you call it a "plan," but there is a hope that FHA will offer a 100 percent financing product of its own.

Mr. SCOTT. Why are my constituents calling me very concerned? Why are they saying to me that you are proposing in this rule to eliminate the program? And when I ask you the question, you say you are not eliminating the program.

Where is this misunderstanding?

Ms. BURNS. I understand that there is a campaign of some misinformation out there to try to stop FHA from moving forward with this rulemaking process. And I would also say that the rulemaking process is actually beneficial for parties who feel that the rulemaking is inappropriate.

This is an opportunity for parties to comment to FHA, to the Department of Housing and Urban Development, to make substantive constructed proposals for alternative regulatory fixes. This is an opportunity for that to take place.

The campaign of misinformation won't necessarily do that. It is really through the rulemaking process, through those protocols that a change could occur.

Chairwoman WATERS. Thank you very much.

I would like to thank the panel for your testimony here this afternoon and a question has been asked of me about the possibility of extending the rulemaking process. As I understand it, you have until July 10th to give comments; is that right?

Ms. BURNS. That is right.

# EXHIBIT B

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc] [Bottom] [Help] [Text Only]



Click Here for MS Word version of this Notice

### U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

November 14, 2002

MORTGAGEE LETTER **2002-22**

TO:   ALL GOVERNMENT AGENCIES
         ALL APPROVED MORTGAGEES
         ALL APPROVED NONPROFIT AGENCIES

SUBJECT:   Downpayment Assistance Programs Operated by
              Governmental Agencies and Nonprofits Using Subordinate Financing

Over the past few months, FHA has received several questions about downpayment assistance programs operated by governmental agencies and nonprofits.  The purpose of this Mortgagee Letter is to provide technical guidance to mortgagees about these downpayment assistance programs by summarizing existing program rules and requirements, based on Section 528 of the National Housing Act.

A.   State and Local Governments and Nonprofit Instrumentalities of Government

Section 528 of the National Housing Act requires FHA to insure first mortgages with second mortgages or loans made or held by any state or local government agency or instrumentality of government, provided all FHA requirements are met.  Mortgagee Letter 94-2 describes the conditions that a nonprofit must meet in order to be considered an instrumentality of government and, thus, eligible to provide secondary financing for as much as 100% of the borrower's required cash investment.  To obtain this status, according to Section 528 of the National Housing Act, the nonprofit must be an entity "established by a governmental body or with governmental approval or under special law to serve a particular public purpose or designated by law (statute or court opinion)."  FHA also requires that the unit of government that established the nonprofit also must either exercise organizational control, operational control, or financial control of the nonprofit in its entirety or, at minimum, the specific homebuyer assistance program that is using FHA's credit enhancement.  As described in ML 00-08 and ML 01-02, our Homeownership Centers (HOCs) may review applications from nonprofits that purport to be instrumentalities of government and make approval decisions based on information submitted by the nonprofit.

The policies discussed in ML 94-2 have enabled state and local

governments, by themselves or through nonprofit instrumentalities established by the governmental units, to operate successful downpayment assistance programs. However, mortgagees must be aware that only the actual units of government or their established nonprofit instrumentalities may provide the second lien under the 100 percent financing policies acceptable to FHA.

B.    Information Regarding the Second Lien

The second lien itself must be made or held by the eligible governmental body or instrumentality. Neither governmental units nor their established nonprofit instrumentalities may use "agents," including other nonprofits or for-profit enterprises to make the second lien regardless of the source of those funds. In other words, even if the funds used for the secondary financing were derived from an acceptable source such as HUD HOME funds or from a unit of government or the eligible nonprofit instrumentality, the subordinate lien must be in the name of the eligible entity, i.e., the state, county, city or eligible nonprofit instrumentality must be the lien holder. This authority cannot be delegated to another party that is not itself permitted to provide this level of secondary financing. These other entities, however, may be used to service the subordinate lien if regularly scheduled payments are to be made by the mortgagor.

In addition, in accordance with 24 CFR 203.41, if the subordinate lien includes any restrictions on transferability, such as occupancy requirements or resale restrictions, those must automatically and permanently terminate upon foreclosure, deed-in-lieu of foreclosure, or assignment of the insured mortgage to HUD. The relevant legal documents must have language that accomplishes this result. It is also important to note that "forgivable" second liens (e.g., no repayment if the homeowner remains in the house for five years) are not gifts and, thus, are subject to these requirements.

The FHA-insured mortgage amount is calculated by applying the maximum loan-to-value multipliers based on location of the property and value, as described in ML 98-29, to the lesser of the sales price or appraised value and making certain that there is at least a 3 percent cash investment (which may be met with proceeds from the second lien). The combined loan-to-value (CLTV) is limited to the amount to acquire the property, which may include the sales price, closing costs, prepaid expenses, and discount points, and in some cases, the costs for property rehabilitation; this may not, however, result in any cash back to the borrower. As an example, a $100,000 sales price would yield a $97,000 FHA mortgage amount. Combined with $3,500 for closing costs and prepaid expenses being paid by the nonprofit, the combined indebtedness could equal $103,500 with secondary financing equaling $6,500.

In addition, the combined indebtedness may exceed the value of the property if the governmental unit or nonprofit instrumentality of government is supporting or engaging in a neighborhood revitalization effort. In many cases, the combined indebtedness including the amount spent for rehabilitation cannot be supported by the property's value after completing the improvements; these revitalization programs are usually designed

to increase property values of in the neighborhood over an extended period of time.  Subject to approval by the HOC, the subordinate financing, when combined with the FHA-insured first mortgage, may exceed the value of the property even after rehabilitation has been completed.  Repayment of the subordinate lien is due only when the property is sold or the mortgage is paid in full.

As an example, a $100,00 sales price would yield a $97,000 FHA mortgage amount.  Combined with $3,500 for closing costs and prepaid expenses being paid by the nonprofit, along with $20,000 for rehabilitation, the combined indebtedness could equal $123,500 with secondary financing equaling $26,500.  The after-rehabilitation appraised value, however, is only $120,000. Nevertheless, provided there are assurances that the funds for rehabilitation are expended only for that purpose and not given to the homebuyer, the HOC can approve revitalization programs that result in the costs of the improvements exceeding their effect on value.

C.   Nonprofits with FHA-Approved Affordable Housing Programs

In accordance with ML 00-08 and ML 02-01, when a nonprofit that is not recognized by FHA as an instrumentality of government is providing subordinate financing and that nonprofit has obtained FHA's approval as a provider of subordinate financing, the nonprofit may provide downpayment assistance that covers the gap between the FHA first mortgage and amount to acquire the property, minus the required homebuyer's minimum cash investment requirement of three percent.

The FHA-insured mortgage amount is calculated by applying the maximum loan-to-value multipliers based on the location of the property and value, as described in Mortgagee Letter 98-29, to the lesser of the sales price or appraised value and making certain that there is a 3 percent cash investment (which may not be met with proceeds from the second lien.)  The combined loan-to-value (CLTV) is limited to the amount to acquire the property, pay closing costs, prepaid expenses, and discount points minus the statutory 3 percent investment which may come from the homebuyer's own funds or from a legitimate gift from an acceptable source.

As an example, a $100,000 sales price would yield a $97,000 FHA mortgage amount.  Combined with $3,500 for closing costs and prepaid expenses being paid by the nonprofit, the combined indebtedness could equal $100,500 with secondary financing equaling $3,500.  The 3 percent required investment may not come from any subordinate liens.

D.   Mortgage Amount Limitations When the Downpayment Assistance Provider is Also the
     Seller of Property

In accordance with Section 528 of the National Housing Act, the combined loan-to-value (CLTV) or indebtedness may be affected when the downpayment assistance provider is also the seller.  All sellers are permitted to pay the homebuyer's closing costs, prepaid expenses, and discount points up to an amount equaling six percent of the sales price; any amount above this threshold

results in a dollar-for-dollar reduction to the loan amount.
Similarly, if a governmental unit or nonprofit is providing a
gift of equity from the sale of the property, there must a
dollar-for-dollar reduction to the sales price.

E. Mortgagee Letter 2002-02

ML 2002-02 was issued on January 16, 2002 to clarify and
amplify that FHA's existing underwriting policy does not permit
gifts to borrowers from third parties when such gifts are used to
pay off or reduce their outstanding consumer debt to enable them
to qualify for FHA-insured mortgages and the third parties
receive contributions from the sellers for payment of these
debts. ML 2002-02 referred to nonprofit organizations because
our experience has indicated that such entities are the only ones
that have engaged in this practice. References in ML 2002-02 to
nonprofit organizations should be construed as references to any
third parties. For example, a gift for debt payoff assistance
from a family member is not ordinarily prohibited unless the
family member making the gift receives the funds from the seller
or any other party with an interest in the transaction.

Questions have arisen with regard to application of ML
2002-02 to gifts made for downpayment assistance in situations in
which donors receive contributions from sellers. ML 2002-02 is
limited to debt payoff assistance, not downpayment assistance.
ML 2002-02 does not apply to gifts for downpayment assistance by
nonprofit organizations or other third parties that receive
contributions from sellers or other parties with interests in the
transactions, provided that such contributions are made after
closing.

F. Mortgagee Roster Verification

Mortgagees must verify that nonprofits providing secondary
financing are approved by HUD for that activity specifically by
consulting the Nonprofit Organization Roster, a listing of
nonprofits that HUD has determined are qualified to participate
in certain specified FHA single family activities, including
providing secondary financing. HUD recently (June 6, 2002)
published final regulations governing roster placement and
removal of nonprofit entities. The rules became effective on
July 8, 2002. The Roster can be accessed on HUD's web site at
http://www.hud.gov/offices/hsg/sfh/np/np_hoc.cfm

If you have any questions regarding this Mortgagee Letter, please
contact your Homeownership Center in Atlanta (888) 696-4687;
Denver (800) 543-9378; Philadelphia (800) 440-8647, or Santa Ana
(888) 827-5605.

Sincerely,

John C. Weicher

www.hudclips.org

Assistant Secretary for Housing-
Federal Housing Commissioner

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc]
[Top] [Help]

# EXHIBIT C

# Bloomberg.com



## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*

Bloomberg Printer-Friendly Page                                             Page 2 of 2



©2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

Copyright 2006 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

June 2, 2006 Friday
Final Edition

SECTION: A Section; A01

LENGTH: 1169 words

HEADLINE: IRS Ruling Imperils 'Gift Fund' Charities For Home Buyers

BYLINE: Jacqueline L. Salmon and Kirstin Downey, Washington Post Staff Writers

BODY:

A ruling by the Internal Revenue Service threatens to extinguish a fast-growing -- but controversial -- charitable industry that has funneled hundreds of millions of dollars in cash to first-time home buyers for their down payments.

The unexpected IRS edict throws into question a practice that has helped boost national home ownership rates to a near-record 69 percent in the past six years.

Almost 200 charities, such as AmeriDream, based in Gaithersburg, and Nehemiah Corp. in California, have acted as cash conduits between home sellers and buyers.

Under the system, sellers provide cash to the charities, which then give it to home buyers for their down payments. The sellers, who pay the charities a service fee, often recoup their money by charging a higher price for the homes -- usually 2 or 3 percent more, or an amount equal to the down payment, says a Government Accountability Office study.

Federal authorities have raised concerns, because the mortgages are insured by the Federal Housing Administration. When a home buyer defaults, the FHA loan fund suffers. Home buyers receiving assistance from the charities were more than twice as likely to default or become delinquent in their payments as those who used FHA loans without the charities' assistance, according to a GAO study last year.

Although the system has helped hundreds of thousands of low-income households buy their first homes, it is riddled with abuse, according to the IRS and a variety of government studies. The IRS called the programs "scams" in its ruling last month and said that by providing down payments, the charities actually inflated home prices, making it more likely that homeowners would default on their loans.

Sen. Charles E. Grassley (R-Iowa), chairman of the Senate Finance Committee, who is pushing for charitable reform measures, blasted the down payment assistance charities and praised the IRS ruling.

"Unfortunately, this sector of charities is riddled with individuals who believe their role is to help themselves, not to lend a helping hand," he said. "Some so-called charities need a wake-up call that their business is charitable work."

The IRS's "revenue ruling," issued May 4, states that charities that dole out cash to home buyers that comes from sellers do not qualify as tax-exempt organizations because they benefit private interests, such as builders and other home sellers. The IRS expects to begin revoking some charities' tax-exempt status as it finishes audits, said Marvin Friedlander, chief of the IRS's exempt-organizations technical branch. The IRS also could assess the organizations millions of dollars in income taxes if it decides they are for-profit organizations, not charities.

Executives at the charities say they have helped renters who would not otherwise have been able to buy homes because they were unable to afford the down payment. They dispute the GAO study and disagree with the IRS findings.

Last week, a coalition of the charities asked the Treasury Department to suspend the IRS ruling and solicit public comment before issuing a final decision.

"This could have a sweeping impact on the whole housing industry," said Ann Ashburn, chief executive of AmeriDream, the nation's second-largest down payment assistance charity, and the coalition chair.

The IRS action has also roiled the real estate industry, which depends on the charities as a way to move cash-poor home buyers into the housing market. The charities say they move $500 million a year from sellers to buyers -- money that would disappear if many down payment assistance charities were put out of business.

"Almost anybody building for the first-time home buyer is using these programs," said David Ledford, staff vice president for housing finance and housing policy with the National Association of Home Builders. "Builders are concerned about what would happen not just in the future but for buyers who have already qualified and are going through a sale but who have not closed yet."

Among those who have benefited are Beverly and Kevin Queen, who used $2,500 they received through the AmeriDream down payment program to move their five children out of an Anacostia apartment to a four-bedroom single-family home they bought in Fort Washington in 2000. The only cash the couple had at the time, Beverly Queen said only half-jokingly, "was the $5 holding our bank account open."

Their brick-front home sits on a half-acre backing up to farmland. "This is what I wanted," said Beverly Queen, 44.

The Queens said they have faced no problems keeping up with their mortgage payments.

But consumer advocate Allen Fishbein, director of housing and credit policy with the Consumer Federation of America, said some borrowers have been financially damaged when they fell behind on their mortgages but could not sell the houses because they paid inflated prices.

"Our concern is that people who became homeowners will have trouble making payments," which he said could cause them to lose their homes and wreck their credit.

The IRS has discovered other irregularities in the down payment charities. Although the organizations are meant for home buyers of modest means, the IRS has found that affluent home buyers have improperly taken advantage of them -- even using the "gift funds" to buy vacation residences, Friedlander said.

The charities have also lavished perks on themselves, according to the IRS. Recent audits of 15 of the largest down payment organizations have raised questions about extravagant pay to executives, problematic ties to for-profit companies and inflated prices to low-income buyers that the charities were purporting to help, Friedlander said.

As a result, the IRS has widened its investigation to include an additional 170 charities -- virtually all of the down payment assistance charities that use seller funds.

The "gift fund" mechanism was devised by Don Harris, a Sacramento lawyer and minister who in the late 1990s found a loophole in the rules governing FHA mortgages that generally forbade home sellers from helping customers directly with down payments. He devised the idea of establishing a charity as a go-between for buyers and sellers.

The group Harris started, then called Nehemiah Home Ownership, gave buyers cash for the down payment on an FHA mortgage, generally 3 percent of the purchase price. The sellers then paid the charity an equal amount toward the down payment plus a service fee, typically 0.75 percent of the down payment.

Harris got a ruling from HUD approving the arrangement, and others copied Nehemiah's concept. Within a few years, a multibillion-dollar charitable industry was born, with about 200 nonprofits offering the service. In all, the industry says, it has given down payments to 625,000 households.

These loans make up an increasing amount of the FHA's volume. In 2006, about 28 percent of households receiving FHA loans got their down payments from the charities, up from 1.7 percent in 2000.

LOAD-DATE: June 2, 2006

# EXHIBIT D

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities
Web site at **http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm**.



# Government-to-Government Tribal Consultation Policy

**Department of Housing and Urban Development Tribal Government-to-Government Consultation Policy**

### I. Introduction

A. The United States Government has a unique relationship with American Indian governments as set forth in the Constitution of the United States, treaties, statutes, court decisions, and executive orders and memoranda.

B. On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

On May 14, 1998, the President issued Executive Order 13084, "Consultation and Coordination with Indian Tribal Governments," which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth guidelines for all federal agencies to (1) establish regular and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.

C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

In formulating or implementing such policies, HUD will be guided by the fundamental principles set forth in section 2 of Executive Order 13175, to the extent applicable to HUD programs. Section 2 of the Executive Order provides as follows:

> Sec. 2. Fundamental Principles. In formulating or implementing policies that have tribal implications, agencies shall be guided by the following fundamental principles:
>
>> (a) The United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive Orders,

and court decisions. Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protection. The Federal government has enacted numerous statutes and promulgated numerous regulations that establish and define a trust relationship with Indian tribes.

(b) Our Nation, under the law of the United States, in accordance with treaties, statutes, Executive Orders, and judicial decisions, has recognized the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory. The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights.

(c) The United States recognizes the right of Indian tribes to self- government and supports tribal sovereignty and self-determination.

**II. Definitions**

A. "Consultation" means the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process. This definition adds to any statutorily mandated notification procedures. The goal of notification is to provide an opportunity for comment; however, with consultation procedures, the burden is on the federal agency to show that it has made a good faith effort to elicit feedback.

B. "Exigent situation" means an unforeseen combination of circumstances or the resulting state that calls for immediate action in order to preserve tribal resources, rights, interests, or federal funding.

C. "Indian tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a.

**III. Principles**

A. HUD acknowledges the unique relationship between the federal government and Indian tribes.

B. HUD recognizes and commits to a government-to-government relationship with Federally-recognized tribes.

C. HUD recognizes tribes as the appropriate non-federal parties for making their policy decisions and managing programs at the local level for their constituents.

D. HUD shall take appropriate steps to remove existing legal and programmatic impediments to working directly and effectively with tribes on housing and community development programs administered by HUD.

E. HUD shall encourage states and local governments to work with and cooperate with tribes to resolve problems of mutual concern.

F. HUD shall work with other federal departments and agencies to enlist their interest and support in cooperative efforts to assist tribes to accomplish their goals within the context of all HUD programs.

G. HUD shall be guided by these policy principles in its planning and management activities, including its budget, operating guidance, legislative initiatives, management accountability system and ongoing policy and regulation development processes for all programs affecting tribes.

#### IV. Tribal Coordination, Collaboration and Consultation

A. Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe. The Office of Native American Programs (ONAP), within the Office of Public and Indian Housing, may serve as the lead Departmental office for the implementation of this policy, and is the principal point of contact for consultation with tribes on all HUD programs.

B. Procedures and Methods for Implementation -Tribal, Regional and National Forums.

1. Based on a government-to-government relationship and in recognition of the uniqueness of each tribe, a primary focus for consultation activities is with individual tribal governments. The use of tribal organizations/committees will be in coordination with, and not to the exclusion of, consultation with individual tribal governments. When proposed federal government policies, programs or actions are determined by HUD as having tribal implications, HUD will notify the affected tribe(s) and take affirmative steps to consult tribe(s) or its (their) designee. Tribes at any time may exercise their right to request consultation with HUD.

2. Tribes are encouraged to exercise their option to convene regional tribal meetings to identify and address issues. Tribes may regional meetings with HUD representatives to address issues relevant to HUD policies, regulations, and statutes. At least one national tribal consultation meeting will be held by HUD each year. To reduce costs and conserve extent feasible, tribes and HUD will coordinate consultation meetings to be regularly scheduled meetings such as multi-agency and association meetings.

C. Tribal Advisory Organizations/Committees. The principal focus for consultation activities of HUD is with individual tribal governments. However, it is frequently necessary that HUD have organizations/committees in place from which to solicit tribal advice and recommendations, and to involve tribes in decision-making and policy development. In consultation with elected tribal governments, HUD recognizes tribal advisory organizations/committees. Consultation shall be

conducted as follows:

1. Headquarters. HUD will consult with existing national organizations.

2. Area Offices. Each Area ONAP Administrator, in consultation with tribal governments, will consult with organizations/committees and/or representatives of tribal governments served by the Area ONAP. The tribal organizations/committees and/or representatives will provide advice and consultation to the Area ONAP Administrator and staff. Meetings with the Area ONAP shall occur at least annually, or more frequently when there is a need.

3. National/Area Coordination. To promote coordination in addressing issues arising from tribal consultation events at both the national and local level, a summary record of the comments made during national and area consultations will be made available to tribes.

D. Joint Federal/Tribal Work Groups or Task Forces. It may become necessary for HUD, to establish or select a work group or task force to develop recommendations on certain issues. The work group or task force may conduct its activities through conventional {e.g., telephone and mail), as well as innovative {e.g., e-mail and video conferences) means of communication.

1. Membership and Meeting Notices.

a. Tribal representation should be consistent with the established standard of geographically diverse small, medium and large tribes, whenever possible.

b. Meetings will be posted on the Internet and will be open to the public. In addition to Internet posting, HUD may also announce meetings through FAX, letter, e-mail, publication in the Federal Register, or other appropriate means.

2. Participation.

a. Attendance: Work group members shall make good-faith attempts to attend all meetings. They may be accompanied by other individuals to advise them as they deem necessary.

b. Appointment of Alternates: Alternate work group members may be appointed by written notification signed by the member. Such alternates shall possess the authority of the work group member to make decisions on their behalf if such authority is so delegated to them in writing.

3. Work Group Protocols that may be established.

a. Roles of the work group members.

b. Process for decision-making.

c. Process for creating written products and other
decisional documents.

d. Other items as deemed necessary by the work group.

4. Work Group Final Products and Recommendations. All final recommendations
will be given serious consideration by HUD. Whenever possible, all work group
products should be circulated to tribal leaders for review and comment.

## V. Rulemaking

On issues relating to tribal self-government, tribal trust resources, or treaty and
other rights, HUD will explore, and where appropriate, use consensual
mechanisms for developing regulations, including negotiated rulemaking. HUD
may establish a standing committee, consisting of representatives of tribal
governments, to consult on the appropriateness of using negotiated rulemaking
procedures on particular matters. The procedures governing such a standing
committee would be established through the mutual agreement of HUD and tribal
governments.

## VI. Unfunded Mandates

To the extent practicable and permitted by law, HUD shall not promulgate any
regulation that is not required by statute, that has tribal implications, and that
imposes substantial direct compliance costs on such communities, unless:

1. Funds necessary to pay the direct costs incurred by the Indian tribal
government in complying with the regulation are provided by the federal
government; or

2. HUD, prior to the formal promulgation of the regulation:

a. Consulted with tribal officials early in the process of developing the
proposed regulation;

b. In a separately identified portion of the preamble to the regulation
as it is to be issued in the Federal Register, provides to the Director of
the Office of Management and Budget a description of the extent of
HUD's prior consultation with representatives of affected Indian tribal
governments, a summary of the nature of their concerns and the
agency's position supporting the need to issue the regulation; and

c. Makes available to the Director of the Office of Management and
Budget any written communications submitted to HUD by such Indian
tribal governments.

## VII. Increasing Flexibility for Indian Waivers

HUD shall review the processes under which Indian tribal governments apply for
waivers of statutory and regulatory requirements and take appropriate steps to
streamline those processes.

1. HUD shall, to the extent practicable and permitted by law, consider any
application by an Indian tribal government for a waiver of statutory or regulatory

requirements in connection with any program administered by HUD with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable federal policy objectives and is otherwise appropriate.

2. HUD shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by HUD. HUD shall provide the applicant with timely written notice of the decision and, if the application for a waiver is not granted, the reasons for such denial.

3. This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by HUD. Applicable civil rights statutes and regulations are not subject to waiver.

### VIII. Implementation

1. All committees shall be chaired by at least one tribal and one HUD representative.

2. Time Frames. Time frames for consultation outreach will depend on the need to act quickly. Suggested guidelines are not less than 60 days for significant new matters of national scale, 30 days for routine proposed actions, and 2-3 weeks with expanded tribal outreach efforts for proposed actions which must be "fast tracked" to respond to critical deadlines. These time frames may be compressed in exigent situations.

3. Methods of Communication. The following are examples of communication means by which consultation can be accomplished. The method(s) of communication used will be determined by the significance of the consultation matter, the need to act quickly, and other relevant factors: Internet; broadcast fax; U.S. Postal Service; telephone-conference calls; multimedia; direct contact; and formal meetings.

4. Reporting Mechanisms. In all cases where a tribe or tribes have been involved in the consultation process, the tribe(s) shall be notified of the HUD decision by one or more of the communication method(s) identified above. This notification shall specifically include a discussion of the basis for the HUD decision, including public comments received, relationship to the concerns raised in consultation, and any avenues available for further discussion, protest or appeal of the decisions.

5. Internal HUD policies and procedures are excluded from this policy.

### IX. Applicability of the Federal Advisory Committee Act

The provisions of the Federal Advisory Committee Act (5 U.S.C. App.)(FACA) do not apply to consultations undertaken pursuant to this policy. In accordance with section 204(b) of the Unfunded Mandates Reform Act of 1995 (Pub.L. 104-4, approved March 22, 1995), FACA is not applicable to consultations between the Federal government and elected officers of Indian tribal governments (or their designated employees with authority to act on their behalf). As the Office of Management and Budget stated in its guidelines implementing section 204(b):

This exemption applies to meetings between Federal

officials and employees and ...tribal governments acting through their elected officers, officials, employees, and Washington representatives, at which 'views, information, or advice are exchanged concerning the implementation of intergovernmental responsibilities or administration, including those that arise explicitly or implicitly under statute, regulation, or Executive Order. The scope of meetings covered by this exemption should be construed broadly to include meetings called for any purpose relating to intergovernmental responsibilities or administration. Such meetings include, but are not limited to, meetings called for the purpose of seeking consensus, exchanging views, information, advice, and/or recommendations; or facilitating any other interaction relating to intergovernmental responsibilities or administration. (OMB Memorandum 95-20 (September 21, 1995), pp. 6-7, published at 60 FR 50651, 50653 (September 29, 1995)).

**X. General Provisions**

This document has been adopted for the purpose of enhancing government-to-government relationships, communications, and mutual cooperation between the U.S. Department of Housing and Urban Development and tribes and is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit or trust responsibility, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other persons. This document is effective on the date it is signed.

Dated: 06/28/2001

/s/
Mel Martinez, Secretary

[FR-4580-N-0l]

Content updated August 17, 2001

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112  Find the address of a HUD office near you

# EXHIBIT E

Printer-friendly page from www.hud.gov                                    Page 1 of 4

.

.

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities Web site at **http://www.hud.gov/offices/osdbu/policy/impact.cfm**.



# Department of Housing and Urban Development Policy for Considering Potential Impacts of HUD Rules on Small Entities

- **Section 1 -- Background**
- **Section 2 -- Purpose**
- **Section 3 -- Definitions**
- **Section 4 -- General Policy**
- **Section 5 -- HUD's Regulatory Flexibility Officer**
- **Section 6 -- Outreach Efforts to Small Entities**
- **Section 7 -- For Further Information Contact**
- **Section 8 -- Effective Date**

---

### Section 1 -- Background

On August 13, 2002, President George W. Bush issued Executive Order 13272, entitled "Proper Consideration of Small Entities in Agency Rulemaking." The Executive Order was published in the Federal Register on August 16, 2002 (67 FR 53461). The Order requires that each agency establish procedures and policies to promote compliance with the Regulatory Flexibility Act, as amended (5 U.S.C. 601 et seq.).

| top of page |

---

### Section 2 -- Purpose

This document implements Executive Order 13272 by describing HUD's policies and procedures, consistent with the Regulatory Flexibility Act, to ensure that the potential impacts of its draft rules on small businesses, small governmental jurisdictions, and small organizations are properly considered during the rulemaking process.

| top of page |

. . . . . . _____ . . .

**Section 3 -- Definitions**

As used throughout this document, the terms "agency," "rule," "small business,"
"small entity," "small organization," and "small governmental jurisdiction" shall
have the same meaning as provided in section 601 of the Regulatory Flexibility
Act. (Please note that the term "small entity" is the collective term for small
businesses, small organizations, and small governmental jurisdictions.)

| top of page |

_____

**Section 4 -- General Policy**

It is HUD's policy to thoroughly review its draft rules to assess and take
appropriate account of the potential impact on small businesses, small
governmental jurisdictions, and small organizations, as required by the Regulatory
Flexibility Act. HUD's two principal methods for accomplishing these goals are
through the review and analysis of all draft HUD rules by its Regulatory Flexibility
Officer, and the undertaking of outreach efforts to solicit the views of small entities
in the development of HUD rules.

| top of page |

. . . . . _____ . . . .

**Section 5 -- Regulatory Flexibility Officer**

HUD's Regulatory Flexibility Officer is the Departmental official with primary
responsibility for overseeing HUD's compliance with this policy. The Director of the
Office of Small and Disadvantaged Business Utilization is designated as HUD's
Regulatory Flexibility Officer. The HUD program offices will endeavor to notify the
Regulatory Flexibility Officer as early as possible in the rulemaking process of any
proposed regulatory actions that might have a significant economic impact on a
substantial number of small entities, and to work with the Regulatory Flexibility
Officer in assessing the potential impact.

The duties of the Regulatory Flexibility Officer will include, but not be limited to:

1. Serving as HUD's principal liaison with the Chief Counsel for Advocacy of the
   Small Business Administration (Advocacy), and, in accordance with section 3
   (b) of Executive Order 13272, notifying Advocacy of any draft HUD rules that
   may have a significant economic impact on a substantial number of small
   entities under the Regulatory Flexibility Act;

2. Reviewing the Spring and Fall Semiannual Agenda of Regulations prior to

publication in the Federal Register pursuant to section 602 of the Regulatory Flexibility Act in order to identify new rules that appear to have potential impacts on small entities as early as possible in the rulemaking process and to assist the HUD program offices in addressing any comments provided by Advocacy on the Regulatory Agenda;

3. Reviewing all draft HUD rules during the Departmental clearance process to ensure compliance with the requirements of the Regulatory Flexibility Act and the HUD program office issuing the rule to assess the potential impacts of the draft regulatory action on small entities;

4. Working with the HUD program office issuing the rule to give proper consideration to any comments provided by Advocacy regarding the draft rule, and to develop written responses to the Advocacy comments, as required by section 3(c) of Executive Order 13272;

5. Working with the HUD program office issuing the rule and with the Office of Economic Analysis of HUD's Office of Policy Development and Research to prepare the certification analysis required under section 605 of the Regulatory Flexibility Act;

6. When a rule is determined to have a significant economic impact on a substantial number of small entities, overseeing the preparation of the initial and final regulatory flexibility analyses required by the Regulatory Flexibility Act;

7. Overseeing HUD's periodic review of rules with a significant economic impact on a substantial number of small entities, in accordance with section 610 of the Regulatory Flexibility Act; and

8. Developing such additional guidance for the HUD program offices and/or the public, as may be necessary, for HUD's successful implementation of the Regulatory Flexibility Act and Executive Order 13272.

| top of page |



### Section 6 -- Outreach Efforts to Small Entities

Consistent with section 609 of the Regulatory Flexibility Act, HUD shall undertake outreach efforts to ensure that the views of small businesses, small governmental jurisdictions, and small organizations are considered in the development of HUD rules with potential impacts on small entities These outreach efforts may include, but are not limited to:

1. Specific invitations to small entities, included in the preamble of the rule, to submit comments on the proposed rule;

2. Direct notification of interested small entities concerning publication of the rule;

3. The conduct of public forums concerning the rule at which small entities are

invited to participate;

4. Meeting with appropriate representatives of small entities; and

5. Forming a Federal Advisory Committee that consists of representatives of small entities to assist HUD in its development of a rule through the advisory committee process (including the use of negotiated rulemaking procedures in accordance with the requirements of the Negotiated Rulemaking Act of 1990 (5 U.S.C. 561-570)), consistent with all statutory and other legal prerequisites for the establishment of such a committee.

| top of page |



### Section 7 -- For Further Information Contact

Questions regarding this document should be directed to, A. Jo Baylor, Regulatory Flexibility Officer, U.S. Department of Housing and Urban Development, 451 Seventh Street, SW, Room 3130, Washington, DC 20410; telephone (202) 708-1428, (this is not a toll-free number). Persons with speech or hearing impairments may access this number via TTY by calling the toll-free Federal Information Relay Service at 1-800-877-8339.

| top of page |



### Section 8 -- Effective Date

This policy is effective on February 13, 2003.

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112  Find the address of a HUD office near you

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| PENOBSCOT INDIAN NATION, PENOBSCOT ) | |
| INDIAN NATION ENTERPRISES and ) | |
| GLOBAL DIRECT SALES, LLC, ) | Case No.: 1:07-cv-01282 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| -v- ) | |
| ) | |
| UNITED STATES DEPARTMENT OF HOUSING ) | |
| AND URBAN DEVELOPMENT, ALPHONSO ) | |
| JACKSON IN HIS CAPACITY AS SECRETARY ) | |
| OF HOUSING AND URBANDEVELOPMENT, ) | |
| ROY A. BERNARDI, IN HIS CAPACITY AS ) | |
| DEPUTY SECRETARY OF HOUSING AND ) | |
| URBAN DEVELOPMENT AND BRIAN ) | |
| MONTGOMERY, IN HIS CAPACITY AS ) | |
| ASSISTANT SECRETARY OF HOUSING AND ) | |
| URBAN DEVELOPMENT AND ) | |
| COMMISSIONER OF THE FEDERAL HOUSING ) | |
| ADMINISTRATION, ) | |
| ) | |
| Defendants. ) | |

_____ )

### [PROPOSED] **ORDER GRANTING PLAINTIFFS'**
### **MOTION FOR SUMMARY JUDGMENT**

This matter having been presented to the Court upon the motion the plaintiffs the

Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales, LLC, by

their undersigned counsel, The Mason Law Firm, LLP and Kantrowitz, Goldhamer & Graifman,

LLC, in the presence of U.S. Department of Justice and the United States Attorney for the

District of Columbia, attorneys for the United States Department of Housing and Urban

Development, Alphonso Jackson in his capacity as Secretary of Housing and Urban

Development, Roy A. Bernardi, in his capacity as Deputy Secretary of Housing and Urban

Development and Brian Montgomery, in his capacity as Assistant Secretary of Housing and Urban Development and Commissioner of the Federal Housing Administration; for an Order granting summary judgment: (1) declaring that the Final Rule is contrary to law, arbitrary and capricious, unenforceable and otherwise unlawful; (2) granting permanent injunctive relief enjoining the defendants from enforcing the Final Rule; and (3) granting such further relief as the Court may deem appropriate and just.

IT IS on this _____ day of _____, 2007 ORDERED that plaintiffs' motion for summary judgment on their declaratory judgment cause of action is granted.


_____
Paul L. Friedman, U.S.D.J.