IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN TRIBE,<br>PENOBSCOT INDIAN NATION ENTERPRISES<br>and GLOBAL DIRECT SALES, LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF<br>HOUSING AND URBAN DEVELOPMENT,<br>*et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case Number: 1:07cv01282<br>)<br>)   Hon. Paul L. Friedman<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendants United States Department of Housing and Urban Development, Alphonso Jackson, Roy A. Bernardi, and Brian Montgomery (collectively "Defendants") by and through counsel, respectfully move, pursuant to Federal Rule of Civil Procedure 12 and 56 to dismiss, or in the alternative, for summary judgment.

On November 9, 2007, the Court issued a Minute Order that stayed all briefing in this action, except for the briefing called for by the Stipulation and Order filed by the parties in *AmeriDream, Inc. v. Jackson*, Civ. No. 07-1752 (D.D.C.). Pursuant to the Court's Minute Order, at this time Defendants submit a statement of material facts and a memorandum in support of their motion only insofar as it pertains to the Final Rule entitled "Standards for Mortgagor's Investment in Mortgaged Property." 72 Fed. Reg. 56,002 (Oct. 1, 2007). Defendants will supply supporting memoranda on the remainder of this motion at the appropriate time as prescribed by the Court at a later date.

Dated: November 16, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

 /s/ Tamara Ulrich
MICHAEL SITCOV
TAMARA ULRICH
CHRISTOPHER HALL
ROBERT J. KATERBERG
SCOTT A. RISNER
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel: (202) 305-1432
Fax: (202) 616-8470
E-mail: tamara.ulrich@usdoj.gov

Counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) ) | |
| Defendants. | ) | |
| AMERIDREAM, INCORPORATED, | ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) | |
| Intervenors, | ) ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

# DEFENDANTS' MEMORANDUM IN SUPPORT
# OF MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. ................................................................................. iii

INTRODUCTION ................................................................................................ 1

BACKGROUND. ................................................................................................ 3

    A.    The FHA Mortgage Insurance Program. .................................................... 3

    B.    The Three Percent Cash Investment and Permissible Sources
    Thereof. .................................................................................................. 4

    C.    The Loophole and HUD's Early Treatment of It. ...................................... 6

    D.    The Regulation. ........................................................................................ 9

    E.    The Instant Litigation. ............................................................................ 11

ARGUMENT. .................................................................................................... 13

    I.    STANDARD OF REVIEW. .................................................................... 13

    II.    THE REGULATION IS A PROPER EXERCISE OF HUD'S
    STATUTORY AUTHORITY AND IS SUPPORTED BY THE
    ADMINISTRATIVE RECORD. ............................................................. 14

        A.    The Regulation is Within HUD's Statutory Rulemaking
        Authority. .............................................................................................. 14

        B.    The Regulation is Supported by the Administrative Record. ................... 17

    III.    EACH OF PLAINTIFF'S CHALLENGES TO THE REGULATION
    IS WITHOUT MERIT. ........................................................................... 27

        A.    The Regulation Was Promulgated Consistently with the
        Administrative Procedure Act. ................................................................ 27

            1.    HUD Provided Sufficient Notice of the Regulation. .................... 27

            2.    HUD Was Free to Change its Policy on Seller-Funded
            DPA and Provided a Reasoned Basis For Doing So. .................... 28

3.      HUD Provided Sufficient Notice of the Reasons for the
        Regulation. ................................................................................... 31

4.      HUD Considered Reasonable Alternatives and
        Properly Rejected Them................................................................. 35

5.      Certain Plaintiffs' Arguments That HUD Lacks
        Statutory Authority to Issue the Regulation Are
        Wholly Without Merit.................................................................... 40

B.      The Regulation Does Not Violate the Equal Protection
        Component of the Fifth Amendment's Due Process Clause.................... 42

C.      HUD Did Not Improperly Prejudge the Regulation................................. 43

D.      HUD Promulgated the Regulation Consistently With the
        Regulatory Flexibility Act.......................................................................... 51

E.      The Penobscot Plaintiffs' Tribal Consultation Policy
        Argument Is Without Merit........................................................................ 59

F.      The Differential Effective Dates in the Regulation Do Not
        Violate the APA or Equal Protection, But if the Court Finds
        to the Contrary, the Sole Remedy Should Be to Extend the
        Effective Date. .......................................................................................... 60

CONCLUSION. ..................................................................................................................... 65

# TABLE OF AUTHORITIES

## CASES

AFL-CIO v. Donovan,
    757 F.2d 330 (D.C. Cir. 1985). ................................................... 41

AMFAC Resorts, LLC v. Dep't of the Interior,
    143 F. Supp.2d 7 (D.D.C. 2001). ................................................. 48

Aeronautical Repair Station Ass'n, Inc. v. FAA,
    494 F.3d 161 (D.C. Cir. 2007). ................................................... 58

Alenco Commn's v. FCC,
    201 F.3d 608 (5th Cir. 2000). ..................................................... 52

Alpharma, Inc. v. Levitt,
    460 F.3d 1 (D.C. Cir. 2006). ....................................................... 17

Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe R.R. Co.,
    387 U.S. 397 (1967). .................................................................. 28

American Towers, Inc. v. Williams,
    146 F. Supp. 2d 27 (D.D.C. 2001), aff'd mem., 50 Fed. Appx. 448 (D.C. Cir. 2002)..... 42

Appalachian Power Co. v. EPA,
    251 F.3d 1026 (D.C. Cir. 2001). ............................................ 38, 53

Ass'n of Nat'l Advertisers, Inc. v. FCC,
    627 F.2d 1151 (D.C. Cir. 1979). ...................................... 43, 50, 51

Associated Fisheries of Me., Inc. v. Daley,
    954 F. Supp. 383 (D. Me.), aff'd, 127 F.3d 104 (1st Cir. 1997)...................................... 59

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,
    462 U.S. 87, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983). ........................................... 13, 14

Beverly Enter., Inc. v. Herman,
    130 F. Supp. 2d 1 (D.D.C. 2000). ............................................ 15, 48

Blackfeet Nat'l Bank v. Rubin,
    890 F. Supp. 48 (D.D.C. 2005). ................................................. 59

Bracco Diagnostics, Inc. v.  Shalala,
    963 F. Supp. 20 (D.D.C. 1997). ...................................................................... 62

Camp v. Pitts,
    411 U.S. 138 (1973)..................................................................................... 47

Carpenter v. Sec'y of Vet. Affairs,
    343 F.3d 1347 (Fed. Cir. 2003).............................................................. passim

Cement Kiln Recycling Coalition v. EPA,
    255 F.3d 855 (D.C. Cir. 2001). ............................................................... 56, 57

Chamber of Commerce v. SEC,
    443 F.3d 890 (D.C. Cir. 2006). ...................................................................... 32

Chevron U.S.A. v. Natural Resources Defense Council,
    467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)..................................... 14, 15, 41

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)............................................. 13, 48

City of New Orleans v. Dukes,
    427 U.S. 297 (1976)..................................................................................... 42

City of Stoughton v. EPA,
    858 F.2d 747, 752-53 (D.C. Cir. 1988)........................................................... 34

Cmty. Nutrition Inst. v. Block,
    749 F.2d 50 (D.C. Cir. 1984). ................................................................ 56, 57

Commercial Drapery Contractors, Inc. v. United States,
    133 F.3d 1 (D.C. Cir. 1998). ........................................................................ 46

Common Sense Salmon Recovery v. Evans,
    217 F. Supp. 2d 17 (D.D.C. 2002). .......................................................... 47, 48

Cook County, Ill v. United States ex rel. Chandler,
    538 U.S. 119 (2003)..................................................................................... 41

Cottage Savs. Ass'n v. C.I.R.,
    499 U.S. 554 (1991)..................................................................................... 41

Covad Comm'ns v. FCC,
     450 F.3d 528 (D.C. Cir. 2006). ............................................................................. 35

Davis County Solid Waste Mgmt. v. U.S. EPA,
     108 F.3d 1454 (D.C. Cir. 1997). ........................................................................... 64

Environmental Defense Center, Inc. v. EPA,
     344 F.3d 832 (9th Cir. 2003). .............................................................................. 54

Florida Light & Power v. Lorion,
     470 U.S. 729 (1985)............................................................................................. 47

Greater Boston Television Corp. v. FCC,
     444 F.2d 841 (D.C. Cir. 1970). .......................................................................... 29

Hammond v. Norton,
     370 F. Supp. 2d 226 (D.D.C. 2005). ................................................................... 13

Holy Land Found. for Relief & Dev. v. Ashcroft,
     219 F. Supp. 2d 57 (D.D.C. 2002). ..................................................................... 47

Housing Study Group v. Kemp,
     736 F. Supp. 321 (D.D.C. 1990). ........................................................................ 49

IMS, P.C. v. Alvarez,
     129 F.3d 618 (D.C. Cir. 1997). ........................................................................... 47

Independent Petroleum Ass'n v. Babbitt,
     92 F.3d 1248 (D.C. Cir. 1996). ........................................................................... 62

International Snowmobile Manufacturers Association v. Norton,
     340 F. Supp. 2d 1249 (D. Wyo. 2004). ....................................................... passim

James Madison, Ltd. v. Ludwig,
     82 F.3d 1085 (D.C. Cir. 1996). ........................................................................... 47

K-Mart Corp. v. Cartier, Inc.,
     486 U.S. 281 (1988)............................................................................................. 64

Lee v. Kemp,
     731 F. Supp. 1101 (D.D.C. 1989). ........................................................................ 4

Long Island Care at Home, Ltd. v. Coke,
    127 S. Ct. 2339 (2007). ................................................................................. 28

Marshall Cty. Health Care Auth. v. Shalala,
    988 F.2d 1221 (D.C. Cir. 1993). ................................................................... 47

Mich. v. EPA,
    213 F.3d 663 (D.C. Cir. 2000). ..................................................................... 57

Mich. v. Thomas,
    805 F.2d 176 (6th Cir. 1986). ....................................................................... 57

Mid-Tex Elec. Coop. v. FERC,
    773 F.2d 327 (D.C. Cir. 1985). ..................................................................... 56

Motor & Equip. Mfrs. Ass'n v. Nichols,
    142 F.3d 449 (D.C. Cir. 1998). ..................................................................... 55

Motor & Equip. Mfrs. Ass'n v. Nichols,
    142 F.3d 449 (D.C. Cir. 1998). ..................................................................... 55

Mourning v. Family Publ'ns Serv., Inc.,
    411 U.S. 356 (1973). ..................................................................................... 15

NLRB v. Beverly Enterprises-Massachusetts, Inc.,
    174 F.3d 13 (1st Cir. 1999). ........................................................................... 15

NTEU v. Seidman,
    786 F. Supp. 1041 (D.D.C. 1992). ............................................................... 47

Nat'l Ass'n of Clean Air Agencies v. EPA,
    489 F.3d 1221 (D.C. Cir. 2007). ............................................................. 38, 54

Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.,
    545 U.S. 967 (2005). ..................................................................................... 30

Nat'l Women, Infants, and Children Grocers Ass'n v. Food & Nutrition Serv.,
    416 F. Supp. 2d 92 (D.D.C. 2006). ............................................................... 56

North Carolina Fisheries Ass'n, Inc. v. Gutierrez,
    No. 06-cv-1815 (JDB), 2007 WL 2331048 (D.D.C. Aug. 17, 2007). ........... 52

Occidental Eng'g Co. v. INS,
    753 F.2d 766 (9th Cir. 1985). ........................................................................ 17

Owner-Operator Indep. Driver Ass'n, Inc. v. FMCSA,
    494 F.3d 188 (D.C. Cir. 2007). ..................................................................... 31

Ramaprakash v. FAA,
    346 F.3d 1121 (D.C. Cir. 2003). ................................................................... 31

Recreational Fishing Alliance v. Evans,
    172 F. Supp. 2d 35 (D.D.C. 2001). ............................................................... 47

Sierra Club v. Mainella,
    459 F. Supp. 2d 76 (D.D.C. 2006). ............................................................... 17

Small Ref. Lead Phase-Down Task Force v. EPA,
    705 F.2d 506 (D.C. Cir. 1983). ..................................................................... 28

Solite Corp. v. EPA,
    952 F.2d 473 (D.C. Cir. 1991). ..................................................................... 32

Springfield, Inc. v. Buckles,
    292 F.3d 813 (D.C. Cir. 2002). ..................................................................... 29

TOMAC v. Norton,
    193 F. Supp. 2d 182 (D.D.C. 2002). ............................................................. 48

Texas Rural Legal Aid, Inc. v. Legal Serv. Corp.,
    940 F.2d 685 (D.C. Cir. 1991). ..................................................................... 48

Thompson v. Clark,
    741 F.2d 401 (D.C. Cir. 1984). ................................................................ 35, 36

Transactive Corp. v. United States,
    91 F.3d 232 (D.C. Cir. 1996). ....................................................................... 62

Trawler Diane Marie, Inc. v. Brown,
    918 F. Supp. 921 (E.D.N.C. 1995)................................................................ 59

U.S. Cellular Corp. v. FCC,
    254 F.3d 78 (D.C. Cir. 2001). .................................................................. 52, 59

United States v. Morgan,
    313 U.S. 409 (1941). ................................................................ 49

United Steelworkers of Am. v. Marshall,
    647 F.2d 1189 (D.C. Cir. 1980). ............................................. 49

Vermont Yankee Nuclear Power Corp. v. NRDC,
    435 U.S. 519 (1978). ........................................................ passim

Zyko v. Dep't of Defense,
    180 F. Supp. 2d 89 (D.D.C. 2001). ......................................... 48

## STATUTES

5 U.S.C. § 553 ........................................................................ passim

5 U.S.C. §§ 601-612. ................................................................. 50

5 U.S.C. § 601(4). ...................................................................... 53

5 U.S.C. § 603(a). ...................................................................... 50

5 U.S.C. § 604 ........................................................................... 50

5 U.S.C. § 605(b). .................................................................. 50, 53

5 U.S.C. § 611(a). ...................................................................... 52

12 U.S.C. § 1701 ....................................................................... 43

12 U.S.C. § 1708(a). .................................................................... 4

12 U.S.C. § 1709 .................................................................... passim

12 U.S.C. § 1710(a). .................................................................... 4

12 U.S.C. § 1715b. ..................................................................... 15

26 U.S.C. § 501(c)(3) .................................................................. 15

42 U.S.C. §§ 3532, 3533. .............................................................. 3

I.R.C. § 501(c)(3). .................................................................. passim

## MISCELLANEOUS

24 C.F.R. § 203.355. ................................................................................................ 4

64 Fed. Reg. 49,956. .............................................................................................. 8

66 Fed. Reg. 2,851. ............................................................................................. 8, 47

67 Fed. Reg. 36,102. ............................................................................................. 22

71 Fed. Reg. 60,159-01. ......................................................................................... 43

72 Fed. Reg. 27,048. .......................................................................................... passim

72 Fed. Reg. 37,500. ............................................................................................. 10

72 Fed. Reg. 56,002. .......................................................................................... passim

Exec. Order 12,866. ........................................................................................... 54, 59

Concentrance Consulting Group, An Examination of Downpayment Gift Programs
    Administered by Non-Profit Organizations (May 1, 2005) . ........................................... 18

Dep't of the Interior, Departmental Manual (Sept. 9, 1994). ...................................... 45

GAO Report No. 05-194, Mortgage Financing: Actions Needed to Help FHA Manage
    Risks from New Mortgage Loan Products (Feb. 2005) . .......................................... passim

GAO Report No. 06-24, Mortgage Financing: Additional Action Needed to Manage
    Risks of FHA-Insured Loans with Down Payment Assistance (Nov. 2005) ........... passim

HUD Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis for Mortgage Insurance,
    One to Four Family Properties" . ................................................................ 5, 25

HUD Mortgagee Letter 2006-13. ...................................................................... 5, 26

HUD Office of Inspector General, Audit Report of Ryland Mortgage Company,
    HUD Doc. No. 2006-LA-1001 (Oct. 31, 2005). .............................................. 18

I.R.S. News Release IR-2006-74 (May 4, 2006). .............................................. passim

ix

Lisa A. Fowler & Stephen S. Fuller, An Evaluation of Research on the
   Performance of Loans with Down Payment Assistance (Sept. 2006)....................... passim

1 Richard J. Pierce, Administrative Law Treatise (4th ed. 2002). ....................................... passim

Rev. Rul. 2006-27, 2006-21 I.R.B. 915. .................................................................................. 2, 26

Settlement Agreement dated April 3 and 6, 1998 in <u>Nehemiah Progressive
   Housing Corp. v. Andrew Cuomo</u> Civ. S-97-1817-GEB/PAN (E.D. Cal.)........... 7, 11, 63

## INTRODUCTION

The Federal Housing Administration ("FHA"), a unit of the Department of Housing and Urban Development ("HUD"), insures mortgages, meaning that it agrees to protect mortgage lenders against the risk of losses caused by borrower's non-payment, as authorized by the National Housing Act, 12 U.S.C. § 1701 et seq.  As an insurer, FHA sets conditions on the types of mortgages it will insure; that is, conditions that establish the risk that FHA will accept.  As a condition for insuring mortgages, federal law requires each home buyer to make a cash investment, or "down payment," of at least 3% of the total cost of acquisition.  See 12 U.S.C. § 1709(b)(9).  HUD's longstanding policy -- not challenged in these cases -- has been to allow relatives, legitimate charitable organizations, and certain others to assist home buyers with this down payment, but not to allow such assistance to come directly from the home seller or other parties with an interest in the transaction, for the purpose of ensuring an arms-length transaction and avoiding the distortion of the fundamental economics of the transaction and the resulting mortgage loan.

However, beginning in the late 1990s, a few organizations found a way to exploit HUD's allowance of down payment assistance provided by charities in a way that enables sellers and buyers to do indirectly what they could not do directly.  These organizations devised a form of transaction in which a "charity" or other permitted entity would make a "gift" to the home buyer to fund the necessary down payment, with the understanding that the home seller in the same transaction would later make a concomitant "donation" to the charity.  According to the logic of this scheme, the down payment assistance was being provided by the "charity," not by the home seller, so it was not prohibited and FHA would have to insure the resulting mortgage.  For its

1

services as a conduit for the forbidden funds, the "charity" would collect a substantial processing fee.  A number of "charities" and other entities began to implement this business model, or variations on it.

When this scheme was in its nascent stage, HUD did not act immediately to stop it.  In the ensuing years, however, the number of loans relying upon such down payment assistance has proliferated, with dire consequences for the FHA insurance fund.  As estimated by Congress's Government Accountability Office ("GAO"), in 2004, 30% of all FHA-insured loans originated with down payment assistance from nonprofits, over 90% of which were seller-funded.  See GAO Report No. 06-24, Mortgage Financing:  Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance (Nov. 2005) ("GAO Nov. 2005 Report"), at 14 (A.R. 00518, 00537)[1] (attached hereto as Ex. 1).   HUD observed that loans originated with seller-funded down payment assistance performed significantly worse than other FHA-insured loans, meaning that they experienced a much higher rate of defaults, foreclosures, and resultant claims on the FHA insurance fund, and could eventually be expected to threaten the fund's solvency.  In 2006, the Internal Revenue Service ("IRS") issued a Revenue Ruling holding that entities that facilitate seller-funded down payment assistance through this scheme are not true charitable organizations and not entitled to tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  See Rev. Rul. 2006-27, 2006-21 I.R.B. 915 (A.R. 00021) (attached hereto as Ex. 2).

HUD's new rule, Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 56,002 (Oct. 1, 2007) (to be codified at 24 C.F.R. § 203.19) (A.R. 00001) (the

---

[1] "A.R." refers to the Administrative Record, filed October 26, 2007.

"Regulation"), closes the seller-funded down payment assistance loophole once and for all.[2]  The

Regulation provides in pertinent part that, in order for FHA to insure a mortgage, the funds for

the buyer's down payment "shall not consist, in whole or in part, of funds provided by any of the

following parties before, during, or after closing of the property sale:  (1) The seller or any other

person or entity that financially benefits from the transaction; or (2) Any third party or entity that

is reimbursed, directly or indirectly, by any of the parties described in the paragraph (c)(1) of this

section."  72 Fed. Reg. at 56,007 (to be codified at 24 C.F.R. § 203.19(c)) (A.R. 00007).  Thus,

while legitimate charities remain free to provide down payment assistance to home buyers, the

source (direct or indirect) for those funds can no longer be the seller in the transaction or another

person who stands to benefit financially from the transaction.

## BACKGROUND

**A.    The FHA Mortgage Insurance Program**

FHA was created by the National Housing Act in 1934 to insure mortgage lenders against

default by borrowers to whom they had provided single family home mortgage financing.  48

Stat. 1246 (1934).[3]  To carry out most single family mortgage insurance programs, HUD and

---

[2] This brief uses the term "seller-funded down payment assistance" or "seller-funded DPA" to refer to the particular type of transaction proscribed by the new rule, i.e., a transaction in which downpayment funds are provided by the seller or any other person or entity that financially benefits from the transaction, or any third party or entity that is reimbursed, directly or indirectly, by any such party, either before, during, or after closing of the property sale. It should be clear that, as discussed above, down payment assistance funded directly by the seller has never been allowed for FHA-insured mortgage loans.

[3] With the creation of HUD in 1965, Congress transferred to the Secretary of HUD all of the duties and powers of the FHA.  See 42 U.S.C. §§ 3532, 3533.  The FHA is a part of HUD, and the FHA Commissioner serves as one of several Assistant Secretaries of HUD.  See 42 U.S.C. § 3533(b).

FHA rely on the Mutual Mortgage Insurance Fund ("MMIF").  See 12 U.S.C. § 1708(a).  The

MMIF is a revolving fund that uses the proceeds from insurance premiums, investment income,

and foreclosure sales to provide funds for future mortgage insurance.  Id.; see also Lee v. Kemp,

731 F. Supp. 1101, 1103-04 (D.D.C. 1989).  When an FHA-insured mortgage has been in

monetary default for at least three months, or when the FHA-approved mortgagee forecloses on a

property, the insured mortgagee is entitled to file a claim for insurance benefits payable from the

MMIF.  See 12 U.S.C. § 1710(a); 24 C.F.R. §§ 203.355 to 203.371.  To receive the benefits, the

mortgage-holder generally must convey clear title to HUD and deliver the property in vacant

condition.  12 U.S.C. § 1710(a)(1).  Aside from an initial $10 million appropriation from

Congress when the MMIF was created by statute, HUD has operated the MMIF without any

congressional appropriations, using only the proceeds that the fund generates.  See generally Lee,

731 F. Supp. at 1103.

**B.    The Three Percent Cash Investment and Permissible Sources Thereof**

Section 203 of the National Housing Act, codified at 12 U.S.C. § 1709, sets forth the

requirements for insuring mortgages that meet the Act's eligibility requirements.  Among other

things, the purchaser of the home generally must provide a cash or cash-equivalent down

payment representing at least 3% of the total cost of acquisition.  12 U.S.C. § 1709(b)(9).[4]  This

requirement helps to ensure, among other things, that the purchaser begins home ownership with

_____

[4]  The statute contains two built-in exceptions to this requirement, allowing family
members to provide loans to other family members to satisfy the 3% requirement, and allowing
the 3% payment to be paid by someone other than mortgagor in certain other narrowly limited
circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage
covers a single-family home being purchased in a certain demonstration project, or a housing unit
in a homeownership program under the Homeownership and Opportunity Through HOPE Act.
See 12 U.S.C. § 1709(b)(9).

an equity stake and is committed to making mortgage payments.

HUD Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties," sets forth HUD's longstanding policy regarding credit underwriting requirements, including the buyer's cash investment.  HUD allows a buyer's minimum down payment to be financed by a gift from certain specified sources, including the buyer's relatives, his employer or labor union, a charitable organization, or a governmental agency or certain public entities.  See HUD Handbook 4155.1, Rev. 5, ¶ 2-10(C) (attached as Ex. 3).[5]  But HUD expressly prohibits the seller from financing the buyer's down payment.

> The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them.  Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price.  No repayment of the gift may be expected or implied. []As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. . . .  While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing.  Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price.

Id.  Accordingly, while HUD allows buyers to finance down payments through gifts from charitable organizations recognized by the IRS as 501(c)(3) tax-exempt organizations and certain others, it is settled HUD policy that sellers may not provide the required investment in the property.[6]

---

[5]  HUD defines charitable organizations as "those nonprofits that are exempt from income taxation under section 501(a) of the Internal Revenue Code (IRC) of 1986 pursuant to section 501(c)(3) of the IRC."  HUD Mortgagee Letter 2006-13 (May 25, 2006) (attached hereto as Ex. 4).

[6] Similar language appears in prior versions of the HUD Handbook going back at least to 1983.

Indeed, for a home seller to fund a home buyer's down payment creates an obvious circularity and distorts the fundamental economics of a home purchase transaction. A home seller who has to pay the buyer's down payment in order to make the transaction happen will often demand a higher sale price for that transaction than he would have required in an otherwise equivalent transaction where such down payment assistance was not necessary (or will refrain from discounting the sales price when he otherwise would have done so). Thus, seller-funded down payment assistance tends to push sales prices upwards, because it can be generally expected that the seller will attempt to recoup at least some, if not all, of the down payment assistance through a higher sales price. Higher prices, in turn, result in larger mortgage loans, with the buyer essentially paying the amount of the down payment assistance through a higher sales price and mortgage. Larger mortgage loans mean larger monthly payments, making it more difficult for the purchaser/borrower to make those payments. Thus, while the seller and lender both walk away from closing with immediate benefits, the home purchaser/borrower and FHA bear the long-term risks of default and foreclosure that are associated with less sound mortgages. It is not difficult to see why HUD has long prohibited such seller-funded down payment assistance when provided directly.

**C.     The Loophole and HUD's Early Treatment of It**

In the late 1990s, certain organizations devised a method to circumvent HUD's requirement that FHA-insured loans not be initiated through a transaction involving seller-funded down payment assistance. Because HUD allowed down payment gifts from charitable organizations and certain other entities (such as governmental entities, including Indian tribal governments), these organizations concluded that if the down payment assistance came in the

first instance from a charitable organization, it would be permitted by HUD even if the charity's "gift" ultimately would be reimbursed by the home seller after closing. In other words, by having the charity act as intermediary to hide the ultimate source of the funding, sellers could indirectly fund buyers' down payments on homes purchased with FHA-insured mortgages even though they could not do so directly. For its role in facilitating the transaction, the charity would typically collect a substantial processing fee from the seller.

From the beginning, HUD had concerns about the propriety of this form of transaction. However, the practice was new and not widespread and initially did not affect a material number of FHA-insured loans. HUD recognized that there were legal arguments, depending on the timing and other circumstances, for the proposition that the charity's payment to the home buyer and the home seller's payment to the charity are not related.[7] For various reasons, HUD did not immediately take action to directly curb this newly evolving scheme, but instead resolved to study and monitor these down payment assistance programs over a period of years.[8]

---

[7] One of the original proponents of the scheme was an entity known as Nehemiah Progressive Development Corporation ("Nehemiah"). In 1997 and 1998, Nehemiah and HUD engaged in litigation over the validity of Nehemiah's seller-funded down payment program. See Nehemiah Progressive Housing Corp. v. Andrew Cuomo, et al., Civ. S-97-1817-GEB/PAN (E.D. Cal.). That litigation was settled by an agreement in which HUD represented that it had determined that Nehemiah's down payment assistance program was not in conflict with HUD's regulations and administrative requirements, but "expressly reserv[ed] the right to and may take such actions with regard to down payment assistance programs generally, and with regard to changes or modifications to HUD's regulations, handbook, mortgagee letters, or other governing documents applicable to transactions under Section 203(b) in particular, as they may deem appropriate." Settlement Agreement dated April 3 and 6, 1998, ¶ 2 (A.R. 00884) (attached hereto as Ex. 5).

[8] In 1999, HUD proposed a rule that would have done substantially the same thing as the present Regulation, see 64 Fed. Reg. 49,956 (Sept. 14, 1999), but later withdrew that rule, see 66 Fed. Reg. 2,851 (Jan. 12, 2001).

In the ensuing years, use of seller-funded DPA in FHA-insured loans increased by orders of magnitude, with deleterious consequences for both the MMIF and for homeowners who often became victims of foreclosure.  The GAO issued a report in 2005 expressing its concern that seller-funded DPA resulted in higher home prices without comparable increases in equity for buyers, as well as a greater likelihood of delinquency and default claims.  See GAO Nov. 2005 Report, at 22-23, 26 (A.R. 00545-46, 00549).  The GAO report noted that in 2004 30% of all FHA-insured loans originated with nonprofit, and generally seller-funded, down payment assistance, up from 6% in 2000.  See id.  The GAO report recommended, inter alia, that HUD revise FHA standards to prohibit DPA from seller-funded entities to satisfy the buyer's 3% cash minimum investment requirement.  Id. at 45-46 (A.R. 00568-69).[9]

In May 2006, the Internal Revenue Service released Revenue Ruling 2006-27, regarding the ability of DPA providers to qualify as charitable organizations under section 501(c)(3) of the Internal Revenue Code of 1986, 26 U.S.C. § 501(c)(3).  See Rev. Rul. 2006-27, 2006-21 I.R.B. 915 (A.R. 00021).  The ruling established that an organization is not eligible for 501(c)(3) status when it receives substantial funding from sellers and other entities that stand to benefit from the home purchases facilitated by the organization.  See id. at 918.  In a press release accompanying the ruling, the IRS expressed its concern with what it called "self-serving, circular-financing

---

[9] In a response to the report, Assistant Secretary for Housing and Federal Housing Commissioner Brian D. Montgomery informed the GAO that HUD intended to implement or otherwise substantially agreed with several of the report's other recommendations.  See GAO Nov. 2005 Report, at 89-91 (A.R. 00612-14).  With respect to certain nonprofit DPA programs, Commissioner Montgomery explained HUD's position at that time – that if a seller's contribution could not be traced to the organization's gift to the buyer, the contribution was not an "inducement to purchase" by the seller pursuant to the HUD handbook.  See id. at 91 (A.R. 00614).

arrangements," in which the seller only pays the organization if the buyer completes the purchase

of the home, and noted that such a "scheme" leads to increased home prices. I.R.S. News

Release IR-2006-74 (May 4, 2006) (A.R. 00026).

Most importantly, HUD found in its own experience that loans originated with seller-

funded down payment assistance had a much higher rate of defaults and foreclosures than FHA-

insured loans in general, and that the continued growth of such transactions would eventually

threaten the solvency of the MMIF. HUD needed to take action to protect the solvency of its

programs.

### D.    The Regulation

On May 11, 2007, HUD published a notice of proposed rulemaking ("NPRM").

Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 27,048 (May 11,

2007) (A.R. 00011) (to be codified at 24 C.F.R. pt. 203). The notice indicated that "[t]he

proposed rule would establish that a prohibited source of down payment assistance is a payment

that consists, in whole or in part, of funds provided by any of the following parties before,

during, or after closing of the property sale: (1) The seller, or any other person or entity that

financially benefits from the transaction; or (2) any third party or entity . . . that is reimbursed

directly or indirectly by any of the parties listed in clause (1)." Id. at 27,049 (A.R. 00012).

In the notice, HUD explained that seller-funded DPA leads to inflated sales prices and

"inflated mortgage amounts, which increase the severity of individual claims on the FHA

Insurance Fund and FHA losses on claims paid on such mortgages." Id. The notice also

discussed a 2005 GAO report and Revenue Ruling 2006-27. Id. Finally, the notice offered a

detailed discussion of the terms of the proposed rule. Id. HUD initially provided a 60-day period

for public comment. Id. at 27,048 (A.R. 00011). HUD extended that period for an additional 30

days. 72 Fed. Reg. 37,500 (July 10, 2007) (A.R. 00008-09).

There is little doubt that the proposed rule was widely known and discussed among

organizations with seller-funded DPA programs. HUD received over 15,000 public comments;

most opposed the proposed rule, with the vast majority of the opposition comments being

submitted "in a standard similar format and wording." 72 Fed. Reg. at 56,003 (A.R. 00003).

After reviewing and evaluating the comments, HUD published the Regulation, which is

substantially identical to the proposed rule, on October 1, 2007. Id. The publication included

HUD's discussion of the key issues raised in the public comments. Id. at 56,003-06 (A.R.

00003-06).

The Regulation amended existing 24 C.F.R. § 203.19, which sets forth HUD's standards

regarding the mortgagor's (i.e., home purchaser's) investment in property purchased with an

FHA-insured mortgage. Thus, the Regulation requires that the purchaser have available funds

equal to the difference between the cost of acquisition (the sum of the purchase price and

appropriate settlement costs) and the amount of the insured mortgage. See 72 Fed. Reg. at

56,007 (A.R. 00007). The Regulation further requires that those funds "shall not consist, in

whole or in part, of funds provided by any of the following parties before, during, or after closing

of the property sale: (1) The seller or any other person or entity that financially benefits from the

transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the

parties described in paragraph (c)(1) of this section." Id.

The Regulation was scheduled to take effect on October 31, 2007. Pursuant to the 1998

settlement agreement between HUD and Nehemiah mentioned above, see supra note 7, HUD is

contractually required to delay enforcement of the rule against Nehemiah for six months from the date of publication.[10]  Accordingly, the preamble to the Regulation noted that it would not be effective as to Nehemiah until March 31, 2008.  See 72 Fed. Reg. at 56,003 (A.R. 00003).

### E.    The Instant Litigation

This motion for summary judgment is being filed in two cases in which mostly identical challenges to the Regulation are maintained by plaintiffs and plaintiff-intervenors.  In Civil Action No. 07-1282, Penobscot Indian Nation, Penobscot Indian Nation Enterprises and Global Direct Sales LLC (collectively, the "Penobscot Plaintiffs") challenge the validity of the Regulation.  In Civil Action No. 07-1752, plaintiff AmeriDream, Incorporated, and plaintiff-intervenors Genesis Foundation, Home Downpayment Gift Foundation, Partners in Charity, Inc., Futures Home Assistance Program, Sovereign Grant Alliance, Freedom Home Baptist Church, Inc. and Dove Foundation, Inc. maintain a similar challenge.[11]

All plaintiffs in both cases, other than AmeriDream, previously moved for preliminary injunctions barring enforcement of the Regulation.[12]  On October 31, 2007, following a hearing

---

[10] The Nehemiah settlement agreement provides in pertinent part that "[a]ny such actions, changes or modifications regarding the source of down payment assistance funds shall thereafter become applicable to plaintiff's DAP after the expiration of six (6) months from the date of final promulgation and issuance of any such changes or modifications."  Settlement Agreement dated April 3 and 6, 1998, ¶ 2 (A.R. 00884).

[11] For ease of reference, and because they stand in essentially the same position on the merits, plaintiffs and plaintiff-intervenors will be collectively referred to herein as "plaintiffs."

[12] AmeriDream, the original plaintiff in Civil Action No. 07-1752, had originally moved for a temporary restraining order and preliminary injunction.  However, AmeriDream withdrew those motions after the parties were able to agree to a stipulation that stayed the effectiveness of the Regulation as to AmeriDream and set a schedule for briefing this matter on the administrative record.  See Stipulation and Order filed Oct. 19, 2007 (dkt. no. 10).  This occurred before any of the other parties moved to intervene in Civil Action No. 07-1752.

11

on the motions, the Court granted the motions and enjoined defendants from enforcing the

Regulation until the Court has rendered a decision on the parties' motions for summary judgment

(dkt. no. 25 in Civ. A. No. 07-1282; dkt. no. 34 in Civ. A. No. 07-1752).  In addition to finding

irreparable harm, the Court found that the plaintiffs had demonstrated a likelihood of success on

the merits, or at least raised serious questions, as to some of their claims.  The Court  found that

plaintiffs were likely to succeed on their claims that HUD's rulemaking process violated the

APA by relying significantly on data not disclosed to the public, by not adequately responding to

comments, and by failing to explain why it gave one entity a different effective date than the rest

of the industry.  In addition, the Court found that plaintiffs were likely to succeed on their claim

that the Secretary of HUD improperly prejudged the issue based on comments attributed to him

in a news article to the effect that HUD intended to approve the new rule even if the agency

received critical comments.  The Court found that other of plaintiffs' claims were less likely to

succeed on the merits, including their claim that HUD lacked the authority to promulgate the

Regulation, their Equal Protection claim challenging the substance of the Regulation, and the

claim that HUD violated its policies by not consulting with Indian Tribes prior to promulgation

of the Regulation.  The Court further ordered that all parties were bound by the briefing schedule

set out in the Stipulation and Order between AmeriDream and defendants in Civil Action No. 07-

1752 and approved by the Court on October 24, 2007 (dkt. no. 10 in Civ. A. No. 07-1752).  It is

pursuant to that briefing schedule that this motion for summary judgment is filed.

## ARGUMENT

**I.   STANDARD OF REVIEW**

This action seeks judicial review of a regulation issued by HUD pursuant to notice-and-comment rulemaking under the APA.  Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.  See Hammond v. Norton, 370 F. Supp. 2d 226, 238 n.8 (D.D.C. 2005) (involving cross-motions for summary judgment).  In such cases, however, the Court does not employ the standard of review set forth in Rule 56 of the Federal Rules of Civil Procedure.  See id. (citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  Rather, this Court has described the standard of review as follows:

> Under the Administrative Procedure Act ("APA"), a reviewing court may only set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious if an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). Especially in complex, technical areas, there is a strong presumption in favor of upholding agency decisions.  See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-78, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989). Nonetheless, a reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision and then decide whether it was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971).  Review of agency action generally "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." Id. at 420, 91 S. Ct. 814.  If the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made," its decision must be upheld.  Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 105, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983).

Id. at 238.[13]  Furthermore:

> For challenges to an agency's construction of the statutes that it administers, the
> Court's review must be particularly deferential.  The Court must defer to the
> agency's interpretation of a statute that it implements "so long as it is reasonable,
> consistent with the statutory purpose, and not in conflict with the statute's plain
> language."  OSG Bulk Ships v. United States, 132 F.3d 808, 814 (D.C. Cir.1998)
> (quoting Coal Employment Project v. Dole, 889 F.2d 1127, 1131 (D.C. Cir.
> 1989)); see Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837,
> 845, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); Davis v. Latschar, 83 F. Supp. 2d
> 1, 5 (D.D.C. 1998), aff'd, 202 F.3d 359 (D.C. Cir.2000).

Id. at 239.

## II.     THE REGULATION IS A PROPER EXERCISE OF HUD'S STATUTORY AUTHORITY AND IS SUPPORTED BY THE ADMINISTRATIVE RECORD

### A.     The Regulation is Within HUD's Statutory Rulemaking Authority

The National Housing Act requires that a mortgagor "shall have paid" a down payment of

at least 3% of the Secretary's estimated cost of acquisition in order to be eligible for an FHA-

insured mortgage.  See 12 U.S.C. § 1709(b)(9).  To enforce this requirement and others, Congress

gave HUD broad authority to issue regulations: "The Secretary is authorized and directed to make

such rules and regulations as may be necessary to carry out the provisions of this subchapter."  Id.

§ 1715b.[14]  The Supreme Court has held that when Congress grants an agency rulemaking

---

[13] While some agency rules promulgated under the APA are subject to review for whether they are supported by "substantial evidence," that standard of review does not apply here.  It is applicable only to "a case subject to sections 556 or 557 of [title 5] or otherwise reviewed on the record of an agency hearing provided by statute."  5 U.S.C. § 706(2)(E).  The Regulation at issue here was issued through informal rulemaking pursuant to 5 U.S.C. § 553 and was not subject to 5 U.S.C. §§ 556 and 557, or an agency hearing provided by statute.

[14] In addition to this general grant of rulemaking authority, 12 U.S.C. § 1709(a) specifically authorizes the Secretary to insure mortgages that meet the eligibility requirements of the statute "upon such terms as the Secretary may prescribe."  This language clearly empowers the Secretary to regulate concerning the conditions upon which mortgages will be accepted for insurance by FHA.

14

authority with that type of language, a regulation promulgated pursuant to that authority is within the agency's authority so long as it is "reasonably related to the purposes of the enabling legislation." Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356, 369 (1973) (internal quotations omitted); see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)). "Moreover, a regulation is reasonably related to the purposes of the legislation to which it relates if the regulation serves to prevent circumvention of the statute and is not inconsistent with the statutory provisions." Carpenter v. Sec'y of Vet. Affairs, 343 F.3d 1347, 1352 (Fed. Cir. 2003); see also NLRB v. Beverly Enterprises-Massachusetts, Inc.,174 F.3d 13, 32 (1st Cir. 1999) (holding that statutory grants of rulemaking authority employing the phrase "as may be necessary" confer broad power on agencies).

The Federal Circuit's decision in Carpenter v. Secretary of Veterans Affairs, 343 F.3d 1347, is closely analogous. The statutory scheme at issue there prohibited attorneys from charging veterans for certain assistance in applying for veterans' benefits, but did allow attorneys to be paid for such assistance to individual veterans if the payment came from a "disinterested third party." VA became aware that the "disinterested third party" provision was being used to circumvent the prohibition on direct payment by the claimant, as funds from the claimant would simply be funneled through an intermediary organization that purported to be a "disinterested third party." Therefore, VA promulgated a regulation to "prevent circumvention of the statutory prohibition through the use of third-party fee payers." Id. at 1353. The court easily rejected the

15

petitioner's contention that, because the statute did not itself bar the intermediary arrangement, VA lacked authority to do so by regulation. "The agency is authorized to issue rules governing the conduct of third-party fee payers where those rules are designed to prevent circumvention of the statutory prohibition against attorney fee payments made by the claimant or from funds intended for the benefit of the claimant." Id. at 1352. Moreover, "there is no inconsistency between the statute, which prohibits fee payments by claimants, and the regulation, which seeks to prevent circumvention of the statutory prohibition through the use of third-party fee payers." Id. at 1353.

Here, as in Carpenter, the Regulation is reasonably related to the purposes of the enabling legislation because it is designed to prevent circumvention of the statutory requirement that buyers make a meaningful down payment consisting of their own funds. If sellers could simply provide buyers with the funds to make the 3% required minimum investment, there can be no question that the requirement set forth in § 1709(b)(9) would be rendered meaningless. In fact, it is telling that plaintiffs do not suggest that HUD's longstanding policy precluding FHA insurance where sellers directly provide the money for the buyer's down payment is outside its statutory authority.[15] Yet the Regulation is no more than a logical extension of that policy. To allow a third party reimbursed by the seller after loan closing to finance a borrower's down payment is simply an end run around the prohibition on sellers providing such financing directly. HUD's authority to implement and enforce § 1709(b)(9) necessarily includes the ability to strengthen enforcement of the provision by filling gaps in the statute.

---

[15] Indeed, plaintiffs' business model depends on HUD's longstanding prohibition on direct seller funding, because if buyers and sellers could engage in such transactions directly, there would be no need for anyone to hire an intermediary and pay the associated processing fees.

16

**B.      The Regulation is Supported by the Administrative Record**

"Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision

that is supported by the administrative record, whereas 'the function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did.'" Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C.

2006) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)). A court's

review is limited to an assessment of whether the agency has "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." Alpharma, Inc. v. Levitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The

administrative record contains ample support for HUD's assessment of the risks associated with

seller-funded DPA and the need to take action to ensure the continued viability of the FHA

Insurance Fund.

In the publication of the final rule, HUD explained its "primary concern" with seller-

funded DPA:  that "the sales price is often increased to ensure that the seller's net proceeds are

not diminished, and such increase in sales price is often to the detriment of the borrower and

FHA." 72 Fed. Reg. at 56,002 (A.R. 00002). The prevalence of inflated sales prices is supported

by both raw data and the observations of mortgage industry participants. In its November 2005

report, the GAO analyzed "a sample of FHA-insured loans settled in March 2005," and found

that "for loans with seller-funded down payment assistance, the appraised value and sales price

were higher as compared with loans without such assistance." GAO Nov. 2005 Report, at 22-23

(A.R. 00545-46). A study commissioned by HUD interviewed over 400 persons involved in the

mortgage industry and corroborates that assessment; the study "found overwhelming evidence

that the cost of the [down payment assistance] is added to the sales price, which then increases

the allowable FHA loan amount and eliminates any borrower equity in the property."

Concentrance Consulting Group, An Examination of Downpayment Gift Programs Administered

by Non-Profit Organizations (May 1, 2005), at 6 (A.R. 00617, 00631) (attached hereto as Ex.

6).[16]  HUD was not alone in its concern about the effects of seller-funded DPA.  As the GAO

noted in a February 2005 report, leading mortgage industry participants such as Fannie Mae and

Freddie Mac do not allow DPA to be provided by seller-funded entities in part because officials

with those organizations believe that "such seller-related contributions could contribute to an

overvaluation of the price of the property."  GAO Report No. 05-194, Mortgage Financing:

Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products (Feb. 2005)

("GAO Feb. 2005 Report"), at 16 (A.R. 00451, 00470) (attached hereto as Ex. 8).  See also I.R.S.

News Release IR-2006-74 (May 4, 2006) (A.R. 00026) (concluding that the "scheme" of seller-

funded DPA is typically characterized by increased sales prices and higher costs of home

ownership).

Evidence in the administrative record shows that the overvalued sales price makes a loan

originated with seller-funded DPA more likely to result in default than loans involving other

---

[16] HUD also identified specific situations where the amount of DPA was added to the
base sales price of a home through several audits the agency conducted of lenders with
significant numbers of underperforming loans.  See, e.g., HUD Office of Inspector General,
Audit Report of Ryland Mortgage Company, HUD Doc. No. 2006-LA-1001 (Oct. 31, 2005), at 9
(A.R. 00892, 00900) (attached hereto as Ex. 7) ("Ryland inappropriately made price adjustments
to the original base sales price to recover part or all of the amount it provided to the [DPA
provider], service fees, and buydown. . . . [T]he borrowers were essentially unaware that they
were repaying the gift funds through their monthly mortgage payments.  The increase in sales
price caused the payments to be inflated for 13 of the 24 cases by part or all of the amount of the
gift, service fee, and/or buydown.").

DPA sources.  This is the inevitable result of transactions in which buyers too frequently cannot

afford to make inflated mortgage payments.  In the final rule, HUD explained that, based on an

"analysis of its loan portfolio going back to 1998, HUD has assessed that there is 2 to 3 times

greater risk of default and claim" for loans that involve seller-funded DPA.[17]  72 Fed. Reg. at

56,003 (A.R. 00003).  As the GAO recognized, an overvalued purchase price and mortgage

amount results in an increased loan-to-value ("LTV") ratio, and "[t]he higher the LTV ratio, the

less cash borrowers will have invested in their homes and the more likely it is that they may

default on mortgage obligations, especially during times of economic hardship."  GAO Feb. 2005

Report at 17 (A.R. 00471).  After an analysis of FHA mortgage data and default claims, the GAO

concluded that "the presence of seller-funded down payment assistance increased claims by 76

percent."  GAO Nov. 2005 Report, at 32 (A.R. 00555).  Since additional default claims result in

greater losses to FHA, the increased risk of default associated with seller-funded DPA places the

MMIF, FHA insurance fund, at great exposure.  This threat is compounded by the overvaluation

of the mortgage, as HUD will often be forced to resell the property at a loss, since it has insured

an amount in excess of the property's market value.  As HUD explained in the NPRM, "inflated

sales prices result in inflated mortgage amounts, which increase the severity of individual claims

---

[17] The Penobscot Plaintiffs argue that the application of the Regulation to non-charity tribal entities is not supported because the data and concerns that motivated the Regulation generally involved seller-funded DPA provided through charities.  However, that is simply a relic of the historical fact that charities have been the main proponents of the seller-funded DPA business model, and so most of the experience with seller-funded DPA has been in that context. The material consideration is the fact of seller funding, not the particular nature of the intermediary that serves as the conduit for the seller funding.  The Penobscot Plaintiffs do not offer any principled basis -- and there is none -- to expect that the problems associated with seller-funded DPA would somehow be ameliorated when the seller funding is funneled through a for-profit tribal entity rather than a non-profit charity.

on the MMIF and FHA losses on claims paid on such mortgages." 72 Fed. Reg. at 27,049 (A.R.

00012).

While the financial risks posed by seller-funded DPA are inherent in the transaction's

structure, the threat to both the FHA and the FHA Insurance Fund has become increasingly more

severe as the use of seller-funded DPA has grown exponentially in recent years. As the GAO

recognized in its November 2005 report, in 2000 only 6% of FHA-insured loans originated with

down payment assistance from nonprofits. GAO Nov. 2005 Report, at 14 (A.R. 00537). By

2004, the proportion of FHA-insured loans using down payment assistance had grown

dramatically to 30%. Id. Over 90% of the non-profit organizations providing such down

payment assistance were funded by sellers. Id. With such risky loans constituting a growing

portion of the FHA mortgage portfolio, it was entirely reasonable for HUD to exercise its

statutory authority to address an emerging threat to the continued viability of the FHA mortgage

insurance program.

In sum, evidence in the administrative record supports HUD's assessment that down

payment assistance provided by seller-funded charitable organizations results in inflated sales

prices, greater risk of default, and significant exposure for FHA and the MMIF. Based on these

circumstances, the GAO recommended that HUD revise FHA standards to bar seller-funded

entities from contributing to a buyer's down payment investment. GAO Nov. 2005 Report, at 45

(A.R. 00568). It was appropriate for HUD to subsequently decide to take such action.

In its preliminary injunction ruling, this Court found that plaintiffs had a likelihood of

success on the argument that, of three bases relied upon in the final rule, two of them do not

support the rule (Tr. at 19, 22). Defendants respectfully submit, however, that this argument both

takes an unduly narrow view of the bases relied upon in the final rule, and is too quick to diminish the significance of the two items that plaintiffs claim do not support the Regulation.

First, plaintiffs' argument that the final rule identifies only three bases of support for the Regulation is a self-serving caricature, rather than a fair reading, of the final rule. The APA simply requires that final rules be published with a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c); see also Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 545-48 (1978) (holding that courts may not impose requirements for informal rulemaking that exceed the requirements of § 553 and the Constitution). Nothing in this statutory language or the cases interpreting it suggests that only a specific, citeable document like a GAO report, an IRS Revenue Ruling, or a written analysis can serve as a "basis" for a rule. Particularly in cases, like this one, not subject to "substantial evidence" review, see supra note 13, a statement of basis and purpose need not read like proposed findings of fact and conclusions of law, stacked with layers of evidentiary citations. Cf. 1 Richard J. Pierce, Administrative Law Treatise § 7.3, at 436 (4th ed. 2002) (noting in the context of proposed rules that agencies cannot be expected to provide "a complete bibliography of the scientific works" that support the rule). To the contrary, a narrative description of a general problem that an agency has encountered in its administration of a program may suffice, depending on the circumstances. Indeed, growing manipulation of a loophole in a regulatory scheme can easily be a basis for a rule closing that loophole. See, e.g. Carpenter v. Sec'y of Vet. Affairs, 343 F.3d 1347, 1355-56 (Fed. Cir. 2003) (rejecting petitioner's argument that VA rule preventing use of intermediary to circumvent prohibition on certain payments of attorney fees was not supported by the record, because the agency made "statements as to its experience with such agreements," found suspicious circumstances in a

21

number of such agreements, and received comments that corroborated its concerns).[18]

Here, HUD set out the statutory and regulatory background, articulated its longstanding policy against DPA when provided directly by sellers, and, motivated by its experience "that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly," explained that it was concerned by the growing use of the loophole allowing charitable organizations to act as conduits for such funds.  See 72 Fed. Reg. at 56,002 (A.R. 00002).  HUD went on to explain that its "primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and that such increase in sales price is often to the detriment of the borrower and FHA."  Id.  HUD explained that "the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan."  Id. at 56,003 (A.R. 00003).  HUD did discuss the GAO's February 2005 report and the IRS's Revenue Ruling 2006-27 in the course of this discussion, but those two materials do not constitute the sum total of HUD's knowledge and experience on this topic.  Moreover, even to the extent one takes plaintiffs' artificially narrow and formalistic view that only something reduced to writing in a discrete document can serve as a "basis" for a rule, HUD referred to other documents as well in the preamble.  See, e.g., id. (discussing public comments that "shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure," and "stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems"); id. at 56,005 (A.R. 00005) (discussing

---

[18]  Notably, the statement of basis and purpose for the VA rule that the Federal Circuit upheld in Carpenter is substantially shorter and less detailed than that of the rule at issue in the instant case.  See 67 Fed. Reg. 36,102 (May 23, 2002).

analysis of HUD Real Estate Owned (REO) sales data since 2004 showing that sales proceeds from seller-funded DPA are 3-6% less than other REO sales).

Second, plaintiffs are far too quick to diminish the significance of the February 2005 GAO report and the IRS Revenue Ruling themselves. The February 2005 GAO report, as its title shows, addressed serious, emerging risks to the FHA insurance program posed by the proliferation of new forms of transactions, including the provision of seller-funded DPA through intermediaries. See GAO Report No. 05-194, Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products (Feb. 2005) (A.R. 00452). GAO accomplished this analysis, in large part, by comparing FHA's program to the policies and practices of other significant institutions in the mortgage industry, such as Fannie Mae and Freddie Mac. See id. at 2 (A.R. 00456) ("this report examines . . . what lessons FHA might learn from others that support low and no down payments"). With respect to seller-funded DPA, the report observed that FHA's failure to restrict the provision of seller-funded DPA through intermediaries placed it alone among major mortgage industry participants. See id. at 16 (A.R. 00470). "In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property." Id. While plaintiffs attempt to demean these findings and comparisons as casual "remarks" made in "chat[s]" with "unidentified Fannie Mae and Freddie Mac officials," who plaintiffs speculate may

lack "any expertise,"[19] this attempt at trivialization is unsuccessful. GAO duly consulted with Fannie Mae and Freddie Mac, which collectively handle a major share of mortgage volume in the United States, and found that FHA's previous policies regarding seller-funded DPA were notably more lax, permissive, and risk-prone than those prevailing in other market segments, and that Fannie Mae and Freddie Mac perceived seller-funded DPA to be correlated with price inflation in a way that was consistent with HUD's own experience.[20] It was hardly unreasonable, arbitrary, or capricious for HUD to take these findings into account as a factor in promulgating the Regulation, and these findings do support the Regulation.

With respect to the IRS Revenue Ruling holding that the provision of seller-funded DPA is inconsistent with 501(c)(3) tax-exempt status, the Court previously found that "[t]hat's not a basis. Some or all of these organizations could choose to give up their 501(c)(3) designations.

---

[19] AmeriDream's Response to Intervenors' Motions for Preliminary Injunction and HUD's Brief in Opposition Thereto (dkt. no. 32), at 7.

[20] As GAO noted, "Fannie Mae and Freddie Mac are government-sponsored private corporations with stated public missions chartered by Congress to provide a continuous flow of funds to mortgage lenders and borrowers. Fannie Mae and Freddie Mac purchase mortgages from lenders across the country and finance their mortgage purchases through borrowing or issuing mortgage-backed securities that are sold to investors. . . . Their purchase guidelines and underwriting standards have a dominant role in determining the types of loans that primary lenders will originate in the conventional conforming market." GAO Feb. 2005 Report at 8 (A.R. 00462). The Court may take judicial notice of the generally known fact that Fannie Mae and Freddie Mac collectively handle a vast share of mortgage volume in the United States.

Moreover, contrary to plaintiffs' self-serving attempt to portray GAO's findings as based on casual, uninformed "chats," the report makes clear that GAO had extensive discussions with authorized and "knowledgeable" Fannie Mae and Freddie Mac officials (see GAO Feb. 2005 Report at 3 (A.R. 00457)), shared and received a draft of the report with Fannie Mae and Freddie Mac, and received and incorporated technical comments from those entities (see id. at 48-49 (A.R. 00502-03)). Of course, neither GAO in conducting a congressionally chartered investigation, nor HUD in conducting informal rulemaking under 5 U.S.C. § 553, is supposed to proceed by way of a formal evidentiary hearing. See Vermont Yankee, 435 U.S. at 547-48.

They could choose other mechanisms through which to do this, set up subsidiaries, affiliated organizations." Tr. at 20. However, defendants respectfully submit that this statement misapprehends the underlying program. HUD's longstanding policy -- not challenged in this case -- allows gifts of down payment funds <u>only</u> if "the donor is [1] the borrower's relative, [2] the borrower's employer or labor union, [3] a charitable organization, [4] a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate income families or first-time homebuyers, or [5] a close friend with a clearly defined and documented interest in the borrower." HUD Handbook 4155.1, Rev. 5, ¶ 2-10(C) (numerical subdivisions added).[21] With respect to most of the plaintiffs, it is only by virtue of their status as "charitable organization[s]" that they have been able to provide down payment assistance at all.[22] HUD defines charitable organizations as entities that possess valid tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. <u>See</u> HUD Mortgagee Letter 2006-13 (May 25, 2006). Thus, the IRS's determination that the seller-funded DPA business model espoused by plaintiffs is not consistent with 501(c)(3) status as genuine "charitable organization[s]" was highly significant because it removed the sole basis, tax-exempt status-upon which plaintiffs

---

[21] The new Regulation, in a part that has not been challenged by plaintiffs, similarly defines the "[p]ermissible sources of gifts" as family members and certain governmental agencies and instrumentalities, tribal governments or agencies or instrumentalities thereof, an employer or labor union of the mortgagor, organizations with 501(c)(3) tax-exempt status, disaster relief grants, and other sources as may be approved by the Secretary on a case-by-case basis. <u>See</u> 72 Fed. Reg. at 56,007 (subsection (f) of the Regulation).

[22] The IRS Revenue Ruling does not apply to the plaintiffs that are Indian nations or instrumentalities thereof. Those plaintiffs do not need to rely on charitable status, because they are able to provide down payment gifts under the separate category of "governmental agenc[ies] or public entit[ies]" under the Handbook provision, or tribal government or agency or instrumentality thereof under the new Regulation.

could maintain seller-funded DPA programs for FHA-insured mortgages, even absent the new

Regulation.  The only "other mechanisms" through which the putative 501(c)(3) plaintiffs could

avoid the Revenue Ruling would be if they could somehow convert themselves into the

borrower's relative, employer, labor union, close friend, or governmental agency or public entity.

Moreover, contrary to plaintiffs' arguments, the Revenue Ruling is highly relevant to the

problem at hand.  The IRS examined the precise business model that the putative 501(c)(3)

plaintiffs in this case admit to using, and concluded that because "the benefit to the home seller is

a critical aspect of [the organization's] operations," an organization operating under this business

model "is not operated exclusively for exempt purposes" and "does not qualify for exemption

from federal income tax as an organization described in § 501(c)(3)."  Rev. Rul. 2006-27, 2006-

21 I.R.B. 915 (A.R. 00024).  The IRS further explained that "[t]he payments do not proceed from

detached and disinterested generosity, but rather are in response to an anticipated economic

benefit, namely facilitating the sale of a seller's home."  Id.  In a notice accompanying the

Revenue Ruling, the IRS noted that it "has found that organizations claiming to be charities are

being used to funnel down-payment assistance from sellers to buyers through self-serving,

circular-financing arrangements" and that such transactions "ultimately jack up the cost of the

home."  I.R.S. News Release IR-2006-74 (May 4, 2006) (A.R. 00026).  HUD did not err by

taking notice of the fact that another agency of the United States government had officially

concluded that one of HUD's own programs was being manipulated and misused in this way,

forcing the MMIF, other homeowners with FHA-insured mortgages who pay insurance

premiums, and ultimately the taxpayers, to subsidize such activity.  Plaintiffs' argument to the

contrary is not only strained, but perhaps unprecedented:  government agencies are sometimes

criticized for not sufficiently coordinating with each other, but this may be the first time a litigant

has ever argued that an agency violated the APA by being <u>overly</u> cognizant of another agency

dealing with a different facet of the same problem.[23]

## III.   EACH OF PLAINTIFF'S CHALLENGES TO THE REGULATION IS WITHOUT MERIT

### A.   The Regulation Was Promulgated Consistently with the Administrative Procedure Act

#### 1.   HUD Provided Sufficient Notice of the Regulation

As the Court found in ruling on the preliminary injunction motions (Tr. at 23), there is no

serious question about whether HUD provided sufficient notice of the Regulation.  The APA

requires that an agency publish a notice of proposed rulemaking, including "either the terms or

substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C.

§ 553(b)(3).  Courts evaluating whether an NPRM gave sufficient notice of the final rule that it

spawned usually look at whether the final rule is a "logical outgrowth" of the proposed rule.  <u>See</u>,

<u>e.g.</u>, <u>Long Island Care at Home, Ltd. v. Coke</u>, 127 S. Ct. 2339, 2351 (2007); <u>Small Ref. Lead</u>

<u>Phase-Down Task Force v. EPA</u>, 705 F.2d 506, 547 (D.C. Cir. 1983).

Here, HUD published a notice of proposed rulemaking on May 11, 2007, which set out

---

[23]  Plaintiff AmeriDream asserts that the Revenue Ruling actually <u>dis</u>proves that the sales price of homes purchased with nonprofit DPA are often increased to ensure that the seller's net proceeds are not diminished.  <u>See</u> AmeriDream's Response to Intervenors' Motions for Preliminary Injunction and HUD's Brief in Opposition Thereto (dkt. no. 32), at 8.  This assertion is specious.  The IRS's discussion that a down payment assistance gift "represents a rebate or purchase price reduction" related to the technical tax issue of whether such a gift is includible in the buyer's taxable income, not to the general tendency of seller-funded DPA transactions to inflate prices.  Indeed, the whole point is that the "purchase price reduction" that down payment "gifts" purport to represent is typically illusory because the seller typically inflates the home price at the outset in order to cover the cost of the "gift" he anticipates he will have to fund.

the text of a proposed rule precluding the provision of seller-funded DPA through intermediaries

in transactions resulting in FHA-insured mortgage loans, provided a general discussion of the

subject matter, and requested comments.  See  72 Fed. Reg. at 27,048 (A.R. 00011).  The

Regulation, as promulgated is substantially identical to the proposed rule published on May 11.

Thus, it cannot be seriously disputed that the Regulation is a "logical outgrowth" of the proposed

rule, and therefore was preceded by sufficient notice.[24]

### 2.     HUD Was Free to Change its Policy on Seller-Funded DPA and Provided a Reasoned Basis For Doing So

The Supreme Court has emphasized that an agency can – and should – continually

evaluate its interpretations and policies to ensure that they are consistent with the factual and

legal environment.  See Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe R.R. Co., 387

U.S. 397, 416 (1967) ("flexibility and adaptability to changing needs . . . is an essential part of the

office of a regulatory agency").  When an agency changes course on an issue that it has

previously considered, "courts may require only 'a reasoned analysis indicating that prior policies

and standards are being deliberately changed, not casually ignored.'"  Springfield, Inc. v.

Buckles, 292 F.3d 813, 819 (D.C. Cir. 2002) (quoting Greater Boston Television Corp. v. FCC,

444 F.2d 841, 852 (D.C. Cir. 1970) (internal citations omitted)).  It is settled that "[a]n agency's

view of what is in the public interest may change, either with or without a change in

circumstances."  Greater Boston Television Corp., 444 F.2d at 852.

The Court's discussion of this issue in its preliminary injunction ruling effectively merged

---

[24] Defendants treat as analytically distinct, as the Court did in its preliminary injunction ruling, plaintiffs' argument that insufficient notice was given of the facts or data supporting the Regulation (as opposed to the terms of the Regulation itself).  That distinct argument is addressed infra at Part III.A.3.

with its discussion of the general issues of whether the record supported the final rule and whether plaintiffs were given adequate notice of the material on which HUD relied, and the Court did not make an express finding as to plaintiffs' likelihood of success on this discrete argument. See Tr. at 18-23. Defendants submit, as they did in opposing the preliminary injunction, that this case is analogous to Springfield v. Buckles, where the Bureau of Alcohol, Tobacco and Firearms ("BATF") changed its interpretation of whether certain firearms qualified for the "sporting purposes" exception to an import ban. See 292 F.3d 813. Springfield argued that "it was arbitrary and capricious for BATF to bar importation of firearms it had in the past allowed to be imported." Id. at 819. The D.C. Circuit found the "reasoned analysis" standard satisfied by BATF's having "fully explained why it has now decided that this particular military feature found in Springfield's rifles is of considerable significance." Id. Similarly, here, notwithstanding its previous tolerance of indirect seller funding of down payment assistance, HUD has fully explained in the NPRM and final rule why it has now decided that such indirect seller funding represents a serious problem and should not be allowed in FHA-insured mortgages. See supra Part II.B. Nothing more is required.

As HUD's analysis shows, the problems associated with seller-funded DPA have greatly magnified since HUD first considered precluding its use in FHA-insured mortgages in 1999. In 2000, only 6% percent of FHA-insured loans received DPA from nonprofits. See GAO Nov. 2005 Report, at 14 (A.R. 00537). In 2004, that proportion had risen to 30%. See id. The higher risks of default associated with seller-funded DPA than with other FHA-insured loans, combined with the 400% increase in the proportion of FHA-insured loans financed by seller-funded DPA, have led to severe exposure for the MMIF. In these circumstances, it was hardly unreasonable for

29

HUD to reconsider the propriety of continuing to insure such a problematic category of loans.

Given that HUD has adequately justified its decision, there is no fault in "providing a fresh

analysis of the problem." Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs., 545 U.S.

967, 1002 (2005).

It is also important to note that rather than a far-reaching and unanticipated departure

from settled issues of policy, as plaintiffs suggest, the Regulation in fact reconciles HUD's

longstanding policies of allowing charitable organizations and certain other specified entities, but

not sellers, to contribute to a home buyer's down payment.  The Regulation continues to allow

"[o]rganizations described in section 501(c)(3) . . . of the Internal Revenue Code," tribal

governments, and others to provide gifts or grants to a home buyer, but prohibits the use of funds

provided by "(1) The seller or any other person or entity that financially benefits from the

transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the

parties described in paragraph [](1) of this section."  72 Fed. Reg. at 56,007 (A.R. 00007).  The

impact of the Regulation is to preclude charitable organizations from operating simply as a

conduit for a seller's contribution to a buyer's required cash investment – a type of payment long

prohibited by HUD when made directly.  By eliminating a loophole that was increasingly

rendering the prohibition on seller contributions meaningless, and posing an increasing threat to

the FHA insurance fund, the agency is ensuring greater and more effective enforcement of such

policy.

The cases cited by plaintiffs are distinguishable.  For example, Ramaprakash v. FAA, 346

F.3d 1121 (D.C. Cir. 2003), did not involve a rulemaking at all, but rather an adjudicatory order

of the National Transportation Safety Board ("NTSB") upholding a suspension of a pilot's

certificate.  The court vacated the NTSB's order because in three different ways it deviated from

propositions established in prior NTSB case law, all without any explanation, attempt to

distinguish, or signal that it was consciously overruling those propositions.  See id. at 1125-29.

Here, in contrast, HUD does not deny that it has changed its position on whether seller-funded

DPA is rendered permissible if provided through a conduit, but it has provided extensive

explanation of the reasons for its new position.

### 3.    HUD Provided Sufficient Notice of the Reasons for the Regulation

In addition to providing "the terms or substance of the proposed rule," a notice of

proposed rulemaking must provide "a description of the subjects and issues involved," 5 U.S.C.

§ 553(b)(3), and "give interested persons an opportunity to participate in the rule making through

submission of written data, views, or arguments," id. § 553(c).  See Owner-Operator Indep.

Driver Ass'n, Inc. v. FMCSA, 494 F.3d 188, 199 (D.C. Cir. 2007).

In its preliminary injunction ruling, the Court found that plaintiffs had a likelihood of

success on their claim that HUD violated these standards by not affording the plaintiffs an

opportunity to comment on an analysis by FHA of its loan portfolio that was referenced in the

final rule's discussion of comments received.  See Tr. at 20-21.  However, this finding was

derivative of the Court's antecedent finding that there likely was no other valid basis for the

Regulation.  See Tr. at 21 ("Given the flimsiness of the other two bases in particular, this

becomes a critical factor, a critical source of information that went to the heart of the matter as to

whether this rule is justified.").  As defendants already have shown, a full and fair review of the

record shows that the Regulation is well supported on a number of grounds, and that the other

two bases to which the Court was referring are not, in fact, "flimsy."  See supra Part II.B.  Given

31

that the Regulation is independently justified on other grounds, the additional analysis that FHA

conducted of its loan portfolio in a good-faith effort to address comments does not constitute "the

most critical factual material" supporting the Regulation.

Moreover, it is significant that HUD's reference to FHA's analysis of its loan portfolio

came as part of a specific response to public comments. Of course, "[r]ulemaking proceedings

would never end if an agency's response to comments must always be made the subject of

additional comments." Cmty. Nutrition Inst. v. Block, 749 F.2d 50, 58 (D.C. Cir. 1984). This

fact distinguishes the instant case from Chamber of Commerce v. SEC, 443 F.3d 890 (D.C. Cir.

2006), where the data at issue was offered not in an attempt to respond to comments, but as the

"primary" and "critical" basis for a cost analysis that the SEC was required to conduct pursuant

to a prior D.C. Circuit decision, see id. at 903. Instead, this case is more analogous to Solite

Corp. v. EPA, 952 F.2d 473 (D.C. Cir. 1991), where the D.C. Circuit rejected an argument that

EPA "'performed a classic bait-and-switch' by 'substituting at the last moment one set of data

and analysis for another.'" Id. at 484 (quoting petitioners' brief). As the D.C. Circuit held,

"updated and expanded data in the [new survey] enabled EPA to respond to several industry

objections to use of the data in the [earlier report] . . . by providing a more precise quantitative

measure based on more complete information . . . ." Id. at 485. Exactly the same is true here. In

the NPRM, HUD explained a basis for its concerns with seller-funded DPA by saying that

"inflated sales prices result in inflated mortgage amounts which increase the severity of

individual claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages.

Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the

risk to FHA increases if FHA cannot recover the full amount when FHA acquires and resells a

home . . ." 72 Fed. Reg. at 27,049 (A.R. 00012).  By later referencing FHA's portfolio history in

the final rule, HUD was responding to an objection to HUD's risk assessment with a more

precise metric of the increased risk (a "2 to 3 times greater risk of default and claim") produced

by mortgages with seller-funded DPA.  72 Fed. Reg. at 56,003 (A.R. 00003).

To the extent that plaintiffs argue that the NPRM was inadequate because it did not

specifically cite the November 2005 GAO Report, as opposed to a February 2005 GAO Report

dealing with similar subject matter, that contention is also without merit because plaintiffs cannot

reasonably complain that the November 2005 GAO Report somehow took them by surprise.  See

Community Nutrition Inst. v. Block, 749 F.2d 50, 58 (D.C. Cir. 1984) (emphasizing need for

party claiming lack of notice to show prejudice).  When the November GAO Report came out, it

challenged the very underpinnings of plaintiffs' business model, and there is little doubt that it

was widely discussed among providers of seller-funded DPA.  AmeriDream repeatedly discussed

that report, and in fact relied on aspects of it, in its comment letter, see AmeriDream Aug. 9,

2007 Comment Letter at 5-6, 7, 15 (A.R. 66613, 66617-19, 66627) (attached hereto as Ex. 9),

and went so far as to commission a study to respond to it, see A.R. 00438-50.

In any event, to the extent plaintiffs raise a technical objection that the November 2005

GAO report was not cited by name in the NPRM, they fail to recognize that the IRS press release

accompanying Revenue Ruling 2006-27, which was cited in the NPRM, see 72 Fed. Reg. at

27,049, directly refers to the November 2005 GAO Report by name.  I.R.S. News Release IR-

2006-74 (May 4, 2006) (A.R. 00026)  Moreover, the NPRM cited a GAO report from a few

months before dealing with the same general topic.  As a leading administrative law scholar has

explained, "potentially affected members of the public do not need . . . a bibliography to submit

meaningful comments critical (or supportive) of the agency's proposal.  They should assume that

the agency's proposal is based on the published literature in the fields relevant to the proposal

and should shape their comments with reference to that literature."  1 Kenneth J. Pierce,

Administrative Law Treatise § 7.3, at 436.  Moreover, in the D.C. Circuit and elsewhere, courts

have found "actual notice" of the content of an extra-record report where commenters

specifically addressed the report or its pertinent issues during the rulemaking.  See City of

Stoughton v. EPA, 858 F.2d 747, 752-53 (D.C. Cir. 1988) (upholding EPA rule because while

agency had not made a consultant's report available to the public, it had adequately set forth its

theory on the issue and commenters could and did specifically address the issues raised).  As

AmeriDream's comment letter shows, that is what happened here.

In hindsight, it might have been preferable for the NPRM to have included an express

citation to the November 2005 GAO Report and to FHA's analysis of its loan portfolio.

However, the APA does not require perfection.  Its plain language calls for the agency to provide

"a description of the subjects and issues involved," not the likes of an article in a scholarly

journal complete with reams of data, mathematical calculations, and exhaustive citations to the

relevant literature.  See 5 U.S.C. § 553(b)(3); see also Vermont Yankee, 435 U.S. at 545-48

(holding that courts may not impose requirements for informal rulemaking that exceed the

requirements of § 553 and the Constitution).  This standard was amply met here.  The notice of

proposed rulemaking left little doubt as to the subject matter of the proposed rule and the issues

involved, and thousands of people did "participate in the rule making through submission of

written data, views, or arguments."  5 U.S.C. § 553(c).  Plaintiffs' argument that they did not

have adequate notice of the basis for the rule or a meaningful opportunity to comment should be

rejected.

> **4.    HUD Considered Reasonable Alternatives and Properly
> Rejected Them**

The APA "has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial." Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984). Rather, the agency is obliged to address in a reasonable manner those comments that raised "significant problems." See Covad Commc'ns v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006). Conversely, the agency bears no obligation to provide a substantive response to comments that are not themselves substantial. See Thompson, 741 F.2d at 408 (citing Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)). To that end, a lack of specific response to any discrete comment is significant "'only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" Covad, 450 F.3d at 550 (quoting Thompson, 741 F.2d at 408). And a comment must contain "meaningful analysis or data refuting the agency's conclusions" to merit substantive response. Thompson, 741 F.2d at 409. This Court properly recognized these standards in ruling on the preliminary injunction motions. See Tr. at 22 ("HUD, of course, is right that they don't need to respond to every comment, they don't need to analyze every alternative. They need to only consider the significant comments and the reasonable alternatives.").

Here, as defendants previously pointed out, nearly four full pages of the Federal Register issuing release are devoted to a detailed discussion of 28 discrete categories of comments. See 72 Fed. Reg. at 56,003-06 (A.R. 00003-06). In the preliminary injunction ruling, however, the

Court found that "when you look at most of the 28 comments on which they commented, they are either irrelevant or minor points. And as to the major points, HUD didn't go a very good job of explaining why they were rejecting the comments. In fact, if you look at the first four and read the responses by HUD, they're mostly nonsequiturs." Tr. at 22.

Defendants agree with the first part of the Court's statement -- that many of the 28 comments were irrelevant or minor points -- but it is not clear why that should be held against defendants. Indeed, given that defendants have no obligation at all to respond to irrelevant or minor points, see Thompson, 741 F.2d at 408, they should not be faulted for going above and beyond what the APA requires. As for the first four comments addressed in the rulemaking, defendants respectfully submit that HUD's responses are not non sequiturs. For example, the second comment was that "[a]lthough down payment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level." 72 Fed. Reg. at 56,003. In response, HUD (1) explained that it had determined that purchase loans involving seller-funded DPA present a 2-3 times greater risk of default from loans with DPA funded by other sources; (2) cited two statistical analyses illustrating this differential; and (3) explained that "[t]he difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund." Id. at 56,003-04. This discussion responds directly to the comment with data and explanation. Similarly, the third comment was that "HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers." Id. But, as HUD pointed out in response, FHA requirements already required disclosure. See id. It is not a non sequitur to respond to a proposed alternative

by pointing out that the so-called alternative is already in place.[25]  Similarly, HUD properly

responded to commenters' suggestions to require home inspections or warranties by noting that

the sales price inflation caused by seller-funded DPA transactions "is a separate issue from repair

costs a homeowner may face after purchasing a home."  Id.

In its preliminary injunction ruling, the Court also mentioned -- without making a finding

as to likelihood of success -- the allegation that the final rule did not adequately refute or deal

with an analysis performed by researchers associated with George Mason University ("GMU").

See Tr. at 21.  HUD did not err in this respect.  As a threshold matter, while AmeriDream did

briefly reference the 2006 GMU study (as well as a separate 2007 GMU study) in its comment

letter during the rulemaking process, it did not actually submit a copy of either study, and it cited

them for propositions entirely different from its current far-reaching argument that the GMU

researchers somehow rebutted the conclusions reached by GAO about the riskiness of seller-

funded DPA.[26]  Standing alone, this omission warrants rejection of AmeriDream's current

argument.  See Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is

---

[25] Indeed, in its preliminary injunction, the Court appeared to accept this rationale in a
slightly different context.  See Tr. at 22-23 (stating that, contrary to plaintiffs' argument, certain
suggestions GAO made in its November 2005 report "were not really alternatives to the Rule"
because "[t]hey were things that were already being done").

[26] The sole mention of the 2006 GMU study in AmeriDream's comment letter was as
support for the proposition that "[i]n 2005, the average income of a homebuyer receiving DPA
was $43,551, or 69 percent of the average household income nationally.  In addition, about two
in five homebuyers receiving assistance had a co-borrower, indicating a need for additional
financial resources."  AmeriDream Aug. 9, 2007 Comment Letter at 7 (A.R. 66619).  Compare
AmeriDream's Response to Intervenors' Motions for Preliminary Injunction and HUD's Brief in
Opposition Thereto (dkt. no. 32), at 20 (citing the 2006 GMU study for the proposition that
"prominent academic economists who have identified serious flaws in the methodology used by
GAO").

black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.") (internal quotation marks omitted); Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1231 (D.C. Cir. 2007) ("Objections must be prominent and clear enough to place the agency on notice, for [the agency] is not required to cull through all the letters it receives and answer all of the possible implied arguments.").  HUD was not required in the preamble to the final rule to anticipate arguments or potential uses of a study that AmeriDream, one of nearly 15,000 commenters, did not itself squarely present during the comment period.

In any event, the GMU study fails to rebut the GAO's conclusions.  Far from "identif[ying] serious flaws in the methodology used by GAO" (AmeriDream's Response to Intervenors' Motions for Preliminary Injunction and HUD's Brief in Opposition Thereto (dkt. no. 32), at 20), the AmeriDream-funded GMU study actually complimented the GAO study as the "most rigorous" of several that had been done.  Lisa A. Fowler & Stephen S. Fuller, An Evaluation of Research on the Performance of Loans with Down Payment Assistance (Sept. 2006), at 2 ("GMU Study") (attached hereto as Ex. 10) (A.R. 00437, 00439).  The GMU study also emphasized that it "did not rigorously examine the methodology GAO used; however, the model [GAO] used to estimate home prices is standard in the field."  Id. at 4 (A.R. 00441). While the GMU study did imply that the GAO study did not include all of the independent variables that would be necessary for "an ideal regression analysis of loan performance," it almost immediately retracted this criticism, conceding that "[i]t would be virtually impossible to collect all of this data for a large enough sample with which to run a regression," and emphasized that "[t]he point is not that GAO should have included all of the above factors as independent

38

variables." Id. at 5 (A.R. 00442)  In other places, while the GMU study did attempt to plant

seeds of doubt about some of the conclusions reached by GAO, all of the GMU study's criticisms

were couched in highly tentative and equivocal language:  "[t]he descriptive results . . . could be

overstating the extent of the default and/or claim rates;" "[t]heir results . . . could be subject to

alternative interpretation;" "this type of dummy variable may be an inadequate measure of

resources."  Id. at 1, 5 (emphasis added) (A.R. 00438, 00442).  But the GMU study repeated,

without expressing any doubt or caveats, the staggering finding by GAO that "assistance from a

'seller-funded' nonprofit increased the probability that the loan would default by 93% compared

to loans with no assistance."[27] Id. at 10 (A.R. 00447).  The APA did not require HUD to go out

of its way to make a comprehensive analysis and rebuttal of all aspects of a study that

AmeriDream only mentioned in passing in its comments, and that offered only a tepid and

inconclusive analysis of the matters in issue.[28]

---

[27] The GMU study seizes upon the fact that "the national results from the GAO
multivariate regression analysis show no statistically significant difference in the claim rates of
NDPA loans and FHA loans with other types of gifts."  GMU Study at 2 (A.R. 00439); see also
id. at 10 (A.R. 00447) (citing GAO Nov. 2005 Report at 69 (A.R. 00592)).  However, review of
the GAO report in full context shows that this comparison is a single island of statistical
insignificance, in a sea of statistically significant differences.  The national results did show a
statistically significant difference in the claim rates of FHA loans with some form of DPA,
compared to those without it.  See Nov. 2005 GAO Nov. Report at 69 (A.R. 00592).  Further,
when using Metropolitan Statistical Area (MSA) rather than national data, there were statistically
significant differences in claims rates both between seller-funded DPA and no DPA, and between
seller-funded DPA and non-seller-funded DPA.  See id.  And, as the GMU study concedes, when
default rates rather than claim rates are used as the relevant metric, "[t]he differences between
'seller-funded' assistance and assistance from other sources were large and were statistically
significant."  GMU Study at 10 (A.R. 00447) (citing Nov. 2005 GAO Report at 68 (A.R.
00591)).

[28] It should be noted, however, that to the extent the GMU study criticized the GAO's
analysis for not segregating the effects of seller-funded DPA from other variables, HUD did

**5.    Certain Plaintiffs' Arguments That HUD Lacks Statutory
Authority to Issue the Regulation Are Wholly Without Merit**

To the extent any of the plaintiffs intend to press the argument that HUD exceeded its

statutory mandate,[29] this Court was correct in its initial assessment that the claim is without

merit.  See Tr. at 26.  The Regulation is well within HUD's statutory mandate for the reasons

discussed above in Part II.A.  Plaintiffs' only arguments to the contrary appear to be that because

the statute does not directly and expressly prohibit seller-funded DPA in FHA-insured

mortgages, HUD lacks the authority to do so by regulation; or that because Congress amended

the statute in other respects during the period when seller-funded DPA was permitted by HUD,

but did not speak to this particular issue, Congress somehow "endorsed" and locked HUD in to

its previous approach.  The first form of the argument is self-defeating; it makes no sense to say

that an agency's regulations can only impose requirements that the enabling statute itself already

expressly provides for.  Putting aside that few regulations would survive that test, it would defeat

---

address this issue, even if it did not mention the GMU study by name in the process (which, of
course, is not required).  HUD acknowledged receiving comments to the effect that "[t]he rule is
not supported by data.  The analysis of the [GAO] found that down payment-assisted loans had
higher default and claim rates than other FHA loans, but did not segregate the effects of down
payment assistance from those of low down payments and low credit ratings.  HUD should
conduct additional research because the data presented does not appear to be conclusive."  72
Fed. Reg. at 56,005 (A.R. 00005).  HUD responded to these comments by noting that it "has
collected and analyzed additional data through its portfolio analysis.  This analysis provides
additional verification of the higher level of risk associated with down payments funded by a
seller or other financially interested party compared to down payments funded from other
sources, which HUD continues to permit.  HUD's analysis has also established that loans with
down payment assistance from sellers or other parties with a financial interest in the transaction
have a higher loss rate associated with them and currently represent 30 percent of FHA's REO
portfolio."  Id.

[29]   At least some of the plaintiffs appeared to abandon this claim at oral argument on the
motions for preliminary injunction.

the whole purpose of regulations if they could only be redundant of the statute.  See Chevron,
U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) ("The power of an
administrative agency to administer a congressionally created . . . program necessarily requires
the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by
Congress.") (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).  The second variation of the
argument fails in light of AFL-CIO v. Donovan, 757 F.2d 330 (D.C. Cir. 1985), where the D.C.
Circuit held that Congress's inaction on a particular issue does not cause the agency's then-
current regulatory approach to become engrafted into the statute and thus incapable of later
alteration.  See id. at 344 (rejecting argument that Department of Labor was barred from
changing its interpretation of the Service Contract Act of 1965 because Congress had allegedly
ratified its previous interpretation by amending the statute several times without addressing that
interpretation).[30]  As in Donovan, Congress's amendment of the statute in unrelated ways during
a period in which HUD withheld taking action to prohibit seller-funded DPA in FHA-insured
mortgages simply does not serve to demonstrate any congressional intent to forbid HUD from
taking such action.

---

[30]  In their preliminary injunction briefs, some of the plaintiffs relied upon Cook County,
Ill v. United States ex rel. Chandler, 538 U.S. 119, 132 (2003), and Cottage Savs. Ass'n v. C.I.R.,
499 U.S. 554, 561 (1991).  But these cases merely support the principle that, when an agency's
longstanding regulation or interpretation of a statute is left unchanged by repeated congressional
reenactments of the underlying statute, the agency's action may be deemed to have received the
approval of Congress and should be given appropriate deference by a court.  It is one thing to
give an agency deference on the basis of implicit congressional approval of the agency's action,
but it is entirely another to require the agency to refrain from acting in light of congressional
silence.

### B.     The Regulation Does Not Violate the Equal Protection Component of the Fifth Amendment's Due Process Clause

The Court correctly concluded in its preliminary injunction ruling that plaintiffs' equal protection challenge to the substance of the Regulation is meritless.[31]  See Tr. at 26.  No suggestion has been made that the applicable standard of review is anything other than rational-basis.  See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (equal protection "require[s] only that the classification challenged be rationally related to a legitimate state interest"); see also American Towers, Inc. v. Williams, 146 F. Supp. 2d 27, 30-31 (D.D.C. 2001) ("To pass constitutional muster under the equal protection component of the Fifth Amendment's Due Process Clause, an official government action need only bear a rational relationship to a legitimate governmental purpose so long as no suspect or quasi-suspect class is involved."), aff'd mem., 50 Fed. Appx. 448 (D.C. Cir. 2002).  As the Court previously concluded, "[t]here is a rational basis for saying that seller-funded down-payment assistance poses special problems." Tr. at 26.  Home sellers have a self-interest in seeing a particular transaction completed in a way that other donors do not.  Indeed, home sellers are uniquely situated to inflate the selling price (or to refrain from discounting an already inflated selling price) to offset a DPA gift, whereas with other donors there is no possibility of the transaction being distorted in this way.  As discussed above, HUD found that seller-funded down payment assistance posed special problems, such as increased risk of default, that are simply not associated in the same magnitude with down payment assistance from other sources, such as family members or legitimate charities.  See 72

---

[31] We address plaintiffs' separate and discrete equal protection claim as to the different effective dates for Nehemiah and AmeriDream separately below.  See infra Part III.F.

Fed. Reg. at 56,003 (A.R. 00003) (noting that for loans endorsed for insurance in FY 2001, the cumulative claim rate as of July 2007 was 7.1% for loans with permitted sources of DPA such as relatives, but 15.8% for loans with seller-funded DPA).  Plaintiff AmeriDream's own experts conceded that "[t]he differences" in default rates "between 'seller-funded' assistance and assistance from other sources were large and statistically significant."  GMU Study at 10 (A.R. 00447).  Thus, the Regulation's prohibition of seller-funded down payment assistance is rationally related to the legitimate governmental interests in preventing abusive transactions that circumvent the statutory 3% purchaser-contribution requirement and result in higher sale prices and more risky loans at the expense of the overall viability of the MMIF.  The Regulation plainly does not violate equal protection on this basis.

## C.    HUD Did Not Improperly Prejudge the Regulation

To succeed on their claims that Secretary Jackson impermissibly "prejudged" the outcome of the rule-making process, plaintiffs must prove through "clear and convincing" evidence that Secretary Jackson possessed "an unalterably closed mind on matters critical to the disposition of the proceeding."  See Ass'n of Nat'l Advertisers, Inc. v. FCC, 627 F.2d 1151, 1170 (D.C. Cir. 1979).  Of course, plaintiffs must as a threshold matter show that Secretary Jackson in fact was the decision-making official before his comments concerning the substance of the rule-making even become an issue.  Plaintiffs cannot satisfy either of those requirements.

First, the record establishes that any comments Secretary Jackson may have made concerning the substance of the rule-making were immaterial to the process because he was not the decision-maker in the rule-making process.  Rule-making authority for regulations governing a wide range of single- and multi-family housing programs is expressly delegated to the FHA

Commissioner, who is directly appointed by the President to that position.  See Consolidated

Delegation of Authority for the Office of Housing – Federal Housing Administration (FHA), 71

Fed. Reg. 60,169 (Oct. 12, 2006) (attached hereto as Ex. 11).  Pursuant to this delegation, the

FHA Commissioner possesses the authority "to issue rules or regulations to carry out housing

programs," id., including those created by the National Housing Act, 12 U.S.C. § 1701 et seq., id.

at 60,171.  Rules relating to the permissible sources of downpayment funds for the purchase of

single-family homes financed through FHA-insured loans fall squarely within this area of

delegated authority.  See 12 U.S.C. § 1709.  Thus, the decision-making official who was

responsible for the rule-making was the FHA Commissioner, as evinced by his signature at the

end of both the NPRM and the Regulation.  See 72 Fed. Reg. 56,002, 56,007 (signature of Brian

D. Montgomery, Ass't Sec'y for Housing – Fed. Housing Commissioner); 72 Fed. Reg. 27,048,

27,051 (signature of Brian D. Montgomery, Ass't Sec'y for Housing – Fed. Housing

Commissioner).  This alone should foreclose plaintiffs' prejudgment claim.[32]

 In this respect, International Snowmobile Manufacturers Association v. Norton, 340 F.

Supp. 2d 1249 (D. Wyo. 2004), upon which plaintiffs relied at the preliminary injunction stage,

provides no support for plaintiffs' argument; to the contrary, it underscores that the Court must

focus its analysis on the official who possesses decision-making authority over a challenged rule-

making.  See 340 F. Supp. 2d at 1253-55, 1260-61.  Similarly, although the Court suggested at

---

 [32]  Plaintiffs' own arguments elsewhere further weaken their prejudgment argument.  Far
from alleging any bias on the part of FHA Commissioner Montgomery, plaintiffs previously have
gone out of their way to portray him as an ally of seller-funded DPA.  See, e.g., AmeriDream
Resp. to Intervenors' Mots. for P.I. and HUD's Brief in Opp. Thereto at 4-5 (AmeriDream dkt.
no. 32); Penobscot Am. Comp. § 53 (Penobscot dkt. no. 15).

the preliminary injunction stage that it found International Snowmobile persuasive, Tr. at 28-29, a more detailed comparison of International Snowmobile's facts to those at issue here establishes that the Court's preliminary conclusion was incorrect.[33]

Unlike this case, the commenting official in International Snowmobile – the Assistant Secretary for Fish and Wildlife and Parks – was in fact the Department of the Interior decision-maker in the rule-making process at issue there. 340 F. Supp. 2d at 1253-55, 1260-61 (finding that the Assistant Secretary had made at least two apparently prejudicial comments during the rule-making period). Significantly, the Assistant Secretary was the decision-maker in that rule-making pursuant to a broad rule-making Delegation of Authority from the Secretary of the Interior. See Dep't of the Interior, Departmental Manual Part 209, Chapter 6, § 6.1(A) (Sept. 9, 1994) (attached hereto as Ex. 12).[34] Here, as shown supra, the Secretary of HUD does not retain

---

[33]  It should be noted that plaintiffs neither discussed nor analyzed the facts of International Snowmobile in their preliminary injunction memoranda, instead relying solely on a single parenthetical to argue that it constituted persuasive authority from a district court outside the D.C. Circuit. See, e.g., AmeriDream P.I. Mem. at 41 (dkt. no. 4).

[34]  Section 6.1(A) of the Department Manual stated as follows:

6.1 **Delegation.** Subject to the limitations in 200 DM 1, the Assistant Secretary for Fish and Wildlife and Parks is authorized to exercise all of the authority of the Secretary including, but not limited to:

     A.  The authority to issue amendments of and additions to the material in the Code of Federal Regulations.

Dep't of the Interior, Departmental Manual Part 209, Chapter 6, § 6.1(A) (Sept. 9, 1994). This version of Part 209, Chapter 6 was superceded by an identical provision issued on May 31, 2007, although this version governed the period encompassed by the rule-making challenged in International Snowmobile, which occurred between 1993 and 2003. See 340 F. Supp. 2d at 1254.

rule-making authority for FHA regulations; rather, through a broad provision similar to that in

International Snowmobile, he has delegated that authority to the FHA Commissioner.  Thus,

whereas International Snowmobile concerned comments made by the decision-making official,

this case concerns comments made by an official outside of the rule-making process.  For that

reason, the Court's observation that in International Snowmobile "it was only an Assistant

Secretary, not the Secretary," who made the comments at issue, Tr. at 28-29, underscores that

insofar as International Snowmobile is relevant to the facts of this case, it only underscores the

conclusion that Secretary Jackson's comments do not suggest that HUD improperly prejudged

the rule-making outcome.

Moreover, even if the Court were to conclude that Secretary Jackson occupied the

decision-maker role in this rule-making despite the express delegation of authority to the FHA

Commissioner, plaintiffs cannot meet their evidentiary burden to make a "clear and convincing"

showing that the Regulation was the product of improper prejudgment on Secretary Jackson's

part.  That is because the sole basis for plaintiffs' claim is a single Bloomberg.com news story

dated June 5, 2007, attributing certain comments to Secretary Jackson.  That news story is not

part of the administrative record, and thus cannot be considered by the Court at summary

judgment absent exceptional circumstances.  Commercial Drapery Contractors, Inc. v. United

States, 133 F.3d 1, 7 (D.C. Cir. 1998); James Madison, Ltd. v. Ludwig, 82 F.3d 1085, 1095 (D.C.

Cir. 1996) (administrative record comprises the "materials compiled by the agency . . . that were

before the agency at the time the decision was made."); see also Holy Land Found. for Relief &

Dev. v. Ashcroft, 219 F. Supp. 2d 57, 65 (D.D.C. 2002).  As established in Camp v. Pitts, 411

U.S. 138 (1973) (per curiam), "[t]he focal point for judicial review" of agency action "should be

the administrative record already in existence, not some new record made initially in the reviewing court."  411 U.S. at 142; see also Florida Light & Power v. Lorion, 470 U.S. 729, 743-44 (1985).  Accordingly, "courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made," and "should have before [them] no more nor less information than did the agency when it made its decision."  IMS, P.C. v. Alvarez, 129 F.3d 618, 623-24 (D.C. Cir. 1997); Recreational Fishing Alliance v. Evans, 172 F. Supp. 2d 35, 40 (D.D.C. 2001) ("courts [must] review only those facts before the agency at the time of the action"); NTEU v. Seidman, 786 F. Supp. 1041, 1046 (D.D.C. 1992).  Because the Bloomberg news story was not part of the agency's administrative record during the rule-making process, it cannot support plaintiffs' claims on this count.

       To the extent plaintiffs may argue that some heretofore-unidentified exceptional circumstances might justify going beyond the record to consider the Bloomberg news story, that argument cannot succeed.  "[B]ecause a court's review of an agency's decision is confined to the administrative record," "[i]n the administrative law context courts uniformly have held that discovery typically is not permitted."  Common Sense Salmon Recovery v. Evans, 217 F. Supp. 2d 17, 20 (D.D.C. 2002); see also Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (challengers to agency action are not ordinarily entitled to augment the agency's record with discovery); Texas Rural Legal Aid, Inc. v. Legal Serv. Corp., 940 F.2d 685, 698 (D.C. Cir. 1991).  Discovery may be permitted in APA litigation only in rare instances where: (1) the plaintiff has made a "strong showing of bad faith or improper behavior" by the agency; (2) "there have been no contemporaneous administrative findings," or the record is otherwise so bare, that discovery provides "the only possibility for effective judicial review;" or

(3) the plaintiff makes a "strong" or "substantial" showing that the agency deliberately or

negligently excluded documents that may be adverse to its decision.  Common Sense Salmon

Recovery, 217 F. Supp. at 20; TOMAC v. Norton, 193 F. Supp. 2d 182, 194-95 (D.D.C. 2002);

AMFAC Resorts, LLC v. Dep't of the Interior, 143 F. Supp.2d 7, 11, 12-13 (D.D.C. 2001); see

also Zyko v. Dep't of Defense, 180 F. Supp. 2d 89, 92 (D.D.C. 2001); Beverly Enter., Inc. v.

Herman, 130 F. Supp. 2d 1, 7 (D.D.C. 2000).[35]  Plaintiffs have made no showing whatsoever as

to any of these three factors, and thus cannot persuasively argue that the administrative record

that the agency actually considered should be augmented to include the Bloomberg news story.

Insofar as plaintiffs may seek to rely on International Snowmobile to argue that the

comments attributed to Secretary Jackson in the Bloomberg news story should be considered,

they find no support there.  In International Snowmobile, unlike here, the comments at issue (one

of them a written memorandum to the Director of the National Park Service) were actually part

of the rule-making process, the promulgation of a Final Rule that ultimately disallowed most

recreational snowmobile use in several national parks, 340 F. Supp. 2d at 1253-55, 1260-61.  In

particular, the memorandum to the Director of the NPS actually directed the NPS "to prohibit

---

[35]  This Court previously has noted that evidence of bad faith or improper behavior is not
required for a court to supplement an agency's administrative record.  Ad Hoc Metals Coalition
v. Whitman, 227 F. Supp. 2d 134, 139-40 n.5 (D.D.C. 2002) (citing Citizens to Preserve Overton
Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971)).  However, the Court noted that such showings are
still necessary where the method of supplementation involves testimony inquiring into the mental
processes of decision-making officials.  Id.  This case represents the latter situation, as a set of
comments in a news story do not in and of themselves constitute the substantive data or analysis
that comprise the contents of an administrative record.  In other words, what plaintiffs appear to
be seeking through the inclusion of Secretary Jackson's quoted and paraphrased comments
represents discovery rather than supplementation; thus, they must make a showing of bad faith or
improper behavior to warrant any consideration of those comments.

snowmobile access in national park units," and included what the court termed "a sweeping condemnation of all recreational snowmobile use in the National Park System," one of the multiple alternatives the agency was considering in the rule-making process. Id. at 1260. Accordingly, the memorandum was part of the administrative record, see id., as was the transcript of a press conference in which the Assistant Secretary made similar statements, see id. (quoting cited portions of the administrative record). By contrast, the comments made by Secretary Jackson in this case were part of an interview with a reporter, and played no role in the decision-making process, as shown supra.

Finally, even if the Court were persuaded that it would be appropriate to consider the Bloomberg news story in adjudicating this matter, plaintiffs still cannot carry their heavy burden to show that HUD prejudiced the outcome of the rule-making process. "An administrative official is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" United Steelworkers of Am. v. Marshall, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)). "Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." Housing Study Group v. Kemp, 736 F. Supp. 321, 332 (D.D.C. 1990). As plaintiffs concede, a court may set aside agency action based on an official's public comment "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding." Ass'n of Nat'l Advertisers, 627 F.2d at 1170. Moreover, for obvious reasons, agency officials have much more leeway to engage in discussion of policy issues in the rule-making context, compared to adjudications. See id. at 1168 ("The

legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues."); Housing Study Group, 736 F. Supp. at 333 ("In order to intelligently perform his duties by making informed decisions, Secretary Kemp has made his intention known so that interested parties can contribute to the debate.").

The Bloomberg.com story cited by plaintiff clearly does not meet the Association of National Advertisers standard. The story provides a single quotation from Secretary Jackson addressing seller-funded DPA: "'I'm very much against it,' Jackson said in an interview. 'I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.'" The article then purports to paraphrase Secretary Jackson, contending that "Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." Id.

The direct-quote statement, of course, does nothing more than show that Secretary Jackson "expressed strong views" or "[held] an underlying philosophy," which as a matter of law does not establish predecisional bias. Housing Study Group, 736 F. Supp. at 332. Nor does a statement attributed to Secretary Jackson that HUD intended to approve the rule even if it received critical comments represent "clear and convincing" proof of an "unalterably closed mind." Ass'n of Nat'l Advertisers, 627 F.2d at 1170. The fact that an agency has published a notice of proposed rule-making itself is an indication of the agency's intention to promulgate a final rule, similar to the one published in the notice, at the end of the public comment period. While the review and evaluation of comments can certainly lead the agency to revise or even withdraw the proposed rule – as HUD's previous consideration of the rule at issue shows – it is hardly prejudicial for an agency official to express the mere intention to implement the rule as

50

proposed.  Furthermore, HUD and Secretary Jackson had every reason to anticipate heavy

opposition to the proposed rule, given the mobilization of entities with a financial interest in

being able to continue their seller-funded DPA programs, and given that – as noted in the very

next sentence of the Bloomberg story – the previous consideration of this issue led to an

"overwhelming majority of comments" opposing the rule.  66 Fed. Reg. 2,851.  Simply put,

language in a news story attributed to Secretary Jackson cannot by itself overcome the "strong

presumption of administrative regularity."  Ass'n of Nat'l Advertisers, 627 F.2d at 1168.  For all

of these reasons, plaintiffs cannot succeed on their claim that the rule-making outcome was

"prejudged" on the basis of Secretary Jackson's comments.  Thus, defendants are entitled to

summary judgment as to this claim.

> **D.    HUD Promulgated the Regulation Consistently With the
>        Regulatory Flexibility Act**

Although they did not press it as part of their preliminary injunction motions, plaintiffs

also assert a claim under the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612.[36]  That statute

requires agencies, at the same time they propose rules through a notice of proposed rulemaking,

to "prepare and make available for public comment an initial regulatory flexibility analysis" that

"shall describe the impact of the proposed rule on small entities."  5 U.S.C. § 603(a).  The statute

also requires that final rules be accompanied by a "final regulatory flexibility analysis."  5 U.S.C.

§ 604.  The statute specifies the contents of both types of analysis.  5 U.S.C. §§ 603(b) (initial),

604(b) (final).  However, neither an initial nor final regulatory flexibility analysis is required "if

---

[36]  See AmeriDream Compl. ¶ 28; Genesis/HDGF Compl. ¶ 17; Partners in Charity et al.
Compl. ¶ 17; FHBC/Dove Compl. ¶ 18; Penobscot Am. Compl. ¶ 60.

the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). Because the Regulatory Flexibility Act is "purely procedural," it requires only a "'reasonable, good-faith effort to carry out [RFA's] mandate.'" U.S. Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001) (quoting Alenco Commn's v. FCC, 201 F.3d 608, 625 (5th Cir. 2000)). As one Judge of this Court recently explained, "a court reviewing a RFA-based challenge does not evaluate whether the agency got the required analysis right, but instead examines whether the agency has followed the procedural steps laid out in the statute. What is required of the agency is not perfection, but rather a reasonable, good-faith effort to take those steps and therefore satisfy the statute's mandate." N.C. Fisheries Ass'n, Inc. v. Gutierrez, __ F. Supp.2d __, No. 06-cv-1815 (JDB), 2007 WL 2331048, *24 (D.D.C. Aug. 17, 2007).

Here, the agency certified in both the notice of proposed rulemaking and the final rule that "this rule will not have a significant economic impact on a substantial number of small entities." 72 Fed. Reg. at 27,050 (A.R. 00013); 72 Fed. Reg. at 56,006 (A.R. 00006). Plaintiffs' claim that this certification violated the Regulatory Flexibility Act fails for four separate and independent reasons.

First, this issue has not been preserved for judicial review. As AmeriDream itself has stressed, "a party challenging a final agency regulation must previously have raised their arguments in the agency rulemaking proceedings." AmeriDream's Opp. to Mots. to Intervene (dkt. no. 18), at 2. See also Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to

52

consider the issue."); Environmental Defense Center, Inc. v. EPA, 344 F.3d 832, 879 n.66 (9th Cir. 2003) (considering Regulatory Flexibility Act claim, but commenting that "[o]ur consideration of the issue at all may be gratuitous, since petitioners failed to submit timely comment disputing the adequacy of EPA's consideration of economic impacts on small businesses proposed [in the NPRM]").  None of the plaintiffs except AmeriDream even mentioned the Regulatory Flexibility Act in their comments, if they even submitted any comments at all.[37]  And AmeriDream's sole mention of the Regulatory Flexibility Act in its 16-page, single-spaced comment letter consisted of the following:  "While there is no specific definition for 'economically significant' listed in the Executive Order [12,866], the description of 'having an annual effect on the economy of $100 million or more . . .' is clearly met by DPA, as detailed above.  As such that would then provide under the Regulatory Flexibility Act additional analysis on the DPA subject matter to be undertaken."  AmeriDream Aug. 9, 2007 Comment Letter at 13 (A.R. 66625).  This half-formed and legally inaccurate prose falls short of giving the agency the meaningful notice of the substance of an objection that is necessary for preservation.[38]

---

[37] Genesis apparently did not submit any comments of its own, but instead attempts to piggyback on comments submitted by the National Association of Home Builders, in which it claims it "participated significantly," Schwedland 10/26/07 Decl. ¶ 5 and Ex. 2 (filed with Genesis/HDGF's motion for preliminary injunction), but which do not mention the Regulatory Flexibility Act.  HDGF's comments are attached as Ex. 1 to the Del Sontro 10/26/07 Decl., and do not mention the Regulatory Flexibility Act.  The Penobscot Plaintiffs submitted a comment letter that did not mention the Regulatory Flexibility Act.  On information and belief, Partners in Charity, Inc., Futures Home Assistance Program, Sovereign Grant Alliance, Freedom Home Baptist Church, and Dove Foundation never submitted comments on the proposed rule.

[38] To the extent the comment was trying to say that the fact that the proposed rule qualified as a "significant regulatory action" under Executive Order 12,866 triggered additional requirements under the Regulatory Flexibility Act, that analysis is simply erroneous.  See Exec. Order 12,866, § 6(a)(3) (attached hereto as Ex. 13) (listing requirements stemming from

See Vermont Yankee, 435 U.S. at 553-54 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"); Nat'l Ass'n of Clean Air Agencies, 489 F.3d at 1231 (emphasizing need for comments to be "prominent and clear enough to place the agency on notice").

Second, only a "small entity" may sue under the Regulatory Flexibility Act's judicial review provision.  See 5 U.S.C. § 611(a).  The statute defines "small entity" to include, inter alia, "small organization," which in turn is defined as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field . . . ."  5 U.S.C. § 601(4) (emphasis added).  None of the plaintiffs have established that they fit the definition of "small organization" or "small entity."[39]  And the record tends to suggest that the only plaintiff who

_____

"significant regulatory action" classification).  In any event, as discussed elsewhere in the margin, see infra note 44, HUD's compliance with Executive Order 12,866 is not subject to judicial review.

[39] The Penobscot Plaintiffs' Amended Complaint implies that the Penobscot Indian Nation constitutes a "small governmental jurisdiction," which is a type of "small entity."  See Penobscot Pls. Am. Compl. ¶¶ 73-74; 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand").  However, as the Court already found in the analogous context of the Penobscot Plaintiffs' lack-of-tribal-consultation claim, it is doubtful that plaintiffs can show that the Regulation has a significant economic impact on the Penobscot Indian Nation as a whole.  See Tr. at 29.  Moreover, as set forth above, the Penobscot Plaintiffs failed to preserve any issue under the Regulatory Flexibility Act.  In any event, a significant economic impact on a single such entity would not establish that the rule will "have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b) (emphasis added); see Envtl. Defense Center, 344 F.3d at 879 (rejecting as erroneous an

even arguably might have preserved this issue, AmeriDream, does not qualify. AmeriDream, after all, touts itself as "one of the nation's most prominent DPA providers, and is the nation's largest nonfaith-based DPA charity," and boasts of having disbursed over 200,000 "gifts" to aspiring homeowners totaling $726 million, resulting in $21.8 billion in FHA-insured loans. AmeriDream PI Mem. at 6. Its website calls it "the nation's largest nonprofit down payment gift provider,"[40] and "the Gold Standard for down payment gift programs, . . . the program by which all other gift programs are matched."[41] An entrenched industry leader making hundreds of millions of dollars in "gifts" in hundreds of thousands of transactions nationwide is hardly the type of "small entity" that Congress was seeking to protect through the Regulatory Flexibility Act and its judicial review provision.

Third, the agency was not obligated to consider the economic impact of the Regulation on AmeriDream and other so-called charities that run seller-funded DPA programs, because those entities are not directly regulated by HUD or FHA. The D.C. Circuit "has consistently rejected the contention that the [Regulatory Flexibility Act] applies to small businesses indirectly affected by the regulation of other entities." Cement Kiln Recycling Coalition v. EPA, 255 F.3d 855, 869 (D.C. Cir. 2001) (citing cases) (emphasis added). In Cement Kiln, the court reviewed an EPA rule that regulated hazardous waste combustors by imposing new emissions standards on them.

_____

interpretation that "rewrites the test to omit the 'substantial number' component").

[40] See "What to Look For in a DPA," http://www.ameridream.org/Homebuyers/What%20to%20Look%20For (visited Nov. 16, 2007) (screen shot attached as Ex. 14).

[41] http://www.ameridream.org/Documents/Brochures/Brochure-English.pdf (visited Nov. 16, 2007) (screen shot attached as Ex. 15).

A business that was a hazardous waste <u>generator</u> complained that EPA's regulatory flexibility analysis failed to take into the account the economic impact on itself and other generators of hazardous waste, who were expected to bear some of the burdens of compliance. <u>Id.</u> at 868. The Court rejected this argument, noting that "the language of the statute limits its application to the 'small entities <u>which will be subject to the proposed regulation</u>' -- that is, those 'small entities <u>to which the proposed rule will apply</u>.'" <u>Id.</u> at 869 (quoting <u>Mid-Tex Elec. Coop. v. FERC</u>, 773 F.2d 327, 342 (D.C. Cir. 1985) (quoting 5 U.S.C. § 603(b)) (emphasis in <u>Mid-Tex</u>)). After all, "Congress 'did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy.'" <u>Id.</u> at 869 (quoting <u>Mid-Tex</u>, 773 F.2d at 342). Such an approach would convert rulemaking "into a massive exercise in economic modeling." <u>Id.</u> Applying the same principle, in <u>Nat'l Women, Infants, and Children Grocers Ass'n v. Food & Nutrition Serv.</u>, 416 F. Supp. 2d 92 (D.D.C. 2006), a Judge of this Court held that the Food and Nutrition Service ("FNS") did not have to consider the economic impact that a new rule requiring states to adopt certain cost containment measures in connection with the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") would have on food vendors whose sole business consisted of selling through the WIC program. <u>See id.</u> at 108-10. The court reasoned that "the entities directly regulated by the interim rule are state agencies. The state agencies, not WIC-only vendors, are required to establish price criteria in order to receive federal funding." <u>Id.</u>[42]

---

[42] <u>Accord</u> <u>Mich. v. EPA</u>, 213 F.3d 663, 688-89 (D.C. Cir. 2000) (where rule directly regulated state governments, agency did not have to analyze economic impact on small entities likely to be affected by state governments' compliance with rule); <u>Motor & Equip. Mfrs. Ass'n v. Nichols</u>, 142 F.3d 449, 467 (D.C. Cir. 1998) (where rule directly regulated automobile

Here, AmeriDream and other charities that facilitate transactions involving seller-funded DPA are not "directly regulated" by the Regulation. Rather, the Regulation simply establishes conditions that a lender must follow if it expects FHA to insure a mortgage arising out of a home purchase. To be sure, the Regulation is likely to reduce the demand for seller-funded DPA inasmuch as it attaches negative consequences (i.e., ineligibility for FHA insurance) to the buyer's receipt of such DPA. But such a reduction in demand for services of a third party is the type of "indirect effect" that the D.C. Circuit has held the Regulatory Flexibility Act does not reach. See Cement Kiln, 255 F.3d at 869 (no regulatory flexibility analysis required as to hazardous waste generators even where "EPA actually intended to affect the conduct of hazardous waste generators by raising the cost of incineration"); see also Grocers Association, 416 F. Supp. 2d at 410 (no regulatory flexibility analysis required as to WIC-only vendors even if such entities were "'targets' of the interim rule"). Thus, HUD was not required to consider the economic impact of disallowing seller-funded DPA on the business models of entities other than lenders whom the Regulation directly regulates.[43]

---

manufacturers, agency did not have to analyze economic impact on aftermarket parts manufacturers) Mid-Tex, 773 F.2d at 340-43 (where rule directly regulated utilities, agency did not have to analyze economic impact on wholesale customers of utilities).

[43] The D.C. Circuit's recent decision in Aeronautical Repair Station Ass'n, Inc. v. FAA, 494 F.3d 161 (D.C. Cir. 2007), is not to the contrary. In Aeronautical Repair Station, the court concluded that the agency was required in its regulatory flexibility analysis to address the economic impact of new FAA drug and alcohol testing regulations on contractors and subcontractors of air carriers, rather than merely air carriers themselves. Key to the court's decision was the fact that "the regulations expressly require that the employees of contractors and subcontractors be tested . . . . In other words, the 2006 Final Rule imposes responsibilities directly on the contractors and subcontractors and they are therefore parties affected by and regulated by it." Id. at 177. In contrast, the HUD Regulation at issue in this case does not directly regulate the conduct of charities that provide down payment assistance; it merely sets

Fourth, even if (1) HUD was required to analyze the economic impact of the Regulation on seller-funded DPA programs, and (2) AmeriDream preserved the issue for judicial review and (3) somehow could be considered the type of "small entity" entitled to sue under the Regulatory Flexibility Act, HUD's certification that the Regulation would not have a significant economic impact on a substantial number of small entities clearly passes muster. As HUD explained in the notice of proposed rulemaking, existing law -- specifically, IRS Revenue Ruling 2006-27 -- already prevents charitable organizations from providing seller-funded down payment assistance while maintaining their tax-exempt status under I.R.C. § 501(c)(3). See 72 Fed. Reg. at 27,050 (A.R. 00012). HUD's regulatory flexibility analysis, of course, was not required to assume that such organizations would structure their programs in ways that flout the tax laws. See Carpenter v. Sec'y of Vet. Affairs, 343 F.3d 1347, 1357 (Fed. Cir. 2003) ("because the effect of the amendments would be to prevent fee arrangements that were already unlawful under current statutory standards, they would not have a substantial effect on the legitimate activities of any small entities"). HUD further observed that, as reflected in the same Revenue Ruling, there are other ways that charitable organizations can legitimately provide down payment assistance, and that down payment assistance programs that conform to the Revenue Ruling are not prohibited by the new rule. See 72 Fed. Reg. at 27,050. Particularly in light of this Circuit's law that the Regulatory Flexibility Act requires only a "reasonable, good-faith effort," U.S. Cellular Corp., 254 F.3d at 88 (internal quotation marks omitted), these conclusions are eminently reasonable

certain restrictions on mortgage loans for which FHA insurance is available. Charities remain free to provide down payment assistance under the Regulation.

and should be upheld.[44]

    **E.**    **The Penobscot Plaintiffs' Tribal Consultation Policy**
                     **Argument Is Without Merit**

As the Court concluded at the preliminary injunction stage, the Penobscot Plaintiffs'

claim that HUD violated its tribal consultation policy in promulgating the rule is without merit.

See Tr. at 29.  As the final rule indicates, responding to a comment to the same effect:

> As with other rules that are generally applicable and, thus, also incidentally apply
> to Indian tribes, HUD did not undertake tribal consultation.  HUD's tribal
> consultation policy states, "Tribal Coordination, Collaboration and Consultation
> applies when any proposed policies, programs or actions are identified by HUD as
> having a substantial direct effect on an Indian tribe."  (66 FR 49785).  Since the
> effect of the rule on tribes is only incidental and since the rule applies to all FHA-
> insured single family mortgages, the tribal consultation policy is not applicable.

72 Fed. Reg. at 56,006 (A.R. 00006).  The Penobscot Plaintiffs do not plead -- and cannot -- that

the Regulation will have a substantial direct effect on the Penobscot Indian Nation.  See

Penobscot Pls.' Am. Compl. ¶¶ 65-71.  Indeed, the Penobscot Indian Nation just approved

formation of a down payment assistance program earlier this year, see id. ¶¶ 24-25, and their

---

[44] The Complaints also allege that the Regulation was promulgated in violation of
Executive Order 12,866, which establishes an Executive Branch-wide framework for regulatory
planning and review.  However, that Order expressly provides that "[t]his Executive order is
intended only to improve the internal management of the Federal Government and does not
create any right or benefit, substantive or procedural, enforceable at law or equity by a party
against the United States, its agencies or instrumentalities, its officers or employees, or any other
person."  Exec. Order 12,866 § 10.  As such, it creates no private right of action.  See Associated
Fisheries of Me., Inc. v. Daley, 954 F. Supp. 383, 390 (D. Me.) (rejecting bid for judicial review
of compliance with Exec. Order 12,866), aff'd, 127 F.3d 104 (1st Cir. 1997); Trawler Diane
Marie, Inc. v. Brown, 918 F. Supp. 921, 932 (E.D.N.C. 1995) (same); see also Mich. v. Thomas,
805 F.2d 176, 187 (6th Cir. 1986) (same conclusion regarding predecessor executive order
containing same language); Blackfeet Nat'l Bank v. Rubin, 890 F. Supp. 48, 51 (D.D.C. 2005)
(Friedman, J.) (rejecting on other grounds motion for preliminary injunction against regulation
sought on the ground that, inter alia, it was promulgated in violation of Exec. Order 12,866).

59

pleadings are notably vague about to what extent it is fully operational. Summary judgment should be granted for defendants on this claim.

   **F.    The Differential Effective Dates in the Regulation Do Not Violate
           the APA or Equal Protection, But if the Court Finds to the Contrary,
           the Sole Remedy Should Be to Extend the Effective Date**

   The plaintiffs all assert APA and equal protection claims regarding the provision of a special March 31, 2008 effective date to Nehemiah Progressive Housing Development Corporation ("Nehemiah"), as opposed to the generally applicable October 31, 2007 effective date of the Regulation. On the preliminary injunction motions, this Court found that plaintiffs had a "substantial likelihood of success" on their claims that HUD violated the APA by not providing an explanation for giving the later effective date to Nehemiah but not to all others. See Tr. at 23-26.[45]

   Defendants note at the outset that this is an issue with a limited shelf life. Because this Court has issued a preliminary injunction barring HUD from enforcing the Regulation, the differential effective dates do not currently have any impact, and what impact they ultimately have will depend on the date this Court issues final judgment. If the Court upholds the Regulation in a decision on or after March 31, 2008, the differential effective dates will not have any effect because the special period given to Nehemiah will have already expired. If this Court sets aside the Regulation on other grounds, it will not need to reach this issue because the differential effective dates will not matter. It is only if the Court upholds the Regulation in a decision before March 31, 2008 that the differential effective dates will matter, although even

_____

   [45] This disposition made it unnecessary for the Court to reach the separate issue of whether the differential effective dates violated equal protection. See Tr. at 26.

then, the disparity may have been substantially narrowed from the original five-month difference, depending on how much time remains until March 31, 2008.

In any event, the Court found it significant that the effective dates and the Nehemiah settlement agreement are discussed in the final rule.  See Tr. at 25.  Defendants agree that the fact that the effective dates are set forth in the final rule makes them subject to judicial review under the APA.  However, defendants submit that the APA's requirement of explanation is met.  As a general matter, final rule releases generally do not contain elaborate discussion of effective dates, because it is assumed that a rule will go into effect shortly after it is published in final form.  Indeed, the APA provides a default effective date of 30 days after publication, subject to certain exceptions.  See 5 U.S.C. § 553(d).  Here, the Regulation was to be generally effective on that default date, 30 days after its publication on October 1.  However, because of a prior contractual obligation, the Regulation had to carve out a special effective date for Nehemiah.  The final rule described the nature and source of that contractual obligation, which explains the later effective date for Nehemiah.  See 72 Fed. Reg. at 56,003 (A.R. 00003).  This was sufficient explanation.  If it was not improper to enter into the settlement agreement with Nehemiah alone in the first place, surely HUD's ability to honor its contractual obligations does not come only at the price of making those benefits universally applicable to everyone.[46]

The Court cited three cases in its preliminary injunction ruling for the proposition that the

------

[46]  In its preliminary injunction ruling, the Court reasoned that the Nehemiah settlement "explains the settlement in 1998.  It doesn't explain the October 31st date now."  Tr. at 25.  But the Nehemiah settlement does explain why the agency was obligated to carve out an exception delaying the effectiveness of the Regulation as to Nehemiah by six months.  The generally applicable October 31 effective date is a function of ordinary effective date principles, see 5 U.S.C. § 553(d), and did not require any elaborate explanation.

APA requires an agency to provide a rational basis for treating similarly situated entities differently.  Again, defendants do not dispute this proposition, but contend that it was not violated here.  In Transactive Corp. v. United States, 91 F.3d 232 (D.C. Cir. 1996), the court found that the Treasury Department had not sufficiently justified its position that only a party qualifying under certain statutes as a "financial agent of the federal government" could administer Treasury's Electronic Benefits Transfer program.  See id. at 237.  In Independent Petroleum Ass'n v. Babbitt, 92 F.3d 1248 (D.C. Cir. 1996), the court examined the Department of the Interior's requirements that royalties were due from its lessees on one form of payment that they received from gas pipelines, but not on another form of payment from gas pipelines that the court found "functionally indistinguishable."  See id. at 1257-60.  And in Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20 (D.D.C. 1997), this Court dealt with a situation where the Food & Drug Administration chose to regulate three of four "virtually identical" products as drugs, and the fourth as a medical device subject to a separate, and allegedly less onerous, regulatory track. See id. at 24-25, 27-28.  None of the distinctions found arbitrary in these cases is analogous to a difference in treatment that flows contractually from a settlement agreement entered into with one particular entity at a time when the other, allegedly similarly situated entities were not even in existence.

The Court also observed that HUD had written in a letter at the time of the Nehemiah settlement agreement that it would extend the delay in effectiveness to "all other similarly situated DPA programs."  Tr. at 24-25; see also A.R. 00891.  It is important to note that while this letter was attached as an exhibit to the Nehemiah settlement agreement, HUD's adherence to this language was not a binding part of HUD's settlement with Nehemiah.  Rather, the language

in the letter merely represented a statement of HUD's unilateral intent at that time.  The

settlement agreement itself, in contrast, is clear that the six-month delay, inasmuch as it

constitutes a binding contractual obligation, applies only to Nehemiah.  <u>See</u> Settlement

Agreement dated April 3 and 6, 1998, ¶ 2 (A.R. 00884) ("Any such actions, changes or

modifications regarding the source of down payment assistance funds shall thereafter become

applicable to <u>plaintiff</u>'s DAP after the expiration of six (6) months from the date of final

promulgation and issuance of any such changes or modifications.") (emphasis added); <u>see also</u>

<u>id</u>. at preamble (A.R. 00883) (defining "plaintiff" as Nehemiah Progressive Development

Corporation).  While HUD's initial intent was to make the six-month delay generally applicable

to all similarly situated down payment assistance providers, that was ten years ago when the DPA

landscape was far different than it has become.  In 1998, seller-funded DPA was in a nascent

stage and was not a major industry player, whereas today it has been identified as a key threat to

the MMIF's economic viability.  <u>See generally supra</u> at 7-9, 20 (tracing history and explosive

growth of seller-funded DPA).  In light of these changed circumstances, it was not arbitrary and

capricious for HUD to decide, notwithstanding its original intent, that immediate action was

necessary except to the extent direct, express contractual obligations required otherwise.

       For the above reasons, the different effective date for Nehemiah did not violate the APA

or equal protection principles.  However, should the Court find to the contrary (and not find the

Regulation deficient on any other grounds), the remedy would not be to vacate the Regulation in

its entirety, but merely to stay the effectiveness of the Regulation for whatever period of time

remains before March 31, 2008.  In this Circuit, whether the invalidation of a particular provision

of a regulation requires the entire regulation to fall depends on whether severance would "impair

63

the function" of the remainder, and whether there is any indication that the regulation would not

have been issued "but for the inclusion" of the offending portion. See Davis County Solid Waste

Mgmt. v. U.S. EPA, 108 F.3d 1454, 1460 (D.C. Cir. 1997) (citing K-Mart Corp. v. Cartier, Inc.,

486 U.S. 281, 294 (1988)). Here, of course, the Regulation's ability to function substantively is

completely independent of and unaffected by the particular date upon which it becomes effective.

Moreover, given what the administrative record shows about the nature of the problem HUD was

addressing, there is no basis on which to conclude that HUD's issuance of this Regulation was

somehow contingent on its being able to prescribe different effective dates for different entities.

HUD gave a later effective date to Nehemiah not for any public policy reason, but because it was

under a contractual obligation to do so. Thus, if the Court finds that the different effective date

for Nehemiah violates the APA or equal protection, such a finding would not require invalidation

of the Regulation in toto, but only a generally applicable stay of its effectiveness until March 31,

2008 to bring all parties into parity with Nehemiah.[47]

---

[47] To the extent the plaintiffs other than AmeriDream, even after receiving their own preliminary injunction, continue to challenge the stipulation HUD entered with AmeriDream in this litigation providing for a stay of effectiveness as to AmeriDream until February 29, 2008, that claim is without merit for the reasons identified by the Court in its preliminary injunction ruling. See Tr. at 23-24 ("I'm inclined to agree with the principle as articulated by the government that a decision it makes in litigation is not subject to APA review . . . . And so I don't think that the plaintiffs have any likelihood of succeeding in showing that there was a violation of the Administrative Procedure Act with respect to the AmeriDream stipulation.").

**CONCLUSION**

For the foregoing reasons, defendants respectfully request that their motions for summary judgment be granted.

Dated: November 16, 2007                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            JEFFREY A. TAYLOR
                                            United States Attorney

                                            ____/s/ Tamara Ulrich_____
                                            MICHAEL SITCOV
                                            TAMARA ULRICH
                                            CHRISTOPHER HALL
                                            ROBERT J. KATERBERG
                                            SCOTT RISNER
                                            United States Department of Justice
                                            20 Massachusetts Avenue, N.W.
                                            Washington, D.C. 20530
                                            Telephone: (202) 514-4778
                                            Fax: (202) 616-8470

                                            Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN TRIBE,<br>PENOBSCOT INDIAN NATION ENTERPRISES<br>and GLOBAL DIRECT SALES, LLC,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>HOUSING AND URBAN DEVELOPMENT,<br>*et al.*,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case Number: 1:07cv01282<br>)<br>)    Hon. Paul L. Friedman<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

Upon consideration of the Defendants' motion to dismiss or, in the alternative for

summary judgment, it is hereby

ORDERED, that the motion is GRANTED; and it is further

ORDERED, that judgment is entered in favor of Defendants.


Dated: _____          _____

                                         Hon. Paul L. Friedman
                                         U.S. DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PENOBSCOT INDIAN NATION, et al., ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 07-1282 (PLF) |
| ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., ) ) ) ) | |
| ) | |
| Defendants. ) | |
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| and ) | |
| ) | |
| GENESIS FOUNDATION, et al., ) | |
| ) | |
| Intervenors, ) | |
| v. ) | Civil Action No. 07-1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, ) ) ) ) ) | |
| ) | |
| Defendant. ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Defendants, by and through their undersigned counsel, and pursuant to Local Civil Rules

7(h) and 56.1, submit the following statement of material facts not in dispute.

Judicial review of this action is governed by the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701 to 706.  In APA cases, the district court sits as an appellate tribunal.  Univ. Med.

Ctr. of S. Nev. v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999).  Under the APA, judicial

review is normally confined to the administrative record already in existence, and does not

contemplate a new factual record developed in federal district court. Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985) (The district court "is not required to resolve any facts in a review of an administrative proceeding. Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."). Therefore, no material facts are in dispute, there is no role for the admission of facts or evidence into the record beyond the administrative record itself, and there is no need for a trial. See Fl. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985); Nat'l Audubon Soc'y v. U.S. Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1993). While all material facts are within the administrative record, which stretches over 15,000 pages, Defendants set forth below some of the material facts that support their motion for summary judgment. While this statement includes certain matters that are appropriately characterized as matters of law, the inclusion of such matters is done only to provide necessary context, and should not be construed as defendants' assessment that they should be treated as matters of fact rather than law.

1.      Section 203 of the National Housing Act allows the Department of Housing and Urban Development ("HUD") to insure certain mortgages, provided that the mortgagor "shall have paid on account of the property (except with respect to a mortgage executed by a mortgagor who is a veteran) at least 3 per centum, or such larger amount as the Secretary may determine, of the Secretary's estimate of the cost of acquisition." 12 U.S.C. § 1709(b)(9). The Secretary of Housing and Urban Development, Alphonso Jackson, has authority under the Act "to make such rules and regulations as may be necessary to carry out the provisions of this subchapter." Id. § 1715b. Rule-making authority for regulations governing a wide range of single- and multi-family housing programs is expressly delegated to the Commissioner of the Federal Housing

Administration ("FHA") as one of several HUD assistant secretaries.  <u>See</u> Consolidated

Delegation of Authority for the Office of Housing – Federal Housing Administration (FHA), 71

Fed. Reg. 60,169-01 (Oct. 12, 2006).  Pursuant to this delegation of authority, the FHA

commissioner possesses the authority "to issue rules or regulations to carry out housing

programs," <u>id.</u> at 2, including those created by the National Housing Act, 12 U.S.C. § 1701 <u>et</u>

<u>seq.</u>, <u>id.</u> at 7.

2. HUD published a notice of proposed rulemaking ("NPRM"), signed by the FHA

Commissioner, on May 11, 2007.  72 Fed. Reg. 27,048; A.R. 00011.  The notice outlined the

statutory authority for the rulemaking, and indicated that "[t]he proposed rule would establish

that a prohibited source of down payment assistance is a payment that consists, in whole or in

part, of funds provided by any of the following parties before, during, or after closing of the

property sale: (1) The seller, or any other person or entity that financially benefits from the

transaction; or (2) any third party or entity . . . that is reimbursed directly or indirectly by any of

the parties listed in clause (1)."  72 Fed. Reg. 27,049; A.R. 00012.

3. In the NPRM, HUD expressed its concern with situations in which a charitable

organization establishes a fund that provides a "gift" to a homebuyer but is then "replenished

after loan closing by the seller who provides a 'charitable donation' and, in some cases, pays a

'service fee' to the organization from the proceeds of the house and does so only if the

homebuyer is using the charitable organization's downpayment assistance program."  72 Fed.

Reg. 27,048; A.R. 00011.  HUD explained that "the sales price is often increased to ensure that

the seller's net proceeds are not diminished, and such increase in sales price is often to the

detriment of the borrower and FHA."  72 Fed. Reg. 27,048; A.R. 00011.  Among other sources,

the NPRM refers to a February 2005 report from the Government Accountability Office entitled

"Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products," and Revenue Ruling 2006-27, in which the Internal Revenue Service found that seller-funded DPA providers do not qualify as tax-exempt organizations under section 501(c)(3) of the Internal Revenue Code.  A.R. 00024-25.

5.      HUD invited comments from the public, and initially provided a 60-day comment period.  72 Fed. Reg. 27,048; A.R. 00011.  On July 11, 2007, HUD extended that period for an additional 30 days.  72 Fed. Reg. 37,500; A.R. 00008-09.  HUD received over 15,000 comments in response to the rule, and subsequently noted that most of the comments were submitted "in a standard similar format and wording."  72 Fed. Reg. 56,003; A.R. 00003.

6.      On October 1, 2007, HUD published a final rule, which is substantially identical to the terms of the NPRM and that, like the NPRM, was signed by the FHA Commissioner and not the Secretary of Housing and Urban Development.  72 Fed. Reg. 56,003; A.R. 00003.  The final rule requires that a purchaser have available funds equal to the difference between the cost of acquisition and the amount of the insured mortgage.  72 Fed. Reg. 56,007; A.R. 00007.  The rule provides that those funds "shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller or any other person or entity that financially benefits from the transaction; or (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section."  72 Fed. Reg. 56,007; A.R. 00007.

7.      The publication of the final rule included HUD's detailed discussion of 28 discrete categories of issues raised in the public comments.  72 Fed. Reg. 56,003-06; A.R. 00003-06.

8.      The final rule was scheduled to become generally effective on October 31, 2007.

72 Fed. Reg. 56,002; A.R. 00002.  In 1998, HUD entered into a settlement agreement with

Nehemiah Progressive Development Corporation that terminated a suit Nehemiah had brought

against HUD.  In that agreement, HUD agreed that any future changes to its treatment of DPA

providers "shall thereafter become applicable to [Nehemiah] after the expiration of six (6)

months from the date of final promulgation and issuance of any such changes or modifications."

See A.R. 00884.  Pursuant to that agreement, HUD delayed the effective date of the final rule at

issue in this case as to Nehemiah until March 31, 2008.  72 Fed. Reg. 56,003; A.R. 00003.

       9.     All further material facts in this action are contained in the certified

administrative record.

Dated: November 16, 2007           Respectfully submitted,

                                  PETER D. KEISLER
                                  Assistant Attorney General

                                  JEFFREY A. TAYLOR
                                  United States Attorney

                              */s/ Tamara Ulrich*_____
                                  MICHAEL SITCOV
                                  TAMARA ULRICH
                                  CHRISTOPHER HALL
                                  ROBERT J. KATERBERG
                                  SCOTT RISNER
                                  United States Department of Justice
                                  20 Massachusetts Avenue, N.W.
                                  Washington, D.C. 20530
                                  Telephone: (202) 514-4778
                                  Fax: (202) 616-8470

                                  Attorneys for Defendants

# Exhibit 1

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

November 2005

# MORTGAGE FINANCING

## Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance



**GAO**

Accountability ★ Integrity ★ Reliability

00518

## The Percentage of Purchase Loans in FHA's Portfolio with Down Payment Assistance Has Been Increasing Since 2001

As the number of home mortgages FHA insures each year has fallen, the number of FHA-insured single-family purchase money loans with nonprofit down payment assistance has not. As a result, the proportion of loans with down payment assistance that FHA insures each year has increased significantly. From 2000 to 2004, the total proportion of FHA-insured single-family purchase money loans that had an LTV ratio greater than 95 percent and that also involved down payment assistance, from any source, grew from 35 to nearly 50 percent (fig. 2).[21] Assistance from nonprofit organizations, about 93 percent of which were funded by sellers, accounted for an increasing proportion of this assistance. Approximately 6 percent of FHA-insured loans received down payment assistance from nonprofit organizations in 2000, but, by 2004 this figure had grown to about 30 percent.[22] Our analysis of a sample of FHA-insured loans from 2000 to 2002 showed that the average amount of down payment assistance, regardless of source, was about $3,400 and that the amount of down payment assistance relative to sales price was about 3 percent.[23]

---

[21]The data sample we relied on included only FHA-insured, single-family purchase money loans with an LTV ratio greater than 95 percent. Loans with an LTV ratio greater than 95 percent account for almost 90 percent of FHA's total portfolio.

[22]Loans insured by FHA's 203(b) program, its main single-family program, and its 234(c) condominium program. Small specialized programs, such as 203(k) rehabilitation and 221(d) subsidized mortgages, were not included. For 2000, 2001, and 2002, our analysis is based on a representative sample of FHA-insured purchase money loans with an LTV ratio greater than 95 percent. For 2003, 2004, and 2005, our analysis is based on the total universe of FHA-insured purchase money loans with an LTV ratio greater than 95 percent. HUD data do not differentiate between nonprofit down payment assistance providers that receive funding from sellers and those that do not. See the note to figure 2 for details on the proportions of loans in the samples with seller-funded assistance.

[23]Ninety percent of assistance from seller-funded nonprofit organizations was between 2.8 and 5.5 percent of the sales price; however, 90 percent of assistance from other sources was between 1.0 percent and 8.8 percent of the sales price.

**00537**

**Figure 5:  Generic Illustration of Addendum to the Sales Contract Completed Prior to Closing that Facilitates Seller's Commitment to Providing Financial Payment to the Nonprofit Organization after Closing**



Nonprofit ABC — Participating Home Agreement

Dear Seller:

Welcome to Nonprofit ABC's down payment assistance program. For homebuyers interested in properties under our program and using an eligible loan program (e.g., an FHA loan), we offer gift funds to help make homeownership a reality.

Your signature below qualifies your home for our program. By signing, you also agree to make a contribution to Nonprofit ABC in the event a buyer using our down payment assistance program purchases your property.

Seller agrees to pay Nonprofit ABC contribution and processing fee:

$ _____  +  $ _____  =  $ _____
Contribution amount          Processing fee              **Total due to**
(1-10% of purchase price)                                **Nonprofit ABC**

Note: Payment of the above contribution and processing fee is contingent upon a buyer using Nonprofit ABC's down payment assistance program to purchase your home.

Source: GAO.

## Seller-Funded Down Payment Assistance Often Results in Higher Sales Prices

When a homebuyer receives down payment assistance from a seller-funded nonprofit, property sellers often raise the sales price of the property to recover the required payment to the nonprofit providing the assistance. GAO analysis of a national sample of FHA-insured loans endorsed in 2000, 2001, and 2002 suggests that homes with seller-funded assistance were appraised and sold for about 3 percent more than comparable homes without such assistance.[27] Additionally, our analysis of more recent loans, a sample of FHA-insured loans settled in March 2005, indicates that homes sold with nonprofit assistance were appraised and sold for about 2 percentage points more than comparable homes without nonprofit

---

[27]We drew the sample of loans for this analysis from a national sample of FHA-insured loans developed through a file review study funded by HUD and conducted by the Concentrance Consulting Group. The sample consisted of just over 5,000 purchase money loans endorsed in 2000, 2001, and 2002 with LTV ratios greater than 95 percent.

**00545**

assistance.[28] To examine the possibility that sales prices of homes with seller-funded assistance were in fact higher than sales prices of comparable homes without such assistance, we contracted with First American Real Estate Solutions to provide estimates of the value of homes in a sample of FHA-insured loans. The values were calculated for the month prior to the closing, using an AVM. AVMs, which use statistical processes to estimate the property values, using property characteristics and trends in sales prices in the surrounding areas, are widely used in the mortgage industry for quality control and other purposes. We examined the ratio of the estimated AVM values to the appraisal values and sales prices and found that the ratios for loans with seller-funded nonprofit down payment assistance ranged from about 2 to 3 percentage points lower than the ratios for loans without such assistance. In other words, for loans with seller-funded down payment assistance, the appraised value and sales price were higher as compared with loans without such assistance. See appendix II for the details of our analysis.

---

[28]The sample of loans for this analysis is a stratified random sample of 2,000 FHA-insured purchase money loans with first amortization dates in April 2005, extracted from FHA's Single-Family Data Warehouse.

00546

assistance provided by a party with an interest in the sale of the property is limited to 6 percent of the sales price and can be used only for closing costs. Contributions from interested parties, such as sellers, that exceed 6 percent of the sales price or the actual closing costs result in a dollar-for-dollar reduction to the sales price when calculating the loan's LTV ratio. Along with the maximum allowable LTV ratio, the effect of this requirement is to ensure that FHA homebuyers obtain a certain amount of "instant equity" at closing. That is, when the sales price represents the fair market value of the house, and the homebuyer contributes 3 percent of the sales price at the closing, the LTV ratio is less than 100 percent. But when a seller raises the sales price of a property to accommodate a contribution to a nonprofit that provides down payment assistance to the buyer, the buyer's mortgage may represent 100 percent or more of the property's true market value.

## FHA-Insured Loans with Down Payment Assistance, particularly from Seller-Funded Nonprofits, Do Not Perform as Well as Similar Loans without Assistance

Holding other variables constant, FHA-insured loans with down payment assistance do not perform as well as similar loans without such assistance. Furthermore, loans with down payment assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources. This difference in performance may be explained, in part, by the higher sales prices of comparable homes bought with seller-funded down payment assistance.

For our analyses, we used two samples (i.e., national and MSA) of FHA-insured single-family purchase money loans endorsed in 2000, 2001, and 2002.[35] We grouped the loans into the following three categories:

- loans with assistance from seller-funded nonprofit organizations,

- loans with assistance from nonseller-funded sources, and

---

[35]The data (current as of June 30, 2005) consisted of loans insured by FHA's 203(b) program, its main single-family program, and its 234(c), condominium program. Small specialized programs, such as 203(k) rehabilitation and 221(d) subsidized mortgages, were not in the sample. The national sample included all 50 states and the District of Columbia, but not U.S. territories. The Metropolitan Statistical Area (MSA) sample consisted of loans from three MSAs with high rates of down payment assistance (Atlanta, Indianapolis, and Salt Lake City). Performance is measured by claim rate, 90-day delinquency rate, and rate of loss given default.

**00549**

The higher probability of claims in the MSA sample, as compared to the national sample, may be attributable to higher house price appreciation rates at the national level as compared to the MSAs. Research suggests that delinquent borrowers who have accumulated equity in their properties are more likely than other borrowers to prepay in order to avoid claims.[41] During the 5-year period from the first quarter of 2000 to the last quarter of 2004, the median house price increase in the national sample was about 39 percent. During the same period, the Salt Lake City, Indianapolis, and Atlanta MSAs realized increases in the median price of existing homes of 11 percent, 18 percent, and 32 percent, respectively. On average, then, borrowers in the national sample could be expected to have accumulated more equity than those in the MSAs and to be more likely to sell their homes and prepay their mortgages if they faced delinquency. The effect of the increased LTV ratio associated with loans with seller-funded down payment assistance may be less important in the presence of substantial accumulated equity.[42]

The effect of seller-funded down payment assistance on loan performance is substantial and to achieve an equivalent decline in loan performance requires substantial changes in other factors. For example, the presence of seller-funded down payment assistance increased claims by 76 percent. Adjusting other factors to increase claims by 76 percent would require lowering a borrower's credit score about 60 points, for example, or raising the payment to income ratio about 25 percentage points. Both of these adjustments to a loan are significant.

---

[41]Brent W. Ambrose and Charles A. Capone, "The Hazard Rates of First and Second Defaults," *Journal of Real Estate Finance and Economics*, vol. 20, no. 3 (May 2000), 275–93; Michelle A. Danis and Anthony Pennington-Cross, "A Dynamic Look at Subprime Loan Performance," Federal Reserve Bank of St. Louis Working Paper 2005-029A (May 2005), available at http://research.stlouisfed.org/wp/2005/2005-029.pdf.

[42]Our claim probability findings for nonseller-funded down payment assistance were similar with the national and MSA samples.

**00555**

- Because down payment assistance provided by seller-funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from seller-funded nonprofits as a gift from the seller and, therefore, subject to the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD for its review and comment. We received written comments from HUD's Assistant Secretary for Housing (Federal Housing Commissioner), which are reprinted in appendix IV. HUD generally agreed with the report's findings, noting that the analysis of loan performance is consistent with its own findings regarding the performance of loans with down payment assistance and how seller-funded down payment assistance programs operate. HUD also agreed to take steps that will improve its oversight of down payment assistance lending. Specifically, HUD will modify its information systems to document assistance from seller-funded nonprofits, and HUD will consider incorporating down payment assistance into FHA's TOTAL Mortgage Scorecard and requiring lenders to inform appraisers when assistance is provided by seller-funded nonprofits.

The department commented on certain aspects of selected recommendations. First, although HUD agreed with the report's recommendation to perform routine and targeted loan performance analyses of loans with down payment assistance, it maintained that FHA already performs monitoring of these loans. We recognized that FHA has conducted ad hoc risk analyses of its loans with down payment assistance. Additionally, the actuarial review of FHA's insurance Fund for 2005 includes, for the first time, down payment assistance as a variable in its model of loan performance. Consistent with our findings, the 2005 actuarial review found the presence of down payment assistance to be a significant factor in explaining loan performance. Further, the 2005 actuarial review states that loans with down payment assistance should be closely monitored. We agree. Because the proportion of loans FHA insures that involve some form of down payment assistance is growing dramatically, and because the risks associated with down payment assistance are substantial, we continue to recommend that FHA more routinely monitor the performance of loans with down payment assistance.

Second, HUD disagreed with our recommendation that it should revise its standards to prohibit the use of down payment assistance from seller-funded nonprofit organizations to meet the three percent borrower

contribution requirement. Our recommendation was based on our conclusion that the down payment assistance provided by seller-funded nonprofits was, in effect, a seller inducement to purchase. As the basis of its disagreement with our recommendation, FHA cites a 1998 internal HUD Office of the General Counsel memorandum, acknowledged in our report. The 1998 HUD memorandum reasoned that as long as seller-funded down payment assistance is provided to the buyer *before* closing, and the seller's contribution to the nonprofit entity occurs *after* closing, the buyer has not received funds that can be directly traced to the seller's contribution.

We realize that FHA relies on HUD's 1998 memorandum to authorize sellers to do indirectly what they cannot do directly, namely provide gifts of down payment assistance to buyers. We continue to believe that HUD should recognize that because gifts of down payment assistance from seller-funded nonprofits are ultimately funded by the sellers, they are like gifts of down payment assistance made directly by sellers. We, therefore, continue to believe that FHA should revise its standards to treat assistance from a seller-funded entity as a seller inducement to purchase.

In addition, as noted in our report, HUD agreed with our conclusion and recommendation after it issued its 1998 memorandum. In 1999, HUD proposed a rule that would have prohibited use of gifts from nonprofit organizations for buyers' down payment assistance, if the organizations received funds for the gifts—directly or indirectly—from sellers. Although HUD later withdrew the rule without substantive explanation, we continue to believe HUD's rationale in proposing the rule was correct.

Third, in its comment letter, HUD stated that FHA has incorporated the source of down payment assistance in the 2005 actuarial review of the Mutual Mortgage Insurance Fund, which was published during the course of obtaining HUD's comments on a draft of this report. In response, we have added information describing the analyses contained in the 2005 actuarial review, and modified our recommendation to address a weakness in the actuarial review's analysis of down payment assistance, and to emphasize the need to continue considering the presence and source of down payment assistance in future loan performance models.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate Congressional Committees and the Secretary of Housing and

Appendix III
Loan Performance Analysis

**Delinquency Results**

In both the national and MSA samples, down payment assistance substantially increased the likelihood of 90-day delinquency. Using the augmented GAO actuarial model, results in the national sample indicated that down payment assistance from a seller-funded nonprofit raised the delinquency rate by 100 percent, compared with similar loans with no assistance (table 12).[10] Assistance from other sources raised the delinquency rate by 20 percent, relative to similar loans with no assistance. With the model based on the augmented TOTAL Mortgage Scorecard variables, the results indicated that assistance from a seller-funded nonprofit raised the delinquency rate by 93 percent, while assistance from other sources raised the delinquency rate by 21 percent (table 10). The differences between loans with seller-funded assistance and loans without it are significant with a one-tailed test at a level of 1 percent in all variations of the model. The differences between seller-funded assistance and assistance from other sources were large and also significant at 1 percent in a one-tailed test in all variations. Differences in delinquency rates in the MSA sample were also substantial. Considering the augmented GAO actuarial model, loans with seller-funded down payment assistance had delinquency rates that were 105 percent higher than the delinquency rates on comparable loans without assistance, while loans with assistance from other sources had delinquency rates that were 34 percent higher than the delinquency rates of loans without assistance (table 16). The differences between seller-funded assistance and no assistance, and between seller-funded assistance and other assistance, were both significant at 1 percent in one-tailed tests in all variations.[11]

---

[10]This can be calculated from the regression coefficients for seller-funded down payment assistance and non-seller-funded down payment assistance in table 12, by taking the exponent of the coefficient. See Betty Kirkwood and Johnathan Sterne, *Essential Medical Statistics*, 2nd edition (Oxford UK: Blackwell Publishing, 2003), 197-198.

[11]The model based on the TOTAL Mortgage Scorecard variables found even larger differences, with seller-funded nonprofit assistance loans having claim rates 109 percent higher and loans with assistance from other sources having claim rates 36 percent higher than comparable loans without assistance.

**00591**

**Appendix III**
**Loan Performance Analysis**

| | |
|---|---|
| **Claim Results** | Down payment assistance also had a substantial impact on claims in both the national and MSA samples. Results from the national sample using the augmented GAO actuarial model indicated that assistance from a seller-funded nonprofit raised the claim rate by 81 percent, relative to similar loans with no assistance, as shown in the odds ratio point estimate column of table 20.[12] Assistance from other sources raised the claim rate by 44 percent, relative to similar loans with no down payment assistance. With the model based on the augmented TOTAL Mortgage Scorecard variables, we found that assistance from a seller-funded nonprofit raised the claim rate by 76 percent, while assistance from other sources raised the claim rate by 49 percent (table 18). The differences between loans with down payment assistance and those without it were statistically significant with a one-tailed test at a level of 1 percent. Seller-funded assistance had a larger impact on claims than did assistance from other sources. Those differences, while large, were not quite significant at conventional levels.[13] Differences in the MSA sample were even larger for seller-funded nonprofit assistance. Using the GAO actuarial model, loans with seller-funded down payment assistance had claim rates that were 134 percent higher than the claim rates on comparable loans without assistance, while loans with down payment assistance from other sources had claim rates that were 24 percent higher than the claim rates on loans without assistance (table 25). The difference between seller-funded assistance and no assistance, and the difference between seller-funded assistance and other assistance, were both significant at 1 percent in one-tailed tests in all variations of the model. |

---

[12]The odds ratio is the probability that an event, such as a claim or a prepayment, will occur, divided by the probability that the event will not occur.

[13]The p values for a one-tailed test range from 0.11 to .12 with the constructed risk variable, and .2 to .27 with the TOTAL Mortgage Scorecard variables.

**00592**

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

October 25, 2005

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D. C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING: Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years. The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit. The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance. FHA represents a better, safer

**00612**

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their homes or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

<u>GAO Recommendation</u>: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

<u>FHA Response</u>: FHA agrees with this recommendation and will modify the systems to collect this additional information.

<u>GAO Recommendation</u>: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

<u>FHA Response</u>: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

<u>GAO Recommendation</u>: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

<u>FHA Response</u>: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

<u>GAO Recommendation</u>: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

<u>FHA Response</u>: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

00613

Appendix IV
Comments from the Department of Housing
and Urban Development

-3-

<u>GAO Recommendation:</u>  To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

<u>FHA Response:</u>  Lenders are required to inform appraisers about all seller concessions, including down payment assistance.  Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report.  Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

<u>GAO Recommendation:</u>  Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

<u>FHA Response:</u>  HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase.  If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment.  After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity.  The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property.  Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report.  Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

00614

# Exhibit 2

# Part I. Rulings and Decisions Under the Internal Revenue Code of 1986

## Section 61.—Gross Income Defined

Whether certain down payment assistance provided to a home buyer is includible in the recipient's gross income under section 61. See Rev. Rul. 2006-27, page 915.

---

## Section 102.—Gifts and Inheritances

Whether certain down payment assistance provided to a home buyer is excludible from the recipient's gross income as a gift under section 102. See Rev. Rul. 2006-27, page 915.

---

## Section 501.—Exemption From Tax on Corporations, Certain Trusts, etc.

*26 CFR 1.501(c)(3)–1: Organizations organized and operated for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals. (Also §§ 61, 102, 1012.)*

**Down payment assistance; home buyers.** This ruling sets forth the applicable rules and standards for determining whether organizations that provide down payment assistance to home buyers qualify as tax-exempt charities. In addition, the ruling addresses whether assistance received for a down payment is treated as a gift and included in a home buyer's basis.

## Rev. Rul. 2006–27

ISSUES:

1. Whether organizations that otherwise meet the requirements of § 501(c)(3) of the Internal Revenue Code and are described in the situations below operate exclusively for charitable purposes.

2. Whether home buyers who receive down payment assistance from the organizations may exclude the amount of the assistance from their gross income as gifts under § 102.

3. Whether home buyers who receive down payment assistance from the organizations may include the amount of the assistance in the cost basis of their homes under § 1012.

FACTS

Situation 1

*X* is a non-profit corporation that helps low-income individuals and families purchase decent, safe and sanitary homes throughout the metropolitan area in which *X* is located. As a substantial part of its activities, *X* makes assistance available exclusively to low-income individuals and families to provide part or all of the funds they need to make a down payment on the purchase of a home. *X* uses standards set by Federal housing statutes and administered by the Department of Housing and Urban Development to determine who is a low-income individual. Individuals are eligible to receive assistance from *X*'s program if they are low-income individuals, have the employment history and financial history necessary to qualify for a mortgage, and would so qualify but for the lack of a down payment. *X* also offers financial counseling seminars and conducts other educational activities to help prepare potential low-income home buyers for the responsibility of home ownership.

*X* will consider applications for assistance in connection with an applicant's purchase of any home that meets *X*'s standards for habitability. Before making a grant of down payment assistance, *X* requires a home inspection report for the property that the applicant intends to buy to ensure that the house will be habitable.

To fund its down payment assistance program and other activities, *X* conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

*X*'s grantmaking process is structured to ensure that *X*'s staff awarding grants on behalf of *X* does not know the identity of the party selling the home to the grant applicant or the identities of any other parties, such as real estate agents or developers, who may receive a financial benefit from the sale. The staff also does not know whether any of the interested parties to the transaction have been solicited for contributions to *X* or have made pledges or actual contributions to *X*. Further, *X* does not

accept any contributions contingent on the sale of a particular property or properties.

Situation 2

*Y* is a nonprofit corporation that is like *X* in all respects as set forth in Situation 1, except as follows. Under *Y*'s grantmaking procedures, *Y*'s staff considering a particular applicant's application knows the identity of the party selling the home to the grant applicant and may also know the identities of other parties, such as real estate agents and developers, who may receive a financial benefit from the sale. Moreover, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller. Further, there is a direct correlation between the amount of the down payment assistance provided by *Y* in connection with each of these transactions and the amount of the home seller's payment to *Y*. Finally, *Y* does not conduct a broad based fundraising campaign to attract financial support. Rather, most of *Y*'s support comes from home sellers and real estate-related businesses that may benefit from the sale of homes to buyers who receive *Y*'s down payment assistance.

Situation 3

*Z* is a nonprofit corporation formed to combat community deterioration in an economically depressed area that has suffered a major loss of population and jobs. Studies have shown that the average income in the area is below the median level for the State. *Z* cooperates with government agencies and community groups to develop an overall plan to attract new businesses to the area and to provide stable sources of decent, safe and sanitary housing for the area residents without relocating them outside the area. As part of the renewal project, *Z* receives funding from government agencies to build affordable housing units for sale to low and moderate-income families. As a substantial part of its activities, *Z* makes down payment assistance available to eligible home buyers who wish to purchase the newly-constructed units

from Z. Z also offers financial counseling seminars and conducts other educational activities to help prepare potential low and moderate-income home buyers for the responsibility of home ownership.

To fund its down payment assistance program and other activities, Z conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

LAW

Section 501 of the Code provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided that no part of the net earnings inures to the benefit of any private shareholder or individual. See § 501(c)(3).

Section 1.501(c)(3)–1(c)(1) of the Income Tax Regulations provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in § 501(c)(3). An organization must not engage in substantial activities that fail to further an exempt purpose. In *Better Business Bureau of Washington, D.C. v. U.S.*, 326 U.S. 279, 283 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

Section 1.501(c)(3)–1(d)(1)(ii) provides that an organization is not organized or operated exclusively for exempt purposes unless it serves a public rather than a private interest. To meet this requirement it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests.

Section 1.501(c)(3)–1(d)(2) defines the term "charitable" as used in § 501(c)(3) as including the relief of the poor and distressed or of the underprivileged, and the promotion of social welfare by organizations designed to lessen neighborhood tensions, to eliminate prejudice and discrimination, or to combat community deterioration. The term "charitable" also includes the advancement of education.

Section 1.501(c)(3)–1(d)(3)(i) provides, in part, that the term "educational" as used in § 501(c)(3) relates to the instruction of the public on subjects useful

to the individual and beneficial to the community.

Section 1.501(c)(3)–1(e) provides that an organization that .operates a trade or business as a substantial part of its activities may meet the requirements of § 501(c)(3) if the trade or business furthers an exempt purpose, and if the organization's primary purpose does not consist of carrying on an unrelated trade or business.

In *Easter House v. U.S.*, 12 Cl. Ct. 476, 486 (1987), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988), the U.S. Court of Federal Claims considered whether an organization that provided adoption and related health services to pregnant women who agreed to place their newborns for adoption through the organization qualified for exemption under § 501(c)(3). The court concluded that the organization did not qualify for exemption under § 501(c)(3) because its primary activity was placing children for adoption in a manner indistinguishable from that of a commercial adoption agency. The court rejected the organization's argument that the adoption services merely complemented the health-related services to unwed mothers and their children. Rather, the court found that the health-related services were merely incident to the organization's operation of an adoption service, which, in and of itself, did not serve an exempt purpose. The organization did not provide health-related services to unwed mothers who wished to keep their children or who arranged for an adoption independent of the organization. The organization's sole source of support was the fees it charged adoptive parents, rather than contributions from the public. The court also found that the organization competed with for-profit adoption agencies, engaged in substantial advertising, and accumulated substantial profits. Accordingly, the court found that the "business purpose, and not the advancement of educational and charitable activities purpose, of plaintiff's adoption service is its primary goal" and held that the organization was not operated exclusively for purposes described in § 501(c)(3). *Easter House*, 12 Cl. Ct. at 485–86.

In *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the court held that an organization that operated a school to train individuals for careers as political campaign profession-

als, but that could not establish that it operated on a nonpartisan basis, did not exclusively serve purposes described in § 501(c)(3) because it also served private interests more than incidentally. The court found that the organization was created and funded by persons affiliated with a particular political party and that most of the organization's graduates worked in campaigns for the party's candidates. Consequently, the court concluded that the organization conducted its educational activities with the objective of benefiting the party's candidates and entities. Although the candidates and entities benefited were not organization "insiders," the court stated that the conferral of benefits on disinterested persons who are not members of a charitable class may cause an organization to serve a private interest within the meaning of § 1.501(c)(3)–1(d)(1)(ii). The court concluded by stating that even if the political party's candidates and entities did "comprise a charitable class, [the organization] would bear the burden of proving that its activities benefited members of the class in a non-select manner." *American Campaign Academy*, 92 T.C. at 1077.

In *Columbia Park and Recreation Association v. Commissioner*, 88 T.C. 1 (1987), *aff'd* without published opinion, 838 F.2d 465 (4th Cir. 1988), the court held that an association formed in a private real estate development to operate parks, swimming pools, boat docks, and other recreational facilities did not qualify as a § 501(c)(3) organization. Although the organization provided some benefit to the general public, the primary intended beneficiaries were the residents and property owners of the private development. Thus, the organization operated for a substantial non-exempt purpose rather than for exclusively charitable purposes.

Rev. Rul. 67–138, 1967–1 C.B. 129, held that helping low-income persons obtain adequate and affordable housing is "charitable" because it relieves the poor and distressed or underprivileged. In Rev. Rul. 67–138, the organization carried on several activities directed to assisting low-income families in obtaining improved housing, including (1) conducting a training course relative to various aspects of homebuilding and homeownership, (2) coordinating and supervising joint construction projects, (3) purchasing building

sites for resale at cost, and (4) lending aid in obtaining home construction loans.

Rev. Rul. 70–585, 1970–2 C.B. 115, discussed four situations of organizations providing housing and analyzed whether each organization qualified as charitable within the meaning of § 501(c)(3). Situation 1 described an organization formed to construct new homes and renovate existing homes for sale to low-income families who could not obtain financing through conventional channels. The organization also provided financial aid to low-income families eligible for loans under a Federal housing program who did not have the necessary down payment. The organization made rehabilitated homes available to families who could not qualify for any type of mortgage. When possible, the organization recovered the cost of the homes through very small periodic payments, but its operating funds were obtained from federal loans and contributions from the general public. The revenue ruling held that by providing homes for low-income families who otherwise could not afford them, the organization relieved the poor and distressed.

Situation 2 described an organization formed to ameliorate the housing needs of minority groups by building housing units for sale to persons of low and moderate-income on an open-occupancy basis. The housing was made available to members of minority groups who were unable to obtain adequate housing because of local discrimination. The housing units were located to help reduce racial and ethnic imbalances in the community. As the activities were designed to eliminate prejudice and discrimination and to lessen neighborhood tensions, the revenue ruling held that the organization was engaged in charitable activities within the meaning of § 501(c)(3).

Situation 3 described an organization formed to formulate plans for the renewal and rehabilitation of a particular area in a city as a residential community. The median income level in the area was lower than in other sections of the city and the housing in the area generally was old and badly deteriorated. The organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project, and involved residents in the area renewal plan. The organization also purchased an apartment building that it rehabilitated and rented at cost to low and

moderate-income families with a preference given to residents of the area. The revenue ruling held that the organization was described in § 501(c)(3) because its purposes and activities combated community deterioration.

Situation 4 described an organization formed to alleviate a shortage of housing for moderate-income families in a particular community. The organization planned to build housing to be rented at cost to moderate-income families. The Service held that the organization failed to qualify for exemption under § 501(c)(3) because the organization's program was not designed to provide relief to the poor or further any other charitable purpose within the meaning of § 501(c)(3) and the regulations.

Rev. Rul. 72–147, 1972–1 C.B. 147, held that an organization that provided housing to low-income families did not qualify for exemption under § 501(c)(3) because it gave preference to employees of a business operated by the individual who also controlled the organization. Although providing housing for low-income families furthers charitable purposes, doing so in a manner that gives preference to employees of the founder's business primarily serves the private interest of the founder rather than a public interest.

Rev. Rul. 72–559, 1972–2 C.B. 247, held that an organization that subsidized recent law graduates during the first three years of their practice to enable them to establish legal practices in economically depressed communities that have a shortage of available legal services, and to provide free legal services to needy members of the community, qualified for exemption under § 501(c)(3). Although the recipients of the subsidies were not themselves members of a charitable class, the resulting benefit to them did not detract from charitable purposes. Rather, the young lawyers were merely the instruments by which the organization accomplished the charitable purpose of providing free legal services for those unable to pay for, or obtain, such services.

Rev. Rul. 74–587, 1974–2 C.B. 162, held that an organization providing low-cost or long-term loans to, or equity investments in, businesses operating in economically depressed areas qualified for exemption under § 501(c)(3). The organization provided financial assistance only to

businesses that were unable to obtain funds from conventional sources, and gave preference to businesses that would provide training and employment opportunities for unemployed or under-employed area residents. Although some of the individual business owners receiving financial assistance from the organization were not themselves members of a charitable class, the benefit to them did not detract from the charitable character of the organization's program. As in Rev. Rul. 72–559, the recipients of aid were instruments for accomplishing the organization's charitable purposes.

Rev. Rul. 76–419, 1976–2 C.B. 146, held that an organization that converts blighted land in an economically depressed community to an industrial park and leases space on favorable terms to businesses that agree to hire a significant number of unemployed area residents and train them in needed skills qualifies for exemption under § 501(c)(3). The organization furthered charitable purposes by improving economic conditions for the poor and distressed and combating community deterioration. The organization offered inducements to businesses solely for the purpose of advancing charitable goals.

Section 61 provides that, except as otherwise provided in subtitle A (relating to income taxes), gross income means all income from whatever source derived.

Section 1012 provides, generally, that the basis of property shall be its cost to the taxpayer.

Section 1016(a)(1) provides that proper adjustment shall be made to the basis of property for expenditures, receipts, losses, or other items properly chargeable to capital account.

Section 1001(a) provides that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis for determining gain provided in § 1011. Section 1011(a) provides generally that the adjusted basis for determining gain from the sale or other disposition of property is the basis determined under § 1012, adjusted as provided in § 1016.

Section 102 provides that the value of property acquired by gift is excluded from gross income. A gift "proceeds from a 'detached and disinterested generosity,' . . . 'out of affection, respect, admiration,

charity or like impulses.'" *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). Payments that proceed from "the constraining force of any moral or legal duty," or from "'the incentive of anticipated benefit' of an economic nature," are not gifts. *Duberstein*, 363 U.S. at 285. Thus, payments attendant to ordinary business or commercial transactions, or that proceed primarily from the moral or legal obligations attendant such transactions, are not gifts. However, a payment made to an individual that responds to the individual's needs, that is made without economic or other consideration being received by the donor, and that does not proceed from any moral or legal duty, is motivated by detached and disinterested generosity, and may be excluded from gross income as a gift under § 102. *See, e.g.*, Rev. Rul. 99–44, 1999–2 C.B. 549.

ANALYSIS

In Situation 1, *X*'s purposes and activities relieve the poor, distressed and underprivileged by enabling low-income individuals and families to obtain decent, safe and sanitary homes. The way *X* conducts its down payment assistance program establishes that *X*'s primary purpose is to address the needs of its low-income grantees. *See* Rev. Rul. 70–585, Sit. 1. As a condition of providing assistance, *X* requires a home inspection to ensure that the house the applicant intends to buy will be habitable. *X*'s financial counseling seminars and other educational programs help to prepare potential home buyers for the responsibility of home ownership. *See* Rev. Rul. 67–138. *X* conducts a broad based fundraising program, and *X* receives support from a wide array of sources. *X*'s policies of ensuring that its grantmaking staff does not know the identity or contributor status of the party selling the home to the grant applicant (or any other party who may receive a financial benefit from the sale), and of not accepting contributions contingent on the sale of any particular properties, ensure that *X* is not beholden to any particular donors or other supporters whose interest may conflict with that of the low-income buyers *X* is working to help.

*X*'s grantmaking procedures combined with its efforts to educate home buyers ensure that *X* is operated primarily to benefit the low-income beneficiaries of its down-payment assistance. The low-income beneficiaries constitute a charitable class. Any benefit to other parties (such as home sellers, real estate agents, or developers) who participate in the transactions does not detract from the charitable purpose of relieving the poor and distressed. *See* Rev. Ruls. 72–559, 74–587, 76–419. Because *X* is operated exclusively for charitable purposes, *X* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

By contrast, in Situation 2, *Y* does not qualify as an organization described in § 501(c)(3). To finance its down payment assistance activities, *Y* relies on sellers and other real-estate related businesses that stand to benefit from the transactions *Y* facilitates. Furthermore, in deciding whether to provide assistance to a low-income applicant, *Y*'s grantmaking staff knows the identity of the home seller and may also know the identities of other interested parties and is able to take into account whether the home seller or another interested party is willing to make a payment to *Y*. *Y*'s receipt of a payment from the home seller corresponding to the amount of the down payment assistance in substantially all of the transactions, and *Y*'s reliance on these payments for most of its funding indicate that the benefit to the home seller is a critical aspect of *Y*'s operations. In this respect, *Y* is like the organization considered in *Easter House*, which received all of its support from fees charged to adoptive parents, so that the business purpose of the adoption service became its primary goal and overshadowed any educational or charitable purpose. Like the organization considered in *American Campaign Academy*, *Y* is structured and operated to assist private parties who are affiliated with its funders. Like the organizations considered in *American Campaign Academy*, *Easter House*, and *Columbia Park Recreation Association*, *Y* also serves an exempt purpose, but because *Y* is not operated exclusively for exempt purposes, *Y* does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

In Situation 3, although *Z* does not limit its down payment assistance program to low-income recipients, *Z*'s down payment assistance program still serves a charitable purpose described in § 501(c)(3) because it combats community deterioration in a specific, economically depressed area that has suffered a major loss of population and jobs. Through a combination of counseling and financial assistance, *Z* helps low and moderate-income families in that area to acquire decent, safe and sanitary housing and to prepare for the responsibilities of home ownership. In this respect, *Z* is like the organization described in Situation 3 of Rev. Rul. 70–585. Because *Z* is operated exclusively for charitable purposes, *Z* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

Down payment assistance payments for home buyers in Situations 1 and 3 are made by those organizations out of a detached and disinterested generosity and from charitable or like impulse, rather than to fulfill any moral or legal duty, and thus qualify for exclusion from such home buyers' gross incomes as "gifts" under § 102. The benefits provided to the home buyers in these circumstances are sufficiently removed from the interests of any home sellers or sales agents that they proceed from a detached and disinterested generosity on the part of the donor organization, and such grants lack the indicia of a rebate, price adjustment, or *quid pro quo* incident to a sale. Favorable treatment under § 102 is thus appropriate. The home buyer's payment of such amount toward the purchase of the residence will be included in his or her cost basis under § 1012.

In Situation 2, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller that directly correlates to the amount of the down payment assistance *Y* provides to the home buyer. In those cases, the payments received by the home buyers do not qualify for exclusion from gross income as gifts under § 102. The payments do not proceed from detached and disinterested generosity, but rather are in response to an anticipated economic benefit, namely facilitating the sale of a seller's home. Under *Duberstein*, *supra*, such payments are not gifts for purposes of § 102. Unlike in Situations 1 and 3, in Situation 2, the down payment assistance received by those home buyers represents a rebate or purchase price reduction. As a rebate or purchase price reduction, the down payment assistance is not includible in a home

buyer's gross income under § 61 and the amount of the down payment assistance is not included in the home buyer's cost basis under § 1012, as adjusted under § 1016.

HOLDINGS

1. In Situations 1 and 3, the organization is operated exclusively for charitable purposes and qualifies for exemption from federal income tax as an organization described in § 501(c)(3). In Situation 2, the organization is not operated exclusively for charitable purposes, and consequently, does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

2. In Situations 1 and 3, the home buyers may exclude the down payment assistance from their gross income as gifts under § 102. In Situation 2, the home buyers may not exclude the down payment assistance as gifts under § 102. However, in Situation 2, the down payment assistance is excluded from the gross income of home buyers because it represents a rebate or purchase price reduction.

3. In Situations 1 and 3, the home buyers may include the down payment assistance in the cost basis of their homes under § 1012. In Situation 2, the home buyers may not include the amount of the down payment assistance in the cost basis of their homes under § 1012. Rather, the amount of the down payment assistance represents a rebate or purchase price reduction that is excluded from the home buyer's cost basis under § 1012.

DRAFTING INFORMATION

The principal author of this revenue ruling is Elizabeth C. Kastenberg of Exempt Organizations, Tax Exempt and Government Entities Division. For further information regarding this revenue ruling, contact Elizabeth C. Kastenberg at (202) 283–9468 (not a toll-free call).

## Section 1012.—Basis of Property—Cost

*Whether certain down payment assistance provided to a home buyer is included in the buyer's cost basis under section 1012. See Rev. Rul. 2006-27, page 915.*

## Section 1502.—Regulations

*26 CFR 1.1502–13: Intercompany transactions.*

## T.D. 9261

## DEPARTMENT OF THE TREASURY
Internal Revenue Service
26 CFR Part 1

## Intercompany Transactions; Manufacturer Incentive Payments

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document contains final regulations under section 1502 of the Internal Revenue Code. *Example 13* of the intercompany transaction regulations illustrates the treatment of manufacturer incentive payments. Because a premise underlying the example is under reconsideration, these final regulations remove and reserve this example. The regulations will affect corporations filing consolidated returns.

DATES: *Effective Date:* These regulations are effective on May 8, 2006.

FOR FURTHER INFORMATION CONTACT: Frances Kelly, (202) 622–7770 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

### Background

Section 1.1502–13 of the consolidated return regulations provides rules for taking into account items of income, gain, deduction, and loss of members from intercompany transactions. In particular, §1.1502–13(c)(7)(ii), *Example 13*, illustrates how the matching rule of the intercompany transaction regulations treats a transaction involving manufacturer incentive payments. On August 13, 2004, the IRS and Treasury Department published a notice of proposed rulemaking (REG–131264–04, 2004–2 C.B. 506) in the **Federal Register** (69 FR 50112) proposing regulations to address additional transactions involving manufacturer incentive payments and to clarify the

proper treatment of such incentive payments under the intercompany transaction regulations.

On April 25, 2005, the IRS and Treasury Department published Rev. Rul. 2005–28, 2005–19 I.R.B. 997, which suspends, in part, Rev. Rul. 76–96, 1976–1 C.B. 23. Rev. Rul. 2005–28 states that the IRS will not apply, and taxpayers may not rely upon, the conclusion reached in Rev. Rul. 76–96 that certain rebates made by a manufacturer to retail customers are ordinary and necessary business expenses deductible under section 162, pending the IRS's reconsideration of the issue and publication of subsequent guidance.

**Explanation of Provisions**

The manufacturer incentive payment transaction described in §1.1502–13(c)(7)(ii), *Example 13* relies, in part, upon the premise that the manufacturer incentive payment is an ordinary and necessary business expense deductible under section 162. To the extent that this premise is correct, this example illustrates the proper application of the intercompany transaction regulations. However, because Rev. Rul. 2005–28 suspends Rev. Rul. 76–96, in pertinent part, these final regulations remove §1.1502–13(c)(7)(ii), *Example 13*, pending further guidance on the section 162 issue considered in Rev. Rul. 76–96.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. These final regulations do not alter substantive provisions of the intercompany transaction regulations. They merely remove an example which may be misleading and cause confusion for taxpayers. Accordingly, good cause is found for dispensing with prior notice and comment pursuant to 5 U.S.C 553(b), and for dispensing with a delayed effective date pursuant to 5 U.S.C 553(d). Because no notice of proposed rulemaking is required, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply. Pursuant to section 7805(f)

# Exhibit 3

## FOREWORD

This Handbook describes the basic mortgage credit underwriting requirements for single-family (one to four units) mortgage loans insured under the National Housing Act. For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout this Handbook and must be supported by sufficient documentation.

These underwriting guidelines discuss the types of transactions and properties eligible for mortgage insurance, and FHA's requirements for determining the borrower's ability and willingness to repay the debt. Information regarding valuation and architectural requirements can be found in HUD Handbooks 4150.1 REV-1 and 4145.1 REV-2, CHG-1, respectively. These underwriting guidelines apply to mortgages insured under Sections 203(b) and 234(c) of the National Housing Act, and are also generally applicable to other single-family mortgage insurance programs (except where inconsistent with special features of those programs). Other single-family mortgage insurance programs are described in HUD Handbook 4000.2 REV-2.

This Handbook provides direction to lenders and FHA staff and is based on FHA 's experience in insuring single-family mortgages. While it is not FHA's intent to insure mortgages that are likely to result in default, regardless of the borrower's equity, lenders may exercise some discretion in the underwriting of home mortgages where the borrower's financial and other circumstances are not specifically addressed by this Handbook. However, lenders are expected to exercise both sound judgment and due diligence in the underwriting of loans to be insured by FHA. For ease of reading, we have chosen to use "lender" in lieu of "mortgagee" throughout this user guide. However, "lender" is to be interpreted as a FHA-approved mortgagee as described in 24 CFR § 202.10. Similarly, "loan" is to be interpreted as "mortgage" as also described in 24 CFR § 202.10

Questions not addressed in the text should be directed to the appropriate Home Ownership Center (HOC) or the Director, Office of Single Family Program Development, HUD Headquarters, Robert Weaver Building, 451 Seventh St., SW, Washington, DC 20410-8000.

References:

1) 4000.2 REV-2 Mortgagees' Handbook, Application through Insurance
2) 4145.1 REV-2, CHG-1, Architectural Processing and Inspections
3) 4150.1 REV-1 Valuation Analysis for Home Mortgage Insurance
4) 4330.1 REV-5 Administration of Insured Home Mortgages
5) Code of Federal Regulations, Title 24 (24 CFR). Codifies the general and permanent rules of the Department.

# TABLE OF CONTENTS

## CHAPTER 1    INTRODUCTION

| | | |
|---|---|---|
| 1-1 | WHAT FHA INSURES ............................................................ | 1-1 |

### SECTION 1:    OCCUPANCY STATUS
| | | |
|---|---|---|
| 1-2 | PRINCIPAL RESIDENCES ...................................................... | 1-1 |
| 1-3 | SECONDARY RESIDENCES.................................................... | 1-1 |
| 1-4 | INVESTMENT PROPERTIES ................................................... | 1-1 |
| 1-5 | NONPROFIT ORGANIZATIONS AND GOVERNMENT AGENCIES .............. | 1-1 |

### SECTION 2:    MAXIMUM MORTGAGE AMOUNTS
| | | |
|---|---|---|
| 1-6 | MAXIMUM MORTGAGE AMOUNT ....................................... | 1-1 |
| 1-7 | MAXIMUM MORTGAGES FOR PURCHASE TRANSACTIONS .................... | 1-1 |
| 1-8 | TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS | 1-1 |

### SECTION 3:    SETTLEMENT REQUIREMENTS
| | | |
|---|---|---|
| 1-9 | SETTLEMENT REQUIREMENTS.............................................. | 1-1 |

### SECTION 4:    REFINANCE TRANSACTIONS
| | | |
|---|---|---|
| 1-10 | REFINANCING ...................................................................... | 1-1 |
| 1-11 | CALCULATING THE MORTGAGE AMOUNT ON REFINANCES................... | 1-1 |
| 1-12 | STREAMLINE REFINANCES .................................................. | 1-1 |

### SECTION 5:    SECONDARY FINANCING
| | | |
|---|---|---|
| 1-13 | SECONDARY FINANCING...................................................... | 1-1 |

## CHAPTER 2    MORTGAGE CREDIT ANALYSIS
| | | |
|---|---|---|
| 2-1 | OVERVIEW............................................................................ | 2-1 |
| 2-2 | MORTGAGE ELIGIBILITY (BORROWERS).............................. | 2-1 |
| 2-3 | ANALYZING THE BORROWER'S CREDIT ............................. | 2-1 |
| 2-4 | CREDIT REPORT REQUIREMENTS......................................... | 2-1 |
| 2-5 | CREDIT ELIGIBILITY REQUIREMENTS ................................ | 2-1 |

### SECTION 2:    EFFECTIVE INCOME
| | | |
|---|---|---|
| 2-6 | STABILITY OF INCOME......................................................... | 2-1 |
| 2-7 | SALARIES, WAGES, AND OTHER FORMS OF INCOME................................ | 2-1 |
| 2-8 | EMPLOYMENT BY FAMILY-OWNED BUSINESS........................... | 2-1 |
| 2-9 | SELF-EMPLOYED BORROWERS ........................................... | 2-1 |

### SECTION 3:    BORROWER'S CASH INVESTMENT IN THE PROPERTY
| | | |
|---|---|---|
| 2-10 | FUNDS TO CLOSE ................................................................. | 2-1 |

### SECTION 4:    TYPES OF LIABILITIES
| | | |
|---|---|---|
| 2-11 | LIABILITIES ......................................................................... | 2-1 |

### SECTION 5:    BORROWER QUALIFYING
| | | |
|---|---|---|
| 2-12 | DEBT TO INCOME RATIOS ................................................... | 2-1 |
| 2-13 | COMPENSATING FACTORS................................................... | 2-1 |

## SECTION 6:    SPECIAL UNDERWRITING INSTRUCTIONS

2-14        TEMPORARY INTEREST RATE BUYDOWNS ...................................    2-1
2-15        ADJUSTABLE RATE MORTGAGES.........................................................    2-1
2-16        CONDOMINIUM UNITS: UTILITY EXPENSES ................................    2-1
2-17        CONSTRUCTION- PERMANENT MORTGAGE PROGRAM ..........    2-1
2-18        MORTGAGE ASSISTANCE FOR DISASTER VICTIMS [Section 203(h)] .........    2-1
2-19        ENERGY EFFICIENT HOMES (EEH) ...................................................    2-1
2-20        ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM....................    2-1

## CHAPTER 3 DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

### SECTION 1:    UNDERWRITING DOCUMENTATION

3-1        APPLICATION PACKAGE ......................................................................    3-1
3-2        DOCUMENTATION STANDARDS ..........................................................    3-1
3-3        REAL ESTATE CERTIFICATION............................................................    3-1
3-4        AMENDATORY CLAUSE ......................................................................    3-1

### SECTION 2:  PROCESSING REQUIREMENTS

3-5        POWER OF ATTORNEY .........................................................................    3-1
3-6        LOAN APPLICATION DOCUMENT PROCESSING............................    3-1
3-7        SEVEN-UNIT DOCUMENTATION  ......................................................    3-1
3-8        HOTEL AND TRANSIENT USE..............................................................    3-1
3-9        SALES CONTRACT AND LOAN CLOSING ........................................    3-1
3-10        LENDER RESPONSIBILITY AT CLOSING ........................................    3-1

### SECTION 3:  FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

3-11        FEDERAL STATUTES AND REGULATIONS.......................................    3-1
3-12        FHA-PROCESSED HUD EMPLOYEE LOANS .....................................    3-1

## CHAPTER 4 ASSUMPTIONS

4-1        GENERAL ...............................................................................................    4-1
4-2        RESTRICTIONS OF THE HUD REFORM ACT OF 1989 ....................    4-1
4-3        RELEASE FROM LIABILITY................................................................    4-1
4-4        CREDIT-WORTHINESS REVIEW PROCESSING .............................    4-1
4-5        LTV REDUCTION REQUIREMENTS....................................................    4-1

## APPENDICES

I.        SINGLE FAMILY HOC JURISDICTIONS .............................................
II.        CLOSING COSTS AVERAGES FOR STATES .......................................

### SECTION 3: BORROWER'S CASH INVESTMENT IN THE PROPERTY

**2-10    FUNDS TO CLOSE.**  The cash investment in the property must equal the difference between the amount of the insured mortgage, excluding any upfront MIP, and the total cost to acquire the property including prepaid expenses and closing costs as described in paragraph 1-9.

*All funds for the borrower's investment in the property must be verified and documented*.  Acceptable sources of these funds include the following:

A.    **Earnest Money Deposit.**  If the amount of the earnest money deposit exceeds 2 percent of the sales price *or* appears excessive based on the borrower's history of accumulating savings, the lender must verify with documentation the deposit amount and the source of funds.  Satisfactory documentation includes a copy of the borrower's cancelled check.  A certification from the deposit-holder acknowledging receipt of funds and separate evidence of the source of funds is also acceptable.  Evidence of source of funds includes a verification of deposit or bank statement showing that at the time the deposit was made the average balance was sufficient to cover the amount of the earnest money deposit.

B.    **Savings and Checking Accounts.**  A verification of deposit (VOD), along with the most recent bank statement, may be used to verify savings and checking accounts.  If there is a large increase in an account, or the account was opened recently, the lender must obtain a credible explanation of the source of those funds.

C.    **Gift Funds.**  An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.  The gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or any entity associated with them.  Gifts from these sources are considered inducements to purchase and must be subtracted from the sales price.  No repayment of the gift may be expected or implied.  (As a rule, we are not concerned with how the donor obtains the gift funds provided they are not derived in any manner from a party to the sales transaction. Donors may borrow gift funds from any other acceptable source provided the mortgage borrowers are not obligors to any note to secure money borrowed to give the gift.)  This rule also applies to properties of which the seller is a government agency selling foreclosed properties, such as the Veterans Administration or Rural Housing Services.  Only family members may provide equity credit as a gift on a property being sold to other family members.  These restrictions

on gifts and equity credit may be waived by the jurisdictional HOC provided that the seller is contributing to or operating an acceptable affordable housing program.

FHA deems the payment of consumer debt by third parties to be an inducement to purchase.  While FHA permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing.  Other expenses paid on behalf of the borrower must result in a dollar-for-dollar reduction to the sales price.  The dollar-for-dollar reduction to the sales price also applies to gift funds not meeting the requirement that the gift be for downpayment assistance and is provided by an acceptable source.  When someone other than a family member has paid off debts, the funds used to pay off the debt must be treated as an inducement to purchase and the sales price must be reduced by a dollar-for-dollar amount in calculating the maximum insurable mortgage.

**Documentation Requirements.**  The lender must document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifies the dollar amount of the gift, states that no repayment is required, shows the donor's name, address, telephone number and states the nature of the donor's relationship to the borrower.  In addition, the lender must document the transfer of funds from the donor to the borrower, as follows:

1.  If the gift funds are in the homebuyer's bank account, the lender must document the transfer of the funds from the donor to the homebuyer by obtaining a copy of the canceled check or other withdrawal document showing that the withdrawal is from the donor's account.  The homebuyer's deposit slip and bank statement that shows the deposit is also required.

2.  If the gift funds are to be provided at closing:

    a.  If the transfer of the gift funds is by certified check made on the donor's account, the lender must obtain a bank statement showing the withdrawal from the donor's account, as well as a copy of the certified check.

    b.  If the donor purchased a cashier's check, money order, official check, or any other type of bank check as a means of transferring the gift funds, the donor must provide a withdrawal document or canceled check for the amount of the gift, showing that the funds came from the donor's personal account.  If the donor borrowed the gift funds and cannot provide documentation from the bank or other

# Exhibit 4



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

**May 25, 2006**

**MORTGAGEE LETTER 2006 -13**

**TO:**          **ALL APPROVED MORTGAGEES**

**SUBJECT:**     **Charitable Organizations Making Downpayment Gifts**

Federal Housing Administration (FHA) approved mortgagees that seek FHA mortgage insurance on loans secured by single family houses, on which downpayment assistance has been provided to the borrower in the form of gifts, are required to determine that the gifts are from sources acceptable to FHA.

Paragraph 2-10 C of handbook HUD-4155.1 REV-5 provides that the donor of any such gift must be the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.  For FHA, charitable organizations are those nonprofits that are exempt from income taxation under section 501(a) of the Internal Revenue Service Code (IRC) of 1986 pursuant to section 501(c)(3) of the IRC.

This Mortgagee Letter advises mortgagees about how to determine whether a gift from a charitable organization can be used for all, or part, of the borrower's downpayment when the organization providing the gift for the downpayment loses or gives up its federal tax-exempt status.  Provided that the homebuyer has entered into a contract of sale (including any amendments to purchase price) on, or before, the date the IRS officially announces that the charitable organization's tax-exempt status is terminated, FHA will recognize the gift—if made to the homebuyer and properly documented—as an acceptable source of the downpayment.  FHA believes this policy avoids harm to any homebuyer who, in good faith, has entered into a contract of sale in anticipation of receiving a gift for the downpayment from such a charitable organization.

The mortgagee is responsible for ensuring that an entity is a charitable organization as defined above.  One resource available to mortgagees for obtaining this information is the Internal Revenue Service (IRS) Publication 78, *Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986*, which contains a list of organizations eligible to receive tax-deductible charitable contributions.  The IRS has an online version of this list that can help mortgagees and others conduct a search of these organizations.  The online version can be found at: http://apps.irs.gov/app/pub78, using the following instructions to obtain the latest update.

- Enter search data and click "Search"
- Click "Search for Charities" under "Charities & Non-Profits Topics"
- Click "Recent Deletions from Cumulative List" under "Additional Information"

- Click name of organization if that name appears on list of names under "Recent Deletions from Cumulative List (Publication 78)"

In addition, FHA has developed a web page that provides a listing of downpayment assistance providers whose nonprofit status has been revoked.  This page can be found at: http://www.hud.gov/offices/hsg/sfh/np/irstatus.cfm

FHA continues to examine downpayment assistance programs and will provide appropriate notification about any changes that may be made to existing policies.

Please note that Mortgagee Letter 2005-02 provides guidance to mortgagees and appraisers about their responsibilities for reporting sales concessions and verifying sales data, including downpayment assistance provided by the seller or any other party involved in the transaction.

If you have any questions regarding this Mortgagee Letter, call 1-800-CALLFHA.

Sincerely,


Brian D. Montgomery
Assistant Secretary for Housing-
   Federal Housing Commissioner

# Exhibit 5

10/19/1999  21:51     916-554-2900                    L  ATTORNEY                    PAGE  02

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement" or "Settlement Agreement") is entered into in the matter of <u>Nehemiah Progressive Housing Corporation, vs. Andrew Cuomo, et al.</u>, Civ. S-97-1817-GEB/PAN, United States District Court, Eastern District of California ("the action").

Plaintiff Nehemiah Progressive Housing Corporation, a California corporation, is hereinafter referred to as "Nehemiah" or "plaintiff."

Defendants Andrew Cuomo, Secretary, United States Department of Housing and Urban Development, et al. are collectively referred to hereinafter as "defendants." Each of the defendants is sued only in his/her official capacity. Defendant Andrew Cuomo, sued herein in his official capacity as Secretary of the United States Department of Housing and Urban Development, is hereinafter referred to as "HUD."

Nehemiah and HUD are collectively referred to hereinafter as "the parties to this Agreement."

The parties to this agreement, for and in consideration of the matters herein set forth, hereby agree as follows:

1. <u>Dismissal Of Action And Reservation Of Jurisdiction</u>: Upon the execution, by the parties to this Agreement, of this Agreement and the Stipulation For Dismissal With Prejudice and For Reservation of Jurisdiction, a copy of which is attached hereto as **Exhibit A**, plaintiff shall cause that Stipulation to be lodged with the Clerk of the United States District Court, for consideration and action by the Court.

2. <u>Status of Program</u>: Consistent with the letter attached hereto as **Exhibit B**, HUD has determined that plaintiff's down payment assistance program ("DAP") is not in conflict with HUD's

- 1 -

**00883**

regulations and administrative requirements. Plaintiff may
operate that DAP throughout the United States, in accordance with
the approval set forth herein and with HUD's existing
regulations, handbook, mortgagee letters and other governing
documents applicable to transactions under Section 203(b) of the
Act.

Notwithstanding the approval of plaintiff's DAP, however,
HUD and/or defendants and their successors expressly reserve the
right to and may take such actions with regard to down payment
assistance programs generally, and with regard to changes or
modifications to HUD's regulations, handbook, mortgagee letters,
or other governing documents applicable to transactions under
Section 203(b) of the Act in particular, as they may deem
appropriate. Any such actions, changes or modifications
regarding the source of down payment assistance funds shall
thereafter become applicable to plaintiff's DAP after the
expiration of six (6) months from the date of final promulgation
and issuance of any such changes or modifications. Prior to that
date, plaintiff may continue to operate its down payment
assistance program in accordance with the approval set forth
herein and with HUD's existing regulations, handbook, mortgagee
letters and other governing documents applicable to transactions
under Section 203(b) of the Act.

3. Release and Waiver: Plaintiff, individually and on
behalf of its past, present and future principals, agents,
servants, employees, attorneys, representatives, predecessors in
interest, successors in interest, affiliates, directors,
officers, stockholders and all other persons and entities acting
for or on behalf of plaintiff, hereby expressly releases and
forever discharges each named individual defendant and HUD, and
HUD's past, present and future employees, agents, attorneys,
representatives, and all other persons and entities acting for or
on behalf of HUD, from any and all conduct, claims, demands,

-2-

damages, injuries, grievances, charges, actions or causes of
action, known or unknown, either at law or in equity, which
plaintiff, at any time prior to the effective date of this
Settlement Agreement, had or now has against defendants, arising
out of or in any way related to, directly or indirectly, the
dispute referenced in plaintiff's complaint or this Settlement
Agreement.

This Agreement is intended to be complete and final and to
cover not only conduct, claims, demands, damages, injuries,
grievances, charges, actions and causes of action which are
known, but also conduct, claims, demands, damages, injuries,
grievances, charges, actions and causes of action that the
plaintiff does not know or suspect to exist in its favor which,
if known at the time of executing this Agreement, might have
affected the Agreement and the plaintiff's willingness to enter
into and execute it.  Accordingly, except as otherwise expressly
set forth herein, plaintiff expressly waives the benefit of the
provisions of Section 1542 of the California Civil Code, and the
benefit of any other statutes and/or common law principles of
similar effect arising in any other jurisdiction.  Section 1542
of the California Civil Code provides:

> A general release does not extend to claims which the
> creditor does not know or suspect to exist in his favor at
> the time of executing the release, which if known by him
> must have materially affected his settlement with the
> debtor.

Plaintiff hereby represents that it understands and acknowledges
the significance and consequences of the foregoing waiver and the
exceptions thereto, and assumes full responsibility for any
damage or loss that may be incurred as a result of such waiver.
Plaintiff further represents that if any fact with respect to any
matter covered by this Agreement is found hereafter to be other
than or different from the facts now believed by plaintiff to be
true, this Agreement shall nevertheless be and remain effective
notwithstanding any such difference.

-3-

**00885**

10/19/1999  21:51    916-554-2900    916 554 2900    US ATTORNEY    PAGE  05

4.   <u>Waiver of Costs and Attorneys' Fees</u>:  It is agreed, by
and among the parties to this Agreement, that in consideration
for settlement of the action which is the subject of this
Agreement, the respective parties will each bear their own costs,
attorneys' fees and expenses.

5.   <u>No Admission Of Liability</u>:  This Agreement has resulted
from a compromise of disputed claims and demands, and each party
to this Agreement agrees that it is not to be construed by any
person, entity or administrative, judicial or other deliberative
body as an admission of liability or responsibility, or non-
liability or non-responsibility, on the part of any party to this
Agreement to any party to this Agreement, or of the existence or
non-existence of any fact whatsoever, except as otherwise
expressly set forth herein.

5.   <u>Warranties Of The Parties And Representatives</u>:
Plaintiff and HUD hereby warrant and represent to each other as
follows:

a.    That no promises, representations, understandings
or warranties have been made to either of them by any other party
to this Agreement other than those which are expressly contained
herein;

b.    That the Secretary of Housing and Urban
Development, through his designee, has heretofore authorized his
attorney in the action to execute this Agreement on  behalf of
HUD, and that by doing so, that attorney has full legal and
factual authority and capacity to bind HUD to the terms and
provisions of this Agreement; and

//

//

//

- 4 -

**00886**

10/19/1999  21:51    916-554-2900    US ATTORNEY    PAGE  06

        c.    That plaintiff and its signing representative have full legal and factual authority and capacity to execute and enter into this Agreement.

DATED: 4/6_____, 1998    NEHEMIAH PROGRESSIVE HOUSING
                          DEVELOPMENT CORPORATION

                          BY: _____
                          DON F. HARRIS, President

APPROVED AS TO FORM:

McDONOUGH, HOLLAND & ALLEN
Professional Corporation
By: _____
        RICHARD W. NICHOLS
        Attorneys for Plaintiff


DATED: April 3_____, 1998    PAUL L. SEAVE
                          United States Attorney

                          _____
                          KENDALL J. NEWMAN
                          Assistant U.S. Attorney
                          EDWARD EITCHES
                          Senior Trial Attorney
                          U.S. Dept. Of Housing and Urban Development

                          Attorneys for Defendant Secretary
                          of Housing and Urban Development

00887

10/19/1999  21:51    916-554-2900         US ATTORNEY                    PAGE  10
  04/03/98    17:53    BLDG MAINT SECTION → 916 554 2100                NO.545    002



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3  1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

    The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments.  Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program (as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

    Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah and all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

                                    Sincerely,

                                    Emelda Johnson
                                    Deputy Assistant Secretary
                                     Single Family Housing Programs

EXHIBIT B

# Exhibit 6

# AN EXAMINATION OF DOWNPAYMENT GIFT PROGRAMS ADMINISTERED BY NON-PROFIT ORGANIZATIONS

### FINAL REPORT

### HUD CONTRACT NO: C-OPC-22550/M0001

### SUBMITTED TO: THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT



### MARCH 1, 2005

**PREPARED BY:**



733 Fifteenth St. NW, Suite 340; Washington, DC 20005 * (202) 969-2880

# II. KEY OBSERVATIONS

The Concentrance team conducted 401 interviews in 10 SMSAs with individuals that participated in property sales and lending activities on transactions where DA was provided by non-profits that received contributions from property sellers. Assured of confidentiality, the participants interviewed were, for the most part, very open and candid about their experiences with seller-financed DAPs. The interviews were collectively analyzed in order to identify meaningful trends, including conflicting and corroborating statements. We gained insights from personnel involved in property sales, mortgage loan originations, mortgage risk management and DA provider management.

The following key insights, characterized in terms of our observations, are intended to provide information that will assist HUD in identifying and determining aspects of seller-funded DA transactions that may advance or impede sustainable homeownership. These observations form the basis for our recommended risk management options outlined in Section VI of this report. Our observations are categorized in terms of the following research objectives for this examination:

| Examination Objectives | Description |
|---|---|
| Program Characteristics | To identify systematic and structural features of the seller-funded DAPs. |
| Participant Relationships | To identify potential impacts the design of the programs may have among all parties involved in the homebuying process and mortgage transaction. |
| Seller-Funded DA Providers' Structure and Ownership | To identify structural and ownership features of seller-funded DA providers. |
| Default and Foreclosure Risk | To understand systemic factors in program design that may lead to the potential for increased default and foreclosure incidence among FHA-insured borrowers. |

## PROGRAM CHARACTERISTIC OBSERVATIONS

- Seller-funded DA providers serve as conduits for the "indirect" transfer of funds targeted for downpayment between the homebuyer and the seller as FHA will not allow the seller to provide DA directly to the homebuyer. This transfer is described as "indirect" because the seller-funded DA provider disburses the downpayment gift to the homebuyer from a pre-existing pool of funds. The seller subsequently makes a contribution to the seller-funded DA provider in an amount equal to the downpayment gift disbursement to the homebuyer, plus a processing fee. This

**00629**

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
*HUD Contract No: C-OPC-22550/M0001*

contribution, including the processing fee, is deducted from the seller proceeds when the sales transaction is closed.

- The motivation for using the seller-funded DAPs by parties driving the sales transaction is almost exclusively to transfer gift funds to the homebuyer in order to complete the sales transaction. Without the requirement for a conduit, the seller-funded DA provider would no longer have a purpose in the transaction. There is no evidence, based on our interviews that the presence of this intermediary provides any additional protections to the homebuyer or FHA, especially in those cases where the seller-funded DA providers' sole activity is to manage the distribution of a "blind pool" of funds provided by sellers. The term "blind pool" is intended to show some distinction between the gift provided to the borrower and the funds contributed by the seller. There is at least 72 hours between the time the gift is provided to the borrower and the contractual seller donation is routed to the seller-funded DA provider.

- The seller-funded DAP structure, in practice, provides for little to no contact between the seller-funded DA provider and the borrower. The primary interface with the seller-funded DA provider is the mortgage broker or loan officer. The seller-funded DA provider functions in an order-taking and fulfillment capacity, by accepting requests for assistance and funding them with little to no analysis or investigation. The seller-funded DA providers, unlike the non-seller-funded DA providers, rely completely on the mortgage lenders' validation of the mortgage and property transaction.

- Given the operational structure of these seller-funded DAPs, the stated value-added features beyond the DA, such as borrower education are rarely realized. For the most part, we did not observe any evidence that education programs offered by the seller-funded DA providers were mandated for the homebuyer. These programs are voluntary. Information on these programs is available over the internet to anyone seeking guidance about the homebuying and mortgage process. Additionally, unlike non-seller-funded DA providers, most seller-funded DA providers we examined are not structured to provide a comprehensive education program on a face-to-face basis, as all processing is done centrally. Field personnel are focused on sales and do not provide such education. They interface with the mortgage lenders primarily and, to some extent, with builders and real estate agents.

- The other value-added feature offered as a component of the seller-funded DAPs is an optional mortgage payment protection insurance, or MPPI policy. The policy offers payment protection for the borrower in the event of involuntary job loss where the loss persists in excess of 30 days. The fee for participation in the insurance is paid by the seller. The seller can purchase coverage for the buyer for 1-5 years; however, the one year policy is the industry standard. The fee for this optional coverage is another item that property sellers routinely add to the sales price in order to protect their net proceeds. The seller-funded DA providers that offer the coverage indicated that participation in the insurance program was limited and, furthermore, the proportion of claims relative to premiums paid was low.

**00630**

 **An Examination of Downpayment Gift Programs Administered by Non-Profit Organizations**
HUD Contract No: C-OPC-22550/M0001

- The borrower, through an increased sales price, incurs costs that would not be required in the typical transaction. These costs include an additional processing fee charged by the seller-funded DA provider to administer the funds transfer and, in many counties, transfer taxes, and recordation and other settlement fees are based upon this higher sales price, thus increasing settlement costs.

- Seller-funded DA providers accommodate property sellers and market dynamics by encouraging sellers to view the cost of the program as an alternative to accepting a bid price below their original asking price. Marketing information published by the seller-funded DA providers suggests that, by using a seller-funded DAP, property owners can execute a sales contract at the "full list price." It is a quid-pro-quo: if the purchaser is willing to pay "full list price" then the seller agrees to offer DA. The seller-funded DA providers reason that the seller was going to lower the sales price, but offering seller-funded DA allows them to receive the "full list price" for the property and support homeownership. They also point out that the seller is *not adding the DA to the sales price; they are simply selling the property at the "full list price" which generates the funds for the contribution.*

  Though the seller-funded DA providers deny that it is true, we found overwhelming evidence that the cost of the DA is added to the sales price, which then increases the allowable FHA loan amount and eliminates any borrower equity in the property.

## PARTICIPANT RELATIONSHIP OBSERVATIONS

Based upon our interviews with all of the participants in the homebuying and mortgage transaction it appears that:

- The seller-funded DAP structure requires the seller to, in essence, reimburse the seller-funded DA provider for contributions made on behalf of the homebuyer for the downpayment.

- The seller-funded DAP structure exacerbates subjective motivations inherent in the typical mortgage transaction that tend to, knowingly or unknowingly; compromise the actions and judgments of those individuals such as appraisers and underwriters whose fiduciary role in the process is to protect the interests of the borrower, FHA, and the investment community.

- The risk control process most vulnerable to compromise is the property valuation process.

**00631**

# Exhibit 7



| Issue Date |
| --- |
| October 31, 2005 |
| Audit Report Number |
| 2006-LA-1001 |

TO:        Brian D. Montgomery, Assistant Secretary for Housing-Federal Housing
           Commissioner, H

           *Joan S. Hobbs*

FROM:      Joan S. Hobbs, Regional Inspector General for Audit, Region IX, 9DGA

SUBJECT:   Ryland Mortgage Company, Tempe Arizona, Did Not Follow HUD
           Requirements in the Origination of Insured Loans

# HIGHLIGHTS

## What We Audited and Why

In response to a recommendation from the Department of Housing and Urban
Development's (HUD) Santa Ana Homeownership Center Quality Assurance
Division and Ryland Mortgage Company's (Ryland) high default rate for its
branch office, we audited Ryland's loan origination activities for its Tempe,
Arizona, branch office. The audit objectives were to determine whether Ryland
acted in a prudent manner and complied with HUD regulations, procedures, and
instructions in its approval of Federal Housing Administration-insured mortgages
and whether it adequately implemented its quality control plan.

## What We Found

Although most of Ryland's loans are performing, Ryland failed to originate 23 of
the 24 loans in our sample in compliance with HUD requirements and regulations.
All 23 loans involved multiple origination deficiencies that should have precluded
their approval. The deficiencies included false employment data; questionable/
false Social Security numbers; improper treatment of downpayment gifts, service
fees, and/or buydowns, resulting in inflated sales prices; unsupported/overstated
income; insufficient income and employment documentation; an understated

00892

- Our Lexis Nexis query showed one borrower had more than one Social Security number (see appendix D, case 023-1073648). Ryland's only documentation of verification of the borrower's Social Security number was the individual's tax returns (1999-2001), which appeared questionable since they lacked the borrower's signature, and his name was misspelled. The credit report for the borrower showed no activity. However, the accounts that were used to analyze his liabilities were listed under his spouse's Social Security number.
- Lexis Nexis reported that the second borrower's Social Security number belonged to another individual (see appendix D, case 023-1932092). Moreover, Ryland required that the borrower provide a clearer copy of his Social Security card; however, the loan was underwritten without either the card or a documented explanation in the Ryland case file.
- The third borrower's Social Security number was altered on the pay stubs to show "765" rather than the printed "665" (see appendix D, case 023-1451488).

**Inflated Sales Prices and Improper Treatment of Downpayment Gifts and Buydowns (13 of 24 Cases)**

Ryland generally offers an incentive to new home buyers if they use Ryland as their lender to finance the purchase of a home. Through the Nehemiah or OWN program, the buyer is offered gift funds, which go toward financing the downpayment and closing costs. In exchange for supplying the homebuyers with this gift, Ryland agrees to make a contribution in the amount of the gift, along with a $300, $385, $500, or $800 service fee to the gift provider (Nehemiah or OWN). We found that 13 of the 21 cases we reviewed included this type of situation. While this is an accepted practice, Ryland inappropriately made price adjustments to the original base sales price to recover part or all of the amount it provided to the Nehemiah or OWN program, service fees, and buydown.

Contrary to HUD Handbook 4155.1, REV-4, CHG-1, and REV-5, paragraph 2-10 C, the borrowers were essentially unaware that they were repaying the gift funds through their monthly mortgage payments. The increase in sales price caused the payments to be inflated for 13 of the 24 cases by part or all of the amount of the gift, service fee, and/or buydown.

A former Ryland loan officer claimed that Ryland management's aggressive position on approving loans led its employees to circumvent more prudent loan approval practices. For instance, if the borrower's income was insufficient to qualify for a loan, the two-to-one buydown would be offered to the borrower to

**00900**

# Exhibit 8

United States Government Accountability Office

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

February 2005

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products



**GAO**

Accountability ★ Integrity ★ Reliability

February 2005



**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-05-194, a report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

## MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products

### Why GAO Did This Study

The U.S. Department of Housing and Urban Development (HUD), through its Federal Housing Administration (FHA), insures billions of dollars in home mortgage loans made by private lenders. FHA insures low down payment loans and a number of parties have made proposals to either eliminate or otherwise change FHA's borrower contribution requirements. GAO was asked to (1) identify the key characteristics of existing low and no down payment products, (2) review relevant literature on the importance of loan-to-value (LTV) ratios and credit scores to loan performance, (3) report on the performance of low and no down payment mortgages supported by FHA and others, and (4) identify lessons for FHA from others in terms of designing and implementing low and no down payment products.

### What GAO Recommends

GAO suggests that Congress consider limiting any new no down payment product it may authorize. GAO recommends that HUD, among other things, consider piloting new or changed products and that HUD establish a framework for when and how to pilot products. In written comments, HUD stated that it had considered these actions, including piloting, but instead adopted an alternative solution. However, it is not clear under which circumstances HUD would consider piloting.

www.gao.gov/cgi-bin/getrpt?GAO-05-194.

To view the full product, including the scope and methodology, click on the link above. For more information, contact William B. Shear at (202) 512-8678 or shearw@gao.gov.

### What GAO Found

FHA and many other mortgage institutions provide many low and no down payment products with requirements that vary in terms of eligibility, borrower investment, underwriting, and risk mitigation. While these products are similar, there are some important differences, including that FHA has lower loan limits, allows closing costs and the up-front insurance premium to be financed in the mortgage, and permits the down payment funds to come from nonprofits that receive funds from sellers. FHA also differs in that it does not require prepurchase counseling.

A substantial amount of research GAO reviewed indicates that LTV ratio and credit score are among the most important factors when estimating the risk level associated with individual mortgages. GAO's analysis of the performance of low and no down payment mortgages supported by FHA and others corroborates key findings in the literature. Generally, mortgages with higher LTV ratios (smaller down payments) and lower credit scores are riskier than mortgages with lower LTV ratios and higher credit scores.

Some practices of other mortgage institutions offer a framework that could help FHA manage the risks associated with introducing new products or making significant changes to existing products. Mortgage institutions may impose limits on the volume of the new products they will permit and on who can sell and service these products. FHA officials question the circumstances in which they can limit volumes for their products and believe they do not have sufficient resources to manage a product with limited volumes. Mortgage institutions sometimes require additional credit enhancements, such as higher insurance coverage; and sometimes require stricter underwriting, such as credit score thresholds, when introducing a new low or no down payment product. FHA is authorized to require an additional credit enhancement by sharing risk through co-insurance but does not currently use this authority. FHA has used stricter underwriting criteria but this has not included credit score thresholds.

**Average Four-Year Default Rates for FHA Insured Loans Originated in 1998, 1999, and 2000 (by LTV)**



Source: FY 2003 Actuarial Review of the Mutual Mortgage Insurance Fund.

00452



**United States Government Accountability Office**
Washington, D.C. 20548

February 11, 2005

The Honorable Bob Ney
Chairman
Subcommittee on Housing and Community Opportunity
Committee on Financial Services
House of Representatives

Dear Mr. Chairman:

Every year, the U.S. Department of Housing and Urban Development
(HUD), through its Federal Housing Administration (FHA), insures billions
of dollars in home mortgage loans made by private lenders, very often with
low down payments. FHA mortgage insurance helps homebuyers with
limited funds to obtain a home mortgage. Homebuyers with FHA-insured
loans need to make a 3 percent contribution toward the purchase of the
property and may finance some of the closing costs associated with the
loan. As a result, an FHA-insured loan could equal nearly 100 percent of the
property's value or sales price—commonly called loan-to-value (or LTV)
ratio.[1]  In recent years, various mortgage industry participants, such as
lenders, private mortgage insurers, and government-sponsored enterprises
(the Federal National Mortgage Association [Fannie Mae] and the Federal
Home Loan Mortgage Corporation [Freddie Mac]) have begun to support
mortgage products that require very little or no down payment. Among
these products, some allow third-party provision of gift down payment
assistance. Recently, in a HUD contractor study of a national sample of
FHA loans, of those loans that received down payment assistance, 29
percent received assistance from a nonprofit down payment assistance
provider. In addition, the FHA and others have proposed eliminating the
borrower contribution requirement for FHA-insured loans. At the same
time, the mortgage industry has moved toward greater use of automated
systems assessing the risk level of mortgages. These automated
underwriting systems rely, in part, on individuals' credit scores or credit
history, and these systems have played an integral role in the provision of
low and no down payment mortgage products.[2]

---

[1]For purposes of this report, we define loans with LTV ratios of greater than 97 percent as
having a high LTV ratio.

[2]Credit scores are a single numerical score, based on an individual's credit history, that
measures that individual's creditworthiness.

**00455**

In light of recent changes in the composition of FHA-insured mortgage products and the proposal to eliminate the borrower contribution requirement for FHA-insured mortgages, you asked us to evaluate low and no down payment lending. Specifically, this report examines (1) the key characteristics and standards of mortgage products—supported by FHA and others—that require low or no down payments; (2) what published research indicates about the importance of variables such as LTV ratios and credit scores in estimating the risk level associated with individual mortgages; (3) the performance of low and no down payment mortgages supported by FHA and others; and (4) what lessons FHA might learn from others that support low and no down payment lending in terms of designing and implementing such products.

To address the objectives we interviewed officials at FHA, the U.S. Department of Agriculture (USDA), and U.S. Department of Veterans Affairs (VA); and staff at selected conventional mortgage providers[3]; private mortgage insurers; two government-sponsored enterprises (GSE); the Office of Federal Housing Enterprise Oversight (OFHEO); selected state housing finance agencies; and nonprofit down payment assistance providers. We reviewed descriptions of low and no down payment mortgage products supported by selected mortgage industry participants and compared the standards used by these entities. To determine what published research indicates about the variables that are most important when estimating the risk level associated with individual mortgages, we reviewed recent and relevant papers that we identified through a systematic search of economic literature. To describe the low and no down payment performance of loans supported by FHA and others, we examined the relationship among mortgage performance, LTV ratio, and credit score using 4-year default rates for a special research sample of over 400,000 mortgages insured by FHA during 1992, 1994, and 1996 and for all conventional loans originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac. We chose these years because, for FHA, these data are the only significant data set of FHA-insured loans that includes credit scores and that had at least 4 years of loan performance activity. For Fannie Mae and Freddie Mac, in 1997, these institutions began purchasing an increasing number of loans with the highest LTV ratios; loans originated after 1999 would have less than 4 years of experience to analyze. The GSEs provided us data that they considered to be proprietary. We did not disclose

---

[3]Conventional lenders provide mortgages that do not carry government insurance or guarantees.

information that could be considered proprietary, but this did not limit our overall findings. We assessed the reliability of the FHA, Fannie Mae, and Freddie Mac data by discussing the data with knowledgeable FHA officials and Fannie Mae and Freddie Mac officials; reviewing recent audit reports that evaluated the information systems at each entity; and comparing the data with similar publicly available data. We determined that the data are sufficiently reliable to use in our analysis of the performance of low and no down payment mortgages. To determine what lessons FHA might learn from others that support low and no down payment lending, we obtained testimonial information from mortgage industry participants about the steps they take to design and implement low and no down payment lending products. We did not verify that these institutions, in fact, used these practices.

We performed our audit work from January 2004 to December 2004 in accordance with generally accepted government auditing standards. Appendix I provides a full description of our scope and methodology.

## Results in Brief

FHA and other mortgage institutions provide products that enable homebuyers to purchase homes using little of their own funds. While similar, the products offered by FHA and others have important differences in terms of eligibility, borrower investment, underwriting, and risk mitigation. With respect to eligibility, for example, FHA loan limits are lower than those in the conventional market. In terms of borrower investment, FHA's product differs from others in that it allows some of the closing costs and the up-front insurance premium to be financed in the mortgage. Although FHA requires a 3 percent borrower contribution, it can come from sources other than the borrower. Many conventional low and no down payment products also permit down payment funds to come from others but generally stipulate that down payment funds, either directly or indirectly, cannot come from an interested or seller-related party. FHA also does not permit down payment funds to come directly or indirectly from sellers but does permit nonprofits that receive contributions from sellers to provide down payment assistance to homebuyers. With respect to underwriting, many mortgage institutions use automated systems to some extent. These systems allow lenders to quickly assess the riskiness of mortgages by simultaneously considering multiple factors including the credit score and credit history of borrowers. With respect to risk mitigation, FHA differs from conventional mortgage institutions that provide low and no down payment products. For example, while FHA does not require prepurchase counseling, some institutions require borrowers to

**00457**

housing under its Mutual Mortgage Insurance Fund. To cover lenders' losses, FHA collects insurance premiums from borrowers. These premiums, along with proceeds from the sale of foreclosed properties, pay for claims that FHA pays lenders as a result of foreclosures.

Fannie Mae and Freddie Mac are government-sponsored private corporations with stated public missions chartered by Congress to provide a continuous flow of funds to mortgage lenders and borrowers. Fannie Mae and Freddie Mac purchase mortgages from lenders across the country and finance their mortgage purchases through borrowing or issuing mortgage-backed securities that are sold to investors. They purchase single-family mortgages up to the "conforming loan limit," which for 2005 was set at $359,650.[12] Their purchase guidelines and underwriting standards have a dominant role in determining the types of loans that primary lenders will originate in the conventional conforming market.

Members of the conventional mortgage market (such as private mortgage insurers, Fannie Mae, Freddie Mac, and large private lenders) have been increasingly active in supporting low and no down payment mortgage products. Many private mortgage insurers will now insure a mortgage up to 100 percent of the value of the housing being purchased. Fannie Mae and Freddie Mac, working together with the private mortgage insurers, have become more aggressive in developing high LTV products that target low-and moderate-income or first-time homebuyers while also developing high LTV products designed for use by borrowers across the income spectrum. Figure 1 shows the history of the introduction of low and no down payment mortgage products at three LTV levels. FHA and VA have been backing low and no down payment mortgages for many years, and Fannie Mae and Freddie Mac permitted conventional lenders to sell them mortgages with an LTV of 97 percent in 1994 and 1998, respectively. Freddie Mac and Fannie Mae's no down payment mortgage products were introduced in 2000.

---

[12]Referred to as the conforming loan limit because the mortgages conform to underwriting standards established by Fannie Mae and Freddie Mac. The limit is higher for single-family mortgages secured by two-, three-, and four-unit dwellings.

**00462**

## Most Low and No Down Payment Products Require Some Form of Borrower Investment

Most low and no down payment mortgage products require some form of borrower investment, either a borrower contribution or cash reserve, as a way of reducing risk and assuring that the borrower has a stake in the property. Low down payment products offered by FHA, Fannie Mae, Freddie Mac and private insurers require a cash investment of at least 3 percent from the borrower. No down payment mortgage products offered by VA, RHS, Fannie Mae, Freddie Mac, and some private insurers require either no down payment or a minimum amount (such as $500 in Fannie Mae's MyCommunityMortgage program).

Many institutions permit down payment assistance. FHA stipulates that the gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or entity associated with them. FHA mortgagee letters state that "gifts from these sources (seller, builder, etc.) are considered inducements to purchase and must be subtracted from the sales price." However, FHA allows nonprofit agencies that may receive contributions from the seller to provide down payment assistance to the borrower. In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property.

Even where borrowers pay no down payment they very often must pay a minimum percentage of closing costs from their own funds.[18] FHA requires that borrowers pay 3 percent of the total loan amount toward the purchase of the home. This contribution may be used for down payment or closing costs. Thus, FHA borrowers may finance closing costs, within limits. FHA borrowers may also finance their insurance premium. Unlike FHA, some mortgage institutions do not allow financing of the closing costs and the insurance premiums in the first mortgage. VA generally allows payment of all closing costs to be negotiated while restricting those that may be charged to the borrower. VA allows borrowers to finance their insurance premium, called the funding fee. In the section 502 Guaranteed Loan program for RHS, borrowers may pay closing costs but they are not required to do so and may be allowed to finance the closing costs and their

---

[18]Closing costs could include a loan origination fee, a mortgage recordation fee, a title transfer tax, appraisal fees, attorney fees, and title insurance.

**00470**

insurance premium, called the Guarantee Fee.[19] Freddie Mac in its no down payment product requires a 3 percent borrower contribution to be used for closing costs, financing costs, or prepaids and escrows, all of which can come from gifts or property seller contributions.

FHA, RHS, VA, Fannie Mae, and Freddie Mac differ somewhat in terms of their maximum allowable LTV ratios and how they calculate this ratio. LTV ratios are important because of the direct relationship that exists between the amount of equity borrowers have in their homes and the likelihood of risk of default. The higher the LTV ratio, the less cash borrowers will have invested in their homes and the more likely it is that they may default on mortgage obligations, especially during times of economic hardship.

The Omnibus Budget Reconciliation Act of 1990 (Pub. L. No. 101-508), established LTV limits for FHA-insured mortgages of 98.75 percent if the home value is $50,000 or less, or 97.75 percent if the home value is in excess of that. However, because FHA allows financing of the up-front insurance premium, borrowers can receive a mortgage with an effective LTV ratio of close to 100 percent.

In table 2, we calculate the effective LTV ratio for selected low and no down payment products. The example assumes a $100,000 purchase price (appraisal value) and a 30-year fixed-rate mortgage. It also assumes average closing costs of about 2.1 percent of sales price. FHA has a formula to calculate the maximum loan amount based on a percentage of the purchase price of the home. FHA does not have a down payment requirement but instead has what FHA calls a minimum cash investment requirement. This investment requirement can be used to pay either the down payment and in some cases the closing costs. Not shown are the actual out-of-pocket expenses to the borrower which could vary based on the individual transaction and whether the investment requirement was split among the closing costs and down payment, as well as whether the borrower opted to finance their up-front premium.[20]

---

[19]According to USDA officials, a borrower may finance closing costs and the Guarantee Fee as long as they do not exceed the property's appraised value.

[20]Out-of-pocket expenses can include expenses such as funds required to establish an escrow account.

**00471**

performing lenders and servicers as part of a demonstration program or to limit the time period during which the product is first offered.

## Recommendations for Executive Action

If Congress provides the authority for FHA to implement a no down payment mortgage product or other products about which the risks are not well understood, we recommend that the Secretary of HUD direct the Assistant Secretary for HUD-Federal Housing Commissioner to consider the following three actions:

- incorporating stricter underwriting criteria such as appropriate credit score thresholds or borrower reserve requirements,

- piloting the initial product or limiting its initial availability and asking Congress for the authority if HUD officials determine they currently do not have this authority, and

- utilizing other techniques for mitigating risks including use of credit enhancements and prepurchase counseling.

Regardless of any new products Congress may authorize, when making significant changes to its existing products or establishing new products, we recommend that the Secretary of HUD direct the Assistant Secretary for HUD-Federal Housing Commissioner to consider the following two actions:

- limiting the initial availability of the product and when doing so, the Commissioner should establish the conditions under which piloting should be used, the techniques for limiting the initial availability of a product, and the methods of enhanced monitoring that would be connected to predetermined measures of success or failure for the product.; and

- asking Congress for the authority to offer its new products or significant changes to existing products on a limited basis, such as through pilots, if HUD officials determine they currently lack sufficient authority.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD, Fannie Mae, Freddie Mac, USDA, and VA. We received written comments from HUD, which are reprinted in appendix III. We also received technical comments from HUD, Fannie Mae,

**00502**

Freddie Mac, and USDA, which have been incorporated where appropriate. VA did not have comments on the draft.

HUD stated that it is in basic agreement with GAO that all policy options, implications, and implementation methods should be evaluated when considering or proposing a new FHA product. HUD also stated that in designing its zero down payment program it considered the items that we recommended it consider, including piloting. HUD stated that it adopted the prepurchase counseling requirement as a component of a proposed zero down program and that it determined that structuring the mortgage insurance premium in such a way as to minimize risk represents the most appropriate tool for managing the risk of this proposed program.

However, it is not clear under what circumstances HUD believes that piloting or limiting the availability of a changed or new product would be appropriate or possible. As we noted in our draft report, HUD officials told us that they face challenges in administering a pilot program because of the difficulty of selecting only a limited number of lenders and borrowers. HUD officials also held that they may not have the authority to limit products and that they lacked sufficient resources to adequately manage products as part of a pilot or with limited volumes.

We believe that HUD needs to further consider piloting or limiting volume of new or changed products because, as we state in the report, it is a practice followed by others in the mortgage industry and could assist HUD in mitigating the risks and costs associated with new or changed products, while still allowing HUD to meet its goal of providing homeownership opportunities. Difficulties in selecting a limited number of lenders and questions about a lack of authority could both be addressed by seeking clear authority from Congress on these matters, if HUD officials determine they currently lack sufficient authority. As we note in our report, when considering the resources necessary to implement products with limited volumes, if FHA does not use pilots or limit the availability of certain new or changed products, FHA may face costs due to the significant risks that can be associated with products that are implemented broadly and about which the risks are not well understood. We do not believe that implementing products with initial limits is appropriate or necessary in all cases. To ensure that piloting or limiting the initial availability is given sufficient consideration, we continue to recommend that HUD consider establishing the conditions under which piloting should be used and the techniques for limiting the initial availability of a product, as well as the

**00503**

# Exhibit 9

200 Professional Drive I 4th Floor I Gaithersburg, MD 20879
ph 301.977.9133I fx 301.987.5185I www.ameridream.org

**AmeriDream**
Down Payment Assistance Program

August 9, 2007

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Room 10276
Washington, DC 20410-0500

Re:  Docket No. FR-5087-P-01, "Standards for Mortgagor's Investment in Mortgaged
     Property"

Dear Sir/Madam:

On behalf of AmeriDream, Inc., a 501(c)(3) charitable entity which is dedicated to
helping low and moderate income families purchase their own homes, I respectfully
submit these comments on Docket No. FR-5087-P-01, "Standards for Mortgagor's
Investment in Mortgaged Property".

### *Summary*

Any policy initiative directed at down payment assistance (DPA) programs must
serve the broader purpose of helping responsible, low and moderate income families to
purchase their own homes.  Judged by that criterion, DPA programs work, and work well,
having provided critical assistance to over one million individuals and families in the past
few years to buy their own homes, some 80% of whom for the first time.

Because down payment assistance programs are so critical, AmeriDream
welcomes efforts by the Department of Housing and Urban Development (HUD) to
ensure that down payment assistance providers adhere to their mission and work
assiduously to assist families with limited means to buy their own homes.  AmeriDream
also applauds HUD's insistence that down payment assistance providers conduct
themselves in strict compliance with both sound business practices and high ethical
standards.  Finally, AmeriDream acknowledges that some down payment assistance
programs have had significant problems.  Those issues tend to be endemic among nascent
industries, particularly those which experience very rapid growth, and DPA providers, a
sector of nonprofits which began barely a decade ago, are no exception.  AmeriDream
and other responsible DPA providers have worked hard to resolve those problems, and
would support HUD initiatives that did the same.

For all those reasons, AmeriDream strongly encourages HUD to actively take steps to
strengthen down payment assistance programs.  However, if HUD is to do so effectively, and
in the interests of the aspiring homeowners whom HUD is committed to serve, it is essential
that HUD develop rules that seek to improve DPA programs, not eradicate them.  Moreover,



if those rules are to improve DPA programs, HUD must properly assess their problems, and its rules must be specifically targeted to remedy those concerns. Unfortunately, the proposed "Standards for Mortgagor's Investment in Mortgaged Property", which seeks to cut off most current funding to DPA programs, fails on both counts.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other charities which were the initial providers of down payment assistance, DPA programs sought other sources of support, particularly within the real estate industry, including home builders and home sellers. That expanded donor base has permitted down payment assistance to be extended to far more families, and enabled DPA programs to grow without using taxpayer dollars. Yet HUD views that essentially positive development as inherently abusive. As a result, the proposed rule seeks to prohibit most current donors from contributing as they have in the past, a ban which would not improve DPA programs, but eradicate them.

A more constructive approach would be to target specific problems within DPA programs. However, the proposed rule has only a tenuous relationship with the very problem it purports to address. The background to the proposed HUD rule states that "FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." That statement asserts, in essence, that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price may not be supported by an accurate appraisal. Yet that assertion fails to acknowledge that transactions involving down payment assistance, like all purchases utilizing loans guaranteed by the Federal Housing Administration (FHA), are based on valuations validated using HUD-approved appraisal criteria applied by HUD-certified appraisers neither chosen by, nor related to, either the DPA providers or their donors.

If further safeguards are required to ensure the integrity of the appraisal process, such as random assignment of HUD-certified appraisers or mechanisms for reviewing appraisals prior to closing, AmeriDream strongly supports implementing such measures which relate *directly* to the alleged problem. Seeking to remedy alleged flaws in the appraisal process *indirectly*—through restricting how donations are made to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach.

AmeriDream stands ready, as it has for years, to work with HUD to improve current DPA programs to provide critical help to the low and moderate income aspiring homebuyers whom both HUD and AmeriDream are dedicated—and, indeed, legally obligated—to serve. Towards that end, these comments offer a detailed description of current DPA programs, a candid assessment of issues relating to the provision of DPA, and a suggested list of steps which may be taken to ensure that down payment assistance is provided to deserving families in an efficient, effective, and ethical manner.

66614

HUD's proposed rule seeks to change current policy and long standing practice regarding a mortgagor's investment in a property. The proposed rule is both premised upon, and symptomatic of, fundamental misconceptions regarding downpayment assistance programs. As a consequence, the proposed rule is deeply flawed, and should be withdrawn.

## *Discussion*

### Background Information on AmeriDream

AmeriDream, a 501(c)(3) charity, was established in 1999. Based in Gaithersburg, Maryland, AmeriDream conducts housing-related programs throughout the United States. AmeriDream provides a wide range of programs to benefit the families it serves, including homebuyer education, loss mitigation counseling, community development, and privately-funded down payment gift assistance. Through those various programs, AmeriDream not only seeks to help families to purchase homes, but also to provide those families with the education and other resources needed to help them meet the responsibilities of homeownership. In turn, those responsible, committed homeowners help build safe, thriving communities.

AmeriDream exists to serve low and moderate income individuals and families. Our mission is to permit these aspiring homeowners, a disproportionate number of whom are first-time homebuyers, minorities, legal immigrants, women headed households, and single-parents, achieve homeownership. Most significantly, AmeriDream has provided critical down payment assistance to over 200,000 low and moderate income homebuyers, enabling them to purchase their homes. In addition, since 1999, AmeriDream has educated over 60,000 homebuyers through our homebuyer education course; counseled and assisted approximately 1,200 people to retain their home when confronted with mortgage difficulties; and built 168 affordable housing units in our inner cities, most notably in Southeast Washington, DC. To date, AmeriDream has committed over $30 million to projects unrelated to its down payment assistance programs.

### Charitable Sector's Successful Response to FHA Authorization of DPA

(a) **FHA Loan Guarantees.** Congress created the Federal Housing Administration to establish and implement crucial policy initiatives to assist low and moderate income individuals and families make the transition from tenants to homeowners. To help achieve that worthy goal, the FHA guarantees certain loans for moderately priced homes. That single program, the FHA loan guarantee, is perhaps the most important federal initiative to promote homeownership among families with limited means. Significantly, low and moderate income borrowers who qualify for FHA-backed loans are able to get credit at reasonable rates from reputable lenders. They do not fall prey to predatory lenders, and are not burdened with debt accruing at confiscatory rates.

**66615**

To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer must make a down payment of at least 3% of the purchase price of the home. That criterion has proven to be an insurmountable obstacle for many otherwise qualified low and moderate income families seeking to purchase their own homes. Even families who have pristine credit histories, steady employment, and sufficient income to meet mortgage payments nonetheless often have trouble setting aside a significant portion of their paychecks to meet the FHA's down payment requirement. As a result, the FHA program, though highly commendable, nonetheless has failed to benefit many of the very families which it was designed to serve. As a result, families who have been denied access to FHA-backed loans are left with two options, both very unfavorable: resort to potentially predatory, sub-prime loans, or do not purchase a home at all.

To the credit of both Congress and the FHA, they have long recognized that the down payment requirement would prove too burdensome for many of the families whom they sought to help. For that reason, prospective homebuyers are expressly permitted to use monetary gifts to make the required down payments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code. As a practical matter, for many aspiring home purchasers—whose relatives also have modest means, who do not belong to a union, and do not have employers who provide the requisite gifts—the only source of down payment assistance on that list to whom they may have recourse are charities.

**(b) Evolution of DPA Organizations.** One of the largest barriers to homeownership is saving the down payment, particularly for low and moderate income families and traditionally underserved home buyers. Many of these individuals and families can meet all the requirements of an FHA-insured loan, such as, employment history, income, and credit, yet cannot afford to set aside the minimum down payment of 3% of the contract sales price of the home. DPA was designed to work with FHA and its population of homebuyers to safely help them overcome the down payment barrier to homeownership while also giving homebuyers positive equity in their home day one which is the beginning of wealth building for these lower income homebuyers. Beginning in the mid-1990s, a number of 501(c)(3) organizations began to step up to meet this need. Faith-based organizations first took the lead, initiating programs to provide needed down payment assistance to these low and middle income aspiring homebuyers, typically from the very communities in which the churches were based.

From those modest beginnings, down payment assistance programs grew very rapidly to meet the pent up demand of hundreds of thousands of families who longed to purchase their own homes, and qualified for FHA loans in every respect except for the required down payment.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other providers of down payment

**66616**

assistance, providers turned to other sources of support, particularly within the real estate industry. That expanded donor base has permitted down payment assistance to be extended to far more families, who then are able to purchase homes at valuations validated by HUD-certified appraisers. Moreover, an expanded donor base has permitted down payments assistance programs to grow without taxpayer dollars.

(c) **Compliance and Acceptance of DPA.** AmeriDream and other reputable charitable organizations which provide down payment assistance seek to operate their programs in compliance with both sound financial management principles and applicable law, including existing HUD rules.

HUD Handbook 4155.1 Rev 5, Section 2-10 provides the authority for charitable organizations to provide down payment assistance.

> Gift Funds. An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.

AmeriDream raises money for down payment gifts from various sources. That money is deposited into a commingled account, which is episodically drawn upon to make down payment gifts to qualified home buyers taken from a waiting list. The money is sent directly to the closing attorney and placed in the home buyer's escrow account in advance of the loan closing. After the loan closes and the real estate transaction is complete, the seller of that property often pays the organization a service fee, typically within seven to ten days after closing. The service fee is deposited into the organization's fund for down payment assistance and is later used for new homebuyers requesting down payment assistance, other charitable programs, and administrative costs.

This process, still adhered to today, was developed with the full knowledge of HUD's Office of General Counsel. Significantly, in 1998, HUD's Office of General Counsel reviewed the down payment assistance process and found that it was in compliance with HUD's guidelines. Further, in a letter dated October 25, 2005 from HUD to GAO, Brian Montgomery, Assistant Secretary for Housing - Federal Housing Commissioner relied on the Office of General Counsel's determination to respond to GAO recommendations.

> HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as a closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the

**66617**

three percent required down payment. After the completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (Appendix IV)

Further, the use of down payment assistance is reported on the HUD-1, a standard form that itemizes all funds associated with the home purchase. In addition, HUD has issued several mortgagee letters clarifying the appropriate use of down payment assistance which did not question the way DPA providers are funded. For instance, Mortgagee Letter 2004-02 addresses proper documentation when downpayment funds are provided from charities and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations. In fact, HUD has not only made favorable statements about DPA programs in the past, HUD actually has utilized DPA programs itself when selling some of its own inventory of properties.

**(d) <u>DPA Benefits to Low and Moderate Income Families & the Economy</u>.**
As recently as 2005, FHA itself has affirmed that DPA programs, as currently structured, serve the low and moderate income families to whom FHA is committed, and that DPA programs permit those aspiring homebuyers to purchase their homes without resorting to potentially predatory lenders. FHA has affirmed that down payment assistance does, in fact, serve a disadvantaged population. In his 2005 letter, FHA Commissioner Brian Montgomery stated:

Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier then FHA.

By any quantitative measure, down payment assistance programs have proven to be an enormous success.

- To date, over one million low and moderate income individuals and families in all 50 states, the District of Columbia, and Puerto Rico have received down payment assistance which has allowed them to buy their own homes, usually for the first time.

66618

- Approximately, $3.8 billion in down payment assistance was given to these low and moderate income families. Funds were entirely from private sources; no government funds were used.

- Down payment assistance programs are targeted at low and moderate income purchasers purchasing modestly priced homes in neighborhoods which would particularly benefit from an increase in owner-occupied housing.

- In 2005, the average income of a homebuyer receiving DPA was $43,551, or 69 percent of the average household income nationally. In addition, about two in five homebuyers receiving assistance had a co-borrower, indicating a need for additional financial resources. [George Mason University Center for Regional Analysis Report "Characteristics of Home Buyers Receiving Assistance from Non-Profit Down Payment Assistance Providers" November 2006 (page 1)]

- The average down payment gift amount is approximately $3,600.

- In 2005, the average sales price of homes purchased with down payment assistance is $125,000 compared with a national home value of $247,000.

- Homeowners receiving assistance from DPA benefited from increase in housing values between 2000-2005. They saw their total wealth grow by $9.6 billion over this period. [George Mason University Center for Regional Analysis Report "National Economic Impact of Non-Profit Down Payment Assistance Providers" March 2007 (GMU 2007 Study) (page ii)]

- Down payment assistance has been given to deserving, credit worthy borrowers who, notwithstanding their limited incomes, are able to meet their mortgage payments. They are only unable to come up with the required down payments. A GAO report concluded that approximately 94% of down payment assistance recipients have met their mortgage obligations in a timely manner. [GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (page 28 – National claim rate graph)]

- Down payment assistance programs have been crucial to achieving record levels of homeownership, both among the general population and among groups which historically have been denied the ability to purchase their own homes. In its June 2, 2006 edition, *The Washington Post* reported that DPA has helped boost homeownership to a record 69% level.

- Home purchases which utilize down payment assistance now reportedly comprise approximately 40% of FHA's loans with over 80% of those home purchases being made by first time homebuyers.

66619

- Housing is a corner stone of the national economy. The opportunity for homeownership provided by DPA generated additional spending by families totaling $12.9 billion. These expenditures supported 211,000 new jobs, which generated $8.2 billion in increased personal income and $24.8 billion in total national economic output. [GMU 2007 Study (page ii)]

In short, down payment assistance works. No one disputes that these programs have enabled many hundreds of thousands of low and moderate income families to purchase homes for the first time. No one questions whether the beneficiaries of these programs have received every penny promised. And no one doubts that these programs have been instrumental in lifting homeownership rates to record levels, particularly among minority groups. To our knowledge there has been no report undertaken or released for public review that finds there would not be a significant gap if DPA were eliminated.

## Housing Policy Issues Presented by DPA Programs

It is appropriate to categorize issues relating to DPA programs into two types— those issues which relate to HUD's areas of expertise and jurisdiction, and those which do not. Only the former are properly addressed by HUD's proposed rule. Conversely, HUD is not an expert to assess, nor empowered to issue rules with respect to, the latter. Accordingly, this comment letter focuses on housing policy issues which are presented by the proposed rule.

(a) **Validity of Appraisals in DPA Transactions.** In the "Background" discussion prefacing the proposed rule, HUD mentions only one housing policy concern as justifying the proposed action. HUD asserts that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price might not be supported by an accurate appraisal. Specifically, HUD states, "FHA's primary concern with [DPA] transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." (page 27048)

HUD cites two sources for this assertion.

First, HUD states that a 2005 Government Accountability Office (GAO) report entitled "Mortgage Financing Actions Need to Help FHA Manage Risks from New Loan Products" concludes, as summarized by HUD, "that seller-related contributions *could* contribute to the overvaluation of the property". (Emphasis supplied.) We note that this report is not an analysis on DPA in general nor is it an analysis on property values when DPA is used. To our knowledge there has been no quantitative report undertaken on this issue.

Second, and at greater length, HUD cites an IRS press release of May 4, 2006 to support the proposition that "seller contributions increase the sales price of the home". The extensive reliance on the IRS press release is misplaced. HUD is the expert on

housing policy; the IRS is the expert on tax policy. HUD's failure to substantiate its housing policies with its own research, and reliance on a *press release* issued by an agency whose expertise is limited to tax matters raises questions about those policies, to say the least.

In fact, all homes with an FHA-insured mortgage, including all those acquired with the benefit of down payment assistance, must have their purchase price validated through a home appraisal performed by a HUD-certified appraiser using appraisal criteria established by the Secretary of HUD. Nowhere in its discussion accompanying the proposed rule does HUD acknowledge that fact, let alone seek to explain why those appraisals are inaccurate.

More fundamentally, even if one assumes that HUD's claim that appraisals prepared by HUD-certified appraisers using HUD-approved criteria overstate the true fair market value of homes purchased with down payment assistance, though inadequately substantiated, is nonetheless true, HUD does not explain how the proposed rule would remedy that perceived problem.

AmeriDream strongly supports any HUD initiative which would impose further safeguards on the appraisal process, such as requiring qualified appraisers to be randomly assigned to transactions or providing additional levels of review of the appraisal by disinterested experts. Yet it is essential that this concern be addressed *directly*. To do so *in*directly—through restricting donations to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach. The practical effect of the proposed rule would hurt, not help, aspiring homebuyers. It would wipe out the capacity of downpayment assistance providers to help all but a relative handful of the low and moderate income families they now serve.

(b) **Default or Claim Rates on Loans Obtained in DPA Transactions.** Neither HUD's proposed rule nor the accompanying discussion make any mention of the default or claim rates on loans obtained to finance homes purchased with down payment assistance. However, as detailed below, that issue is raised often in other contexts. For that reason, it merits mention in discussing housing policy issues presented by down payment assistance programs, and possible policy initiatives to address those issues.

It is well documented that foreclosure is typically due to life catastrophic events such as unexpected job loss, serious illness, or divorce - to name a few. It is also well documented and acknowledged that the population of homebuyers that HUD and DPA serve are financially the riskiest. However, HUD has not determined an acceptable risk or claim rate level. AmeriDream encourages HUD to establish a threshold so that programs and services can be evaluated appropriately.

The statistics regarding the incidence of default or claim among borrowers of FHA-insured loans who utilize down payment assistance relative to those who do not is a matter of considerable dispute. However, HUD itself apparently has determined that the

**66621**

problem, to the extent it exists, may be effectively addressed through improved underwriting standards, which AmeriDream strongly supports.

In the recent June 2007 GAO report entitled "Federal Housing Administration: Modernization Proposals would have Program and Budget Implications and Require Continued Improvements in Risk Management", GAO stated that HUD indicated that the underwriting criteria for purchasers utilizing down payment assistance were "well understood". Specifically, GAO reported that:

> HUD indicated that it had a firm basis for anticipating the performance of zero- and lower-down-payment loans as a result of its experience with mortgages with seller-funded down payment assistance. HUD said it used this experience to establish risk-based insurance premiums and minimum credit scores for zero- and lower-down-payment borrowers.

GAO report, at page 42.

Although HUD did not cite default or claim rates among borrowers utilizing down payment assistance as a justification for its proposed rule, if, as HUD has claimed in other discussions, that is a concern, that may be effectively addressed through applying the underwriting criteria which HUD says it has developed for those borrowers. Doing so would be an example of the right way to address a problem—target it directly, and in a way that improves down payment assistance programs rather than abolishes them.

(c) **DPA Policy Issues Relating to HUD Zero Down Payment Program.** In the past several Congresses, HUD has strongly advocated passage of legislation which would authorize FHA to insure zero-down payment mortgages. AmeriDream does not object to those proposals; in general, we support legislation and other policy initiatives which help low and moderate income families achieve their dream of homeownership. However, AmeriDream strongly objects to HUD's contradictory positions opposing current down payment assistance programs and supporting proposed zero-down payment mortgages.

As HUD itself notes, as reported by GAO in the language excerpted above, the policy issues presented by down payment assistance are highly analogous to those relating to zero-down payment mortgages—so much so that HUD advised GAO that it did not require a pilot program for the latter because it could simply structure its program based on the data acquired through dealing with the former. How, then, can HUD actively lobby for zero-down payment programs while attacking current programs that also do not require a purchaser to come up with a down payment, but instead of requiring the purchaser to borrow the down payment, gives it to the purchaser? Clearly, if there is any meaningful difference between the two programs, down payment assistance confers the greater benefit to the purchaser. If the appraisals in DPA transactions are valid—and, again, AmeriDream very much supports measures designed to ensure that they are—families who purchase homes with down payment assistance rather than zero-down

**66622**

payment mortgages benefit from a lower purchase price, smaller mortgage payments, and immediate equity in their homes.

Similarly, in the proposed rule, HUD goes out of its way to point out that the proposed rule does not interfere with "market practices in which sellers customarily agree to pay some of buyer's closing costs…[up to] 6 percent of the purchase price." (page 27050) Yet HUD does not seek to explain why seller-financed down payment assistance (applied to future homebuyers) of up to 6 percent is pernicious, while seller-financed closing cost assistance of up to 6 percent is benign. If HUD determines that the 6 percent threshold is meaningful in terms of housing policy, perhaps it may wish to consider limiting the *total* amount of seller-financed down payment assistance *and* closing cost assistance to that amount.

### Rulemaking Considerations

(a) **HUD's Proposed Rule is Impermissibly Arbitrary and Capricious.** HUD's proposal that would eliminate DPA programs cannot be justified. The programs are a proven success and have years of regulatory acceptance and recent legislative actions. HUD has done more than acquiesce; for the past decade, it has actively facilitated DPA programs and, over six years ago, shut down a formal proceeding in which it proposed virtually the same change in the regulations as it proposes here.

This rulemaking is not prompted by any instruction from Congress or implied from any change in the law. HUD concedes that the section of the statute that it purports to apply here is "silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute." In fact, HUD initiated a rulemaking proceeding eight years earlier, which made the very same proposal to restrict downpayment assistance, Congress has amended §1709 several times. Each time, it has left §1709(b) untouched, adding not one prohibition on downpayment assistance. When Congress revises a statute, its decision to leave certain sections unamended constitutes at least acceptance, if not explicit endorsement of the preexisting construction and application of the unamended terms. *See Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003); *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 561-62 (1991); *Asarco Inc. v. Kadish*, 490 U.S. 605, 632 (1989).

HUD also shut down its prior rulemaking on prohibited sources of DPA, leaving its existing regulations undisturbed. HUD initiated the earlier rulemaking in September 1999, expressing concern that "the sales price is often increased so that the seller's net proceeds are not diminished … [which] increases FHA's risk that it will not recover the full amount owed if forced to acquire and resell a home purchased by a participating borrower who then defaults on the loan." In January 2001, HUD withdrew the proposed rule, noting that it had received 1,871 comments during the commend period, with only 21 favoring the rule. "The overwhelming majority of comments opposed the rule." 66 FR 2851. HUD said nothing to suggest that the decision was a close call, that it continued to have concerns, or that it planned to revisit the subject at a later time.

**66623**

For the next six-and-a-half years, HUD made no further proposals for DPA regulations and took no other action inconsistent with DPA programs. The current proposed rule states, however, that "[t]he matter ... remains of concern" to HUD for what appears to be the same reason as expressed in the 1999 rulemaking – "that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." HUD points to little or no evidence, however, for renewing the proposal, or for why its concerns are any different now than when it decided to close its rulemaking in January 2001.

If HUD is relying on more compelling evidence than it had in 2001 to support its concern about sales prices, basic Administrative Procedures Act (APA) notice requirements dictate that the evidence be presented in the proposed rule and subjected to public comment. While "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," *Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006), a "[s]udden and unexplained change .. or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion." *Id.*, citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996).

Finally, although HUD is not bound by comments made by individual Members of Congress, the recent comments by Members of the House Subcommittee on Housing and Community Opportunity, coming just a month after HUD issued the proposed rule, are worthy of notice. Subcommittee Members strongly and unequivocally supported the continued operation of DPA programs. Indeed, there was not a single voice in favor of HUD's proposed action. Chairwoman Maxine Waters (CA) noted that between 2000 and 2005, approximately 680,000 homebuyers have been supported by downpayment assistance. Congressman Gary Miller (CA) observed: "Let's not just throw a program out that obviously is benefiting hundreds of low-income people who otherwise would never have an opportunity to own a home." Congressman Al Green (TX) noted that DPA programs help many break the cycle of poverty. Congressman David Scott (GA) commented: "What we can look at and continually strive for is the goodness and decency in man. Nowhere is that more applicable than in making sure that this DPA program continues and is strengthened." These comments further demonstrate that this rulemaking is headed in the wrong direction.

An agency must "supply a reasoned analysis" when it departs from a prior position. *Sun Country Airlines v. F.A.A.*, 56 F.3d 1531 (D.C. Cir. 1995), citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 42 (1983). There is no sound basis for HUD to abandon a position it has consistently maintained for a decade, and to reverse a path that literally hundreds of thousands have followed in pursuit of home ownership.

(b) **Administrative Procedures Act Compliance.** The regulatory process of a proposed rule is subject to the Administrative Procedures Act. As such, the public, entities affected by the proposed rule, and other stakeholders are able to provide

**66624**

comments so that their views are considered and appropriately addressed. AmeriDream, its programs and its program participants of which 95% are FHA homebuyers, will be negatively affected should this proposed rule become final.

Prior to the end of the proposed rule comment period, over 14,000 comments have been submitted to the regulations division opposing the proposed rule and requesting it be withdrawn. There are less than 30 comments supporting the proposed rule.

The proposed rule was issued May 11, 2007, and recommended that comments be submitted through www.regulations.gov. However, the regulations.gov site was not operating May 29-31, 2007 and experienced subsequent problems. Additionally, a significant number of comments submitted to regulations.gov are not posted on the website. Less than 3,000 comments are posted.

A statement causing concern to the fairness of this rulemaking process was made by Secretary Jackson that he intended to ban DPA by the end of the year even if critical comments to the proposed rule were received. [June 5, 2007 *Bloomberg News* "U.S. To Ban Down Payment Program Over Objections Jackson Says."]

The first time HUD issued a similar proposed rule in 1999, that rule was ultimately withdrawn in January 2001. The withdraw notice states "by the time of the close of the comment period, HUD received 1,871 comments. Only 21 of these comments favored the rule. The overwhelming majority of comments opposed the rule. Based on these public comments, HUD has determined to withdraw this proposed rule on sources of homeowner downpayment."

(c) **Executive Order 12866 & Regulatory Flexibility Act Best Practices.** We recognize the discretion in applying the EO and RFA best practices to proposed rules is in the sole discretion of the agencies. However, we submit for the record, the "Findings and Certifications" portion of the proposed rule contains flaws in analysis and conclusions. The two primary inaccuracies are: 1) this proposed rule meets all 4 components of the definition of "Significant Regulatory Action" defined in Executive Order 12866. While there is no specific definition for "economically significant" listed in the Executive Order, the description of "having an annual effect on the economy of $100 million or more..." is clearly met by DPA, as detailed above. As such that would then provide under the Regulatory Flexibility Act additional analysis on the DPA subject matter to be undertaken; 2) IRS Revenue Ruling 2006-27 does not warrant the deference given it in the proposed rule. HUD's Mortgagee Letter 2006-13 recognizes charities operating today with a 501(c)(3) tax exemption as allowable sources to provide down payments. The organizations providing DPA contain a 501(c)(3) status and warrant the recognition of a small entity.

(d) **Proposed Regulation Violates the United States Constitution.** The proposed regulation, if adopted, would also violate the United States Constitution's Fifth

Amendment's Equal Protection clause by discriminating against charitable, non-profit organizations that provide down payment assistance in the form of gifts, which are supported through service fees paid by home sellers, while permitting down payment gifts from governmental agencies and instrumentalities, family members, disaster relief grants, and charitable organizations that are not reimbursed, directly, or indirectly, by the seller. The proposed regulation also discriminates among groups of potential homebuyers: those who have access to funds from churches, government agencies, and approved charities will have the means to buy their own homes, while those for whom DPA programs are the only recourse will "suffer precisely the privations [that Congress, HUD, and FHA have long sought] to alleviate." *U.S. v. Califano*, 506 F. Supp. 1230 (D. Mass. 1981).

"Where a governmental regulation creates a classification which results in different treatment of the members of each class, the constitutional requirement of equal protection mandates that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.*, quoting *Reed v. Reed*, 404 U.S. 71 (1971). *See also General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 285 (2d Cir. 1997, cert. denied, 524 U.S. 951 (1998

In this case, HUD asserts that the targeted group of charitable nonprofit organizations offers gifts to homebuyers in a manner that "often" increases the sales price "to the detriment of the borrower and FHA." 72 FR 27048. HUD not only fails to identify reliable evidence to support this assertion, but it literally ignores the fact that hundreds of thousands of borrowers would not have acquired their first homes if not for these programs. Even if the proposed regulation is not foreclosed by the statutory provisions governing applications for mortgage insurance - and AmeriDream makes no concession as to that point - it is flatly inconsistent with the goals of the National Housing Act, and imposes burdens irrationally on some groups and not others. It therefore violates the Equal Protection Clause of the Fifth Amendment.

## Policy Recommendations

In order to best serve the interests of aspiring low and moderate income homebuyers who rely on down payment assistance to purchase their homes, AmeriDream respectfully requests that HUD withdraw its proposed rule. Instead, AmeriDream asks that HUD promulgate new rules which are directly targeted at remedying alleged shortcomings in current DPA programs, not abolishing them.

Towards that end, AmeriDream would like to identify some of the policy options available to HUD to improve all FHA-insured loan programs that use down payment assistance from any allowable source or provide 100% financing. Homebuyers who need assistance, regardless of the source of those funds, or homebuyers qualifying for 100%

**66626**

financing present a higher risk and need additional services to be successful. These homebuyers have the same very high loan-to-value (LTV) characteristic.

- Require mandatory homebuyer/ownership education for very high LTV homebuyers either in person or online. Pre and post-purchase education has been proven to lower foreclosure rates. Often the difficulty with administering pre and post-purchase education is the location of the classes. It is also suggested that HUD approve long distance learning via the internet to better serve today's homebuyers.

- Mitigate default rates by developing and applying eligibility criteria for borrowers receiving down payment assistance in accordance with the data HUD advised GAO it has acquired and analyzed with respect to such borrowers.

- Refine the current appraisal process:

   o Select appraisers through a blind draw process modeled upon programs currently administered under the auspices of the Department of Veterans Affairs.

   o Require, in accordance with GAO's recommendation, that the appraiser be informed about the use of down payment assistance in the transaction.

   o Require the lender, seller, and appraiser to affirm that no coercion or manipulation took place in connection with the appraisal.

- Limit the total amount of down payment assistance and closing cost assistance to 6 percent of the purchase price of homes financed by FHA-insured mortgages.

- HUD should review and approve organizations that want to provide DPA. HUD currently has an approval process for several of its programs. Approval and oversight of entities providing down payment assistance will help ensure a successful program.

   o In order to offset any administrative costs of implementing a review and approval of organizations to provide DPA, it is recommended that HUD charge an application fee that would appropriately cover HUD's administrative costs.

   o Impose more rigorous standards and certification requirements for down payment assistance organizations, such as strengthened financial requirements, annual disclosures for participating organizations, and greater accountability.

   o Require minimum levels of experience and strong histories of compliance with applicable law for down payment assistance providers seeking to

**66627**

raise funds from private sellers that operate in states other than their own home state.

o   Require background checks for all officers and board members or other such decision-makers for down payment assistance.

If you have any questions or wish to discuss this comment letter in more detail, please do not hesitate to contact me. All of the reports referenced in these comments are public documents or are in HUD's possession. If duplicate reports are needed please let me know. I may be contacted at (301) 977-9133.

On behalf of AmeriDream, thank you for your consideration of our comments. We look forward to working with HUD to address these very important issues in a manner which best serves the public interest.

Respectfully submitted,

Ann Ashburn
President
AmeriDream, Inc.

**66628**

# Exhibit 10



George Mason University School of Public Policy
**Center for Regional Analysis**

# An Evaluation of Research on the Performance of Loans with Down Payment Assistance

by

Lisa A. Fowler, PhD
Stephen S. Fuller, PhD

Center for Regional Analysis
George Mason University
Fairfax, Virginia

September 2006

**00437**

# HIGHLIGHTS

## Purpose of the Study

*AmeriDream, Incorporated requested an analysis of the fiscal, economic and social impact of non-profit down payment assistance programs. As part of this larger project, the research team conducted an independent evaluation of prior research on the performance of home mortgage loans with down payment and other assistance. The objective of this analysis was to provide AmeriDream, Inc. staff with a sound understanding of the prior research in order for them to respond to challenges to their program.*

## Main Findings

• The descriptive results from studies done by the Office of the Inspector General and the General Accountability Office could be overstating the extent of the default and/or claim rates of FHA loans with assistance from nonprofit downpayment assistance programs compared with loans with other types of assistance (e.g. gifts from realtives).

• The General Accountability Office report provides the most rigorous analysis of claim rates. Based on GAO's national sample, the three-year claim rate for loans receiving assistance from nonprofit downpayment assistance providers was 6% (compared with 5% for loans with other assistance.)

• When foreclosure (or claim rate) is used as the performance measure, the difference in the performance of loans with nonprofit down payment assistance may be (i) much smaller than these studies suggest and/or (ii) related not to assistance from nonprofit downpayment assistance programs specifically but rather to loans where the buyer receives a gift from any source.

• The Office of the Inspector General studies used data on just four cities with a relatively large share of loans with nonprofit down payment assistance. The sample data, therefore, represent places with slower than average housing markets and relatively depressed economies. Focusing on underserved or economically lagging metropolitan areas may result in findings that overstate the difference in performance nationally of loans with nonprofit down payment assistance and loans with other types of assistance.

• The studies focused on home prices but did not show a direct link between assistance from nonprofit down payment assistance programs, higher home prices, and foreclosure. Higher home prices, therefore, may not be a predictor of poor loan performance.

• The most significant methodological issue is the lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim: (i) the financial situation of the borrower and (ii) the economic conditions of the area in which the home is located. GAO attempted to account for some of these other factors, but data limitations led to the inclusion of incomplete information. Their results, therefore, could be subject to alternative interpretation.

## Purpose

The purpose of this report is to review critically prior analyses of the performance of home loans secured by buyers receiving down payment assistance from nonprofit down payment assistance (NDPA) programs. Research by the HUD Office of the Inspector General and the U.S. Government Accountability Office has been used to argue that FHA loans that receive assistance from NDPA programs perform worse than other FHA loans, even those with other types of down payment assistance, such as gifts from relatives. This independent evaluation assesses those claims based on the data and methodology used in the prior research. This evaluation is in lieu of an independent analysis of the performance of NDPA program mortgage loans against the performance of other FHA mortgage loans. The information requirements for an independent evaluation were deemed too onerous for a non-federal government research team. Furthermore, several studies have been done previously by federal agencies with access to the requisite data.

This report reviews the following three studies:

• Office of Inspector General. *Final Report of a Nationwide Audit: Down Payment Assistance Programs*. 2000-SE-121-0001. March 2000. (OIG 2000)
• Office of Inspector General. *Follow Up of Down Payment Assistance Programs Operated by Private Nonprofit Entities*. 2002-SE-001. September 2002. (OIG 2002)
• U.S. Government Accountability Office. *Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans With Down Payment Assistance*. GAO-06-24. November 2005. (GAO 2005)

## Analysis

This review raises several methodological issues, particularly for the studies done by the Office of the Inspector General. These criticisms raise concerns that the descriptive results from the three studies reviewed could be subject to erroneous interpretation or could be overstating the extent of the default and/or claim rates of FHA loans with assistance from NDPA programs compared with loans with other types of assistance (e.g. gifts from relatives.) This conclusion is supported by the results from the most rigorous study, which was done by the U.S. Government Accountability Office. The national results from the GAO multivariate regression analysis show no statistically significant difference in the claim rates of NDPA loans and FHA loans with other types of gifts.

### Key Methodological Issues Affecting Study Results

**1. Measure of Loan Performance**
These studies use two different measures of loan performance: (1) default, as defined as a 90+ day delinquent loan and (2) claim, defined as a loan that has a claim submitted to the FHA for foreclosure. When evaluating the performance of a program, it is necessary to consider carefully what "good performance" and "bad performance" mean. It seems apparent that mortgages that end in foreclosure are bad. These loans force additional costs on the FHA and, therefore, society at large. It is less clear that delinquency—even delinquency of 90 or more days—is particularly problematic at the macro level. Being delinquent on one's mortgage payments certainly does have implications for an individual's credit, but does it have a social cost? If not, how concerned should we be?

None of the studies reviewed explained how it chose default (as measured by 90+ days of delinquency) and claim rate as their measure of performance. None of the studies showed

empirically how default was related to foreclosure in their study samples.

If the appropriate measure of performance is claim rate, rather than default rate, then the performance problem for loans with assistance (of any kind) could be considered quite low indeed. The OIG (2002) report found that over a three-to-five year time period, about 7.8% of Nehemiah-assisted loans went to claim. No information was reported on loans with assistance from other sources. The 2005 GAO report could not show that there was a statistical difference between the claim rate of loans with assistance from NDPA programs (or what GAO termed "seller-funded" assistance) and loans with assistance from other sources.

Thus, when foreclosure (or claim rate) is used as the performance measure, the loan performance issue related to nonprofit down payment assistance may be (1) much smaller than these studies suggest and/or (2) related not to assistance from NDPA programs particularly but rather to loans where the buyer receives a gift from <u>any</u> source.

## 2. Appropriateness of the Data

Researchers are often called upon to make generalizations about a large-scale program or policy based on analysis of only a small sample of program data. The first two OIG studies were particularly limited by the amount of data available. The HUD database, which contains information on all FHA-insured loans, did not contain reliable information on the presence and source of down payment assistance. Therefore, the OIG analyses relied on program data from the Nehemiah Progressive Development Corporation. Their results based on analysis of the Nehemiah data alone were used to draw broad conclusions about the performance of all loans with down payment assistance from nonprofit organizations. If the Nehemiah program was significantly different in some way from other programs, such as AmeriDream, it would be fallacious to compare findings from Nehemiah program data to all nonprofit down payment assistance providers. An example of a program difference is the relative mix of new construction versus resale properties purchased by program participants.

If Nehemiah management had stricter application procedures for potential home buyers than did the management of other NDPA providers, then OIG results could potentially understate the default and claim rates of loans with down payment assistance. If Nehemiah's policies allowed for less qualified applicants to receive assistance, then the OIG results could potentially overstate the default and claim rates of loans with down payment assistance. The OIG analyses did not confirm that management, administration, policies and procedures of the program from which their data come from were much the same as the management, administration, policies and procedures at all other nonprofit organizations providing down payment assistance. Therefore, the OIG results should have been carefully worded to state that they applied to the Nehemiah program only and not all down payment assistance programs.

Another data issue is related to the choice of the four cities the OIG used in its analyses. Stockton, Sacramento, Indianapolis and Las Vegas were chosen because they were the cities where Nehemiah had provided the most down payment assistance. That fact alone implies that the housing markets in those four cities were substantially different than housing markets in other cities. OIG stated that flat or decreasing markets are the only types of markets in which down payment assistance programs can work (OIG 2000, p. 23). The nature of the housing market in slow or depressed areas could contribute to a wider disparity in default and/or claim rates between loans with down payment assistance and other FHA-insured loans. Weaker economic conditions could mean that lower-income home buyers face more precarious financial situations. One company closing its doors or one major layoff could mean the difference between paying one's mortgage and defaulting for home buyers at the margins. This group of marginal home buyers is exactly the group that nonprofit down payment

assistance providers are serving. Thus, limiting analysis to areas with large numbers of home buyers receiving down payment assistance could overstate the relative differences in loan performance.

The GAO 2005 report uses a sample of national data, in addition to a sample of targeted metropolitan areas, which is a better approach. When GAO compared the differences in default/claim rates between loans with what GAO termed "seller-funded assistance" and loans with no assistance, they found greater differences in the MSA sample compared with their national sample. This finding is further suggestion that focusing on underserved or economically lagging metropolitan areas may result in findings that overstate the difference in performance nationally of loans with nonprofit down payment assistance and loans with other types of assistance.

### 3. Focus on home prices
Both the OIG and GAO commented on the circuitous relationship between down payment assistance, home prices, and default, though no data was provided that empirically linked these three items in the study samples. The OIG reviewed several independent studies showing a strong relationship between the amount of equity a buyer has in the home and the default rates on FHA-insured mortgages. According to one independent study, "When borrowers experiencing mobility-induced events such as a job loss which produce significant changes in household income have little or no equity, they may be unable to sell their properties for a profit and may have insufficient income to meet mortgage payments, resulting in higher claim rates." (OIG 2000, Appendix A, p. 6)

GAO contracted out an empirical analysis of the relationship between down payment assistance, appraisal and home price. Their analysis showed that homes with "seller-funded assistance" were appraised and sold for about three percent more than comparable homes without such assistance. (p. 22) Both GAO and OIG also cited agents involved in loan transactions involving nonprofit down payment assistance saying that home prices were sometimes increased.

Assuming that this phenomenon does occur,[1] the question becomes "Should we be concerned?" Higher home prices hurt the buyer *only if they would have been able to purchase the home for the lower price otherwise.* Without the down payment assistance program, the potential home buyer may not have been able to purchase a home at any price. However, if higher prices facilitated by down payment assistance lead directly to more foreclosures, then there is a social cost associated with the phenomenon. None of the studies reviewed provided sufficient evidence to show this link in their study samples.

### 4. Omission of factors related to the financial situation of the family and the economic conditions in the area.
The most significant issue that stands out with regards to the studies reviewed is the lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim: (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is located. Families in more precarious financial situations are probably more likely to be in default. Areas with poor economic conditions likely contribute to the instability of financially precarious families. If these families, living in these areas, are more likely to be participants in NDPA programs than are other families, then their presumed higher default rates will show up as defaults in loans with nonprofit down payment assistance. However, the cause of the default could have little to do with the down payment assistance itself but everything to do with the characteristics of the home buyers the down payment assistance providers serve.

---

[1]     This analysis did not rigorously examine the methodology GAO used; however, the model used to estimate home prices is standard in the field.

GAO attempted to account for these other factors in their regression analysis but data limitations and/or specification errors led to inclusion of incomplete information. The GAO regression models included variables for borrowers' resources, first-time home buyer, whether or not the area was a HUD-designated underserved area, unemployment rate, and home price appreciation. None of these variables was a statistically significant predictor of the probability of default or foreclosure.

It is possible that the lack of significant results is related to how the independent variables were specified. The variable for borrowers' resources is a notable example. The independent variable for borrowers' reserves is a dummy variable that takes a value of 1 if the borrower had less than two months of mortgage payments in liquid assets after closing, 0 otherwise. The GAO report does not explain how this threshold was decided upon. However, this type of dummy variable may be an inadequate measure of resources, and thus, an insufficient approximation of the financial situation of the borrower.

One reason GAO may have defined this variable in this way is limited data availability. According to the Concentrance Consulting Group which developed the database on which GAO based its analysis, there was missing and inconsistent data on borrower assets. Concentrance notes that the excluded and inconsistent data resulted because there was no uniformity among lenders as to what to include in the total assets available field on the MCA worksheet.[2]

In an ideal regression analysis of loan performance, the independent variables would include:

o  **Characteristics of the loan**—15- or 30-year term, ARM, down payment assistance, amount, loan-to-value ratio;
o  **Characteristics of the borrower**—income, income history, employment, assets, family composition;
o  **Characteristics of the market**—unemployment rate, job mix (e.g. some indicator of jobs with high layoff potential), home price appreciation, poverty rates or average family incomes; and
o  **Characteristics of the home**—size, age, quality.

It would be virtually impossible to collect all of this data for a large enough sample with which to run a regression. The point is not that GAO should have included all of the above factors as independent variables; rather, the point is that there are numerous other factors that influence the probability of default and/or foreclosure. When other factors are excluded, the results could show that one factor has significant predictive power (e.g. presence of nonprofit down payment assistance) when really there are omitted variables that are correlated with the one factor, that are truly driving the prediction.


# Review

This section provides more details on each study's data, methodology and main findings. Table A in the appendix summarizes the review.

The *Final Report of a Nationwide Audit: Down Payment Assistance Programs* (OIG 2000) report was prepared for the U.S. Department of Housing and Urban Development's (HUD's) Office of Inspector General (OIG) in late 1999. The purpose of the OIG audit was three-fold: (1) to determine

---

2   ·    Concentrance Consulting Group. 2004. *Audit of Loans with Downpayment Assistance*. Contract Number C-OPC-22550.

### Table 3. Results from GAO 2005[a]

| | National Sample | | MSA Sample[b] | |
|---|---|---|---|---|
| | Default Rate | Claim Rate | Default Rate | Claim Rate |
| Seller-funded assisted loans | 22 to 28% | 6 to 18% | 23 to 27% | 14 to 17% |
| Other assistance | 11 to 16% | 5 to 10% | 11 to 15% | 5 to 9% |
| No assistance | 8 to 12% | 3 to 6% | 8 to 11% | 3 to 5% |

Source: OIG (2005). Loans originating in fiscal years 2000, 2001, and 2003. The ranges in the rates reflect the three cohorts of loans. Loans in default defined as loans that are delinquent 90 or more days. The default and claim rates are calculated as of June 2005.

[a] The GAO report did not provide detailed data on the number of loans in default or with a claim.

[b] The MSA data were reported only in bar charts. Thus, the figures presented here are estimated from looking at those charts (p. 28).

The GAO also conducted a regression analysis of loan performance. Regression analysis is a better method of investigating loan performance because it allows the analyst to control for other factors—aside from whether or not the loan had down payment assistance—that might also affect the rate of default and/or claim.

The GAO models were binary regression models, meaning the dependent variable (DV) is set equal to 1 or to 0. In the models of default, the DV was a dummy variable equal to 1 if the loan defaulted and 0 if it had not. In the claim models, the DV was a dummy variable equal to 1 if the loan had a claim, 0 if otherwise. GAO specified several different models using both the national and MSA sample data. The final models included the independent variables (IV) summarized in Table 4.

The various model specifications revealed that some factors are very important in estimating the probability that a loan defaults or goes to claim. The constructed risk variable, credit score, and front-end ratio were all important predictors. Borrower reserves, condo, first-time home buyer, and underserved area all turned out to be insignificant predictors.

The regression results using the national sample of data show that assistance from a "seller-funded" nonprofit increased the probability that the loan would default by 93% compared to loans with no assistance. Assistance from a nonseller-funded source increased the probability that the loan would default by 21% compared to loans with no assistance. The differences between "seller-funded" assistance and assistance from other sources were large and were statistically significant.[9] (p. 68)

The probability that the loan would go to claim was 76% greater for loans with "seller-funded" assistance compared with loans with no assistance. For loans with nonseller-funded assistance, there was a 49% increase in the probability that the loan would go to claim. These differences were not statistically significant. (p. 69) In other words, it is not possible to say with confidence that loans with "seller-funded" assistance are more likely to go to claim than loans with other types of assistance based on GAO's multivariate analysis.

---

9    When a difference is statistically significant, it means that there is very little chance that the difference observed occurred by chance. It indicates that there are important differences between the two groups in terms of probability of default, even after controlling for all other factors included as independent variables.

# Exhibit 11



71 FR 60169-01                                                                                    Page 1
(Publication page references are not available for this document.)


NOTICES

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-5076-D-05]

Consolidated **Delegation** of **Authority** for the Office of Housing--**Federal-Housing Administration** (FHA)

Thursday, October 12, 2006

AGENCY: Office of the Secretary, HUD.


ACTION: Notice of revocation and **delegation** of **authority**.


SUMMARY: This notice supersedes the 2003 consolidated **delegation** of **authority** to the Assistant Secretary for Housing--Federal Housing Commissioner and the General Deputy Assistant Secretary for Housing--Deputy Federal Housing Commissioner, published on August 20, 2003. This delegation supersedes and/or revokes all prior delegations from the Secretary to the Assistant Secretary for Housing--Federal Housing Commissioner. Additionally, the authority now being delegated applies not only to current statutory authorities, but also to later-enacted statutes and statutory amendments that pertain to the legislative acts cited in the delegation.


DATES: Effective Date: September 15, 2006.


FOR FURTHER INFORMATION CONTACT: Eliot C. Horowitz, Senior Advisor to the Assistant Secretary for Housing--Federal Housing Commissioner, Office of Housing, Department of Housing and Urban Development, 451 Seventh Street, SW., Room 9110, Washington, DC 20410-8000; telephone (202) 708-1490. (This is not a toll-free number.) Persons with hearing or speech impairments may call HUD's toll-free Federal Information Relay Service at 1-(800) 877-8339.


SUPPLEMENTARY INFORMATION: This notice supersedes and specifically amends in two ways the prior consolidated **delegation** of **authority** issued on August 11, 2003, and published on August 20, 2003 (68 FR 50157). First, it clarifies the nature and scope of the authority delegated to the Assistant Secretary for Housing--Federal Housing Commissioner (Assistant Secretary) and General Deputy Assistant Secretary for Housing--Deputy Federal Housing Commissioner (General Deputy Assistant Secretary) in relation to the regulation of government sponsored enterprises (GSEs) under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

4501 et seq.) (FHEFSSA). That authority continues to be set forth in Subpart E of this **delegation** of **authority**. In addition, the delegation has been updated (in a new section (32) under Subpart B) to include more recently issued authority, the Legacy Act of 2003 (Public Law 108-186), which was enacted by Congress in December 2003. Finally, section (23) of Subpart B has been updated to indicate that the Assistant Secretary is responsible for carrying out the provisions of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA) (42 U.S.C. 1437f note). In connection with the latter authority, the Secretary issued a redelegation of authority to the Assistant Secretary effective October 1, 2004 (69 FR 62070, October 22, 2004), while also revoked authority previously redelegated to the Director of the Office of Multifamily Housing Assistance Restructuring, whose office was terminated on September 30, 2004.


 Subpart E of the 2003 consolidated **delegation** of **authority** for the Office of Housing referred the reader to a **delegation** of **authority** concerning the regulation of the GSEs that was published on February 12, 1999, at 64 FR 7406. However, that 1999 delegation was unclear about the functions that were delegated to the Assistant Secretary regarding determinations whether mortgage data and information received from the GSEs were proprietary or were releasable to the public. This notice makes clear that the Secretary has delegated, to the Assistant Secretary and the General Deputy Assistant Secretary, the portion of the Secretary's general regulatory authority that gives the Secretary the authority to make determinations regarding whether any activity of a GSE is or is not authorized under its Charter Act and to request that the Director of the Office of Federal Housing Enterprise Oversight take action against a GSE that has engaged, is engaging, or is about to engage in any activity that is not authorized under its Charter Act. Authority is also delegated to the Assistant Secretary and the General Deputy Assistant Secretary to determine whether mortgage data or other information provided to HUD by Fannie Mae or Freddie Mac are proprietary or publicly releasable and to issue any rule, regulation, order, notice, letter, or other document regarding such determinations as may be necessary.


 HUD is also publishing a separate **delegation** of **authority** to the Assistant Secretary for Fair Housing, of all the power and authority under the fair housing provisions of FHEFSSA set forth at 12 U.S.C. 4545, and in HUD's regulations at 24 CFR part 81, subpart C.


Section A. General **Delegation** of **Authority**


 Unless otherwise stated, the Assistant Secretary and the General Deputy Assistant Secretary are each delegated the power and authority of the Secretary of HUD with respect to all housing programs and functions, including, but not limited to, those listed below in Sections B through E, with authority to redelegate to employees of the Department, unless otherwise specified. Only the Assistant Secretary, however, is delegated the authority to issue rules or regulations to carry out housing programs and to waive regulations. This authority may not be redelegated. The

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                          Page 3
(Publication page references are not available for this document.)

Assistant Secretary, as well as other Office of Housing officials, are authorized to cause the seal of HUD to be affixed to, and to authenticate copies of documents. The authority to affix the seal and authenticate copies of documents is also addressed in a separate **delegation** of **authority**. Finally, the authority delegated herein supersedes and revokes prior delegations from the Secretary to the Assistant Secretary and applies both to current authority and later enacted statutory authority.

Section B. Multifamily Programs--Authority Delegated

 The authority of the Secretary of HUD with respect to the Office of Housing's multifamily housing programs and functions that are authorized under the following:

 (1) Titles I, II, V, VI, VII, VIII, IX, and XI of the National Housing Act  (12 U.S.C. 1701 et seq.) in exercising the power and authority delegated under this section;

 (2) Section 202 of the Housing Act of 1959, as such section existed prior to the enactment of the Cranston-Gonzalez National Affordable Housing Act (12 U.S.C. 1701q note), as amended by section 811 of the American Homeownership and Economic Opportunity Act of 2000 (Pub. L. 106-561);

 (3) Section 202 of the Housing Act of 1959 (12 U.S.C. 1701q), as amended by Subtitle A of Title VIII of the National Affordable Housing Act of 1990, with respect to the provision of capital advances and rental housing assistance for supportive housing for the elderly, as amended by Subtitle C of the American Homeownership and Economic Opportunity Act of 2000 (Pub. L. 106-561);

 (4) Section 101 of the Housing and Urban Development Act of 1965 (12 U.S.C. 1701s) with respect to the Rent Supplement program for disadvantaged persons, including the authority to administer contracts and requirements for rent supplements;

 (5) Section 8 Housing assistance under the United States Housing Act of 1937  (42 U.S.C. 1437, et seq.), including the authority delegated under Executive Order 11196 to approve the undertaking of any annual contribution, grant, or loan, or any agreement or contract for any annual contribution, grant, or loan;

 (6) Section 808 of the National Affordable Housing Act (Public Law 101- 625), and sections 671, 672, 674, 676, and 677 of the Housing and Community Development Act of 1992 (42 U.S.C. 13631) with respect to the provision of service coordinators in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

federally assisted housing;

(7) Sections 201, 202, 203, and 204 of the Housing and Community Development
Amendments of 1978, and the amendments contained in Title I of the Multifamily
Housing Property Disposition Reform Act of 1994 (Pub. L. 103-233, 12 U.S.C. 1701
note);

(8) The Housing Development Grant Program, pursuant to Section 17 of the United
States Housing Act of 1937 (42 U.S.C. 1437o);

(9) Section 4(d) of the Department of Housing and Urban Development Act (42 U.S.C.
3533), which provides that the Assistant Secretary is the Assistant to the Secretary
who shall be responsible for providing information and advice to nonprofit
organizations desiring to sponsor housing projects assisted under programs
administered by the Department;

(10) The authority of the Secretary under the Revolving Fund for Liquidating
Programs (12 U.S.C. 1701q) to manage, repair, lease, and otherwise take all actions
necessary to protect the financial interest of the Secretary in properties as to
which the Secretary is mortgagee-in-possession, and to manage; repair; complete;
remodel and convert; administer; dispose of; lease; sell or exchange for cash or
credit at public or private sale; pay annual sums in lieu of taxes on; obtain
insurance against loss on; and otherwise deal with properties as to which the
Secretary has acquired title based on a loan made under the former Section 312
Rehabilitation Loan Program;

(11) The function of the Secretary under Section 7(i)(3) of the Department of
Housing and Urban Development Act (42 U.S.C. 3535(i)(3)), concerning the sale,
exchange, or lease of real or personal property and the sale or exchange of
securities or obligations with respect to any multifamily project;

(12) Title IV of the Housing and Community Development Amendments of 1978  (42
U.S.C. 8001, et seq.);

(13) The authority to endorse any checks or drafts in payment of insurance losses
on which the United States of America, acting by and through the Secretary or the
Secretary's successors or assigns, is a payee (joint or otherwise) in connection
with the disposition of the government's interest in property or lease of such
property;

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                                                    Page 5
(Publication page references are not available for this document.)

(14) Section 2 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701t);

(15) The Multifamily Mortgage Foreclosure Act of 1981 (12 U.S.C. 3701- 3717);

(16) To act as an Attesting Officer with authorization to cause the seal of the Department of Housing and Urban Development to be affixed to such documents as may require its application and to certify that a copy of any book, record, paper, microfilm, electronic document, or any other document is a true copy of that in the files of the Department;

(17) The Congregate Housing Services Program under Section 802 of the National Affordable Housing Act (42 U.S.C. 8011);

(18) The HOPE for Homeownership of Multifamily Units Program under Title IV, Subtitle B, of the National Affordable Housing Act (42 U.S.C. 12701, 12871);

(19) The Multifamily Risk Sharing Programs pursuant to Section 542 of the Housing and Community Development Act of 1992 (Public Law 102-550, October 28, 1992);

(20) Title II of the Housing and Community Development Act of 1987 (12 U.S.C. 1715 note), and the Emergency Low-Income and Housing Preservation Act of 1987 (ELIHPRA), as amended by Subtitle A of Title VI of the National Affordable Housing Act (12 U.S.C. 4101 et seq.), the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRA), as further amended by Title III of the Housing and Community Development Act of 1992 (12 U.S.C. 4141 et seq.);

(21) Section 811 of Subtitle B of Title VIII of the National Affordable Housing Act of 1990 (42 U.S.C. 8013), with respect to the provision of capital advances and rental housing assistance for supportive housing for persons with disabilities as amended by Subsection C of Title VIII of the American Homeownership and Economic Opportunity Act of 2000 (Pub. L. 106- 569);

(22) Section 581 of the National Affordable Housing Act of 1990 (Pub. L. 101-625) and Chapter 2, Subtitle C of Title V of the Anti-Drug Abuse Act of 1988 (42 U.S.C. 1190 et seq.), relating to the federally assisted low-income housing drug elimination program;

(23) The Portfolio Reengineering Demonstration Program authorized under Sections 211 and 212 of the Departments of Veterans Affairs and Housing and Urban

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                                                           Page 6
(Publication page references are not available for this document.)

Development, and Independent Agencies Appropriations Act, 1997 (Pub. L. 104-204, 110
Stat. 2874, approved September 26, 1997), as re-authorized and amended by Section
522(b) of the Departments of Veterans Affairs and Housing and Urban Development, and
Independent Agencies Appropriations Act, 1998 (Pub. L. 105-65, 111 Stat. 1344, 1446,
approved October 27, 1997) (42 U.S.C. 1437f note); all provisions of the
Mark-to-Market Extension Act of 2001 (Title VI of Pub. L. 107-116); and all
provisions of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA)
(42 U.S.C. 1437f note);


 (24) To take actions necessary to ensure that participants in HUD programs under
the jurisdiction of the Assistant Secretary for Housing comply with the regulations,
rules, and procedures of the Department including, but not limited to, imposing
limited denials of participation and acting as the debarring official in proceedings
under part 24 of Title 24 of the Code of Federal Regulations;


 (25) The Rental Assistance Program authorized by Section 236 of the National
Housing Act (12 U.S.C. 1715z-1);


 (26) The management and disposition of HUD-owned multifamily projects and HUD-held
mortgages and the provision of grants and loans, as provided under Section 204(a) of
the Departments of Veterans Affairs and Housing and Urban Development, and
Independent Agencies Appropriations Act, 1997 (Public Law 104-204) (12 U.S.C.
1715z-11a);


 (27) Section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u);


 (28) To the Assistant Secretary only, without the power to redelegate, the
authority to issue regulations under Section 7(d) of the Department of Housing and
Urban Development Act (42 U.S.C. 3535(d)) and to waive regulations under Section
7(q)(2) of the Department of Housing and Urban Development Act (42 U.S.C.
3535(q)(2));


 (29) The authority to administer the provisions of Section 7(i) of the Department
of Housing and Urban Development Act (42 U.S.C. 3535(i)), relating but not limited
to the foreclosure of mortgages, sales of foreclosed properties, and the
modification of terms of the contracts;


 (30) The authority to administer the provisions of Section 7(j) of the Department
of Housing and Urban Development Act (42 U.S.C. 3535(j)), relating to the
establishment of fees and charges;


© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                                    Page 7
(Publication page references are not available for this document.)

(31) The authority to administer the provisions of Section 7(k) of the Department of Housing and Urban Development Act (42 U.S.C. 3535(k)), relating to the acceptance of voluntary services;

(32) The authority to administer the provisions of the Legacy Act of 2003  (Pub. L. 108-186).

Section C. Single Family Programs--Authority Delegated

 The authority of the Secretary of HUD with respect to the Office of Housing single family housing programs and functions, and the authority with respect to mortgagee activities (including Title I lenders) for single family programs of the following:

(1) Titles I, II, V, VI, VIII, and IX of the National Housing Act (12 U.S.C. 1701 et seq.);

(2) Section 106 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701x);

(3) The Interstate Land Sales Full Disclosure Act, Title XIV of the Housing and Urban Development Act of 1968 (15 U.S.C. 1701, et seq.);

(4) The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601, et seq.);

(5) The authority to prescribe standards for designs, construction, and alteration of structures for programs (other than public housing programs) prescribed under the National Housing Act (12 U.S.C. 1701 et seq.);

(6) To approve or disapprove variances from the design or construction standards for all programs (other than public housing programs) under the National Housing Act (12 U.S.C. 1701, et seq.);

(7) The authority to evaluate and determine the technical suitability of housing products and materials under Section 21 of the National Housing Act (12 U.S.C. 1735e), and to issue engineering and technical bulletins governing the acceptability of housing system components, materials, and methods of construction;

(8) All matters and requirements of the National Manufactured Housing Construction

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

and Safety Standards Act of 1974 and Title VI of the Housing and Community
Development Act of 1974 (42 U.S.C. 5401-5426);

 (9) To convey and execute deeds of conveyance, deeds of release, assignments,
satisfactions of mortgages, and any other written instrument relating to real or
personal property or any interest therein, heretofore, or hereafter acquired by the
Secretary pursuant to the National Housing Act (12 U.S.C. 1701, et seq.);

 (10) To perform the functions of the Secretary under Section 7(i)(3) of the
Department of Housing and Urban Development Act (42 U.S.C. 3535(i)(3)), concerning
the sale, exchange, or lease of real or personal property, and the sale or exchange
of securities or obligations with respect to any single family property;

 (11) The authority to endorse any checks or drafts in payment of insurance losses
on which the United States of America, acting by and through the Secretary or
his/her successors or assigns, is a payee (joint or otherwise), in connection with
the disposition of the government's interest in property or lease of such property;

 (12) The authority of the Secretary under the Revolving Funds for Liquidating
Programs (12 U.S.C. 1701q) to manage, repair, lease, and otherwise take all actions
necessary to protect the financial interest of the Secretary in properties as to
which the Secretary is mortgagee-in-possession and to manage, repair, complete,
remodel and convert, administer, dispose of, lease, sell or exchange for cash or
credit at public or private sale, pay annual sums in lieu of taxes on, obtain
insurance against loss on, and otherwise deal with properties as to which the
Secretary has acquired title based on a loan under the former Section 312
Rehabilitation Loan Program;

 (13) To act as an Attesting Officer with authorization to cause the seal of the
Department of Housing and Urban Development to be affixed to such documents as may
require one and to certify that a copy of any book, record, paper, microfilm,
electronic document, or any other document is a true copy of that in the files of
the Department;

 (14) The Nehemiah Housing Opportunity grant program in Sections 609-613 of the
Housing and Community Development Act of 1987 (12 U.S.C. 1715e);

 (15) To take actions necessary to ensure that participants in HUD programs comply
with regulations, rules, and procedures of the Department including, but not limited
to, imposing limited denials of participation and acting as the debarring official
in proceedings under part 24 of Title 24 of the Code of Federal Regulations (24 CFR
part 24);

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(16) To appoint a Special Assistant for Cooperative Housing pursuant to Section 102(h) of the Housing Amendments of 1955 (12 U.S.C. 1715e note);

(17) To the Assistant Secretary only, without the power to redelegate, the authority to issue regulations under Section 7(d) of the Department of Housing and Urban Development Act (42 U.S.C. 3535(d)) and to waive regulations under Section 7(q)(2) of the Department of Housing and Urban Development Act (42 U.S.C. 3535(q)(2)).

Section D. Financial Operations and Management Controls-Authority Delegated

(1) To provide financial management for programs administered by the Assistant Secretary;

(2) To formulate and develop financial management and internal control policies; to oversee compliance by the Office of Housing and **Federal Housing Administration** (FHA) with OMB Circulars A-123 (Management and Accountability Control), A-127 (Financial Management Systems), and A-130 (Federal Information Resources) as they apply to Housing and FHA financial and program operations; to establish and supervise the development and execution of uniform Housing and FHA policies, principles, and procedures necessary for financial management; to issue directions that implement these policies and modification to existing products;

(3) To maintain the FHA General Ledger and the chart of accounts of the FHA funds;

(4) To establish and maintain appropriate financial management controls over Housing and FHA programs; to provide technical guidance to organizational elements under the Assistant Secretary in the field of accounting and fiscal matters; to track Housing and FHA financial activities against the budget and business plan; and to coordinate the development and maintenance of integrated financial management systems needed for accounting and management of housing and FHA programs;

(5) To prepare reports; to report to the Assistant Secretary, other offices, the Department's Chief Financial Officer, and other HUD Regional and Field staff on the financial condition of FHA mortgage insurance programs (including actual and projected cash flows, accounting and performance reports, program effectiveness controls, and insurance reserves analyses); to publish an annual FHA report reflecting prior year accomplishments and the audited financial statements; and to prepare internal reports on the financial condition of Office of Housing and FHA

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                                                    Page 10
(Publication page references are not available for this document.)

programs;

(6) To develop and maintain integrated financial management systems; and to direct studies and audits of the accounting and financial information and systems functions;

(7) To prepare and execute policies and systems to measure the financial and actuarial soundness of Office of Housing and FHA programs; and to ensure the conduct of an independent annual audit of the FHA program financial statements;

(8) To obtain reports, information, advice, and assistance in carrying out assigned functions; and to develop financial management information to assist in developing budget, financial, accounting, and cost-accounting information on a timely basis;

(9) To direct the investment of money held in the various Office of Housing/FHA insurance funds that is not needed for current operations, in bonds or other obligations of the United States, or in bonds or other obligations guaranteed as to principal and interest by the United States;

(10) To borrow funds from the Treasury to facilitate credit reform programs.

Section E. Regulations of Government-Sponsored Enterprises (GSEs)-Authority Delegated

(1) With the exception of the income adjustments and determinations under 12 U.S.C. 4502(8)(B), (9), (10)(B), and (19)(B), and the authority and power provided to Administrative Law Judges under 24 CFR 81.82(b)(2) and (b)(3), 81.83(d)(3)-(4), and 81.84, the Secretary delegates to the Assistant Secretary and the General Deputy Assistant Secretary all the power and authority with respect to housing goal activities in 12 U.S.C. 4541 and 4561-89 including, but not limited to: monitoring the GSEs' performance under the housing goals and special affordable subgoals, and enforcing compliance with the housing goals and special affordable subgoals, including determining whether a GSE has failed, or is likely to fail, to meet a housing goal; providing written notices to the GSEs of failure or substantial probability of failure to meet a goal; extending response periods for the GSEs; requiring a housing plan; providing required notices to Congress under the housing goal provisions; reviewing housing plans; approving and disapproving housing plans; monitoring compliance with housing plans; issuing cease-and-desist orders and imposing civil money penalties; requesting the Attorney General to bring actions; settling and depositing civil money penalties; and making orders and agreements publicly available.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(Publication page references are not available for this document.)

(2) With the exception of the authority and power provided to Administrative Law Judges under 24 CFR 81.82(b)(2) and (b)(3), 81.83(d)(3)-(4), and 81.84, the Secretary delegates to the Assistant Secretary and the General Deputy Assistant Secretary all the power and authority with respect to prior approval of new programs under 12 U.S.C. 4542 including, but not limited to: requiring under 24 CFR 81.52 that GSEs submit information about a program and requiring that GSEs submit new program requests; approving and disapproving new program requests; and extending the period for programs of review.

(3) With the exception of the authority and power provided to Administrative Law Judges under 24 CFR 81.82(b)(2) and (b)(3), 81.83(d)(3)-(4), and 81.84, the Secretary delegates to the Assistant Secretary and the General Deputy Assistant Secretary all the power and authority with respect to reporting activities in 12 U.S.C. 1456(e)-(f), 1723a(m)-(n), and 4547, and under 24 CFR 81.102, including but not limited to: determining the form of data submitted; requiring the submission of additional data; requiring additional reports and other information concerning GSE activities; requiring the GSEs to provide data underlying any of the reports required under 24 CFR part 81 and to conduct additional analyses concerning any report required under 24 CFR part 81; to independently verify the accuracy and completeness of data, information, and reports provided by each GSE, including conducting on-site verification when such steps are reasonably related to determining whether a GSE is complying with 12 U.S.C. 4541- 4589 and the GSE's Charter Act; determining whether a GSE has failed to provide the certification required under 24 CFR 81.102(b); determining whether a GSE's year-end data contains any errors, omissions, or discrepancies and, if so, if a GSE fails to correct or resolve each error, omission, or discrepancy, making appropriate adjustments to a GSE's year-end data and taking additional enforcement action against a GSE for any material error, omission, or discrepancy in its year-end data under 24 CFR 81.102(c); determining whether there are any errors, omissions, or discrepancies in a GSE's data for a prior year; requiring a GSE to correct any material error, omission, or discrepancy in its data for a prior year and, should a material error, omission, or discrepancy in a GSE's data for a prior year be not corrected by its purchase of a sufficient amount or type of mortgages, issuing a notice that the GSE has failed a housing goal or Special Affordable subgoal for a prior year and seeking additional enforcement remedies and/or pursuing any other available civil or administrative remedies under 24 CFR 81.102(d); taking enforcement action under 24 CFR 81.102(e)(2), if the Assistant Secretary or General Deputy Assistant Secretary determines under 24 CFR 81.102(e)(1) that a GSE has failed to submit data, information, or reports; establishing standards and procedures for and imposing civil money penalties; requesting the Attorney General to bring enforcement actions; settling and depositing civil money penalties; making orders and agreements publicly available; and requesting the Director of the Office of Federal Housing Enterprise Oversight (OFHEO) to bring actions under 12 U.S.C. 4631, 4632, and 12 U.S.C. 4636 for violations of 12 U.S.C. 1456(e)-(f), 1723a(m)-(n), and 4547, and 24 CFR 81.102.

(4) The Secretary delegates to the Assistant Secretary and the General Deputy Assistant Secretary all the power and authority with respect to access to information provided by the GSEs governed by 12 U.S.C. 4525, 4543, and 4546

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

including, but not limited to: recommending the invocation of 5 U.S.C. 552(b)(3),
(4), (5), (6), or (8); and to determine whether mortgage data or other information
provided by the GSEs to HUD are proprietary or publicly releasable and to issue any
rule, regulation, order, notice, letter, or other document regarding such
determinations as may be necessary.

(5) The Secretary delegates to the Assistant Secretary and the General Deputy
Assistant Secretary the portion of the Secretary's general regulatory power under 12
U.S.C. 4541 that gives the Secretary the authority to make determinations regarding
whether any activity of a GSE is or is not authorized under its Charter Act and to
request the Director of the Office of Federal Housing Enterprise Oversight to take
action, under 12 U.S.C. 4631(a)(3) and 12 U.S.C. 4632 through 12 U.S.C. 4636,
against a GSE that has engaged, is engaging, or is about to engage in any activity
that is not authorized under its Charter Act. The authority delegated herein does
not include any other portion of the Secretary's general regulatory authority under
12 U.S.C. 4541.

(6) The Secretary delegates to the Assistant Secretary and the General Deputy
Assistant Secretary all the power and authority with respect to book-entry procedure
activities in 24 CFR part 81, subpart H, including, but not limited to, establishing
certain procedures for Federal Reserve Banks and waiving book-entry regulations.

(7) The Secretary delegates to the Assistant Secretary and the General Deputy
Assistant Secretary all the power and authority with respect to OFHEO activities in
12 U.S.C. 4513(c), 4516(g)(1)-(2), and 4548(b), including, but not limited to:
reviewing and approving certain actions of the OFHEO Director; and receiving and
commenting to Congress on OFHEO's financial plans, forecasts, and operations
reports. When taking action relating to OFHEO under this paragraph, the Assistant
Secretary and the General Deputy Assistant Secretary shall consult with the
Secretary.

(8) The Secretary delegates to the Assistant Secretary only, without the power to
redelegate, all the power and authority with respect to issuing regulations under
the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12
U.S.C. 4501 et seq.) and waiving regulations promulgated under that Act.

(9) The Secretary delegates to the Assistant Secretary and the General Deputy
Assistant Secretary the power and authority to take any appropriate action to
implement the power and authority delegated under this delegation.

Section F. Authority Excepted

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

71 FR 60169-01                                                              Page 13
(Publication page references are not available for this document.)


 Authority excepted from this **delegation** of **authority** from the Secretary of Housing
and Urban Development to the Assistant Secretary and the General Deputy Assistant
Secretary is the authority to sue and be sued.


Section G. Conclusive Evidence of Authority


 Any instrument or document executed in the name of the Secretary by an employee of
the Department of Housing and Urban Development under the authority of this
delegation purporting to relinquish or transfer any right to, title to, or interest
in, real or personal property, shall be conclusive evidence of the authority of such
employee to act for the Secretary in executing such instrument or document.


Section H. Delegations Revoked


 This delegation supersedes and/or revokes all prior delegations from the Secretary
to the Assistant Secretary for Housing-Federal Housing Commissioner and the General
Deputy Assistant Secretary for Housing-Deputy Federal Housing Commissioner.


 Authority: Section 7(d), Department of Housing and Urban Development Act  (42
U.S.C. 3535(d)).


  Dated: September 15, 2006.


Alphonso Jackson,


Secretary.


[FR Doc. E6-16857 Filed 10-11-06; 8:45 am]


BILLING CODE 4210-67-P


71 FR 60169-01


END OF DOCUMENT


© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 12

# Department of the Interior
# Departmental Manual

---

**Effective Date**: 9/9/94
**Series**:    Delegation
**Part 209**: Secretarial Officers
**Chapter 6**:  Assistant Secretary for Fish and Wildlife and Parks

**Originating Office**:  Office of the Assistant Secretary for Fish and Wildlife and Parks

---

**209 DM 6**

6.1 **Delegation**.  Subject to the limitations in 200 DM 1, the Assistant Secretary for Fish and Wildlife and Parks is authorized to exercise all of the authority of the Secretary including, but not limited to:

    A.  The authority to issue amendments of and additions to the material in the Code of Federal Regulations.

    B.  The authority delegated to the Secretary by Section 204(a) of Public Law 94-579 relating to withdrawal or reservation of certain lands by the issuance of public land orders.

    C.  The administration of the oath of office or any oath required by law in connection with employment.

6.2 **Authority to Redelegate.**  Except where redelegation is prohibited by statute,  Executive order, or limitations established by other competent authority, the Assistant Secretary for Fish and Wildlife and Parks may redelegate general administrative authority and those program authorities specifically related to the functions and responsibilities assigned to the Assistant Secretary for Fish and Wildlife and Parks in 109 DM 6.  All redelegations of authority made by the Assistant Secretary for Fish and Wildlife and Parks will be in the form of a Departmental Manual release issued in strict compliance with the provisions of 200 DM 3.  No other form of redelegation is authorized.

6.3 **Deputy Assistant Secretary.**

    A.  In the absence of, and under conditions specified by the Assistant Secretary for Fish and Wildlife and Parks,  a Deputy Assistant Secretary for Fish and Wildlife and Parks may exercise the authority delegated in 209 DM 6.1, excluding 209 DM 6.1B.

    B.  A Deputy Assistant Secretary may not redelegate the authority conferred by paragraph 209 DM 6.3.

6.4 **Migratory Bird Conservation Commission**.  The Assistant

Secretary for Fish and Wildlife and Parks, upon designation, may exercise the authority of the Secretary of the Interior as Chairman, Migratory Bird Conservation Commission.  This authority may not be redelegated, except that the Director or Assistant Director--Policy, Budget and Administration of the Fish and Wildlife Service may be authorized to pay the expenses of the Commission.

6.5 **Emergency Law Enforcement Activities B National Park Service**.  The Assistant Secretary for Fish and Wildlife and Parks is authorized to approve the use of any funds available to the National Park Service to maintain law and order in an emergency law enforcement activity.  The provisions for this delegation of authority are set forth in the Appropriations Act, Public Law 97-394, Administrative Provisions dated December 30, 1982.  This authority may not be redelegated.

6.6 **North American Wetlands Conservation Act Acquisition Projects**.  The Assistant Secretary for Fish and Wildlife and Parks is authorized to sign letters to the Migratory Bird Conservation Commission for any land acquisition projects funded through the North American Wetlands Conservation Act that are not to become part of the National Wildlife Refuge System.  The authority to sign such letters is set forth in Section 6 of the North American Wetlands Conservation Act (P.L. 101-233) dated December 13, 1989.  This authority may not be redelegated.

6.7 **Fishway Prescriptions**.  The Assistant Secretary for Fish and Wildlife and Parks is authorized to exercise the authority of the Secretary of the Interior with regard to the prescription of fishways pursuant to Section 18 of the Federal Power Act (16 U.S.C. 791a et seq.).  This authority may be redelegated by the Assistant Secretary.

9/9/94 #3019
Replaces 2/27/92 #2944

# Exhibit 13



**Monday**
**October 4, 1993**

Part VIII

# The President

**Executive Order 12866—Regulatory**
**Planning and Review**

# Presidential Documents

Federal Register

Vol. 58, No. 190

Monday, October 4, 1993

**Title 3—**

**The President**

**Executive Order 12866 of September 30, 1993**

## Regulatory Planning and Review

The American people deserve a regulatory system that works for them, not against them: a regulatory system that protects and improves their health, safety, environment, and well-being and improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable. We do not have such a regulatory system today.

With this Executive order, the Federal Government begins a program to reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public. In pursuing these objectives, the regulatory process shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Statement of Regulatory Philosophy and Principles.* (a) *The Regulatory Philosophy.* Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American people. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

(b) *The Principles of Regulation.* To ensure that the agencies' regulatory programs are consistent with the philosophy set forth above, agencies should adhere to the following principles, to the extent permitted by law and where applicable:

(1) Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.

(2) Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation

is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.

(3) Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

(4) In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.

(5) When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.

(6) Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

(7) Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

(8) Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

(9) Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

(10) Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

(11) Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

(12) Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty.

**Sec. 2.** *Organization.* An efficient regulatory planning and review process is vital to ensure that the Federal Government's regulatory system best serves the American people.

(a) *The Agencies.* Because Federal agencies are the repositories of significant substantive expertise and experience, they are responsible for developing regulations and assuring that the regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order.

(b) *The Office of Management and Budget.* Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management and Budget (OMB) shall carry out that review function. Within OMB, the Office of Information and Regulatory Affairs (OIRA) is the repository of expertise concerning regulatory issues, including methodologies and procedures that affect more than one agency, this Executive order, and the President's regulatory policies. To the extent permitted by law, OMB shall provide guidance to agencies and assist the President, the Vice President, and other regulatory policy advisors to the President in regulatory planning and shall be the entity that reviews individual regulations, as provided by this Executive order.

(c) *The Vice President.* The Vice President is the principal advisor to the President on, and shall coordinate the development and presentation of recommendations concerning, regulatory policy, planning, and review, as set forth in this Executive order. In fulfilling their responsibilities under this Executive order, the President and the Vice President shall be assisted by the regulatory policy advisors within the Executive Office of the President and by such agency officials and personnel as the President and the Vice President may, from time to time, consult.

**Sec. 3.** *Definitions.* For purposes of this Executive order: (a) "Advisors" refers to such regulatory policy advisors to the President as the President and Vice President may from time to time consult, including, among others: (1) the Director of OMB; (2) the Chair (or another member) of the Council of Economic Advisers; (3) the Assistant to the President for Economic Policy; (4) the Assistant to the President for Domestic Policy; (5) the Assistant to the President for National Security Affairs; (6) the Assistant to the President for Science and Technology; (7) the Assistant to the President for Intergovernmental Affairs; (8) the Assistant to the President and Staff Secretary; (9) the Assistant to the President and Chief of Staff to the Vice President; (10) the Assistant to the President and Counsel to the President; (11) the Deputy Assistant to the President and Director of the White House Office on Environmental Policy; and (12) the Administrator of OIRA, who also shall coordinate communications relating to this Executive order among the agencies, OMB, the other Advisors, and the Office of the Vice President.

(b) "Agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10).

(c) "Director" means the Director of OMB.

(d) "Regulation" or "rule" means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:

(1) Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;

(2) Regulations or rules that pertain to a military or foreign affairs function of the United States, other than procurement regulations and regulations involving the import or export of non-defense articles and services;

(3) Regulations or rules that are limited to agency organization, management, or personnel matters; or

(4) Any other category of regulations exempted by the Administrator of OIRA.

(e) "Regulatory action" means any substantive action by an agency (normally published in the **Federal Register**) that promulgates or is expected

to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking.

(f) "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

Sec. 4. *Planning Mechanism.* In order to have an effective regulatory program, to provide for coordination of regulations, to maximize consultation and the resolution of potential conflicts at an early stage, to involve the public and its State, local, and tribal officials in regulatory planning, and to ensure that new or revised regulations promote the President's priorities and the principles set forth in this Executive order, these procedures shall be followed, to the extent permitted by law: (a) *Agencies' Policy Meeting.* Early in each year's planning cycle, the Vice President shall convene a meeting of the Advisors and the heads of agencies to seek a common understanding of priorities and to coordinate regulatory efforts to be accomplished in the upcoming year.

(b) *Unified Regulatory Agenda.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of all regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602 and 41 U.S.C. 402 into these agendas.

(c) *The Regulatory Plan.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). (1) As part of the Unified Regulatory Agenda, beginning in 1994, each agency shall prepare a Regulatory Plan (Plan) of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form in that fiscal year or thereafter. The Plan shall be approved personally by the agency head and shall contain at a minimum:

(A) A statement of the agency's regulatory objectives and priorities and how they relate to the President's priorities;

(B) A summary of each planned significant regulatory action including, to the extent possible, alternatives to be considered and preliminary estimates of the anticipated costs and benefits;

(C) A summary of the legal basis for each such action, including whether any aspect of the action is required by statute or court order;

(D) A statement of the need for each such action and, if applicable, how the action will reduce risks to public health, safety, or the environment, as well as how the magnitude of the risk addressed by the action relates to other risks within the jurisdiction of the agency;

(E) The agency's schedule for action, including a statement of any applicable statutory or judicial deadlines; and

(F) The name, address, and telephone number of a person the public may contact for additional information about the planned regulatory action.

(2) Each agency shall forward its Plan to OIRA by June 1st of each year.

(3) Within 10 calendar days after OIRA has received an agency's Plan, OIRA shall circulate it to other affected agencies, the Advisors, and the Vice President.

(4) An agency head who believes that a planned regulatory action of another agency may conflict with its own policy or action taken or planned shall promptly notify, in writing, the Administrator of OIRA, who shall forward that communication to the issuing agency, the Advisors, and the Vice President.

(5) If the Administrator of OIRA believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in this Executive order or may be in conflict with any policy or action taken or planned by another agency, the Administrator of OIRA shall promptly notify, in writing, the affected agencies, the Advisors, and the Vice President.

(6) The Vice President, with the Advisors' assistance, may consult with the heads of agencies with respect to their Plans and, in appropriate instances, request further consideration or inter-agency coordination.

(7) The Plans developed by the issuing agency shall be published annually in the October publication of the Unified Regulatory Agenda. This publication shall be made available to the Congress; State, local, and tribal governments; and the public. Any views on any aspect of any agency Plan, including whether any planned regulatory action might conflict with any other planned or existing regulation, impose any unintended consequences on the public, or confer any unclaimed benefits on the public, should be directed to the issuing agency, with a copy to OIRA.

(d) *Regulatory Working Group.* Within 30 days of the date of this Executive order, the Administrator of OIRA shall convene a Regulatory Working Group ("Working Group"), which shall consist of representatives of the heads of each agency that the Administrator determines to have significant domestic regulatory responsibility, the Advisors, and the Vice President. The Administrator of OIRA shall chair the Working Group and shall periodically advise the Vice President on the activities of the Working Group. The Working Group shall serve as a forum to assist agencies in identifying and analyzing important regulatory issues (including, among others (1) the development of innovative regulatory techniques, (2) the methods, efficacy, and utility of comparative risk assessment in regulatory decision-making, and (3) the development of short forms and other streamlined regulatory approaches for small businesses and other entities). The Working Group shall meet at least quarterly and may meet as a whole or in subgroups of agencies with an interest in particular issues or subject areas. To inform its discussions, the Working Group may commission analytical studies and reports by OIRA, the Administrative Conference of the United States, or any other agency.

(e) *Conferences.* The Administrator of OIRA shall meet quarterly with representatives of State, local, and tribal governments to identify both existing and proposed regulations that may uniquely or significantly affect those governmental entities. The Administrator of OIRA shall also convene, from time to time, conferences with representatives of businesses, nongovernmental organizations, and the public to discuss regulatory issues of common concern.

**Sec. 5.** *Existing Regulations.* In order to reduce the regulatory burden on the American people, their families, their communities, their State, local, and tribal governments, and their industries; to determine whether regula-

tions promulgated by the executive branch of the Federal Government have become unjustified or unnecessary as a result of changed circumstances; to confirm that regulations are both compatible with each other and not duplicative or inappropriately burdensome in the aggregate; to ensure that all regulations are consistent with the President's priorities and the principles set forth in this Executive order, within applicable law; and to otherwise improve the effectiveness of existing regulations: (a) Within 90 days of the date of this Executive order, each agency shall submit to OIRA a program, consistent with its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities and the principles set forth in this Executive order. Any significant regulations selected for review shall be included in the agency's annual Plan. The agency shall also identify any legislative mandates that require the agency to promulgate or continue to impose regulations that the agency believes are unnecessary or outdated by reason of changed circumstances.

(b) The Administrator of OIRA shall work with the Regulatory Working Group and other interested entities to pursue the objectives of this section. State, local, and tribal governments are specifically encouraged to assist in the identification of regulations that impose significant or unique burdens on those governmental entities and that appear to have outlived their justification or be otherwise inconsistent with the public interest.

(c) The Vice President, in consultation with the Advisors, may identify for review by the appropriate agency or agencies other existing regulations of an agency or groups of regulations of more than one agency that affect a particular group, industry, or sector of the economy, or may identify legislative mandates that may be appropriate for reconsideration by the Congress.

**Sec. 6.** *Centralized Review of Regulations.* The guidelines set forth below shall apply to all regulatory actions, for both new and existing regulations, by agencies other than those agencies specifically exempted by the Administrator of OIRA:

(a) *Agency Responsibilities.* (1) Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. In particular, before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials). In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.

(2) Within 60 days of the date of this Executive order, each agency head shall designate a Regulatory Policy Officer who shall report to the agency head. The Regulatory Policy Officer shall be involved at each stage of the regulatory process to foster the development of effective, innovative, and least burdensome regulations and to further the principles set forth in this Executive order.

(3) In addition to adhering to its own rules and procedures and to the requirements of the Administrative Procedure Act, the Regulatory Flexibility Act, the Paperwork Reduction Act, and other applicable law, each agency shall develop its regulatory actions in a timely fashion and adhere to the following procedures with respect to a regulatory action:

(A) Each agency shall provide OIRA, at such times and in the manner specified by the Administrator of OIRA, with a list of its planned regulatory actions, indicating those which the agency believes are significant regulatory

actions within the meaning of this Executive order. Absent a material change in the development of the planned regulatory action, those not designated as significant will not be subject to review under this section unless, within 10 working days of receipt of the list, the Administrator of OIRA notifies the agency that OIRA has determined that a planned regulation is a significant regulatory action within the meaning of this Executive order. The Administrator of OIRA may waive review of any planned regulatory action designated by the agency as significant, in which case the agency need not further comply with subsection (a)(3)(B) or subsection (a)(3)(C) of this section.

(B) For each matter identified as, or determined by the Administrator of OIRA to be, a significant regulatory action, the issuing agency shall provide to OIRA:

(i) The text of the draft regulatory action, together with a reasonably detailed description of the need for the regulatory action and an explanation of how the regulatory action will meet that need; and

(ii) An assessment of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

(C) For those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1), the agency shall also provide to OIRA the following additional information developed as part of the agency's decision-making process (unless prohibited by law):

(i) An assessment, including the underlying analysis, of benefits anticipated from the regulatory action (such as, but not limited to, the promotion of the efficient functioning of the economy and private markets, the enhancement of health and safety, the protection of the natural environment, and the elimination or reduction of discrimination or bias) together with, to the extent feasible, a quantification of those benefits;

(ii) An assessment, including the underlying analysis, of costs anticipated from the regulatory action (such as, but not limited to, the direct cost both to the government in administering the regulation and to businesses and others in complying with the regulation, and any adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), health, safety, and the natural environment), together with, to the extent feasible, a quantification of those costs; and

(iii) An assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulation, identified by the agencies or the public (including improving the current regulation and reasonably viable nonregulatory actions), and an explanation why the planned regulatory action is preferable to the identified potential alternatives.

(D) In emergency situations or when an agency is obligated by law to act more quickly than normal review procedures allow, the agency shall notify OIRA as soon as possible and, to the extent practicable, comply with subsections (a)(3)(B) and (C) of this section. For those regulatory actions that are governed by a statutory or court-imposed deadline, the agency shall, to the extent practicable, schedule rulemaking proceedings so as to permit sufficient time for OIRA to conduct its review, as set forth below in subsection (b)(2) through (4) of this section.

(E) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, the agency shall:

(i) Make available to the public the information set forth in subsections (a)(3)(B) and (C);

(ii) Identify for the public, in a complete, clear, and simple manner, the substantive changes between the draft submitted to OIRA for review and the action subsequently announced; and

(iii) Identify for the public those changes in the regulatory action that were made at the suggestion or recommendation of OIRA.

(F) All information provided to the public by the agency shall be in plain, understandable language.

(b) *OIRA Responsibilities.* The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency. OIRA shall, to the extent permitted by law, adhere to the following guidelines:

(1) OIRA may review only actions identified by the agency or by OIRA as significant regulatory actions under subsection (a)(3)(A) of this section.

(2) OIRA shall waive review or notify the agency in writing of the results of its review within the following time periods:

(A) For any notices of inquiry, advance notices of proposed rulemaking, or other preliminary regulatory actions prior to a Notice of Proposed Rulemaking, within 10 working days after the date of submission of the draft action to OIRA;

(B) For all other regulatory actions, within 90 calendar days after the date of submission of the information set forth in subsections (a)(3)(B) and (C) of this section, unless OIRA has previously reviewed this information and, since that review, there has been no material change in the facts and circumstances upon which the regulatory action is based, in which case, OIRA shall complete its review within 45 days; and

(C) The review process may be extended (1) once by no more than 30 calendar days upon the written approval of the Director and (2) at the request of the agency head.

(3) For each regulatory action that the Administrator of OIRA returns to an agency for further consideration of some or all of its provisions, the Administrator of OIRA shall provide the issuing agency a written explanation for such return, setting forth the pertinent provision of this Executive order on which OIRA is relying. If the agency head disagrees with some or all of the bases for the return, the agency head shall so inform the Administrator of OIRA in writing.

(4) Except as otherwise provided by law or required by a Court, in order to ensure greater openness, accessibility, and accountability in the regulatory review process, OIRA shall be governed by the following disclosure requirements:

(A) Only the Administrator of OIRA (or a particular designee) shall receive oral communications initiated by persons not employed by the executive branch of the Federal Government regarding the substance of a regulatory action under OIRA review;

(B) All substantive communications between OIRA personnel and persons not employed by the executive branch of the Federal Government regarding a regulatory action under review shall be governed by the following guidelines: (i) A representative from the issuing agency shall be invited to any meeting between OIRA personnel and such person(s);

(ii) OIRA shall forward to the issuing agency, within 10 working days of receipt of the communication(s), all written communications, regardless of format, between OIRA personnel and any person who is not employed by the executive branch of the Federal Government, and the dates and names of individuals involved in all substantive oral communications (including meetings to which an agency representative was invited, but did

not attend, and telephone conversations between OIRA personnel and any such persons); and

(iii) OIRA shall publicly disclose relevant information about such communication(s), as set forth below in subsection (b)(4)(C) of this section.

(C) OIRA shall maintain a publicly available log that shall contain, at a minimum, the following information pertinent to regulatory actions under review:

(i) The status of all regulatory actions, including if (and if so, when and by whom) Vice Presidential and Presidential consideration was requested;

(ii) A notation of all written communications forwarded to an issuing agency under subsection (b)(4)(B)(ii) of this section; and

(iii) The dates and names of individuals involved in all substantive oral communications, including meetings and telephone conversations, between OIRA personnel and any person not employed by the executive branch of the Federal Government, and the subject matter discussed during such communications.

(D) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, or after the agency has announced its decision not to publish or issue the regulatory action, OIRA shall make available to the public all documents exchanged between OIRA and the agency during the review by OIRA under this section.

(5) All information provided to the public by OIRA shall be in plain, understandable language.

**Sec. 7.** *Resolution of Conflicts.* To the extent permitted by law, disagreements or conflicts between or among agency heads or between OMB and any agency that cannot be resolved by the Administrator of OIRA shall be resolved by the President, or by the Vice President acting at the request of the President, with the relevant agency head (and, as appropriate, other interested government officials). Vice Presidential and Presidential consideration of such disagreements may be initiated only by the Director, by the head of the issuing agency, or by the head of an agency that has a significant interest in the regulatory action at issue. Such review will not be undertaken at the request of other persons, entities, or their agents.

Resolution of such conflicts shall be informed by recommendations developed by the Vice President, after consultation with the Advisors (and other executive branch officials or personnel whose responsibilities to the President include the subject matter at issue). The development of these recommendations shall be concluded within 60 days after review has been requested.

During the Vice Presidential and Presidential review period, communications with any person not employed by the Federal Government relating to the substance of the regulatory action under review and directed to the Advisors or their staffs or to the staff of the Vice President shall be in writing and shall be forwarded by the recipient to the affected agency(ies) for inclusion in the public docket(s). When the communication is not in writing, such Advisors or staff members shall inform the outside party that the matter is under review and that any comments should be submitted in writing.

At the end of this review process, the President, or the Vice President acting at the request of the President, shall notify the affected agency and the Administrator of OIRA of the President's decision with respect to the matter.

**Sec. 8.** *Publication.* Except to the extent required by law, an agency shall not publish in the **Federal Register** or otherwise issue to the public any regulatory action that is subject to review under section 6 of this Executive order until (1) the Administrator of OIRA notifies the agency that OIRA has waived its review of the action or has completed its review without

any requests for further consideration, or (2) the applicable time period in section 6(b)(2) expires without OIRA having notified the agency that it is returning the regulatory action for further consideration under section 6(b)(3), whichever occurs first. If the terms of the preceding sentence have not been satisfied and an agency wants to publish or otherwise issue a regulatory action, the head of that agency may request Presidential consideration through the Vice President, as provided under section 7 of this order. Upon receipt of this request, the Vice President shall notify OIRA and the Advisors. The guidelines and time period set forth in section 7 shall apply to the publication of regulatory actions for which Presidential consideration has been sought.

**Sec. 9.** *Agency Authority.* Nothing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law.

**Sec. 10.** *Judicial Review.* Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 11.** *Revocations.* Executive Orders Nos. 12291 and 12498; all amendments to those Executive orders; all guidelines issued under those orders; and any exemptions from those orders heretofore granted for any category of rule are revoked.

*William J. Clinton*

THE WHITE HOUSE,
*September 30, 1993.*

[FR Doc. 93–24523
Filed 10–1–93; 12:12 pm]
Billing code 3195–01–M

**Editorial note:** For the President's remarks on signing this Executive order, see issue 39 of the *Weekly Compilation of Presidential Documents.*

# Exhibit 14

Home | About Us | Register | Log In | 866.263.7437

**Homebuyers**

Homebuyers | Lenders | Sellers | Builders | Real Estate Professionals | Settlement Companies

Testimonials | What to Look for in a DPA



### What to Look For in a DPA

#### Selecting a Down Payment Assistance Program

If you're looking to buy or sell a house, you may want to consider using a nonprofit down payment assistance program.

These are programs that provide down payment gifts to homebuyers. Since the down payment is a gift, it does not have to be repaid.

The experts the nation's largest nonprofit down payment gift provider, AmeriDream, Inc., offer the following tips on choosing a down payment gift provider and applying for a gift:

- Be sure you choose a program that has been around for a few years, has a strong reputation, and has developed the technology and infrastructure to create a solid organization that will be there for you at the settlement table and beyond.

- Make sure your lender or real estate agent does not get any direct benefit or kickback based on the down payment gift provider that is selected. Section 8 of The Real Estate Settlement Procedures Act (RESPA) prohibits anyone from giving or accepting a fee, kickback or anything of value – such as a trip – in exchange for referrals of settlement service business involving

**How It Works**
Getting down payment or closing cost help is easy! Click here to learn how The AmeriDream Downpayment Gift Program works.

**Homebuyer Education**
Escrow? Settlement? What do they mean? Our highly regarded homebuyer education course prepares you for the exciting process ahead.

**AHAA**
Get more information on the organization that represents you as a homebuyer and a homeowner! The Association for Homeowners Across America.

**Contact Us**
Our gift administration team is ready to assist you!

Since 1999, AmeriDream has helped 235660 individuals and families reach the American Dream of homeownership.

On average, every 22 minutes there is a new homeowner because of AmeriDream.

Click here to register and take the first step toward owning your own home and achieving your American dream.

Contact Us | Terms & Conditions

AmeriDream® - a 501(c)(3) nonprofit organization. Copyright © 2004-2007. All rights reserved.

# Exhibit 15





**OPPORTUNITY... INDEPENDENCE...**

**THE AMERIDREAM DOWNPAYMENT GIFT PROGRAM**

AmeriDream understands that some borrowers have achieved good credit scores by making timely rent or mortgage payments, but have been unable to save the money needed for a down payment on their dream house. The AmeriDream Downpayment Gift Program provides gift funds to be used for the down payment or closing costs. Borrowers who qualify for a loan that allows gift funds—and who purchase a home enrolled in the AmeriDream program—never repay their AmeriDream gift ... it is truly a gift!

Since 1999, AmeriDream, Inc., a 501(c)(3) nonprofit, has been the Gold Standard for down payment gift programs, and is the program by which all other gift programs are matched. AmeriDream has already helped see than 350,000 buyers and sellers purchase and sell homes, many for the first time. AmeriDream helps to make the dream of homeownership a reality for thousands of individuals and families each month. AmeriDream has given more than $400 million in down payment gifts to homebuyers nationwide, which has translated into more than $14 billion in home sales. Homeowners have gained hundreds of thousands of dollars in home equity.

---

AmeriDream
Down Payment Assistance Program

Doing things right for America's homebuyers.

200 Professional Drive
4th Floor
Gaithersburg, MD 20879

**www.ameridream.org**

---

HELPING PEOPLE
in search
of their **American**
**Dream**



**www.ameridream.org**

AmeriDream
Down Payment Assistance Program

Doing things right for America's homebuyers.

---

**GENERAL PROGRAM GUIDELINES**

**3–6% typical gift, as high as 10%.** Homebuyers can receive up to 10% of the contract sales price to be applied towards down payment, closing costs and other allowable costs.

**Seller participation required.*** The seller must sign the Seller Enrollment Form. The service fee is paid at settlement.

**Gift means gift.** There is no lien, silent second, or second mortgage placed on the property to repay the gift.

**No income, asset or geographic restrictions.** No income, asset or geographic restrictions. The buyer does NOT have to be a first-time homebuyer, and can receive gift funds as long as the property and the borrower qualify for a mortgage. The buyer is required to occupy the property.

**No gift funds approval required.** If the borrower qualifies for a loan that accepts gifts for down payment (eg, FHA), and the seller agrees to participate in our program, the borrower may be approved to receive gift funds.

**Homebuyer education recommended.** AmeriDream provides its online homebuying course free of charge at www.ameridream.org

**24-Hour Turnaround for Funding Available.**

*Seller-paid service fee is not tax deductible as a charitable contribution.







Doing things right for America's homebuyers.

Doing things right for America's homebuyers.

## GOLD STANDARD IN PROGRAMS

### HOMEBUYER EDUCATION

Our Homebuyer Education Course, available online and in a classroom setting, is a resource that gives buyers the tools to understand what it means to purchase, own and keep a home. At the end of the course, buyers are able to print a certificate of completion to show to their lenders.

### AMERIDREAM DREAMKEEPER PROGRAM

DreamKeeper provides the initial down payment gift to help homebuyers get into homes, while also providing one of the most comprehensive Mortgage Payment relief programs available. This program helps homebuyers who have unexpected shortages of income due to temporary unemployment or short-term disability so they can keep their homes.

### AMERIDREAM HOME RETENTION PROGRAM

AmeriDream works to help homeowners keep their homes by providing loss mitigation counseling. AmeriDream facilitates communication between the homeowner and lender to find alternatives to foreclosure.

### GIFT ASSURANCE (COMING SOON)

AmeriDream is confident that our gift process will not cut our gift recipients in situations that make it difficult for them to sell their homes. If for any reason gift recipients are not able to sell their homes after three years for at least the full amount of their purchase price, AmeriDream will pay the buyer the amount of the loss, up to the full gifted amount.

### CHARITABLE DONATIONS

AmeriDream has donated more than $2.5 million since 1999 to housing-related causes such as housing assistance programs, disaster relief, and community revitalization. AmeriDream is committed to providing donations to local housing and community development-related causes. For more information about donations in your community, please contact your local AmeriDream representative at www.ameridream.org.

## GOLD STANDARD IN SERVICE

### AMERIDREAM OFFERS PREMIER CUSTOMER OUTREACH.

With its dynamic force of outreach representatives, AmeriDream is always available to conduct on-site training for mortgage and real estate industry professionals.

### AMERIDREAM ALWAYS HAS LIVE TELEPHONE SUPPORT.

When you call AmeriDream on regular business days during normal business hours you will be greeted and assisted by AmeriDream's friendly, dedicated and capable staff committed to helping you every step of the way.

### AMERIDREAM IS THE LEADER IN ONLINE SERVICES.

For every transaction, every step of the way, AmeriDream's unique, automated processing system provides complete control over the gift fund transaction. Lenders can submit applications, track gifts, update transactions, print forms... all in real-time... providing unmatched speed, reliability and peace of mind. Gift Xpress ™ allows you to apply for and receive funds within minutes on last-second settlements!





---

HELPING PEOPLE in search of their

# American Dream



"I always dreamed of having my own house where my children could sleep in peace, a place that no one could take away from us. This kind of life was not possible for us in El Salvador. My son had to sleep in the apartment's living room because we did not have a bed or anywhere else for him to sleep. We couldn't afford anything else. My poor son had to sleep on that floor for many years... Now, my son is a Marine and we're very proud of him, but I'll never forget him sleeping on the floor... We tried to save money for the down payment for 6 years when my son's friend told us about the program. I didn't know such a program existed. There is not a day that goes by that I am not thankful for this program and the opportunity it gave our family to own our own home. Owning our own house is one of the best things for us. Sometimes I miss El Salvador, but having our own house, seeing my children sleeping in their own beds and being able to live in peace with my family reminds me why we choose to live here in America."

**Carmen Guardado**
Los Angeles, CA

The AmeriDream Downpayment Gift Program is operated by AmeriDream, Inc., a non-profit, publicly registered organization that is tax-exempt under Internal Revenue Code Section 501(c)(3). AmeriDream, Inc. is a public service charity that meets the requirements for a charitable organization as referenced in the HUD Handbook 4155.1 Rev. 4, Section 2:10, for FHA insured loans. 2004 AmeriDream, Inc. All rights reserved. No portion of this brochure may be copied or reproduced without the express written consent of AmeriDream, Inc.

---

For more information about AmeriDream or any of our programs, please contact us at:

www.AmeriDream.org | 1-866-AMERIDREAM
(1-866-263-7437)



## AmeriDream

Down Payment Assistance Program

Doing things right for America's homebuyers.



There are many down payment gift programs, but when it's something as important as someone's home that is at stake, you don't want to mess around with a second-rate organization. That is why AmeriDream is committed to providing homebuyers, sellers, mortgage professionals, real estate professionals, governing agencies and Congress with a clear understanding of its non-profit governance practices. Visit www.ameridream.org/about/governance to find AmeriDream's Code of Ethics and best Practice of Down Payment Providers, Final Non-Profit Determination Letter from the IRS and many other disclosures about AmeriDream.

---

**Doing things right for America's homebuyers.**

www.ameridream.org



# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN NATION, et al.,     )<br>    )<br>    )<br>Plaintiffs,     )<br>v.     )<br>    )<br>UNITED STATES DEPARTMENT OF     )<br>HOUSING AND URBAN     )<br>DEVELOPMENT, et al.,     )<br>    )<br>Defendants.     ) | Civil Action No. 07-1282 (PLF) |

PENOBSCOT INDIAN NATION,
  et al.,                                  )
                                           )
                                           )
            Plaintiffs,                    )
        v.                                 )   Civil Action No. 07-1282 (PLF)
                                           )
UNITED STATES DEPARTMENT OF                )
HOUSING AND URBAN                          )
DEVELOPMENT, et al.,                       )
                                           )
            Defendants.                    )

AMERIDREAM, INCORPORATED,                  )
                                           )
            Plaintiff,                     )
                                           )
    and                                    )
                                           )
GENESIS FOUNDATION, HOME                   )
DOWNPAYMENT GIFT                           )
FOUNDATION, PARTNERS IN                    )
CHARITY, INC., FUTURES HOME                )
ASSISTANCE PROGRAM, and                    )
SOVEREIGN GRANT ALLIANCE,                  )
                                           )
            Intervenors,                   )
        v.                                 )   Civil Action No. 07-1752 (PLF)
                                           )
HON. ALPHONSO JACKSON                      )
SECRETARY OF THE UNITED                    )
STATES DEPARTMENT OF                       )
HOUSING AND URBAN                          )
DEVELOPMENT,                               )
                                           )
            Defendant.                     )
                                           )
                                           )

## DECLARATION OF SCOTT RISNER

1.      The statements herein are based on my personal knowledge and, if called upon to testify, I could and would competently testify thereto.

2.    I am a Trial Attorney with the United Sates Department of Justice and am one of the attorneys engaged in the defense of the above-captioned cases.

3.    Exhibit 14 to Defendant's Memorandum in Support of Motions for Summary Judgment is a true and accurate copy of a document entitled "What to Look For in a DPA." I obtained this document from a website purporting to be that of AmeriDream, Incorporated, at http://www.ameridream.org/Homebuyers/What%20to%20Look%20For, on November 16, 2007.

4.    Exhibit 15 to Defendant's Memorandum in Support of Motions for Summary Judgment is a true and accurate copy of a document entitled "Helping People in Search of their American Dream." I obtained this document from a website purporting to be that of AmeriDream, Incorporated, at http://www.ameridream.org/Documents/Brochures/ Brochure-English.pdf, on November 16, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 16, 2007.

SCOTT RISNER