# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )          Case No.: 07-1282 (PLF)
)
              Plaintiffs, )
)
     -v- )
)
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
)
             Defendants. )
_____ )

---

## MEMORANDUM OF LAW IN OPPOSITION TO THE
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.     PLAINTIFFS AND THEIR DPA PROGRAM . . . . . . . . . . . . . . . . . . . . . . .4
      B.     FHA AND DOWNPAYMENT ASSISTANCE . . . . . . . . . . . . . . . . . . . . . 5
      C.     THE FINAL RULE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            1.     HUD RATIONALE FOR THE FINAL RULE . . . . . . . . . . . . . . . 7
            2.     FEBRUARY 2005 GAO REPORT . . . . . . . . . . . . . . . . . . . . . . . . 8
            3.     IRS PRESS RELEASE ON REVENUE RULING 2006-27 . . . . . . . 8

LEGAL ARGUMENT - POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

      DEFENDANTS' SUMMARY JUDGMENT MOTION SHOULD BE DENIED
      BECAUSE THE FINAL RULE VIOLATES THE ADMINISTRATIVE
      PROCEDURES ACT

      A.     HUD RELIES ON DATA THAT PROVIDES NO BASIS FOR THE
              RULE OR WAS NEVER PRODUCED FOR COMMENT . . . . . . . . . . . . . 10
      B.     HUD FAILED TO CONSIDER REASONABLE ALTERNATIVES
              OR OFFER A REASONED EXPLANATION FOR REJECTING
              THEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            1.     HUD SHOULD SAFEGUARD THE APPRAISAL PROCESS . . . 15
            2.     FHA SHOULD CHARGE A HIGHER PREMIUM FOR
                  LOANS WITH DPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.     HUD IMPROPERLY PREJUDICED THE OUTCOME OF
              THE RULEMAKING PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      D.     HUD VIOLATED ITS OWN POLICIES DURING THE RULE
              MAKING PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            1.     HUD VIOLATED ITS TRIBAL CONSULTATION POLICY . . . . .19
            2.     HUD VIOLATED ITS POLICY FOR CONSIDERING
                  POTENTIAL IMPACTS OF HUD RULES ON SMALL
                  ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

CASES:                                                              PAGE NO.

Ass'n of Nat'l Advertisers, Inc.
    627 F.2d 1151 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Int'l Ladies Garment Workers' Union v. Donovan
    722 F.2d 795 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 15

Int'l Snowmobile Mfrs. Ass'n v. Norton
    340 F.Supp.2d 1249 (D. Wyo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier
    494 F.3d 188 (C.A.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Shays v. U.S. Federal Election Com'n
    508 F.Supp.2d 10,45 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14


MISCELLANEOUS:

    Internal Revenue Code section 501(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## INTRODUCTION AND SUMMARY OF ARGUMENT

This memorandum of law is submitted in opposition to the defendants' motion for summary judgment.

HUD's proposed rule identifies only three bases, the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, for the Final Rule. The only perceptible basis for the Final Rule contained in the February 2005 GAO Report is the unattributed statement "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added). However, in 2004, the FHA insured 515,000 loans (AR 538), 30% of which (154,500) involved DPA (AR 00518, 00537). Accordingly, HUD would have the Court believe that all 154,500 appraisals performed by HUD-certified and licensed appraisers who are not chosen by the DPA providers, buyers or sellers are wrong. The sole basis for HUD's position? That unidentified Fannie Mae and Freddie Mac officials, who have no experience with DPA because Fannie Mae and Freddie Mac allow no money down 100% financing and do not utilize DPA (defendants' brief at p. 18), stated "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added). The Revenue Ruling and Press Release deal with whether an organization qualifies "for exemption from federal income tax as an organization described in §501(c)(3)" (AR 00024) and admittedly does not apply to the Penobscot plaintiffs. This is no basis.

To the extent a concern "could" exist, HUD ignores that rectifying the appraisal process, along with several other proposals, would be a reasonable less restrictive alternative. HUD failed to offer a reasoned explanation for rejecting these and other reasonable less restrictive alternatives, including, charging a higher insurance premium to compensate HUD for any increased risk, a less restrictive alternative HUD proposed and stated it would adopt.

Additionally, HUD Secretary Alphonso Jackson's undisputed statement that he does not care what the comments say, HUD's going to approve the rule show that HUD had already reached a prejudged political conclusion.

Lastly, HUD violated its own policies regarding tribal consultation and considering potential impacts of HUD rules on small entities during the rule making process. Accordingly, the Final Rule should not stand.

Under these circumstances, HUD's motion for summary judgment should be denied.

## STATEMENT OF FACTS

For a complete statement of facts, the plaintiffs respectfully refers to the papers submitted herein and in support of their motion for summary judgment, all prior proceedings had herein and incorporate by reference all documents and arguments submitted by plaintiffs AmeriDream, Incorporated and intervenors Freedom Home Baptist Church, Inc., Dove Foundations, Inc., Partners In Charity, Inc., Future Home Assistance Program, Sovereign Grant Alliance, Genesis Foundation and Home Downpayment Gift Foundation

### A.    Plaintiffs and their DPA Program

It is undisputed that the sole bases for the Final Rule deal exclusively with charitable/non-profit DPA programs which have no bearing on the Penobscot plaintiffs' tribal and governmental DPA program.  Accordingly, HUD argues that GAP could not "ameliorate" the purported concern with DPA.  However, GAP has instituted some of the reasonable less restrictive alternatives that HUD refused to consider.

Unlike unregulated non-profit DPA providers, GAP requires that the seller certify that the sale price has not been increased to account for the seller's contribution to GAP (Russell aff. at ¶ 7).  GAP promotes home buyer education classes (Russell aff. At ¶ 7).  Further, all transactions are accompanied by a real estate appraisal performed by a HUD certified and licensed real estate appraiser.  GAP requires that the fee paid by the seller, when combined with any additional seller closing cost contributions, does not exceed six percent of the sales price.  FHA allows property sellers to pay up to six percent of the sales price in borrower's closing costs.  Even though the fee paid by the seller is not considered a "seller contribution" for loan purposes, GAP has enacted stricter requirements than HUD has instituted (Russell aff. At ¶ 7).  The performance of GAP loans is instantaneously available to HUD, because HUD requires the lender to put the

4

downpayment program Tax ID number into the CHUMS system when an FHA loan is originated (Russell aff. At ¶ 8). If the performance of GAP loans supported HUD's argument in any way, shape or form, one can be sure that it would have been produced in the 4½ months since the Penobscot plaintiffs filed suit.

**B.**  **FHA and Downpayment Assistance**

For approximately ten years, HUD has expressly permitted DPA providers to accept contributions from sellers and others involved in the real estate industry. In fact, after the February and November 2005 GAO Reports, HUD expressly rejected curtailing DPA.

On October 25, 2005, approximately nine months after the February 2005 GAO report averred to be relied upon by HUD, and in response to the November 2005 GAO Report, HUD noted the successes of seller-financed DPA, rejected suggestions that those programs be curtailed and proposed a reasonable less restrictive alternative that it would adopt:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan. (AR at 612.)

HUD failed to adopt its self-proposed, reasonable and less restrictive alternative or explain its departure from longstanding policy.

Further, HUD's argument that the increase in DPA - "the numbers of loans relying upon down payment assistance has proliferated" and "DPA in FHA-insured loans increased by order of magnitude" warrants its abrupt change from longstanding policy is inaccurate and belies the

administrative record. In fact, DPA in FHA insured loans has decreased (AR 00538). The November 2005 GAO report makes it clear that DPA in FHA loans has decreased each year since 2000 (AR 00538)[1]. To avoid this disclosure, the defendants exclusively refer to the increase in DPA in percentage terms. The percentage of DPA in FHA insured loans has increased despite the decrease in DPA, because of the precipitous decline in total number of FHA loans (AR 00538).

Further Assistant Secretary Brian D. Montgomery's recent comments at an October 2007 Mortgage Bankers Association convention bring into serious question the validity of FHA's claimed poor financial performance and increased foreclosure rate. Mr. Montgomery stated as follows:

MONTGOMERY:    So doing that, we have moved away toward that. I want to be as validated that we are no longer going to a positive credit subsidy, so they are wrong in that respect. No, we don't need an appropriation. **Quite frankly, we're generating - I won't say record levels of budget offsets, but a good bit of budget offset.**

And the second part of that, sir, I'm sorry?

MONTGOMERY:    Let me just say -- these are MBA numbers -- **our foreclosure rate actually dropped between the last two reporting periods**, albeit only about two- or three-tenths of a percentage, but nonetheless, it has dropped. **Our default rate stays about the same year as of late. I think the borrower has traditionally come in out of default. That's no mystery, probably because of a change in job status and some interest rate reset.**

So anyway, we actually spent some time with this editorial rider, and maybe too much time, and he just got it wrong, to be blunt.

Exhibit "F". As Assistant Secretary Montgomery states that FHA's at near record levels of profitability (**"I won't say record levels of budget offsets, but a good bit of budget offset"**)

---

[1] The bar graph at AR 00538 detailing the decrease in DPA each year since 2000 and precipitous decline in FHA loans is easier to read in color and can be found at  http://www.gao.gov/new.items/d0624.pdf.

and that foreclosures are down, the defendants claimed detrimental effects of DPA seem questionable at best.

HUD has also encouraged the rapid growth of DPA providers by readily extending FHA insurance to loans obtained in transactions utilizing downpayment assistance and **even using DPA in the sale of certain HUD-owned properties**.

**C.     The Final Rule**

In May 2007, HUD departed from its longstanding approval of seller-financed DPA when it published "Standards for Mortgagor's Investment in Mortgaged Property" (AR at 10-14). Contrary to its prior position, the Proposed Final Rule sought to completely prohibit DPA in the form of gifts from programs supported in part by contributions from sellers or others that financially benefit from the transaction.

During the public comment period for the Proposed Final Rule HUD received approximately 15,000 comments (AR at 50,000-66,631). Over 14,000 comments opposed the Final Rule and requested that it be withdrawn, while fewer than 30 comments supported the Final Rule. As Secretary Jackson promised, notwithstanding this strong opposition, HUD published the Final Rule adopting this change on October 1, 2007 (AR at 1-7).

**1.     HUD Rationale for the Final Rule**

HUD provides no reasoned explanation for its abrupt change of course, contradiction of its prior longstanding policy and statements regarding DPA. HUD articulates a single "primary" concern "that the sales price is often increased to ensure that the seller's net proceeds are not diminished." (AR at 11). But the only sources cited as providing the basis for that concern – a February 2005 GAO study, a 2006 IRS press release and 2006 IRS Revenue Ruling – provide no basis. (AR at 451-517, 26 and 21-25).

Further, HUD's identified data deals exclusively with charitable DPA programs and has no bearing on governmental agency and tribal government DPA programs, an important distinction since the available data shows loan performance varies based on the entity providing the DPA and GAP has implemented several less restive alternatives designed to "ameliorate" HUD's purported concern with DPA (AR 519).

2.      **February 2005 GAO Report**

The only perceptible basis for the Final Rule contained in the February 2005 GAO Report is the unattributed statement "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added.)  However, in 2004, FHA insured 515,000 loans (AR 00538), 30% of which (154,500) received DPA. (AR 00537). Accordingly, HUD would have the Court believe that all 154,500 appraisals performed by HUD-certified appraisers who are not chosen by the DPA providers, buyers or sellers are wrong.  The sole basis for HUD's position?  That unidentified Fannie Mae and Freddie Mac officials, who have no experience with DPA because Fannie Mae and Freddie Mac allow 100% financing and do not utilize DPA (defendants' brief at p. 18), stated "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added).  This is no basis.

3.      **IRS Press Release on Revenue Ruling 2006-27**

HUD also relies on statements found in an IRS press release and claims its final regulation is justified because it "harmonize[s] its regulations regarding downpayment assistance with recent rulings of the IRS."  (AR at 3).  However, Revenue Ruling 2006-27 deals exclusively with whether charitable organizations providing DPA may properly maintain their as tax-exempt charitable status under the Internal Revenue Code section 501(c)(3) (AR at 21-25).  Lastly, the

IRS revenue ruling deals exclusively with charitable DPA providers and, as the defendants'

admit, has no bearing on plaintiffs' DPA program or any other government agency or tribal

government DPA program (AR at 21-25).

**LEGAL ARGUMENT**

**POINT I**

**DEFENDANTS' SUMMARY JUGDMENT MOTION
SHOULD BE DENIED BECAUSE THE FINAL RULE
VIOLATES THE ADMINISTRATIVE PROCEDURES ACT**

The defendants' motion for summary judgment should be denied because the Final Rule violates the APA. The defendants' motion for summary judgment should be denied because: a) HUD relies on data that provides no basis for the Final Rule or was never produced for comment; b) HUD failed to offer a reasoned explanation for rejecting reasonable alternatives; c) HUD improperly prejudiced the outcome of the rulemaking proceeding; and d) HUD violated its own policies regarding tribal consultation and considering potential impacts of HUD rules on small entities during the rule making process.

**A.     HUD Relies On Data That Provides No Basis for the
Rule or Was Never Produced For Comment**

The Final Rule violates the APA because: 1) the relied upon data provides no basis for the rule and even fails to establish the existence of the concern the rule was intended to rectify; 2) the relied upon data deals exclusively with non-profit/charitable DPA and has no bearing on governmental agency or tribal government DPA programs; and 3) the most critical data was not supplied for comment.

The Final Rule relies upon material, the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, that provides no basis for the rule or available critical data what was not made available during the comment period. In fact, the relied upon material does not even establish that the concern the Final Rule was intended to address even exists.

The only perceptible basis for the Final Rule contained in the February 2005 GAO Report is the unattributed statement "that seller-related contributions **could** contribute to an

10

overvaluation of the price of the property." (AR at 470)(emphasis added.) However, in 2004, the FHA insured 515,000 loans (AR 538), 30% of which (154,500) involved DPA. (AR 00537). Accordingly, HUD would have the Court believe that all 154,500 appraisals performed by HUD-certified and licensed appraisers who are not chosen by the DPA providers, buyers or sellers. The sole basis for HUD's position?  That unidentified Fannie Mae and Freddie Mac officials, who have no experience with DPA because Fannie Mae and Freddie Mac allow 100% financing and do not utilize DPA, stated "that seller-related contributions **could** contribute to an overvaluation of the price of the property." (AR at 470)(emphasis added).  This is no basis for the Final Rule.

The IRS Revenue Ruling and IRS Press Release provide do basis for the Final Rule.  The Revenue Ruling and Press Release deal with whether certain organization qualify "for exemption from federal income tax as an organization described in §501(c)(3)" (AR 00024).   An organizations §501(c)(3) status does not provide a basis for HUD's articulated "primary" concern - "that the sales price is often increased to ensure that the seller's net proceeds are not diminished" (AR at 11) and provides no basis for the Final Rule.

 Further, the defendants concede that the IRS Revenue Ruling and IRS Press Release do not apply to the Penobscot plaintiffs (Brief at p. 25. fn. 22).  As the Revenue Ruling and Press Release do not apply to the Penobscot plaintiffs, or any other governmental or tribal DPA provider, it cannot provide a basis for the Final Rule for any governmental or tribal DPA program.

It is undisputed that HUD has relied exclusively on data regarding charitable DPA programs, which has no bearing on governmental agency or tribal government DPA programs. This is an important distinction since the available data shows loan performance varies based on

the type of entity providing the DPA.  On November 14, 2002, HUD issued Mortgage Letter

2002-22 regarding DPA's operated by Governmental Agencies and Nonprofits using subordinate

financing.  Mortgagee Letter 2002-22 provides that:

> The policies discussed in ML 94-2 have enabled state and local
> governments, by themselves or through nonprofit instrumentalities
> established by the governmental units, to operate successful
> downpayment assistance programs. (Exhibit "B".)

Further, the November 2005 GAO provides that **"[l]oans with assistance from seller-**

**funded nonprofits do not perform as well as loans with assistance from other sources."** (AR

at 519) (emphasis added.)  GAP, as a governmental and tribal downpayment assistance program,

has requirements, at time more stringent then those required by HUD, that unregulated non-profit

DPA providers may not require.  GAP requires that the seller certify that the sale price has not

been increased to account for the seller's contribution to GAP, promotes buyer education classes

and has limitation on closing cost contributions. (Francis Dec. at ¶ 16 and Russell aff. at ¶ 7).

Further, all transactions are accompanied by a real estate appraisal by a FHA certified and

licensed appraiser (Francis Dec. at ¶ 17).  The data regarding the performance of loans with DPA

from GAP, along with other tribal and governmental DPA programs, is readily available to the

defendants and their failure to even allege poor performance is telling.   Accordingly, at

minimum, the Final Rule is arbitrary, capricious and contrary to law with regard to governmental

and tribal DPA programs.

Further, HUD did not provide the most critical data it relied upon for public comment.

The APA requires that an agency publish a notice of proposed rulemaking, setting forth "either

the terms or substance of the proposed rule or a description of the subjects and issues involved,"

5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule

making through submission of written data, views, or arguments." Id. at § 553(c).  As the Court

of Appeals stated in <u>Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier</u>,

494 F.3d 188, 199 (D.C. Cir. 2007)(emphasis added):

> '[i]ntegral' to these requirements 'is the agency's duty 'to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.... An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.' <u>Solite Corp. v. EPA</u>, 952 F.2d 473, 484 (D.C.Cir.1991) (quoting <u>Connecticut Light & Power Co. v. NRC</u>, 673 F.2d 525, 530-31 (D.C. Cir. 1982)); <u>see</u> <u>Chamber of Commerce v. SEC</u>, 443, F.3d 890, 899 (D.C. Cir. 2006); <u>see also</u> <u>Air Transp. Ass'n of Am.</u>, 169 F.3d 1, 7 (D.C.Cir.1999) (" **'[T]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation.'**" (quoting <u>Association of Data Processing Serv. Orgs. V. Bd. Of Governors of the Fed. Reserve Sys.</u>, 745 F.2d 677, 684 (D.C. Cir. 1984)).

As discussed above, HUD's proposed rule cited only three sources, an IRS press release, an IRS revenue ruling and a February 2005 GAO report. HUD's summary judgment motion tacitly concedes that it failed to make the most critical factual material it relied upon. A review of the defendants' argument that the Final Rule is supported by the Administrative Record makes clear that the most critical basis for the Final Rule was not made available for public comment.

In defending the basis for the Final Rule, the defendants played their strongest card first, discussing the November 2005 GAO Report, a March 1, 2005 HUD commissioned study and an FHA analysis of its loan portfolio. However, none of these basis were mentioned in the proposed rule or made available for public comment.

In fact, in the Final Rule, HUD responded to commentators' objections to its data by claiming it has performed a **new** analysis to support its conclusions, purportedly based on its loan portfolio dating back to 1998. The data underlying HUD's newly-revealed analysis allegedly comes from HUD's own loan portfolio from 1998. This data obviously existed and was

available **before** the notice and comment period.  Further, as the IRS press release, IRS revenue ruling and February 2005 GAO report provide no basis for the Final Rule, HUD's analysis for its loan portfolio is "the most critical factual material that is used to support" HUD's position. Id. In fact, HUD's portfolio analysis is the only data which HUD relies upon in the Final Rule when defending comments that the Final Rule is not supported by data (AR at 5).  The new data is not supplemental, but the only arguable support for the Final Rule.

As HUD failed to disclose the most critical data on which it relied in reaching its conclusions, the material relied upon, the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release, provide no support for the rule and have no bearing on governmental agency or tribal government DPA programs, the defendants' summary judgment motion should be denied.

**B.    HUD Failed to Consider Reasonable Alternatives or
        <u>Offer A Reasoned Explanation For Rejecting Them</u>**

HUD failed to consider reasonable less restrictive alternatives, such as safeguarding the appraisal process and charging a higher premium on loans with DPA, and failed to offer a reasoned explanation for rejecting them.  Accordingly, the defendants' summary judgment motion must be denied.

An agency must, in a statement of basis and purpose accompanying a final rule, provide a reasoned explanation of its rejection of reasonable alternatives.  If the agency fails to do so, the final rule will be vacated.  <u>See</u> <u>Shays III</u>, 2007 WL2616689, at *24 ("Unless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.").  In violation of APA requirements, HUD has ignored proposals advanced for remedying alleged shortcomings in current DPA programs, including a proposal HUD itself advanced.

An agency's duty to consider responsible alternatives clearly applies where, as here, the agency is offered less restrictive alternatives to the action taken. In Int'l Ladies Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), the D.C. Circuit considered the Secretary of Labor's rescission of longstanding restrictions on employing homeworkers in the knitted outerwear industry. The Court vacated the agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding the Department of Labor's longstanding restrictions:

> We do not suggest that [the Secretary] had to opt for any particular one of these proposals. However, he was required to address common and known or otherwise reasonable options, and to explain any decision to reject such options. His complete failure to satisfy these quintessential aspects of reasoned decision making is the primary basis for our decision to vacate his rescission of the restrictions in the knitted outerwear industry.

Id. at 818.

HUD's explanation for the challenged regulation fails to address reasonable alternatives. In fact, none of the various proposals are even mentioned in HUD's statement of basis and purpose for the Final Rule. In violation of APA requirements, HUD has ignored proposals advanced during the comment period for remedying alleged shortcomings in current DPA programs, including a proposal HUD itself advanced. Accordingly, the Final Rule cannot be sustained.

### 1.     HUD Should Safeguard the Appraisal Process

HUD should deal directly with the alleged problem by safeguarding the appraisal process to ensure home prices are not manipulated to exceed actual fair market value. HUD has not provided a reasoned explanation for its rejection of this proposed reasonable alternative that deals directly with HUD's purported concern.

Despite HUD's averred concern, HUD ignores that transactions involving DPA, like all purchases utilizing loans guaranteed by the FHA, have home prices validated using HUD-approved appraisal criteria applied by HUD-certified and licensed appraisers that are not chosen by the DPA providers, buyers or sellers.  In other words, a FHA certified appraiser with no relation to the DPA provider, buyer or seller, confirms that the sale price does not exceed fair market value.  HUD ignores multiple comments regarding safeguarding the integrity of the appraisal process, including suggestions, such as the random assignment of HUD-certified appraisers and mechanisms for reviewing appraisals prior to closing (AR 52623-52629, 50118, 50907, 52632-52636, 53138-53139, 53732 *et al*).  As HUD cannot provide a reasoned explanation for rejecting this less restrictive alternative, HUD merely avers that the alternative is "an issue outside the scope of the present rule." (AR at 4.)

HUD, in violation of the APA, failed to provide a reasoned explanation for rejecting less restrictive alternatives.

**2.    FHA Should Charge a Higher Premium for Loans With DPA**

In addition to ignoring reasonable alternatives set forth during the comment period, HUD ignored a reasonable alternative that it proposed and stated that it would implement.

On October 25, 2005, approximately nine months after the February 2005 GAO report allegedly relied upon by HUD, HUD noted the successes of seller-financed DPA, rejected suggestions that those programs be curtailed and stated that it would implement a less restrictive reasonable alternative:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are

16

more costly and riskier than FHA. **Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan**.

(AR at 612)(emphasis added.)  Additionally, this less restrictive alternatives was suggested on numerous occasions during the comment period. (see AR 52624, 53139, 53317 *et al*).

HUD, in violation of the APA, has failed to provide a reasoned, or any, explanation for its rejection of a reasonable less-restrictive alternative that it proposed and stated it would implement.  HUD ignored its obligation to consider and provide a reasoned explanation for rejecting less restrictive alternatives.  Instead, HUD brushes off its obligation, ignoring a reasonable less restrictive plan that was set forth in numerous comments and that it had in fact proposed.  Accordingly, the defendants' summary judgment motion should be denied.

**C.    HUD Improperly Prejudiced the Outcome
        of the Rulemaking Proceeding**

Desperate times call for desperate arguments.  Since HUD Secretary Alphonso Jackson by committing himself to a result demonstrated an "unalterably closed mind" during rule making process, the defendants attempt to argue that Secretary Jackson is not a "decision-maker" and that his undisputed comments, are not part of the Administrative Record.

A court may set aside a final regulation based on prejudgment of the outcome "when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding."  Ass'n of Nat'l Advertisers, Inc., 627 F.2d 1151, 1170 (D.C. Cir. 1979).  In this matter, HUD Secretary Alphonso Jackson, the deciding official, did not merely express an opinion; he committed himself to an outcome.

It is clear that Secretary Alphonso Jackson demonstrated an "unalterably closed mind", establishing beyond doubt that HUD was not going to be swayed by the comment process and

would adopt the proposed rule.  On June 5, 2007, Bloomberg News reported that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said."  The Secretary stated:  "I'm very much against it . . . I think it's wrong.  I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments."  Id.  With respect to the then-pending rulemaking proceeding, "**Jackson said in his interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments.**" (Exhibit "C" and the Roland Affidavit).

Since these statements amply satisfy the "clear and convincing showing" of agency prejudgment the defendants attempt to argue that Secretary Jackson is not a "decision-maker" and that his undisputed comments are not part of the Administrative Record. However, in discussing Secretary Jackson powers, the HUD website states that:

- "all powers and functions of the Department of Housing and Urban Development are vested in the Secretary"; and

- that the assistant secretary head of the FHA "administer, **under the supervision and direction of the Secretary**, Departmental programs relating to the private mortgage market."

http://www.hud.gov/about/secretary/powersec.cfm    (emphasis    added).    Further,    Secretary Jackson's undisputed comments are properly before the Court.  See Exhibit "C" to the Penobscot plaintiffs' motion for summary judgment and to supplement the administrative record and the Roland Affidavit.

Under these circumstances, HUD's Final Rule violates due process and cannot stand. See Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F.Supp.2d 1249, 1261 (D. Wyo. 2004) ("definite" statements by the Assistant Secretary during the administrative process show that the National Park Service had already reached a prejudged political conclusion).

18

**E.**     **HUD Violated Its Own Policies During the Rule Making Process**

HUD violated its own policies regarding tribal consultation and considering potential impacts of HUD rules on small entities during the rule making process.  Accordingly, the Final Rule should not stand.

**1.**     **HUD Violated its Tribal Consultation Policy**

HUD violated its tribal consultation policy.  HUD's stated Tribal Government-to-Government Consultation Policy provides that:

> On April 29, 1994, a Presidential Memorandum was issued reaffirming the federal government's commitment to operate within a government-to-government relationship with federally recognized American Indian and Alaska Native tribes, and to advance self-governance for such tribes. http://www.hud.gov/offices/pih/ih/regs/govtogov_tcp.cfm

The policy further provides that:

> The Presidential Memorandum directs each executive department and agency, to the greatest extent practicable and to the extent permitted by law, to consult with tribal governments prior to taking actions that have substantial direct effects on federally recognized tribal governments. In order to ensure that the rights of sovereign tribal governments are fully respected, all such consultations are to be open and candid so that tribal governments may evaluate for themselves the potential impact of relevant proposals.

HUD's "Tribal Government-to-Government Consultation Policy" continues, stating that:

> On May 14, 1998, the President issued Executive Order 13084, 'Consultation and Coordination with Indian Tribal Governments,' which was revoked and superseded on November 6, 2000, by the identically titled Executive Order 13175, which sets forth the policy guidelines for all federal agencies to (1) establish regular and meaningful consultation and collaboration with Indian tribal officials in the development of federal policies that have tribal implications; (2) strengthen the United States government-to-government relationships with Indian tribes; and (3) reduce the imposition of unfunded mandates upon Indian tribes.

C. This consultation policy applies to all HUD program that have substantial direct effects on federally recognized Indian tribal governments.

Lastly, the policy states that "Consultation":

[M]eans the direct and interactive (i.e., collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications. Consultation is the active, affirmative process of (1) identifying and seeking input from appropriate Native American governing bodies, community groups and individuals; and (2) considering their interest as a necessary and integral part of HUD's decision-making process.

PIN requested that HUD consult with PIN regarding the Final Rule which impacts the plaintiffs' ability to generate the independent revenue streams necessary to become independent of government subsidies and provide the essential government functions and social and educational programs necessary to revitalize PIN and HUD knowingly failed to consult with PIN or any other federally recognized tribal government regarding the Final Rule. HUD's conduct violated its own polices, as well as the United States Government's fiduciary duty to federally recognized tribal governments. Accordingly, the plaintiffs' motion for summary judgment should be granted.

2.    **HUD Violated its Policy for Considering Potential Impacts of HUD Rules on Small Entities**

HUD violated its own policies by failing to consider the impact the Final Rule will have on small entities. HUD's "Policy for Considering Potential Impacts of HUD Rules on Small Entities" provides that:

It is HUD's policy to thoroughly review its draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as required by the Regulatory Flexibility Act. HUD's two principal methods for accomplishing these goals are through the review and analysis of all draft HUD rules by its Regulatory Flexibility Officer, and the undertaking of outreach

efforts to solicit the views of small entities in the development of
HUD rules.

Small entities include "small governmental jurisdictions" as defined by 601(5) of the

Regulatory Flexibility Act, which provides that:

> [t]he term 'small governmental jurisdiction' means governments of
> cities, counties, towns, townships, villages, school districts, or
> special districts, with a population of less than fifty thousand.

The Final Rule directly impacts small entities, including plaintiffs. HUD has not

provided a review and analysis of the Final Rule's impact on small entities. HUD has failed to

engage in outreach efforts to solicit the views of small entities in the development of the Final

Rule. Accordingly, the plaintiffs' motion for summary judgment should be granted.

**CONCLUSION**

For the foregoing reasons, the plaintiffs respectfully request that this Court deny the defendants' motion in its entirety.

Dated:  December 7, 2007

**THE MASON LAW FIRM, LLP**

/s/ Gary E. Mason
Gary E. Mason
DC Bar #418073
Nicholas A. Migliaccio
DC Bar #484366
1225 19th Street Northwest
Washington, D.C.  20036
(202) 429-2290


**KANTROWITZ, GOLDHAMER**
  **& GRAIFMAN, P.C.**
Michael Braunstein
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570

Attorneys for Plaintiffs

**ORIGINAL**

SUB-PRIME CONVENTION

Transcribed on December 5, 2007

1          MR. MASELLI:  Good afternoon, and

2   welcome to today's business strategy session.  I'm

3   Pete Maselli with Land America, and it's a

4   pleasure to be here, and we at Land America are

5   very proud to be sponsoring this strategy session

6   today and tomorrow.

7          Our panel today is entitled, "What is the

8   future of subprime?"  The subprime mortgage market

9   is being portrayed as having precipitated a credit

10  crunch that's rippling through the global economy.

11  It's also contributed to putting more people in

12  homes than ever before, most of which are still

13  paying their mortgages.

14         As the subprime market is changing,

15  clearly, the stakes are very high, and today we

16  have a very distinguished panel that will address

17  this, led by our moderator, Kurt Fauhtenheimer

18  (ph), which I'd like to now introduce Kurt.

19         Kurt is a Senior Vice President of

20  Government Affairs for the Mortgage Bankers

21  Association.  He's responsible for overall

22  management and implementation of legislative and

23  regulatory efforts.  He oversees policy

24  formulation, strategy developments, and the MBA's

25  Government Affairs Team.

1           Prior to joining the MBA in 2002, Kurt was

2    a Chief of Staff to Senator Gordon Smith of Oregon

3    for five years.  He advised the Senator in

4    political communications and policy areas related

5    to a variety of Senate committee assignments.

6           Previously, Mr. Fauhtenheimer was with the

7    United Parcel Service for five years, most

8    recently as Vice President of Public Affairs, and

9    before that, he was Chief of Staff to Denny Smith.

10           I'm very pleased to turn this over

11    now to Kurt and have him run the panel.  Thank you

12    very much.

13           MR. FAUHTENHEIMER:  Thank you for

14    your sponsorship.  Thank you for making this

15    possible.  We do indeed have a distinguished

16    panel.  I'm the extinguished part of the panel,

17    but -- and that's with one day still to go at this

18    convention, but these guys are some of the best we

19    could put together.  I think we're going to have

20    an interesting conversation.

21           You know, back in late winter, early spring

22    of this year when we started planning for the

23    convention here at MBA, we were trying to come up

24    with panel topics that would attract attention and

25    draw people in.  Who knew we would be this

1   topical, but we were apparently on the right path

2   when we came up with this one.

3          But at the time, we honestly didn't know

4   how critical the issue would be.  Certainly, the

5   issue of subprime was center stage in Congress and

6   in the news frequently during the early months of

7   the year.  However, since then, as you all know,

8   it is now on the front page practically every day

9   and in every news outlet in the U.S. and abroad.

10          Notwithstanding the current climate, I want

11   to talk with this panel less about new cycles and

12   more about the need for this industry, of which

13   we're all a part, to find ways to continue to

14   responsibly reach out to borrowers who need access

15   to credit.  Why?  Because whether we serve this

16   market or not, the demand for subprime products is

17   going to be there.  It's not going away.

18          So this panel asked the question, will

19   there be an industry to meet the demand?  If so,

20   what will that industry look like?  Whom will it

21   serve and on what terms?  To answer this question,

22   we have this panel.

23          We're going to lead off with my friend, Tom

24   Cronin, and Tom is going to spend most of his

25   presentation talking about how we got here so that

1    he sets the stage for where we're going.  Tom is a

2    certified mortgage banker and a long-serving

3    member of MBA's governments, including a stint on

4    the Board of Directors, as well as -- I think you

5    did service as Vice President and Treasurer.

6            He's currently a member of our Residential

7    Board of Governors which is the prime policymaking

8    body on the residential side of the MBA.  He's the

9    Senior Managing Director of Clayton Holdings (ph)

10   where he's responsible for the areas of sales and

11   corporate development.  And then Clayton Thomas

12   focused on the long-term development of new

13   services that improved the performance and

14   oversight of private label securities, focusing on

15   benefiting mortgage servicers, security dealers

16   and investors.

17           Tom has more than 30 years experience in

18   the industry, and prior to joining Clayton, he was

19   a managing member of Interactive Mortgage

20   Advisors, a company he helped launch in 2001.  Mr.

21   Cronin also served as Vice Chairman at Matrix Bank

22   Corp.

23           Following Tom, we're honored to have Mike

24   McQuiggin (ph), who also has more than 30 years of

25   industry experience.  At MBA, he is a member of

1   the Executive Committee of our non-prime Alt A

2   counsel which was formed in the wake of MBA's

3   merger with Nahima (ph) last year.  He has also

4   served as President of the Southern California

5   Mortgage Bankers Association in Los Angeles County

6   Association of Wholesale Lenders.  Mike is

7   currently the CEO of Tri-Emerald Financial Group

8   but began his career in 1972 with Beneficial

9   Finance in Phoenix.

10          In 1988, he founded First Colony Financial

11  Group, a national wholesale and retail mortgage

12  lender in Culver City, and seven years later, he

13  successfully negotiated the sale of the company

14  while maintaining an executive management

15  position.

16          Mike also served as Vice President of

17  Secondary Marketing for Master Financial in 2003

18  and was most recently co-founder and CEO of

19  Lenders Direct Capital Group.

20          We're then going to go to my friend,

21  Commissioner Brian Montgomery (ph) to bring an FHA

22  perspective on serving the demand.  As those of

23  you who don't know, Commissioner Montgomery, he is

24  Assistant Secretary for Housing in the Department

25  of Housing & Urban Development, and he also goes

1    by the title of Federal Housing Commissioner.

2           In that capacity, he's responsible for

3    overseeing the $400 billion FHA insurance

4    portfolio, and he also overseas HUD's regulatory

5    responsibilities in the area of RESPA, the housing

6    mission of the GSE's, and the manufacturing

7    housing community.

8           The Commissioner came to HUD from the

9    Executive Office of the President where he served

10   as a Department Assistant to the President from

11   January 2003 until April 2005, and while serving

12   in the White House, Mr. Montgomery contributed to

13   the policy process on a long range of issues,

14   including the administration's efforts to boost

15   homeownership, increase access to affordable

16   housing and to reform both RESPA and the GSE's.

17          Since his confirmation by the Senate, one

18   of the Commissioner's primary initiatives has been

19   the creation and promotion of a bill designed to

20   modernize the FHA.  Another one of his priorities

21   while at HUD has been the preservation of

22   affordable multi-family rental housing achieved

23   primarily through mortgage insurance as well as

24   flexible refinancing options.

25          His tenure as Commissioner has also been

1    marked by extensive work with Hurricane Katrina

2    disaster victims.  He chaired HUD's hurricane

3    recovery and response center at headquarters and

4    helped coordinate and secure temporary and

5    long-term housing for displaced persons.  He's the

6    crisis manager that they sent in, so obviously,

7    the man for the hour.

8        Batting clean up today is Stephen Neiden

9    (ph), another 30-year-plus veteran of mortgage

10   banking.  At MBA, we have been lucky to have Steve

11   serve on our Board of Directors and RESPA.  During

12   2006, he served as a member of MBA Counsel to

13   Shape Change, which was another MBA initiative to

14   take a look at our industry, this time with a

15   ten-year horizon.

16       Steve, who first joined Option One

17   Corporation in 1993, was named its President & COO

18   in January of this year.  He has responsibility

19   for the wholesale and retail sales organizations,

20   loan fulfillment and servicing, enterprise risk,

21   government affairs, and information technology.

22       Prior to his current position, Neiden was

23   President of H&R Block's Consumer Financial

24   Services Group, and before that, served as Option

25   One COO, responsible for Option One and H&R Block

1    mortgage origination businesses, all internal
2    lending operation and Option One's housing and
3    trade relation efforts.  Steve also serves on the
4    National Community Reinvestment Coalitions,
5    mortgage and finance and credit committee, he's
6    previously served as a Chairman for the Coalition
7    for Fair and Affordable Lending.  He's got clear
8    eyesight, and he's articulate about what he sees,
9    and we're grateful to have him on this panel
10   today.

11        So let me get out of the way and invite our
12   first panelist up.  Tom, if you'll lead us off.

13        MR. CRONIN:  All right.  Thanks,
14   Kurt.  And thank you all for being here.  It never
15   ceases to amaze me how an otherwise intelligent
16   and professional looking crowd could have nothing
17   better to do on an afternoon in Boston.

18        But be that as it may, I guess it raises
19   the bar for us to present a dialogue that in some
20   ways hopefully will be provocative and challenging
21   in solving for the question, not mine so much as
22   how did we get here, but where do we go from here,
23   which the other panelists will address.

24        To frame the discussion a little, I'll use
25   some analysis put forward by my friend Doug Donkin

1    (ph), the Chief Economist for the MBA.  Not many

2    people are aware of the drivers, because when you

3    see the headlines and the read the press around

4    this meltdown and what's happened as a result of

5    it, it really has become a complex discussion,

6    well beyond the grasp of the typical guy reading

7    the newspapers.  As far as he's concerned, we're

8    all just a bunch of bums.  We made loans to

9    88-year-old people on fixed incomes that they can

10   no longer afford to pay.  They're not central to

11   the issues necessarily.  But what is really

12   dramatic about it is really the size of the

13   problem and its shear numbers, or lack thereof,

14   relative to the overall economy or the total gross

15   domestic product.

16        Thirty-five percent of the homes in this

17   country are owned free and clear with no debt

18   whatsoever.  That's a much bigger number than I

19   ever thought.  Sixty-five percent, therefore, are

20   subject to finance.  And if you look at that, and

21   if you look at where the subprime space or even

22   the all day space is in terms of percentages of

23   that market, and then you break it down even

24   further to the percentage of those that are

25   performing versus non-performing, I think Doug's

1    statistic is his favorite two numbers -- and

2    correct me if I'm wrong, Kurt -- are 35 and 95 for

3    rounding purposes.  Thirty-five percent of the

4    homes are free and clear, and 95 percent of them

5    are paying on time.  So we're talking about 5

6    percent of seven million home mortgages in this

7    country.

8         And even if that number is true, how many

9    of them are delinquent versus seriously

10   delinquent?  Nobody's trying to diminish the

11   importance of the discussion.  Nobody's trying to

12   say that it isn't a problem and that we have to do

13   it better next time.  But the real discussion is

14   about magnitude, and a lot of it is a little bit

15   out of proportion.

16         Now, having said that, how did we get

17   where we are?  I would suggest that the crisis of

18   2007 didn't manifest itself just in the year of

19   2007 or even the latter half of 2006, but rather

20   the problem has been there for several years.  But

21   what changed was in the fourth quarter of 2004, we

22   saw home price appreciation not only come to a

23   halt but go into a decline.

24         You could say that the first couple

25   quarters of '05 were a bit of a head fake as home

1    prices improved a little bit, but I want you to

2    remember this chart as we go through the

3    discussion because from that time on, from about

4    the third quarter of 2005, as we as lenders and

5    issuers of subprime and all day securitizations

6    (ph) continued to get more creative and be more

7    aggressive in the offerings we were making

8    available to the public, we weren't doing -- we

9    were not doing those borrowers or ourselves any

10   favors.

11        Total subprime originations peaked in 2005

12   at $625 billion.  According to this, there's some

13   question about 2006 and how you define the

14   product.  2006 was not much off of 2005, but

15   that's -- that was the heyday.

16        Mortgage-backed security composition during

17   those periods -- this is a pretty interesting

18   one -- and keep in mind what happened to home

19   prices, the first chart that we saw.  During this

20   period, we steadily increased the share of

21   adjustable rate mortgages as the total of MBS

22   composition.  In 2005 when we achieved our peak

23   volumes, 80 percent of those were adjustable rate

24   loans.

25        The interest only share of subprime

1    mortgage-backed securitizations was almost 30
2    percent in 2005.  So now you've created an
3    adjustable rate instrument on which somebody only
4    has to pay their interest in a declining housing
5    market.  That of the non-agency MBS, forgetting
6    subprime, but interest only in and of itself,
7    non-agency got up to about 36 percent of the total
8    in 2005.
9         Here's an interesting one.  Interest only
10   and NAGAM (ph) origination, so now it's not only a
11   question of telling the guy he can only pay his
12   interest.  We're also allowing him to have an
13   election where he can allow that asset or that
14   mortgage to NAGAM in a period of declining home
15   prices.  Doesn't make much sense when we look at
16   it this way, does it?
17        Total delinquency rates, this is an
18   interesting one, I think.  If you look at the way
19   they ramp up in the subprime which is the top bar,
20   things actually got pretty good in terms of the
21   performance of these loans from about '01 until
22   about the end of '04 when home prices began going
23   down.  Again, an intersect that if you don't take
24   it and compartmentalize it and analyze it on this
25   basis, you wouldn't necessarily see the total

1   delinquencies on those loans began to increase

2   right around the time that home prices quit going

3   up.

4       Not surprising, foreclosure inventory went

5   along a similar path.  The new foreclosure rate by

6   loan type.  Take a look again.  What's happening

7   with the subprime, and when did it start

8   happening?  Where are we now?  Well, the market

9   has seized.  Nonconforming securitizations are

10  down 82 percent from December of '06 to August of

11  '07.  Risk is no longer predictable.  Everything

12  seems to be mispriced.

13      The nonconforming, we've all seen it in the

14  paper, and we've talked to guys who run hedge

15  funds who provide the liquidity in these markets,

16  and you say, why aren't you buying?  You keep

17  telling us you have money.  You have more money.

18  Every time a payroll is made, more money comes

19  into the pension funds, more money comes into your

20  investment vehicles.  Why aren't you coming out

21  and doing something?  And they all said, well, we

22  tried about that about nine months ago, and it was

23  like trying to catch a falling knife.  The early

24  adopters for trying to solve the crisis that is

25  out there today all realize pretty significant

1   losses.  Rating agencies, lenders and vendors

2   testifying before Congress and the New York

3   Attorney General.  It's not a pretty scene.

4        How did we get there?  Well, I was going to

5   ask the question, but I tried to tone it down a

6   little bit.  I was going to say, how many of you

7   in the room think you had any part to do with

8   this?  How many of you contributed to the problem

9   that we've got today?  And I wasn't sure what kind

10  of show of hands I'd get, but the truth is most of

11  us have stuff on our shoes.  We all got

12  complacent.

13        You know, the models are only as good as

14  the assumptions we use, and I think we can look

15  today and analytics and say that those assumptions

16  being made today going forward are going to be

17  quite different.  And that does give hope.  I

18  mean, Kurt asked me to this as part of the

19  diagnostic approach, and then the other gentlemen

20  are going to provide the cure.  My hope is that

21  it's not forensic pathology, that it really is

22  diagnostic and it's something we can help with by

23  looking at where the assumptions went wrong and

24  what we did.

25        Later, risk was ignored.  We're shocked --

1   shocked -- to find out that to learn that
2   borrowers and brokers don't always tell the truth.
3   Securities were purchased on the basis of ratings.
4   Distance from the borrower and the investor grew
5   and then disconnected.  When I say that, I have a
6   really specific recall, and this is an interesting
7   one that was even more interesting last December
8   when one of our friends, Bill Dallas, the founder
9   of First Franklin and the guy who got to sell it
10  twice, and then later became the owner who owned
11  it, was being pilloried for all of the activity
12  and all of the loans that he had made, and he came
13  back and said, well, it was the street.  You know,
14  they wanted us to make these loans, they pushed us
15  to make these loans.  They redefined the product
16  and made it affordable for us.  The vertical
17  integration, and they were financing us, and then
18  they wanted to buy our products.  They were giving
19  us menus, and then it just kind of got out of
20  control.
21       But two years before that, I was in a room
22  where Bill Dallas addressed 250 CDO buyers and
23  investors in Las Vegas in a B of A investor
24  conference, and he told them they were all nuts.
25  He told them the lack of credit inquiry and

1    underwriting inquiry around the CDO investments

2    was going to come home to bite us one day, and it

3    was going to be bad.

4        And two years later, he was right.  He was

5    wasn't the only one.  A lot of us worried about

6    lending 100 percent to a guy with a 540 FYCO score

7    in the form of a first and a second and all the

8    creative financing that was taking place.  But we

9    talked to a room full of people who for two years

10   after that allowed credit spreads to be as narrow

11   as they were without any inquiry.  So truly, the

12   distance from this set of borrowers and the

13   investors was disconnected.

14       It's not over yet, sadly, and I think I

15   know Steve will concur with that when he gets up

16   here.  Let's take a look at loan quality.  You

17   know, about two months ago, the Residential Board

18   of Governors at the yearly MBA convened in a

19   special emergency session to talk about what we

20   could do to bring liquidity back into the market

21   to serve all of our members because everybody was

22   having trouble paying their bills.  And we went

23   out on a limb, and we defined three things that we

24   thought we could do to try to affect the

25   discussion.

1    One was we were going to join some of our

2    housing finance peers in Washington and support an

3    increase in the GSC cap, not in the loan limits,

4    but in the cap.  Secondly, we were going to work

5    with the rating agencies to try and define the

6    levels and the definitions so that investors

7    coming into the next wave could understand clearly

8    what it was they were buying and why it was

9    defined that way.

10    And then third, and I think Steve was on

11    the call and suggested it was time to get back on

12    airplanes the way we did 14 years ago and visit

13    investors but show them how the quality had

14    improved, how the 2007 book of business was better

15    than the previous book and that we would get on

16    that right away.

17    Well unfortunately, and I had our people

18    run our analytics -- we're the largest

19    surveillance firm in the industry for the

20    performance of private label securitizations -- so

21    we did a lot of analytics, and I think some of the

22    other issuers in the room went back to their book,

23    and what we learned was not good.  The reality was

24    that things hadn't gotten better.

25    You know, we had talked about improving

1   underwriting, we had talked about applying

2   standards differently, and I think there is an

3   honest effort to get there, but it hadn't happened

4   yet, and it is still a work in process.

5        If you look at the percentage of subprime

6   originations with FYCOS scores below 600, over

7   that period of time, you see very little change

8   all the way through April of '07.  Got a little

9   bit better, and then it -- we were still making

10  those loans.  If you go down, the Alt A

11  originations with FYCOS scores lower, what I would

12  suggest is that there was a migration from

13  subprime into Alt A.  These aren't terribly

14  different loans.  All we've done is do more of

15  them down in a different defined category.

16       Okay, here we go.  Nurture and challenges.

17  Again, it isn't over.  The 2007 subprime MBS looks

18  just like 2006.  Here are early payment defaults

19  through the four quarters of '06 and the first

20  quarter of '07, and I'm telling you that the

21  second quarter of '07 didn't change much.

22       Now this doesn't really surprise you in

23  subprime, probably.  Look at the ramp up in 90-day

24  delinquents from this has since originated.  We're

25  ahead of the curve.  The '07 vintage, look at that

1    fourth quarter of '06 where it is in relation to

2    third quarter of '06.  It was getting worse.

3         Now, we're going to look at the Alt A

4    performing versus '06.  Holy Cow, the Alt A, the

5    first quarter of '07 is performing every bit as

6    bad in terms of early payment defaults as the

7    subprime sector, and all we saw was an increase in

8    Alt A lending and a decline in subprime lending,

9    so I would suggest to you that it's worse than

10   even this graph demonstrates.  We've got about

11   three and a half percent of that vintage of Alt A

12   finding itself in early payment defaults.

13        Here's another chart that shows you 90 plus

14   days delinquent, the same way we did on the last

15   one, by vintage, and this is months since it's

16   originated, and look what's happening.

17        So a lot of the problems have bled over to

18   the Alt A space in the private securitization

19   market, and that's what's presenting a challenge.

20   That's the story that needs to be developed and

21   told, and as we all know, and sort of in

22   conclusion, the last hurdle we have to get over

23   are the arm resets.

24        Forty percent of the subprime arms that we

25   monitor will reset between now and the second

1   quarter of '08, less than nine months.  Sixteen
2   percent of those are already 60 days plus
3   delinquent, and from our experience, this is over
4   a trillion six of private label securitization
5   since the year 2000.  When we see a reset and the
6   loan is 60 days delinquent, it's our observation
7   that four months after that time, ten percent of
8   them are being liquidated at a loss, 65 percent of
9   them remain 60 days plus delinquent, and less than
10  20 percent of them are paid off.  And I think
11  that's quite different than the assumptions that
12  were made and modeled when the securities were put
13  together.
14          So just an old quote, we all know it.
15  Insanity.  Are we going to do the same thing over
16  and over again expecting different results?  I
17  certainly hope not.  But the good take-away is,
18  what doesn't kill us will make us stronger.
19              MR. MCQUIGGIN:  It's kind of hard to
20  follow all that wonderful news.
21          Is there a future?  I think we have to go
22  back a little bit to the beginning.  The history
23  of subprime, I felt, dealt with common sense
24  lending.  You needed credit, capacity, collateral.
25  Two out of the three, you could fund the loan.

1    The five worst words in business, I've been saying

2    this for about a year now, is, everybody else is

3    doing it.

4         So what happens?  2005, 2006, we lay a

5    risk, we have no credit, no capacity, no income,

6    we don't do anything to justify making a loan to a

7    customer.  The result:  Borrowers have no

8    incentive to pay or stay in the house, the cash

9    flows aren't working in the securities, the rating

10   agencies AAA's are only worth 90 cents on the

11   dollar.  If you get down to the BBB's, they've

12   gone from 97 to maybe 30 cents on the dollar.

13   Investors abandon the MBS, we have no liquidity,

14   we get margin calls, massive closings of our

15   companies and job losses.

16        So where do we go?  The flight to quality,

17   we've got FHA here to talk to us about where they

18   can help in this situation.  We're going to have

19   legislation, and it's going to be big.  We need to

20   realize that's coming.  If you've been to any of

21   the other meetings, they've got -- Barney Frank's

22   got items coming out.

23        Be concerned, if we have in the United

24   States a run on one of our banks the way that

25   Northern Rock had, bet that the Federal Government

1    is coming down hard and fast on us.  Market

2    liquidity isn't coming back.

3        I think the future is back to basics.

4    Rating agencies are going to have to really

5    convince the investors that a AAA is a AAA and

6    that the ratings are accurate.  We have to be

7    concerned about the regulations, the regulators.

8    You know, if we remember Enron, they rushed to

9    legislation, and we did ended up with

10   (unintelligible).  I mean, they go to the

11   extremes.  We have to be very cognizant that that

12   could come to us, and we have to be ready for

13   that.

14       And then the lenders have to get back to

15   the basics, the three C's.  We have to make common

16   sense loans.  You know, verify income, regular

17   equity loan to values, some kind of credit, get

18   back to the basics.

19       Here's how I think it's going to look.

20   This is where I think the strategy is going to be

21   a little different.  Currently with the MBS, kind

22   of like Tom indicated, we were far away from the

23   customer to the investor.  We had the broker, we

24   had the mortgage banker, the investment banker,

25   the rating agencies, the servicer.  We finally get

1   to the investor, we've got six degrees of
2   separation there.  I believe that's problematic in
3   the nonprime business.  It creates a disconnect or
4   a lack of sense of responsibility.  People kept
5   passing it on.  Okay, they weren't too concerned.

6          I think we're going to have a problem
7   getting the mortgage-backed security market back
8   to what we've experienced in the last five, ten
9   years.  I think those are going to be difficult
10  things to come and get the money and the liquidity
11  back into today's environment.

12         If it does come back, there's going to be
13  much stronger ups and warrants that will be
14  required from all levels from the customer to the
15  investor, and there will be greater responsibility
16  for all parties between the customer and the
17  investor.

18         My concept, or my thought, of what our
19  future is going to look like is the old finance
20  company model.  This is kind of where the genesis
21  of the nonprime business came.  You've got the
22  customer, maybe a broker gets involved in the
23  transaction, and then you're the lender/servicer.
24  You're taking care of it from Point A to Point B.
25  I believe that's going to be able to deal with

```
 1   some other -- some of the compliance issues that
 2   could be coming through with the federal
 3   regulators.  I think the portfolio play is going
 4   to be a strong play in today's market because of
 5   the lack of the mortgage-backed securities
 6   working.  But how do you finance it?
 7        The hedge funds have significant capital,
 8   but they need to earn their returns.  I think we
 9   may get back to the subordinated, senior
10   subordinated programs, kind of the basics of how
11   we got into the mortgage financing where the
12   servicer, the lender is taking the bottom piece in
13   the transaction.
14        There will be a future, I believe.
15   Subprime lending supplies access to credit to an
16   underserved market, and it's part of the essential
17   to our economy, it's an important business, and I
18   think there's a huge future for us.
19        I got through it.  Thank you.
20             COMMISSIONER MONTGOMERY:  I'm the
21   Government.  We're very low-tech, so I don't need
22   a computer.  Yeah, so we may be here to help.
23        Kurt, thank you very much for the
24   introduction and greetings to my fellow panelists.
25   You know, I have to say that it's not often that
```

1    parallels can be drawn between nuclear physics and

2    housing, but I'd like to begin this afternoon by

3    taking a stab at it.

4        You know, this won't be about RESPA.

5    Instead -- that will be later -- instead, I'm

6    going to tell you about a theory presented by a

7    noted American physicist by the name of Dr. Glen

8    T. Seaborg (ph).  The theory I'm referring to is

9    quite fitting these days, and it's known as the

10    Sea of instability."

11        You see, in the 1960's, Dr. Seaborg

12    postulated, and I don't want to get too technical

13    here, that while physical elements are

14    continuously being discovered, they're exists a

15    point at which their atomic weight causes them to

16    become unstable.  Certain elements due to the

17    complexity of their make-up and the increased

18    energy caused by the marriage of so many protons

19    and so many neutrons, they virtually expire the

20    millisecond that they are created.  Thus, Seaborg

21    referred to these elements and the chaos that

22    ensued as the sea of instability.

23        Well, for years, physicists around the

24    world attempted to discover the rationale behind

25    this curious phenomena.  With Seaborg himself, who

1    later discovered that if they could reach a

2    balance between the numbers of protons and

3    neutrons in a given element, the atoms would be

4    able to comfortably cohabitate, making the element

5    itself stable.

6         Applying this theory, Seaborg was able to

7    produce physically complex, yet stable, elements

8    within the realm of a volatile hypersensitive

9    environment.  Quite fittingly, Dr. Seaborg called

10   this new force the "island of stability."

11        Okay, so what then does all this have to do

12   with housing?  Well, as has been well documented,

13   the current housing environment is experiencing

14   some significant instability of its own.  The

15   uncertainty and risk associated with a subprime

16   market has caused unprecedented turbulence in not

17   only the housing market itself, but also the way

18   people -- homeowners, lenders, brokers and

19   investors alike -- exist within the housing

20   market.

21        Similar to the stability Dr. Seaborg was

22   able to create within the complex environment of

23   unstable elements, the Federal Housing

24   Administration has remained the stable force among

25   today's complex housing environment of uncertainty

1   and hypersensitivity.  For to borrow a page from

2   Dr. Seaborg, the FHA has been the "island of

3   stability."

4        I have long said that FHA stays in all

5   markets all the time, and at no time is that

6   message more apparent than today.  The FHA has

7   been a model of stability throughout the unstable

8   subprime boom and subsequent credit crunch, but

9   only recently have people come to realize that

10  fact.  Therefore, I'd like to spend my brief time

11  today explaining why the FHA "island" has remained

12  stable since 1934 and tell you about what we're

13  doing to stay relevant in today's sea of housing

14  instability.

15       First I want to talk about FHA secure.  As

16  you all know, prior to September of 2007, the FHA

17  wasn't offering mortgage insurance to borrowers

18  who were delinquent on their mortgages.  However,

19  given the substantial volatility in the market and

20  the fact that many borrowers were clearly in

21  products that didn't make sense to them, we knew

22  it was time for the FHA too step in and help.  So

23  we expanded FHA's refinance product which we are

24  now calling FHA Secure to serve families and

25  individuals who have fallen behind on their

1    mortgage payments, and we've already seen a

2    substantial increase in our refinance business

3    over the past year, and those loans are performing

4    very, very well, many better than our purchase

5    business, quite frankly.

6         And just since September of '07, FHA has

7    processed more than 45,000 conventional FHA

8    mortgage refi's, the overwhelming majority of

9    those being subprime loans.  And these figures

10   only include the borrowers who were able to

11   refinance prior to becoming delinquent.  But the

12   recent inclusion of delinquent borrowers under the

13   FHA Secure umbrella, these numbers will definitely

14   grow.  We've projected that we will serve

15   approximately 80,000 delinquent borrowers this

16   year, in addition to another 160,000 non-deliquent

17   borrowers.

18        Of course, these projections were done

19   prior to all the press that highlighted the

20   President's announcement of FHA Secure.  I can't

21   help but think that we may reach even more

22   borrowers than we predicted.  Regardless, I, for

23   one, am proud to say that the Government will now

24   be able to assist more troubled homeowners and

25   keep more families in their homes.

1           FHA Secure for delinquent borrowers is
2     really picking up.  We now have 380 lenders
3     participating, including Wells Fargo, Countrywide,
4     City Mortgage and Chase.  I think the initial
5     interest was tempered by the way somewhat by the
6     surprising reaction from Wall Street.  I'm sure
7     you all heard that investors were apprehensive to
8     purchase Jennie Mae Securities.  If the loan pools
9     co-mingled loans to delinquent borrowers with
10    those of non-delinquent borrowers.  They expressed
11    concern about the performance of FHA secured loans
12    to delinquent borrowers and that, of course, with
13    some uncertainty.

14          To help clear up some of that uncertainty,
15    my staff has met with a number of Wall Street
16    firms along Jennie Mae, including UBS, Bear
17    Stearns and others, as well as representatives
18    from Sifma (ph).  The good news is Jennie Mae and
19    FHA will have an announcement, I believe, later
20    today that should help resolve the matter.

21          Secondly, let me talk a little bit about
22    FHA modernization.  Well, it's unfortunate that
23    the bill didn't pass last year, as I think it
24    would have assisted countless individuals and
25    maybe helped them avoid some high-cost loans.  I

1   am pleased to say that we appear to have some very

2   positive momentum up on The Hill.  Behind the

3   leadership of Chairman Frank, Congresswoman

4   Waters, Congressman Baccus (ph) and Congresswoman

5   Biggert (ph), HR1852, the Expanding American

6   Homeownership Act of 2007 passed the House by a

7   vote of 348 to 72.  The Senate version of the bill

8   also saw action recently passing out a set of

9   Banking Committee by a vote of 20 to 1.

10         As we witnessed last year, there are no

11  guaranties that the bill will get to a full Senate

12  vote soon, but I think we have good reason to be a

13  little more optimistic this year.  As many of you

14  know, some of the improvements we are hoping to

15  implement through FHA modernization legislation

16  include lowering the downpayment requirements,

17  establishing mortgage insurance premiums based on

18  the borrower's ability repay them -- and I'll talk

19  about that here in a second -- and linking the

20  available loan terms from 30 to 40 years,

21  increasing our loan limits, and eliminating the

22  cap on the reverse mortgages that FHA can insure.

23         Let me talk a little bit about the

24  risk-based pricing proposal that has gotten, I

25  understand, is subject to lot of different

1    queries.  As you know, since 1934, we have helped

2    close to 35 million people become homeowners.  Our

3    role is to assist lenders who might otherwise be

4    reluctant to make loans to borrowers who have a

5    riskier credit profile, less savings and perhaps

6    lower incomes.

7         As you all know today, borrowers have paid

8    a uniform price for this insurance.  The

9    risk-based premium proposal is intended to expand

10   access to FHA financing to more borrowers,

11   particularly borrowers with weaker credit profiles

12   and to better serve all borrowers for a slightly

13   higher premium charge rather than being denied an

14   FHA loan (inaudible) borrowers will pay a slightly

15   higher fee.  Borrowers will pay premiums

16   appropriate for and commensurate with the risk

17   they pose, so lower risk borrowers won't have to

18   wholly subsidize riskier borrowers access to

19   credit.

20        Risk-based premiums will benefit you, the

21   lenders, because you will be able to lower the cut

22   points in total score card, so more borrowers will

23   qualify with an accept so fewer borrowers will

24   require manual underwriting.

25        Risk-based premiums will benefit borrowers

1    because more families who qualify for FHA, and

2    they will qualify more easily.  And many borrowers

3    will pay a lower fairer premium to access prime

4    rate financing.

5         Risk-based premiums will benefit FHA, of

6    course, because we will be able to operate like

7    any other insurance company, and we will better

8    manage our risk.  In fact, we estimate that with

9    risk-based pricing, we will be able to help an

10   additional 120,000 new borrowers buy a home in FY

11   '08.

12        We do recognize you'd like us to make some

13   changes to the proposal we put forward, and we

14   will absolutely work through your concerns.  A

15   number of you have been involved in conversations

16   with us already regarding some appropriate changes

17   and clarifications that we can make.  We also

18   recognize how difficult the timing will be for

19   many of you, and we will certainly heed your

20   comments on this matter.

21        And finally, let me say a little bit about

22   RESPA.  A draft of the RESPA reformed proposed

23   rule will be submitted to O&B later this week.

24   The rule would standardize the good faith estimate

25   and substantially enhance the disclosure of loan

1  terms, including the initial interest rate and

2  monthly payment, whether the interest rate and

3  principal can rise, and the maximum to which they

4  can rise, and whether the loan has a prepayment

5  penalty and/or a balloon payment, as well as a

6  total estimated settlement charges.  The approach

7  is to provide more loan information in an

8  understandable manner so consumers can shop for

9  the best loan for them.

10      The rule would also identify charges that

11  can and cannot change at settlement, also limit

12  the amount of permissible changes and modify the

13  HUD one to facilitate comparison of the estimated

14  charges on GFE and the final charges on the HUD

15  one.  As promised by Secretary Jackson, we expect

16  to begin confidential consultations with

17  Congressional committees and their staff very

18  soon.

19      Well, as you can see with so much going on

20  at FHA, any given day at the office can be seen as

21  a "sea of instability."  The truth remains that we

22  have a critical role to play in today's volatile

23  housing market, and just as Dr. Seaborg learned

24  nearly 50 years ago, we can't always control what

25  happens in our surrounding environment.  However,

```
 1    we can take measures to control that environment
 2    and, more importantly, to improve that
 3    environment.
 4              Thank you very much.
 5              MR. NEIDEN:  One thing that is
 6    interesting about this particular session from
 7    some of the ones that I remember in the past,
 8    because I've done this a few times, is that two or
 9    three years ago on a session that was coming
10    toward the end of the day, I would get up to say
11    whatever it is that I was asked to say, and I
12    would see five or six people.  Most of everyone
13    else had gone out to enjoy the rest of the day,
14    there was no interest in the subprime or nonprime
15    industry for the most part because everything was
16    going so swimming well.  And now, I'm looking at
17    almost a standing-room-only kind of crowd, so I
18    don't know if that means it's really cold outside
19    or you're just really fascinated by this topic.
20              It is one that I actually spend a good deal
21    of my time talking about which goes back to the
22    sort of the core of this session today, and that
23    is, what is the future of the subprime business?
24    I have been in it, save one year when I worked
25    full time for a pizza place in high school, this
```

1  is the only career that I have had, is over 30

2  some odd years and doing nothing but finding ways

3  to lend money to people that, for one reason or

4  another, are unable to qualify with a bank and

5  obtain a prime loan.

6          I started like Mike did.  I started in the

7  finance companies.  I worked at the better one,

8  TransAmerica.  And I'm a believer in the market,

9  as I'll talk about a couple things here, but one

10 of the things I do believe in is that while the

11 market may at times do some interestingly wrong

12 things, things that we probably shouldn't do, as

13 probably as best exampled over this last 12 to 24

14 months, our industry maybe got a little bit ahead

15 of itself in things.

16         But over the longer term, and I am a

17 long-term thinker -- my view of the world is not

18 three months or six months; my view of the world

19 tends to be five years and ten years out -- when I

20 go back several years in my career, I remember

21 making loans to the very same people that our

22 company makes loans to today, and their options

23 back in those days were they either couldn't buy a

24 house, so they were relegated to renting, or they

25 had to go to a hard money lender, and the hard

1    money lender was more interested in the value of
2    their home than they were in whether they could
3    make their payments or not, and they charged them
4    actually very low interest rates because they
5    assumed they weren't going to pay, but they
6    charged them a lot of money in points and fees, or
7    they went to the finance companies, and the
8    finances companies were at the time the better
9    option of all of that.
10         And for those same borrowers that we make
11   loans to today, in the nine percent-ish kind of
12   range, our loan programs at the time were 18
13   percent with ten points on a 15-year term with a
14   five year hard prepay.  There was no negotiating
15   anything; that was just what the deal was.
16         Now I was young, so you can't hold that
17   against me because I was like 19 years old.  But I
18   mean, I learned that you could do it a better way.
19   But the market actually did figure out that there
20   was a way to serve those consumers and serve them
21   with five, six, seven, eight percent rates as
22   opposed 18 or 19 percent rates, and there was a
23   way to do it for one or two points rather than ten
24   points.
25         The market does have a way over a long

1  period of time of solving some of the problems, so

2  I'm very optimistic of where we'll be five years

3  from now.  I'm not terribly excited about where we

4  are at the moment, but I'm very excited about what

5  the future looks like.

6          So there were some basic questions that I

7  think are relevant to this particular discussion,

8  and I'm going to focus on those, and then we'll

9  open it up for some broader questions.  And our

10  company happens to be a 15-year-old, monolined

11  subprime company.  That's all we've ever done, and

12  the company has optioned one mortgage.  And we

13  have gone through this last year or so as

14  everybody else has, and it's been a painful

15  process.  And a layered on top of that is the fact

16  that, almost one year ago -- November 6th, it

17  would be our first year anniversary -- we were put

18  up for sale by on our parent company which was H&R

19  Block.  And we have effectively been in escrow to

20  Service Capital Management since April, and a

21  deal -- I firmly believe a deal is going to close,

22  but we have not yet got to the point where the

23  deal is closing.

24          So the people in our company have had to

25  weather what it feels like to be up for sale with

1    sort of an unknown future in front of them for

2    quite some time now and trying to figure out

3    what's going on in the industry as they have

4    watched so many other companies in the industry

5    either go out of business or certainly pull back

6    from where they were.  They've watched some people

7    in the business who have pulled away from the

8    business in segments -- like they don't do

9    business with brokers anymore, but they will do it

10   on a retail basis.

11        It's been extremely painful, so volumes are

12   way off from where they were even a year ago for

13   all of us -- ours, certainly, by design for the

14   most part.  We've taken our volumes to extremely

15   low levels until we can get some certainty as to

16   what's going on in the marketplace.

17        So the topic of what's the future is

18   something that I happen to deal with virtually

19   every day when I go to work, for the people in our

20   own organization, and, to some degree, people

21   outside of our company that are trying to figure

22   out where does this all go, and do I have a

23   future?  Do I not?  Should I stay in this

24   industry, or should I not?

25        So the kind of questions that I get, will

1    the subprime business as we've known it over the

2    last 10 or 15 years, will that ever come back?  I

3    hear that one a lot.  What does a successful

4    subprime model of the future actually look like,

5    assuming for a moment that one agrees that there's

6    actually going to be a future, then what is that

7    business model?  What does someone either have to

8    do to change their current business to become, or

9    if they're thinking about entering the business

10   today, then what do they have to create in order

11   to make it work?

12         Are we going to be able to serve all of the

13   borrowers that we've been able to serve up to this

14   point, or are we only going to be able to serve a

15   subset of that group, and who gets left out?  Who

16   are we not going to be able to serve?  Who takes

17   care of those people?  What is FHA's role in the

18   process, which I think is a critical role in the

19   process.  I really liked his comments.  It's a

20   wonderful organization that I think can play an

21   extremely important part.  We all talked a little

22   bit about that more.

23         Another one that I get a lot is will the

24   private label market ever come back, or is our

25   business going forward for the next five or ten

1    years, are we really an agency or FHA?  Is that

2    really all we have?  I get that one a lot.  And

3    then will a monolined subprime company, can that

4    ever work?  If you think back over time, there

5    were a lot of us 15 years ago, 10 years, whatever,

6    a lot of us started these little companies, and

7    they got bigger than we ever thought they were

8    going to get.  Can that model ever work again?

9         So I'm going to try to tick some of these

10   off sort of one by one to at least what my

11   personal view of it is as someone who works in

12   this industry every day and take these opinions

13   for what they're worth, which is don't give it a

14   lot of value because this is just my personal view

15   of the world.

16        Will the subprime business as we've known

17   it the last 15 years come back?  I don't think so.

18   I really don't.  I don't think that the business

19   model that has worked for our company and for a

20   number of other very good companies that have been

21   in the marketplace, I don't think that model can

22   work the same way, and I think there's fundamental

23   things that have changed in the marketplace,

24   setting aside what's happening in the capital

25   markets right now.

1          But this market has been a relatively

2   immature market, the way that we have done this

3   business, but it has been going down the path of

4   commodernization (ph), in my opinion, for quite

5   some time, actually.  And as we go further down

6   that road, there were some things that were

7   eventually going to become important that just

8   weren't important before.

9          When we used to operate on a regular basis,

10  year in and year out, with net margins of 200 to

11  225 basis points, you could actually be off in

12  your assumptions by 25, 40 basis points, and at

13  the end of the year, you still had a good year, so

14  you didn't think about it very much.  You didn't

15  think like you would think if you were running a

16  large prime organization where the margins are, I

17  understand, to be much thinner than that.

18         But in today's world, our margins have been

19  very compressed.  We're operating under very thin

20  margins today.  A slight mistake in an assumption

21  of 15 or 20 basis points could make the real

22  difference of whether you can go on or not go on

23  as an organization.  We didn't use to talk about

24  cost ten years ago.  We knew the word, so it was a

25  line item on our financials, but we didn't pay

1   attention to them the same way that we pay
2   attention to them today.  So you have to be very,
3   very cost-oriented, and my personal view is that
4   if you cannot find yourself at the very low end on
5   the cost side of operating a business, you will
6   not be able to compete in what I think the
7   nonprime business is going to be as you go into
8   the future.

9          Are we going to be able to serve as many
10  borrowers as we had before?  I'm not sure that we
11  will be able to do that, frankly.  But I'm not so
12  sure that's a bad thing.  If there's a way that as
13  the market becomes more sophisticated, as we
14  become better at what we are doing -- because I
15  think we're all going to be better out of this,
16  those of us who stay in it are going to be better
17  operators than we were before -- if we can get
18  people into a lower cost FHA loan, that's a win,
19  and if they make it rather than us make it, I'm
20  okay with that.

21         If we can get more customers educated in
22  how they can get their credit scores handled the
23  right way so they can actually qualify for a prime
24  loan, I'm okay with that.  So I'm not sure that a
25  true subprime company is going to serve the same

1   market, but I think that that's probably an okay
2   thing.  I think that should actually be something
3   that we're all striving to get to.
4        Hopefully, subprime companies, subprime
5   servicers become that interim step, which is what
6   I really think they were intended to be for those
7   customers that had some sort of a life event, some
8   thing that they could not have predicted that they
9   could not have planned for, has them in a
10  situation where they no longer qualify for a prime
11  loan, or they're not able to get that first time
12  home purchase.
13       Companies like a subprime company have
14  served to fill that need.  FHA serves that need.
15  If we can do that and service people properly,
16  keep them in their homes to a point where they,
17  two years later, actually qualify for a prime
18  loan, we should help them get into a prime loan.
19  That should be part of our mission in life is to
20  help people get to that place.
21       I think FHA's role in this right now --
22  I'll get a little bit short term for a moment -- I
23  think over the next 12 months certainly, 24 months
24  and maybe 36 months, and I'm going to use this as
25  a phrase -- and I don't mean literally -- the

 1   subprime is FHA because there is no subprime

 2   market today.  There is no liquidity for that

 3   market anywhere today.  There's no private label

 4   market.  You cannot originate product and sell

 5   them for prices that are as low as you could fetch

 6   in the market today.  You can't have a viable

 7   business.

 8        So I think that is a direction that

 9   everybody's business should include is a very

10   robust FHA program with very good programs.  If

11   you need to get the education on that, which our

12   organization needs to get more educated on that,

13   the resources are available, and they can help you

14   get to that place where you can serve more of the

15   consumers that may fall outside of the GSE's

16   framework.

17        I do believe, though, because I'm an

18   optimist by nature, the prime label market will,

19   in fact, come back.  I'm completely confident in

20   that.  And I say that because the U.S. mortgage

21   market is so important to any portfolio, whether

22   you're a small investor or you're a European hedge

23   fund with many, many billions of dollars to

24   invest, you have to be invested in the United

25   States economy, and you have to be invested in the

1    U.S. mortgage market.  I firmly believe that.  It

2    is too sound an investment, and this country is

3    too strong, the economy is very good.  You just

4    have to be able to do that.

5        What has to happen before the capital

6    markets start coming back the way that they were

7    and investing the way that they were, in my

8    personal opinion, is that they have to gain

9    confidence -- which they don't have right now --

10   that if they're going to buy some amount of

11   mortgage-backed bonds that the way that those are

12   rated by the rating agencies, it's actually going

13   to be considered to be the same rating a year down

14   the road or two years down the road.

15       It causes problems for a large investor if

16   they're not quite sure if what they're buying is a

17   AAA or BBB.  They'll buy either one.  They just

18   have to know what it is going in so they can price

19   it right.  There's a market for it.  And there's

20   lots of liquidity sitting on the sidelines right

21   now.

22       So one of my goals is to find ways that we

23   can, as an organization -- but also I think MBA as

24   an organization -- can facilitate this process is

25   how do we help convince the investing side that

1    there has, in fact, been a substantive change in

2    the quality of the product being originated?  I

3    can just tell you if you were to look at the loans

4    that our company originates today and compare that

5    to what we were originating in the first quarter

6    of 2007, you will see a market difference in the

7    quality of that product.  For one, because we

8    tightened up the guidelines so tight that you

9    would almost call us a prime lender.  I don't want

10   to go that far because it would ruin my resume,

11   but you would almost think that we were.  It is a

12   very, very good product, and we are starting to

13   see 2007 loan performance start to level off and

14   get better.

15        So that initial spike up, which was from

16   earlier originations under different sets of

17   guidelines in the first quarter of 2007, that

18   stuff is starting to clean out.  So I'm very, very

19   convinced that that market is going to come back,

20   I firmly believe that the subprime market is going

21   to come back -- albeit looking a little different.

22        And to sort of wrap this up, if I was going

23   to give some advice to some people that are

24   thinking about expanding in the market or getting

25   into the market to remember some basic

1   fundamentals, and I think the whole panel has

2   talked about this, you've got to get back to

3   fundamentals.

4          One thing I would say is to never lose

5   sight of is, a quality is much more important than

6   quantity.  Doing it right is what matters.  Doing

7   it right from a process standpoint and doing

8   what's right for the consumer is what matters.

9   Doing a whole bunch of it is not what your report

10  card should be, so you have to go back to that.

11  And I think, going back to TransAmerica, we had

12  the four C's of credit, because we included the

13  customer was one of our C's, but it was capacity,

14  collateral and credit with customer, it's getting

15  back to that very fundamental way of looking at

16  credit and making your decisions based on as

17  opposed to, oh, well, there's someone that's

18  willing to buy a loan that looks like that so

19  let's make a whole bunch of it and try to make as

20  much money as we can.

21          I don't think that it's right for the

22  market to do that.  I don't think that it's right

23  for our industry to do that.  So focus on quality,

24  embrace change, and my last comment would be

25  remember patience is a virtue, so be prepared for

1    2009 as a recovery period and not 2008.

2              That's it.

3              MR. MASELLI:  Gentlemen, thank you

4    very much.  It's a lot to think about.  I want to

5    give the audience an opportunity to ask some

6    questions, and while you're working up your

7    gumption to actually ask a question, I've got one

8    for the panel.

9         All of you mentioned in one form or another

10   the importance in the private label market, at

11   least, of the rating agencies being able to be

12   depended on for their ratings.  When either any of

13   you care to take a stab at what they'll have to do

14   in order to gain investor confidence back again, I

15   mean, what kind -- is it an underwriting issue?

16   Is it that we've got to convince people that the

17   loans that are being originated are well -- are

18   underwritten well, or is it just something that

19   the rating agencies may have to change with their

20   guaranties or with their transparency, or is it

21   all of the above?  Anybody want take a stab?

22   Steve.

23             MR. NEIDEN:  I'll take the first cut

24   at that.  One suggestion I would make if I had a

25   room full of people from the rating agencies in

1   front of me, I would say that when you come in to
2   do a servicer rating, because servicing companies
3   have to be rated and our servicing business has to
4   be rated, they do a fair amount of due diligence
5   in that process, and they spend a good deal of
6   time in our offices.  They meet with management,
7   they talk about how the process is, and they look
8   at all kinds of information.

9          I would encourage them to actually come out
10  much more often than they do to the originators'
11  side of the business and sit down and talk to the
12  people that are making the loans to look at the
13  data that's being done today versus what was done
14  a year ago.  Looking at real loan performance
15  data, but in the context of all the changes that
16  have been made and invest the time in doing that.

17         I can't tell you the last time that I had a
18  conversation in our shop with someone from the
19  rating agencies where they came to our offices and
20  talked about the origination side of the business.
21  So that educational process and -- I think they do
22  a very good job, by the way, but I think they need
23  to take one more step up in their understanding of
24  the product.

25                MR. MASELLI:  Mike or Tom, do you

```
 1   want to add on?
 2             MR. CRONIN:  Only to the extent that
 3   there is a loud, almost shrill cry from the
 4   investment community, and I'll frame it by saying
 5   that my group for the last two months kind of went
 6   off our normal course, and we did nothing but
 7   visit with hedge funds and investors in MBS.  It
 8   was sort of back to our roots, if you understand
 9   our company, which I'm not going to get into right
10   now.  But 11 years ago we were founded, the
11   surveillance side at least, to protect the
12   interest of investors.
13        So we went back to that, and we wanted to
14   hear what people had to say.  And as recently as a
15   week ago, one of the rating agencies stepped out
16   and pretty much said that part of their job
17   perspectively was going to be to provide greater
18   transparency.
19             So to your point, Kurt, and in
20   support of what Steve said, you know, there's
21   going to be more transparency around, I believe,
22   around how loans are originated, what the loans
23   look like that are in those pools, and they're
24   going to provide access, I believe, to data going
25   forward, so that the investor won't have this
```

1    argument -- I didn't know.  You didn't tell me.  I
2    mean it's going to be laid out more clearly, I
3    believe, than the prosubs.
4         And on the back end to the extent that
5    there is an industry that provides surveillance
6    and makes those reports available, we're hearing
7    from the domestic and international community that
8    that's a must as well.  They don't want to know
9    just what happened when the loan was originated.
10   They want to follow it through its life.  They
11   want to know how it's being serviced.  So I would
12   say, overall, there's going to be a lot more of
13   that.
14             UNIDENTIFIED SPEAKER:  Kurt, one
15   other thing, some of the larger CDO's now are
16   actually starting to develop their own ratings for
17   the investors rather than the rating agencies to
18   create another method for the investors to make
19   decisions on the transactions.
20             MR. MASELLI:  I've got a question
21   right back here, and then we'll go to the
22   gentleman on the left.
23             UNIDENTIFIED SPEAKER:  I don't want
24   to beat up on the Wall Street Journal, but I don't
25   think they're entirely accurate in some of their

 1   statements.

 2        For one, we are not going to require

 3   appropriation.  Not to get too technical, but

 4   because of the lot of seller-funded gift

 5   downpayment programs are becoming such a large

 6   part of our portfolio, and the fact that they were

 7   almost two and a half times more likely to fail,

 8   we just couldn't sustain that.  And as you know,

 9   we've moved toward banning that type of

10   assistance.

11        That was driving us toward a positive

12   credit subsidy which, as we know in government

13   parliaments, positive credit subsidy is bad.  You

14   want negative credit subsidy.

15             MR. FAUHTENHEIMER:  Of course.

16             UNIDENTIFIED SPEAKER:  So doing that,

17   we have moved away toward that.  I want to be as

18   validated that we are no longer going to a

19   positive credit subsidy, so they are wrong in that

20   respect.  No, we don't need an appropriation.

21   Quite frankly, we're generating -- I won't say

22   record levels of budget offsets, but a good bit of

23   budget offset.

24             And the second part of that, sir, I'm

25   sorry?

1              (Inaudible.)

2              UNIDENTIFIED SPEAKER:  Let me just

3    say -- these are MBA numbers -- our foreclosure

4    rate actually dropped between the last two

5    reporting periods, albeit only about two- or

6    three-tenths of a percentage, but nonetheless, it

7    has dropped.  Our default rate stays about the

8    same year as of late.  I think the borrower has

9    traditionally come in out of default.  That's no

10   mystery, probably because of a change in job

11   status and some interest rate reset.

12        So anyway, we actually spent some time with

13   this editorial rider, and maybe too much time, and

14   he just got it wrong, to be blunt.

15             UNIDENTIFIED SPEAKER:  Yeah, I can

16   tell you that I've looked at those MBA numbers,

17   and while delinquencies generally at the FHA

18   generally track those subprime, roughly the

19   foreclosures are lower, and I think that's a

20   credit to your loss mitigation efforts.

21        We've got a question right over here on

22   that.

23             UNIDENTIFIED SPEAKER:  Yeah, the cost

24   origination is an interesting one for our business

25   because it's hard to get good comparative data as

1    to where everyone else is.  There's a couple of

2    surveys that try to capture the data, but not

3    everyone reports their cost data the same.

4         So like when our cost origination, we

5    include everything.  So anything that is spent for

6    anything is covered in our cost origination.  Some

7    companies exclude their incentive compensation or

8    things like, that so it's hard to get a good

9    accurate number.

10        I can tell you that we were working very,

11   very hard going through 2006 to get ourselves down

12   to about 125 basis point all in cost origination.

13        Now that was last year, 2006.  The market

14   has changed dramatically, and so I'm not sure that

15   I could peg that number on our organization,

16   certainly, right now.  But I do believe long-term

17   that companies have to get down to that 100, 120

18   basis point all in cost.  And it would include, if

19   I got some of your question correctly, on the

20   EPD's, that would include whatever your loss

21   reserves have to be for buybacks and things like

22   that related to the loan.  It would not include

23   anything related to your servicing up side.

24             UNIDENTIFIED SPEAKER:  Tom?

25             MR. CRONIN:  Just an interesting, in

 1   support of something Steve said earlier, he was

 2   out there 15 years ago and margins were two, two

 3   and a quarter, and they're not that anymore, and

 4   that tends to be the nature of markets.  But I

 5   think there's also a history lesson here.  If we

 6   had all evening, we could talk about liquidity and

 7   what happened to the hedge funds and how leverage

 8   affected the bid today, and some of the spill-over

 9   factors that aren't directly related to the

10   subprime factor itself.

11        But if you were to look at, and I'll tell

12   you, as simple as this, go inside BNC Lending and

13   look at their annual change from 1996 through 2006

14   in the lead tables as to who migrated into the

15   industry, and you link it with the plateauing or

16   the trough in interest rates, and where the cities

17   and the wealth and the wamus (ph) decided to come

18   to get margin, it's an interesting story.

19        And sometimes we can take efficiency to a

20   point that it doesn't serve the rest of the

21   industry, and it doesn't end up serving anybody in

22   the channel.  You still have to be able to make

23   money to reserve for performance issues and loss

24   issues and the like, but it's an interesting study

25   just to go back and look at it to see who's in the

1    lead tables today versus (inaudible).

2                   UNIDENTIFIED SPEAKER:  I think each

3    state has their own regulations.  California is a

4    single action rule state, so you have a single

5    action.  If it's a purchase transaction, you can

6    only go after and foreclose on the property and

7    can't go against the consumer.  If they've

8    refinanced the purchase money note, then the

9    mortgage servicer has the choice to either

10   foreclose on the property or sue the borrower

11   personally in California.  Each state has their

12   own specific rules to comply with, whether you go

13   after the buyer personally or you go after -- some

14   states you can foreclose on the property and then

15   sue the consumer for the deficiency balance, so it

16   just depends on what the state law is.

17                   MR. MASELLI:  Any other questions?

18                   UNIDENTIFIED SPEAKER:  I've got one

19   for the panel before we would close out here,

20   guys.

21        You know, it sounds like you all believe in

22   the free market, and that market, Steve, if only

23   over time will correct, why did it take a couple

24   of years for the pricing signals to get sent back

25   and for the market to start to get the information

1    that it needed, that risk was, in fact, mispriced

2    for a while and --

3                    MR. NEIDEN:  It wasn't only

4    mispriced.  Everybody -- if you look, one of the

5    things you have to realize, a third of the

6    foreclosures and the issues we're dealing with are

7    the investors that were out there trying to flip

8    properties.  They were coming in trying to make

9    the quick buck, so that's one-third of the issue

10   that we're dealing with.

11        The other is everybody was in the euphoria

12   of property values are going up, we've got our

13   loan, we're going to refinance it in two years,

14   we've done it for the last ten years that way, and

15   you know what?  It stopped working.  And we got

16   away from the balance credit decisions, so you're

17   making a 100 percent loan to the guy that doesn't

18   have the, you know, everybody made $10,000 a month

19   stated income -- everybody -- and they all got 100

20   percent financing.  So those dynamics just don't

21   continue to work, so it just forced everything

22   through faster.

23                    UNIDENTIFIED SPEAKER:  The only thing

24   that I would add to that is, I think that this may

25   be an indictment on those of us who work in the

 1   industry, I think that we recognized in 2005 that
 2   there was a mismatch between where the loans are
 3   being priced and what the risk was, and you could
 4   see that evidence against itself as you watch the
 5   changes in margin as you went through the summer
 6   of 2005 and into the fall of 2005.  And I know
 7   that's when our company started doing significant
 8   rate increases, frankly, that put us at a real
 9   cost disadvantage.  I've got a couple of people in
10   the sales in the room right now, as a matter of
11   fact, and they felt the pain of that.  But we had
12   raised rates because we were not priced properly,
13   and there was a marketplace mentality through
14   the -- in the mid-part of 2005 that I think
15   carried into 2006 where we had irrational pricing,
16   and some of it was caused by people sitting in
17   their conference room when they're making their
18   making their pricing decisions saying, well, we
19   really need to raise rates 40 or 50 basis points.
20   And then they would, before making a decision ask,
21   well, what do you want X, Y and Z is going to do?
22   And if we do that and nobody else does, what does
23   that do to our volume?
24        And for a long time, to our own discredit,
25   many of us in the industry said, well, I'll tell

1    you what, we can't put ourselves at that much of a
2    price disadvantage if we raise the rates as much
3    as we really need to, and it took time before we
4    all started to step up as a group and started
5    raising rates.  And by the time we started doing
6    it as a group, it had gone too far to the other
7    side, and you couldn't raise rates fast enough to
8    make up for the damage that was being done in your
9    organization.

10                   MR. NEIDEN:  One other thing to
11   remember, increased rate does not reduce the risk
12   no matter what the rate is if they're not going to
13   pay and there's no equity in the property, you
14   still lose money.  Okay.

15                   UNIDENTIFIED SPEAKER:  So the last
16   word is this:  Some things are just not worth
17   doing at any price, and I believe if you look back
18   in your childhood, someone told you that along the
19   way.  Yeah.

20        I appreciate your being here today, I
21   appreciate your attention.  I will tell you as a
22   Government Affair Specialist that the hardest
23   thing about predicting your future is going to be
24   what Congress reacts to this market and to these
25   market events.  Because as we speak, they are

1    rewriting the laws that will rewrite business

2    models that will determine the options available

3    to borrowers and to business people in this market

4    in the future.

5                  Good luck, and have a great

6    convention.

7                  (End of meeting.)

8                         *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3    STATE OF NEW YORK  )

 4    COUNTY OF ROCKLAND  )ss:

 5

 6

 7

 8    I, Kathy Mannon, certify that the foregoing

 9    transcript of the proceedings, was prepared

10    using digital transcription equipment and is a

11    true and accurate record of the proceedings.

12

13

14

15

16                         Kathy Mannon for

17                         Sally Mann

18                         SANDY SAUNDERS REPORTING

19

20                         254 South Main St., 2nd Floor

21

22                         New City, New York  10956

23

24

25
```

**A**

AAA 23:5,5 46:17
AAA's 22:10
abandon 22:13
ability 31:18
able 24:25 27:4,6,22
  29:10,24 32:21 33:6,9
  40:12,13,14,16 43:6,9
  43:11 44:11 46:4
  49:11 56:22
about 4:11,12,25 9:8
  10:12 11:5,14 12:3,13
  13:7,21,22 14:22,22
  17:5,17,19 18:25 19:1
  20:10 22:2,17 23:7
  26:4,6 28:12,15 30:11
  30:21 31:19,23 33:21
  35:6,21 36:9 38:3,4
  40:9,22 42:14,23
  47:24 48:2 49:4 50:7
  50:20 54:5,7 55:12
  56:6 60:23
above 49:21
abroad 4:9
absolutely 33:14
accept 32:23
access 4:14 7:15 25:15
  32:10,18 33:3 51:24
According 12:12
accurate 23:6 52:25
  55:9 62:11
achieved 7:22 12:22
Act 31:6
action 31:8 57:4,5
activity 16:11
actually 13:20 35:20
  37:4,19 40:4,6 42:5
  42:11 43:23 44:2,17
  46:12 49:7 50:9
  52:16 54:4,12
add 51:1 58:24
addition 29:16
additional 33:10
address 2:16 9:23
addressed 16:22
adjustable 12:21,23
  13:3
Administration 27:24
administration's 7:14
adopters 14:24
advice 47:23
advised 3:3
Advisors 5:20
Affair 60:22
affairs 2:20,25 3:8 8:21
affect 17:24
affected 56:8
afford 10:10
affordable 7:15,22 9:7
  16:16
after 17:10 21:7 57:6

**B**

afternoon 2:1 9:17 26:2
again 13:23 14:6 19:17
  21:16 41:8 49:14
against 37:17 57:7 59:4
agencies 15:1 18:5
  22:10 23:4,25 46:12
  49:11,19,25 50:19
  51:15 52:17
agency 41:1
aggressive 12:7
ago 12:42 17:17 18:12
  34:24 35:9 38:16
  39:12 41:5 42:24
  50:14 51:10,15 56:2
agrees 40:5
ahead 19:25 36:14
airplanes 13:8
albeit 47:21 54:5
alike 27:19
allow 13:13
allowed 17:10
allowing 13:12
almost 13:1 35:17
  38:16 47:9,11 51:3
  53:7
along 14:5 30:16 60:18
already 21:2 29:1
  33:16
Alt 6:1 19:10,13 20:3,4
  20:8,11,18
always 16:2 34:24
amaze 9:15
America 2:3,4
American 26:7 31:5
among 27:24
amount 34:12 46:10
  50:4
analysis 9:25
analytics 15:15 18:18
  18:21
analyze 18:4
and/or 34:5
Angeles 6:5
anniversary 38:17
announcement 29:20
  30:19
annual 56:13
another 7:20 8:9,13
  20:13 29:16 36:4
  40:23 49:9 52:18
answer 4:21
anybody 49:21 56:21
anymore 39:9 56:3
anything 22:6 37:15
  55:5,6,23
anyway 54:12
anywhere 45:3
apparent 28:6
apparently 4:1
appear 31:1

applying 19:1 27:6
appreciate 60:20,21
appreciation 11:22
apprehensive 30:7
approach 15:19 34:6
appropriate 32:16
  33:16
appropriation 53:3,20
approximately 29:15
April 7:11 19:8 38:20
area 7:5
areas 3:4 5:10
argument 52:1
arm 20:23
arms 20:24
around 10:3 14:2 17:1
  26:23 51:21,22
articulate 9:8
aside 41:24
asked 4:18 15:18 35:11
asset 13:13
assignments 3:5
assist 29:24 32:3
assistance 53:10
Assistant 6:24 7:10
assisted 30:24
associated 27:15
Association 2:21 6:5,6
assumed 37:5
assuming 40:5
assumption 42:20
assumptions 15:14,15
  15:23 21:11 42:12
atomic 26:15
atoms 27:3
attempted 26:24
attention 3:24 43:1,2
  60:21
Attorney 15:3
attract 3:24
audience 49:5
August 14:10
available 12:8 31:20
  45:13 52:6 61:2
avoid 30:25
aware 10:2
away 4:17 18:16 23:22
  39:7 53:17 58:16

**B**

B 16:23 24:24
Baccus 31:4
back 3:21 16:13 17:20
  18:11,22 21:22 23:2,3
  23:14,18 24:7,11,12
  25:9 35:21 36:20,23
  39:5 40:2,24 41:4,17
  45:19 46:6 47:19,21
  48:2,10,11,15 49:14
  51:8,13 52:4,21 56:25
  57:24 60:17

bad 17:3 20:6 43:12
  53:13
balance 27:2 57:15
  58:16
balloon 34:5
bank 5:21 36:4
banker 5:2 23:24,24
Bankers 2:20 6:5
banking 8:10 31:9
banks 22:24
banning 53:9
bar 9:19 13:19
Barney 22:21
based 31:17 48:16
basic 38:6 47:25
basics 23:3,15,18 25:10
basis 13:25 16:3 39:10
  42:9,11,12,21 55:12
  55:18 59:19
bite 17:2
bled 20:17
Block 8:25 38:19
Block's 8:23
blunt 54:14
BNC 56:12
Board 5:4,7 8:11 17:17
body 5:8
bonds 46:11
book 8:14,15,22
boom 28:8
boost 7:14
borrow 28:1
borrower 16:4 54:8
  57:10
borrowers 4:14 12:9
  16:2 17:12 22:7
  28:17,20 29:10,12,15
  29:17,22 30:1,9,10,12
  32:4,7,10,11,12,14,15
  32:17,18,22,23,25
  33:2,10 37:10 40:13
  43:10 61:3
borrower's 31:18
Boston 9:17
both 7:16
bottom 25:12
break 10:23
Brian 6:21
brief 28:10
bring 6:21 17:20
broader 38:9
broker 23:23 24:22
brokers 16:2 27:18
  39:9
buck 58:9
budget 53:22,23
bums 10:8
bunch 10:8 48:9,19
business 2:2 18:14 22:1
  24:3,21 25:17 29:2,5
  35:23 39:5,7,8,9 40:1
  40:7,8,9,25 41:16,18
  42:3 43:5,7 45:7,9
  50:3,11,20 54:24 61:1

beyond 10:6
bid 56:8
big 22:19
bigger 10:18 41:7
Biggert 31:5
bill 7:19 16:8,22 30:23
  31:7,11
billion 7:3 12:12
billions 45:23
bills 17:22
bit 11:14,25 12:1 15:6
  19:9 20:5 21:22
  30:21 31:23 33:21
  36:14 40:22 44:22
  53:22
bite 17:2
bled 20:17

beginning 21:22
behind 26:24 28:25
  31:2
being 2:9 9:14 15:16
  16:11 21:8 26:14
  29:9 32:13 47:2
  49:11,17 50:13 52:11
  59:3 60:8,20
believer 36:8
below 19:6
Beneficial 6:8
benefit 32:20,25 33:5
benefiting 5:15
best 3:18 34:9 36:13
bet 22:25
better 9:17 11:13 18:14
  18:24 19:9 29:4
  32:12 33:7 36:7 37:8
  37:18 43:14,15,16
  47:14
between 20:25 24:16

became 16:10
become 10:5 26:16 32:2
  40:8 42:7 43:14 44:5
becomes 43:13
becoming 29:11 53:5
before 2:12 3:9 8:24
  15:2 16:21 42:8
  43:10,17 46:5 57:19
  59:20 60:3
began 6:8 13:22 14:1
begin 26:2 34:16

Batting 8:8
BBB 46:17
BBB's 22:11
Bear 30:16
beat 52:24

26:1 27:2 54:4 59:2

61:3
**businesses** 9:1
**buy** 16:18 33:10 36:23
  46:10,17 48:18
**buybacks** 55:21
**buyer** 57:13
**buyers** 16:22
**buying** 14:16 18:8
  46:16

**C**

**California** 6:4 57:3,11
**call** 18:11 47:9
**called** 27:9
**calling** 28:24
**calls** 22:14
**came** 4:2 7:8 16:12
  24:21 50:19
**cap** 18:3,4 31:22
**capacity** 7:2 21:24 22:5
  48:13
**capital** 6:19 25:7 38:20
  41:24 46:5
**capture** 55:2
**card** 32:22 48:10
**care** 24:24 40:17 49:13
**career** 6:8 36:1,20
**carried** 59:15
**cash** 22:8
**catch** 14:23
**category** 19:15
**caused** 26:18 27:16
  59:16
**causes** 26:15 46:15
**CDO** 16:22 17:1
**CDO's** 52:15
**ceases** 9:15
**center** 4:5 8:3
**central** 10:10
**cents** 22:10,12
**CEO** 6:7,18
**Certain** 26:16
**certainly** 4:4 21:17
  33:19 39:5,13 44:23
  55:16
**certainty** 39:15
**certified** 5:2
**certify** 62:8
**chaired** 8:2
**Chairman** 5:21 9:6
  31:3
**challenge** 20:19
**challenges** 19:16
**challenging** 9:20
**change** 8:13 19:7,21
  34:11 40:8 47:1
  48:24 49:19 54:10
  56:13
**changed** 11:21 41:23
  55:14
**changes** 33:13,16 34:12

50:15 59:5
**changing** 2:14
**channel** 56:22
**chaos** 26:21
**charge** 32:13
**charged** 37:3,6
**charges** 34:6,10,14,14
**chart** 12:2,19 20:13
**Chase** 30:4
**Chief** 3:2,9 10:1
**childhood** 60:18
**choice** 57:9
**cities** 56:16
**City** 6:12 30:4 62:22
**clarifications** 33:17
**Clayton** 5:9,11,18
**clean** 8:8 47:18
**clear** 9:7 10:17 11:4
  30:14
**clearly** 2:15 18:7 28:20
  52:2
**climate** 4:10
**close** 32:2 38:21 57:19
**closing** 38:23
**closings** 22:14
**Coalition** 9:6
**Coalitions** 9:4
**cognizant** 23:11
**cohabitate** 27:4
**cold** 35:18
**collateral** 21:24 48:14
**Colony** 6:10
**come** 3:23 11:22 17:2
  23:12 24:10,12 28:9
  40:2,24 41:17 45:19
  47:19,21 50:1,9 54:9
  56:17
**comes** 14:18,19
**comfortably** 27:4
**coming** 14:20 18:7
  22:20,22 23:1,2 25:2
  35:9 46:6 58:8
**commensurate** 32:16
**comment** 48:24
**comments** 33:20 40:19
**Commissioner** 6:21,23
  7:1,8,25 25:20
**Commissioner's** 7:18
**committee** 3:5 6:1 9:5
  31:9
**committees** 34:17
**commodernization**
  42:4
**common** 21:23 23:15
**communications** 3:4
**community** 7:7 9:4
  51:4 52:7
**companies** 22:15 36:7
  37:7,8 39:4 41:6,20
  44:4,13 50:2 55:7,17
**company** 5:20 6:13

24:20 33:7 36:22
  38:10,11,12,18,24
  39:21 41:3,19 43:25
  44:13 47:4 51:9 59:7
**comparative** 54:25
**compare** 47:4
**comparison** 34:13
**compartmentalize**
  13:24
**compensation** 55:7
**compete** 43:6
**complacent** 15:12
**completely** 45:19
**complex** 10:5 27:7,22
  27:25
**complexity** 26:17
**compliance** 25:1
**comply** 57:12
**composition** 12:16,22
**compressed** 42:19
**computer** 25:22
**concept** 24:18
**concern** 30:11
**concerned** 10:7 22:23
  23:7 24:5
**concerns** 33:14
**conclusion** 20:22
**concur** 17:15
**conference** 16:24 59:17
**confidence** 46:9 49:14
**confident** 45:19
**confidential** 34:16
**confirmation** 7:17
**Congress** 4:5 15:2
  60:24
**Congressional** 34:17
**Congressman** 31:4
**Congresswoman** 31:3,4
**considered** 46:13
**consultations** 34:16
**consumer** 8:23 48:8
  57:7,15
**consumers** 34:8 37:20
  45:15
**context** 50:15
**continue** 4:13 58:21
**continued** 12:6
**continuously** 26:14
**contributed** 2:11 7:12
  15:8
**control** 16:20 34:24
  35:1
**convened** 17:18
**convention** 1:12 3:18
  3:23 61:6
**conventional** 29:7
**conversation** 3:20
  50:18
**conversations** 33:15
**convince** 23:5 46:25
  49:16

**convinced** 47:19
**COO** 8:17,25
**coordinate** 8:4
**core** 35:22
**Corp** 5:22
**corporate** 5:11
**Corporation** 8:17
**correct** 11:2 57:23
**correctly** 55:19
**cost** 42:24 43:5,18
  54:23 55:3,4,6,12,18
  59:9
**cost-oriented** 43:3
**counsel** 6:2 8:12
**countless** 30:24
**country** 10:17 11:7
  46:2
**Countrywide** 30:3
**County** 6:5 62:4
**couple** 11:24 36:9 55:1
  57:23 59:9
**course** 29:18 30:12
  33:6 51:6 53:15
**covered** 55:6
**Cow** 20:4
**co-founder** 6:18
**co-mingled** 30:9
**create** 27:22 40:10
  52:18
**created** 13:2 26:20
**creates** 24:3
**creation** 7:19
**creative** 12:6 17:8
  16:25 17:10 21:24
  22:5 23:17 25:15
  28:8 32:5,11,19 43:22
  48:12,14,16 53:12,13
  53:14,19 54:20 58:16
**crisis** 8:6 11:17 14:24
**critical** 4:4 34:22 40:18
**Cronin** 4:24 5:21 9:13
  51:2 55:25
**crowd** 9:16 35:17
**crunch** 2:10 28:8
**cry** 51:3
**Culver** 6:12
**cure** 15:20
**curious** 26:25
**current** 4:10 8:22
  27:13 40:8
**currently** 5:6 6:7 23:21
**curve** 19:25
**customer** 22:7 23:23
  24:14,16,22 48:13,14
**customers** 43:21 44:7
**cut** 32:21 49:23
**cycles** 4:11
**C's** 23:15 48:12,13

**D**

**Dallas** 16:8,22
**damage** 60:8
**data** 50:13,15 51:24
  54:25 55:2,3
**day** 3:17 4:8 10:22 12:5
  17:2 34:20 35:10,13
  39:19 41:12
**days** 20:14 21:2,6,9
  26:9 36:23
**deal** 24:25 35:20 37:15
  38:21,21,23 39:18
  50:5
**dealers** 5:15
**dealing** 58:6,10
**dealt** 21:23
**debt** 10:17
**December** 1:13 14:10
  16:7
**decided** 56:17
**decision** 59:20
**decisions** 48:16 52:19
  58:16 59:18
**decline** 11:23 20:8
**declining** 13:4,14
**default** 54:7,9
**defaults** 19:18 20:6,12
**deficiency** 57:15
**define** 12:13 18:5
**defined** 17:23 18:9
  19:15
**definitely** 29:13
**definitions** 18:6
**degree** 39:20
**degrees** 24:1
**delinquencies** 14:1
  54:17
**delinquency** 13:17
**delinquent** 11:9,10
  20:14 21:3,6,9 28:18
  29:11,12,15 30:1,9,12
**delinquents** 19:24
**demand** 4:16,19 6:22
**demonstrates** 20:10
**denied** 32:13
**Denny** 3:9
**Department** 6:24 7:10
**depended** 49:12
**depends** 57:16
**design** 39:13
**designed** 7:19
**determine** 61:2
**develop** 52:16
**developed** 20:20
**development** 5:11,12
  6:25
**developments** 2:24
**diagnostic** 15:19,22
**dialogue** 9:19
**difference** 42:22 47:6
**different** 15:17 19:14
  19:15 21:11,16 23:21

31:25 47:16,21
**differently** 19:2
**difficult** 24:9 33:18
**digital** 62:10
**diligence** 50:4
**diminish** 11:10
**Direct** 6:19
**direction** 45:8
**directly** 56:9
**Director** 5:9
**Directors** 5:4 8:11
**disadvantage** 59:9 60:2
**disaster** 8:2
**disclosure** 33:25
**disconnect** 24:3
**disconnected** 16:5
   17:13
**discover** 26:24
**discovered** 26:14 27:1
**discredit** 59:24
**discussion** 9:24 10:5
   11:11,13 12:3 17:25
   38:7
**displaced** 8:5
**distance** 16:4 17:12
**distinguished** 2:16 3:15
**documented** 27:12
**doing** 12:8,9 14:21 22:3
   28:13 36:2 43:14
   48:6,6,7,9 50:16
   53:16 59:7 60:5,17
**dollar** 22:11,12
**dollars** 45:23
**domestic** 10:15 52:7
**done** 19:14 29:18 35:8
   38:11 42:2 50:13,13
   58:14 60:8
**Donkin** 9:25
**Doug** 9:25
**Doug's** 10:25
**down** 10:23 13:23
   14:10 15:5 19:10,15
   22:11 23:1 42:3,5
   46:13,14 50:11 55:11
   55:17
**downpayment** 31:16
   53:5
**Dr** 26:7,11 27:9,21 28:2
   34:23
**draft** 33:22
**dramatic** 10:12
**dramatically** 55:14
**draw** 3:25
**drawn** 26:1
**drivers** 10:2
**driving** 53:11
**dropped** 54:4,7
**due** 26:16 50:4
**during** 4:6 8:11 12:16
   12:19
**dynamics** 58:20

**E**
**each** 57:2,11
**earlier** 47:16 56:1
**early** 3:21 4:6 14:23
   19:18 20:6,12
**earn** 25:8
**easily** 33:2
**Economist** 10:1
**economy** 2:10 10:14
   25:17 45:25 46:3
**editorial** 54:13
**educated** 43:21 45:12
**education** 45:11
**educational** 50:21
**effectively** 38:19
**efficiency** 56:19
**effort** 19:3
**efforts** 2:23 7:14 9:3
   54:20
**eight** 37:21
**either** 36:23 39:5 40:7
   46:17 49:12 57:9
**election** 13:13
**element** 27:3,4
**elements** 26:13,16,21
   27:7,23
**eliminating** 31:21
**embrace** 48:24
**emergency** 17:19
**encourage** 50:9
**end** 13:22 35:10 42:13
   43:4 52:4 56:21 61:7
**ended** 23:9
**energy** 26:18
**enhance** 33:25
**enjoy** 35:13
**enough** 60:7
**Enron** 23:8
**ensued** 26:22
**entering** 40:9
**enterprise** 8:20
**entirely** 52:25
**entitled** 2:7
**environment** 24:11
   27:9,13,22,25 34:25
   35:1,3
**EPD's** 55:20
**equipment** 62:10
**equity** 23:17 60:13
**escrow** 38:19
**essential** 25:16
**establishing** 31:17
**estimate** 33:8,24
**estimated** 34:6,13
**euphoria** 58:11
**European** 45:22
**even** 10:21,23 11:8,19
   16:7 20:10 29:21
   39:12
**evening** 56:6
**event** 44:7

**events** 60:25
**eventually** 42:7
**ever** 2:12 10:19 38:11
   40:2,24 41:4,7,8
**every** 4:8,9 14:18 20:5
   39:19 41:12
**everybody** 17:21 22:2
   38:14 58:4,11,18,19
**everybody's** 45:9
**everyone** 35:12 55:1,3
   55:5 58:21
**everything** 14:11 35:15
   55:5 58:21
**evidence** 59:4
**exampled** 36:13
**excited** 38:3,4
**exclude** 55:7
**executive** 6:1,14 7:9
**exist** 27:19
**exists** 26:14
**expand** 32:9
**expanded** 28:23
**expanding** 31:5 47:24
**expect** 34:15
**expecting** 21:16
**experience** 5:17,25
   21:3
**experienced** 24:8
**experiencing** 27:13
**expire** 26:19
**explaining** 28:11
**expressed** 30:10
**extensive** 8:1
**extent** 51:2 52:4
**extinguished** 3:16
**extremely** 39:11,14
   40:21
**extremes** 23:11
**eyesight** 9:8

**F**
**facilitate** 34:13 46:24
**fact** 28:10,20 33:8
   38:15 45:19 47:1
   53:6 58:1 59:11
**factor** 56:10
**factors** 56:9
**fail** 53:7
**fair** 9:7 50:4
**fairer** 33:3
**faith** 33:24
**fake** 11:25
**fall** 45:15 59:6
**fallen** 28:25
**falling** 14:23
**families** 28:24 29:25
   33:1
**far** 10:7 23:22 47:10
   60:6
**Fargo** 30:3
**fascinated** 35:19
**fast** 23:1 60:7

**faster** 58:22
**Fauhtenheimer** 2:17
   3:6,13 53:15
**favorite** 11:1
**favors** 12:10
**federal** 7:1 22:25 25:2
   27:23
**fee** 32:15
**feels** 38:25
**fees** 37:6
**fellow** 25:24
**felt** 21:23 59:11
**fetch** 45:5
**few** 35:8
**fewer** 32:23
**FHA** 6:21 7:3,20 22:17
   28:2,4,6,11,15,16,22
   28:24 29:6,7,13,20
   30:1,11,19,22 31:15
   31:22 32:10,14 33:1,5
   34:20 41:1 43:18
   44:14 45:1,10 54:17
**FHA's** 28:23 40:17
   44:21
**figure** 37:19 39:2,21
**figures** 29:9
**fill** 44:14
**final** 34:14
**finally** 33:25 33:21
**finance** 6:9 9:5 10:20
   18:2 24:19 25:6 36:7
   37:7
**finances** 37:8
**Financial** 6:7,10,17
   8:23
**financials** 42:25
**financing** 16:17 17:8
   25:11 32:10 33:4
   58:20
**find** 4:13 16:1 43:4
   46:22
**finding** 20:12 36:2
**firm** 18:19
**firmly** 38:21 46:1 47:20
**firms** 30:16
**first** 6:10 8:16 9:12
   11:24 12:19 16:9
   17:7 19:19 20:5
   28:15 38:17 44:11
   47:5,17 49:23
**fitting** 26:9
**fittingly** 27:9
**five** 3:3,7 22:1 24:8
   35:12 36:19 37:14,21
   38:2 40:25
**fixed** 10:9
**flexible** 7:24
**flight** 22:16
**flip** 58:7
**Floor** 62:20
**flows** 22:9

**focus** 38:8 48:23
**focused** 5:12
**focusing** 5:14
**follow** 21:20 52:10
**Following** 5:23
**force** 27:10,24
**forced** 58:21
**foreclose** 57:6,10,14
**foreclosure** 14:4,5 54:3
**foreclosures** 54:19 58:6
**foregoing** 62:8
**forensic** 15:21
**forgetting** 13:5
**form** 17:7 49:9
**formed** 6:2
**formulation** 2:24
**Forty** 20:24
**forward** 9:25 15:16
   33:13 40:25 51:25
**founded** 6:10 51:10
**founder** 16:8
**four** 19:19 21:7 48:12
**fourth** 11:21 20:1
**frame** 9:24 51:4
**framework** 45:16
**Frank** 31:3
**Franklin** 16:9
**frankly** 29:5 43:11
   53:21 59:8
**Frank's** 22:21
**free** 10:17 11:4 57:22
**frequently** 4:6
**friend** 4:23 6:20 9:25
**friends** 16:8
**from** 7:8,10 9:22 12:3,3
   13:21 14:10 16:4
   17:12 19:12,24 21:3
   22:12 23:22 24:14,14
   24:24 28:1 30:6,18
   31:20 35:6 38:3 39:6
   39:7,12 47:15 48:7
   49:25 50:18 51:3
   52:7 56:13 58:16
**front** 4:8 39:1 50:1
**fulfillment** 8:20
**full** 17:9 31:11 35:25
   49:25
**fund** 21:25 45:23
**fundamental** 41:22
   48:15
**fundamentals** 48:1,3
**funds** 14:15,19 25:7
   51:7 56:7
**further** 10:24 42:5
**future** 2:8 21:21 23:3
   24:19 25:14,18 35:23
   38:5 39:1,17,23 40:4
   40:6 43:8 60:23 61:4
**FY** 33:10
**FYCO** 17:6
**FYCOS** 19:6,11

**G**

gain 46:8 49:14
General 15:3
generally 54:17,18
generating 53:21
genesis 24:20
gentleman 52:22
gentlemen 15:19 49:3
gets 17:15 24:22 40:15
getting 20:2 24:7 47:24
  48:14
GFE 34:14
gift 53:4
give 15:17 41:13 47:23
  49:5
given 27:3 28:19 34:20
giving 16:18
Glen 26:7
global 2:10
go 3:17 6:20 9:22 11:23
  12:2 19:10,16 21:21
  22:16 23:10 36:20,25
  39:5,19,22 42:5,22,22
  43:7 47:10 48:10
  52:21 56:12,25 57:6,7
  57:12,13
goals 46:22
goes 6:25 35:21
going 3:19 4:17,17,23
  4:24 5:1 6:20 13:22
  14:2 15:4,6,16,16,20
  17:2,3 18:1,4 20:3
  21:15 22:18,19 23:4
  23:19,20 24:6,9,12,19
  24:25 25:3 26:6
  34:19 35:16 37:5
  38:8,21 39:3,16 40:6
  40:12,14,16,25 41:8,9
  42:3,7 43:7,9,15,16
  43:25 44:24 46:10,12
  46:18 47:19,20,22
  48:11 51:9,17,21,24
  51:24 52:2,12 53:2,18
  55:11 58:12,13 59:21
  60:12,23
gone 22:12 35:13 38:13
  60:6
good 2:1 13:20 15:13
  18:23 21:17 30:18
  31:12 33:24 35:20
  41:20 42:13 45:10
  46:3 47:12 50:5,22
  53:22 54:25 55:8
  61:5
Gordon 3:2
gotten 18:24 31:24
government 2:20,25
  8:21 22:25 25:21
  29:23 53:12 60:22
governments 5:3
Governors 5:7 17:18

graph 20:10
grasp 10:6
grateful 9:9
great 61:5
greater 24:15 51:17
greetings 25:24
grew 16:4
gross 10:14
group 6:7,11,19 8:24
  40:15 51:5 60:4,6
grow 29:14
GSC 18:3
GSE's 7:6,16 45:15
guaranties 31:11 49:20
guess 9:18
guidelines 47:8,17
gumption 49:7
guy 10:6 13:11 16:9
  17:6 58:17
guys 3:18 14:14 57:20

**H**

half 11:19 20:11 53:7
halt 11:23
handled 43:22
hands 15:10
happen 39:18 46:5
happened 10:4 12:18
  19:3 52:9 56:7
happening 14:6,8 20:16
  41:24
happens 22:4 34:25
  38:10
hard 21:19 23:1 36:25
  36:25 37:14 54:25
  55:8,11
hardest 60:22
having 2:9 11:16 17:22
head 11:25
headlines 10:3
headquarters 8:3
hear 40:3 51:14
heard 30:7
hearing 52:6
hedge 14:14 25:7 45:22
  51:7 56:7
heed 33:19
help 15:22 22:18 25:22
  28:22 29:21 30:14,20
  33:9 44:18,20 45:13
  46:25
helped 5:20 8:4 30:25
  32:1
heyday 12:15
high 2:15 35:25
higher 32:13,15
highlighted 29:19
high-cost 30:25
Hill 31:2
him 3:11 9:9 13:12
himself 26:25

history 21:22 56:5
hold 37:16
Holdings 5:9
Holy 20:4
home 11:6,22,25 12:18
  13:14,22 14:2 17:2
  33:10 37:2 44:12
homeowners 27:18
  29:24 32:2
homeownership 7:15
  31:6
homes 2:12 10:16 11:4
  29:25 44:16
honest 19:3
honestly 4:3
honored 5:23
hope 15:17,20 21:17
hopefully 9:20 44:4
hoping 31:14
horizon 8:15
hour 8:7
house 7:12 22:8 31:6
  36:24
housing 6:24,25 7:1,5,7
  7:16,22 8:5 9:2 13:4
  18:2 26:2 27:12,13,17
  27:19,23,25 28:13
  34:23
HR1852 31:5
HUD 7:8,21 34:13,14
HUD's 7:4 8:2
huge 25:18
hurdle 20:22
hurricane 8:1,2
hypersensitive 27:8
hypersensitivity 28:1
H&R 8:23,25 38:18

**I**

identify 34:10
ignored 15:25
immature 42:2
implement 31:15
implementation 2:22
importance 11:11
  49:10
important 25:17 40:21
  42:7,8 45:21 48:5
importantly 35:2
improve 35:2
improved 5:13 12:1
  18:14
improvements 31:14
improving 18:25
inaudible 32:14 54:1
  57:1
incentive 22:8 55:7
include 29:10 31:16
  45:9 55:5,18,20,22
included 48:12
including 5:3 7:14 30:3

30:16 34:1
inclusion 29:12
income 22:5 23:16
  58:19
incomes 10:9 32:6
increase 7:15 14:1 18:3
  20:7 29:2
increased 12:20 26:17
  60:11
increases 59:8
increasing 31:21
indeed 3:15
indicated 23:22
indictment 58:25
individuals 28:25 30:24
industry 4:12,19,20
  5:18,25 8:14 18:19
  35:15 36:14 39:3,4,24
  41:12 48:23 52:5
  56:15,21 59:1,25
information 8:21 34:7
  50:8 57:25
initial 30:4 34:1 47:15
initiative 8:13
initiatives 7:18
inquiry 16:25 17:1,11
Insanity 21:15
inside 56:12
instability 26:10,22
  27:14 28:14 34:21
instead 26:5,5
instrument 13:3
insurance 7:3,23 28:17
  31:17 32:8 33:7
insure 31:22
integration 16:17
intelligent 9:15
intended 32:9 44:6
Interactive 5:19
interest 12:25 13:4,6,9
  13:12 30:5 34:1,2
  35:14 37:4 51:12
  54:11 56:16
interested 37:1
interesting 3:20 12:17
  13:9,18 16:6,7 35:6
  54:24 55:25 56:18,24
interestingly 36:11
interim 44:5
internal 9:1
international 52:7
intersect 13:23
introduce 2:18
introduction 25:24
inventory 14:4
invest 45:24 50:16
invested 45:24,25
investing 46:7,25
investment 14:20 23:24
  46:2 51:4
investments 17:1

investor 16:4,23 23:23
  24:1,15,17 45:22
  46:15 49:14 51:25
investors 5:16 16:23
  17:13 18:6,13 22:13
  23:5 27:19 30:7 51:7
  51:12 52:17,18 58:7
invite 9:11
involved 24:22 33:15
irrational 59:15
island 27:10 28:2,11
issue 4:4,5 49:15 58:9
issuers 12:5 18:22
issues 7:13 10:11 25:1
  56:23,24 58:6
item 42:25
items 22:22

**J**

Jackson 34:15
January 7:11 8:18
Jennie 30:8,16,18
job 22:15 50:22 51:16
  54:10
join 18:1
joined 8:16
joining 3:1 5:18
Journal 52:24
just 10:8 11:18 16:19
  19:18 21:14 29:6
  34:23 35:19 37:15
  41:14 42:7 46:3,17
  47:3 49:18 52:9 53:8
  54:2,14 55:25 56:25
  57:16 58:20,21 60:16
justify 22:6

**K**

Kathy 62:8,16
Katrina 8:1
keep 12:18 14:16 29:25
  44:16
kept 24:4
kill 21:18
kind 15:9 16:19 21:19
  18:17,21 24:20 25:10
  35:17 37:11 39:25
  49:15 51:5
kinds 50:8
knew 3:25 28:21 42:24
knife 14:23
know 3:21 4:3,7 6:23
  15:13 16:13 17:15,17
  18:25 20:21 21:14
  23:8,16 25:25 26:4
  28:16 31:14 32:1,7
  35:18 46:18 51:20
  52:1,8,11 53:8,12
  56:7 58:15,18 59:6
known 26:9 40:1 41:16
Kurt 2:17,18,19 3:1,11

9:14 11:2 15:18
25:23 51:19 52:14

_____

**L**

**label** 5:14 18:20 21:4
40:24 45:3,18 49:10
**lack** 10:13 16:25 24:4
25:5
**laid** 52:2
**Land** 2:3,4
**large** 42:16 46:15 53:5
**larger** 52:15
**largest** 18:18
**Las** 16:23
**last** 6:3 16:7 20:14,22
24:8 30:23 31:10
36:13 38:13 40:2
41:17 48:24 50:17
51:5 54:4 55:13
58:14 60:15
**late** 3:21 54:8
**later** 6:12 15:25 16:10
17:4 26:5 27:1 30:19
33:23 44:17
**latter** 11:19
**launch** 5:20
**law** 57:16
**laws** 61:1
**lay** 22:4
**layered** 38:15
**lead** 4:23 9:12 56:14
57:1
**leadership** 31:3
**learn** 16:1
**learned** 18:23 34:23
37:18
**least** 41:10 49:11 51:11
**led** 2:17
**left** 40:15 52:22
**legislation** 22:19 23:9
31:15
**legislative** 2:22
**lend** 36:3
**lender** 6:12 25:12
36:25 37:1 47:9
**lenders** 6:6,19 12:4
15:1 23:14 27:18
30:2 32:3,21
**lender/servicer** 24:23
**lending** 9:2,7 17:6 20:8
20:8 21:24 25:15
56:12
**less** 4:11 21:1,9 32:5
**lesson** 56:5
**let** 9:11 30:21 31:23
33:21 54:2
**let's** 17:16 48:19
**level** 47:13
**levels** 18:6 24:14 39:15
53:22
**leverage** 56:7

**life** 44:7,19 52:10
**like** 2:18 4:20 14:23
19:18 23:22 24:19
26:2 28:10 33:6,12
36:6 37:17 38:5,25
39:8 40:4 42:15
44:13 48:18 51:23
55:4,8,21 56:24 57:21
**liked** 40:19
**likely** 53:7
**limb** 17:23
**limit** 34:11
**limits** 18:3 31:21
**line** 42:25
**link** 56:15
**linking** 31:19
**liquidated** 21:8
**liquidity** 14:15 17:20
22:13 23:2 24:10
45:2 46:20 56:6
**literally** 44:25
**little** 9:24 11:14 12:1
15:6 19:7,8 21:22
23:21 30:21 31:13,23
33:21 36:14 40:21
41:6 44:22 47:21
**loan** 8:20 14:6 17:16
18:3 21:6,25 22:6
23:17 30:8 31:20,21
32:14 33:25 34:4,7,9
36:5 37:12 43:18,24
44:11,18,18 47:13
48:18 50:14 52:9
55:22 58:13,17
**loans** 10:8 12:24 13:21
14:1 16:12,14,15
19:10,14 23:16 29:3,9
30:9,11,25 32:4 36:21
36:22 37:11 47:3
49:17 50:12 51:22,22
59:2
**long** 7:13 28:4 37:25
59:24
**longer** 10:10 14:11
36:16 44:10 53:18
**long-serving** 5:2
**long-term** 5:12 8:5
36:17 55:16
**look** 4:20 8:14 10:20,21
13:15,18 14:6 15:14
17:16 19:5,23,25 20:3
20:16 23:19 24:19
40:4 47:3 50:7,12
51:23 56:11,13,25
58:4 60:17
**looked** 54:16
**looking** 9:16 15:23
35:16 47:21 48:15
50:14
**looks** 19:17 38:5 48:18
**Los** 6:5

**lose** 48:4 60:14
**loss** 21:8 54:20 55:20
56:23
**losses** 15:1 22:15
**lot** 11:14 17:5 18:21
20:17 31:25 37:6
40:3,23 41:2,5,6,14
49:4 52:12 53:4
**lots** 46:20
**loud** 51:3
**low** 37:4 39:15 43:4
45:5
**lower** 19:11 32:6,17,21
33:3 43:18 54:19
**lowering** 31:16
**low-tech** 25:21
**luck** 61:5
**lucky** 8:10

_____

**M**

**made** 10:8 14:18 15:16
16:12,16 21:12 50:16
58:18
**Mae** 30:8,16,18
**magnitude** 11:14
**Main** 62:20
**maintaining** 6:14
**majority** 29:8
**make** 13:15 16:14,15
21:18 23:15 28:21
32:4 33:12,17 37:3,10
40:11 42:21 43:19,19
48:19,19 49:24 52:18
56:22 58:8 60:8
**makes** 36:22 52:6
**make-up** 26:17
**making** 3:14 12:7 19:9
22:6 27:4 36:21
48:16 50:12 58:17
59:17,18,20
**man** 8:7
**manage** 33:8
**management** 2:22 6:14
38:20 50:6
**manager** 8:6
**managing** 5:9,19
**manifest** 11:18
**manner** 34:8
**Mannon** 62:8,16
**manual** 32:24
**manufacturing** 7:6
**many** 10:1 11:8 15:6,8
26:18,19 28:20 29:4
31:13 33:2,19 39:4
43:9 45:23,23 59:25
**margin** 22:14 56:18
59:5
**margins** 42:10,16,18,20
56:2
**marked** 8:1
**market** 2:8,14 4:16

10:23 13:5 14:8
17:20 20:19 23:1
24:7 25:4,16 27:16,17
27:20 28:19 34:23
36:8,11 37:19,25
40:24 42:1,2 43:13
44:1 45:2,3,4,6,18,21
46:1,19 47:6,19,20,24
47:25 48:22 49:10
55:13 57:22,22,25
60:24,25 61:3
**Marketing** 6:17
**marketplace** 39:16
41:21,23 59:13
**markets** 14:15 28:5
41:25 46:6 56:4
**marriage** 26:18
**Maselli** 2:1,3 49:3
50:25 52:20 57:17
**massive** 22:14
**Master** 6:17
**Matrix** 5:21
**matter** 30:20 33:20
59:10 60:12
**matters** 48:6,8
**maximum** 34:3
**may** 9:18 25:9,22 29:21
36:11 45:15 49:19
58:24
**maybe** 22:12 24:22
30:25 36:14 44:24
54:13
**MBA** 3:1,23 5:8,25
8:10,12,13 10:1 17:18
46:23 54:3,16
**MBA's** 2:24 5:3 6:2
**MBS** 12:21 13:5 19:17
22:13 23:21 51:7
**McQuiggin** 5:24 21:19
**mean** 15:18 23:10
37:18 44:25 49:15
52:2
**means** 35:18
**measures** 35:1
**meet** 4:19 50:6
**meeting** 61:7
**meetings** 22:21
**meltdown** 10:4
**member** 5:3,6,19,25
8:12
**members** 17:21
**mentality** 59:13
**mentioned** 49:9
**menus** 16:19
**merger** 6:3
**message** 28:6
**met** 30:15
**method** 52:18
**mid-part** 59:14
**might** 32:3
**migrated** 56:14

**migration** 19:12
**Mike** 5:23 6:6,16 36:6
50:25
**million** 11:6 32:2
**millisecond** 26:20
**mind** 12:18
**mine** 9:2
**mismatch** 59:2
**mispriced** 14:12 58:1,4
**mission** 7:6 44:19
**mistake** 42:20
**mitigation** 54:20
**model** 24:20 28:7 40:4
40:7 41:8,19,21
**modeled** 21:12
**models** 15:13 61:2
**moderator** 2:17
**modernization** 30:22
31:15
**modernize** 7:20
**modify** 34:12
**moment** 38:4 40:5
44:22
**momentum** 31:2
**money** 14:17,17,18,19
24:10 36:3,25 37:1,6
48:20 56:23 57:8
60:14
**monitor** 20:25
**monolined** 38:10 41:3
**Montgomery** 6:21,23
7:12 25:20
**month** 58:18
**monthly** 34:2
**months** 4:6 14:22 17:17
20:15 21:1,7 36:14,18
36:18 44:23,23,24
51:5
**more** 2:11 4:12 5:17,24
12:6,6 14:17,18,19
16:7 19:14 28:6 29:7
29:21,24,25 31:13
32:10,22 33:1,2 34:7
35:2 37:1 40:22
43:13,21 45:12,14
48:5 50:10,23 51:21
52:2,12 53:7
**mortgage** 2:8,20 5:2,15
5:19 6:5,11 7:23 8:9
9:1,5 13:14 23:24
25:11 28:17 29:1,8
30:4 31:17 38:12
45:20 46:1 57:9
**mortgages** 2:13 11:6
12:21 28:18 31:22
**mortgage-backed**
12:16 13:1 24:7 25:5
46:11
**most** 2:12 3:7 4:24 6:18
15:10 35:12,15 39:14
**moved** 53:9,17

much 3:12 9:21 10:18
    12:14 13:15 19:21
    24:13 25:23 34:19
    35:4 42:14,17 48:5,20
    49:4 50:10 51:16
    54:13 60:1,2
multi-family 7:22
must 52:8
mystery 54:10

N

NAGAM 13:10,14
Nahima 6:3
name 26:7
named 8:17
narrow 17:10
national 6:11 9:4
nature 45:18 56:4
nearly 34:24
necessarily 10:11 13:25
need 4:12,14 22:19
    25:8,21 44:14,14
    45:11 50:22 53:20
    59:19 60:3
needed 21:24 58:1
needs 20:25 45:12
negative 53:14
negotiated 6:13
negotiating 37:14
Neiden 8:8,22 35:5
    49:23 58:3 60:10
net 42:10
neutrons 26:19 27:3
never 9:14 48:4
new 4:11 5:12 14:5
    15:2 27:10 33:10
    62:3,22,22
news 4:6,9 21:20 30:18
newspapers 10:7
next 11:13 18:7 40:25
    44:23
nine 14:22 21:1 37:11
nobody 59:22
Nobody's 11:10,11
nonconforming 14:9,13
nonetheless 54:6
nonprime 24:3,21
    35:14 43:7
non-agency 13:5,7
non-delinquent 30:10
non-deliquent 29:16
non-performing 10:25
non-prime 6:1
normal 51:6
Northern 22:25
note 57:8
noted 26:7
nothing 9:16 36:2 51:6
Notwithstanding 4:10
November 38:16
nuclear 26:1

number 10:18 11:8
    30:15 33:15 41:20
    55:9,15
numbers 10:13 11:1
    27:2 29:13 54:3,16
Nurture 19:16
nuts 16:24

O

observation 21:6
obtain 36:5
obviously 8:6
odd 36:2
off 4:23 9:12 12:14
    21:10 39:12 41:10
    42:11 47:13 51:6
offering 28:17
offerings 12:7
office 7:9 34:20
offices 50:6,19
offset 53:23
offsets 53:22
often 25:25 50:10
oh 48:17
okay 19:16 24:5 27:11
    43:20,24 44:1 60:14
old 21:14 24:19 37:17
one 3:17 4:2 7:17,20
    8:16,25,25 12:18 13:9
    13:18 16:7,8 17:2,5
    18:1 20:15 22:24
    29:23 34:13,15 35:5
    35:20,24 36:3,7,9
    37:23 38:12,16 40:3,5
    40:23 41:2,10,10
    46:17,22 47:7 48:4,13
    49:7,9,24 50:23 51:15
    52:14 53:2 54:24
    57:18 58:4 60:10
ones 35:7
One's 9:2
one-third 58:9
only 11:22 12:25 13:3,6
    13:9,10,11 15:13 17:5
    22:10 27:17 28:9
    29:10 36:1 40:14
    51:2 54:5 57:6,22
    58:3,23
open 38:9
operate 33:6 42:9
operating 42:19 43:5
operation 9:2
operators 43:17
opinion 42:4 46:8
opinions 41:12
opportunity 49:5
opposed 37:22 48:17
optimist 45:18
optimistic 31:13 38:2
option 8:16,24,25 9:2
    37:9

optioned 38:12
options 7:24 36:22 61:2
order 40:10 49:14
Oregon 3:2
organization 39:20
    40:20 42:16,23 45:12
    46:23,24 55:15 60:9
organizations 8:19
originate 45:4
originated 19:24 20:16
    47:2 49:17 51:22
    52:9
originates 47:4
originating 47:5
origination 9:1 13:10
    50:20 54:24 55:4,6,12
originations 12:11 19:6
    19:11 47:16
originators 50:10
other 9:23 15:19 18:22
    22:21 25:1 33:7 39:4
    41:20 52:15 57:17
    58:11 60:6,10
others 30:17
otherwise 9:15 32:3
ourselves 12:9 55:11
    60:1
out 4:14 9:11 11:15
    14:20,25 16:1,19
    17:23 21:25 22:22
    31:8 35:13 36:19
    37:19 39:2,5,22 40:15
    42:10 43:15 47:18
    50:9 51:15 52:2 54:9
    56:2 57:19 58:7
outlet 4:9
outside 35:18 39:21
    45:15
over 3:10 17:14 19:6,17
    20:17,22 21:3,15,16
    29:3 36:1,13,16 37:25
    40:1 41:4 44:23
    54:21 57:23
overall 2:21 10:14
    52:12
overseas 7:4
overseeing 7:3
oversees 2:23
oversight 5:14
overwhelming 29:8
own 27:14 39:20 52:16
    57:3,12 59:24
owned 10:17 16:10
owner 16:10
O&B 33:23

P

page 4:8 28:1
paid 21:10 32:7
pain 59:11
painful 38:14 39:11

panel 2:7,16 3:11,16,16
    3:24 4:11,18,22 9:9
    48:1 49:8 57:19
panelist 9:12
panelists 9:23 25:24
paper 14:14
parallels 26:1
Parcel 3:7
parent 38:18
parliaments 53:13
part 3:16 4:13 15:7,18
    25:16 35:15 39:14
    40:21 44:19 51:16
    53:6,24
participating 30:3
particular 35:6 38:7
particularly 32:11
parties 24:16
pass 30:23
passed 31:6
passing 24:5 31:8
past 29:3 35:7
path 4:1 14:5 42:3
pathology 15:21
patience 48:25
pay 10:10 13:4,11 22:8
    32:14,15 33:3 37:5
    42:25 43:1 60:13
paying 2:13 11:5 17:22
payment 19:18 20:6,12
    34:2,5
payments 29:1 37:3
payroll 14:18
peak 12:22
peaked 12:11
peers 18:2
peg 55:15
penalty 34:5
pension 14:19
people 2:11 3:25 10:2,9
    17:9 18:17 24:4
    27:18 28:9 32:2
    35:12 36:3,21 38:24
    39:6,19,20 40:17
    43:18 44:15,20 47:23
    49:16,25 50:12 51:14
    59:9,16 61:3
percent 10:16,19 11:3,4
    11:6 12:23 13:2,7
    14:10 17:6 20:11,24
    21:2,7,8,10 37:13,21
    37:22 58:17,20
percentage 10:24 19:5
    54:6
percentages 10:22
percent-ish 37:11
performance 5:13
    13:21 18:20 30:11
    47:13 50:14 56:23
performing 10:25 20:4
    20:5 29:3

perhaps 32:5
period 12:20 13:14
    19:7 38:1 49:1
periods 12:17 54:5
permissible 34:12
personal 41:11,14 43:3
    46:8
personally 57:11,13
persons 8:5
perspective 6:22
perspectively 51:17
Pete 2:3
ph 2:18 5:9,24 6:3,21
    8:9 10:1 12:6 13:10
    26:8 30:18 31:4,5
    42:4 56:17
phenomena 26:25
Phoenix 6:9
phrase 44:25
physical 26:13
physically 27:7
physicist 26:7
physicists 26:23
physics 26:1
picking 30:2
piece 25:12
pilloried 16:11
pizza 35:25
place 17:8 35:25 44:20
    45:14
planned 44:9
planning 3:22
plateauing 56:15
play 25:3,4 34:22 40:20
pleased 3:10 31:1
pleasure 2:4
plus 20:13 21:2,9
point 24:24,24 26:15
    38:22 40:14 44:16
    51:19 55:12,18 56:20
points 32:22 37:6,13,23
    37:24 42:11,12,21
    59:19
policy 2:23 3:4 7:13
policymaking 5:7
political 3:4
pools 30:8 51:23
portfolio 7:4 25:3
    45:21 53:6
portrayed 2:9
pose 32:17
position 6:15 8:22
positive 31:2 53:11,13
    53:19
possible 3:15
postulated 26:12
practically 4:8
precipitated 2:9
predictable 14:11
predicted 29:22 44:8
predicting 60:23

**premium** 32:9,13 33:3
**premiums** 31:17 32:15
   32:20,25 33:5
**prepared** 48:25 62:9
**prepay** 37:14
**present** 9:19
**presentation** 4:25
**presented** 26:6
**presenting** 20:19
**preservation** 7:21
**President** 2:19 3:8 5:5
   6:4,16 7:9,10 8:17,23
**President's** 29:20
**press** 10:3 29:19
**pretty** 12:17 13:20
   14:25 15:3 51:16
**previous** 18:15
**previously** 3:6 9:6
**price** 11:22 32:8 46:18
   60:2,17
**priced** 59:3,12
**prices** 12:1,19 13:15,22
   14:2 45:5
**pricing** 31:24 33:9
   57:24 59:15,18
**primarily** 7:23
**primary** 7:18
**prime** 5:7 33:3 36:5
   42:16 43:23 44:10,17
   44:18 45:18 47:9
**principal** 34:3
**prior** 3:1 5:18 8:22
   28:16 29:11,19
**priorities** 7:20
**private** 5:14 18:20
   20:18 21:4 40:24
   45:3 49:10
**probably** 19:23 36:12
   36:13 44:1 54:10
**problem** 10:13 11:12
   11:20 15:8 24:6
**problematic** 24:2
**problems** 20:17 38:1
   46:15
**proceedings** 62:9,11
**process** 7:13 19:4 38:15
   40:18,19 46:24 48:7
   50:5,7,21
**processed** 29:7
**produce** 27:7
**product** 10:15 12:14
   16:15 28:23 45:4
   47:2,7,12 50:24
**products** 4:16 16:18
   28:21
**professional** 9:16
**profile** 32:5
**profiles** 32:11
**program** 45:10
**programs** 25:10 37:12

45:10 53:5
**projected** 29:14
**projections** 29:18
**promised** 34:15
**promotion** 7:19
**properly** 44:15 59:12
**properties** 58:8
**property** 57:6,10,14
   58:12 60:13
**proportion** 11:15
**proposal** 31:24 32:9
   33:13
**proposed** 33:22
**prosubs** 52:3
**protect** 51:11
**protons** 26:18 27:2
**proud** 2:5 29:23
**provide** 14:15 15:20
   34:7 51:17,24
**provides** 52:5
**provocative** 9:20
**public** 3:8 12:8
**pull** 39:5
**pulled** 39:7
**purchase** 29:4 30:8
   44:12 57:5,8
**purchased** 16:3
**purposes** 11:3
**pushed** 16:14
**put** 3:19 9:25 21:12
   33:13 38:17 59:8
   60:1
**putting** 2:11

### Q

**qualify** 32:23 33:1,2
   36:4 43:23 44:10,17
**quality** 17:16 18:13
   22:16 47:2,7 48:5,23
**quantity** 48:6
**quarter** 11:21 12:4
   19:20,21 20:1,2,5
   21:1 47:5,17 56:3
**quarters** 11:25 19:19
**queries** 32:1
**question** 4:18,21 9:21
   12:13 13:11 15:5
   49:7 52:20 54:21
   55:19
**questions** 38:6,9 39:25
   49:6 57:17
**quick** 58:9
**quit** 14:2
**quite** 15:17 21:11 26:9
   27:9 29:5 39:2 42:4
   46:16 53:21
**quote** 21:14

### R

**raise** 59:19 60:2,7
**raised** 59:12

**raises** 9:18
**raising** 60:5
**ramp** 13:19 19:23
**range** 7:13 37:12
**rate** 12:21,23 13:3 14:5
   33:4 34:1,2 54:4,7,11
   59:8 60:11,12
**rated** 46:12 50:3,4
**rates** 13:17 37:4,21,22
   56:16 59:12,19 60:2,5
   60:7
**rather** 11:19 32:13
   37:23 43:19 52:17
**rating** 15:1 18:5 22:9
   23:4,25 46:12,13
   49:11,19,25 50:2,19
   51:15 52:17
**ratings** 16:3 23:6 49:12
   52:16
**rationale** 26:24
**reach** 4:14 27:1 29:21
**reaction** 30:6
**reacts** 60:24
**read** 10:3
**reading** 10:6
**ready** 23:12
**real** 11:13 42:21 50:14
   59:8
**reality** 18:23
**realize** 14:25 22:20
   28:9 58:5
**really** 10:5,11,12 15:21
   16:6 19:22 23:4 30:2
   35:18,19 40:19 41:1,2
   41:18 44:6 59:19
   60:3
**realm** 27:8
**reason** 31:12 36:3
**recall** 16:6
**recent** 29:12
**recently** 3:8 6:18 28:9
   31:8 51:14
**recognize** 33:12,18
**recognized** 59:1
**record** 53:22 62:11
**recovery** 8:3 49:1
**redefined** 16:15
**reduce** 60:11
**referred** 26:21
**referring** 26:8
**refinance** 28:23 29:2
   29:11 58:13
**refinanced** 57:8
**refinancing** 7:24
**refi's** 29:8
**reform** 7:16
**reformed** 33:22
**regarding** 33:16
**Regardless** 29:22
**regular** 23:16 42:9
**regulations** 23:7 57:3

**regulators** 23:7 25:3
**regulatory** 2:23 7:4
**Reinvestment** 9:4
**related** 3:4 55:22,23
   56:9
**relation** 9:3 20:1
**relative** 10:14
**relatively** 42:1
**relegated** 36:24
**relevant** 28:13 38:7
**reluctant** 32:4
**remain** 21:9
**remained** 27:24 28:11
**remains** 34:21
**remember** 12:2 23:8
   35:7 36:20 47:25
   48:25 60:11
**rental** 7:22
**renting** 36:24
**repay** 31:18
**report** 48:9
**reporting** 54:5 62:18
**reports** 52:6 55:3
**representatives** 30:17
**require** 32:24 53:2
**required** 24:14
**requirements** 31:16
**reserve** 56:23
**reserves** 55:21
**reset** 20:25 21:5 54:11
**resets** 20:23
**residential** 5:6,8 17:17
**resolve** 30:20
**resources** 45:13
**RESPA** 7:5,16 8:11
   26:4 33:22,22
**respect** 53:20
**response** 8:3
**responsibilities** 7:5
**responsibility** 8:18
   24:4,15
**responsible** 2:21 5:10
   7:2 8:25
**responsibly** 4:14
**rest** 35:13 56:20
**result** 10:4 22:7
**results** 21:16
**resume** 47:10
**retail** 6:11 8:19 39:10
**returns** 25:8
**reverse** 31:22
**rewrite** 61:1
**rewriting** 61:1
**rider** 54:13
**right** 4:1 9:13 14:2 17:4
   18:16 41:25 43:23
   44:21 46:9,19,20 48:6
   48:7,8,21,22 51:9
   52:21 54:21 55:16
   59:10
**rippling** 2:10

**rise** 34:3,4
**risk** 8:20 14:11 15:25
   22:5 27:15 32:16,17
   33:8 58:1 59:3 60:11
**riskier** 32:5,18
**risk-based** 31:24 32:9
   32:20,25 33:5,9
**road** 42:6 46:14,14
**robust** 45:10
**Rock** 22:25
**ROCKLAND** 62:4
**role** 32:3 34:22 40:17
   40:18 44:21
**room** 15:7 16:21 17:9
   18:22 49:25 59:10,17
**roots** 51:8
**roughly** 54:18
**rounding** 11:3
**ruin** 47:10
**rule** 33:23,24 34:10
   57:4
**rules** 57:12
**run** 3:11 14:14 18:18
   22:24
**running** 42:15
**rushed** 23:8

### S

**sadly** 17:14
**sale** 6:13 38:18,25
**sales** 5:10 8:19 59:10
**same** 20:14 21:15 36:21
   37:10 41:22 43:1,25
   46:13 54:8 55:3
**SANDY** 62:18
**SAUNDERS** 62:18
**save** 35:24
**savings** 32:5
**saw** 11:22 12:19 20:7
   31:8
**saying** 22:1 51:4 59:18
**scene** 15:3
**school** 35:25
**score** 17:6 32:22
**scores** 19:6,11 43:22
**sea** 26:10,22 28:13
   34:21
**Seaborg** 26:8,11,20,25
   27:6,9,21 28:2 34:23
**second** 17:7 19:21
   20:25 31:19 53:24
**Secondary** 6:17
**Secondly** 18:4 30:21
**Secretary** 6:24 34:15
**sector** 20:7
**secure** 8:4 28:15,24
   29:13,20 30:1
**secured** 30:11
**securities** 5:14 16:3
   21:12 22:9 25:5 30:8
**securitization** 20:18

21:4
securitizations 12:5
13:1 14:9 18:20
security 5:15 12:16
24:7
see 10:3 13:25 19:7
21:5 26:11 34:19
35:12 47:6,13 56:25
59:4
seems 14:12
seen 14:13 29:1 34:20
sees 9:8
segments 39:8
seized 14:9
sell 16:9 45:4
seller-funded 53:4
Senate 3:5 7:17 31:7,11
Senator 3:2,3
senior 2:19 5:9 25:9
sense 11:5 21:23
23:16 24:4 28:21
sent 8:6 57:24
separation 24:2
September 28:16 29:6
seriously 11:9
serve 4:15,21 8:11
17:21 28:24 29:14
32:12 37:20,20 40:12
40:13,14,16 43:9,25
45:14 56:20
served 5:21 6:4,16 7:9
8:12,24 9:6 44:14
serves 9:3 44:14
service 3:7 5:5 38:20
44:15
serviced 52:11
servicer 23:25 25:12
50:2 57:9
servicers 5:15 44:5
services 5:13 8:24
servicing 8:20 50:2,3
55:23
serving 6:22 7:11 56:21
session 2:2,5 17:19 35:6
35:9,22
set 17:12 31:8
sets 5:1 47:16
setting 41:24
settlement 34:6,11
seven 6:12 11:6 37:21
several 11:20 36:20
Shape 8:13
share 12:20,25
shear 10:13
shocked 15:25 16:1
shoes 15:11
shop 34:8 50:18
short 44:22
show 15:10 18:13
shows 20:13
shrill 51:3

side 5:8 43:5 46:25
50:11,20 51:11 55:23
60:7
sidelines 46:20
Sifma 30:18
sight 48:5
signals 57:24
significant 14:25 25:7
27:14 59:7
similar 14:5 27:21
simple 56:12
since 4:7 7:17 19:24
20:15 21:5 28:12
29:6 32:1 38:20
single 57:4,4
sir 53:24
sit 50:11
sitting 46:20 59:16
situation 22:18 44:10
six 21:4 24:1 35:12
36:18 37:21
Sixteen 21:1
Sixty-five 10:19
size 10:12
slight 42:20
slightly 32:12,14
small 45:22
Smith 3:2,9
solve 14:24
solving 9:21 38:1
some 3:18 9:19,25
12:12 18:1,21 23:17
25:1,1 27:14 30:13,14
30:25 31:1,14 33:12
33:16 35:7 36:2,11
38:1,6,9 39:2,6,15,20
41:9 42:5,6 44:7,7
46:10 47:23,23,25
49:5 52:15,25 54:11
54:12 55:6,19 56:8
57:13 59:16 60:16
somebody 13:3
someone 40:7 41:11
48:17 50:18 60:18
something 14:21 15:22
39:18 44:2 49:18
56:1
sometimes 56:19
somewhat 30:5
soon 31:12 34:18
sophisticated 43:13
sorry 53:25
sort 20:21 35:22 39:1
41:10 44:7 47:22
51:8
sound 46:2
sounds 57:21
South 62:20
Southern 6:4
space 10:21,22 20:18
speak 60:25

SPEAKER 52:14,23
53:16 54:2,15,23
55:24 57:2,18 58:23
60:15
special 17:19
Specialist 60:22
specific 16:6 57:12
spend 4:24 28:10 35:20
50:5
spent 54:12 55:5
spike 47:15
spill-over 56:8
sponsoring 2:5
sponsorship 3:14
spreads 17:10
spring 3:21
ss 62:4
St 62:20
stab 26:3 49:13,21
stability 27:10,21 28:3
28:7
stable 27:5,7,24 28:12
staff 3:2,9 30:15 34:17
stage 4:5 5:1
stakes 2:15
standardize 33:24
standards 19:2
standing-room-only
35:17
standpoint 48:7
start 14:7 46:6 47:13
57:25
started 3:22 36:6,6
41:6 59:7 60:4,4,5
starting 47:12,18 52:16
state 57:3,4,11,16 62:3
stated 58:19
statements 53:1
states 22:24 45:25
57:14
statistic 11:1
status 54:11
stay 22:8 28:13 39:23
43:16
stays 28:4 54:7
steadily 12:20
Stearns 30:17
step 28:22 44:5 50:23
60:4
Stephen 8:8
stepped 51:15
Steve 8:10,16 9:3 17:15
18:10 49:22 51:20
56:1 57:22
still 2:12 3:17 19:4,9
42:13 56:22 60:14
stint 5:3
stopped 58:15
story 20:20 56:18
strategy 2:2,5,24 23:20
street 16:13 30:6,15

52:24
striving 44:3
strong 25:4 46:3
stronger 21:18 24:13
study 56:24
stuff 15:11 47:18
subject 10:20 31:25
submitted 33:23
subordinated 25:9,10
subprime 2:8,8,14 4:5
4:16 10:21 12:5,11,25
13:6,19 14:7 19:5,13
19:17,23 20:7,8,24
21:23 25:15 27:15
28:8 29:9 35:14,23
38:11 40:1,4 41:3,16
43:25 44:4,4,13 45:1
45:1 47:20 54:18
56:10
subsequent 28:8
subset 40:15
subsidize 32:18
subsidy 53:12,13,14,19
substantial 28:19 29:2
substantially 33:25
substantive 47:1
SUB-PRIME 1:12
successful 40:3
successfully 6:13
sue 57:10,15
suggest 11:17 19:12
20:9
suggested 18:11
suggestion 49:24
summer 59:5
supplies 25:15
support 18:2 51:20
56:1
sure 15:9 30:6 43:10,12
43:24 46:16 55:14
surprise 19:22
surprising 14:4 30:6
surrounding 34:25
surveillance 18:19
51:11 52:5
surveys 55:2
sustain 53:8
swimming 35:16

_____
T
_____
T 26:8
tables 56:14 57:1
take 8:14 13:23 14:6
17:16 35:1 41:12
49:13,21,23 50:23
56:19 57:23
taken 39:14
takes 40:16
take-away 21:17
taking 17:8 24:24
25:12 26:3

talk 4:11 17:19 22:17
28:15 30:21 31:18,23
36:9 42:23 50:7,11
56:6
talked 14:14 17:9 18:25
19:1 40:21 48:2
50:20
talking 4:25 11:5 35:21
Team 2:25
technical 26:12 53:3
technology 8:21
tell 16:2 26:6 28:12
47:3 50:17 52:1
54:16 55:10 56:11
59:25 60:21
telling 13:11 14:17
19:20
tempered 30:5
temporary 8:4
ten 21:7 24:8 36:19
37:13,23 40:25 42:24
58:14
tends 36:19 56:4
tenure 7:25
ten-year 8:15
term 36:16 37:13 44:22
terms 4:21 10:22 13:20
20:6 31:20 34:1
terribly 19:13 38:3
testifying 15:2
thank 3:11,13,14 9:14
25:19,23 35:4 49:3
Thanks 9:13
their 2:13 13:4 17:22
18:22 25:8 26:15,17
28:18,25 29:25 34:17
36:22 37:2,3 40:8
43:22 44:16 49:12,19
49:20 50:23 51:16
52:16,25 55:3,7 56:13
57:3,11 59:17,17,18
theory 26:6,8 27:6
thereof 10:13
thin 42:19
thing 21:15 35:5 43:12
44:2,8 48:4 52:15
58:23 60:10,23
things 13:20 17:23
18:24 24:10 36:9,10
36:12,12,15 41:23
42:6 55:8,21 58:5
60:16
think 3:19 5:4 10:25
13:18 15:7,14 17:14
18:10,21 19:2 21:10
21:21 23:3,19,20 24:6
24:9 25:3,8,18 29:21
30:4,23 31:12 38:7
40:18,20 41:4,17,18
41:21,22 42:14,15,15
43:6,15 44:1,2,6,21

44:23 45:8 46:23
47:11 48:1,11,21,22
49:4 50:21,22 52:25
54:8,19 56:5 57:2
58:24 59:1,14
**thinker** 36:17
**thinking** 40:9 47:24
**thinner** 42:17
**third** 12:4 18:10 20:2
58:5
**Thirty-five** 10:16 11:3
**Thomas** 5:11
**though** 45:17
**thought** 10:19 17:24
24:18 41:7
**three** 17:23 20:11
21:25 23:15 35:9
36:18
**three-tenths** 54:6
**through** 2:10 7:23 12:2
19:8,19 25:2,19 31:15
33:14 38:13 52:10
55:11 56:13 58:22
59:5,13
**throughout** 28:7
**tick** 41:9
**tight** 47:8
**tightened** 47:8
**time** 4:3 8:14 11:5,13
12:3 14:2,18 18:11
19:7 21:7 28:5,5,10
28:22 35:21,25 37:8
37:12 38:1 39:2 41:4
42:5 44:11 50:6,16,17
54:12,13 57:23 59:24
60:3,5
**times** 35:8 36:11 53:7
**timing** 33:18
**title** 7:1
**today** 2:6,7,15 8:8 9:10
14:25 15:9,15,16 28:6
28:11 30:20 32:7
35:22 36:22 37:11
40:10 42:20 43:2
45:2,3,6 47:4 50:13
56:8 57:1 60:20
**today's** 2:2 24:11 25:4
27:25 28:13 34:22
42:18
**together** 3:19 21:13
**told** 16:24,25 20:21
60:18
**Tom** 4:23,24 5:1,17,23
9:12 23:22 50:25
55:24
**tomorrow** 2:6
**tone** 15:5
**top** 13:19 38:15
**topic** 35:19 39:17
**topical** 4:1
**topics** 3:24

**total** 10:14 12:11,21
13:7,17,25 32:22 34:6
**toward** 35:10 53:9,11
53:17
**track** 54:18
**trade** 9:3
**traditionally** 54:9
**transaction** 24:23
25:13 57:5
**transactions** 52:19
**TransAmerica** 36:8
48:11
**Transcribed** 1:13
**transcript** 62:9
**transcription** 62:10
**transparency** 49:20
51:18,21
**Treasurer** 5:5
**tried** 14:22 15:5
**trillion** 21:4
**Tri-Emerald** 6:7
**trouble** 17:22
**troubled** 29:24
**trough** 56:16
**true** 11:8 43:25 62:11
**truly** 17:11
**truth** 15:10 16:2 34:21
**try** 17:24 18:5 41:9
48:19 55:2
**trying** 3:23 11:10,11
14:23,24 39:2,21 58:7
58:8
**turbulence** 27:16
**turn** 3:10
**twice** 16:10
**two** 11:1 16:21 17:4,9
17:17 21:25 35:8
37:23 44:17 46:14
51:5 53:7 54:4,5 56:2
56:2 58:13
**type** 14:6 53:9
**typical** 10:6

**U**

**UBS** 30:16
**umbrella** 29:13
**unable** 36:4
**uncertainty** 27:15,25
30:13,14
**under** 29:12 42:19
47:16
**underserved** 25:16
**understand** 18:7 31:25
42:17 51:8
**understandable** 34:8
**understanding** 50:23
**underwriting** 17:1 19:1
32:24 49:15
**underwritten** 49:18
**unfortunate** 30:22
**unfortunately** 18:17

**UNIDENTIFIED**
52:14,23 53:16 54:2
54:15,23 55:24 57:2
57:18 58:23 60:15
**uniform** 32:8
**unintelligible** 23:10
**United** 3:7 22:23 45:24
**unknown** 39:1
**unprecedented** 27:16
**unstable** 26:16 27:23
28:7
**until** 7:11 13:21 39:15
**ups** 24:13
**Urban** 6:25
**use** 9:24 15:14 42:23
44:24
**used** 42:9
**using** 62:10
**U.S** 4:9 45:20 46:1

**V**

**validated** 53:18
**value** 37:1 41:14
**values** 23:17 58:12
**variety** 3:5
**Vegas** 16:23
**vehicles** 14:20
**vendors** 15:1
**verify** 23:16
**version** 31:7
**versus** 10:25 11:9 20:4
50:13 57:1
**vertical** 16:16
**very** 2:5,15,16 3:10,12
19:7 23:11 25:21,23
29:4,4 31:1 34:17
35:4 36:21 37:4 38:2
38:4 41:20 42:14,19
42:19 43:2,3,4 45:9
45:10 46:3 47:12,12
47:18,18 48:15 49:4
50:22 55:10,11
**veteran** 8:9
**viable** 45:6
**Vice** 2:19 3:8 5:5,21
6:16
**victims** 8:2
**view** 36:17,18 41:11,14
43:3
**vintage** 19:25 20:11,15
**virtually** 26:19 39:18
**virtue** 48:25
**visit** 18:12 51:7
**volatile** 27:8 34:22
**volatility** 28:19
**volume** 59:23
**volumes** 12:23 39:11,14
**vote** 31:7,9,12

**W**

**wake** 6:2

**Wall** 30:6,15 52:24
**wamus** 56:17
**want** 4:10 12:1 26:12
28:15 47:9 49:4,21
51:1 52:8,10,11,23
53:14,17 59:21
**wanted** 16:14,18 51:13
**warrants** 24:13
**Washington** 18:2
**wasn't** 15:9 17:5 28:17
58:3
**watch** 59:4
**watched** 39:4,6
**Waters** 31:4
**wave** 18:7
**way** 9:11 13:16,18 18:9
18:12 19:8 20:14
22:24 27:17 30:5
37:18,20,23,25 39:12
41:22 42:2 43:1,12,23
46:6,7,11 48:15 50:22
58:14 60:19
**ways** 4:13 9:20 36:2
46:22
**weaker** 32:11
**wealth** 56:17
**weather** 38:25
**week** 33:23 51:15
**weight** 26:15
**welcome** 2:2
**well** 5:4 7:23 10:6 14:8
14:21 15:4 16:13
18:17 26:23 27:12,12
29:4 30:17,22 34:5,19
35:16 48:17 49:17,18
52:8 59:18,21,25
**Wells** 30:3
**went** 14:4 15:23 17:22
18:22 37:7 51:5,13
59:5
**were** 3:23 4:1 11:25
12:7,9,23 16:3,17,18
16:24 17:11 18:1,4,8
19:9 21:12,12 23:22
28:18,20 29:10,18
30:7 36:23,24 37:2,8
37:12 38:6,17 39:6,12
41:5,7 42:6,6,15
43:17 44:6 46:6,7
47:3,5,11 51:10 53:6
55:10 56:2,11 58:7,8
59:12
**weren't** 12:8 24:5 37:5
42:8
**we'll** 38:2,8 52:21
**we're** 3:19 4:13,23 5:1
5:23 6:20 9:9 10:7
11:5 13:12 15:25
18:18 19:24 20:3
22:18 24:6 25:21
28:12 42:19 43:15

44:3 52:6 53:21 58:6
58:10,13
**we've** 14:13,14 15:9
19:14 20:10 22:17
24:1,8 29:1,14 38:11
39:14 40:1,13 41:16
49:16 53:9 54:21
58:12,14
**whatsoever** 10:18
**while** 6:14 7:11,21
26:13 36:10 49:6
54:17 58:2
**White** 7:12
**whole** 48:1,9,19
**wholesale** 6:6,11 8:19
**wholly** 32:18
**willing** 48:18
**win** 43:18
**winter** 3:21
**witnessed** 31:10
**wonderful** 21:20 40:20
**word** 42:24 60:16
**words** 22:1
**work** 8:1 18:4 19:4
33:14 39:19 40:11
41:4,8,22 58:21,25
**worked** 35:24 36:7
41:19
**working** 22:9 25:6 49:6
55:10 58:15
**works** 41:11
**world** 26:24 36:17,18
41:15 42:18
**worried** 17:5
**worse** 20:2,9
**worst** 22:1
**worth** 22:10 41:13
60:16
**wouldn't** 13:25
**wrap** 47:22
**wrong** 11:2 15:23
36:11 53:19 54:14

**X**

**X** 59:21

**Y**

**Y** 59:21
**Yeah** 25:22 54:15,23
60:19
**year** 3:22 4:7 6:3 8:18
11:18 21:5 22:2 29:3
29:16 30:23 31:10,13
35:24 37:14 38:13,16
38:17 39:12 42:10,10
42:13,13 46:13 50:14
54:8 55:13
**yearly** 17:18
**years** 3:3,7 5:17,24
6:12 11:20 16:21
17:4,9 18:12 24:9

26:23 31:20 34:24
35:9 36:2,19,19,20
37:17 38:2 40:2 41:1
41:5,5,17 42:24 44:17
46:14 51:10 56:2
57:24 58:13,14
**York** 15:2 62:3,22
**young** 37:16

---

**Z**

**Z** 59:21

---

**$**

**$10,000** 58:18
**$400** 7:3
**$625** 12:12

---

**0**

**01** 13:21
**04** 13:22
**05** 11:25
**06** 14:10 19:19 20:1,2,4
**07** 14:11 19:8,20,21,25
20:5 29:6
**08** 21:1 33:11

---

**1**

**1** 31:9
**10** 40:2 41:5
**100** 17:6 55:17 58:17
58:19
**10956** 62:22
**11** 51:10
**12** 36:13 44:23
**120** 55:17
**120,000** 33:10
**125** 55:12
**14** 18:12
**15** 40:2 41:5,17 42:21
56:2
**15-year** 37:13
**15-year-old** 38:10
**160,000** 29:16
**18** 37:12,22
**19** 37:17,22
**1934** 28:12 32:1
**1960's** 26:11
**1972** 6:8
**1988** 6:10
**1993** 8:17
**1996** 56:13

---

**2**

**2nd** 62:20
**20** 21:10 31:9 42:21
**200** 42:10
**2000** 21:5
**2001** 5:20
**2002** 3:1
**2003** 6:17 7:11
**2004** 11:21

**2005** 7:11 12:4,11,14
12:22 13:2,8 22:4
59:1,6,6,14
**2006** 8:12 11:19 12:13
12:14 19:18 22:4
55:11,13 56:13 59:15
**2007** 1:13 11:18,19
18:14 19:17 28:16
31:6 47:6,13,17
**2008** 49:1
**2009** 49:1
**225** 42:11
**24** 36:13 44:23
**25** 42:12
**250** 16:22
**254** 62:20

---

**3**

**30** 5:17,24 13:1 22:12
31:20 36:1
**30-year-plus** 8:9
**348** 31:7
**35** 11:2 32:2
**36** 13:7 44:24
**380** 30:2

---

**4**

**40** 31:20 42:12 59:19
**45,000** 29:7

---

**5**

**5** 1:13 11:5
**50** 34:24 59:19
**540** 17:6

---

**6**

**6th** 38:16
**60** 21:2,6,9
**600** 19:6
**65** 21:8

---

**7**

**72** 31:7

---

**8**

**80** 12:23
**80,000** 29:15
**82** 14:10
**88-year-old** 10:9

---

**9**

**90** 20:13 22:10
**90-day** 19:23
**95** 11:2,4
**97** 22:12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )
                         )     Case No.: 07-1282 (PLF)
                         )
           Plaintiffs, )
                         )
    -v- )
                         )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
                         )
           Defendants. )

---

## AFFIDAVIT IN OPPOSITION

I, **CHRISTOPHER RUSSELL**, declare, under the penalty of perjury, as follows:

1.     I am the director Global Direct Sales, LLC ("GDS"), a Maryland limited liability company with its principal place of business located at 7824 Cessna Avenue, Gaithersburg, MD 20879. I submit this affidavit in opposition to the defendants' motion for summary judgment.

2.     HUD's proposed rule identifies only three basis for the Final Rule - the February 2005 GAO report, IRS Revenue Ruling and IRS Press Release. The only perceptible basis for the Final Rule contained in the February 2005 GAO Report is the unattributed statement "that seller-related contributions **could** contribute to an overvaluation of the price of the property."

However, since Fannie Mae and Freddie Mac allow no money down 100% financing, they have no need for, do not allow and have no experience with the DPA at issue. Reliance on unattributed statements from officials who admittedly have no experience with the DPA at issue is no basis for the Final Rule.

3.      The Revenue Ruling and Press Release deal with whether an organization qualifies §501(c)(3) status. An organizations §501(c)(3) status does not provide a basis HUD articulated "primary" concern - "that the sales price is often increased to ensure that the seller's net proceeds are not diminished" (AR at 11), admittedly does not apply to the Penobscot plaintiffs and provides no basis for the Final Rule.

4.      To the extent a concern "could" exist, HUD ignores that rectifying the appraisal process, along with several other proposals, would be a reasonable less restrictive alternative. HUD failed to offer a reasoned explanation for rejecting these and other reasonable less restrictive alternatives, including, charging a higher insurance premium to compensate HUD for any increased risk, a less restrictive alternative HUD proposed and stated it would adopt.

5.      Additionally, HUD Secretary Alphonso Jackson's undisputed statement that he does not care what the comments say, HUD's going to approve the rule, demonstrated an "unalterably closed mind" during rule making process and shows that HUD had already reached a prejudged political conclusion.

6.      HUD's identified data deals exclusively with charitable DPA programs, which has no bearing on governmental agency, public entity or tribal government DPA programs. This is particularly important because the November GAO Report acknowledges that "[l]oans with assistance from seller-funded nonprofits do not perform as well as loans with assistance from other sources."

7.    Further, GAP has more stringent borrower and seller requirements, when compared to unregulated non-profit programs.  GAP requires that the seller certify that the sale price has not been increased to account for the seller's contribution to GAP.  GAP promotes home buyer education classes.  All transactions are accompanied by a real estate appraisal performed by a HUD certified and licensed real estate appraiser.  GAP requires that the fee paid by the seller, when combined with any additional seller closing cost contributions, does not exceed six percent of the sales price.  FHA allows property sellers to pay up to six percent of the sales price in borrower's closing costs.  This remains is unaffected by the rule.  Even though the fee paid by the seller is not considered a "seller contribution" for loan purposes, GAP has enacted stricter requirements than HUD has instituted.  The requirements, guidelines and performance of governmental and tribal programs were not taken into account by HUD.

8.    This data is readily available to HUD, since HUD requires the lender to put the downpayment program Tax ID number into the CHUMS system when an FHA loan is originated.  Either HUD has failed to study the impact of requirements such as home buyer educations classes, seller price certification and others or the result of such study does not support HUD's argument.

9.    I attended the October 14-17, 2007 Mortgage Bankers Association 93rd Annual Convention and Expo in Boston Massachusetts, during which Assistant Secretary Brian D. Montgomery was a panelist.  His comments bring into serious question the validity of FHA's claimed poor financial performance and increased foreclosure rate.  Mr. Montgomery stated as follows:

MONTGOMERY:    So doing that, we have moved away toward that.  I want to be as validated that we are no longer going to a positive credit subsidy, so they are wrong in that respect.  No, we don't need an appropriation. **Quite frankly,**

3

**we're generating - I won't say record levels of budget offsets, but a good bit of budget offset.**

And the second part of that, sir, I'm sorry?

MONTGOMERY:    Let me just say -- these are MBA numbers -- **our foreclosure rate actually dropped between the last two reporting periods**, albeit only about two- or three-tenths of a percentage, but nonetheless, it has dropped. **Our default rate stays about the same year as of late.  I think the borrower has traditionally come in out of default.  That's no mystery, probably because of a change in job status and some interest rate reset.**

So anyway, we actually spent some time with this editorial rider, and maybe too much time, and he just got it wrong, to be blunt.

In light of Mr. Montgomery's statements, I purchased an audio recording of the convention, which has been transcribed by a court reporter.  A copy of the transcript is attached as Exhibit "F" and the disc containing the audio recording can be provided. I was present and Mr. Montgomery is the speaker who made the above comments.

WHEREFORE, based on the foregoing, it is respectfully requested that the defendants' motion be denied in its entirety.

**Christopher Russell**

STATE OF MARYLAND    )
                                              )
COUNTY OF _HOWARD._    )

Subscribed and sworn to (or affirmed) before
me on this 7th day of December, 2007.

My Comm. Exps. _07_ ,2011

Notary Public

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

PENOBSCOT INDIAN NATION, PENOBSCOT )
INDIAN NATION ENTERPRISES and )
GLOBAL DIRECT SALES, LLC, )              Case No.: 07-1282 (PLF)
 )
Plaintiffs, )
 )
-v- )
 )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, ALPHONSO )
JACKSON IN HIS CAPACITY AS SECRETARY )
OF HOUSING AND URBANDEVELOPMENT, )
ROY A. BERNARDI, IN HIS CAPACITY AS )
DEPUTY SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND BRIAN )
MONTGOMERY, IN HIS CAPACITY AS )
ASSISTANT SECRETARY OF HOUSING AND )
URBAN DEVELOPMENT AND )
COMMISSIONER OF THE FEDERAL HOUSING )
ADMINISTRATION, )
 )
Defendants. )
_____ )

## PLAINTIFFS' RESPONSE TO THE DEFENDANTS'
## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Plaintiffs the Penobscot Indian Nation ("PIN"), Penobscot Indian Nation Enterprises ("PINE") and Global Direct Sales, LLC ("GDS"), by their undersigned counsel, The Mason Law Firm, LLP and Kantrowitz, Goldhamer & Graifman, PC, pursuant to LCvR7(h), hereby respond to the defendants' November 16, 2007 Statement of Material Facts Not In Dispute:

1.    The defendants' sets forth a statement law not fact.

2.    Not in dispute.

3.    The defendants' statement contains three distinct statements which are appropriately addressed separately:

(a)     "In the NPRM, HUD expressed its concern with situations in which a charitable organization establishes a fund that provides a 'gift' to a homebuyer but is then 'replenished after loan closing by the seller who provides a 'charitable donation' and, in some cases, pays a 'service fee' to the organization from the proceeds of the house and does so only if the homebuyer is using the charitable organization's downpayment assistance program.' 72 Fed. Reg. 27,048; A.R. 00011."

**Response**:     The defendants' statement accurately states HUD's purported concern and reflects that that the concern was exclusively limited to charitable DPA programs, which has no bearing on governmental agency or tribal government DPA programs. A.R. 00011.

(b)     "HUD explained that 'the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA.' 72 Fed. Reg. 27,048; A.R. 00011."

**Response**:     The defendants' statement accurately reflects FHA's purported "primary concern".  However, the defendants proffer no data to establish that sale's prices were increased above fair market value.  HUD ignores that transactions involving DPA, like all purchases utilizing loans guaranteed by the FHA, have home prices validated using HUD-approved appraisal criteria applied by HUD-certified and licensed appraisers that are not chosen by the DPA providers, buyers or sellers confirming that the sale price does **not** exceed fair market value.

(c)     "Among other sources the NPRM refers to a February 2005 report from the Government Accountability Office entitled 'Mortgage Financing; Actions Needed to Help FHA Manage Risks from New Loan Products,' and Revenue Ruling 2006-27, in which the Internal Revenue

Service found that seller-funded DPA providers do not qualify as tax-exempt organizations under section 501(c)(3) of the Internal Revenue Code. A.R. 00024-25."

**Response**:    The defendants' statement accurately reflects that the NPRM refers to the February 2005 GAO report and IRS Revenue Ruling.   However, those sources were the exclusive sources listed and not "[a]mong other sources".   A.R. 00010-00014.

4.    The defendants' failed to include statement number 4.

5.    The defendants' statement accurately reflects the comment period.  The defendants' self-serving statement regarding the format and wording of the comments does not accurately reflect the public comments. A.R. 50,000 to 66631.

6.    Not in dispute, although Brian D. Montgomery is identified as "Assistant Secretary for Housing – Federal Housing Commissioner" not the FHA Commissioner.

7.    The defendants' discussion of 28 categories of issues raised in the public comments was not "detailed" and failed to provide a reasoned basis for rejecting reasonable alternatives. A.R. 00001-00007

8.    The defendants' statement regarding the Nehmiah settlement is incomplete and fails to include Exhibit "B" to the settlement, which provides that:

> In the event that there are any such changes regarding the source of borrower downpayment funds, the changes will become applicable to Nehemiah **and all other similarly situated downpayment assistance programs six months after the final promulgation and issuance of any such changes.** (AR at 891)(emphasis added.)

9.    The Administrative Record fails to include all further relevant material factual information, including, but not limited to HUD Secretary Alphonso Jackson statements as reported on June 5, 2007 by Bloomberg News that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso

Jackson said." The Secretary stated: "I'm very much against it . . . I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments." With respect to the then-pending rulemaking proceeding, "**Jackson said in his interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments.**" Exhibit "C" to the plaintiffs' motion for summary judgment and to supplement the administrative record. Additionally, the Administrative Record fails to include statements from FHA Assistant Secretary Brian D. Montgomery regarding FHA's fiscal condition and clarification regarding FHA default rates. See Russell affidavit in opposition at Exhibit "F".


Dated:  December 7, 2007

**THE MASON LAW FIRM, LLP**

/s/ Gary E. Mason
Gary E. Mason
DC Bar # 418073
Nicholas A. Migliaccio
DC Bar #0484366
1225 19th Street Northwest
Washington, D.C.  20036
(202) 429-2290


**KANTROWITZ, GOLDHAMER
 & GRAIFMAN, P.C.**
Michael Braunstein
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570


Attorneys for Plaintiffs