**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

PENOBSCOT INDIAN NATION *et al.*,            )
                                            )       Case No.: 07-1282 (PLF)
                          Plaintiffs,        )
                                            )
            -v-                              )
                                            )
UNITED STATES DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT *et al.*,              )
                                            )
                          Defendants.        )

---                                          )

## <u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>

The Penobscot plaintiffs hereby provide the Court with supplemental authority directly relating to the pending APA summary judgment motions.  Nehemiah Corporation of America commenced an action in the United States District Court for the Eastern District of California, pursuant to the APA, alleging that HUD violated the APA when it adopted a rule barring the use of seller-funded downpayment assistance for mortgages insured by the Federal Housing Administration (the Nehemiah matter").  The Nehemiah matter challenges the same rule being challenged in this case and the related AmeriDream matter.  In the Nehemiah matter, Senior Judge Lawrence K. Karlton issued an Order, dated February 29, 2008, which set aside the final rule, remanded the matter to the agency for further action consistent with the Order, disqualified Secretary Jackson from participating in the remanded proceedings and directed the clerk to enter judgment and close the case.  A copy of Senior Judge Lawrence K. Karlton's Order is attached hereto as Exhibit "A".

Robert J. Katerberg, Esq., counsel for the defendants, has consented to the submission of the decision in the Nehemiah matter.


Dated:  March 4, 2008

/s/ Gary E. Mason____
Gary E. Mason
**THE MASON LAW FIRM, LLP**
DC Bar #418073
1225 19th Street Northwest
Washington, D.C.  20036
(202) 429-2290

**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
Michael L. Braunstein
747 Chestnut Ridge Road
Chestnut Ridge, N.Y. 10977
(845) 356-2570
Attorneys for Plaintiff

# EXHIBIT A

1

2

3

4

5

6

7              UNITED STATES DISTRICT COURT

8          FOR THE EASTERN DISTRICT OF CALIFORNIA

9

NEHEMIAH CORPORATION OF
10  AMERICA,

11                                    NO. CIV. S-07-2056 LKK/DAD
             Plaintiff,
12
        v.
13                                         O R D E R
    ALPHONSO JACKSON, et al.,
14
             Defendants.
15  _____/

16       Plaintiff Nehemiah Corporation of America ("Nehemiah") has

17  brought this action against the Department of Housing and Urban

18  Development and its Secretary Alphonso Jackson (collectively,

19  "HUD") pursuant to the Administrative Procedures Act ("APA"), 5

20  U.S.C. § 551. Nehemiah alleges that HUD violated the APA when it

21  adopted a rule barring the use of seller-funded downpayment

22  assistance for mortgages insured by the Federal Housing

23  Administration ("FHA"), a component of HUD. In particular,

24  Nehemiah claims that HUD failed to provide a reasoned analysis for

25  the departure from its previous policy, ignored reasonable

26  alternatives to the final rule, relied on data that it never

                              1

1  produced for public comment, and prejudged the merits of the final
2  rule.    Pending before the court are cross-motions for summary
3  judgment.    The court resolves the motions after oral argument and
4  upon the parties' initial papers and supplemental briefing.    For
5  the reasons explained below, plaintiff's motion is granted in part
6  and denied in part, and defendants' motion is denied.

7                              **I. Background**

8  **A. Overview**

9       As authorized by the National Housing Act, 12 U.S.C. § 1701
10 et seq., the FHA insures mortgages, meaning that it agrees to
11 protect mortgage lenders against the risk of losses caused by
12 borrower non-payment.    As an insurer, FHA sets conditions on the
13 types of mortgages it will insure.    One such condition is the
14 requirement that home buyers must make a downpayment of at least
15 3 percent of the total cost of acquisition.    12 U.S.C. § 1709(b)(9)
16 ("[T]he mortgagor shall have paid on account of the property . .
17 . at least 3 per centum").    HUD's policy has been to allow certain
18 third-parties, such as family members and charities, to assist with
19 the downpayment, but to disallow other third-parties, such as the
20 home seller to the transaction, from doing so.

21      In the 1990s, organizations such as Nehemiah sprouted up and
22 began exploiting what HUD describes as a loophole against the ban
23 on downpayment assistance ("DPA") by sellers.    They devised a form
24 of transaction in which a charity would make a gift to the home
25 buyer to satisfy the 3 percent downpayment requirement, with the
26 understanding that the seller would make a donation to the charity

                                    2

1  after the sale was complete. Because this donation was not being
2  used to fund the downpayment of the individual purchasing the
3  seller's home -- but rather would be used to fund a future home
4  buyer's downpayment -- it was not prohibited by HUD's policy
5  against downpayment assistance by sellers. Sellers also paid a
6  processing fee in addition to their "donations."

7      On October 1, 2007, HUD published a rule that would prohibit
8  transactions such as those facilitated by Nehemiah. Standards for
9  Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 56,002,
10 56,007 (Oct. 1, 2007) (to be codified at 24 C.F.R. § 203.19(c).
11 The regulation provides that in order for FHA to insure a mortgage,
12 the funds for a buyer's downpayment may not be provided by the
13 seller or any entity that financially benefits from the
14 transaction. The effect of the rule would be to bar indirect
15 seller-funded DPA.[1]

16 **B. Statutory and Regulatory History**

17     **1. FHA Mortgage Insurance Program**

18     Congress created the FHA through the National Housing Act of
19 1934. 48 Stat. 1246 (1934). In 1965, FHA became a part of the

20

21     [1] Although Nehemiah prefers the nomenclature of "privately-funded DPA" because not all of its funding comes from sellers, what
22 is at stake in this litigation is only the portion of that private funding derived from sellers. While the method employed by
23 plaintiff does not involve direct funding by the seller, it is not unreasonable to recognize that seller assistance is ultimately
24 necessary to make the scheme work. In doing so, no intent to denigrate the program is manifested. Accordingly, the court
25 employs the terminology of "seller-funded DPA." As used in this order, seller-funded DPA refers to the financing arrangements
26 between sellers and home buyers facilitated by organizations such as Nehemiah.

1 | Department of Housing and Urban Development and is still a
2 | component of HUD to this day. 42 U.S.C. § 3534(a). FHA was
3 | established primarily for the purpose of insuring mortgage lenders
4 | against default by borrowers. 48 Stat. 1246 (1934).

5 | To accomplish this end, both HUD and FHA depend on the Mutual
6 | Mortgage Insurance Fund ("MMIF"). See 12 U.S.C. § 1708(a). The
7 | MMIF is a revolving fund that uses proceeds from insurance
8 | premiums, investment income, and foreclosure sales to provide funds
9 | for future mortgage insurance. Id. In other words, MMIF is self-
10 | sustaining. Aside from an initial $10 million appropriation from
11 | Congress, HUD has operated the MMIF using only the proceeds that
12 | the fund generates, without any other congressional appropriations.
13 | See generally Lee v. Kemp, 731 F. Supp. 1101, 1103-04 (D.D.C.
14 | 1989).

15 | If an FHA-insured mortgage has been in default for at least
16 | three months, or when the mortgage lender forecloses on a property,
17 | the lender is entitled to file a claim for insurance benefits from
18 | the MMIF. See 12 U.S.C. § 1710(a); 24 C.F.R. §§ 203.355 to
19 | 203.371. In order to receive benefits, the mortgage-holder must
20 | convey clear title to HUD. 12 U.S.C. § 1710(a)(1). According to
21 | HUD, loans originated with seller-funded DPA have much higher rates
22 | of default and foreclosure than other types of loans, and the
23 | continued increase of such loans threatens the solvency of the
24 | MMIF.[2]

25 |

26 | [2] In today's market, it hardly needs noting that other, and
perhaps more pernicious, conduct relating to mortgages threatens

4

## 2. Three Percent Requirement

Before FHA can insure a single-family home mortgage, the loan must first meet certain eligibility requirements set forth in the National Housing Act. 12 U.S.C. § 1709. One of these eligibility requirements involves the three percent downpayment of the home's acquisition cost. 12 U.S.C. § 1709(b)(9). The statute mandates that "the mortgagor" must be the individual to pay this sum. <u>Id.</u> ("*the mortgagor* shall have paid on account of the property . . . at least 3 per centum) (emphasis added). But the statute also provides two exceptions: first, a family member may lend the required sum to the home buyer, and second, a corporation or person other than the borrower may pay the sum under certain circumstances not relevant here (e.g., when the borrower is 60 years of age or older, or when the mortgage covers a housing unit under the Homeownership and Opportunity Through HOPE Act). <u>Id.</u> These are the only exceptions to the three percent rule expressly stated in the statute. 12 U.S.C. § 1709(b)(9).

Nevertheless, HUD's policy has been to permit the downpayment to be financed by sources in addition to a family member: these include the borrower's employer or labor union, a governmental entity, a charitable organization,[3] and a close friend with a

---

the entire economy.

[3] HUD defines a charitable organization as a nonprofit "exempt from income taxation under section 501(a) of the Internal Revenue Code (IRC) of 1986 pursuant to section 501(c)(3) of the IRC." HUD Mortgagee Letter 2006-13 (May 25, 2006) (Def.'s Mot, Ex. 4).

5

1   clearly defined and documented interested in the borrower.[4]   HUD

2   Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis for Mortgage

3   Insurance, One to Four Family Properties" (Def.'s Mot., Ex. 3).

4   But HUD's policy prohibits the seller from financing the buyer's

5   downpayment: "The gift donor may not be a person or entity with an

6   interest in the sale of the property, such as the seller, real

7   estate agent or broker, builder, or any entity associated with

8   them."   Id.   The prohibition on direct financing of downpayments

9   by sellers is also not challenged in this action.[5]

10      **3. Plaintiff Nehemiah**

11      In the 1990s, organizations such as Nehemiah developed seller-

12   funded DPA programs.   Pl.'s Statement of Undisputed Fact ("SUF")

13   ¶ 11.   Nehemiah provides funds for downpayment and closing costs

14   to home buyers.   In exchange, the seller agrees to make a

15   contribution to Nehemiah of one to six percent of the final

16   contract sales price and to pay a processing fee.   SUF ¶ 20.   The

17   contribution paid by the seller is not used specifically for the

18   buyer's downpayment assistance.   SUF ¶ 22.   Instead, Nehemiah

19   provides the funds to the home buyer from a pre-existing pool of

20   funds.   SUF ¶ 22.   The seller then pays a contribution to Nehemiah

21   only after the loan has successfully closed.   SUF ¶ 23.   The

22   contributions collected from sellers replenish Nehemiah's pool of

23   _____

24      [4] HUD's policy of allowing downpayments to be financed by
     these other sources is not challenged in this action.

25      [5] Indeed, Nehemiah's business model depends entirely on such
     a prohibition; otherwise, Nehemiah would have no role to play as
26   the intermediary.

                              6

1   funds for other home buyers.  SUF ¶ 23.

2        In late 1997, HUD and Nehemiah engaged in litigation over the

3   legality of Nehemiah's seller-funded down payment program.  See

4   Nehemiah Progressive Housing Corp. v. Andrew Cuomo, et al., Civ.

5   S-97-1817-GEB/PAN (E.D. Cal.).    This litigation  ended  in  a

6   settlement agreement whereby Nehemiah was permitted to continue

7   operation of its DPA program.  Administrative Record ("A.R.")

8   00884.  HUD, however, "expressly reserve[d] the right to and may

9   take [regulatory] actions with regard to down payment assistance

10  programs generally."  Id.

11       4. Earlier Treatment of Seller-Funded DPA

12       In 1999, HUD proposed a rule that would have accomplished the

13  same effect as the present rule at issue.  Sources of Homeowner

14  Downpayment, 64 Fed. Reg. 49,956 (proposed Sept. 14, 1999).  Under

15  the proposed rule, a gift could not be used for the borrower's

16  downpayment if the organization providing the gift received its

17  funds either directly or indirectly from the seller of the

18  property.    Id.    Following the receipt and review of public

19  comments, the "overwhelming majority of [which] opposed the rule,"

20  HUD withdrew the proposed rule.  Withdrawal of Proposed Rule on

21  Sources of Homeowner Downpayment, 66 Fed. Reg. 2,851, 2,852 (Jan.

22  12, 2001).

23       In November 2005, the Government Accountability Office (GAO)

24  issued a report expressing concerns that seller-funded DPA results

25  in higher home prices without comparable increases in equity for

26  buyers.  A.R. 00545-46 (finding homes with seller-funded DPA sold

                                    7

1  for three percent more than comparable homes without such
2  assistance). Accordingly, buyers relying on seller-funded DPA
3  possess less initial equity in their homes. The report also found
4  that seller-funded DPA was associated with a greater likelihood of
5  delinquency and default claims. A.R. 00549-50 (finding 22-28
6  percent delinquency for loans with seller-funded DPA, compared to
7  11-16 percent for other types of DPA and 8-12 percent for loans
8  without any type of DPA at all).[6]

9      Furthermore, the November 2005 GAO report recommended that the
10  FHA "revise [] standards to treat assistance from a seller-funded
11  nonprofit as a seller contribution" because "down payment
12  assistance provided by seller-funded entities is, in effect, a
13  seller inducement." A.R. 00568-69. In a letter responding to the
14  report, FHA Commissioner (and HUD Assistant Secretary) Brian
15  Montgomery defended seller-funded DPA against outright prohibition.
16  A.R. 00614. He argued that if a seller's contribution could not

17

18      [6] The greater risk associated with loans involving seller-
    funded DPA may be caused by several factors. For instance, buyers
19  who are unable to satisfy the three percent downpayment requirement
    through other nonseller-related sources (e.g., personal savings,
20  family members) may also be less able to turn to these sources in
    the event of income disruption (occasioned by illness or job loss,
    for example).
21      Further, seller-funded DPA results in higher home prices,
    which in turn may result in higher and more unmanageable mortgage
22  payments. But the difference in home prices (in the neighborhood
    of $4,100, the average amount that Nehemiah gives to borrowers,
23  plus Nehemiah's processing fee) -- amortized over the life of a
    mortgage -- may not represent a significant difference between the
24  monthly mortgage payments of borrowers who relied on seller-funded
    DPA and those who did not. In addition, delinquency rates for
25  loans with DPA from sources other than sellers are still higher
    than those without any type of DPA, and yet there is no seller-
26  induced price inflation with either of these types of loans.

1  be traced to the organization's gift to the buyer, the contribution
2  was not a seller inducement to purchase.  Id.

3      In May 2006, the Internal Revenue Service ("IRS") ruled that
4  an organization is not eligible for 501(c)(3) status when it
5  receives substantial funding from sellers and other entities that
6  stand to benefit from the home purchases facilitated by the
7  organization.[7]  See Rev. Rul. 2006-27, 2006-21 I.R.B. 915, 918;
8  accord A.R. 00021.  In its press release accompanying the ruling --
9  which HUD subsequently referenced in its own rulemaking -- the IRS
10  expressed concern with arrangements where the seller only pays the
11  organization if the buyer completes the purchase of the home.
12  I.R.S. News Release IR-2006-74 (May 4, 2006) ("The IRS is
13  increasingly concerned with organizations that are taking advantage
14  of homebuyers who need assistance for a down payment to realize the
15  American dream of homeownership. . . . So-called charities that
16  manipulate the system do more than mislead honest homebuyers and
17  ultimately jack up the cost of the home.  They also damage the
18  image of honest, legitimate charities.") (internal quotation marks
19  omitted); accord A.R. 00026.

20  **C. Proposed and Final Rule**

21      On May 11, 2007, HUD published a notice of proposed rulemaking
22  ("notice" or "proposed rule").  Standards for Mortgagor's
23  Investment in Mortgaged Property, 72 Fed. Reg. 27,048 (May 11,
24  2007) (to be codified at 24 C.F.R. pt. 203).  The notice indicated

25  _____

26  [7] Despite this ruling, Nehemiah contends that its tax-exempt
   status remains intact.  SUF ¶¶ 37-41.

that "[t]he proposed rule would establish that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity . . . that is reimbursed directly or indirectly by any of the parties listed in clause (1)." Id. at 27,049.  HUD also cited to both an earlier February 2005 GAO report[8] and the IRS press release.  Id. at 27,048-49.

HUD provided a total of 90 days for the comment period.  See 72 Fed. Reg. at 27,048 (initial provision for 60 days); 72 Fed. Reg. 37,500 (July 11, 2007) (extension by 30 days).  As described in greater detail below, Secretary Jackson purportedly made a statement to Bloomberg News in the middle of the comment period suggesting that the rule would be passed, regardless of critical comments.  Neil Roland, U.S. to Ban Down Payment Program Over Objections, Jackson Says, Bloomberg News, June 5, 2007 (Decl. of Joseph Genshlea, Ex. U).  During the entire comment period, HUD received over 15,000 comments in response to the rule.  72 Fed. Reg. at 56,003.  After reviewing the comments, HUD published a final rule that was substantially similar to the proposed rule. Id.  The final rule included HUD's discussion of 28 categories of issues raised in public comments.  Id. at 56,003-06.

_____

[8] This is distinct from the November 2005 GAO report discussed above.

10

1   The final rule was scheduled to take effect on October 31,
2   2007. _Id._ at 56,002. Due to the terms of HUD's 1998 settlement
3   agreement with Nehemiah, any changes to HUD's treatment of DPA
4   providers would only become applicable to Nehemiah "after the
5   expiration of six (6) months from the date of final promulgation
6   and issuance of any such changes or modifications." A.R. 00884.
7   Accordingly, HUD delayed the effective date of the final rule as
8   to Nehemiah until March 31, 2008. 72 Fed. Reg. at 56,003.

9   **D. Other Litigation**

10  Litigation is currently pending in the U.S. District Court for
11  the District of Columbia in two similar cases challenging the
12  regulation: Penobscot Indian Nation, et al., v. HUD, No. 07-cv-1282
13  (D.D.C.), and AmeriDream, Inc., et al., v. Jackson, No. 07-cv-1752
14  (D.D.C.). In October 2007, plaintiffs in both cases (excluding
15  AmeriDream) moved for preliminary injunctions barring enforcement
16  of the regulation. On October 31, 2007, following a hearing on the
17  motions, the district court orally ruled on the motions and
18  enjoined HUD from enforcing the regulation until the court rendered
19  a decision on the parties' cross-motions for summary judgment.

20  The court found that plaintiffs had shown a substantial
21  likelihood of irreparable harm and demonstrated a likelihood of
22  success on the merits, or at least raised serious questions, as to
23  some of their claims. Among other things, the court found that
24  plaintiffs were likely to succeed on their claims that HUD violated
25  the APA by not adequately responding to public comments. In
26  addition, the court found that plaintiffs were likely to succeed

11

1 | on their claim that the Secretary of HUD improperly prejudged the
2 | rule.  The <u>Penobscot/AmeriDream</u> court has not yet issued a ruling
3 | on pending cross-motions for summary judgment.

## II. Standard

### A. Summary Judgment

In challenges to final agency action, the court does not employ the standard summary judgment analysis for determining whether a genuine issue of material fact exists when analyzing the merits of the challenge. <u>Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.</u>, 268 F. Supp. 2d 1197, 1206 (E.D. Cal. 2003).  This is because the court is not generally called upon to resolve facts in a review of an agency action. <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir. 1985); <u>Home Builders Ass'n</u>, 268 F. Supp. 2d at 1207.

While there may have been issues of fact before the administrative agency, the court's function is to determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did. <u>Occidental Eng'g</u>, 753 F.2d at 769-70; <u>Home Builders Ass'n</u>, 268 F. Supp. 2d at 1207.  Summary judgment is therefore an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did. <u>Occidental Eng'g</u>, 753 F.2d at 769-70; <u>Home Builders Ass'n</u>, 268 F. Supp. 2d at 1207.

### B. Review of Agency Action

In a rulemaking action, the APA "requires an agency to: (1) publish a general notice of proposed rulemaking in the Federal

1 Register; (2) give interested parties an opportunity to participate
2 in the rulemaking through submission of data, views, and arguments;
3 and (3) after consideration of the relevant matter presented,
4 incorporate in the rules a concise general statement of the rule's
5 basis and purpose." <u>Ober v. EPA</u>, 84 F.3d 304, 312 (9th Cir. 1996)
6 (citing 5 U.S.C. § 553(b)-(c)).

7    The APA authorizes the court to set aside agency action that
8 is "arbitrary, capricious, an abuse of discretion, or otherwise not
9 in accordance with the law." 5 U.S.C. § 706(2)(A); <u>Nw. Envt'l Def.</u>
10 <u>Ctr. v. Bonneville Power Admin.</u>, 477 F.3d 668, 682 (9th Cir. 2007).
11 While "the scope of review under the arbitrary and capricious
12 standard is narrow and a court is not to substitute its judgment
13 for that of the agency," "the agency must examine the relevant data
14 and articulate a satisfactory explanation for its action including
15 a rational connection between the facts found and the choice made."
16 <u>Id.</u> at 687 (internal quotation marks omitted).

17    "That is, an agency must cogently explain why it has exercised
18 its discretion in a given manner and in reviewing that explanation,
19 [the court] must consider whether the decision was based on a
20 consideration of the relevant factors and whether there has been
21 a clear error of judgment." <u>Id.</u> (internal quotation marks
22 omitted). The court "may uphold a decision of less than ideal
23 clarity if the agency's path may be reasonably be discerned." <u>Beno</u>
24 <u>v. Shalala</u>, 30 F.3d 1057, 1073 (9th Cir. 1994) (internal quotation
25 marks omitted). But the court "cannot infer an agency's reasoning
26 from mere silence or where the agency failed to address significant

13

1 objections and alternative proposals." Id.

2                        **III. Analysis**

3      Here, Nehemiah argues that HUD violated the APA for four

4 independent reasons.  Nehemiah contends that HUD (1) failed to

5 supply a reasoned analysis for departing from its longstanding

6 support of seller-funded DPA, (2) neglected to provide

7 reasonable explanations for rejecting alternatives to the rule,

8 (3) relied on data that it never produced for the public, and

9 that (4) Secretary Jackson exhibited an unalterably closed mind

10 regarding the final rule.

11 **A. Reasoned Analysis for Departure from Prior Policy**

12      First, in Nehemiah's words, "HUD reversed its decade-long

13 history without coming to grips with the fact that it was

14 undertaking [a] 180-degree change in course."[9]  Pl.'s Mot. at

15 34.  An agency "is entitled to change its course when its view

16 of what is in the public's interest changes," Nw. Envt'l Def.

17 Ctr., 477 F.3d at 687, "with or without a change in

18 circumstances," Greater Boston Television Corp., 444 F.2d at

19 852.  Flexibility and adaptability are integral to an agency's

20 efficacy.  See Am. Trucking Ass'ns v. Atchison, Topeka & Santa

21 Fe Ry. Co., 387 U.S. 397, 416 (1967) ("Regulatory agencies do

22 not establish rules of conduct to last forever; they are

23 ────────────────────
         [9] It is not unreasonable to contend, as HUD does, that the
24 complaint failed to allege this particular claim.  But the court
   finds that it was captured by the catch-all paragraph stating that
25 the "Final Rule violates the APA inasmuch as it constitutes
   arbitrary and capricious agency action." Compl. ¶ 36.  In
26 addition, because there were cross-motions for summary judgment,
   HUD has had an adequate opportunity to respond.

1  supposed, within the limits of the law and of fair and prudent
2  administration, to adapt their rules and practices to the
3  Nation's needs in a volatile, changing economy.").

4      Nevertheless, an agency "'must supply a reasoned analysis
5  indicating that prior policies and standards are being
6  deliberately changed, not casually ignored, and if an agency
7  glosses over or swerves from prior precedents without discussion
8  it may cross the line from the tolerably terse to the
9  intolerably mute.'"  Id. at 687-88 (quoting Greater Boston
10 Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970));
11 Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
12 Ins. Co., 463 U.S. 29, 42 (1983) ("[A]n agency changing its
13 course by rescinding a rule is obligated to supply a reasoned
14 analysis for the change.").

15     The rule requiring reasoned analysis exists because there
16 is a presumption that an agency's current course of behavior
17 best carries out Congress' policies; accordingly, deviation from
18 that course warrants explanation.  Atchison, Topeka & Santa Fe
19 Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807-08 (1973).
20 Where an agency reverses track, it has a duty to provide a
21 reasoned analysis "over and above" that required when writing on
22 a clean slate, in the first instance.  W. Petroleum Ass'n v.
23 E.P.A., 87 F.3d 280, 284 (9th Cir. 1996); Motor Vehicle Mfrs.
24 Ass'n, 463 U.S. at 42.

25     1. HUD's Prior Policy
26     Here, Nehemiah argues that HUD has "openly embraced"

15

1   seller-funded DPA for years. Pl.'s Mot. at 37. At least with

2   respect to HUD's initial treatment of seller-funded DPA, this

3   overstates the case. During this initial phase, it may be more

4   accurate to say that HUD begrudgingly tolerated entities such as

5   Nehemiah. In 1999, for example, HUD proposed a rule that,

6   although ultimately withdrawn, would have accomplished the same

7   effect as the present regulation. 64 Fed. Reg. 29,956 (Sept.

8   14, 1999).

9        While Nehemiah points out that HUD approved of its business

10  model in the 1998 settlement agreement, that agreement seems to

11  contemplate the potential demise of seller-funded DPA as much as

12  it approves of the same. A.R. 00883-91. A provision of the

13  agreement permits Nehemiah to continue operations for six months

14  longer than would otherwise be permitted in the event that HUD's

15  position regarding seller-funded DPA changes.[10] More

16  fundamentally, HUD approved of seller-funded DPA in the context

17  of a settlement agreement, which is necessarily a product of

18  compromise and mutual acquiescence and is rarely reflective of

19  each party's ideal desired outcome.

20       More recently, however, HUD warmed to seller-funded DPA.

21  In a 2005 letter, Commissioner Montgomery defended it against

22  calls for its ban by the GAO. He wrote that because those who

23

24  _____
    [10] A.R. 00884 ("Notwithstanding the approval of plaintiff's
    [program], however, HUD . . . expressly reserve[s] the right to and
25  may take [] actions with regard to down payment assistance programs
    generally."); id. ("Any such actions, changes or modifications .
26  . . shall thereafter become applicable to plaintiff's [program]
    after the expiration of six (6) months.").

16

1  use seller-funded DPA "are representative of the population that

2  FHA was established to serve," FHA would prefer to charge a

3  higher premium on loans arising from seller-funded DPA, rather

4  than banning them altogether.  A.R. 00612.  But he recognized

5  that there were problems associated with seller-funded DPA that

6  needed to be addressed.  He also responded to GAO's concern that

7  seller-funded DPA was a seller inducement to purchase, arguing

8  that "the timing of the payments is a key point," and that

9  "[b]ecause the buyer has not received funds from the nonprofit

10  that can be traced to the seller's contribution, there has not

11  been an inducement."  A.R. 00614.  In sum, HUD supported seller-

12  funded DPA in more recent history, whatever the agency's

13  previous position.

14  ////

15      **2. Reasoned Analysis**

16      The issue is whether HUD "'suppl[ied] a reasoned analysis

17  indicating that prior policies and standards [were] being

18  deliberately changed, not casually ignored.'"  <u>Nw. Envt'l Def.</u>

19  <u>Ctr.</u>, 477 F.3d at 687.  Conceptually, this requirement can be

20  viewed as containing two components: first, whether HUD's change

21  was supported by reasoned analysis, and second, whether HUD was

22  honest with itself and the public that it was changing its

23  policy.

24      With respect to the first point, the court finds that HUD

25  provided the requisite reasoned analysis.  The notice of

26  proposed rulemaking explained:

17

[I]nflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments. . . . [I]nflated sales prices result in inflated mortgage amounts, which increase the severity of individual claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages. Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan.

72 Fed. Reg. at 27,049; accord 72 Fed. Reg. at 56,003. The final rule also reiterated that, in FHA's experience, "loans made to borrowers who rely on these types of seller-funded assistance perform very poorly." Id. at 56,002.

Although not categorized as such, HUD essentially discussed two distinct negative outcomes it associated with seller-funded DPA: one directed at the consumer and one directed at HUD (and, specifically, the MMIF). With regard to harm to consumers, HUD stated that seller-funded DPA leads to sales price inflation, causing home buyers to pay above-market mortgage payments. This consequence remains even if the loans originating from seller-funded DPA do not present any added risk to HUD.[11]

_____

[11] The court will assume without deciding that HUD may permissibly act to curb such inflation, even in instances where the home buyer might be willing to accept the price inflation. Because the government has no duty to insure mortgages at all, it may choose to do so on such terms and conditions that it deems appropriate (subject to constitutional limitations). Accordingly, the court will presume that it is permissible for HUD to refuse to insure loans for borrowers who, although perhaps willing to accept price inflation, have a "two to three times higher possibility of losing their home" based on HUD's statistics, 72 Fed. Reg. at

18

1      With regard to harm to itself, HUD noted that loans relying
2  upon seller-funded DPA do, in fact, present an added risk to
3  HUD, as they categorically perform worse than other loans.
4  Also, when these loans do default, the resulting impact on FHA
5  is more severe than with other loans because they tend to thrive
6  in depreciating housing markets, making it more difficult for
7  FHA to recoup its losses.  Accordingly, even if loans originated
8  with seller-funded DPA defaulted at the same rate as other
9  loans, there would still be a greater impact on FHA and the
10  MMIF.

11      The description of each of these harms independently
12  satisfies HUD's duty to provide a reasoned basis for the
13  regulation.  Other courts have upheld agency action on less.
14  See, e.g., Personal Watercraft Indus. Ass'n v. Dep't of
15  Commerce, 48 F.3d 540, 545 (D.C. Cir. 1995) (finding that APA
16  requirement of "concise general statement" of the "basis and
17  purpose" for a regulation satisfied by two paragraphs).

18      Nevertheless, HUD was not honest with itself or the public
19  that it was reversing course from its prior policy.  See Int'l
20  Union, United Auto., Aerospace and Agric. Implement Workers of
21  Am. v. NLRB, 802 F.2d 969, 974 (7th Cir. 1986) (noting that an
22  agency must "'fess up to its changes of position").  While HUD
23  obliquely recognized that its prior practice was to allow
24  seller-funded DPA, it was less than fully candid in doing so.

25  _____

26  56,004, or for HUD to choose to only insure loans for homes
   purchased at a fair market price.

1  For example, in the "Background" section in the notice of
2  proposed rulemaking, HUD noted that it attempted to prohibit
3  seller-funded DPA in 1999 but withdrew the rule.  72 Fed. Reg.
4  at 27,048.  At best, this abortive attempt at banning seller-
5  funded DPA indirectly indicated that HUD's prior policy was to
6  permit the practice.

7       Similarly, in the final rule, HUD noted that certain
8  organizations "have been able to circumvent" the general rule
9  against direct DPA from a seller.  72 Fed. Reg. at 56,002.
10 This, however, hardly appears to be even a reluctant recognition
11 that seller-funded DPA was previously permitted.  Indeed, as
12 Nehemiah argues, HUD never mentioned Commissioner Montgomery's
13 defense of seller-funded DPA in 2005.  Thus, it is difficult to
14 conclude that HUD made it clear that its prior policy supported
15 seller-funded DPA.  The court cannot find that HUD manifested
16 the requisite candor about its previous positions.

17      Put differently, while HUD may have set forth good reasons
18 for the rule's adoption, it did not adequately explain why it
19 was changing its mind.  See Sec'y of Agriculture of U.S. v.
20 U.S., 347 U.S. 645, 652-53 (1984) ("[W]hile the Commission has
21 adumbrated the reasons that commended these charges to its
22 approval, the Commission has not adequately explained its
23 departure from prior norms.").  Accordingly, while HUD provided
24 substantive analysis to support the rule, it failed to
25 acknowledge its previous position, thereby violating the APA.
26 ////

## B. Reasonable Alternatives

Second, Nehemiah argues that HUD failed to provide reasonable explanations for rejecting several proposed alternatives to an outright prohibition on seller-funded DPA. An agency "need only respond to 'significant' comments, i.e., those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." Am. Mining Congress v. EPA, 965 F.2d 759, 771 (9th Cir. 1992) (citing Home Box Office v. FCC, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)). The agency "is required to address common and known or otherwise reasonable options, and to explain any decision to reject such options." Int'l Ladies' Garment Workers' Union v. Donovan, 772 F.2d 795, 818 (D.C. Cir. 1983). Here, Nehemiah argues that HUD failed to respond to four categories of comments. The court agrees that HUD failed to satisfy its duties under the APA with respect to the first two categories.

### 1. Risk-Based Insurance Premiums

The first comment in the final rule suggested that "HUD should not eliminate downpayment assistance, but regulate such assistance or establish standards for downpayment supported loans, including . . . [the use of] a higher insurance premium for such loans." 72 Fed. Reg. at 56,003. Risk-based insurance premiums could, presumably, compensate HUD for the extra risk posed by loans originating from seller-funded DPA. HUD's response to this comment clarified that the rule would not eliminate all DPA, such as that received from a family member,

21

1  because many commenters apparently expressed beliefs to the
2  contrary.   The response to the comment did not, however, address
3  the issue of insurance.

4       In its brief, HUD argues that it did not need to do so,
5  because two weeks before the publication of the rule at issue,
6  HUD published a proposed rule that would implement risk-based
7  premiums.   Federal Housing Administration (FHA) Single Family
8  Mortgage Insurance: Announcement of Planned Implementation of
9  Risk-Based Premiums, 72 Fed. Reg. 53,872 (Sept. 20, 2007).   One
10  of the factors that would be taken into account under the
11  proposed rule is whether the downpayment is funded by the
12  borrower or the borrower's relative, or by some other source.
13  Id.   Given this regulatory context, HUD argues that it
14  adequately addressed the insurance alternative -- and in fact
15  agreed that it should be adopted -- but expressed its position
16  in a separate proposed rule.

17       HUD's argument is a non-sequitur.   The proposal of risk-
18  based insurance premiums was suggested in lieu of banning
19  seller-funded DPA -- not merely in addition to banning  seller-
20  funded DPA.   Whether the proposal has utility beyond that
21  purpose, such as in differentiating risks between loans where
22  the downpayment is paid by a family member versus some other
23  (nonseller-funded) source, is a wholly separate issue.

24       Nevertheless, HUD stressed in both the proposed and final
25  rule that its "primary concern with [seller-funded DPA]
26  transactions is that the sales price is often increased to

22

ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." 72 Fed. Reg. at 27,048; accord 72 Fed. Reg. at 56,002. Thus, it could be argued that insurance only addresses half the problem, because it mitigates harm to FHA, but not to the borrowers at issue, who pay inflated sales prices and are also more likely to "ultimately lose their homes." A.R. 00565. Even assuming that this form of consumer protection is a permissible objective, however, HUD did not rely on such a rationale for the rule's adoption.[12] Beno, 30 F.3d at 1073 (court "may not consider reasons for agency action which were not before the agency"). Accordingly, the court finds that HUD failed to respond adequately to this category of comments.

### 2. Disclosure of Downpayment Assistance

Second, Nehemiah also argues that HUD provided an inadequate response to the comment that "HUD can mitigate risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers." 72 Fed. Reg. at 56,004. HUD responded by stating that "FHA requirements currently require disclosure of downpayment assistance." Id.

But it appears that at least some of the comments proposed

---

[12] Indeed, by contrast, HUD did make this argument in response to a different issue. See 72 Fed. Reg. at 56,004 ("the recommendations pertaining to warranty . . . do[] not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.").

1  that FHA require disclosure of the *source* of DPA, not merely its
2  existence or amount.[13]  For example, AmeriDream suggested that
3  HUD "[r]equire, in accordance with GAO's recommendation, that
4  the appraiser be informed about the use of downpayment
5  assistance in the transaction."  GAO's recommendation, in turn,
6  was to require that lenders inform appraisers of the source of
7  DPA.  A.R. 00567 ("To more fully consider the risks posed by
8  downpayment assistance when underwriting loans, include the
9  presence and source of down payment assistance as a loan
10 variable in . . . the underwriting process.").  HUD therefore
11 failed to respond to the suggestion that it require disclosure
12 of the source of DPA.

13     **3. Home Inspections and Homeowner's Warranties**

14     Another category of comments argued that "HUD can further
15 mitigate risk by requiring a complete home inspection, to avoid
16 potentially huge repair costs to the homeowner.  HUD could also
17 require the owner to obtain a homeowner's warranty . . . to
18 avoid high repair cost as a source of default and foreclosure."
19 72 Fed. Reg. at 56,004.  HUD responded: "The commenters'
20 recommendations are noted, but the suggested actions are outside
21 the scope of the present rule.  In addition, the recommendations
22 pertaining to warranty . . . do[] not deal directly with sales
23 price inflation, which is a separate issue from repair costs a

24 _____

25 [13] HUD fixates on the wording of Nehemiah's comment to the
exclusion of all others, because Nehemiah's comment only suggested
disclosure as to the existence and amount of DPA, rather than its
26 source.

24

1 homeowner may face after purchasing a home." Id. With regard
2 to this issue, there was nothing incomplete or improper about
3 HUD's response. Warranties and inspections might mitigate a
4 cause of default and foreclosure (repair costs) but they would
5 not address the problem of sales price inflation.

6      4. Blind Pool Appraiser Selection Process

7      The last category of comments identified by Nehemiah
8 suggested that "[p]rice inflation does not arise from
9 downpayment assistance, but from the appraisal process. The
10 appraisal process should be reformed, by example, by
11 establishing a blind pool appraiser selection process for loans
12 with downpayment assistance." 72 Fed. Reg. at 56,004. HUD
13 responded: "Downpayment assistance can be an independent source
14 of price inflation separate from, or in conjunction with, any
15 price inflation which may arise from the appraisal process. . .
16 . HUD has already taken steps to address the appraisal issue
17 [through other regulations]." Id.

18      Again, there was nothing inadequate about HUD's response.
19 Price inflation may occur for two separate reasons: first,
20 sellers increase prices because they want to recoup what they
21 pay to entities such as Nehemiah, and second, appraisers may
22 overvalue property because those who procure their services
23 (e.g., loan officers, mortgage brokers) are more likely to do so
24 when the appraisers "bring in value." A.R. 00720. Even if HUD
25 only chose to address the first issue and ignore the second one,
26 it would have been entitled to do so. An agency does not have

1 to "make progress on every front before it can make progress on
2 any front." <u>United States v. Edge Broadcasting Co.</u>, 509 U.S.
3 418 (1993). But, in fact, HUD explained that it was addressing
4 the second reason through other regulations.

5 **C. Failure to Produce Data**

6     Third, Nehemiah argues that the rule should be set aside
7 because HUD failed to make available the data that it relied
8 upon in proposing and evaluating the rule.[14]  "'To suppress
9 meaningful comment by failure to disclose the basic data relied
10 upon is akin to rejecting comment altogether.'" <u>Wash. Trollers</u>
11 <u>Ass'n v. Kreps</u>, 646 F.2d 684, 686 (9th Cir. 1981) (quoting
12 <u>United States v. Nova Scotia Food Prods. Corp.</u>, 568 F.2d 240,
13 252 (2d Cir. 1977)). "'It is not consonant with the purpose of
14 a rulemaking proceeding to promulgate rules on the basis of
15 inadequate data, or on data that, to a critical degree, is known
16 only to the agency.'" <u>Wash. Trollers</u>, 646 F.2d at 686 (quoting
17 <u>Portland Cement Ass'n v. Ruckelshaus</u>, 486 F.2d 375, 393 (D.C.
18 Cir. 1973)). That said, "'[n]othing prohibits [an a]gency from
19 adding supporting documentation for a final rule in response to
20 public comments.'" <u>Kern County Farm Bureau v. Allen</u>, 450 F.3d
21 1072, 1076 (9th Cir. 2006) (quoting <u>Rybachek v. EPA</u>, 904 F.2d
22 1276, 1286 (9th Cir. 1990)). "[T]he public is not entitled to
23 review and comment on every piece of information utilized during
24

---

25 [14] HUD argues that this claim, like the "reasoned analysis"
claim, was not articulated in the complaint. For the reasons
explained earlier, the court declines to dismiss the claim on this
26 basis.

1  rule making.  Instead, an agency, without reopening the comment
2  period, may use 'supplementary data, unavailable during the
3  notice and comment period, that expands on and confirms
4  information contained in the proposed rulemaking and addresses
5  alleged deficiencies in the pre-existing data, so long as no
6  prejudice is shown.'"  Id. (quoting Idaho Farm Bureau Fed'n v.
7  Babbitt, 58 F.3d 1392, 1402 (9th Cir. 1995)).

8      Here, Nehemiah contends that HUD relied on its own
9  portfolio analysis to gauge the risk of loans with seller-funded
10 DPA but failed to disclose what that analysis entailed.  72 Fed.
11 Reg. at 56,003 ("Based on HUD's analysis of its loan portfolio
12 going back to 1998, HUD has assessed that risk and has
13 determined that there is a 2 to 3 times greater risk of default
14 and claim with purchase loans that receive downpayment
15 assistance from the seller . . . than from all other loans with
16 downpayment assistance from all other sources.").

17     First, assuming that HUD's disclosure of its analysis was
18 deficient, the analysis at issue may not be material to the
19 rule's adoption.  See Kern County Farm Bureau, 450 F.3d at 1079
20 (declining to reopen notice-and-comment where new/undisclosed
21 information did "not provide the sole, essential support for the
22 [agency] decision").  As even AmeriDream pointed out in its
23 comment, "HUD did not cite default or claim rates among
24 borrowers utilizing downpayment assistance as a justification
25 for its proposed rule," A.R. 66622; rather, it was not until
26 later in the rulemaking process that HUD noted the increased

1 default and claim rates associated with seller-funded DPA,
2 prompted principally in response to comments.[15]  But throughout
3 the process, HUD was clear that its "primary concern" with
4 seller-funded DPA was that "sales price is often increased to
5 ensure that the seller's net proceeds are not diminished."  72
6 Fed. Reg. at 56,002.

7    Regardless of how loans with seller-funded DPA ultimately
8 perform as a class (e.g., whether they default more often), the
9 regulation nevertheless counters sales price inflation.[16]  As
10 noted in the proposed rule, the February 2005 GAO report also
11 stated that mortgage industry participants (Fannie Mae and
12 Freddie Mac) "do not allow seller-related contributions to the
13 downpayment [because they] could contribute to an overvaluation
14 of the price of the property."  72 Fed. Reg. at 27,049.  There
15 is nothing improper about HUD's consideration of private
16 industry practices.  See A.R. 00557 ("Government internal

17

18 [15]  Agencies are entitled to respond to comments with
additional material without triggering a new comment period.
19 Rybachek, 904 F.2d at 1286 (otherwise, "either the comment period
would continue in a never-ending circle, or, if the [agency] chose
20 not to respond to the last set of public comments, any final rule
could be struck down for lack of support in the record.").

21 [16]  These are two distinct issues.  Even if loans with seller-
funded DPA defaulted at an identical rate as loans without seller-
22 funded DPA, and HUD foreclosed on homes within these two groups at
the same frequency, HUD's losses on loans with seller-funded DPA
23 would be more severe than with other loans because HUD would be
unable to resell the homes at their same inflated purchase prices.
24 These losses are also exacerbated by the fact these homes are
likely to have depreciated, because seller-funded DPA programs tend
25 to thrive in depreciating markets.  72 Fed. Reg. at 27,049; accord
72 Fed. Reg. at 56,003.
26

1  control guidelines advise agencies to consider and recognize the
2  value of industry practices that may be applicable to agency
3  operations.").

4      Furthermore, in the proposed and final rules, HUD relied
5  upon information and analysis available to the public to support
6  its concern regarding sales price inflation.  For example, HUD
7  relied upon the IRS press release, A.R. 00026, which in turn
8  cited the November 2005 GAO report and the 2005 HUD report.[17]
9  Both reports confirmed that seller-funded DPA leads to sales
10 price inflation.  The November 2005 GAO report found that "for
11 loans with seller-funded down payment assistance, the appraised
12 value and sales price were higher as compared with loans without
13 such assistance."  A.R. 00546.  The 2005 HUD report also "found
14 overwhelming evidence that the cost of the [downpayment
15 assistance] is added to the sales price."[18]  A.R. 00631.  Because
16 price inflation was the "primary reason" for the rule, the
17 information that was actually material to HUD's rule was
18 available to the public.

19     Second, even if HUD's portfolio analysis of the default

20 ───────────────
   [17]  Nehemiah argues that the latter two sources cannot be
21 considered here because HUD did not expressly cite them.  Reduced
   to its essence, Nehemiah's position is that if HUD relied on Source
22 A, and Source A relied on Sources B and C, examination of those
   latter sources would be beyond the court's scope of review.  The
23 argument is unavailing.

24 [18]  The report, commissioned by HUD and conducted by a
   management consulting firm, stopped short of recommending an
25 outright ban on seller-funded DPA.  But HUD is entitled to rely on
   part of the report (i.e., its findings) without adopting it
26 wholesale (i.e., both the findings and recommendations).

1  risk for loans with seller-funded DPA was material to the rule's
2  adoption, plaintiff would need to demonstrate that it were
3  prejudiced by HUD's non-disclosure.  See Kern County Farm
4  Bureau, 450 F.3d at 1076 (agency may use supplementary data not
5  previously available "so long as no prejudice is shown"); see
6  also Personal Watercraft Industry Ass'n, 48 F.3d at 544 ("The
7  party objecting has the burden of 'indicat[ing] with 'reasonable
8  specificity' what portions of the documents it objects to and
9  how it might have responded if given the opportunity.'")
10  (quoting Small Refiner Lead Phase-Down Task Force v. EPA, 705
11  F.2d 506, 540-41 (D.C. Cir. 1983)).

12      Nehemiah cannot do so here.  It argues that "[p]rior to
13  2003, it was virtually impossible to use the HUD database to
14  identify which loans had down payment assistance and the source
15  of that assistance."  A.R. 00446 (2006 GMU Report[19]).  But this
16  fails to refute analyses for year 2003 to the present.
17  Furthermore, if loans with seller-funded DPA were not reliably
18  flagged, they would have been incorrectly categorized with other
19  types of loans, artificially depressing this latter group's
20  performance.  Accordingly, if there was any bias, it would have
21  understated rather than overstated the disparity in claim and
22  default rates between the two groups.  For all of these reasons,
23  the court rejects Nehemiah's contention that HUD violated the
24  APA by failing to disclose data.

25      [19] The fact that there are public critiques of HUD's database
26  also casts doubt on plaintiff's claim that it could not meaningful
    respond to HUD's analysis.

D. Prejudgement

Last, Nehemiah alleges that Secretary Jackson prejudged the merits of the rule by manifesting an unalterably closed mind. To succeed, plaintiff must prove with "clear and convincing" evidence that Secretary Jackson exhibited "an unalterably closed mind on matters critical to the disposition of the proceeding." See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1467 (9th Cir. 1987) (citing Ass'n of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151, 1170 (D.C. Cir. 1979)). Allowing the public to submit comments to an agency that has already made its decision is no different from prohibiting comments altogether. Indeed, if the public perceives that the agency will disregard its comments, there may be a chilling effect that causes the public to refrain from submitting comments as an initial matter.

Nevertheless, it has been said that "[m]ere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" is not enough to overcome the presumption that an official is objective and fair. Housing Study Group v. Kemp, 736 F. Supp. 321, 332 (D.D.C. 1990). Whatever the value of the observation is generally, it is particularly true in administrative rulemaking as opposed to adjudication, because "[t]he legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues." Ass'n of Nat'l Advertisers, 627 F.2d at 1168.

If, on the one hand, the court finds that an official has

31

1  exhibited an unalterably closed mind and the proceeding in
2  question is still ongoing, the court may disqualify that
3  official from further participation.  See Housing Study Group,
4  736 F. Supp. at 332 (attempt to disqualify HUD Secretary from
5  ongoing rulemaking proceeding).  If, on the other hand, the
6  proceeding has already been completed, then the appropriate
7  remedy would be to vacate and remand the proceeding to be redone
8  without the participation of the biased official.  See, e.g.,
9  Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249,
10 1266 (D. Wyo. 2004) (vacating and remanding for further
11 proceedings).

12      Here, on June 5, 2007, Bloomberg News published an article
13 indicating that HUD "will ban a downpayment assistance program
14 for home buyers over objections from nonprofit groups, HUD
15 Secretary Alphonso Jackson said."  Neil Roland, U.S. to Ban Down
16 Payment Program Over Objections, Jackson Says, Bloomberg News,
17 June 5, 2007 (Genshlea Decl., Ex. U).  The only direct quote
18 attributed to Secretary Jackson stated: "I'm very much against
19 it. . . I think it's wrong.  I don't want to continue to be a
20 partner in a program where so many people can't afford to keep
21 up their payments."  Id.  The article also stated that "Jackson
22 said in the interview that HUD intends to approve the new rule
23 by the end of the year even if the agency receives critical
24 comments."  Id.

25      Secretary Jackson's direct quote (that he is "very much
26 against" seller-funded DPA and that he thinks it is "wrong") is

32

1  perhaps not enough, standing alone, to demonstrate a closed mind
2  given that policymakers have leeway to "express strong views."
3  <u>Housing Study Group</u>, 736 F. Supp. at 332.  What is troubling,
4  however, is the indirect quote, in which Secretary Jackson
5  allegedly stated that HUD would approve the new rule even in the
6  face of critical comments.  <u>See</u> <u>Int'l Snowmobile Mfrs. Ass'n</u>,
7  340 F. Supp. 2d at 1261 (agency prejudged outcome to ban
8  snowmobile access to national parks where agency memorandum
9  showed "sweeping condemnation" of such access and where official
10 stated at press conference that "there will be no[] future" for
11 such vehicles in national parks).

12      As a threshold matter, HUD argues that the news article may
13 not be considered by the court.  Although the court's review is
14 generally limited to the record, extra-record evidence is
15 admissible subject to certain narrow exceptions, such as when
16 plaintiffs make a "strong showing" of agency bad faith.  <u>Animal</u>
17 <u>Defense Council v. Hodel</u>, 840 F.2d 1432, 1437 (9th Cir. 1998);
18 <u>Ranchers Cattlemen Action Legal Fund United Stockgrowers of</u>
19 <u>America v. USDA</u>, 499 F.3d 1108, 1117 (9th Cir. 2007).  If the
20 Bloomberg News article falls short of this admittedly exacting
21 standard, it is hard to imagine what evidence could possibly
22 satisfy the standard, at least in the context of a prejudgment
23 claim where the comments at issue were made outside the
24 administrative record.  Accordingly, the court finds that the
25 article is appropriately before it.

26      The next question is whether Secretary Jackson was the

33

1  decision-making official for the rule at issue.  It appears
2  that, as a practical matter, Commissioner Montgomery was the
3  decision-making official rather than Secretary Jackson.  The FHA
4  Commissioner (who, pursuant to 42 U.S.C. § 3533(b), is a HUD
5  Assistant Secretary) has (delegated) rule-making authority for
6  regulations governing a range of single- and multi-family
7  housing programs, and rules regarding DPA fall within this
8  scope.  See 71 Fed. Reg. 60,169 ("[T]he Assistant Secretary . .
9  . [is] delegated the power and authority of the Secretary of HUD
10 with respect to all housing programs").  Moreover, it was
11 Commissioner Montgomery who signed the proposed rule as well as
12 the final rule.  72 Fed. Reg. at 27,051; 72 Fed. Reg. at 56,007.
13       Plaintiff responds that although the HUD Secretary may
14 delegate this authority to Assistant Secretaries, the relevant
15 statute only empowers him to do so "without in any way relieving
16 him from final responsibility."  12 U.S.C. § 1701c(a) ("The
17 Secretary, without in any way reliving himself from final
18 responsibility, may delegate any of his functions and powers to
19 such officers, agents, or employees as he may designate.").  But
20 it seems imprudent, as a matter of the efficient allocation of
21 administrative resources, to reopen a rulemaking process simply
22 to exclude from participation an official who was never involved
23 with that process in the first instance.
24       Because the court has already concluded that HUD failed to
25 provide a reasoned analysis for its departure from prior policy
26 and failed to adequately respond to comments, and must set aside

34

1  the rule on those bases, the only issue is whether it would be
2  appropriate to disqualify Secretary Jackson from the remanded
3  proceedings.  Given that Secretary Jackson was not actually
4  involved in the initial rulemaking proceeding, disqualifying him
5  from further participation in this matter will likely impose
6  little or no burden on the agency.  In addition, while the
7  agency received voluminous comments in response to the rule, it
8  is unknown whether any prospective commenters were chilled by
9  Secretary Jackson's statement.  Accordingly, the court finds
10 that disqualification is an appropriate remedy.

11                          IV. Conclusion

12      For the reasons explained above, the court orders as
13 follows:

14      1. Plaintiff's motion for summary judgment granted in part
15 and denied in part and defendants' motion for summary judgment
16 is denied;

17      2. The final rule is set aside;

18      3. The matter is remanded to the agency for further action
19 consistent with this order;

20      4. Secretary Jackson is disqualified from participating in
21 the remanded proceedings; and

22      5. The clerk's office is directed to enter judgment and
23 close the case.

24      IT IS SO ORDERED.

25      DATED:  February 29, 2008.

26

                                        LAWRENCE K. KARLTON
                          35            SENIOR JUDGE
                                        UNITED STATES DISTRICT COURT