UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
PENOBSCOT INDIAN NATION, *et al.,*                )
                                                  )
            Plaintiffs,                           )
                                                  )
      v.                                          )       Civil Action No. 07-1282 (PLF)
                                                  )
UNITED STATES DEPARTMENT                          )
OF HOUSING AND URBAN                              )
DEVELOPMENT, *et al.,*                            )
                                                  )
            Defendants.                           )
_____)
                                                  )
AMERIDREAM, INC.,                                 )
                                                  )
            Plaintiff,                            )
                                                  )
      v.                                          )       Civil Action No. 07-1752 (PLF)
                                                  )
ALPHONSO JACKSON, Secretary,                      )
United States Department of Housing and           )
Urban Development,                                )
                                                  )
            Defendant.                            )
_____)

OPINION

        This matter is before the Court on cross-motions for summary judgment filed by

plaintiffs in Civil Action No. 07-1282, plaintiff and plaintiff-intervenors in Civil Action No.

07-1752, and the United States Department of Housing and Urban Development ("HUD"), which

is the defendant in both cases.[1]  While Civil Action No. 07-1282 and Civil Action No. 07-1752

_____
        [1]      The papers submitted in connection with this matter in Civil Action No. 07-1282
are: Notice of Motion for Summary Judgment by Penobscot Indian Nation, Penobscot Indian
Nation Enterprises and Global Direct Sales, LLC (collectively, "Penobscot Plaintiffs") [28]
("Penobscot Motion"); Defendants' Motion to Dismiss Or, in the Alternative, For Summary

are not technically consolidated, the Court addresses the cross-motions in the two cases

simultaneously because plaintiffs in both cases challenge the same HUD regulation on similar

grounds.

The regulation at issue establishes that the Federal Housing Administration

("FHA"), a unit of HUD, will no longer insure mortgages originated with certain kinds of

downpayment assistance.  See Standards for Mortgagor's Investment in Mortgaged Property, 72

Fed. Reg. 56,002 (Oct. 1, 2007) (codified at 24 C.F.R. § 203.19) ("Final Rule").  The Court

concludes that HUD's promulgation of the Final Rule violated the Administrative Procedure Act.

## I.  BACKGROUND

### A.  The FHA Mortgage Insurance Program

FHA insures mortgages, meaning that it agrees to protect mortgage lenders against

the risk of loss caused by borrowers' non-payment, as authorized by the National Housing Act,

---

Judgment [30] ("HUD Motion"); Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment [32] ("Penobscot Opposition"); and Defendants' Consolidated Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment [33] ("HUD Opposition").

The papers submitted in connection with this matter in Civil Action No. 07-1752 are: Freedom Home Baptist Church, Inc. and Dove Foundation, Inc.'s Motion for Summary Judgment [37]; Genesis' and Home Downpayment Gift Foundation's Motion for Summary Judgment [38]; Partners in Charity, Inc., Futures Home Assistance Program and Sovereign Grant Alliance's Motion for Summary Judgment [39]; Defendant's Motion for Summary Judgment [41] ("HUD Motion"); Motion for Summary Judgment by Plaintiff AmeriDream, Incorporated [42] ("AmeriDream Motion"); Genesis' and Home Downpayment Gift Foundation's Response in Opposition to Defendant's Motion for Summary Judgment [44]; Partners in Charity, Inc., Futures Home Assistance Program and Sovereign Grant Alliance's Memorandum in Opposition to Defendant's Motion for Summary Judgment [45]; Defendants' Consolidated Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment [46] ("HUD Opposition"); Opposition of Plaintiff AmeriDream, Incorporated to Defendant's Motion for Summary Judgment [47] ("AmeriDream Opposition"); Freedom Home Baptist Church, Inc. and Dove Foundation, Inc.'s Opposition to HUD's Motion for Summary Judgment [48].

12 U.S.C. § 1701 *et seq.* ("NHA" or "the Act").[2]  As an insurer, FHA sets conditions on the types of mortgages it will insure, subject to certain statutory requirements and conditions.  See NHA § 1709(b)(9).  One condition imposed by the NHA requires a home buyer to make a cash investment, or "downpayment," of at least 3% of the total cost of acquisition.  See id.[3]

HUD's longstanding policy – not challenged in these cases – has been to allow certain parties to assist home buyers with this downpayment, but not to allow such assistance to come directly from home sellers or other parties with an interest in the transaction:

> An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that

---

[2]    According to the Government Accountability Office ("GAO"):

Mortgage insurance, a commonly used credit enhancement, protects lenders against losses in the event of default.  Lenders usually require mortgage insurance when a homebuyer has a down payment of less than 20 percent of the value of the home.  FHA, VA, the USDA's Rural Housing Service (RHS), and private mortgage insurers provide this insurance. . . .  Of all the insured loans including refinancings originated in 2003, private companies insured about 64 percent, FHA insured about 26 percent, VA insured about 10 percent, and RHS insured a very small number. . . . FHA plays a particularly large role in certain market segments, including low-income and first-time homebuyers.  During fiscal years 2001 to 2003, FHA insured a total of about 3.7 million mortgages with a total value of about $245 billion. . . .  To cover lenders' losses, FHA collects insurance premiums from borrowers.  These premiums, along with proceeds from the sale of foreclosed properties, pay for claims that FHA pays lenders as a result of foreclosures.

GAO Report No. 05-194, MORTGAGE FINANCING: ACTIONS NEEDED TO HELP FHA MANAGE RISKS FROM NEW MORTGAGE LOAN PRODUCTS at 7-8 ("February 2005 GAO Report").

[3]    The NHA contains "two built-in exceptions to this requirement."  HUD Mot. at 4. In some cases, such as when the mortgagor is 60 or older, someone other than the mortgagor may pay the 3% downpayment.  See NHA § 1709(b)(9).  In addition, home purchasers may receive loans from family members to satisfy the 3% downpayment requirement.  See id.

3

> has a program to provide homeownership assistance to low- and
> moderate-income families or first-time homebuyers, or a close
> friend with a clearly defined and documented interest in the
> borrower. *The gift donor may not be a person or entity with an
> interest in the sale of the property, such as the seller, real estate
> agent or broker, builder, or any entity associated with them.*

HUD Handbook 4155.1, Rev. 5, at 2-24 (Oct. 2003) (emphasis added). HUD's view has always

been that to permit home sellers to provide downpayment assistance would "create[] an obvious

circularity and distort[] the fundamental economics of a home purchase." HUD Mot. at 6.

According to HUD:

> A home seller who has to pay the buyer's downpayment in order to
> make the transaction happen will often demand a higher sale price
> for that transaction than he would have required in an otherwise
> equivalent transaction where such down payment assistance was
> not necessary (or will refrain from discounting the sales price when
> he otherwise would have done so). Thus, seller-funded down
> payment assistance tends to push sales prices upwards, because it
> can be generally expected that the seller will attempt to recoup at
> least some, if not all, of the down payment assistance through a
> higher sales price. Higher prices, in turn, result in larger mortgage
> loans, with the buyer essentially paying the amount of the down
> payment assistance through a higher sales price and mortgage.
> Larger mortgage loans mean larger monthly payments, making it
> more difficult for the purchaser/borrower to make those payments.
> Thus, while the seller and lender both walk away from closing with
> immediate benefits, the home purchaser/borrower and FHA bear
> the long-term risks of default and foreclosure that are associated
> with less sound mortgages.

Id. In other words, HUD believes that loans originated with downpayment assistance from home

sellers are bad for borrowers (because they tend to increase the sales price) and bad for FHA

(because increased sales prices tend to result in larger, riskier loans).

4

### B. The Emergence of Seller-Funded Downpayment Assistance

Beginning in the late 1990s, several Section 501(c)(3) tax-exempt organizations began providing what has come to be called seller-funded downpayment assistance ("SFDPA"). HUD Mot. at 6.  Typically, an SFDPA provider will give a charitable gift to a home buyer which allows the buyer to make the 3% downpayment required to obtain an FHA-insured mortgage. Then the home seller will make a charitable donation to the SFDPA provider and/or pay the SFDPA provider a processing or enrollment fee.  Thus, in form at least, the home buyer receives downpayment assistance from a charitable organization (which is permissible under HUD policies), and not from a home seller (which is not permissible under HUD policies).  See HUD Handbook 4155.1, Rev. 5, at 2-24 (Oct. 2003).

According to HUD, the agency "had concerns about the propriety of this form of transaction" from the beginning.  HUD Mot. at 7.  But because the practice "initially did not affect a material number of FHA-insured loans," HUD elected not to ban SFDPA immediately and instead "resolved to study and monitor [such] programs over a period of years."  Id.

HUD now contends that it must cease insuring SFDPA loans because the number of FHA-insured SFDPA loans has exploded.  See HUD Mot. at 2.[4]  The problem with that, says HUD, is that SFDPA loans experience a much higher rate of default, foreclosure, and resultant claims on the FHA insurance fund.  Indeed, HUD contends that SFDPA loans are so risky that, if FHA continues to insure them, they will threaten the fund's solvency.  See id. at 9.

---

[4]      According to the GAO, in 2004, 30% of all FHA-insured loans originated with downpayment assistance from nonprofits, over 90% of which were seller-funded.  See GAO Report No. 06-24, MORTGAGE FINANCING: ADDITIONAL ACTION NEEDED TO MANAGE RISKS OF FHA-INSURED LOANS WITH DOWN PAYMENT ASSISTANCE at 14.

### C. The Challenged Rule

HUD therefore has promulgated a new regulation which provides that FHA will no longer insure loans originated with SFDPA. In pertinent part, the Final Rule provides that FHA will not insure a mortgage if the funds for the buyer's downpayment

> consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:
>
> (1) The seller or any other person or entity that financially benefits from the transaction; or
>
> (2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in [paragraph (1)].

Final Rule, 72 Fed. Reg. at 56,007. Simply stated, the Final Rule rejects the fundamental premise of the SFDPA business model: that seller-*funded* downpayment assistance – that is, downpayment assistance provided by home sellers indirectly, through charitable organizations – is not impermissible seller-*provided* downpayment assistance.

### D. The Instant Action

Plaintiffs and plaintiff-intervenors are SFDPA providers. All of the plaintiffs and plaintiff-intervenors are private, Section 501(c)(3) entities except for the Penobscot Plaintiffs, which are tribal entities offering essentially the same services as the private SFDPA providers. Plaintiffs and plaintiff-intervenors challenge various aspects of the Final Rule and the procedure by which it was promulgated. The Court need not reach all of these claims because it concludes that the Final Rule must be remanded because HUD violated the APA by failing to allow comment on critical factual material and failing to offer a rational explanation for the Final Rule.[5]

---

[5]     Notably, plaintiffs and plaintiff-intervenors also argue that HUD Secretary Alphonso Jackson impermissibly prejudged the outcome of the rulemaking at issue. <u>See</u>, <u>e.g.</u>,

6

## II.  PROCEDURAL POSTURE

After following standard notice-and-comment rulemaking procedures, HUD published the Final Rule on October 1, 2007.  The Final Rule was to take effect on October 31, 2007 for all but one SFDPA provider – an issue of differential treatment much debated by the parties but at this point not relevant to the disposition of this case.  Soon thereafter, plaintiff AmeriDream filed Civil Action No. 07-1752, and then filed motions for a temporary restraining order and a preliminary injunction.  The Penobscot Plaintiffs filed similar motions in Civil Action No. 07-1282.

AmeriDream subsequently withdrew its motions because HUD agreed to postpone enforcement of the Final Rule as against AmeriDream until February 29, 2008 in order to facilitate an orderly briefing schedule.  HUD declined to agree to a similar postponement for the Penobscot Plaintiffs.  HUD also declined to agree to a postponement for private SFDPA providers Genesis Foundation, Home Downpayment Gift Foundation, Partners in Charity, Inc., Futures Home Assistance Program, Sovereign Grant Alliance, Freedom Home Baptist Church,

---

AmeriDream Mot at 2 (arguing that "HUD Secretary Alphonso Jackson . . . exhibited an 'unalterably closed mind[,' Ass'n of Nat'l Advertisers, Inc. v. FCC, 627 F.2d 1151, 1170 (D.C. Cir. 1979),] when, as prominently reported, he made statements during the comment period that HUD would approve the Regulation expeditiously 'even if the agency receives critical comments.' [Neil Roland, U.S. to Ban Down Payment Program Over Objections, Jackson Says, http://www.bloomberg.com/apps/news?pid=20670001&refer=&sid=aZh46Q0pwsNk. ("Roland Article")]").

There is indeed some indication that Secretary Jackson impermissibly prejudged the outcome of the rulemaking proceeding.  See Roland Article (quoting Secretary Jackson to the effect that he is "very much against" SFDPA, thinks SFDPA is "wrong," and does not "want to continue to be a partner in a program where so many people can't afford to keep up their payments").  While these statements certainly are distressing, see Nehemiah Corp. of America v. Jackson, Civil Action No. 07-2056, Opinion and Order at 33 (E.D. Cal. Feb. 29, 2008) (finding the Roland Article "troubling"), the Court need not decide whether Secretary Jackson prejudged the rulemaking proceeding in order to resolve this matter.

Inc., and Dove Foundation, Inc. – all of whom were permitted to intervene in Civil Action No.

07-1752.  On October 31, 2007, the Court granted motions for preliminary injunctive relief filed

by the Penobscot Plaintiffs in Civil Action No. 07-1282 and by the plaintiff-intervenors in Civil

Action No. 07-1752, and enjoined enforcement of the Final Rule pending the Court's resolution

of all challenges to the Final Rule.

## III.  DISCUSSION

Judicial review of the Final Rule and the procedures by which it was promulgated

is governed by Section 706 of the Administrative Procedure Act.  Under Section 706, a

reviewing court may set aside agency actions, findings, or conclusions when they are arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law.  See 5 U.S.C.

§ 706(2)(A); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375 (1989).  A court may

also set aside agency action taken "without observance of procedure required by law."  5 U.S.C.

§ 706(2)(D).  In reviewing the agency's actions, the Court considers whether the agency acted

within the scope of its legal authority, whether the agency has explained its decision, whether the

facts on which the agency purports to have relied have some basis in the record, and whether the

agency considered all relevant factors.  Marsh v. Oregon Natural Resources Council, 490 U.S. at

378; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971).

### A.  HUD's Rationale and Opportunity to Comment

According to HUD, the Final Rule is justified because the nature of SFDPA

transactions makes SFDPA-originated loans inherently and unacceptably risky.  See Final Rule,

72 Fed. Reg. at 56,002 (HUD's "primary concern" in promulgating the Final Rule was that "the

sales price [of a home purchased with SFDPA] is often increased to ensure that the seller's net

proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA"). See also Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 27,048, 27,049 (May 11, 2007) ("Proposed Rule") (noting that SFDPA leads to inflated sales prices and "inflated mortgage amounts, which increase the severity of individual claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages"). In other words, HUD's stated rationale for the Final Rule is that SFDPA transactions inflate sales prices; that inflated sales prices lead to larger and riskier mortgages for both the buyer and the FHA; and that SFDPA-originated loans therefore should be excluded, as a class, from FHA coverage. See, e.g., HUD Mot. at 9, 17.

As support for the fundamental proposition that SFDPA loans are inherently and unacceptably risky, HUD's Final Rule relies on three sources: (1) IRS Revenue Ruling 2006-27, 2006-21 I.R.B. 915 ("IRS Revenue Ruling"), and an associated press release; (2) the February 2005 GAO Report referenced above (see supra at 3 note 2); and (3) HUD's own internal analysis of its loan portfolio going back to 1998. See Final Rule, 72 Fed. Reg. at 56,002-56,004.[6]

The IRS Revenue Ruling and the February 2005 GAO Report were mentioned in the Proposed Rule published on May 11, 2007, and interested persons – including the plaintiffs and plaintiff-intervenors – therefore had an opportunity to comment on those documents. The internal loan analysis was not cited in HUD's May 11, 2007 Proposed Rule. It is mentioned for the first time in the Final Rule issued on October 1, 2007. Nevertheless, the Final Rule relies heavily on the internal loan analysis to justify HUD's decision to cease insuring SFDPA loans.

---

[6]    The Final Rule also makes a passing reference to "an analysis of HUD Real Estate Owned (REO) sales since 2004." Final Rule, 72 Fed. Reg. at 56,005. No party contends that this study played a major role in HUD's decisionmaking process, so the Court will not address it any further.

The Final Rule asserts that, according to the internal analysis by HUD of its loan portfolio going

back to 1998,

> there is 2 to 3 times greater risk of default and claim with purchase
> loans that receive downpayment assistance from the seller or other
> persons or entities that financially benefit from the sale of a home
> to the borrower than from all other loans with downpayment
> assistance from all other sources.
>
> For example, for loans endorsed for insurance in Fiscal Year
> (FY) 2001, the cumulative claim rate as of July 2007 was 7.1
> percent for loans with downpayment assistance from relatives,
> public agencies, and employers, but 15.8 percent for loans with
> downpayment assistance from nonprofit entities that received
> reimbursements from sellers. . . .  In conjunction with the FY 2006
> Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's
> independent actuaries estimated that the ultimate claim rate for 30-
> year fixed-rate purchase loans endorsed in FY 2008 would be
> 11.04 percent if they did not have seller-funded downpayment
> assistance, but 23.06 percent if they did. . . .  The difference
> between these rates represents the difference between acceptable
> and unacceptable levels of risk to the FHA insurance fund.
>
> In addition, HUD has determined that loans with
> downpayment assistance from sellers or other parties with a
> financial interest in the transaction are also associated with a higher
> loss rate than other single family loans insured by FHA.  In other
> words, homeowners with this type of downpayment assistance
> have a two to three times higher possibility of losing their home.

Final Rule, 72 Fed. Reg. at 56,003-56,004.

Plaintiffs and plaintiff-intervenors argue that HUD's reliance in the Final Rule on

its own internal analysis of its loan portfolio to establish the riskiness of SFDPA loans violates

the notice-and-comment requirements of the APA.  See 5 U.S.C. § 553; id. § 706(2)(D).

Specifically, they contend that HUD's reliance on the internal loan analysis is improper because

this analysis "was not even mentioned, let alone cited, in the Proposed Regulation."

AmeriDream Mot. at 20.  And while it was mentioned, and conclusions were drawn from it, in

the Final Rule, the analysis and its methodology were never explained.  See id. (noting that HUD

"failed to provide the study or even include a citation noting where it could be found" in the

Final Rule); id. at 29 (observing that the Final Rule "did not provide the loan portfolio analysis,

did not provide a meaningful account of its conclusions, and did not contain information about

HUD's methodology employed in the analysis").  See also Penobscot Mot. at 17-19.  The Court

agrees that this failing is fatal.  In the absence of any reference in the Proposed Rule to the

internal loan analysis and at least a summary of the specific data and methodology on which the

analysis relied, plaintiffs and plaintiff-intervenors were deprived of any meaningful opportunity

to comment on what became the centerpiece of the rationale underlying the Final Rule.

> As the D.C. Circuit has explained:
>
> Section 553 of the APA requires that an agency give notice of a
> proposed rule setting forth "either the terms or substance of the
> proposed rule or a description of the subjects and issues involved,"
> 5 U.S.C. § 553(b), and "give interested persons an opportunity to
> participate in the rule making through submission of written data,
> views, or arguments with or without opportunity for oral
> presentation," id. § 553(c).  Among the information that must be
> revealed for public evaluation are the "technical studies and data"
> upon which the agency relies.

Chamber of Commerce of the United States v. SEC, 443 F.3d 890, 899 (D.C. Cir. 2006) (citing

Solite Corp. v. EPA, 952 F.2d 473, 484 (D.C. Cir. 1991)).  "[T]he most *critical factual material*

that is used to support the agency's position on review . . . [must be] made public in the

proceeding and exposed to refutation."  Ass'n of Data Processing Svc. Orgs., Inc. v. Bd. of Govs.

of Fed. Reserve System, 745 F.2d 677, 684 (D.C. Cir. 1984) (emphasis added).[7]  See also Owner-

---

[7]    Judge (now Justice) Scalia, speaking for the court, relied for this conclusion on
the express language of Section 553(c): "[T]he agency shall give interested persons an
opportunity to participate in the rule making."  5 U.S.C. § 553(c).  See Ass'n of Data Processing
Svc. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve System, 745 F.2d at 685.

Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 199, 201-02 (D.C. Cir. 2007); Solite Corp. v. EPA, 952 F.2d at 484 ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.") (internal quotation marks and citations omitted).  This requirement "ensure[s] that agency regulations are tested through exposure to public comment, . . . afford[s] affected parties an opportunity to present comment and evidence to support their positions, and . . . enhance[s] the quality of judicial review."  Chamber of Commerce of the United States v. SEC, 443 F.3d at 900.[8]

        HUD's internal analysis of its loan portfolio constitutes critical factual information that should have been disclosed during the rulemaking proceeding.  As discussed more fully below, the IRS Revenue Ruling and the February 2005 GAO Report offer little or no support for the basic assumptions underlying the Final Rule.  The internal loan analysis represents the *only* direct evidence or statistical data offered in support of HUD's stated reasons for declining to insure SFDPA loans.  Thus, this factual information necessarily played a critical role in HUD's decisionmaking.  See HUD Mot. at 9 ("*Most importantly*, HUD found *in its own experience* that loans originated with seller-funded down payment assistance had a much higher rate of defaults and foreclosures than FHA-insured loans in general, and that the continued growth of such transactions would eventually threaten the solvency of the [FHA Fund].") (emphasis added); id. at  18-19.  See also Chamber of Commerce of the United States v. SEC,

---

        [8]        That is not to say that an agency may never rely on data that was not disclosed for comment.  For example, the D.C. Circuit has said that so long as it is not entirely new information critical to the agency's determination, and there is no prejudice to interested parties, an agency may rely on extra-record data to supplement or corroborate data in the rulemaking record.  See Solite Corp. v. EPA, 952 F.2d at 484; Community Nutrition Inst. v. Block, 749 F.2d 50, 57-58 (D.C. Cir. 1984).

443 F.3d at 902-03 (data "essential" and "central" to the agency's decisionmaking process is

critical factual information that must be disclosed).  That having been said, HUD was required by

the APA to give interested persons a meaningful opportunity to comment on the internal loan

analysis before the Final Rule was promulgated, so that, if they wished, they could provide their

own expert analysis or other data in an effort to contradict HUD's internal loan analysis and

undermine the most essential information used to justify the Final Rule.  See Owner-Operator

Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d at 201.

　　　　　HUD resists this conclusion on two grounds.  First, HUD maintains that the

internal loan analysis is not critical information but rather only "supplementary" information

proffered in response to comments and objections.  See HUD Mot. at 32.  The Court rejects this

argument.  "For extra-record data to be 'supplementary'" – and hence not subject to the APA's

notice-and-comment requirements – "it must clarify, expand, or amend other data that has been

offered for comment."  Chamber of Commerce of the United States v. SEC, 443 F.3d at 903; see

also Solite Corp. v. EPA, 952 F.2d at 484-85.  The data derived from HUD's internal loan

analysis is of an entirely different character from the indirect, anecdotal evidence contained in the

other sources cited in the Proposed Rule and the Final Rule.  Thus, it is difficult to see how the

internal loan analysis merely "updates" or "expands" upon earlier data or information that had

already been offered for comment; it clearly is "primary, rather than supplementary evidence."

Chamber of Commerce of the United States v. SEC, 443 F.3d at 903.  Nor does the Court

understand why it should excuse HUD's failure to disclose the internal loan analysis merely

because "HUD's reference to FHA's analysis of its loan portfolio came as part of a specific

response to public comments."  HUD Mot. at 32.  An agency may not excuse its failure to

disclose critical factual information at the outset of a rulemaking proceeding on the ground that

interested parties were forced to demand it.  Cf. Chamber of Commerce of the United States v. SEC, 443 F.3d at 903 (generally, an agency may not rely, "without affording comment, on data critical to support a rule solely because the existing record contains a deficiency that extra-record data might cure").[9]

Second, HUD argues that its reliance on the internal loan analysis is permissible because plaintiffs have not been prejudiced.  See HUD Opp. at 14-16.  The Court rejects this argument as well.  To establish prejudice, a party challenging the use of extra-record data need only point to inaccuracies in the data, see Solite Corp. v. EPA, 952 F.2d at 484, or "indicate with 'reasonable specificity' what portions of the [data] it objects to and how it might have responded if given the opportunity [to comment]."  Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d at 202; see also Air Transp. Ass'n of America v. Civil Aeronautics Bd., 169 F.3d 1, 8 (D.C. Cir. 1999).  "The [D.C. Circuit] has not required a particularly robust showing of prejudice in notice-and-comment cases, holding that 'an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure.'"  Chamber of Commerce of the United States v. SEC, 443 F.3d at 904 (quoting Sugar Cane Growers Co-op of Fla. v. Veneman, 289 F.3d 89, 96 (D.C. Cir. 2002)).

Here, plaintiffs have set forth plausible reasons for doubting the accuracy of HUD's loan data and explained how they would have contested HUD's use of the internal loan analysis had they been given the opportunity to do so.  See, e.g., AmeriDream Mot. at 20  ("Had

---

[9]      Moreover, HUD's characterization of the internal loan analysis as merely "supplementary" is belied by the text of the Final Rule.  See Final Rule, 72 Fed. Reg. at 56,005 (citing *only* the internal loan analysis in response to a comment suggesting that "[t]he rule is not supported by data").

commenters properly been given [the] opportunity [to comment on the internal loan analysis],

they undoubtedly would have pointed out while HUD claimed to have evaluated the performance

of loans utilizing seller-funded DPA, no records were kept identifying the funding source for any

downpayment assistance for several years of the period HUD purportedly analyzed [in the

internal loan analysis].").  They need do nothing more to establish prejudice.  A party's

"demonstration that it had something useful to say about . . . critical data is sufficient to establish

prejudice."  Chamber of Commerce of the United States v. SEC, 443 F.3d at 905.

       The Court therefore concludes that HUD violated Sections 553 and 706 of the

APA by relying on the previously undisclosed internal loan analysis to the prejudice of the

plaintiffs and plaintiff-intervenors.  See Chamber of Commerce of the United States v. SEC,

443 F.3d at 904-05.

### B.  Rational Explanation

       Even apart from the internal loan analysis, plaintiffs and plaintiff-intervenors

argue that HUD's explanation of its Final Rule is deficient because that explanation lacks

evidentiary support and cannot be regarded as "reasoned" or "rational."  See AmeriDream Mot.

at 18, 21; Penobscot Mot. at 15.

       As noted above, see supra at 9, HUD's Final Rule explicitly relies on two sources

besides the internal loan analysis discussed above: the IRS Revenue Ruling and the February

2005 GAO Report.  Plaintiffs and plaintiff-intervenors argue that the IRS Revenue Ruling is

irrelevant because it does not address the riskiness of SFDPA loans (or any loans, for that

matter).  Rather, it "concerns an entirely different set of regulatory issues, i.e., whether

organizations can engage in [SFDPA] and retain their 501(c)(3) designations."  AmeriDream

Mot. at 18.[10]  Plaintiffs and plaintiff-intervenors also argue that the February 2005 GAO Report

does not support HUD's stated rationale because the portion of the report cited by HUD merely

describes "unattributed comments made by unidentified individuals" suggesting that SFDPA

loans *could* drive up sales prices, with "no indicia of reliability or support" for these third-party

statements.  Id. at 19.[11]

        The APA requires agencies to "incorporate in the rules adopted a concise general

statement of their basis and purpose."  5 U.S.C. § 553(c).  "[T]his requirement is not meant to be

particularly onerous."  Nat'l Mining Assoc. v. Mine Safety and Health Admin., 512 F.3d 696,

700 (D.C. Cir. 2008).  Nevertheless,

> the agency must examine the relevant data and articulate a
> satisfactory explanation for its action including a rational
> connection between the facts found and the choice made. . . .  In
> reviewing that explanation, [the Court] must consider whether the
> decision was based on a consideration of the relevant factors and
> whether there has been a clear error of judgment.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal

---

        [10]    The IRS Revenue Ruling "sets forth the applicable rules and standards for
determining whether organizations that provide down payment assistance to home buyers qualify
as tax-exempt charities," and "addresses whether assistance received for a down payment is
treated as a gift and included in a home buyer's basis."  IRS Revenue Ruling at 915; see also 72
Fed. Reg. at 56,002 (referring to the IRS Revenue Ruling).

        [11]    The passage from the February 2005 GAO Report alluded to in the Final Rule
states, in pertinent part:

> Fannie Mae, Freddie Mac, and some of the private insurers
> generally do not allow down payment funds, either directly or
> indirectly, from an interested or seller-related party to the
> transaction.  Fannie Mae and Freddie Mac officials told us that
> such seller-related contributions could contribute to an
> overvaluation of the price of the property.

February 2005 GAO Report at 16; see also 72 Fed. Reg at 56,002 (referring to this passage from
the February 2005 GAO Report).

quotation marks and citations omitted).  See also Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C.

Cir. 2006); United States Telecom Ass'n v. FCC, 227 F.3d 450, 460 (D.C. Cir. 2000) ("It is well-

established that 'an agency must cogently explain why it has exercised its discretion in a given

manner,' and that explanation must be 'sufficient to enable us to conclude that the [agency's

action] was the product of reasoned decisionmaking'") (internal quotation marks omitted)

(quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1491 (D.C. Cir. 1995)).  This requirement

includes an obligation to explain a decision to depart from a "settled course of behavior."  Int'l

Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 813-15 (D.C. Cir. 1983); see also

Nuvio Corp. v. FCC, 473 F.3d 302, 308 (D.C. Cir. 2006).

         HUD's explanation in this case strongly suggests that the agency did not

genuinely engage in reasoned decisionmaking because neither of the sources upon which HUD

permissibly relied supports the Final Rule's stated rationale.  The IRS Revenue Ruling does not

support HUD's conclusion that SFDPA loans are inherently and unacceptably risky because the

IRS Revenue Ruling has nothing to say on that score.  It merely addresses (1) how SFDPA

assistance should be treated for purposes of calculating a home buyer's basis for tax purposes,

and (2) whether SFDPA providers may qualify as Section 501(c)(3) entities.[12]  Nor does HUD's

reliance on the February 2005 GAO Report suggest reasoned decisionmaking.  The passage of

the report cited by HUD merely declares – without attribution or explanation – that "Fannie Mae

and Freddie Mac officials told [GAO] that [SFDPA] could contribute to an overvaluation of the

---

[12]     The press release accompanying the IRS Revenue Ruling does opine that SFDPA
transactions are "self-serving" and "circular," and that such transactions lead to higher home
prices.  See Press Release, IRS Targets Down-Payment Assistance Scams; Seller-Funded
Programs Do Not Qualify as Tax Exempt (May 4, 2006), available at http://www.irs.gov/
newsroom/article/0,,id=156675,00.html.  But a passing reference to another agency's press
release is hardly enough to demonstrate reasoned decisionmaking.

price of the property." February 2005 GAO Report at 16. There is no indication of the evidence

or information on which the unnamed Fannie Mae and Freddie Mac officials relied for their

opinion. HUD's reliance on such flimsy anecdotal evidence "is not sufficient to enable [the

Court] to conclude that the [Final Rule] was the product of reasoned decisionmaking." Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43. Cf. Ass'n of Data

Processing Svc. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve System, 745 F.2d at 683 (Section

706(2)(A) of the APA "enable[s] the courts to strike down, as arbitrary, agency action that is

devoid of needed factual support").

   HUD observes that courts routinely uphold agencies' regulations even when

agencies provide little or no "citeable authority" to justify their policy choices. See HUD Opp. at

4-5 (citing Personal Watercraft Indus. Ass'n v. Dep't of Comm., 48 F.3d 540 (D.C. Cir. 1995)).

But this argument misapprehends the problem with HUD's explanation in this case. The

problem with HUD's explanation is not that it lacks a sufficient number of citations; the problem

with HUD's explanation is that it explicitly (and inexplicably) relies on sources that do not

support its conclusions. As a result, this Court is unable to conclude that HUD engaged in "a

course of reasoned decisionmaking." Nat'l Mining Assoc. v. Mine Safety and Health Admin.,

512 F.3d at 701.

   HUD also argues that this Court may uphold the Final Rule because, even if the

IRS Revenue Ruling and the February 2005 GAO Report do not support it, the "Administrative

Record shows that a plethora of material supports the [Final Rule]." HUD Opp. at 14. It may or

may not be true that, during the rulemaking proceeding, HUD possessed and reviewed materials

that support the Final Rule. See HUD Mot. at 17-19 (discussing various sources which HUD

contends support the Final Rule). But the APA imposes on HUD a duty to publicly "identif[y] a

18

reasonable basis in the record" for its conclusions. <u>Int'l Union, United Mine Workers of America v. Fed. Mine Safety and Health Admin.</u>, 920 F.2d 960, 964 (D.C. Cir. 1990). It is not the Court's responsibility on review to pore through the record and validate the agency's decision. <u>See Hornbeck Offshore Transportation v. United States Coast Guard</u>, 424 F. Supp. 2d 37, 45 (D.D.C. 2006) (a reviewing court may not attempt itself to make up for any deficiencies in the agency's decision or rationale by supplying "'a reasoned basis for the agency's action that the agency itself has not given'" (quoting <u>Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43)).

　　　　　Nor can HUD's counsel in the course of this litigation cure the agency's failure to articulate a rational explanation by pointing to various sources that HUD possessed but never referred to during the rulemaking. As this Court has observed in a slightly different context:

> [N]o matter how thorough counsel may have been in combing through the record and picking out the materials they think support the Secretary's finding, that is no substitute for the Secretary himself reviewing the record materials, examining the relevant data, and coherently articulating the decision he made and the bases on which he in fact rested his finding – which is, of course, his obligation under the APA.

<u>Milk Indus. Found. v. Glickman</u>, 949 F. Supp. 882, 895 (D.D.C. 1996). <u>See also Grand Canyon Air Tour Coalition v. FAA</u>, 154 F.3d 455, 469 (D.C. Cir. 1998); <u>City of Brookings Municipal Telephone Co. v. FCC</u>, 822 F.2d 1153, 1165 (D.C. Cir. 1987) ("Post hoc rationalizations advanced to remedy inadequacies in the agency's record *or its explanation* are bootless.") (emphasis added). The Court concludes that HUD's explanation of the Final Rule reflects a lack of reasoned decisionmaking and therefore violates the APA.[13]

---

[13]　　　Relatedly, it appears that HUD also failed to provide a reasoned explanation for its rejection of responsible alternatives. <u>See</u> AmeriDream Mot. at 21-27; Penobscot Mot. at 19-21. For example, HUD's response to the first comment identified in the Final Rule –

## IV.  REMEDY

Plaintiffs seek vacatur of the Final Rule.  See, e.g., AmeriDream Mot. at 16, 22.

HUD responds that should the Court find defects in the administrative process in violation of the

APA, the proper remedy is to remand to the agency for further consideration and explanation

while leaving the Final Rule in place.  HUD Opp. at 25-26.  The Court agrees with HUD that it

has the discretion to remand the Final Rule without vacating it, but declines to do so in this case.

While an agency's failure to set forth a reasoned explanation or adequately

respond to comments requires a reviewing court to remand to the agency for further

consideration, see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 57,

the D.C. Circuit has concluded that such defects do not always require vacatur.  See, e.g.,

Advocates for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136,

1151 (D.C. Cir. 2005) ("While unsupported agency action normally warrants vacatur, . . . this

court is not without discretion [to remand without vacating].");  Allied-Signal, Inc. v. Nuclear

Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993).  The decision whether to vacate hinges

on "the seriousness of the [regulation's] deficiencies (and thus the extent of doubt whether the

---

suggesting that "HUD should not eliminate downpayment assistance, but regulate such
assistance, or establish standards for downpayment supported loans, including taking action to
improve appraisals and require stricter underwriting and a higher insurance premium for such
loans," Final Rule, 72 Fed. Reg. at 56,003 – studiously ignores the alternatives proposed and
instead focuses on the noncontroversial point that HUD "is not eliminating all privately funded
downpayment assistance."  Id.  Cf. Nehemiah Corp. of America v. Jackson, Civil Action No.
07-2056, Opinion and Order at 21-23 (concluding that HUD did not adequately respond to the
higher insurance premium proposal).  Nor does HUD directly address the comment's proposed
alternatives elsewhere in the Final Rule.  Such lack of responsiveness suggests that HUD did not
engage in reasoned decisionmaking.  See Covad Communications Co. v. FCC, 450 F.3d 528, 550
(D.C. Cir. 2006) (an agency "need not address every comment, but it must respond in a reasoned
manner to those that raise significant problems"); Canadian Ass'n of Petroleum Producers v.
FERC, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless the Commission answers objections that on
their face seem legitimate, its decision can hardly be classified as reasoned.").

agency chose correctly) and the disruptive consequences" of vacatur.  Int'l Union, United Mine Workers of America v. Fed. Mine Safety and Health Admin., 920 F.2d at 967.  A similar analysis applies when a court decides that an agency has failed to provide a meaningful opportunity to comment.  See Chamber of Commerce of the United States v. SEC, 443 F.3d at 908.

_____  The Court concludes that both factors – the seriousness of the Final Rule's deficiencies and the consequences of vacatur – militate in favor of vacating the Final Rule and remanding it, rather than merely remanding it for further consideration.  First, as discussed above, HUD's promulgation and explanation of the Final Rule suffer from multiple significant infirmities.  Those infirmities inspire a good deal of doubt as to "whether the agency chose correctly."  Int'l Union, United Mine Workers of America v. Fed. Mine Safety and Health Admin., 920 F.2d at 967.  More importantly, there is no "serious possibility'" that the agency would be able to offer an adequate explanation of the Final Rule on remand without first resorting to further notice-and-comment proceedings.  Milk Train, Inc. v. Veneman, 310 F.3d 747, 756 (D.C. Cir. 2002) (quoting Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d at 151).  See also supra at 8-15.  Second, vacatur would not be disruptive in this case because the Final Rule has not yet become effective.  The Court therefore will vacate the Final Rule and remand it to HUD for further proceedings consistent with this Opinion.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: March 5, 2008